## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, ROCK ISLAND DIVISION

REBEKAH HILLMAN, individually and as
next friend of P.J.H., a minor; AND
JENNIFER HILLMAN

               Plaintiffs,

v.

THE TORO COMPANY, a Corporation,

               Defendant.

No. 4:21-cv-04081-SLD-JEH

---

### PLAINTIFFS' RESISTANCE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. 113)

### (ORAL ARGUMENT REQUESTED)

---

### TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………………1
TABLE OF AUTHORITIES…………………………………………………………...2
LIST OF EXHIBITS…………………………………………………………………...4
A. INTRODUCTION………………………………………………………………6
  i.  Precise Relief Requested………………………………………………………9
B. PLAINTIFFS' RESPONSE TO TORO'S UNDISPUTED MATERIAL FACTS…………10
  i.  Undisputed Material Facts………………………………………………………10
  ii.  Disputed Material Facts…………………………………………………………19
  iii.  Disputed Immaterial Facts………………………………………………………27
  iv.  Undisputed Immaterial Facts……………………………………………………39
  v.  Plaintiffs' Additional Material Facts……………………………………………41
    a.  The Injury History of Toro's ZRT Mowers………………………………….....41
    b.  Design Features of Toro's ZRT Mowers that Make them Unstable, Inherently Dangerous and All Substantially Similar……………………………………..42
    c.  Toro's Unsafe Design – A Single Point of Failure…………………………….45
    d.  First Loss of Control – The Upper Yard and the Flowerbed…………………..47
    e.  Towing the Timecutter 5000 Out of the Flowerbed……………………………53
    f.  Second Loss of Control – No Warning, No Interlock, and No Brake…………....57
    g.  Evidence of Defect and Proximate Cause Bypass Pins and Exclusion of Brake……………………………………………………………………………62
    h.  The Lack of Guard – Toro Refuses to Design or Equip the Timecutter with ROPS……………………………………………………………………………65

      i.   Alternative Designs to Alleviate the Loss of Control and Prevent Rebekah's Injuries...........................................................................65

      j.   Plaintiffs Were Experienced with Machinery, Tools, and Vehicles driven by Hydrostatic Power, Such That Honest and Proper Warnings and Instructions Would Likely Have Saved Rebekah Hillman's Legs....................................66

      k.   The Illusion of Toro's Reliance on ANSI standards to Claim the Timecutter is Reasonably Safe – Toro Is Grading Its Own Homework...............................70

      l.   Defense Expert Lisa P. Gwin, DO and the Cartoon Opinion............................75

C. ARGUMENT....................................................................................79

  i.   Law Governing Summary Judgments......................................................79

  ii.  Plaintiffs Have Substantial Evidence of Proximate Cause for Their Claims of Product Liability and Negligence.............................................................80

      a.   Controls and Lack of Braking................................................................81

      b.   Lack of Warnings and Instruction...........................................................83

      c.   Lack of Rollover Protective Systems (ROPS)............................................83

  iii.  Plaintiffs Have Provided Ample Evidence to Submit the Issue of Proximate Cause to The Jury....................................................................................................88

      a.   It is reasonably foreseeable that the failure to include a true "brake", rather than a park lock, would lead to injury...................................................................89

      b.   Toro has actual knowledge, and in fact promotes the knowledge, that failure to equip the Timecutter with a ROPS would lead to preventable injury............................90

      c.   It is reasonably foreseeable that the failure to warn Plaintiffs regarding the lack of a true "brake" and the lack of a ROPS would lead to injury..............................90

      d.   The Toro Timecutter mower is defective under both the consumer-expectation test and the risk utility test.................................................................91

      e.   The Timecutter is defective under the consumer-expectation test, as it did not perform as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner........................................................................93

      f.   The Time cutter is defective under the risk-utility test, as there were available alternative designs at the time, the injury was foreseeable, and the factors clearly weigh in Plaintiffs' favor..........................................................................94

      g.   *Abrams* is inapplicable to the present case................................................97

  iv.  Plaintiffs Have Presented Evidence of Their Failure to Warn Claims......................98

      a.   The risk to Plaintiffs was not open and obvious.........................................101

      b.   It is foreseeable that the failure to warn consumers the "parking brake" was not in fact capable of braking would lead to injury..............................................102

      c.   Plaintiffs' claim for failure to warn does not fail for alleged lack of proposed alternative warnings.........................................................................102

  v.   Plaintiffs Have Established a Prima Facie Case that Toro's Conduct Was Negligent...103

## TABLE OF AUTHORITIES

**Cases**

*Abrams v. City of Chicago,*
811 N.E.2d 670, 672, 285 Ill.Dec. 183, 185, 211 Ill.2d 251, 254 (Ill.2004)..................97, 98

*Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)…………………………………79, 80

*Betaco, Inc. v. Cessna Aircraft Co.,*
32 F.3d 1126, 1138 (7th Cir.1994)…………………………………………………………………79

*Grant v. Trs. of Ind. Univ.,*
870 F.3d 562, 568 (7th Cir. 2017)…………………………………………………………..80

*Hakim v. Safariland, LLC,*
2023 WL 5344311, at *4 (7th Cir.2023)…………………………………………...98, 99, 101, 102

*In Re Boeing 737 MAX Pilots Litigation,*
638 F. Supp 838 (E.D.Ill.2022)……………………………………………………...84, 85

*Malen v. MTD Products, Inc.,*
628 F.3d 296, 309 (7th Cir.2010)…………………………………………………...86, 87, 88

*McCann v. Iroquois Mem'l Hosp.,*
622 F.3d 745, 752 (7th Cir. 2010)…………………………………………………………..80

*Payne v. Pauley,*
U.S. Ct. of Appeals, 7th Circuit, 337 F. 3d. 767 at 770
(2003)……………….........................80

*Sarsha v. Sears, Roebuck & Co.,*
3 F.3d 1035, 1041 (7th Cir.1993)………………………………………………………79, 80

*Spurgeon v. Julius Blum, Inc.,*
*816 F. Supp. 1317 (C.D. Ill.1993)*…………………………………………………………..87

*Walker v. Macy's Merchandising Group, Inc.,*
*288 F.Supp.3d 840, 857 (N.D.Ill.2017)*…………………………………91, 92, 93, 94, 95, 96

*Winters v. Fru-Con Inc.,*
*498 F.3d 734 (7th Cir.2007)*…………………………………………………………...96

*Wright v. General Motors Corp.,*
*479 F.2d 52, 53 (7th Cir.1973)*…………………………………………………………..87


**Rules**
Fed. R. Civ. P.
   56…………………………………………………………………………………………..79

## LIST OF EXHIBITS

- **Exhibit 1** – Memo from Toro CEO, Ken Melrose, to Mike Hoffman re: Z mowers deaths, dated July 23, 2002

- **Exhibit 2** – Early Toro Agenda for Safety Meeting

- **Exhibit 3** – May 3, 2004 letter to Pamela C. Major of US Consumer Product Safety Commission from Toro Manager of Product Safety and Government Relations, Joe Newberg, providing reports of 40 injury incidents with Toro/Exmark ZRT mowers of all models.

- **Exhibit 4** – August 02, 2006 email from Mr. Newberg to Ms. Major to update CPSC about Toro's receiving another loss of control fatality in June of 2006, and informing CPSC representative of the status of Toro's "field rework" campaign to install (free of charge) ROPS on commercial mowers it had originally built without ROPS.

- **Exhibit 5** – August 15, 2007 email from Newberg to CPSC (Ms. Major) updating her that Toro had received notice of 5 additional loss of control/rollover accidents since their last update on August 15, 2006.

- **Exhibit 6** – ZRT incident/accident history produced by Toro's in-house legal department after Court entered Order Compelling Discovery (Dkt. 55) on June 21, 2022, with 72 total incidents including 20 fatalities, along with injuries from loss of control, rollovers/tip overs and many serious, non-fatal injuries such as paralysis.

- **Exhibit 7** – List of incidents/accidents (identified as "Exhibit A" to a production) that Toro's legal department prepared as a Supplemental Answer to Interrogatories, concerning other similar incidents in response to the Court's Order Compelling Discovery.

- **Exhibit 8** – Toro Safety Reviews listing "Industry Experience". January 15, 2016 Safety Review of the Rincon New Res Z Platform.

- **Exhibit 9** – Toro Safety Reviews listing "Industry Experience". January 15, 2016 Safety Review on DCI program of Timecutter/Quest new 60" Z

- **Exhibit 10** – Toro Safety Reviews listing "Industry Experience." October 5, 2016 Safety Review on DCI program of new Timecutter/Quest Models for MY17

- **Exhibit 11** – Selected Toro Safety Reviews listing "Industry Experience." November 17, 2017 5.0 Review of Exmark Quest Mid-Mount Z Mowers.

- **Exhibit 12** – Deposition of Toro 30(b)(6) Representative Carol Drutowski January 18, 2023

4

- **Exhibit 13** – Deposition of Toro 30(b)(6) Representative Todd Porter

- **Exhibit 14** – Expert Report of Thomas Berry dated March 17, 2023 and CV

- **Exhibit 15** – Expert Report of David Bilek dated March 17, 2023 and CV

- **Exhibit 16** – Williams v. Toro Complaint; U.S. District Court for the Northern District of Alabama Northeastern Division

- **Exhibit 17** – Toro Owner's Manual supplied with Hillman Timecutter Mower

- **Exhibit 18** – Hydro-Gear ZT2100-ZT2200 Service and Repair Manual

- **Exhibit 19** – 2010 Official Toro ZRT Training Video "Zero-Turn Riding Mower Operator Safety Training. Copy sent to Court via thumb drive. (This video can also be accessed via YouTube at **https://www.youtube.com/watch?v=UCVbnTl-b6M**.)

- **Exhibit 20** – Deposition of Rebekah Hillman, with Exhibits 1 and 16, taken November 17, 2022

- **Exhibit 21** – Deposition of Jennifer Hillman taken November 16 and 17, 2022, with Exhibits

- **Exhibit 22** – Invoice for Hillman Toro Mower, dated May 29, 2014, from B&B in Geneseo, Illinois

- **Exhibit 23** – Toro's Risk Assessment for the Timecutter series ZRT

- **Exhibit 24** – Report of Biomechanics Expert Kelly B Kennett March 17, 2023 and CV

- **Exhibit 25** – ANSI B71.1 2003

- **Exhibit 26** – Deposition of retired Toro Safety Manager, Jim Fear, taken July 17, 2023

- **Exhibit 27** – Highlighted copy of OPEI Standards Manual August 1978

- **Exhibit 28** – List of Toro Warranty Failures of Hydrostatic Motors showing control issues

- **Exhibit 29** – Deposition of Lisa P. Gwin, DO, taken August 17, 2023

- **Exhibit 30** – Deposition of Tom Berry, taken July 11, 2023

- **Exhibit 31** – Z Slope Operation by Jim Fear and Dale Hammon in October 2003

- **Exhibit 32** – ANSI Z590.3-2011

- **Exhibit 33** – ANSI/ASSP Z590.3-2021

- **Exhibit 34** – Lisa Gwin McCall Report

- **Exhibit 35** – Collier Shannon Scott Memo, dated November 24, 2003

- **Exhibit 36** – OPEI Lawnmower Sub Committee Meeting February 2001

- **Exhibit 37** – OPEI/ANSI Meeting December 2009 – Toro Representative

- **Exhibit 38** – OPEI/ANSI Meeting December 2009 – Product Liability Defense & Injury Stats for "Z Mowers"

## A.    INTRODUCTION

Defendant Toro's Motion for Summary Judgement is Resisted by Plaintiffs who ask the Court to DENY Toro's Motion in its entirety, in support of which they state:

1.  Toro's Motion for Summary Judgment appears to be based on two major theories. First, Toro's myopic and adversarial version of facts, in which it omits an enormous amount of contrary evidence and simply claims that the sole proximate cause of Plaintiffs' injuries and damages was their own mistakes or negligence, and that a jury could not possibly find that any conduct on the part of Toro established fault or proximate cause of Plaintiff's injuries. Second, Toro seems to argue that it has complied with the same ANSI standards it helped write and therefore, is entitled to summary judgment on that basis alone. Toro also claims that it's entitled to summary judgement because the danger which injured the plaintiff was "open and obvious".

2.  Plaintiffs have voluminous and substantial evidence of material facts and competent evidence supporting their claim that the 2013 Toro ZRT Timecutter 5000 (accident mower) they purchased new from a Toro dealer was defective and unreasonably dangerous when they purchased it.

6

3. Plaintiffs have voluminous and substantial evidence that the design defects complained of by Plaintiffs were a factual and legal (proximate) cause of Plaintiff's injuries, including:

    a. Lack of any warnings or instructions concerning the safe way to tow or pull the mower if it became stuck, broke down, or was involved in any situation where it had to be moved on any surface other than a flat floor;

    b. Lack of any warning that engaging the bypass pins to push or tow the mower disconnected the hydrostatic motors from the hydrostatic drive pumps, so that all means to turn or stop the mower were unavailable through the levers and so, the mower had no brakes once it was moving with the bypass pins engaged;

    c. Toro's referring to the park lock as an electric park brake was misleading, confusing, and created a false sense of security that the mower could be stopped with the electric park brake when they knew that was not true;

    d. Toro's decision to omit an independent service brake, capable of slowing the mower and stopping it when the control levers were bypassed, lead to loss of control and rendered the mower unreasonably dangerous in foreseeable situations, such as the one which occurred to the Hillmans; and,

    e. Toro's omission of a rollover protective system resulted in Rebekah Hillman's need to jump from the mower to avoid the entire machine falling on her as it went over the retaining wall, but still resulted in the machine falling directly on her left and right legs creating severe life changing injuries.

4. Plaintiffs have undisputed, substantial evidence that the ANSI standards allegedly used to design the accident ZRT mower in 2013:

    a. Are nothing more than a consensual set of conventions created by interested mower manufacturers and do not have the force of law;

    b. Were not created by any independent, private or governmental authority concerned with public safety or reducing consumer injuries, but were written by representatives of Toro and other ZRT mower manufacturers via membership in the Outdoor Power and Equipment Manufacturing Institute who wrote the standards and then submitted them to ANSI;

    c. Do not control the manufacture of ZRT mowers, as any member is free to deviate from the standards without penalty or consequences; and,

    d. Expressly state that no person or organization has the right to publicly interpret ANSI standards, and that certification that a mower design complies with ANSI standard B71.1-

2003 <u>does not mean that ANSI (or anyone but Toro) claims that the mower is reasonably safe. (Emphasis mine)</u>

5.  Toro's claim that the accident mower met or exceeded B71.1-2003 is untrue and inaccurate, as Toro ignored other applicable ANSI standards (and accepted industry safety procedures) which required Toro to review its ZRT mowers and design out hazards whenever feasible to prevent injuries. The accident mower does not comply with all ANSI applicable safety standards and procedures, as Toro failed to comply with ANSI Z590.3-2011 which requires Toro to design out the effects Plaintiffs complain of, before the mower was built in 2013.

6.  Plaintiffs have substantial engineering and practical evidence of existing, feasible alternative designs for independent brakes and ROPS, as well as simple and effective warnings and instructions that Toro could and should have employed had it wanted to make its product safer, and which would have prevented Rebekah Hillman's injuries.

7.  Toro's claims that Plaintiffs' actions were the sole, proximate cause of injury are simply without merit. Toro knows full well that the plaintiffs have substantial evidence that the design defects and negligence complained of in this case, against Toro, were so factually and legally connected to: a) the initial loss of control leading to Rebekah getting stuck in the flowerbed, b) towing the mower up the hill and parking it with the front facing down the hill, c) Rebekah's failure to remember to disengage the bypass pins and Jennifer's failure to warn her to disengage them before releasing the park lock at the top of the hill, d) the loss of all ability to control the Timecutter when Rebekah released the electric park lock at the top of the hill, and, finally, e) the mowers lack of a ROPS failed to keep Rebekah in her seat in a protected space to prevent severe injuries to her lower extremities, all of which lead to the amputation of her left leg and permanent damage to her right leg.

8.  Toro should not be allowed to claim or even suggest that their Timecutter designs are reasonably safe, because they allegedly comply with ANSI standards, because B71.1 (2003) was promulgated by the same people they purport to regulate, have no force of law, are purely voluntary, and are unenforced by anyone concerned with public safety.

9.  In Illinois courts, expert witness testimony is not always required to submit a claim for insufficient warnings and instructions. Since this case involves the complete lack of several, simple, key warnings and instructions necessary for safe operation of the subject mower, Plaintiffs should be allowed to present evidence of warnings that should have appeared on the mower based on Toro's own admissions and data from the manufacturer of the Timecutter's drive motors, Hydro-Gear.

10. In summary, cases in which the plaintiffs have this much evidence should not be subject to summary judgement. Questions of proximate cause and negligence are normally jury questions, and Plaintiffs have provided sufficient, additional material facts and evidence in this Response to confirm that Plaintiffs will generate genuine questions of material fact for the jury's determination when this matter goes to trial. Defendant's Motion for Summary Judgement should be denied in its entirety.

**i.    Precise Relief Requested and Withdrawal of Warranty Claims**

11. Given the strength of Plaintiffs' evidence in support of their claims of negligence and product liability against Toro, with the Court's permission, Plaintiffs voluntarily withdraw claims based on breach of express and implied warranty, and will not request submission at trial. Therefore, the issues of claims based on implied or express warranty are MOOT and the Court should grant Plaintiffs' Motion to withdraw such claims and DENY the balance of Toro's Motion for Summary Judgement for the reasons set forth in Plaintiffs' Resistance.

### B.     PLAINTIFFS' RESPONSE TO TORO'S UNDISPUTED MATERIAL FACTS

**NOTE: Defendant Toro has, apparently, misnumbered several paragraphs of its Statement of Material Facts in support of its Motion for Summary Judgement. Plaintiffs have identified these apparent duplications, and tried to make it clear which page and paragraphs they are responding to, when preparing their response to Section B of Toro's Motion. (Due to these numbering issues, Toro's paragraphs have been copied verbatim and italicized for ease of identification and to avoid further confusion.)**

### i.     Undisputed Material Facts

7.1 *Rebekah Hillman, her wife Jennifer Hillman, and their child P.J.H., a minor, filed this lawsuit against Defendant on May 4, 2021. Plaintiffs' Original Complaint (Dkt. 1) at ¶¶ 1-3, 6.*

7.2 *On August 12, 2021, Plaintiffs filed their First Amended and Substituted Complaint Ex. A (Dkt. 17) ("Amended Complaint"). In the Amended Complaint, Rebekah appeared as next friend of P.J.H., a minor. Ex. A.*

7.3 *Plaintiffs' claims arise out of an alleged incident dated June 18, 2020 (the "Incident") in which Rebekah sustained personal injuries when the Subject Mower (a Toro TimeCutter SS 5000 model 74631 ZRT mower, serial number 313015934), landed on her legs after going over a retaining wall. Plaintiffs purchased the Subject Mower new in 2014 or 2015 from B&B lawn Equipment, a Geneseo, Illinois TTC dealer. Ex. A, ¶¶ 13-22.*

7.4 *Plaintiffs assert causes of action for (a) strict product liability, (b) negligence and (c) breach of express or implied warranty. Ex. A, ¶¶ 24-49.*

7.5 *Plaintiffs allege that the Subject Mower was defective and unreasonably dangerous,[1] and*

---

[1] *Plaintiffs specifically allege that the Subject Mower had the following "unreasonably dangerous" conditions or defects:*

    a.  *The accident mower was not equipped with an effective emergency brake or braking system that was open, obvious, and easily accessed by an operator in an emergency;*

    b.  *The accident mower failed to have an emergency brake, parking brake or braking system with sufficient braking power to bring the mower to a stop in the event the drive wheel motors were disconnected or failed and the machine began to roll;*

    c.  *The accident mower did not have an interlock system to prevent starting the mower or moving it if the drive/tow pins were in the rearward position; and [sic]*

that TTC was negligent[2] and in breach of express or implied warranties, because, in sum, the Subject Mower:

    a.  was not equipped with an additional brake or braking system (in addition to the hydrostatic service brakes and parking brake on the mower),

    b.  was not equipped with an interlock to prevent starting or moving the mower when the hydrostatic braking system was disengaged,

    c.  lacked a Rollover Protective Structure (ROPS), and

    d.  failed to include sufficient instructions or warnings.

Ex. A, ¶¶ 27, 35 and 43.

    7.6 On August 23, 2021, TTC filed its Answer to Plaintiffs' Amended Complaint (Dkt. 18), by which it responded to Plaintiffs' allegations, denied certain of Plaintiffs' allegations, and asserted fourteen (14) affirmative defenses, including, in pertinent part, that Plaintiffs' claims are barred:

    a.  By Plaintiffs' own contributory or comparative negligence (First, Second and Fourth Affirmative Defenses),

    b.  Because the alleged danger was open and obvious (Third Affirmative Defense), and

    c.  By operation of the statute of limitations (Ninth Affirmative Defense).

---

    d.  The accident mower lacked safe and appropriate instructions and warnings concerning the lack of braking power and the hazards of operating the mower on even a slight incline with the drive/tow pins in the rearward position because the solenoid/parking brake would not bring the machine to a stop in an emergency.

    e.  The accident mower lacked a ROPS (Rollover Protective Structure) to restrain, contain, and protect an operator in the event of a tipping or rollover if the machine went out of control.

    f.  The instructions and warnings of the accident mower did not convey to the plaintiffs the manufacturers actual knowledge of the likelihood of loss of control and consequent rollovers and tip overs of zero turn mowers such as the Timecutter 5000, as well as the likelihood of serious injury and/or death in such events.

    g.  The instructions and warnings of the accident mower did not advise the plaintiffs that the unique characteristics and controls of the accident mower required the installation of a ROPS to operate the mower with reasonable safety. Ex. A, ¶ 27(a)-(g).

[2] Plaintiffs specifically allege that the following constitute "negligent acts or omissions" by TTC:

    a.  Failing to properly design the accident mower with appropriate safeguards, instructions and warnings before it was sold to the plaintiffs;

    b.  By designing and/or manufacturing the mower in such a way as to make it likely to suddenly go out of control without an adequate braking system to bring the mower to a stop in an emergency when the rear wheel motors were disconnected or when they became ineffective;

    c.  By designing and/or manufacturing the mower with insufficient protective devices to prevent loss of control injuries such as that described above; and [sic]

    d.  Failing to provide warnings to the ultimate purchasers of the mower regarding the safety related problems alleged immediately above.

    e.  Failing to equip the accident mower without a ROPS (Rollover Protective Structure) to restrain, contain, and protect an operator in the event of a tipping or rollover if the operator lost control.

    f.  Failing to instruct and warn the plaintiffs of the manufacturer's actual knowledge of the likelihood of loss of control and consequent rollovers and tip overs of zero turn mowers such as the Timecutter 5000, as well as the likelihood of serious injury and/or death in such events.

    g.  Failing to instruct and warn of the accident mower did not advise the plaintiffs that the unique characteristics and controls of the accident mower required the installation of a ROPS to operate the mower with reasonable safety. Ex. A, ¶ 35(a)-(g).

*Ex. B*, pgs. 1-25.

7.7 *ZRT mowers are highly maneuverable and efficient mowers because, as the name suggests, they can make a zero radius turn. Unlike traditional riding mowers that have a larger turning radius, ZRT mowers can effectively pivot in place, allowing them to make sharp 180-degree turns. The Subject Mower involved in the Incident in this lawsuit is depicted in the photograph below:*



*Ex. C-1 to Grace Affidavit.*

7.8 *To accomplish zero radius turns, ZRT mowers utilize two independently controlled rear drive wheels which can operate at different speeds and in different directions and thus rotate around the mower's axis. The two rear drive wheels are each powered by a hydraulic transmission known as a hydrostatic motor or hydrostatic transmission. Ex. A, ¶ 14; Ex. D, Porter Affidavit, ¶ 3; Ex. E, Jennifer Day 1 Dep., 139:12-18.*

7.9 *Instead of controlling the front wheels with a steering wheel, the operator controls the two rear wheels independently of each other with motion control levers. Ex. D, Porter Affidavit, ¶ 4. When the two rear wheels are operated at different speeds, the mower will turn left or right. When the two rear wheels are operated in different directions—one forward and one in reverse—the*

*mower will pivot around a point midway between the drive wheels, a classic z-turn. Id. The mower can also pivot around one of the rear wheels with one rear wheel stopped and the other moving forward or backward. Id.; Ex. F, Porter 30(b)(6) Dep., 12:4-23.*

7.10 **(First Two Sentences)** *The hydrostatic transmission also functions as the mower's service brake by slowing or stopping the drive wheels when the motion control levers are moved toward the center position. Ex. D, Porter Affidavit, ¶ 5; Ex. F, Porter 30(b)(6) Dep., 13:17-24. To bring the mower to a full stop, the operator moves both motion control levers to the center position—neither forward nor backward. Ex. D, Porter Affidavit, ¶ 5.*

7.11 *The Subject Mower has a parking brake to keep the mower stationary when necessary. The operator may engage the parking brake by moving the motion control levers outward from the center (or stop) position. Ex. D, Porter Affidavit, ¶ 6; Ex. E, Jennifer Day 1 Dep., 117:6-24.*

7.14 *Heavy-duty commercial ZRT mowers typically come equipped with a Roll-Over Protection System ("ROPS"), which consists of a roll bar and a seat belt. Ex. D, Porter Affidavit, ¶ 10. In certain scenarios, ROPS can be effective in preventing the operator from severe injury or death in the event of a rollover. Id.*

7.20 *TTC manufactured the Subject Mower, Serial No. 313015934, in 2013. Ex. F, Porter 30(b)(6) Dep., 17:10-14.*

7.21 *The Subject Mower weighs less than 600 pounds. Ex. G, Drutowski Dep., at 111:19-24.*

7.22 **(First Sentence)** *TTC designed and manufactured the 2013 Toro TimeCutter SS 5000 ZRT Mower model at issue for residential, non-commercial use in accordance with ANSI B71.1 – 2003, the version of the standard in force at the time the Subject Mower was manufactured and sold. Ex. D, Porter Affidavit, ¶ 16; Ex. G, Drutowski Dep., 109:2-3.*

7.25 *Section 3.23 of ANSI B71.1 – 2003 defines the service brake system as the designated primary brake system used for decelerating and stopping the machine.  Ex. D, Porter Affidavit, ¶ 19; Ex. D-1 to Porter Affidavit.*

7.26 **(First Sentence)** *Section 3.20 of ANSI B71.1 – 2003 defines the parking brake system as a system used to hold one or more brakes or braking means continuously in an applied position. Ex. D, Porter Affidavit, ¶ 20; Ex. D-1 to Porter Affidavit.*

7.30 (**p.14 version**) *The final page of the Operator's Manual explicitly states that the warranty period for TimeCutter mowers is 3 years for Residential use, applying from the date of purchase. Ex. D-4 to Porter Affidavit, p. 52.*

7.31 **(First Sentence)** *As part of Plaintiffs' strict product liability claims, Plaintiffs allege that the Subject Mower should have been equipped with an "interlock," which would prevent starting the engine while the Bypass Pins are engaged. Ex. A, ¶ 27(c).*

7.32 (**p.15 version**) **(First Sentence)** *Additionally, Plaintiffs allege that the Subject Mower had "inadequate warnings." Ex. A, ¶ 43.*

7.32 (**p.16 version**) *Plaintiffs purchased the Subject Mower in "2014 or 2015." Ex. A, ¶ 11; Ex. E, Jennifer Hillman Day 1 Dep., 94:9-11. The Incident occurred on June 18, 2020, almost five (5) years later. Ex. A, ¶ 13; Ex. E, Jennifer Day 1 Dep., 57:8. Plaintiffs operated the Subject Mower without incident during those approximate five years. Ex. E, Jennifer Day 1 Dep., 239:2-5.*

7.34 **(First Two Sentences)** *When purchasing the Subject Mower, Plaintiffs considered many options, including mowers that were equipped with ROPS. Ex. E, Jennifer Day 1 Dep., 96:5-97:2. Jennifer decided to purchase the Subject Mower, and not a mower with a ROPS, due to cost. Ex. E, Jennifer Day 1 Dep., 96:19-97:2, 99:7-12.*

14

7.36 *Plaintiffs mowed this area without any problems for three or four years before the Incident.* Ex. E, *Jennifer Day 1 Dep., 195:24-196:3.*

7.37 **(First Sentence)** *On the day of the Incident, Rebekah was mowing the grass while Jennifer was working in other parts of the yard.*  Ex. E, *Jennifer Day 1 Dep., 236:1-18.*

7.38 *Rebekah, as a heavy equipment operator, recognized this as a close call and was "shaken up" by it.* Ex. K, *Rebekah Dep., 98:3-5, 101:3-5. This was the first time that this had ever happened to the Plaintiffs when mowing this area of their yard.* Ex. E, *Jennifer Day 1 Dep., 258:17-259:3.*

7.39 *To get the Subject Mower out of the flower bed, Jennifer drove their John Deere utility tractor onto the slope above the flower bed and the retaining wall so she could tow the Subject Mower out of the flower bed.* Ex. E, *Jennifer Day 1 Dep., 262:13-15, 265:3-22.*

7.40 *To tow the Subject Mower from the flowerbed, Jennifer first disengaged the mower's drive wheels by pushing in the Bypass Pins on the backside of the mower and through a keyhole on the back of the mower.* Ex. E, *Jennifer Day 1 Dep., p. 270:5-21.*

7.41 **(First Two Sentences)** *When these Bypass Pins are pushed in, both rear wheels can then turn freely (like an automobile in neutral gear). This process is explained in the Subject Mower's Operator's Manual and includes the following diagram:*



*Ex. D-4* to Porter Affidavit, pg. 25.

7.43 *Jennifer then towed the Subject Mower out of the flower bed using the front-end loader to lift the mower's rear wheels off the ground so that the Subject Mower rolled only on the front caster wheels as she towed it. Ex. E, Jennifer Day 1 Dep., 279:24-280:4.*

7.44 *Jennifer towed the Subject Mower 40-50 feet up the hill directly above the flower bed and retaining wall. Ex. A, ¶17; Ex. E, Jennifer Day 1 Dep., 276:14-277:1, 282:4-7. When she lowered the Subject Mower back onto all four wheels, the mower was pointing downhill, directly toward the flower bed and retaining wall. Ex. E, Jennifer Day 1 Dep., 288:5-10. This area is depicted in the two photographs below.*





16

*Exs. C-4 and C-5 to Grace Affidavit.*

7.45 *Rebekah then removed the tow strap from the Subject Mower but forgot to re-engage the drive wheels by pulling the Bypass Pins back out. Jennifer explained Rebekah's failure to re-engage the drive wheels as follows:*

| | |
|---|---|
| Q. Okay. And what was your plan for disengaging the bypass pins?<br><br>A. I mean, it didn't cross my mind at the time.<br><br>Q. You – you knew that you had to disengage those before the mower would start using its operating mode again, though, right?<br><br>A. Yes.<br><br>Q. Did you just forget?<br><br>A. I, I mean, we were working together and, yeah, I pulled the levers in t   he outward position.  And then I went back to the John Deere, and she got on the TimeCutter.<br><br>Q. Do you know if Rebekah knew how the bypass pins worked?<br><br>A. I think at the time I assumed that she did. | Q. But – but you all didn't have any discussion where you said, well, when we get it up there, then you go pull them back out?<br><br>A. No. We didn't have a discussion about it.<br><br>Q. Was your original plan, then, that you would then pull them back out?<br><br>A. I mean, I didn't have a plan with that. I just – just assumed that when she was unhooking it, she put them in.<br><br>Q. You assumed – you assumed that at the time?<br><br>A. I did.<br><br>Q. Okay. Because she – when she took the strap off, she would have been right there, right next to where the bypass pins are?<br><br>A. Yes. |
| Q. But you all did not discuss that? | A. No. |

*Ex. E, Jennifer Day 1 Dep., 284:10-285:19.*

7.46 *The entire process of towing the Subject Mower out of the flower bed adjacent to the retaining wall and drop off, and up the slope, facing it directly back down the slope and towards the retaining wall, took only 10 or 15 minutes. Ex. E, Jennifer Day 1 Dep., 285:20-24, 286:9-11, 286:17-19.*

7.47 *The following photograph illustrates the proximity of the Bypass Pins to the location of the tow strap on the Subject Mower (as Jennifer's testimony above references):*



*Ex. C-6* to Grace Affidavit; *Ex. E*, Jennifer Day 1 Dep., 145:9-11.

7.49 **(Last Sentence)** *...Further, because the rear drive wheels remained in bypass mode, there was no way to steer the Subject Mower. Ex. E, Jennifer Day 1 Dep., 148:13-24.*

7.50 **(First Two Sentences)** *Rebekah, intending to continue mowing in operation mode, then got on the Subject Mower and started it with the parking brake activated and the mower holding still on the hill.  Ex. E, Jennifer Day 1 Dep., 287:11-21. However, the service brake and steering controls were still bypassed and disengaged. Id.*

7.51 **(First Three Sentences)** *Next, Rebekah pulled the Subject Mower's levers inward and pushed them forward. Ex. E, Jennifer Day 1 Dep., 297:1-14. This action released the parking brake but did not engage the drive wheels because they were still in bypass mode. The Plaintiffs*

*claim that the Subject Mower began to roll down the slope toward the retaining wall. Ex. E,*

*Jennifer Day 1 Dep., 298:20-22, 300:9-13.*

*7.55 Rebekah's left leg was pinned beneath the Subject Mower at the foot of the retaining wall*

*and sustained severe injuries to both lower legs. Ex. A, ¶ 22.*

ii.   **Disputed Material Facts**

**Bypass Pins Are Also Referred to as Tow Valves**



**Illustration No. 1 – Troubleshooting table from Toro's Timecutter Owner's Manual, page 48, referring to bypass pins also as tow valves.[3]**

*7.10* **(Last Sentence)** *...Therefore, the Subject Mower (like most ZRT mower models) does not have a foot-operated service brake. Id.* **Response:** Mr. Porter's opinion that hydrostatically controlled ZRT mowers could not be designed and built in 2013, and before, without an independent brake, operated by foot or hand, which would still stop the mower, even if the hydrostatic motors were bypassed for towing or had simply failed, as they often do. (**Ex. 14**, p.5-p.9, and Appendix; **Ex. 18**, p.4; **Ex. 30**, 76:6-79:3 and 83:13-86:22)

*7.31* **(Last Sentence)** *...Nor would such an "interlock" have been feasible at the time of manufacturing the Subject Mower. Ex. F, Porter 30(b)(6) Dep., 105:6-12 ("If we had an interlock on [the Subject Mower], we do have certain service procedures that we have to do that we would need to be able to run the machine or run the engine and operate the control levers in the bypass mode, which we wouldn't be able to do if it had an interlock on it.").* **Response:** Mr. Porter is

---

[3] Despite Toro's protestations about foreseeability, its own owner's manual acknowledges the customer's need to tow the mower if stuck or broken down, as shown above. Therefore, Plaintiffs will use the terms bypass pins and tow valves interchangeably, as Toro has its own owner's manual for the accident mower.

simply incorrect. It would be incredibly simple to install an inexpensive interlock which included switches that would activate with the physical motion of engaging or opening the tow valves (bypass pins). In other words, when an operator simply moved the pins to disconnect the hydrostatic motors, the same motion would send a signal that disconnected the solenoid, which automatically releases the park lock, so that the operator cannot have the park lock released electrically with the bypass pins engaged/tow valves open. This same interlock should also have an indicator light on the control panel (**Ex. 17**, p.13 and p.15) with a red light to warn the operator that the bypass pins were engaged. This interlock would not interfere with any service, as the park lock could still be released manually for service by Toro technicians. (**Ex. 17**, p.36 "Releasing the Electric Brake") This interlock could be installed without any other changes to the machine to make it safer, such as the installation of an independent brake, and clearer instructions and warnings, which is also advocated by the plaintiffs and Mr. Berry.

7.33 **(p.16 version)** *Jennifer read and understood the Subject Mower's Operator's Manual right after she purchased it, and even saved a copy to her phone. Ex. E, Jennifer Day 1 Dep., 69:18-70:1-8, 121:3-18.* **Response:** Plaintiffs agree that Jennifer Hillman read the Operator's Manual and even downloaded a copy to her phone. She was experienced with machines and tools (See Plaintiffs' Section B(v)(j) for further discussion) and believed that she understood the manual thoroughly enough to operate the mower with safety. However, her interpretation of Toro's reference to the park lock as a parking brake and electric brake was that it meant the mower had an independent brake capable of decelerating and stopping the mower when moving. She discovered this was not true on June 18, 2020, when Rebekah put the handles in the outboard position as she rolled down the hill towards the flowerbed and then the retaining wall and the mower did not stop. (**Ex. 21**, 362:20-366:22)

7.35 **(Third Sentence)** ...*Both the flower bed and the retaining wall are drop-off hazards[4] of the type that Defendant warns operators to stay away from while operating the Subject Mower. Ex. D-4, pgs. 5 and 16 ("Do not mow near drop-offs, ditches, steep banks or water.  Wheels dropping over edges can cause rollovers, which may result in serious injury, death or drowning.").*

**Response:** Plaintiffs dispute Toro's baseless assertion that "the flowerbed" was a drop off hazard of the type Toro described in its own instruction manuals. (**Ex. 17**, p.16 and p.17, which do not clearly define what a "drop off" hazard is) Plaintiffs state affirmatively that the edge of the flowerbed was not a "drop off", but only the retaining wall was a "drop off" hazard. For further discussion, see Plaintiffs' Section B(v)(d).

7.37 ...*Rebekah began to mow the area immediately adjacent to the flower bed and just a few feet from the drop-off over the retaining wall. Ex. E, Jennifer Day 1 Dep., 245:5-246:9. Rebekah was mowing so close to the flower bed that the front left caster wheel of the Subject Mower dropped down into the flower bed and the mower got stuck. Id.; Ex. K, Rebekah Dep., 95:23-96:12. As Rebekah tried to back out of the flower bed, the mower slid further into the flower bed, turned about 180 degrees in the opposite direction, and came to rest perilously close to the edge of the retaining wall.  Ex. K, Rebekah Dep., 98:9-20.  At this point, the Subject Mower was stuck in the flower bed. Ex. K, Rebekah Dep., 99:11-18, 100:1-5.* **Response:** Plaintiffs dispute that Rebekah was ever operating the Timecutter "just a few feet from the drop-off over the retaining wall". In fact, the distance was over 9 feet away from the drop off, and the flowerbed actually had a flat area where she stopped the mower from going over the "drop-off" hazard. In other words, Rebekah was

---

[4] *TTC never had the opportunity to inspect the hill and its slope in discovery in this case. Shortly after the Plaintiffs' expert, David Bilek, photographed a portion of the hill, the Plaintiffs bulldozed the hill and completely changed the landscape. See Ex. C-2 to Grace Affidavit, pgs. 5-6, Jennifer's Answer to Defendant Toro's Supplemental Interrogatory No. 10.*

mowing in the safe zone as defined by Toro.  (**Ex. 17**, p.17; **Ex. 19**) (See also, **Figure 10** and Plaintiffs' Section B(v)(d))

7.41 **(Last Sentence)** *...Use of the Bypass Pins is necessary to perform certain maintenance work or to move the Subject Mower if the battery dies or when it otherwise cannot be driven.  Ex. F, Porter Dep., 19:21-25.* **Response:** See **Ex. 17**, page 48, or when towing.

7.42 **(First Two Sentences)** *With the Bypass Pins in the position for pushing the Subject Mower, Jennifer then attached a tow strap to the back of the Subject Mower and the tractor's front loader.  Jennifer made Rebekah "stand back," in an acknowledgment that this was an unusual and dangerous exercise.  Ex. E, Jennifer Day 1 Dep., 266:13-267:3.* **Response:** Plaintiffs dispute that Rebekah acknowledged that the mere operation of the mower, where she was mowing, was "an unusual and dangerous exercise", and Toro mischaracterizes her testimony and takes the comments out of context. (**Ex. 20**, 94:20-103:8. See full discussion of event and Rebekah's description of the Timecutter's unusual and frightening response to steering attempts as she attempted to drive the mower out of the flowerbed.) (See Response to previous two paragraphs and Plaintiffs' Section B(v)(d))

7.48 **(Last Sentence)** *...This means that Rebekah stood behind the Subject Mower, bent down to the rear of the machine and was staring right at the Bypass Pins as she disconnected the tow strap.  Ex. E, Jennifer Day 1 Dep., 285:11-17.* **Response:** Plaintiffs dispute paragraph 7.48 as mischaracterizing and misrepresenting the evidence. There is simply no testimony or indication that Rebekah was staring at the rear of the machine, or particularly the bypass pins, at any time. Plaintiffs would point out that Toro quoted testimony from Jennifer and not Rebekah for this absurd assertion. Plaintiffs concede that the pins are below the frame of the machine, as depicted in appropriate photographs (**Figures 10** and **11**, on p.55 of this Resistance).

7.49 **(First Sentence)** *Because Rebekah failed to disengage the Bypass Pins and re-engage the drive wheels, and Jennifer failed to remind her to do so, the Subject Mower remained in a free-wheel mode rather in operation mode. <u>Ex. E</u>, Jennifer Day 1 Dep., 270:11-271:1, 276:2-13.* **Response:** Plaintiffs deny that Rebekah's failure to disengage the bypass pins was the sole proximate cause of the mower remaining in free-wheel mode, and affirmatively assert that it was the defendant's failure to provide appropriate instructions and warnings, both in the owner's manual and on the machine itself, as well as the other failure to design this hazard out, which caused the mower to remain in free-wheel mode. Further, to the extent that Toro asserts that Jennifer had an independent duty to "remind" Rebekah to close the tow valves (bypass pins), when she believed the electric brake was still viable as a service brake. Plaintiffs resist and assert that Toro's own "troubleshooting" table on page 48 of the owner's manual demonstrates conclusively that Toro had actual knowledge that its customers would have need to tow the mower, and would forget to disengage the bypass pins or close the tow valves, as the phrase is used on page 48. (**Ex. 17**, p.48) (See also, Plaintiffs' Section B(v)(g)) Hence, Plaintiffs assert that a customer needing to tow the mower and open the tow valves (engage the bypass pins), and then forgetting to close the tow valves, was and is foreseeable to Toro because they warned of the exact same scenario in their owner's manual. (**Ex. 17**, p.48.)

7.51 **(Last Sentence)** *…Jennifer soon realized the drive wheels had not been re-engaged, meaning Rebekah could not steer or brake the mower as during normal operation. <u>Ex. E</u>, Jennifer Day 1 Dep., 297:10-18.* **Response:** Plaintiffs dispute this sentence of paragraph 7.51 because Toro mischaracterizes and misquotes Plaintiff Jennifer Hillman. Jennifer specifically testified that, when the mower began to roll, she realized that the tow valves were not closed but believed that

Rebekah could still stop the mower with the "electric brake" which is why she told her to move levers outboard. (**Ex. 21**, 183:7-185:1 and 363:11-366:16)

7.52 *Rebekah then began jerking the control levers outward and inward, causing the parking brake to activate intermittently.* Ex. E, *Jennifer Day 1 Dep., 298:8-19.  Ultimately, the Subject Mower left large skid marks in the grass at the edge of the flower bed as pictured below.* Ex. E, *Jennifer Day 1 Dep., 298:23-299:15.*



Ex. C-7 *to Grace Affidavit;* Ex. E, *Jennifer Day 1 Dep., 298:23-299:15.* **Response:** Rebekah did not "jerk" the control levers outward and inward. Toro misquotes the testimony on page 298 of Jennifer Hillman's testimony. Rebekah was pushing the levers forward or pulling them backwards in an attempt to try and get the mower to respond to normal control inputs. She also pushed the levers outward to try and engage the electric brake, which just created a grinding sound as the teeth of the parking pawl simply ground against the rotating gear on the hydrostatic motor, and was ineffective at slowing or stopping the mower. (**Ex. 21**, p.297-299:3)

7.53 *Rather than simply holding the control levers in the outward position, Rebekah moved the control handles in and out repeatedly and the Subject Mower continued to roll to the edge of the flower bed. Ex. E, Jennifer Day 1 Dep., 298:8-22.* **Response:** Plaintiffs resist Toro's characterization in 7.53 and assert that, based on Toro's defective mower and negligence, Plaintiff Rebekah Hillman would have no reason to "simply hold" the control levers in the outward position. In fact, she tried pushing the levers to the outward position to try and engage the "electric brake". When Rebekah did that, all she got was the grinding noise as the electric park pawl tried to engage the rotating gear. (**Ex. 21**, p.298 and p.299) (See also, Plaintiffs' Section B(v)(g) – Toro also admits that the parking brake was not designed to, nor would it, stop the mower once it was moving.)

7.54 *Once the Subject Mower reached the increased slope at the edge of the flower bed, there was no way Rebekah could keep the Subject Mower from going over the wall. However, before the Subject Mower went over the retainer wall, Jennifer recalls watching Rebekah attempt to jump clear of the Subject Mower. Ex. E, Jennifer Day 1 Dep., p. 303:6-20. Both Rebekah and the mower went over the six-foot retainer wall and the mower landed upside down on her left leg.* **Response:** Plaintiffs dispute Toro's characterization as a statement of fact as pure speculation. Even during the accident, the mower was going less than 10mph as it reached the edge of the flowerbed, down a slope of only 8.5-9.5 degrees. (**Ex. 15**, p.4-p.6 and p.8 -p.10) Toro's statement is also contradicted by the flat area in the flowerbed before the wall, and the fact that Rebekah successfully stopped the Timecutter from going over the wall already when the mower first drug her into the flowerbed. Furthermore, the mower first landed more down on the front and then simply tipped over.

7.56 *Had the Subject Mower been equipped with a ROPS at the time of the incident, including a seat belt, as the Plaintiffs' expert suggests, and had Rebekah remained belted as the Subject Mower went over the retaining wall, Rebekah's injuries would likely have been worse, including*

catastrophic head and neck injuries. *Ex. M*, *Dr. Gwin Affidavit, ¶¶ 11-12.   This end of the aforementioned sequence is depicted in the image below:*



*Exs. M-A and M-B to Dr. Gwin Affidavit.* **Response:** Plaintiffs object to Toro claiming that Dr. Gwin's opinion is a "fact", and particularly that it is a "undisputed" fact, because it is simply false. The illustration is not a fact. Toro regularly retains Dr. Gwin in mower tip over/rollover cases, such as this one, to testify that a ROPS would not have saved the plaintiffs from injury. (**Ex. 34**) Plaintiffs dispute Dr. Gwin's opinions as false and misleading, and based on unreliable methodology and subject to exclusion. (**Ex. 29**, 24:17-28:20 and 39:16-43:18) (See Plaintiffs' Section B(v)(l)) Dr. Gwin admits mower lands approximately 90 degrees or pitch down, not 1800.

7.57 *Had TTC has no record or notice since 2005[5] of any incident similar to the Incident involving Plaintiffs in which an operator engaged the Bypass Pins to disable the service brake system on any Toro ZRT mower on a sloped surface and then experienced a loss of control. Ex. D, Porter Affidavit ¶ 23.* **Response:** Plaintiffs dispute the statement made in 7.57 as false and

---

[5] In accordance with the Court's Discovery Order dated June 21, 2022, the proper scope of discovery in this case is "all Toro ZTR mowers in the last 15 years."  Discovery Order (Dkt. 55) at p. 5.  Accordingly, TTC's review of other incidents dates back to 2005, which is 15 years before the date of the Incident.

misleading, based on the statement itself. Toro attempts to indicated that it had no notice of loss of control incidents leading to death or injury. In fact, Toro has a significant, abysmal history of its ZRT mowers experiencing loss of control whenever the hydrostatic motors are bypassed or fail. (See Plaintiffs' Section B(v)(a) and **Ex. 28**, p.1-p.4, inclusive) Mr. Porter's Affidavit is not only incorrect, it is also misleading, and Plaintiffs object to Toro attempting to use the "scope of discovery" as a rule of admission of evidence of knowledge of hazard.

### iii.    Disputed Immaterial Facts

7.12 *ZRT mowers were originally developed for commercial applications by professional landscaping companies because they can generally mow at higher speed with better maneuverability than traditional lawn tractor mowers. Ex. D, Porter Affidavit, ¶ 7; Commercial ZRT mowers typically weigh between 850 and 1600 pounds. Id.* **Response:** Toro's general assertion about the development of ZRT mowers in paragraph 7.12 is an opinion and immaterial to this case, as, when pressed, Toro had to admit that all ZRT mowers it has manufactured share common design characteristics and unique hazards which require additional safety engineering and precaution. (**Ex. 19**) In 2003, Toro tested Toro and Exmark ZRTs against a number of competitors, all of which weighed over 1,000lbs. The spread was 1,886 lbs., down to 1,330 lbs. (**Ex. 31**, p.1) The tests included "All of the machines tested reacted to the inputs of the operator in a very similar manor." The conclusion reached on page 1 demonstrate that all of the units had the same unique control characteristics common to all ZRTs, regardless of weight, and that the basic design configuration of ZRTs was incredibly similar across units with 556lbs. (difference between the heaviest and lightest) The lesson from this research and the accident data before and after the Timecutter series went into production, is that weight has nothing to do with the injury hazard mitigated or eliminated by ROPS. Lighter, residential mowers weighing almost 600lbs. (as the

Hillmans' mower) have the exact same hazard (tip over, rollover and fall over drop off) as heavier, "commercial mowers". As admitted by Carol Drutowski and James Fear, they share common design configuration and controls, and gravity acts the same on all Toro ZRT mowers. (**Ex. 12**, 44:15-49:19; **Ex. 26**, 126:12-133:13; **Ex. 31**) (See also, Plaintiffs' Section B(v)(b))

7.13 *Over the past approximately 20 years, manufacturers have introduced ZRT mowers for the residential marketplace that offer the same advantages at a lower cost for the homeowner.  Ex. D, Porter Affidavit, ¶ 8.  Residential ZRT mowers generally have smaller engines and smaller cutting decks and are therefore in a lower weight range than larger commercial ZRT mowers.  Id. ZRT mowers have a low center of gravity and are very stable machines. Ex. D, Porter Affidavit, ¶ 9.* **Response:** Mr. Porter's generalizations concerning ZRT mowers are incomplete, have little foundation and failed to provide any information about what safety features have been sacrificed for so-called "residential" mowers for lower cost. In point of fact, many of the commercial mowers have the same engines with the same weight and horsepower as the residential mowers. Plaintiff has both documentary and expert testimony to dispute Mr. Porter's assertion that ZRT mowers have a low center of gravity and are very stable machines. (**Ex. 31**, p.1; **Ex. 26**, 126:12-133:13; **Ex. 15**, p.6-p.8, particularly p.8, in which Mr. Bilek confirms that the nominal stability rating of residential ZRT mowers, such as the Timecutter, is well below 1.0, which renders it "unstable" based on NHTSA data concerning real world rollovers in motor vehicles, which are far superior to mowers because they have suspensions.)

7.15 *Residential ZRT mowers typically do not come equipped with ROPS because, among other reasons, they are smaller, lighter and not as fast as their commercial counterparts, and are typically used on the operator's own property, where there are no unknown or unanticipated rollover hazards. Ex. D, Porter Affidavit, ¶ 11; Ex. F, Porter 30(b)(6) Dep., 33:5-17.* **Response:**

Plaintiffs object to paragraph 7.15 on the basis that it claims, as fact, that which is nothing more than opinions and self-serving conclusory statements on the part of Toro. Furthermore, Toro has produced no documents, in thousands of documents, which confirm Porter's statement of opinions. (See Plaintiffs' Section B(v)(a) and B(v)(b))

7.16 *The American National Standards Institute ("ANSI"), under the sponsorship of the Outdoor Power Equipment Institute ("OPEI"), has promulgated two separate safety standards applicable to ZRT mowers:*

- *ANSI B71.4 for commercial ZRT mowers, and*
- *ANSI B71.1 for residential ZRT mowers.*

*Among other things, ANSI B71.4 and B71.1 set forth criteria for when a ZRT mower should be equipped with a ROPS as well as the requirements for steering, braking and static stability.* *Ex. D, Porter Affidavit, ¶¶ 12-13.* **Response:** Plaintiffs dispute Mr. Porter's statement in paragraph 7.16, as ANSI standards are immaterial to whether or not the plaintiffs' Toro Timecutter mower was unreasonably dangerous due to design defects and a lack of useful warnings and instructions to prevent loss of control accidents. ANSI B71.1-2003 was written by members of the mower industry, including Toro, and simply presented to ANSI. ANSI B71.1-2003 was not sponsored by or promoted by any organization specifically tasked with consumer safety or customer safety. The standards were a product of lobbying by the Outdoor Power and Equipment Institute (OPEI), do not have the force of law, and are immaterial to any issue in this case, as any current and appropriate standard of care, even by the mower industry. (**Ex. 26**, 51:15-64:5) (See also, Plaintiffs' Section B(v)(k))

7.17 *The ANSI B71.1 – 2003 (Consumer Turf Care) standard is entitled "Consumer Turf Care Equipment – Walk-Behind Mowers and Ride-On Machines with Mowers – Safety Specifications." ("ANSI B71.1 – 2003") and was in effect at the time the Subject Mower was designed and*

*manufactured. Ex. D, Porter Affidavit, ¶ 14; Ex. D-1 to Porter Affidavit.* **Response:** Plaintiffs dispute Mr. Porter's statement in paragraph 7.17, as ANSI standards are immaterial to whether or not the plaintiffs' Toro Timecutter mower was unreasonably dangerous due to design defects and a lack of useful warnings and instructions to prevent loss of control accidents. ANSI B71.1-2003 was written by members of the mower industry, including Toro, and simply presented to ANSI. ANSI B71.1-2003 was not sponsored by or promoted by any organization specifically tasked with consumer safety or customer safety. The standards were a product of lobbying by the Outdoor Power and Equipment Institute (OPEI), do not have the force of law, and are immaterial to any issue in this case, as any current and appropriate standard of care, even by the mower industry. (**Ex. 26**, *Id.*; **Ex. 36**; **Ex. 37**; **Ex. 38**) (See also, Plaintiffs' Section B(v)(k))

7.18 *ANSI is comprised of 30 million professionals, representing a wide array of government agencies, companies, and academic societies. Ex. D, Porter Affidavit, ¶ 15. This organization has been accrediting, administrating, coordinating, and promoting private sector voluntary consensus standards for nearly 100 years. Id. ANSI neither develops nor interprets standards; instead its role is to accredit standards developed by traditional standards development organizations and industry groups, like OPEI, through thorough review of the processes by which these standards were created and approved. Id. To obtain ANSI accreditation, a standard must have been developed via an open process in which the views of stakeholders with material interests in the subject matter of the standard are heard, carefully considered, and included in the final iteration of the standard. Id. This type of consensus building is central to ANSI's mission. Id. As such, ANSI accreditation signifies that a standard is not merely the product of a potentially self-interested industry group but, rather, reflects the interests of all who are potentially impacted by changes to industry norms. Id.* **Response:** Plaintiffs dispute Mr. Porter's statement in paragraph

7.18, as ANSI standards are immaterial to whether or not the plaintiffs' Toro Timecutter mower was unreasonably dangerous due to design defects and a lack of useful warnings and instructions to prevent loss of control accidents. ANSI B71.1-2003 was written by members of the mower industry, including Toro, and simply presented to ANSI. ANSI B71.1-2003 was not sponsored by or promoted by any organization specifically tasked with consumer safety or customer safety. The standards were a product of lobbying by the Outdoor Power and Equipment Institute (OPEI), do not have the force of law, and are immaterial to any issue in this case, as any current and appropriate standard of care, even by the mower industry. (**Ex. 26**, *Id.*; **Ex. 25**, p.4) (See also, Plaintiffs' Section B(v)(k)) Plaintiffs also dispute that Mr. Porter has any foundation for the statements in paragraph 7.18, other than copying statements made by the ANSI website. ANSI actually publishes standards for all kinds of machines and the suggestion that 30 million professionals were involved in the mower standards is frankly ridiculous. Specifically, Plaintiffs assert that ANSI B71.1 was merely the product of potentially self-interested industry groups, and for the purpose of defending product liability suits, as indicated in internal documents. (**Ex. 38**) In addition, when the CPSC wanted to lower the weight of ZRTs requiring ROPS, Toro resisted the change and, along with other mower manufacturers, blocked that change from the standard. (**Ex. 27**)

7.19 *The Subject Mower is a consumer-grade ZRT mower intended for residential, non-commercial use by homeowners such as Plaintiffs for use on their own property.* *Ex. D, Porter Affidavit, ¶ 16; Ex. D-4 to Porter Affidavit, The Toro Warranty, pg. 51 at footnote 2.* **Response:** Plaintiffs dispute the relevance or accuracy of the characterization of the subject mower as some kind of consumer grade mower, or that its intention was anything other than to mow grass on the plaintiffs' property. Toro admits that it cannot control who uses the mower or where. Furthermore,

and more importantly, the hazards that injured Rebekah Hillman are absolutely the same whether the subject ZRT is called a "consumer grade" ZRT mower or a commercial grade ZRT mower, as Defendant's 30(b)(6) witness admitted that all ZRT mowers share enough common design features to create the same hazard. (Compare **Ex. 17** with **Ex. 19**)

7.22 *...TimeCutter Model 74632, for the 2011 Model Year, was certified by SGS US Testing Company, Inc. on November 12, 2010 as complying with the requirements of ANSI B71.1-2003. Ex. D, Porter Affidavit, ¶ 16; Ex. D-2 to Porter Affidavit. Models 74632 and Model 74631 are similar machines in that the only difference is that Model 74631 has no lift pedal and no arm rest on the seat. Ex. D, Porter Affidavit, ¶ 16. Under its Self-Certification Program, The Toro Company determined that Model 74631 complied with the mechanical safety requirements of the American National Standards Institute concerning product safety for turf care equipment by meeting the requirements of ANSI B71.1-2003. Ex. D, Porter Affidavit, ¶ 16; Ex. D-3 to Porter Affidavit. Additionally, the Operator's Manual for the 2013 Toro TimeCutter SS 5000 Model 74631 states on page 4 that "[t]his machine meets or exceeds the B71.1-2003 specifications of the American National Standards Institute, in effect at the time of production." Ex. D, Porter Affidavit, ¶ 16; Ex. D-4 to Porter Affidavit.* **Response:** Plaintiffs deny that the Timecutter Model 74632, purchased by the plaintiffs, complied with all pertinent ANSI and industry standards. Toro brags about allegedly complying with ANSI B71.1-2003 while completely ignoring other standards, including ANSI procedural standards for analyzing hazards. (**Ex. 14**, p.25-p.37, including Appendix B, p.38-p.41; **Ex. 32**, "Prevention through Design) (Note: This methodology was well-known in the engineering and design field long before it became an ANSI standard, so even the mower designed and built in 2013 should have complied. Had Toro done so, presumably, it would have identified the hazards identified in this lawsuit and corrected them.)

7.23 *According to section 19.1.3 of ANSI B71.1 – 2003, a ZRT mower is not required to be equipped with ROPS if the mass of the mower (including attachments with all fluids full and with ballast as recommended by the manufacturer) is less than 1,245 pounds. Ex. D, Porter Affidavit, ¶ 17; Ex. D-1 to Porter Affidavit.  The Subject Mower weighs significantly less than 1,245 pounds under the criteria stated in the standard.  Ex. D, Porter Affidavit, ¶ 17.  Therefore, no ROPS was required on the Subject Mower.  Id.* **Response:** The ANSI standard that allows a manufacturer to drop a 600lb. mower on an operator who loses control, without a ROPS, is not a safety standard. It is open and obvious that a 1,244lb. mower falling on a man or woman could easily cripple or kill them. Nevertheless, Toro clings to this standard as if it has any basis in fact, law or morality. (**Ex. 38**, p.2; See also, Plaintiffs' Section B(v)(h) and B(v)(k)) Plaintiffs also incorporates 7.24.

7.24 *Section 19.2.2 of ANSI B71.1 – 2003, Static Stability Tests, requires that a mower's wheels do not lift off a tilt table before a tilt of 30 degrees with the mower oriented longitudinally, and do not lift off a tilt table before a tilt of 25 degrees with the mower oriented laterally. Ex. D, Porter Affidavit, ¶ 18; Ex. D-1 to Porter Affidavit.  The Subject Mower met or exceeded these requirements.  Ex. D, Porter Affidavit, ¶ 18.* **Response:** Again, ANSI B71.1-2003 is immaterial because it is not based on any reliable scientific methodology, and Plaintiffs reiterate the same response they made to paragraphs 7.22 and 7.23. Furthermore, Plaintiffs refer the Court to **Ex. 15**, p.6-p.8. Whether or not the machine complied with ANSI B71.1 is no indication that the mower is stable when it is moving and is completely immaterial to an incident such as this one, when the mower tips over, rolls over or falls from a drop off.

7.26 **(Last Sentence)** *...The Subject Mower met or exceeded the requirements for the parking brake.  Ex. D, Porter Affidavit, ¶ 20.* **Response:** Plaintiffs object to paragraph 7.26, as it is not a fact but an opinion concerning an immaterial allegation of compliance with respect to the parking

brake. Plaintiffs hereby reincorporate their same response as they made for 7.22, 7.23 and 7.24, with respect to the relevance and failure to comply with all relevant ANSI standards, including those that require review and redesign for safety. There is no evidence that Toro ever had any kind of systematic review of their accident cases of serious injury or death and tried to do anything about it from a design, instructions or warnings standpoint.

7.27 *Section 14.2.3 of ANSI B71.1 – 2003 defines the brake requirements for ride-on consumer mowers. Ex. D-1 to Porter Affidavit. It states the following: that a service brake shall be provided and allow for either a foot-operated service break or a combined lever steer and brake control; the lever steer brake shall be accomplished by motion of the levers in a direction opposite that of machine travel; and the parking brake can be hand-operated, foot-operated, or automatically applied, and may be in combination with the service brake. Id. The Subject Mower met all of these requirements. Ex. D, Porter Affidavit, ¶ 22.* **Response:** Plaintiffs object to paragraph 7.27, as it is not a fact but an opinion concerning an immaterial allegation of compliance with respect to the parking brake. Plaintiffs hereby reincorporate their same response as they made for 7.22, 7.23 and 7.24, with respect to the relevance and failure to comply with all relevant ANSI standards, including those that require review and redesign for safety. There is no evidence that Toro ever had any kind of systematic review of their accident cases of serious injury or death and tried to do anything about it from a design, instructions or warnings standpoint.

7.28 *Section 19.3.2 of ANSI B71.1 – 2003 defines service brake tests for effectiveness, durability, and proof load. Ex. D-1 to Porter Affidavit. Section 19.3.3 defines parking brake testing: the machine shall be held on a 16.7 degree or 30% slope by the parking brake. Ex. D, Porter Affidavit, ¶ 20. The Subject Mower also met all of these requirements. Id.* **Response:** Plaintiffs reiterates their objection to the use of ANSI B71.1-2003 in this case, as any evidence

34

that the mower was reasonably safe in any respect. They incorporate their previous responses for paragraphs 7.22 through 7.27, and also state that there is no issue in this case that the parking brake installed on the accident mower failed to hold the machine on a slope.

7.29 *The Operator's Manual includes the following instructions in pertinent part: "Always keep the drive wheels engaged when going down a slope."; "Do not mow near drop-offs, ditches, steep banks or water. Wheels dropping over edges can cause rollovers, which may result in serious injury, death or drowning."; and "Use a walk behind mower and/or a hand trimmer near drop-offs, ditches, steep banks and water." Ex. D-4 to Porter Affidavit, pgs. 4-5 and 16.* **Response:** Plaintiffs dispute that the language cited in paragraph 7.29 is, without appropriate instructions, warnings and definitions, irrelevant and immaterial to this accident.

7.31 **(Second Sentence)** *...However, such an "interlock" is not required by ANSI B71.1 – 2003. Ex. D-1 to Porter Affidavit.* **Response:** Plaintiffs reiterate their objections to any inference that ANSI B71.1-2003 defines a reasonably safe ZRT.

7.32 **(p.15 version**) *...But Plaintiffs have not offered any alternative adequate warnings that Defendant should have given, which is admitted by Plaintiffs' expert witnesses. Ex. H, Tom Berry Dep., 7:23-8:4 ("Q. Are you a warnings expert? A. Warnings, yes. I have designed warnings. Q. Have you done that in this matter? A. No..."), 132:12-15 ("Q. Have you prepared any warnings that you think should have been provided to address these issues that you just stated? A. No, I haven't..."), 132:20-23 ("Q. Are you planning to prepare any warnings that you think should have been provided? A. I would if asked, but I am not planning on it, no."); Ex. I, Kelly Kennett Dep., 8:20-22 ("Q. Do you have any warnings opinions in this case? A. No."); Ex. J, David Bilek Dep., 9:8-12.* **Response:** The statement is demonstrably false. Mr. Berry pointed out the warning, which the Hydro-Gear manufacturer made to Toro (Ex. 14, p. 6), was then not passed on to Timecutter

customers, nor was there any warning that the operator would have no control to turn or brake if the bypass pins/tow valves had placed the hydrostatic motors essentially in neutral, and would be unable to drive in either direction or brake. (**Ex. 26**, 205:11-214:2, in which Plaintiffs' counsel specifically referenced warnings that Plaintiffs allege should be in the Timecutter operator's manual with Mr. Fear, who agreed that it would probably be better to put most of them in or at least "considered".; See also, Plaintiffs' Section B(v)(f))

7.33(**p.15 version**) *Similarly, Plaintiffs' experts did not do any testing or run any simulation that would confirm or prove that their alleged "safer alternative designs" would have prevented Rebekah's injuries. Ex. H, Tom Berry Dep., 97:3-6; 99:1-6 ("Q. You haven't done an analysis, or any testing or calculations, that would show exactly what would show if the ROPS had been on the mower? A. I haven't done that, no….."); Ex. I, Kelly Kennett Dep., 19:13-15 ("Q. What, if any, testing did you perform as part of your work in this case? A. I didn't do any testing in this case…"), 19:18-21. The same goes for the remaining "unreasonably dangerous" conditions or defects that Plaintiffs allege "proximately caused" Plaintiffs' injuries. Ex. I, Kelly Kennett Dep., 55:16-56:7 (admitting that no testing was performed or reviewed as to the third brake design); Ex. H, Tom Berry Dep., 88:13-15 ("Q. Have you done any testing on interlock? A. I have not…").* **Response:** Brakes have been in use on mobile vehicles (including riding lawn mowers) for over half a century. Mr. Berry's alternative designs are simply brakes on existing mowers which, if independent of the hydrostatic control levers, would have stopped the Timecutter before it rolled all the way down the hill, through the flowerbed, and over the retaining wall. (**Ex. 14**, p.7-p.9) It can reasonably be assumed that John Deere, Scag Company and Hydro-Gear tested the brakes incorporated into their product so there was no need for Mr. Berry to determine that, if a reasonable, independent service brake had been available, Rebekah would not have gone over the retaining wall and been injured.

Ironically, the ROPS attached to the plaintiffs' exemplar Timecutter mower was the optional ROPS developed by Toro for the Timecutter around 2020. One presumes that Toro likely tested it enough to convince themselves of its effectiveness. Nevertheless, Mr. Berry has reviewed Toro documents in this and other cases, and he cites the extensive testing of ROPS over the years to demonstrate their effectiveness. (**Ex. 14**, p.16- p.28) The Court should also note that Mr. Berry has actually designed ROPS. (**Ex. 14**, p.28) Plaintiffs would also point out that Dr. Gwin did absolutely no testing of her theory that a ROPS would not have saved Rebekah from serious injury, but relied upon a cartoon created by someone else at BRC. (See Plaintiffs' Section B(v)(l))

7.34 (**Last Sentence**) *...Additionally, at the time of purchasing the Subject Mower, Plaintiffs had their property surveyed by Prairie State, a local dealer, who confirmed that there were no steep hills or inclines on Plaintiffs' property that would indicate a need for ROPS.* <u>Ex. E</u>, *Jennifer Day 1 Dep., 74:13-75:1.* **Response:** Plaintiffs object to paragraph 7.34 as not only immaterial, but double hearsay. Furthermore, Toro's own ZRT safety video includes specific warnings of rollovers, tip overs or falls, which do not necessarily require steep hills or inclines. There is no evidence that Prairie State dealer sold Toro mowers. (**Ex. 17**; **Ex. 19**)

7.35 (**First Two and Last Sentences**) *In "about 2016," Plaintiffs cleared a brushy area above an approximately six-foot high retaining wall and began mowing that part of their property (in addition to the rest of their lawn) with the Subject Mower.* <u>Ex. E</u>, *Jennifer Day 1 Dep., 94:12-14, 194:24-195:2 Plaintiffs also installed a flower bed above the retaining wall at the time they cleared this area.* <u>Ex. E</u>, *Jennifer Day 1 Dep., 196:10-11.... Below is a photograph depicting this area that Plaintiffs cleared off after purchasing the Subject Mower (including the two drop-off hazards) taken shortly after the Incident:*



*Ex. C-3* to *Grace Affidavit.* **Response:** Not only is the information in paragraph 7.35 immaterial to this case, Defendant failed to mention that no part of the hill above the retaining wall, at the time of the injury, exceeded the 15 degrees indicated in Toro's owner's manual (**Ex. 17**, p.6 and p.7; **Ex. 15**, p.9 and p.10 – the general slope of the yard is approximately 9.5 degrees; **Ex. 15**, p.5 – showing the digital survey of the hill and the gentle slope (less than 10 degrees) which the mower followed before entering the flowerbed and then going over the retaining wall; **Ex. 21**, 115:1-116:1)

7.42 **(Last Sentence)** *...Indeed, Jennifer "put the two dogs and the two kids in the ... garage" before she began to move the Subject Mower. Ex. E, Jennifer Day 1 Dep., 277:23-278:2.*
**Response:** Plaintiffs deny that Jennifer putting the dogs and children in the garage, before towing the vehicle, has anything to do with the incident in this case, as inferred by Toro. Putting pets and children inside a building when any vehicle is being towed or any unusual movement of machines is being done outside is simply not indicative of any specific hazard. In addition, it is undisputed

that nobody got hurt while towing the mower out of the flowerbed to the highest, flattest point on the hill.

7.48 **(First Sentence)** *The Bypass Pins (identified by the two blue arrows above) are located just inches from the hand-written "X" which marks the spot where the tow strap was connected to the Subject Mower.* **Response:** The location of bypass pins is generally immaterial without proper information, instructions and warnings to the user to understand their importance to prevent inadvertent loss of control, and serious injury. The bypass pins, or tow valves as they are referred to in the troubleshooting guide, are extremely inconspicuous and contain no color coded, international symbols for danger or warning. (See **Figures 10** and **11** of Plaintiffs' Section B(v))

7.50 **(Last Sentence)** *...During this time, Jennifer remained silent as to the Bypass Pins and watched as Rebekah started the process to return to mowing with the Subject Mower. Ex. E, Jennifer Day 1 Dep., 296:9-15, 297:4.* **Response:** Toro's characterization of Jennifer's conduct is false, particularly when it is characterized as "remained silent". In reality, two women were going about different tasks. Jennifer was collecting the tow strap and returning it to the John Deere tractor to put it back in the shed. Rebekah was getting back on the mower to recommence mowing. **(Ex. 21**, 283:22-287:24 and 296:9-297:21) Jennifer was unaware Rebekah had not closed the tow valves until Jennifer saw Rebekah get on the mower, start it on the flatter part of the hill and pull the control levers from outboard to inboard, disconnecting the "electric brake". Jennifer had no reason to warn Rebekah until that moment.

iv.    **Undisputed Immaterial Facts**

7.30**(p.13 version**) *The Operator's Manual also includes step-by-step instructions for engaging the Bypass Pins which allow the Subject Mower to be pushed by hand (by disengaging the hydrostatic transmission and allowing the wheels to turn freely). Ex. D-4 to Porter Affidavit.*

*It instructs as Step 1 to "park the machine on a level surface." Id. at pgs. 24-25.  The Operator's Manual explicitly informs operators that it is necessary to disengage the electric brake in order to successfully push the mower by hand.  Id.  It also instructs operators to disengage the Bypass Pins before beginning to operate the machine.  Id.  These instructions and graphics are reproduced below:*





*Ex. D-4 to Porter Affidavit, pgs. 24-25.*  **Response:** The instructions referenced in paragraph 7.30(p.13 version) and the instructions from the owner's manual printed with it are immaterial because they contain no explanation, instructions or warnings about the significance of using the bypass pins or "tow valves", and the ineffectiveness of the electric brake to stop the machine, if

40

the operator forgets to close the tow valves before releasing the parking brake. In other words, Mr. Porter testified that the instructions referenced in 7.30(p.13 version) were really only to push the mower around on a flat floor, such as in a factory or garage and so, they are not relevant to this case without much more information, warnings and instructions. Further, Porter is misleading as Toro admits the need to use the bypass pins to "tow". (**Ex. 17**, p.48)

v.      **Plaintiffs' Additional Material Facts**

        a.  **The Injury History of Toro's ZRT Mowers**

1.   In Toro's own documents, Toro's injury experience with all so-called Z mowers (designed for "commercial use" and "residential use") is literally filled with loss of control incidents where operators were injured and killed. This is because all ZRT mowers manufactured under the Toro brand and under Toro's Exmark brand share the same design characteristics which make them challenging to control and unstable when driven on anything but perfectly level terrain. (Design features addressed below in separate section) Thus, Toro has experienced a large number of loss of control accidents with all versions of its ZRT mowers (commercial and residential) leading to tip overs, rollovers, and falls into water or over retaining walls. (See **Ex. 1**; **Ex. 2** "***Accident history led us to develop ROPS*** - *Toro and Exmark's accident history shows the ZRT to have unique operating characteristics.  A number of operators have used the machine on steep hills and slid. Others have driven too close to walls and banks.  The resulting accidents led to a decision to add ROPS to the ZRT.*"; **Exhibits 3 through 7**, inclusive; **Ex. 8**, p.4, para. D; **Ex. 9**, p.2, Section III(D); **Ex. 10**, p.2, Section III(D); **Ex. 11**, p.4, Section III(D).

2.   Toro has long promoted ROPS (Rollover Protective Systems) as highly effective in mitigating or preventing injuries from loss of control, tip overs, rollovers and falls from drop-offs. However, when they are sued for tip over, rollover or fall, they employ retained expert witnesses,

like Dr. Gwin, to opine that, in this accident, a ROPS would not have saved the plaintiff. (**Ex. 24**) In fact, after Ken Melrose sent his memo in 2002 (**Ex. 1**), Toro embarked an ambitious campaign to retrofit its "commercial" ZRT mowers with ROPS free of charge. (**Ex. 4**)

### b. Design Features of Toro's ZRT Mowers that Make them Unstable, Inherently Dangerous and All Substantially Similar

3. A standard riding lawnmower with four wheels, or a garden tractor manufactured to also mow lawns with a mowing deck, is inherently more stable and controllable than a ZRT. Unfortunately, the same thing that makes ZRT mowers sell (maneuverability and faster mowing) also makes them more dangerous. The tractor type unit has two rear wheels that provide power and traction, while the front wheels are fixed to rigid axles that turn left or right only when the steering wheel is moved. (**Ex. 19**, at 00:32-00:40; See also, **Figure 2**, below) A zero-turn radius mower like the Timecutter has two wheels in back that provide both traction and power, and steering. The two front wheels are free castering or able to spin on their swivel mounts, just like the wheels on a grocery cart. (See **Figure 1**, below.)



**Figure 1** – photograph of Hillman Timecutter. Note: The front wheels cannot be steered directly, but only turned by differential torque from rear wheels. Front wheels caster or simply swivel, and are

**totally independent according to forces on each wheel itself. Control levers are in outboard position which actuates the electric park lock.**

When a riding-garden tractor type mower turns the front wheels, the rear wheels follow the path. If the garden tractor starts to slide sideways on a slope, all four wheels resist sliding sideways and the steering wheels can be used to drive into the slide to regain stability and control. This is not the case with ZRTs. If a ZRT starts to slide sideways on a slope, the front wheels make it worse by immediately turning to match the same direction as the wheel that is now trying to go out of the path the operators intend, literally turning the front of the mower in the direction of the slide, increasing the speed of loss of control, and increasing the sliding force on the drive wheels. (**Ex. 17**, p.21 and p.22, and **Ex. 19**, at 03:00-03:40) (Toro presents graphic video of how the machine goes out of control due to sliding, turning or hitting a rut or object, and also shows why rollover tip overs, and falls over retaining walls or into water are so deadly without a ROPS.))



**Figure 2 – photograph of a standard control configuration John Deere riding mower. Mowers like this one have hydrostatic drive motors AND an independently controlled brake operated by foot control. Note that front wheels are controlled directly by steering wheel and front wheels are linked together so that they are always parallel. One cannot simply diverge off in a different direction unless turned in that direction. For example, if the left wheel hits a rut, or a low spot, the parallel linked right-hand wheel holds the mower on the intended path until the left wheel gets out of the rut.**

4.  Toro's attempt to distinguish and differentiate the company's injury causing ZRT mower models by use (commercial versus residential), or weight, and by model numbers, is not only disingenuous, it is misleading to the Court in this case because all Toro ZRT mowers share the same single point of failure that leads to loss of control – employing the hydrostatic motors that turn and drive the rear wheels of the mower as the same control that serves as the service brake. In other words, despite several alternative designs that would have been much safer, Toro created a machine to mow grass that has no independent, reliable brake that will slow the machine and bring it to a stop if it is moving. Toro's corporate representative, Carol Drutowski, admitted that, since 2002 (Melrose memo), all Toro ZRT mowers share design features that, for the sake of this case, make them all substantially similar designs that generate the same types of injury with the same design issues. She admitted that since 2002, Toro's ZRT mowers (whether intended for the commercial operator or the residential operator) had common engineering design characteristics involved in loss of control, tip over, falls and rollover accidents like the one that resulted in the amputation of Rebekah Hillman's leg.

    a.  Gravity acts on all ZRT mowers alike, regardless of weight each machine falls at 32 feet per second per second. (**Ex. 12**, 44:8-45:25)

    b.  Toro ZRT mowers built to cut grass for commercial operators were configured with control systems that operated the same way as those Timecutter series intended to be sold to residential users. Those commercial mowers operated with rear drive wheels powered by hydrostatic motors and castering front wheels so they had the same tendency to go out of control as the residential mowers. (**Ex. 12**, 47:1-49:19 and 176:4-189:9) (Both commercial and residential had same type of controls and power, both had same type of frame, castering front wheels with no front braking, and both relied on hydrostatic motors as the only service brake. The main difference between commercial and residential was that commercial was made heavier for longer life.).

5.  Despite the fact that Toro referred to it as a separate, electrically operated brake in the Hillman's mower manual (**Ex. 17**, p.36, especially where it is referred to as an "electric brake"), unfortunately, the electric brake on the Hillman's Timecutter was not designed as a brake to

decelerate the mower separate from the hydrostatic motors. (**Ex. 13**, 26:11-25) Mr. Porter admitted that Toro had not designed and built any ZRT mowers (residential or commercial) which *"incorporate an independent brake that can ---can decelerate the mower and bring it to a stop if it is moving? Answer: No."* (**Ex. 13**, 86:16-20)

6.  Decades before Toro designed the Timecutters in the early 2000s, safety engineers who wanted to build reasonably safe products of all kinds should follow the safety hierarchy which is graphically depicted below. (**Ex. 32**)



This methodology has stood the test of time. It simply states that when a hazard has been identified, the most effective way of reducing or eliminating it is to design it out (build the product without the hazard if possible). If one cannot design the hazard out, the next, less effective method is to guard against the hazard (such as a guard on a saw to prevent the operator's hand from getting too close to the blade), and the least effective way of dealing with the hazard is simply to warn of it. Unfortunately, Toro completely ignored this common-sense principle of design when dealing with the two hazards which make the Timecutter ZRT involved in this litigation unreasonably dangerous and responsible for Rebekah's injuries. (**Ex. 14**, p.3-p.4, and **Ex. 15**, p.10-p.12)

**c.  Toro's Unsafe Design – A Single Point of Failure**

7.  Failure Mode and Effect Analysis has been a cornerstone of safe design of machines (including lawnmowers) and other systems for decades before the Hillman mower was built in

2013. (**Ex. 14**, p.3-p.7) Design engineers have a responsibility to review product designs **before** they are placed into production and determine what could and will go wrong to serious cause injury and/or death. (Emphasis mine) (**Ex. 32**) Software and systems engineers have coined the term Single Point of Failure, which is defined as: "A **single point of failure** (**SPOF**) is a part of a system that, if it fails, will stop the entire system from working.[1] SPOFs are undesirable in any system with a goal of high availability or reliability, be it a business practice, software application, or other industrial system." Systems can be made robust (and safer) by adding redundancy in all potential SPOFs. Redundancy can be achieved at various levels." *Wikipedia*. The single design point of failure which initiated the event was Toro's control design, a) using the hydrostatic motors for power, steering and braking, and b) instead of having an independent brake capable of decelerating and stopping the mower, even when the hydrostatic motors were disconnected, or failed. When one or both of the hydrostatic motors failed, of if they were disconnected to tow or push the machine, Toro ZRT mowers, including the Timecutter, could not be decelerated and brought to a stop without an independent service brake. The electrically activated parking brake was not designed to, or capable of, stopping the machine once it began to move. In other words, when the hydrostatic motors failed and the machine was or began moving, operator control was lost.

8.   Using long accepted techniques of analysis in engineering design and injury causation, Plaintiffs' engineering experts, Thomas Berry and David Bilek, analyzed the facts of the Hillman accident from the standpoint of safety engineering and design. They concluded that two hazards posed using the Timecutter mower combined to cause injuries to Rebekah Hillman, resulting in the traumatic amputation of her left leg at age 50. These hazards were a) loss of control of the mower, and b) the rollover/fall from the retaining wall without ROPS protection. (**Ex. 14**, p.4; **Ex.15**, p.11 and p.12)

46

**d.  First Loss of Control – The Upper Yard and the Flowerbed**

9.  Despite Toro's rhetoric, the fact remains that Rebekah Hillman was complying with all of Toro's warnings in their operator's manual when she got stuck in the flowerbed on the morning of June 18, 2020.

10. Contrary to Toro's footnote inferring some lack of access to inspect the accident site before part of the upper yard was lowered, Toro received, free of charge, a complete digital survey of the accident area, created at Plaintiffs' expense, before any changes were made to the slope of the terrain, on February 10, 2022, and Mr. Bilek produced all his survey work, including the digital point cloud. Defense experts had no difficulty using that digital scan to form their opinions and conclusions (**Ex. 15**, p.4)

11. It is undisputed that the upper yard, including the area where Rebekah was mowing, was well below the 15-degree slope warning of the Toro operator's manual. (**Ex. 15**, p.5 – *"slope was 9.5 degrees"*) The slope where Rebekah was mowing was approximately 9.5 degrees or less. Rebekah was mowing across the mild slope, parallel to the flowerbed, exactly as Toro recommended in the Owner's Manual. (**Ex. 17**, p.4 and p.5) Rebekah was mowing west to east, so that the mower would blow the grass into the lawn, not the flowerbed. Toro's operator's manual warned users to mow in the "safe zone" instead of getting close to drop offs and water, which could cause rollovers and falls, which would cause injury. (**Ex. 17**, top of p.7) Nowhere does Toro define what it means by a "drop-off", but it only mentions them in connection with falls or rollovers. Toro does not warn against getting stuck in a flowerbed. *Id.* Rebekah was not mowing in the flowerbed when the mower went out of control solely because the left front wheel got stuck. She was mowing the grass. (See **Figure 3**, below, and **Ex. 20**, 185:12-190:7)



**Figure 3** – Photograph of area where the Toro ZRT slid down into the planter, taken July 2020. Note that grass is well away from edge of flowerbed and over 10 feet from retaining wall. (See also Figures 4 and 5, below.)



**Figure 4** – Photograph of area where Toro mower slid into the flowerbed with tape measure only partially extended up to grassy area, taken July 2020.



**Figure 5** – **Photo taken July 2020 showing tape measure indicating grassy area over 108 inches from drop off.**

12. The grass that Rebekah was mowing was over 108 inches (or 9 feet) from the only drop off hazard in the area (the retaining wall), which is why Rebekah was not injured when she merely slid into the flowerbed – she and Jennifer were in the habit of mowing "The Safety Zone" as defined and illustrated by Toro. (See **Figures 3, 4** and **5** showing the "drop-off hazard", that was the retaining wall, was over 108 inches (9 feet) from the grass being mowed.)  (See also, **Figure 6**, below, Safety Zone discussion in Ex. 19, although candidly, Ex. 19 was not provided with the new Hillman mower, and this case was the first time Jennifer or Rebekah had ever seen that safety video.)



**Figure 6** – This is a screen dump from Ex. 19, where Toro is showing the safety zone from a water hazard. 2010 Safety Video online, but not provided with new Toro mower costing $3000.00.)



**Figure 7** – Screen dump from Ex. 19, which shows a Toro mower mowing near a retaining wall above a pond. Clearly, Toro anticipated mowing around retaining walls.

13. Rebekah never intended to turn her mower into the flowerbed. It is an undisputed fact that

the **unique and unstable steering system** of Rebekah Hillman's mower created the first instance

of loss of control into the flowerbed on June 18, 2020. She was merely mowing her lawn just as she and Jennifer had successfully mowed above the flowerbed over one hundred times since buying the mower, without incident. (**Ex. 21**, 127:20-128:24; **Ex. 22**; **Ex. 20**, 95:18-101:7 and 185:12-189:23)

14. As Rebekah was mowing west to east, the left side of the mower was closest to the flowerbed and the right side was blowing the clippings into the grass and away from the flowerbed. She recalls that, suddenly, it seemed like a left, front, castering wheel hit some rough soil or soil that slid towards the flowerbed. (See **Figure 3**, above, and **Ex. 20**, 185:12-190:7) So, by design, the left, front wheel of the Timecutter turned "downhill", or left, towards the flowerbed because it was not steerable and it pivoted towards a lower surface or bogged down in a soft spot, and began to drive directly down the slope of the flowerbed while pulling the entire mower to the left. The front of the mower was relatively lighter than the rear (where the engine is mounted and where the operator sits). Unlike standard garden tractor type mowers, the right, front wheel of the Toro Timecutter was also a non-steerable castering wheel – so the right wheel of the Timecutter immediately swiveled left too. (For an excellent visual depiction of this design flaw in the ZRT steering system, see **Ex. 19** at 3:17, and watch as the animated front wheels of the mower draw the entire mower left and slide down the hill.) (**Figure 8**, below, is a screen dump from the animated sequence – note the front wheels both turned downhill and the rear wheels starting to lose traction and slide.) (**Figure 9** is the end of the sequence with the animated mower equipped with a ROPS – meant to show the importance of ROPS in preventing injury and death in tip overs, falls and rollovers.)



**Figure 8 – Ex. 19 video screen dump, showing how Rebekah Hillman's mower lost control when only one wheel dropped into a rut or soft spot next to the flowerbed and the loss of control develops quickly and often without the ability to regain traction and stop it.**



**Figure 9 – Ex. 19 at time stamp 3:10, showing end of sliding sequence where mower tips over and operator is saved from injury by ROPS.**

The moment the left wheel began its deviation to the left, the right wheel turned the same direction

as it was pulled left, spoiling any traction the rear wheels had to regain steering effectiveness, as

the front of the mower swung left, literally sucking the Timecutter down the small decline and sliding into the flowerbed. Fortunately, though shaken, Rebekah got the mower stopped in the safe zone without injury or fall, shut the blades down and the engine off and got help from Jennifer.

15. It is undisputed that Rebekah was completely uninjured by getting stuck in the flowerbed, and she was uninjured when she and the mower got out of the flowerbed. (**Ex. 29**, 12:22-13:9)

16. Alternative designs like garden tractors or riding four-wheel standard design tractor type mowers have four wheels with the rear wheels providing power, and the front wheels provide the steering. (See **Figures 1** and **2**, above)

17. If Rebekah had been mowing with a garden tractor or standard riding mower, her right front wheel would have resisted and slid to the left and instead, would have given her the ability to turn the steering wheel to the right and use the traction and direction of the right front wheel to keep the mower from sliding sideways. She could have kept the mower on the straight path while at the same time keeping the left wheel on the right path and prevent the entire mower from swinging left and descending into the flowerbed. (See **Figures 1, 2, 8**, and **9**, above, as well as **Ex. 19**, which describes the "unique handling of the Toro ZRTs".; **Ex. 31**)

**e.  Towing the Timecutter 5000 Out of the Flowerbed**

18. It is undisputed that Toro provides no instructions or warnings on how to safely pull or tow the Timecutter when it gets stuck or when it breaks down (both situations being foreseeable). But the owner's manual does admit that owners will have to tow the machine (**Ex. 17**, p.48, where Troubleshooting Guides indicates problem *"The machine does not drive"* and the possible Cause is *"1. The bypass valves are open"*, and the Corrective Action is listed as *"Close the tow valves."*). So, contrary to Toro's claim in its MSJ, Toro did anticipate that it's ZRTs would get stuck and

need to be towed, and that people would forget to "close the tow valves" after towing.  (Emphasis mine)

19. It is undisputed that Jennifer got the John Deere tractor with the tow strap and together the two women successfully towed the machine out of the flowerbed, up the hill, further away from the drop off hazard (the retaining wall) without damaging the machine and without injury to anyone. (**Ex. 15**, p.8)

20. The Hillman's operator's manual has no warning that bypassing the control levers removes all ability to turn or stop the mower. (**Ex. 17**) There is no such warning or instruction anywhere on the machine. There are no warnings or instructions in the Toro Timecutter Operator's Manual that explains or warns that what Toro calls an "electric parking brake" is not a brake at all, but a park lock that is only effective to hold the mower once it is sitting still. It is not even designed to stop the mower, but they call it a brake throughout the operator's manual. (**Ex. 13**, 26:11-25;**Ex. 17**)

21. There is no dispute that Jennifer recalls moving the bypass pins to tow the mower out of the flowerbed, just as she had during an earlier episode, when the Timecutter, owned by her employer, got stuck and needed to be towed out of the mud. (**Ex. 21**, 135:1-142:20) Jennifer knew that the bypass pins likely disconnected the hydrostatic motors, but she believed that the electric brake would still stop the mower if it began to roll or move. (*Id* and **Ex. 21**, 182:6-185:1)

22. Toro is critical of Jennifer and Rebekah leaving the mower on a slope pointing back down the hill when they stopped the John Deere, removed the tow strap and started to put the John Deere back in the shed. Jennifer assumed Rebekah would replace the bypass pins in the drive position. The only markings on the mower that even mention the bypass pins are down low on the mower and do not contain any words or symbols that warn or instruct that failure to replace the pins before

attempting to operate it will cause a loss of control that could result in injury or death. (See **Figures 10** and **11**, below, and **Ex. 17**).



**Figure 10 – Photograph of Hillman mower in July 2020, showing bypass pins below frame and partially hidden from view.**



**Figure 11 – Hillman mower in July 2020 – Extreme close-up of the only instructions regarding use of bypass pins on the mower or in Operator's Manual (Ex. 17), both with no warning whatsoever.**

23. When the women pulled the mower out of the flowerbed, Jennifer was careful and took the safest and only path available to them – any other would have sent the mower rolling towards the tractor and caused damage and, perhaps, even injury. (**Ex. 21**, 275:5-281:23) The top of the hill was an 8.5-9.5-degree slope, and the flattest part of the hill (*Id* and **Ex. 15**, p.4 and p.5), and well below the safe maneuvering slope Toro selected of 15 degrees. So, at this point, the mower was out of danger of the drop off hazard presented by the retaining wall. In fact, the mower was now some 30-40 feet way from the retaining wall and on the flattest part of the top of the hill. Nobody had gotten hurt yet, and there was no damage to the mower or the John Deere Tractor. (*Id*) The fact remains that, under the circumstances, Jennifer towed the mower to the only place she could without losing control or damaging the mower. She could not leave the mower pointing in any direction once they reached the flattest part of the hill except towards the wall some forty feet to the north. (**Ex. 21**, p.275-p.282)

24. They had remembered to engage the electric brake on the Timecutter by moving the handles of the control levers outboard, then they removed the tow strap and Jennifer went to put the tractor away while Rebekah could resume mowing.

> *Q. And did you get off the John Deere as*
> *4 Rebekah was taking the straps off?*
> *5 A. Yes, because I recall putting the handles*
> *6 back out on the TimeCutter. (Witness indicating.)*
> *7 Q. You moved the levers out into the park*
> *8 brake position?*
> *9 A. The outward position.*
> *10 Q. Okay. And what was your plan for disengag-*
> *11 ing the bypass pins?*
> *12 A. I mean, it didn't cross my mind at the*
> *13 time.*
> *14 Q. You -- you knew that you had to disengage*
> *15 those before the mower would start using its operat-*
> *16 ing mode again, though, right?*
> *17 A. Yes.*
> *18 Q. Did you just forget?*

> *19 A. I, I mean, we were working together and,*
> *20 yeah, I pulled the levers in the outward position.*
> *21 And then I went back to the John Deere,*
> *22 and she got on the TimeCutter*

(**Ex. 21**, p.284)

Jennifer was concentrating on the John Deere and did not think much about the bypass pins, as she believed Rebekah would disengage them. Jennifer dismounted the John Deere and pushed the handles back out to the park position. This activated the park lock. (**Ex. 21**, 284:3-9)

### f.   The Second Loss of Control – No Warning, No Interlock, and No Brake

25. In the "Risk Assessment" Toro performed on the Timecutter model, they admitted people would make mistakes, forget to do things, and sometimes act unpredictably when using their product. (**Ex. 23**) When Rebekah got back on the mower, there was no indication on the control panel or anywhere on the machine that anything was wrong or that the mower would not work as it had before it got stuck in the flowerbed. (There is simply no interlock and no warning light that the bypass pins are still engaged) (**Ex. 17**, p.20) Rebekah forgot the bypass pins were still in tow mode. She got on the mower, turned the key on (which energized the electric brake mechanism) and started the engine – still no indication that anything was wrong or unsafe. She pulled the control levers inboard and the electric parking lock released so she could mow, but the drive levers were still disconnected, as Toro designed them to be, when two little inconspicuous wires were in the wrong position.

> *Q. All right. So what happened next?*
> *2 A. I got on the John Deere tractor and went to*
> *3 start it up, and she started the TimeCutter.*
> *4 Q. Which one started first?*
> *5 A. The TimeCutter.*
> *6 Q. And was that just a few seconds before you*
> *7 got the tractor started?*
> *8 A. Yeah. I don't even think I fully gotten*
> *9 the tractor started.*

*10 Q. Okay. All right.*
*11 And so then what happened?*
*12 A. She pulled the levers in --*
*13 Q. Okay.*
*14 A. -- and it started to roll.*
*15 Q. So while the -- while the levers were in*
*16 the outboard position, it wasn't rolling at all?*
*17 A. No.*
*18 Q. And then Rebekah started it.*
*19 And was the next thing that you saw her*
*20 do was to -- to move the levers in?*
*21 A. Yes.*
*22 Q. And the slope was enough that it just*
*23 started rolling on its own?*
*24 A. Yes.*
*Page 287*
*1 Q. She didn't -- Nobody pushed it or --*
*2 A. Nobody pushed it.*
*3 Q. Okay. Just gravity --*
*4 A. Sorry.*
*5 Q. By operation of gravity, it started to roll*
*6 down the slope?*
*7 A. Yes.*
*8 Q. And it was pointed directly at the -- at*
*9 the wall?*
*10 A. Yes.*
*11 Q. How far was the mower from the -- from the*
*12 wall before it started to move?*
*13 A. I don't know. I would say roughly 30, 40*
*14 feet.*

(**Ex. 21**, p.287- p.288)

26. When the electric park lock released, with Rebekah in the driver's seat, she instinctively

pushed the levers forward to resume mowing. As she did, the mower began to roll down the slope.

But when she pulled the levers back, the mower did not respond by slowing as it should. It kept

rolling forward and picking up speed back towards the flowerbed and the retaining wall. Rebekah

began to panic and frantically moved the levers forward and backward in a futile attempt to regain

control. (**Ex. 21**, 296:9-300:2 – set out below)

*Q. All right. After the TimeCutter was de-*

10 tached from the John Deere, and the strap was
11 removed, you described how Rebekah got on the mower
12 and started it.
13 And it didn't move when she just got on
14 it by herself, correct?
15 A. When she just sat down, no.
16 Q. Right.
17 Okay. And so do you have an under-
18 standing of what caused it to start moving forward?
19 MR. CROWLEY: Objection, asked and an-
20 swered.
21 THE WITNESS: When she started it and
22 pulled the levers in, it would have released the
23 electric brake.
24 BY MR. FLORENCE:
Page 296
1 Q. So she took -- she -- she pulled the levers
2 in from the outboard position into the center posi-
3 tion?
4 A. Yes.
5 Q. But it had not rolled at all before that,
6 after it had been detached from the strap?
7 MR. CROWLEY: Asked and answered.
8 THE WITNESS: No.
9 BY MR. FLORENCE:
10 Q. Okay. So what happened next?
11 A. After it started rolling?
12 Q. Yes.
13 A. She started pulling back on the levers, and
14 it still rolled forward.
15 Q. And you realized that was because it was
16 still in bypass mode?
17 A. I realized at that moment that it was still
18 in bypass mode.
19 Q. Okay.
20 A. So I started screaming at her to put it in
21 park, to put the levers outward.
22 Q. What --
23 A. And --
24 Q. -- what exactly did you say?
Page 297
1 A. I was screaming to put the levers out, put
2 the levers out.
3 Q. And were you on -- on the seat of the John
4 Deere?
5 A. Yes.

6 Q. And do you know if she could hear you,
7 with -- above the sounds of the -- of the engines?
8 A. I was watching her push the levers outward.
9 The machine made a weird sound, but it
10 would not stop.
11 Q. Did she start doing that after you were
12 screaming at her to -- to push them out?
13 A. I -- I don't know if she heard me or didn't
14 hear me. I just know that I was screaming it.
15 She was pushing them, pulling them
16 backwards, pushing them outwards.
17 Q. How many times was she pushing them
18 outwards?
19 A. I would say three or four.
20 Q. And the mower rolled straight down toward
21 the wall?
22 A. Yes.
23 Q. And I believe there were some skid marks
24 that were made on the way down; is that right?
Page 298
1 A. I believe so, yes.
2 Q. Okay. And do you know what caused those?
3 A. I don't.
4 I -- I mean, at the time, I would assume
5 that is was the brake attempting to -- to catch.
6 Q. The -- the parking brake that you engage
7 when you push it out?
8 A. The electric brake.
9 Q. Yeah.
10 The one we talked about earlier,
11 that's -- that's in the outward mode, where the
12 directions say the P is?
13 A. The one that's in the manual, yes, that
14 says with the bypass levers in, you still have
15 electric brakes.
16 Q. Okay. And so did she several times push it
17 out?
18 MR. CROWLEY: Objection, asked and an-
19 swered.
20 THE WITNESS: Yes.
21 BY MR. FLORENCE:
22 Q. Do you know how many?
23 MR. CROWLEY: Objection, asked and an-
24 swered.
Page 299
1 THE WITNESS: Again, I think roughly

*2 maybe three or four.*

27. Jennifer saw Rebekah trying to get control as the mower was rolling down the hill. She shouted at Rebekah to put the control levers outboard to engage the electric brake and stop the mower. Rebekah pushed the levers outboard and the electric solenoid tried to pull the pawl lock into the gears, which made the gears just grind against the pawl making a grinding noise but the mower did not slow.

28. The bypass levers created an artificial situation of complete failure of the hydrostatic motors by disconnecting them so they could not turn and stop the machine. The lack of a service brake, that was independent of the hydrostatic system, caused a complete loss of control and the mower proceeded down the hill, into the flowerbed and over the retaining wall. (**Ex. 15**, p.8-p.10; **Ex. 14**)

29. Rebekah knew instinctively that if she stayed on the mower it would fall on top of her and likely kill her and that she had to get off, so she jumped from the mower about the time it was in the flowerbed. She jumped forward and, as the mower struck the wall, she got ahead of the mower. She hit the ground below the wall and the mower then came down (almost nose down) vertical. (**Ex. 20**, 114:2-115:21, below; **Ex. 15**, p.8-p.10)

> *And before we -- we broke you -- you said*
> *3 that as you were approaching the edge, you were*
> *4 thinking that you needed to jump?*
> *5 A. Yes.*
> *6 Q. Okay. As you were traveling down toward*
> *7 the retaining wall, do you recall Jennifer saying or*
> *8 yelling anything to you?*
> *9 A. I don't. The only thing that was in my*
> *10 mind was trying to not hit that retaining wall.*
> *11 Q. Do you recall saying anything, yelling*
> *12 anything out?*
> *13 A. I might have screamed come -- knowing that*
> *14 I had to jump. I don't recall.*
> *15 Q. Do you recall at what point you were when*

*16 you thought, I need to jump?*
*17 A. I don't.*
*18 Q. Can you pinpoint it as between when you got*
*19 into the flower bed and before you got into the*
*20 flower bed?*
*21 A. I don't recall.*
*22 Q. Okay. And I know your memory is not clear*
*23 on a lot of this.*
*24 Do you recall at what point the mower was*
*Page 114*
*1 when you jumped?*
*2 A. I don't recall.*
*3 Q. It could have been into the flower bed, but*
*4 it could have been before?*
*5 A. I don't recall.*
*6 Q. Okay. I think you said you -- you pulled*
*7 the levers out so that you could jump?*
*8 A. Yes, because you can't jump with them*
*9 closed.*
*10 Q. Okay. Do you recall what direction you*
*11 jumped?*
*12 A. No.*
*13 Q. And do you have a recollection of going*
*14 over the edge?*
*15 A. I do not.*
*16 Q. Okay. And so you don't -- you don't recall*
*17 where or how you landed?*
*18 A. No.*
*19 Q. So kind of you just blacked out at this*
*20 point; is -- is that fair?*
*21 A. Fair.*

30. The Timecutter fell nose down on Rebekah's legs, crushing the left leg and then just tipped over on its levers. (**Ex. 15**, p. 8 through p. 10) The crush injury to the left leg was so bad and so contaminated with gravel and dirt that it was amputated at University of Iowa Hospitals on July 1, 2020. (**Ex. 24**)

### g.   **Evidence of Defect and Proximate Cause Bypass Pins and Exclusion of Brake**

31. Rebekah rolled on the mower for at least thirty feet before the mower started into the flowerbed. If she had an independent service brake (such as John Deere builds into its

hydrostatically driven tractors), she could easily have arrested the movement, locked the park lock, gotten off the mower, disengaged the bypass pins, and went on with mowing without injury. (**Ex. 15**, p.8-p.11 and Bullet Point 4 on p.12. *"The lack of a functional independent service brake renders the machine defective and unreasonably dangerous. Had there been a functional brake, the accident does not occur."*) (See also, **Ex. 14**, p.29, para. 1-10, inclusive. The zero-turn mower became *"uncontrollable on the slope and went forward over the retaining wall."* para. 3, p.29) (*The Toro Timecutter should have had a mechanical brake that could be applied by the operator to stop the mower when the hydrostatic drives were not functionally able to stop the mower.*" (**Ex. 14**, p.30, para. 2)

32. Both Mr. Berry and Mr. Bilek opined that the failure to equip the Hillman Timecutter with an independent brake was a defect that rendered the mower unreasonably dangerous <u>and was a cause of Rebekah Hillman's injuries</u>. (Emphasis mine) (**Ex.14**, p.29 and p.30, and **Ex. 15**, p.11 and p.12)

33. As already established, if she had been able to brake the mower (decelerate it to a stop) after it began to roll from a position of safety near the tree with an independent service brake (forty feet from the drop off hazard posed by the retaining wall), she would not have been injured. An independent service brake would have been unaffected by the "bypass pins" and she could have stopped the mower, dismounted, and returned the pins in the "run" position. Toro's total reliance on the hydrostatic motors for all control, including service braking, was unreasonably dangerous, unsafe, ill-advised and contrary to published engineering safety knowledge. The lack of any interlock mechanism or warnings made this accident almost a certainty. As Mr. Berry indicates:

> *"As indicated in the technical publication with respect to hydrostatic drives on turf equipment entitled Application Considerations for Commercial Turf Maintenance Vehicles by Michael Betz in December 18, 1991*

*Dynamic Braking and Input Speed Requirements*
*For descending slopes, the hydrostatic transmission will provide some braking torque to the wheels due to the retarding characteristic of the engine. This is a transmission characteristic called "dynamic braking". <u>This braking capability does not eliminate the need for a service brake. Some type of service brake must be included in the vehicle design to aid dynamic braking or for use in case of transmission failure. Hydrostatic braking must not be considered as the primary braking device for vehicles at static conditions either with the engine running or the engine off…"</u>* (Emphasis mine)

(**Ex. 14**, p.5)

34. The Hillman's Timecutter mower was driven by two Hydro-Gear Z2100 hydrostatic

motors. Hydro-Gear, the manufacturer of the hydrostatic motors Toro installed in the plaintiffs'

mower, warns in its Hydro-Gear manual for the ZT-2100/ZT-2200 (EZT) Integrated Zero-turn

Transaxle Service and Repair Manual, BLN-52622:

### WARNING

**Actuating the bypass will result in the loss of hydrostatic braking capacity. The machine must be stationary on a level surface and in neutral when actuating the bypass.**

Toro excluded this crucial warning in the operator's manual for the Hillman's Timecutter mower.

(**Ex. 14**, p.5; **Ex. 17**)

35. Finally, even the other manufacturers of hydrostatic drives advise against relying solely on

the hydrostatic drives as the sole means of service braking.

*"The Fluid Power Safety Institute has publications that state:*
***Why can't this "inherent dynamic braking system" be used for brakes? -***
*There are simply too many things that can go wrong:*
***1.*** *Lose the oil in the reservoir due to a transmission line failure (even if the failure is in an unrelated circuit).*
***2. Shear a motor or pump shaft.***
***3.*** *Shear a pump or motor drive coupling.*
***4. Lose a transmission line unexpectedly due to wear or neglect.***
***5.*** *Barrel "lift-off" due to wear or over-speeding (in some designs).*
***6. Wear in the pump and/or motor.***
***7.*** *Contaminated or defective valves: charge pressure relief valve; main pressure relief valve; shuttle valve; etc.*
***5. The manufacturer's warnings are very clear! -***

*Here is the warning extracted from Sundstrand's 90 series service manual (ref. SM-S90 • 06/96 • 300047F BLN-09947 • Rev. F • June 1996 – Page 2)*
*"Loss of Hydrostatic Braking Capability*
***WARNING -***
*When Series 90 units are used in vehicular hydrostatic drive systems, the loss of hydrostatic drive line power in any mode of operation (e.g., acceleration, deceleration*
*or "neutral" mode) may cause a loss of hydrostatic braking capacity. A braking system which is independent of the hydrostatic transmission must, therefore, be provided which is adequate to stop and hold the system should the condition develop."*

(**Ex. 14**, p.7)

### h. The Lack of a Guard – Toro Refuses to Design or Equip the Timecutter with ROPS

36. Rebekah and Jennifer Hillman had mowed their yard with the Timecutter without incident over 100 times before June 18, 2020. *Id*

### i. Alternative Designs to Alleviate the Loss of Control and Prevent Rebekah's Injuries

37. Mr. Berry does not merely criticize Toro's violation of standard hazard identification and reasonable engineering safety protocols. Contrary to Toro's unsupported assertion that Plaintiffs proposed no alternative designs that would have saved Rebekah, we see the following at **Ex. 14**, page 7.

> *"As can be seen in the above literature even the manufacturers of the hydrostatic drives indicate that some form of braking needs to be included in the design to enable a vehicle such as this zero-turn mower to be stopped that is independent of the hydrostatic drives."*

Mr. Berry then identifies the independent braking systems on:

    a. John Deere JD Z425;

    b. The EZ Trak; and,

    c. Patriot and Z mowers.

38. Last, but certainly not least, Mr. Berry identifies the Hydro-Gear ZT 2200 hydrostatic transaxle (**Ex. 18**) with a disc-type brake built right into the transaxles system. So, the very

company that produced Toro's 2100 series hydrostatic transaxles for the Timecutters also manufactured and sold a design with a disc-type parking brake capable of decelerating and holding the machine stopped, not the simple park lock, which cannot stop the mower once it is moving. (**Ex. 14**, p.7-p.9) When confronted with this alternative, safer design, Toro corporate representative Todd Porter said he had never considered it for the Timecutter series and had never tested it to see if it would decelerate the mower and stop it if it was moving. (**Ex. 13**, 40:11-22 and 39:24-40:)

39. As Mr. Berry points out on page 6 of his report, Toro knew how to equip its ZRT mowers with independent braking systems, they just refused to do so on the Timecutter.

> *"Toro did not provide any way of braking or stopping the subject mower if the hydrostatic drives were disengaged or some failure had occurred. They did provide mechanical brakes on many of its other mowers including zero turn mowers. For example, the Toro Titan, another residential zero turn mower, had a brake that could be applied to stop the mower. The subject mower was provided with park locks but these are not effective to stop the mower if it is already moving."*

(**Ex.14**, p.6)

### j. Plaintiffs Were Experienced with Machinery, Tools, and Vehicles driven by Hydrostatic Power, Such That Honest and Proper Warnings and Instructions Would Likely Have Saved Rebekah Hillman's Legs

40. Jennifer Hillman was no novice when it came to machines and mechanical issues when the Toro accident happened, nor was she naïve or reckless when it came to working with dangerous tools. On June 18, 2020, Jennifer Hillman was 43 years old. She was college-educated, earning an Associate Degree from Blackhawk College (**Ex. 21**, 18:24-19:7).  She married Rebekah on July 1, 2010 (**Ex. 20**, 33:15) After her deployment as an Army Military Police Officer, she returned to Western Illinois University, studying mathematics and communications, and earning a Bachelor Degree, in 2012.  (**Ex. 21**, p.19 and p.20) Jennifer enlisted in the United States Army in 2001, became a Military Police Officer and was in the Army for ten years, including reserve time. She was deployed to Cuba and, ultimately, to Iraq, where she served in combat and was wounded when

the Humvee she occupied hit an improved explosive device (IED). (**Ex. 21**, 13: 17-p.19, and 23:7-22) Jennifer and her unit were in an area of Iraq which saw some of the most lethal violence against military and civilians. She suffers from PTSD from witnessing the violence, especially against school-aged children. (**Ex. 21**, p.25-29:23)

41. Jennifer Hillman is a construction contractor (**Ex. 21,** 43:16-47:22) who understands carpentry (*Id*), completed an electrical apprenticeship and whose father taught her plumbing. (**Ex. 21**, p.54) Jennifer managed a trailer park in her town and actually mowed the grass there with a Toro Timecutter mower, so she was familiar with its operation. (**Ex. 21**, 84:19-89:18). Jennifer had mowed with a larger Toro ZRT owned by her parents that had a ROPS on it. (**Ex. 21**, 104:21-106:21). When she shopped for the accident mower, she asked for a ROPS with the mower as a safety precaution. However, she discovered that Toro did not provide a ROPS for a $3,000 mower, and she would have to purchase a $5000 -$15,000 mower to get a Toro with a ROPS. (**Ex. 21,** 97:17-101:6)

42. Jennifer read the complete Toro Timecutter 5000 Owner's Manual and even downloaded it to her phone. (**Ex. 21**, 121:3-122:17, see below)

> *Q.Let me show you what's been marked as*
> *4 Exhibit No. 6.*
> *5 Can you identify that document, please?*
> *6 A. It's the Owner's Manual for the Toro*
> *7 TimeCutter.*
> *8 Q. And we've talked about this a couple of*
> *9 times at least today.*
> *10 You read this before or after you bought*
> *11 the TimeCutter?*
> *12 A. After.*
> *13 Q. How soon after?*
> *14 A. Right after.*
> *15 Q. And was there anything about it that you*
> *16 couldn't understand or confused you, that you can*
> *17 recall now?*
> *18 A. Not that I can recall.*

*19 Q. And then did Rebekah read it?*
*20 A. I don't know.*
*21 Q. You filed it away with your other Opera-*
*22 tor's Manuals that you keep?*
*23 A. Yes.*
*24 Q. Where do you keep those?*
*Page 121*
*1 A. My desk.*
*2 Q. Do you recall how often, if at all, you*
*3 then went back to refer back to the manual after you*
*4 initially read it?*
*5 A. Oh, maybe a couple of times.*
*6 Q. Do you recall what prompted that?*
*7 A. Speed control changes, the seat. I*
*8 wondered about moving the seat.*
*9 Q. Do you recall were -- were those two occa-*
*10 sions shortly after you purchased it?*
*11 A. Yeah, it probably wasn't too long after I*
*12 purchased it.*
*13 Q. And then I think you said you downloaded it*
*14 on your phone, as well?*
*15 A. Yes.*
*16 Q. When did you do that?*
*17 A. Right after I purchased it.*

43. Rebekah Hillman was 50 years old on June 18, 2020. Although Rebekah had a number of jobs in her life, at the time of her injury, she had the best job she ever had (which she loved) as a heavy equipment operator through Union Local 150 Heavy Equipment Operators. (**Ex. 20**, 11:13, then 42:6-46:18) Before the accident, Rebekah was trained and certified on loaders, skid steers, and heavy rollers (**Ex. 20**, 46:2), as well as bulldozers, forklifts, and telehandlers. (**Ex. 20**, p.39). She held a commercial driver's license allowing her to operate heavy trucks and semi-trailer trucks. (**Ex. 20**, 36:4-5)

44. It is reasonable to assume that if Toro had provided the following simple warnings to either or both of these women, in the owner's manual and repeated/reinforced those warnings on the machine itself, this tragedy likely would have been avoided. At the very least, the warnings issues in this case are incredibly simple and do not require expert testimony. The same warning Hydro-

Gear placed in its manual for the hydrostatic motor should have been passed on to the ultimate

consumer—the Hillman family. (**Ex. 18**, p.2)

**WARNING**

**Actuating the bypass will result in the**

**loss of hydrostatic braking capacity. The**

**machine must be stationary on a level**

**surface and in neutral when actuating**

**the bypass**

**Preferable warning in the Toro Timecutter Owners Manual**

# DANGER

When bypass levers are engaged TO PUSH OR TOW THE MOWER, the hydrostatic motors are disconnected and an operator CANNOT TURN OR STOP (BRAKE) the mower with the control levers AND the electric parking brake will not stop the mower once it is moving. Attempting to move the mower without full hydrostatic authority will lead to loss of control and may result in serious injury or even death.

NEVER TRY TO OPERATE THE MOWER WHEN THE HYDROSTATIC MOTORS ARE IN BYPASS MODE, OR, IF YOU EXPERIENCE TROUBLE WITH EITHER OF THE HYDROSTATIC MOTORS. CONTACT YOUR TORO DEALER AND ASK THEM TO TRANSPORT THE MOWER TO THE DEALERSHIP AND REPAIR THE PROBLEM

AND/OR

CAUTION

The only braking for this mower is in the hydrostatic drive motors and so the mower slows to a stop when the levers are brought to neutral (center). If, for any reason a hydrostatic motor fails DO NOT TRUST THE MOWER TO BE CONTROLLABLE AND SAFE. SHUT IT DOWN IMMEDIATELY AND CALL YOUR TORO DEALER.

The Park Lock system is electrically activated and it will keep the mower stationary once it stops and the parking lock is engaged, but the Park Lock is not designed to stop the mower if it is moving. Attempting to use the park lock while the mower is moving WILL NOT STOP THE MOWER AND MAY CAUSE DAMAGE TO THE PARK LOCK.

45. Use of ANSI and ISO warning symbols should also be implemented to put Danger and

Caution symbols on the mower itself in plain view of the operator – preferably on the control panel

in a conspicuous position. This language is simple and direct. Any juror who becomes familiar

with the facts of this case is qualified to determine that the lack of such language is a defect in this product and is the basis for liability.

### k. The Illusion of Toro's Reliance on ANSI standards to Claim the Timecutter is Reasonably Safe – Toro Is Grading Its Own Homework

46. The American National Standards Institute, Inc. (ANSI) is not an official agency of any government or organization tasked with developing standards for safety of products as potentially dangerous as zero turn lawnmowers. It is a private organization with no power to enforce any of the standards it publishes for any lawnmower manufacturer in the United States. ANSI B71.1-2003 (**Ex. 25**) was completely written and promulgated by lawnmower manufacturers who had to all vote and agree on what was published as a standard. (**Ex. 25**, p. 3)

47. Perhaps the most important part of the whole introductory statement of Exhibit 25 is the cautionary language quoted from the introduction below, which expressly rejects Toro's attempt to interpret ANSI B71.1-2003 and sell the Court that it is a set of industry standards and that conformity with them means the Timecutter 5000 is reasonably safe. This is Toro's sales job, not that of ANSI.

> *"The American National Standards Institute does not develop standards and will, in no circumstances give an interpretation of any American National Standard. Moreover, no person shall have the right or authority to issue an interpretation of an American National Standard in the name of the American National Standards Institute."*

Notably, this language still appears in the 2017 version of ANSI B71.1 published today. (Go to ANSI Standards online and check ANSI/OPEI B71.1 2017-click on preview)

48. Toro and other manufacturers of ZRTs essentially wrote the ANSI B71.1 2003 Standard since 2003, and intentionally diluted the safety standards relevant to this case. When pressed with documents in deposition, retired Toro Safety Manager, James Fear, admitted that compliance with ANSI B71.1 did not mean the mower was "safe." In fact, the industry competitors put together a

proposed standard (such as whether a manufacturer should have to incorporate an independent

service brake on ZRT mowers, and whether a ROPS would be required on all ZRT mowers that

could tip, roll or fall over a drop off.).

> *And there's -- have you seen the admonition*
> *anywhere in ANSI materials wherein they say*
> *compliance with these standards is not a*
> *certification that the product is safe?*
> *A. I'm not sure how it's worded, but there's a*
> *disclaimer in the front of the standard that*
> *says something similar to that.*
> *Q. Okay. They're not saying if you build it*
> *this way, it's safe. They're saying here's*
> *some standards -- and let's delve into that a*
> *little bit more. In fact, ANSI standards or*
> *American National Standards Institute*
> *standards are, basically, standards that are*
> *written by the industries themselves,*
> *companies like Toro, right?*
> *A. It's more complicated than that, but --*
> *Q. How is it more complicated than that?*
> *A. Well, first of all, we're all competitors.*
> *So it's not a good ol' boys club. We're all*
> *competitors. We sit around and we review*
> *accident data and experience and come up with*
> *standards to try and make the machines safer.*
> *Once a standard is drafted -- in*
> *the ANSI they have what they call a canvas*
> *process. And once a standard is drafted it's*
> *sent out to a canvas group, which includes*
> *other groups like Consumer Product Safety*
> *Commission and Landscapers Association, the*
> *people who would use the machines, and they*
> *review the draft standards; and they're free*
> *to make proposals and suggestions, which then*
> *come back to the industry committee, and the*
> *committee will discuss those and either*
> *incorporate their suggestions or -- or state*
> *the reasons why.*

**(Ex. 26**, 52:10-53:19)

49. Basically, the voluntary "consensus" standard that is B71.1 began for the ZRT industry

through an industry political lobbying and product liability defense organization called the

Outdoor Power and Equipment Institute (OPEI) (**Ex. 27**, p.1 *"The material in this manual is intended for use by OPEI members, as an educational tool, in defending product liability lawsuits. Its purpose is to explain the interrelationship of OPEI sponsorship of voluntary safety standards for power mowers ……."*) (Emphasis mine)

50. The industry representatives from all the mower (including ZRT mowers) manufacturers propose a loose standard that gives them plenty of design freedom and then proposes it to ANSI who sends it to CPSC and, perhaps, the Landscaper Association for comment. But the fate of the proposed standard always rests with the ANSI Board who decides if there is "consensus" enough of the "stakeholders" to accept the language as an ANSI standard. (**Ex. 26**, 56:23-57:18) Mr. Fear, who was safety chief for Toro for 30 years, did not know who was on the ANSI Board that decided what "consensus" was for each standard.

> *In your 30 years at Toro as the safety --*
> *chief of the Safety Committee, do you know*
> *who the Board of Standards Review was? Did*
> *you meet any of them?*
> *A. No.*

(**Ex. 26**, 57:14-18)

The cautionary message says the "consensus" does not necessarily mean unanimity. So, for any ANSI standard, we do not know what interests of concerns the Board took into consideration or the weight attached to each separate consideration.

51. Plaintiffs' Expert Thomas Berry has far more foundation, candor, education, and experience in the history of engineering and mower standards than does Mr. Porter from Toro. (**Ex. 14**, Appendix A Review of CPSC Studies and documents and B) He also summarizes why Toro <u>should not</u> be allowed to claim that the Timecutter ZRT that injured Rebekah Hillman was reasonably safe, even if it did comply with ANSI B71.1 2003. (**Ex. 14**, p.25, para. 9)

52. Finally, notably, this industry standard requires a service brake (**Ex. 25**, p.30 – 14.2.3.1 "*A service brake shall be provided*"). So, one would wonder how in the world Toro got by with designing and building a ZRT mower without an independent service brake. The standards contain an exception that allowed Toro to cheat 14.2.3.1 and get around it. 14.2.3.1.1.4 allows for an exception for "Combined lever seer and brake controls". (**Ex. 25**, p.31) In other words, this "voluntary standard" implies a separate, independent service brake and provides many different requirements depending upon the mower design, but an express exception allowed Toro to build a mower with a service brake that was completely vulnerable to complete failure and loss of control if a) a customer towed or pushed it and forgot to immediately reengage the bypass pins, or b) one or more of the hydrostatic motors failed, which happened with regularity. (See **Ex. 28**) Likewise, B 71.1 required no ROPS since it was a "residential riding mower", even though it weighed almost 600 lbs. (**Note:** Exhibit 28 was prepared before the Hillman mower was designed and built in 2013.)

53. Mr. Fear, who, along with a man named Steve Points, was Toro's representative to OPEI and hence, ANSI was quite candid that these minimum standards were developed for two reasons, 1) defense of personal injury claims and, 2) for marketability to retail outlets, like Lowes and Home Depot, not necessarily the safety of the mowing public. (**Ex. 35**; **Ex. 36**; **Ex. 37**; **Ex. 38**) Exhibit 38, a 2009 memo produced by Toro, confirms OPEI's function of helping mower manufacturers defend product liability suits against injured customers. (See **Figure 12**, below)

ROPS litigation.
- Plaintiffs are now arguing over crash worthiness of the vehicle regardless of the circumstances of the case.
- Relate your facts and information based on what was known when the machine was built. Don't only use the information you know today.
- What changed since the machine was built, what has been learned, etc.
- Jury will review decals to see if they understand them.

Z accident data.
- Industry data collected from OPEI members (7 companies).
- 165 data reports
- 101 injuries or deaths – 67 deaths.
- 10% on machines less than 400 kg – no ROPS – 7 deaths of 10 cases.
  - 30% ROPS would prevent.
  - 40% unknown if ROPS would prevent.
  - 30% ROPS would not prevent – 2 falls over 8 ft, 1 fall into water.

**Figure 12**

Let's turn to the testimony of Toro's Chief of Safety when the Hillman ZRT was designed and

built:

> *In fact, you authored a memo in which you*
> *said, and I quote, "If somebody gets hurt*
> *it's always better if we have a standard,"*
> *didn't you? (Emphasis mine)*
> *A. I don't recall. I may have said something*
> *like that.*
> *Q. Yeah, that would be -- it's always good to be*
> *able to point to a standard that you*
> *supposedly qualified if somebody is injured*
> *and you can claim the standard was part of*
> *your safety operation, correct?*

(**Ex. 26**, 61:4-14)

> *But, in fact -- well, I'm going to ask a*
> *question generated by your last comment. In*
> *other words, if you -- you're saying that if*
> *a manufacturer built a ZRT mower, or any*
> *implement for that matter, that was below*
> *these standards, they probably wouldn't be*
> *able to market it because the large*
> *organizations would not see it as complying*
> *with the minimum standards of ANSI, correct?*
> *A. That's correct.*

(***Id***, 61:24-62:8)

74

> *Now let's look at the other side of*
> *the coin. Any manufacturer, including Toro,*
> *is free to exceed the safety requirements of*
> *ANSI; is that true?*
> *A. Yes. It's true.*
> *Q. Any manufacturer that wants to can exceed the*
> *durability standards, the safety standards,*
> *correct?*
> *A. Yes.*
> *Q. Okay.*

(***Id***, 62:10-19)

**l.  Defense Expert Lisa P. Gwin, DO and the Cartoon Opinion**

54. Toro hired Lisa P Gwin, DO of Byodynamic Research Corporation (BRC) in Austin, Texas, to opine that even if Toro had equipped the Timecutter with a ROPS, it would not have saved Rebekah Hillman from catastrophic harm; thus, allowing Toro to argue at trial that one of the most glaring acts of their negligence, failure to equip a 600lb. Timecutter ZRT mower with a ROPS was not a proximate cause of harm, thus saving Toro from one of the three very bad decisions they made in the design (no independent service brake, no ROPS and the complete lack of very important warnings and instructions).

55. BRC is a private corporation which provides expert witness services to defend lawsuits on behalf of insurance companies, automobile manufacturers, and a wide variety of other companies. (See, brconline.com) Dr. Gwin admitted that all of her time for many years has been solely dedicated to testifying in court and not any clinical medical practice. When questioned about her extensive (5-page) testimony list, she admitted that out of 52 cases in which she has been involved in the past 4 years, she was retained by counsel for an injured person in one case. After discussing that she represented defendants in a series of cases, we had the following exchange:

> *Okay. Okay. So now we are on Exhibit 15, I*
> *17 take it? Savani -- or I'm sorry -- Rodriguez*
> *18 versus Nissan. Were you hired by Nissan?*

*19 A. Yes, Nissan lawyers definitely hired me on that*
*20 one, yes.*
*21 Q. Ben Watson versus Maketa? Defense?*
*22 A. <u>Yes. If you like, not to be a smart aleck, but</u>*
*<u>23 the only one that's on there, on my whole</u>*
*<u>120</u>*
*<u>1 testifying history, is a trial and depo in the</u>*
*<u>2 same case where I was hired by plaintiffs.</u>*
*3 Q. And which one is that?*
*4 A. Switalski versus Clevenger.*
*5 Q. Okay. Can you tell me which page that is on?*
*6 Oh, there it is.*
*7 A. Yes.*

(**Ex. 29**, 119:16-120:7) (<u>Emphasis mine</u>)

56. For an accident reconstruction by a gentleman named Bonugli and Dr. Gwin's opinions, Toro has been charged approximately $100,000 before trial and not counting recent billings (**Ex. 29**, 126:20-127:7) and BRC charges $550/hour for Dr. Gwin's time. Her time has been dedicated 100% to litigation since October of 2016, (*Id*, 127:6-7) Gwin claimed she was a principle in the company but did not know how much of the $550/hour she receives as salary. She claimed it was all done in the accounting department and it was just math. (*Id*, p.130)

57. Dr. Gwin is paid based on the hourly billings. The more she works and bills, the more she is paid. (*Id*, p.131-p.133).  Before being hired in this case, Dr. Gwin was retained by Toro in <u>McCall v. Toro</u> and <u>Reising v. Toro</u> and, in both cases, like the Hillman case, she testified that a ROPS would not have protected the plaintiff from injury. (*Id*, 57:3-10)

58. Gwin adopted the accident reconstruction of Mr. Bonugli, a colleague at BRC.

*So that whole section starting on Page 6 is*
*17 called incident reconstruction, and it starts,*
*18 With according to the reconstruction of*
*19 Mr. Enrique Bonugli. So that whole section*
*20 that ends with the sentence that you just read*
*21 is a summary of Mr. Bonugli's opinions as they*
*22 relate to my incident -- my biomechanical and*
*23 injury causation and human kinematics opinions.*

76

*50*
*1 So I think I must have gotten those from*
*2 Mr. Bonugli, those words from Mr. Bonugli.*

(***Id***, p. 51, L. 16 through p. 50, L. 2)

59. Gwin agreed with Plaintiffs' expert, Kelly Kennett, on everything except whether or not the ROPS would have prevented serious injury. (***Id***, 59:15-19) The primary opinion Toro wants to elicit at trial from Dr. Gwin is that Rebekah Hillman's head would have suffered catastrophic injury because it would have stuck up out of the protected area created by the ROPS on the exemplar mower. (See Series of photos below as Gwin's illustration of her opinion of Rebekah Hillman's movement if she was belted and had the exemplar Timecutter with a ROPS on it.)



**Figure 13 – Gwin's Cartoon Opinion**

60. Dr. Gwin did not use any Toro, ROPS testing with real humans. Rather, a BRC employee named Mr. Martini essentially created the cartoon figures that illustrate her opinion. Gwin created her exemplar lady in the illustration.

*Q. Okay. And let me grab your report, which is*
*4 Exhibit 1, and -- I'm not clear on the lady*
*5 with the ponytail. Where did she come from?*
*6 A. So knowing Ms. Rebekah Hillman's height and*
*7 weight, this is a modeling program used by*
*8 Mr. Martini called Poser and it creates human*
*9 models based on height and weight*
*10 characteristics which uses anthropomorphic*
*11 characteristics of American humans based on*
*12 height and weight using like the human factors*
*13 or ergonomic studies that have been done to*
*14 know, you know, typical arm length and seated*
*15 height and leg lengths and things like that*
*16 based on height and weight.*
*17 Q. So the figure depicted in Exhibit 6 on the*
*18 mower is a computer-generated person created*
*19 from Poser based on height and weight; is that*
*20 right?*
*21 A. Yes. Put into the 3D model of the mower that*
*22 we talked about before in a program called*
*23 Cinema 4D.*

(**Ex. 29**, 79:15-80:23)

61. The fatal flaws in Dr. Gwin's opinion are:

   a. There is no dispute that the mower did not go over the wall, rotate in the air and fall flat as Gwin has depicted it for dramatic effect. Rather, the mower went over the wall, nose down, and the very front end of the mower struck the ground first, absorbing all of the energy of the downward motion, then simply tipped over on its handles. (**Ex. 15**, p.8-p.15; **Ex. 29**, 93:1-4) and,

   b. Gwin's computer-generated human is not acting like a real human under a ROPS who has time to use hands to cushion or deflect forces, or just lean back or over to avoid getting scratched up after the mower lands and then just tips over. See **Figure 13**, above, and **Figure 14**, below)

62. The full 600lbs. of mower landed on Rebekah's legs, with the mower almost vertically falling, then just tipped forward and fell over her, as depicted by Mr. Bilek and corroborated by sworn testimony.



**Figure 14 – John Deere 717A ZRT Mower with ROPs showing operator can lean outside periphery of ROPS (See Ex. 14, p. 20)**

63. Gwin admitted that the artificially created figure on her "opinion" illustration could have leaned backwards, sideways and stayed within the protected space of the ROPS. (**Ex. 29**, 88:18-89:23)

64. Finally, Plaintiffs' expert, Thomas Berry, discovered that Mr. Martini and Dr. Gwin got the illustrated scaling of the ROPS on Gwin's demonstrative mower cartoon wrong. So, the basis of Dr. Gwin's illustrated opinion is also just plain wrong. (**Ex. 29**, 93:1-96:16)

## C. ARGUMENT

### i. Law Governing Summary Judgments

1. Plaintiffs agree with paragraph 8 of Toro's argument regarding the legal standard for summary judgement under Fed. R. Civ. P. 56. On summary judgement, Court has but one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires trial. On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Betaco, Inc. v. Cessna Aircraft Co.,* 32 F.3d 1126, 1138 (7th Cir.1994); *Sarsha v. Sears,*

*Roebuck & Co.,* 3 F.3d 1035, 1041 (7th Cir.1993);  *Payne v. Pauley U.S. Ct. of Appeals, 7th Circuit, 337 F. 3d. 767 at 770 (2003)* (citations omitted) If a reasonable jury could return a verdict for a non-moving party, summary judgment is not appropriate. *Id,* at 770.

2.   The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The non-moving party must "respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017)

3.   As the Court can see from the Plaintiffs' Statement of Additional Facts, and the evidence attached hereto, Toro's Motion for Summary Judgement has no merit, as it ignores substantial evidence and facts which support every element of Plaintiffs' claims for negligence and products liability.

**ii.**     **Plaintiffs Have Substantial Evidence of Proximate Cause for Their Claims of Product Liability and Negligence**

4.   In reviewing the plethora of evidence of proximate cause attached to Plaintiffs' Resistance, it strains the bounds of credulity when Toro claims "plaintiffs cannot establish proximate cause for their strict product liability and negligence claims" (Dkt. 113, p. 26 Section C(II)) The Court could simply review the expert witness reports of Thomas Berry, David Bilek and Kelly Kennett (Ex.14, 15, and 24) and deny summary judgment. However, Plaintiffs have also discovered and attached damaging admissions, knowledge, and sworn testimony of Toro 30(b)(6) representatives, former and current employees, all of which reinforce this relatively simple, straightforward case of design defects and negligence by Toro in the design of Toro ZRT[6] mowers.

---

[6] ZRT zero-radius turn mowers—all of which share common design features.

5.   Plaintiffs generally agree with Toro's stated elements of a design defect and negligence claims on page 26, Section C(II). Common to both is the requirement of proximate cause.

6.   Plaintiffs claim that the following aspects of the Toro's Timecutter model ZRT sold to the plaintiffs were defects which rendered the machine unreasonably dangerous.

**a.  Controls and Lack of Braking**

7.   The controls of the Timecutter relied on two hydrostatic drive motors which provided all power, steering and braking for the machine through two "control levers" on each side of the operator, and Toro provided two small "bypass pins"[7] for towing or pushing the mower. The bypass pins disconnected the hydrostatic motors canceling all power, steering and braking. In addition, when one or both hydrostatic motors failed (which was not uncommon) the machine lost control, and often even braking, for the same reason. This is known as a single point of failure.[8]

8.   Instead of providing an independent service brake to slow and stop the machine, independent of the hydrostatic motors in the event of hydrostatic failure or if someone forgot to reset the tow valves after towing (the situation here), Toro only had what it called a park brake which was not designed to slow the machine and stop it, only to lock it in place once it stopped. The park brake would not stop the machine if it was moving.  (See Illustration No. 1, below.)

---

[7] Toro also refers to the bypass pins "tow valves" on page 48 in the troubleshooting table-the same entry demonstrates it was foreseeable to that people would get stuck or the machine would break down and need to tow it. The same entry shows Toro knew people would forget to close the "tow valves" (Ex.17, p.48)

[8] Scientists and safety engineers refer to a SPOF (single point of failure) as a computer program, machine or system which, if one component fails, the entire system suffers catastrophic failure.



**Illustration No. 1 – This is a photo of the under-side rear of the Hillman ZRT mower, showing left and right Hydro-Gear motors for rear wheels, along with park pawl and gear of what should have been called a park lock, not a brake.**



**Illustration No. 2 – This is a close-up photo of the under-side rear of the Hillman ZRT mower, showing parking brake on left Hydro-Gear motor. Pawl on electrically operated rod, shoved into the gears of the gear wheel to lock mower in place, but the device was not designed to decelerate the**

**mower and stop it once it was moving. The rotating wheel just ground against the pawl teeth but was not an effective brake.**

### b.  Lack of Warnings and Instruction

9.  Hydro-Gear, the manufacturer of the hydrostatic motors on the Timecutter, warned customers like Toro that failure of the hydrostatic motors resulted in the loss of steering and braking. Toro intentionally chose not to pass this warning on to its customers. Toro failed to warn of the danger of complete loss of control in the event an operator failed to reset the bypass pins after towing the machine.

### c.  Lack of Rollover Protective System (ROPS)

10. After dozens of reported deaths and serious injuries from loss of control events with attendant tip-overs, rollovers and falls over retaining walls and drop offs, with its commercial size/heavy grade ZRT mowers, Toro was forced to retrofit old commercial mowers with a ROPS by their then CEO, Ken Melrose. However, when Toro began to build ZRT mowers for residential customers who were not willing to spend $15,000 on a lawnmower, Toro decided to omit ROPS from residential ZRT mowers, such as the Timecutter and Exmark Quest brand.[9] A ROPS includes two components, a seatbelt to hold the operator in the seat and a frame which protruded upward from behind the operator to create a protected zone in the event of a rollover or fall over a drop off.

11. There is no real claim by Toro that its control design without an independent brake, coupled with the bypass valves for towing (or hydrostatic motor failure), along with a parking brake that could not slow and stop the machine if it was moving, was a not a factual cause of the loss of control on the hill when Rebekah released the park lock. Equally connected as an additional defective cause-in-fact, was Toro's decision to sell the Timecutter without a ROPS to prevent her

---

[9] Toro purchased Exmark and continued to design, build and sell ZRT mowers branded as the Exmark Quest.

injury in case of a loss of control rollover, tip over or drop off. The only hope for Toro is the claim that the second requirement for proximate, legal cause cannot be proven. Plaintiffs have now provided this Court with their voluminous response to Toro's allegedly undisputed facts and Plaintiffs' own statement of additional facts, which demonstrate that Plaintiffs have a substantial amount of proof to establish legal cause.

12. In the case of *In Re Boeing 737 MAX Pilots Litigation*, U.S. District Court Judge Steven Seeger presided over a case brought by airline pilots who had not been in any crash of the now infamous Boeing 737 planes, which crashed due to autopilot control and software defects. *In Re Boeing 737 MAX Pilots Litigation,* 638 F. Supp 3d 838 (E.D.Ill.2022). The plaintiffs sought money damages, alleging that they had suffered significant economic losses due to furloughs brought on by the necessary grounding of the Max 737 fleet after the horrific crashes. Boeing filed a Motion to Dismiss the suit, alleging the pilots could not prove the second half of the proximate cause equation, the legal cause requirement.

13.   The difference between the Boeing litigation and Toro, in this case, is that, despite Toro's protestations, misrepresentations and conflation of facts, the owner's manual for the accident mower demonstrates that Plaintiffs' tragic accident was foreseeable, known and expected by Toro. In the troubleshooting guide on page 48, there are three columns. At the top of column marked "Problem" one problem is described as "*The machine does not drive*". In the next column is "Possible Causes" and number 1 is "*The bypass valves are open*", and for "Corrective Action" is listed *"1. Close the tow valves."* (Plaintiffs' Statement of Additional Material Facts "SOAMF", ¶18) Toro's claim that this situation was not foreseeable contradicts their own evidence.

14.  Clearly, Toro had actual knowledge that opening the bypass valves was necessary for pushing or towing the mower if it got stuck or broke down. Toro put the instructions on the back

of the mower and in their owner's manual on opening the tow valves. The very fact there was a "troubleshooting" page with the suggestion to disengage the bypass pin shows Toro anticipated people would forget. Otherwise, why would people be troubleshooting that problem if they remembered what was causing the issue? Toro had actual knowledge that the mower had no steering control or service brake if the valves were open because that is exactly how they designed it. They had actual knowledge that if the park brake was released and the mower started to move, loss of control was instantaneous, and potentially lethal, because there was no service brake and Toro had a long history of loss of control incidents where mowers rolled over, tipped over and went over drop offs with often lethal results because they had no ROPS. Perhaps, Toro should have read its own owner's manual before they decided to waste this Court's time on this Motion.

15. In *Boeing*, Judge Seeger included a substantial discussion of the meaning of "legal cause" because, as the term "legal cause" is not as simple as it might seem:

> *"The second requirement, legal cause, is more difficult to pin down. For starters, the terminology can get in the way and cause a little trouble. Most of the time, proximate causation is another name for legal cause, meaning that it is a subset of the broader causation inquiry. But Illinois courts use "proximate cause" more broadly as an umbrella term, covering both factual cause and legal cause…."*
> *"Courts ask whether the injury is the type of injury that a reasonable person would see as a 'likely result' of his or her conduct, or whether the injury is so 'highly extraordinary' that imposing liability is not justified." Turcios, 392 Ill.Dec. 541, 32 N.E.3d at 1124. For an act to be the proximate cause of a harm, "the injury suffered by the plaintiff must be the natural and not merely a remote consequence of the defendant's act." Martin v. Heinold Commodities, Inc., 163 Ill.2d 33, 205 Ill.Dec. 443, 643 N.E.2d 734, 746 (1994) (quoting Town of Thornton v. Winterhoff, 406 Ill. 113, 92 N.E.2d 163, 166 (Ill. 1950))."*

*Id.,* at 851-52

16. Toro is a multibillion-dollar manufacturer of everything from lawnmowers of all shapes and sizes, to snow blowers and irrigation systems. Toro had a duty to build a reasonably safe mower for all foreseeable use, misuse and common mistakes by consumers, if removal of the hazard or mitigation of injury was feasible. Plaintiffs' expert, Thomas Berry, has a tremendous

amount of engineering experience and knowledge regarding ZRT mowers, their history of design and innovation, as well as their history of injury and death. Mr. Berry's report, coupled with the admissions in documents and employee testimony, satisfies the requirement of proof of legal cause.

17. Proximate cause is a jury determination, except in extreme cases, and this is not one of those exceptions. Given Plaintiffs' overwhelming evidence of cause in fact and legal cause (foreseeability), Toro's legal arguments are weak and curious to say the least. For example, Toro's citation of *Malen v. MTD Products, Inc.* appears to miss the point of the whole decision. *Malen v. MTD Products, Inc.,* 628 F.3d 296, 309 (7th Cir.2010) The *Malen* court stated, "if multiple factors have combined to cause an injury, Illinois law asks whether the defendant's conduct was a "substantial factor" in bringing about the injury." *Id.* It is a fact that Toro's control system, lack of brake. Lack of warning and instruction and lack of ROPs all contributed to Rebekah Hillman's injuries. But for those design defects, she is not hurt.  These facts are clearly spelled out by Plaintiffs, and Toro is aware of those facts.

18. Toro's citation to *Malen* is also odd, as the reasoning and holding provide excellent arguments against Toro's requested relief. In *Malen*, the plaintiff purchased a riding lawn mower that was designed with a safety interlock system to shut off the blade. The plaintiff rode it for years, never realizing the interlock system had somehow been disconnected and was inoperable. *Id.* at 299. The plaintiff then got the mower stuck, dismounted the mower and attempted to dislodge the clog and was injured. The plaintiff alleged the interlock system was inoperable but the district court held the plaintiff was at fault and the sole cause of the accident, granting summary judgment on behalf of the defendant.

19. The 7th Circuit found the efficacy of the interlock system to the facts of the case was in dispute by the parties and summary judgment was not appropriate. *Id.* at 309. The *Malen* court addressed the argument whether the plaintiff's conduct caused the injury and stated that "[l]egal cause is established if the defendant's conduct is so closely tied to the plaintiff's injury that the defendant should be held legally responsible. Legal cause involves an assessment of foresee-ability, in which Illinois courts ask whether the injury is of a type that a reasonable person would foresee as a likely result of his conduct." *Id.* at 310 (internal citations and quotations omitted).

20. The *Malen* defendant's argument was identical to Toro's, which is the accident scenarios was so complicated it was unforeseeable. *Id.* The 7th Circuit made quick work of this argument, noting that even when a plaintiff may be negligent, accidents are natural, foreseeable consequences of using certain products. *Id.* at 311. A reasonably foreseeable intervening act does not relieve a defendant of liability. *Id.* See also, *Wright v. General Motors Corp.,* 479 F.2d 52, 53 (7th Cir.1973) (the intervening force must itself be outside the range of reasonable anticipation as a consequence of defendant's conduct and where the intervening force was a reasonably foreseeable consequence is one over which reasonable man might differ, the issue of proximate causation should never be determined as a matter of law).

21. The issue of proximate cause is slightly different in the context of products liability as well, as manufacturers have a duty to furnish a product that is safe for foreseeable misuses. *Spurgeon v. Julius Blum, Inc.,* 816 F. Supp. 1317 (C.D. Ill.1993) Naturally, unforeseeable misuses do not incur liability for a manufacturer.

22. Toro attempts to frame this case like the defendant in *Malen*, while ignoring the 7th Circuit's actual holding. Toro argues that the facts are nothing more than a series of missteps by Plaintiffs and these missteps are so unpredictable they become the "sole proximate cause".

However, all of Plaintiffs' actions were contemplated in the operator's manual alone, which makes them foreseeable, and any potential fault of Plaintiffs an issue of comparative fault.

23. Even if Plaintiffs may have some comparative fault in this case (which they deny), and even assuming Plaintiffs were at fault, this does not relieve Toro of liability. In *Malen*, the 7th Circuit found that the District Court erred when it concluded that the plaintiff's disregarding of an explicit warning was enough to break the chain of causation given the crashworthiness doctrine in Illinois. *Malen,* 628 F.3d at 312–13. A jury could still conclude the product was unreasonably dangerous and that the "absence of a functional safety mechanism [] was the proximate cause of [plaintiff's] injury." *Id.* The court continued stating that even though the plaintiff "initiated a chain of events that ended with him being injured…the crashworthiness doctrine obligated the defendants to foresee the potential for this type of accident." *Id. Malen* continued stating that even if the plaintiff's actions were negligent, this goes towards apportioning comparative fault and so long as the plaintiff was not more than 50% at fault, he was not barred from recovering. *Id.*

24. Ultimately, this case is an attempt by Defendant to overcomplicate the facts to make it seem so unforeseeable that they could never have predicted this incident. In reality, when one sifts through Toro's contorted version of the facts, ignores the empty rhetoric, and looks at what Toro knew, as well as what it should have known, proximate cause is quite evident. Interpreted in the light most favorable to Jennifer and Rebekah Hillman and their family, this case should go to trial and let an Illinois jury decide proximate cause.

### iii. Plaintiffs Have Provided Ample Evidence to Submit the Issue of Proximate Cause to The Jury

25. Defendant's Motion for Summary Judgement is premised on a parade of hotly disputed facts. Toro adds a multitude of immaterial facts (such as the façade of ANSI standards) to make the facts of this case seem far more complicated than they are.

26. After towing the mower to a place of safety, Plaintiffs forgot to close the "tow valves", started the mower, and disengaged the park lock while on a slope. There is no evidence on the record that once the mower started rolling, there was anything Rebekah could have done to avoid injury. Toro's control system created that scenario, which could have just as easily occurred if one or both of the hydrostatic motors failed, such as from a belt breaking, running out of gas, etc. As Plaintiffs point out in Toro documents, Toro has reports of a fatal loss of control due to motor failure.

    a.  **It is reasonably foreseeable that the failure to include a true "brake", rather than a park lock, would lead to injury.**

27. Plaintiffs can establish it is reasonably foreseeable that the failure to include an independent service brake, rather than a park lock, would lead to injury. To establish this, Plaintiffs must show: (1) Toro must reasonably foresee their customers operate their ZTR mowers on slopes; (2) it is reasonably foreseeable that the hydrostatic motors would be inoperable due to the bypass pins being engaged (or for any other reason); and, (3) a ZTR mower without the ability to turn, brake or otherwise maneuver on a slope could cause injury.

28. Since Toro spends so much time and energy warning their customers about operation of their ZRT's on slopes, one can assume they know their customers drive on slopes to mow their grass. (Dkt. 113, ¶7.29)

29. It is undisputed here that the slope the Hillmans parked the mower on was less than 15 degrees in all directions and that Rebekah was mowing in the "safety zone", some 9 feet from the retaining wall, demonstrated by the fact she even got stuck in the flowerbed, shut it down safely, and she and Jennifer towed it out of the flowerbed without any injury or damage to the mower.

30. As to the second point, it is reasonably foreseeable to Toro that the hydrostatic motors often failed while its ZRT mowers were in motion. (**Ex. 28**)

31. Finally, it is reasonably foreseeable that a ZRT or Timecutter mower without the ability to brake, or otherwise maneuver, on a slope will lead to loss of control and will likely lead to injury due to tip over, rollover or drop off, such as a retaining wall common to many landscapes. As Carol Drutowski, Toro's 30(b)(6) designee, admitted, a ZRT mower weighing 600lbs. and falling on someone could obviously injure them (**Ex. 12**, 118:15-119:6)

32. Even in circumstances such as the present one, where Rebekah Hillman was mowing far away from a hazard, it is certainly foreseeable that a mower in a similar situation that loses power, for any reason, *could roll into* a hazard, as the operator has no way of stopping or redirecting it.

**b. Toro has actual knowledge, and in fact promotes the knowledge, that failure to equip the Timecutter with a ROPS would lead to preventable injury.**

33. Plaintiffs have documented Toro's actual knowledge that a ROPS would have been very successful in mitigating and preventing injuries when mowers tip over, rollover, or fall from drop offs due to operator error or loss of control. Toro produced a ZRT safety video, included with Plaintiffs' evidence, which repeatedly reinforces that ROPS save lives and injuries if a ZRT equipped with a ROPS is involved in a loss of control, tip over, rollover or fall over a drop off. (**Ex. 19**)

**c. It is reasonably foreseeable that the failure to warn Plaintiffs regarding the lack of a true "brake" and the lack of a ROPS would lead to injury.**

34. In the present case, Plaintiffs allege Toro failed to warn regarding: (1) the lack of a true "brake" or the fact that, once the hydrostatic motors were disengaged, the mower had no way of braking and, (2) the lack of a ROPS made the mower dangerous. As to the first point, Plaintiffs contend that Toro should have warned that, once the bypass or tow pins were opened, the hydrostatic mowers were disconnected from the controls and the mower had no ability to brake or

maneuver whatsoever. Toro has admitted that it gave no such warnings in the operator's manual or on their machine.

35. Furthermore, Toro was aware of this danger as the manufacturer of the hydrostatic mower Toro purchased *gave this precise warning*. (SOAMF ¶34) Toro reviewed this warning as it purchased the product, ignored it, intentionally chose not to pass it on to their customers, and now claims such a circumstance was unforeseeable. For all their criticisms of Plaintiffs for failing to heed their alleged warnings, it is strange Toro received and chose not to pass on the warnings of the manufacturer of Timecutter parts.

**d. The Toro Timecutter mower is defective under both the consumer-expectation test and the risk utility test.**

36. The present case is a design defect case and for design defect cases a plaintiff may proceed under two alternative methods of proof to show a product is unreasonably dangerous; the consumer-expectation test or the risk utility test. *Walker v. Macy's Merchandising Group, Inc.,* 288 F.Supp.3d 840, 857 (N.D.Ill.2017) Where the two tests yield conflicting results, the risk utility test triumphs and the when both tests are employed the consumer expectation test is one factor in the multifactor risk-utility analysis. *Id.* "If the evidence is sufficient to implicate the risk-utility test, the broader test, which incorporates the factor of consumer expectations, is to be applied by the finder of fact. Additionally, whether a product is defective is ordinarily a question of fact for the jury to decide." *Id.* (internal quotations and citations omitted) In the present case, it has not yet been decided when test will be utilized by the jury but Plaintiffs' case survives summary judgment under either test.

37. Toro's analysis of *Walker* and the application to the present case is mistaken. The *Walker* case involved a claimant who was wearing a shirt manufactured by Komar and a jacket worn over her shirt purchased from Macy's. When the plaintiff was wearing these two articles of clothing

she leaned over a stove and the jacket quickly caught fire and the jacket burned rapidly and easily, causing the shirt to catch fire as well, and burned the plaintiff.  What is important about this case (and what Toro conveniently omits) is the Court found proximate cause could be established against Macy's, who made the jacket, but could not be found against Komar, the manufacturer of the sleepwear/shirt-under-the-jacket.

38. The *Walker* plaintiff presented expert evidence that the average consumer would not understand that the jacket from Macy's would ignite and burn so easily, which made it more dangerous than other similar jackets. Macy's also defended the case claiming the jacket complied with flammability standards but the Court noted that this is evidence of negligence and was not dispositive of the design defect claim.  *Id.* at 861.  In reviewing these facts, the Court determined that Plaintiff created a triable issue of fact as to the defectiveness of the jacket and denied summary judgment. *Id.* However, the Court found that the plaintiff had not presented any argument as to the idea the sleepwear, as opposed to the jacket, was the legal cause of her injuries, only arguing speculatively that the sleepwear increased the fuel load and the rate at which it burned. Plaintiff had no evidence that it was reasonably foreseeable that the sleepwear would ignite after coming into another article of clothing that was on fire.

39. In comparing *Walker* to the present case, Toro would be analogous to Macy's, the manufacturer of the jacket, rather than Komar, the manufacturer of the sleepwear. Unlike the sleepwear, Plaintiff has presented evidence (in fact, Toro presented evidence via their operator's manual) they foresaw loss of control incidents, tip overs, and the warning from the hydrostatic gear manufacturer warned of total loss of braking if the motor lost power. The Court in *Walker* found it was foreseeable that the jacket manufactured by Macy's would be exposed by a consumer

to flame and there was evidence it was the proximate cause of the plaintiff's injuries. Therefore, Macy's was *not* successful at the summary judgment stage.

40. Toro then moves on to a mistaken analysis of the consumer-expectation test and risk-utility test as set forth under *Walker*. Clearly, under either test, Plaintiffs' claims would survive summary judgment, as there is sufficient evidence of proximate cause.

    **e.   The Timecutter is defective under the consumer-expectation test, as it did not perform as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.**

41. Under the consumer expectation-test a party may prove a product's design was unreasonably dangerous by showing the product failed to perform as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. *Id.* at 858. Jennifer Hillman testified she had no idea that what Toro called the "electric brake" (actually the park lock) would not stop the mower if the hydrostatic motors were bypassed by the tow pins. (**Ex. 21**, 393:14-394:15, 363:7-364:6, 369:1-10) This test is an objective standard based upon the average, ordinary expectations of a reasonable person and is not dependent upon the subjective expectation of a particular consumer or user of the product. *Id.* In this test, no evidence of ordinary consumer expectations is required as the jury may rely on their own experiences to determine what an ordinary consumer would expect. *Id.* What would most people think an "electric brake" would do? This is the role of a jury.

42. Consumers (such as Jennifer Hillman) can and should expect the manufacturer to point out and warn of hazards which will be encountered using the product for normal and use and even foreseeable mistake or misuse. Yet, Toro failed to warn of one of the most important hazards associated with this mower, loss of control with no brake to bring the machine back under to control. A reasonable consumer would not expect a company as large and profitable to create a

mower without a brake. This is a simple lack of responsibility on the part of Toro. Toro created a machine that could, and did, lose all its control-steering and stopping in a second with no redundancy or back-up to save the operator from harm.

43. Finally, after promoting ROPS and bragging about the safety they added to the product, on all of its more expensive mowers, Toro decided that homeowners, and whomever bought a "residential mower", did not deserve the protection of a ROPS in case of a very foreseeable, and often deadly, accident scenario. Any consumer who was aware of the hazards of this machine via Toro's accident history would demand a ROPS.

44. Both of these concepts fit nicely into the consumer-expectation test as set forth in *Walker*. In *Walker*, the plaintiffs argued the average consumer would not expect the jacket to ignite and burn so easily, supporting it with expert testimony. Macy's argued that an average consumer would expect the jacket to catch fire if exposed to open flames. However, the court held it was the *ease* at which the jacket caught fire and burned was a question for the jury to decide. *Id.* at 860. In the present case, the consumer-expectation is far clearer in establishing proximate cause. The question in this case is, would a consumer expect a 600lb. mower that experiences a loss of power to be able to brake on a slope and be outfitted with equipment to protect from a predictable (by the manufacturer) roll. Certainly, Plaintiffs expected the electric brake to operate as a brake, and a jury would hold the same opinion.

**f. The Timecutter is defective under the risk-utility test, as there were available alternative designs at the time, the injury was foreseeable, and the factors clearly weigh in Plaintiffs' favor.**

45. The Timecutter is also defective under the risk-utility test, which utilizes a similar analysis. "Under the risk utility test, a plaintiff may prove a design defect by presenting evidence of the availability and feasibility of alternate designs at the time of its manufacture, or that the design

used did not conform with the design standards of the industry, design guidelines provided by an authoritative voluntary association, or design criteria set by legislation or governmental regulation. Other factors that may be relevant include the utility of the product to the user and to the public as a whole, the safety aspects of the product including the likelihood that it will cause injury and the probable seriousness of the injury, and the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility." *Id.* (internal citations and quotations omitted)

46. Design-defect cases that survive summary judgment under this theory, are generally those in which the plaintiff has provided evidence to create a material issue of fact for "**at _least one of_** the above risk-utility factors." *Id.* (emphasis added) Design defect cases "that have *not* survived summary judgment are those in which **_all_** risk-utility factors weighed in the defendant's favor or the plaintiff failed to present **_any_** evidence to create a factual dispute as to the any of the risk-utility factors." *Id.* (emphasis added) In other words, Plaintiffs only need to present a factual dispute on *one* of the risk-utility factors in order to survive summary judgment.

47. If a plaintiff provides expert evidence that an alternative design would have protected against the type of injury suffered that is sufficient to defeat summary judgment. *Id.*  In the present case, Plaintiffs have presented evidence of alternative designs, the safety aspects of the product, the manufacturer's ability to eliminate the unsafe aspects of the product, and more.

48. As far as the brake is concerned, Plaintiffs' expert, Tom Berry, has presented an alternative design for the brake, which is manufactured by Hydro-Gear, the manufacturer where Toro currently buys its hydrostatic mower from. (SOAMF ¶38) It is an actual disc brake rather than

simply a park lock involving two cogs. Tom Berry has also opined this is feasible in contrast to Porter's self-serving testimony.[10]

49. Toro next argues Plaintiffs have not presented any evidence of an alternative design for the ROPS or tested its efficacy. Such an argument is clearly made in bad faith. Plaintiffs have presented evidence of Toro's own ROPS as an alternative design. (Response to Def. SOF ¶7.33) Plaintiffs have also presented expert evidence regarding the efficacy of ROPS.

50. Toro's argument that the Timecutter complies with ANSI standards is also a fact question. Even if Toro complied with industry standards, the *Walker* case is instructive that this by itself does not require summary judgment in a defendant's favor. *Id.* at 863. Toro cites to *Winters v. Fru-Con Inc.* in support of their contention here. *Winters v. Fru-Con Inc.,* 498 F.3d 734 (7th Cir.2007) In *Winters,* all of the plaintiff's evidence of strict liability was struck except for an allegation that the failure did not comply with OSHA requirements. *Id.* at 744-45. However, the plaintiff in that case failed to provide any evidence how the OSHA violation would have impacted any proposed alternative design or would have presented the injury. In the present case, Plaintiffs' experts have not been struck, and Plaintiffs have presented a litany of facts satisfying every factor of the risk-utility test.

51. There is also the question about whether Toro even complied with the ANSI standards, and questions regarding Toro's role in promulgating them. ANSI standards require a manufacturer to design out issues if possible. (Response to Def. SOF ¶7.23) Toro has not done this and so, compliance is a fact question for the jury. Furthermore, ANSI standards were promulgated in large

---

[10] Despite Toro's representations to the contrary, Porter's testimony, as cited in Toro's brief, refers only to the questionable testimony that an *interlock* would render maintenance of the hydrostatic transmission impractical, which isn't credible to say the least. It doesn't address the addition of a service brake to replace the park lock. (Dkt. 113, p. 35)

part by OPEI, and Toro is a leading figure on OPEI. In other words, Toro helped create the standard.

52. Notably, Toro pretends as if there are only two factors in the risk-utility test, which is inaccurate. Illinois courts, as set forth above, have presented a host of different factors for the risk-utility test and the consumer expectation test is one factor if the risk-utility test is used. As set forth above, the mower fails the consumer expectation test.

53. Another factor is the likelihood that a product will cause injury and the likelihood on its face that the product will cause injury. Removing the ability for a mower to brake or maneuver on a slope should it experience a foreseeable loss-of-power-incident is a recipe for disaster. Then imagine removing proven, highly effective safety equipment designed to protect the rider in case of a crash caused by loss-of-control events.

54. Another factor is the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility. Certainly, Toro was capable of putting on an interlock, adding a ROPS (as they did in other mowers at the time and similar sized mowers years later), and of adding an actual brake instead of the park lock.

**g. *Abrams* is inapplicable to the present case.**

55. Plaintiffs will briefly address *Abrams v. City of Chicago,* as Toro cites it as applicable authority; yet, never explains its applicability. *Abrams v. City of Chicago*,811 N.E.2d 670, 672, 285 Ill.Dec. 183, 185, 211 Ill.2d 251, 254 (Ill.2004) *Abrams* involves a claim by a resident of Chicago against the city for negligent failure to provide ambulance services to a pregnant mother in labor.  In *Abrams*, the City refused to provide an ambulance to a mother in labor due to the length of time between her contractions and the City referred the mother to a private ambulance

service. Instead, the plaintiff/mother called her friend who drove Plaintiff to the hospital and ran a red light on the way when it was then struck by a driver who was driving impaired and speeding.

56. The *Abrams* court found the failure to send an ambulance did not establish that it was foreseeable that two separate drivers would egregiously violate traffic laws and cause the crash. *Id.* at 259-60. The court noted that proximate cause is absent where the independent acts of a third person break the causal connection between the breach of duty and the injury and the independent act itself becomes a proximate or immediate cause. *Id.*

57. *Abrams* is clearly distinguishable as all of Plaintiffs' actions were foreseeable. Toro foresaw consumers would: forget to engage the bypass pins and noted it in their troubleshooting section of the operator's manual; use their ZRTs on slopes; tow their mowers; and ZRTs were prone to losing control. Toro was warned by the manufacturer that loss of power to the hydrostatic motors would eliminate the ability of the ZRT to brake and Toro intentionally chose not to pass that warning on to its customers. Toro was aware of all of this and now, when a foreseeable accident such as the present one arises, Toro claims it could not have possibly foreseen any of it. This is simply not credible and not analogous to *Abrams*.

### iv.   Plaintiffs Have Presented Adequate Evidence of Their Failure to Warn Claims

58. Plaintiffs have presented more than adequate evidence of its failure to design claims to deny Toro's motion for summary judgment. A "failure-to-warn claim will lie if a product has a latent defect or a dangerous propensity of which a user would normally be unaware and the defendant does not provide adequate warning of the defect or dangerous propensity." *Hakim v. Safariland, LLC,* 2023 WL 5344311, at *4 (7th Cir.2023) A warning may be defective if "it does not specific the risk presented by the product, it fails to provide the reason for the warning, or it fails to reach foreseeable users.  The adequacy of a warning is a question of fact typically directed

to the jury; of course, the mere fact that warnings were given is not conclusive evidence that the warnings were adequate." *Id.* (internal citations and quotations omitted)

59. Expert testimony for product defect claims is not always required. Illinois courts have "determined that expert testimony is required to support complex products liability claims in some cases…But it bears repeating that the adequacy of warnings is most often a jury question." *Id.* (internal citations and quotations omitted) Where warnings rather than design choices are at issue, a "jury need only determine whether there was a known risk and whether it was sufficiently disclosed. For this reason, numerous courts in this circuit applying Illinois law have not required expert testimony in the context of a failure-to-warn claim." *Id.*

60. The *Hakim* case involved a failure to warn claim regarding the failure to warn by a manufacturer that a certain type of shotgun shell, "breaching shells", did not disintegrate on contact with a wooden door as they were supposed to. The *Hakim* court found that the lay juror would understand the nature of the relevant risk and the substance of the warning without expert testimony. The concept that a breaching round, when striking wood, would not disintegrate was well within the comprehension of a layperson. *Id.*

61. Similarly, the idea that a mower on a slope that lost its hydrostatic mowers would have absolutely no ability to steer or brake and this result would be dangerous is well within the understanding of a layperson. An analogy would be like if a car lost the ability to steer or brake if it runs out of gas. Mowers are heavy pieces of equipment that roll and if an individual is riding a heavy piece of rolling equipment and if it is on a slope when the motor dies then the mower would have no ability to stop or steer it seems obvious this is dangerous. The need to warn a customer that there is no ability to stop the mower in such a circumstance is common sense.

99

62. There is also evidence that the warnings would have been heeded by Plaintiffs. Jennifer Hillman testified she read the warnings periodically and understood them. (**Ex. 21**, 114:17-115:5) There is also evidence the Plaintiffs heeded other warnings in the operator's manual and on the Timecutter, such as the warning regarding slopes and operating on wet grass. (**Ex. 21.** 115:11 – 116:11) Furthermore, the operator's manual did not warn anywhere the parking brake is not expected to stop the mower. (**Ex. 21**, 394:1-6) In the operator's manual it refers to the park lock as an "electric brake" 17 separate times. (**Ex. 21**, 394:10-15) Jennifer also testified she thought the mower had electric brakes and it would have stopped and didn't understand why the mower didn't stop when the electric (park) brake was engaged. (**Ex. 21**, 363:7 – 364:6, 369:1-10) Jennifer testified she understood the term "electric brake" to mean "brake", or something that was capable or slowing or stopping the Timecutter. (**Ex. 21**, 393:14-21)

63. Plaintiffs' testimony meshes with the basic definition of the word "brake". Oxford defines the word "brake" as "a device for slowing or stopping a moving vehicle, typically by applying pressure to the wheels."[11] Any layperson who drives a vehicle or knows the basic operation of vehicles understands what a brake is and what it is used for. The word "brake" is common parlance. Nevertheless, Toro repeatedly calls the parking "lock" an "electric brake" throughout its user's manual. However, *nowhere* does Toro state the electric brake is actually incapable of operating as a brake. In fact, Toro intentionally chose not to pass on the warning of the manufacturer that the lack of hydrostatic motors meant that the mower would be unable to apply any braking whatsoever. This is contrary to the expectations of Jennifer and Rebekah by the very events that

---

11

https://www.google.com/search?sca_esv=568605030&rlz=1C1GCEU_enUS922US922&sxsrf=AM9HkKljvp4RFPz1Az7Gzk-eRLgCsJCmmQ:1695759431811&q=brake&si=ALGXSlZC_jbid1uaZGfc4a798NDvaPRUOwP3gUi9xcVCQkk_kphglWsiXC7xyFPV5BWq5ZM5mveU-IeuBXLAkRqiAZ7iz3Ordg%3D%3D&expnd=1&sa=X&sqi=2&ved=2ahUKEwjl0bqUjMmBAxV8mYkEHa0-BO0Q2v4IegQIIhBr&biw=1920&bih=931&dpr=1

occurred.  Had either of them known that a loss of power event would remove *any* ability to steer or brake there is certainly a fact question as to whether Plaintiffs would have purchased the mower at all.

64. The case of *Hakim* also sets forth that where a defendant sells a product to a purchaser who then distributes that product to an end user, the defendant may still be liable for failing to provide adequate warnings to the purchaser even where the end user did not read the warnings.  *Id*. at 7, footnote 9.  In this case there is no evidence Toro warned the dealer the mowers it was selling had no braking capability.

**a.  The risk to Plaintiffs was not open and obvious.**

65. Toro makes an interesting argument in stating that the risk to Plaintiffs was open an obvious and that Toro escapes liability on this basis. Toro, on one hand, argues that Plaintiffs operated the Timecutter in such a careless fashion and there were so many complex circumstances involved that Toro could not have possibly foreseen this accident scenario.  On the other hand, Toro argues that the danger of this ultra-complex scenario was so open and obvious to Plaintiffs that they should escape liability. Toro has more expertise in designing and operating mowers than Plaintiffs.  If the risk regarding their mower for the complete absence of independent braking was impossible for Toro to contemplate, it is logically inconsistent that it would be open and obvious to laypersons such as Plaintiffs.

66. Clearly, the lack of a brake was not open and obvious as it ran contrary to the expectations of Plaintiffs as stated directly above.  Jennifer and Rebekah expected the electric brake to act as a brake and were confused why it did not.

67. There is also a fact question generated by the fact that the hydrostatic motor manufacturer felt the need to warn the consumer regarding the lack of control when there was a loss of power,

which suggests it was *not* open and obvious, and Toro intentionally chose *not* to pass that warning on to its customers.

**b. It is foreseeable that the failure to warn consumers the "parking brake" was not in fact capable of braking would lead to injury.**

68. The *Hakim* Court addressed a defendant's claim that the consumer acted improperly and should be relieved of liability, noting that the defendant provided virtually no legal analysis to support its position as to proximate cause. *Id.* This is similar to the present situation where Toro attempts to dress up the circumstances of the accident in order to make it seem so impossible and such a long string of events that it is not foreseeable.  However, this does not address Plaintiffs' arguments regarding proximate cause and the fact that there can be many proximate causes of an injury, including failure to warn. *Id.* In the present case, it is for a jury to decide that, had Toro warned the Timecutter had absolutely no ability to stop or slow down on a slope once it lost power to the hydrostatic motors whether the Plaintiffs would have purchased the Timecutter at all much less started it on a slope. Instead, Plaintiffs believe the Timecutter had a way of stopping via the "electric brake".

**c. Plaintiffs' claim for failure to warn does not fail for alleged lack of proposed alternative warnings.**

69. Toro's argument that Plaintiffs' failure to warn claims must be dismissed for alleged lack of alternative warnings fails on its face. One of Plaintiffs' proposed alternative warnings is the very warning issued by Hydro-Gear, the manufacturer of the hydrostatic motor, which Toro intentionally chose *not* to pass on to the consumer.  (SOAMF ¶44)

70. Plaintiffs also proposes the use of industry standard symbols from ANSI and ISO to be put on the mower in plain view of the operator.  (SOAMF ¶45) These are the same ANSI standards that Toro so heavily relies upon.

### v.   Plaintiffs Have Established a Prima Facie Case that Toro's Conduct Was Negligent

71. Toro fails to establish it is entitled to summary judgment in any of the preceding points. Toro's argument is largely undeveloped and simply cites to Plaintiffs' Complaint and states Plaintiffs have not proven any breach of the standard of care at the time the subject mower was made. Toro provides no real argument, evidence, or authority on this point nor does it even state which allegations it takes issue with other than broad statements. Toro itself cites to the nondelegable duty to design a safe product and Plaintiffs have provided more than adequate evidence of the unreasonably dangerous defects in the Toro mower. There is adequate evidence of Toro's duty, breach, proximate cause, and damages.

## D.   CONCLUSION

For the reasons set forth in this Resistance, the Court should deny Toro's Motion for Summary Judgement in its entirety.

Respectfully submitted,

By: /s/ Steven J Crowley
Lead Counsel

REBEKAH HILLMAN, individually and as next friend of P.J.H., a minor; and JENNIFER
HILLMAN Plaintiffs
Steven J Crowley Lead Counsel ARDC#6314756
Edward J. Prill ARDC#6271392
CROWLEY & PRILL
3012 Division Street
Burlington, IA 52601
T: (319) 753-1330
F: (319) 752-3934
E: scrowley@crowleyprillattorneys.com
E: eprill@crowleyprillattorneys.com
ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on *Monday, October 02, 2023*, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing is being served this day on all counsel of record identified below via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notice of Electronic Filing:

Michael Giacopelli
Thomas Grace
Jonathan R. Sichtermann
McVey & Parsky, LLC
30 North LaSalle Street, Suite 210
Chicago, Illinois 60602
Email: mng@mcveyparsky-law.com
Email: tgg@mcveyparsky-law.com
Email: jrs@mcveyparskylaw.com

Jason Schiffman
Schiffman Firm, LLC
1300 Fifth Avenue
Pittsburgh, PA 15219
P: (412) 288-9444
F: (412) 288-9455
E: jason@SchiffmanFirm.com
ATTORNEY FOR PLAINTIFFS

Kirk T. Florence
Kilpatrick Townsend & Stockton LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
P: (214) 922-7100
F: (214) 279-9194
kflorence@kilpatricktownsend.com
ATTORNEYS FOR THE TORO COMPANY

## CERTIFICATE OF TYPE VOLUME LIMITATION

In accordance with Local Rule 7.1(B)(4), I, Steven J. Crowley, hereby certify that Section C of Plaintiffs' Resistance to Defendant's Motion for Summary Judgment is 7,746 words, and Plaintiffs have moved for permission to file an overlength brief.