In the Matter Of:

## HILLMAN vs THE TORO COMPANY

4:21-CV-04081-SLD-JEH

## TOM BERRY

*July 11, 2023*



800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 30-1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE CENTRAL DISTRICT OF ILLINOIS

 3                    ROCK ISLAND DIVISION

 4

 5

 6    REBEKAH HILLMAN, individually

 7    and as next friend of P.J.H, a

 8    minor; AND JENNIFER HILLMAN,      No.

 9                  Plaintiffs,      4:21-CV-04081-

10    vs.                           SLD-JEH

11    THE TORO COMPANY, a

12    Corporation,

13                  Defendant.

14

15

16

17         REMOTE VIDEOTAPED DEPOSITION OF TOM BERRY, a

18    Witness, taken on behalf of the Defendant, pursuant

19    to the Code of Civil Procedure before Rachelle Smith,

20    CSR. No. 0864 on the 11th day of July, 2023, with all

21    parties, including the witness, appearing via mobile

22    videoconference.

23

24

25
```



Exhibit 30-2

TOM BERRY
HILLMAN vs THE TORO COMPANY

July 11, 2023
2

```
 1                         APPEARANCES

 2

 3    APPEARING FOR THE PLAINTIFFS VIA MOBILE
      VIDEOCONFERENCE:
 4
              Mr. Steven J. Crowley
 5            Mr. Andrew Mahoney
              Crowley & Prill
 6            3012 Division Street
              Burlington, Iowa  52601
 7            319-753-1330
              scrowley@cbp-lawyers.com
 8
      and
 9
              Mr. Jason M. Schiffman
10            Schiffman Firm, LLC
              1300 Fifth Avenue
11            Pittsburgh, Pennsylvania  15219
              412-288-9444
12            Jason@schiffmanfirm.com

13

14    APPEARING FOR THE DEFENDANTS VIA MOBILE
      VIDEOCONFERENCE:
15
              Mr. Kirk T. Florence
16            Kilpatrick Townsend & Stockton, LLP
              2001 Ross Avenue
17            Suite 4400
              Dallas, Texas  75201
18            214-922-7139
              kflorence@kilpatricktownsend.com
19

20    VIDEOGRAPHER VIA MOBILE VIDEOCONFERENCE:

21            Ms. Sofia Johnson

22

23

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 30-3

TOM BERRY                                        July 11, 2023
HILLMAN vs THE TORO COMPANY                              3

```
 1                         INDEX

 2

 3    WITNESS:                              PAGE

 4    TOM BERRY

 5         Direct Examination By Mr. Florence      6

 6         Cross Examination By Mr. Crowley       140

 7         Redirect Examination By Mr. Florence   165

 8         Recross Examination By Mr. Crowley     166

 9

10                        EXHIBITS

11    EXHIBIT                               PAGE
      NUMBER     DESCRIPTION             IDENTIFIED
12

13     1          3/17/23 Report              10

14     2          CV                          17

15     3          Billing Statement           32

16     4          Photograph of Accident Scene 38

17     5          ROPS Design and Installation 101
                  to install the ROPS
18                available for Current Toro
                  Timecutter 4225 mowers onto
19                the Timecutter SS5000

20     6          Testing and Analysis of the  107
                  Static Tip Angles of a Toro
21                SS 5000 With and Without
                  ROPS
22

23    NOTE:   Deposition Exhibits were 1 through 6 are
      attached to the original transcript.

24

25
```



Exhibit 30-4

```
 1              (Deposition commenced at 10:02 a.m.)

 2          THE VIDEOGRAPHER:   This is media unit one

 3    of the videotaped deposition of Tom Berry in the

 4    matter of Rebekah Hillman, et al, versus the Toro

 5    Company.  Case Number 4:21-CV-04081-SLD-JEH.  This

 6    deposition is being held remotely via Zoom on July

 7    11th, 2023, at 10:02 a.m.   My name is Sofia Johnson

 8    and I am the videographer.  The court reporter is

 9    Shelly Smith.

10              Will counsel please introduce

11    yourselves and affiliations and the witness will be

12    sworn.

13              MR. FLORENCE:  Kirk Florence on behalf

14    of the Toro Company.

15              MR. CROWLEY:  Steven Crowley on behalf

16    of the Hillman family.

17              MR. SCHIFFMAN:  Jason Schiffman also

18    on behalf of the be Hillman family.

19              MR. MAHONEY:  Andrew Mahoney also on

20    behalf of Hillman family.

21                   TOM BERRY,

22    being first duly sworn, testified under oath as

23    follows:

24

25
```



Exhibit 30-5

```
 1                    DIRECT EXAMINATION
 2    BY MR. FLORENCE:
 3            Q.      Good morning, Mr. Berry.
 4            A.      Good morning.
 5            Q.      As I just noted, my name is Kirk
 6    Florence and do you understand that I am here on
 7    behalf of the defendant, the Toro Company, correct?
 8            A.      Yes.
 9            Q.      Would you, for the record, please,
10    just tell us your full name.
11            A.      My full name is Thomas Alan Berry and
12    Alan is spelled A-L-A-N.
13            Q.      Do you go by Tom or Thomas?
14            A.      Most of the time Tom.
15            Q.      And where are you today, Mr. Berry?
16            A.      I am in my office at 1762 North St.
17    Francis in Wichita, Kansas.
18            Q.      Is anyone else in the room there with
19    you?
20            A.      No.
21            Q.      Okay.  And what materials do you have
22    with you there in the room, including if you have any
23    on your computer?
24            A.      I don't have any on the computer, I
25    have in my office I have materials on my computer,
```



Exhibit 30-6

1   but I have is, do you want me to go through it?

2          Q.    Why don't you just say generally for

3   now.

4          A.    My report, the reports of the other

5   experts, some materials that I printed out,

6   deposition summaries, my inspection report,

7   depositions themselves.  That basically covers it.

8          Q.    Through Mr. Crowley's office you have

9   provided to us your Reliance materials in this case.

10  Do you recall that?

11         A.    Yes.

12         Q.    Do you have those available to you as

13  well?

14         A.    They are on my computer in my office.

15  I don't have them here with me, all of them.

16         Q.    Okay.  What is your current address,

17  Mr. Berry?

18         A.    My current address, office address?

19         Q.    That's fine.  Is that the one you just

20  gave us?

21         A.    Yes.

22         Q.    That's fine.  Who is your employer?

23         A.    I am self-employed.

24         Q.    Is it a solo proprietorship or what

25  kind?



Exhibit 30-7

```
 1          A.      It's a sole proprietorship, Thomas A.
 2    Berry, PE.  I do have one error.  In my report I
 3    noticed yesterday I have an error that I carried
 4    through the report.  I have it as, in the report, as
 5    a Toro SS 5500 and it should actually be Toro SS 5000
 6    in all places.
 7          Q.      I was going to ask you about that.
 8    Thank you for that clarification.  Mr. Berry, in what
 9    capacity are you appearing as a witness in this
10    lawsuit?
11          A.      Consulting mechanical engineer with
12    expertise in the machine safety and ROPS and
13    designing ROPS and ZTR mowers.
14          Q.      You are not a medical expert, correct?
15          A.      I am not.
16          Q.      Or a marketing expert?
17          A.      I am not a marketing expert, no.
18          Q.      Are you an accident reconstruction
19    expert?
20          A.      It depends on the accident
21    reconstruction, I wasn't asked to do that in this
22    matter.
23          Q.      Are you a warnings expert?
24          A.      Warnings, yes.  I have designed
25    warnings.
```



Exhibit 30-8

1        Q.      Have you done that in this matter?

2        A.      No.  And I should say the warnings is

3    with respect to machine designs.  I am not a

4    specialist in warnings.

5        Q.      Okay.  Thank you for that

6    clarification.  Are you a human factors expert?

7        A.      With respect to machine design, yes.

8        Q.      What training or experience do you

9    have in human factors that makes you an expert in

10   human factors?

11       A.      The training I have had is one of my

12   education, human factors was covered as part of

13   machine design at Wichita State University.  And then

14   it continued under my work at Advance Technology,

15   including taking short courses through the American

16   Society of Agriculture of Engineers.  They have a

17   book that you go through with respect to human

18   factors.  And I did a lot of research with respect to

19   human factors over the years collecting materials at

20   Wichita State University and other libraries,

21   reference materials.  And I have books that cover

22   human factors in my machine design work.

23       Q.      Are you presenting yourself as a human

24   factor expert in this case?

25       A.      Depends on what I am asked.  You can't



Exhibit 30-9

1  really separate human factors from machine design

2  because most machines are operated by humans and you

3  have to have consider that.

4          Q.      Are you a biomechanical expert?

5          A.      I have some expertise in biomechanics,

6  but I have not been asked to do that work in this

7  matter.

8          Q.      Is there any other area of expertise

9  that you are, that you have been asked to perform in

10 this matter that we haven't discussed?

11         A.      Not that I am aware of, no.

12         Q.      You have given a lot of depositions in

13 the past, correct?

14         A.      Quite a few, yes.  I would consider it

15 a lot but I have seen other people that doesn't come

16 close.

17         Q.      You understand the process, correct?

18         A.      I do.

19         Q.      What did you do to prepare for your

20 deposition today?

21         A.      I read through my report, looked

22 through the materials that I have gathered, read

23 through other reports.  Read through the depositions

24 of the Hillmans that have been taken so far in this

25 matter.



Exhibit 30-10

```
 1                    MR. FLORENCE:  I will attempt to show
 2    you my screen and show you what I will mark as
 3    Exhibit 1 to your deposition.
 4                    (Deposition Exhibit 1 was marked for
 5    identification.)
 6    BY MR. FLORENCE:
 7         Q.    Are you able to see what I am sharing
 8    on the screen, Mr. Berry?
 9         A.    Yes.
10         Q.    And I can scroll through it as needed,
11    but based upon what you see on the screen can you
12    identify this document?
13         A.    It looks like my report from the
14    Hillman matter.
15         Q.    It's dated March 17th, 2023?
16         A.    Yes.
17         Q.    And I will tell you that this is 60
18    paged document, it does not include your CV or
19    testimony or things of that nature, but aside from
20    that, can you tell from the 60 pages that that is
21    essentially your report?
22         A.    Yes.
23         Q.    Do you have that in front of you as
24    well?
25         A.    Yes.
```



Exhibit 30-11

```
 1              Q.     Okay.  And again, I have marked that
 2      as Exhibit 1 so when we refer to it throughout your
 3      deposition you will know what I am talking about.
 4      What model of mower is at issue in this case,
 5      Mr. Berry?
 6              A.     It's a model, it's a Toro 74631 with
 7      the SS 5000 on the decals on the front.
 8              Q.     Do you know what year it was
 9      manufactured?
10              A.     It indicates on the machine it was
11      manufactured September of 2013.
12              Q.     Tell us, if you would, what are the
13      defining characteristics of a zero radius turn mower.
14              A.     The defining characteristics is they
15      are able to turn basically in a zero turn radius,
16      which means pivot and not leave a spot when you turn.
17      Whereas a riding lawnmower if you turn you will leave
18      a big spot that you didn't mow, and zero turn mower
19      can pivot on the one rear wheel and have zero turn
20      radius.
21              Q.     What types of brakes do they utilize?
22              A.     Primarily they use dynamic braking for
23      most braking.
24              Q.     And how does that work?
25              A.     It is controlled by the weight of the
```



Exhibit 30-12

```
 1   wheels on the drive tires and through the hydrostatic
 2   drive.
 3          Q.     Do you know what the weight of the
 4   Toro 5000, SS 5000 Timecutter is without an occupant?
 5          A.     Approximately 598 pounds without fuel
 6   and a little over 600 with fuel.
 7          Q.     Where did you derive that information
 8   from?
 9          A.     My weighing of the mower.
10          Q.     The mower that's the subject of this
11   lawsuit?
12          A.     Yes.
13          Q.     And that was with a full gas tank?
14          A.     I don't believe so.  Yes, it is, 598
15   pounds is what I have.
16          Q.     With fuel?
17          A.     Yes.
18          Q.     And that's a full gas tank?
19          A.     Yes.
20          Q.     Was anything else added to the weight?
21          A.     No.
22          Q.     Do you know what the price point is
23   for mowers such as this?
24          A.     The what?
25          Q.     The price point.  What does it cost?
```



1        A.      Between three and four thousand

2   dollars.

3        Q.      Today?

4        A.      I haven't looked today.

5        Q.      Have you have supplemented your report

6   at any time?

7        A.      No.  I can't say that I have

8   supplemented my report.  I provided an affidavit that

9   I prepared in the Lazer Z versus Exmark matter.

10       Q.      You consider that to be supplemental

11   to your report in this case?

12       A.      It would cover opinions, yes.

13       Q.      Why do you refer to an affidavit in

14   the Lazer Z versus the Exmark matter in supplemental

15   to your report?

16       A.      It covers the differences between

17   residential consumer and commercial-type mowers and

18   the type of operators on those and the study I have

19   made with respect to those mowers and my opinions

20   with respect to those mowers.

21       Q.      You have not attached it to your

22   report here though?

23       A.      No.

24       Q.      Do you plan to supplement your report?

25       A.      If Mr. Crowley wants me to provide a



Exhibit 30-14

```
 1   report with the corrections of the, to the SS 5000,
 2   5500, yes, I will do that.  Other than that, I don't
 3   plan on it.
 4        Q.    I think you said earlier that you have
 5   the defense expert reports there with you?
 6        A.    Yes.
 7        Q.    Have you reviewed those?
 8        A.    I have.
 9        Q.    Which ones do you have that you have
10   reviewed?
11        A.    I have the report of Daniel Toomey.  I
12   have the report of Enrique Bonugli.  And the report
13   of Lisa Gwin.
14        Q.    And those are the only three that you
15   have?
16        A.    I was sent all of the ones, these are
17   the three that I printed.
18        Q.    Did you review the other ones?
19        A.    I reviewed all the ones that I was
20   sent.
21        Q.    Do you remember what the other ones
22   were, who they were by?
23        A.    I don't.
24        Q.    You didn't deem them particularly
25   relevant to your testimony here?
```



Exhibit 30-15

```
 1          A.     Right now I don't recall any others,
 2   but, so I guess not.
 3          Q.     Let me ask you this.  Did you in your
 4   report, Exhibit 1, did it set forth all of your
 5   opinions in this case?
 6              MR. CROWLEY:  Objection, misstates the
 7   testimony.
 8          A.     What opinions I might have depends
 9   upon what I am asked, but I tried to cover most areas
10   in my report, yes.
11          Q.     For example, if I were just to ask you
12   what are your opinions in this case you would be able
13   to look at your report and say here are my opinions,
14   correct?
15          A.     Basically, yes.
16          Q.     Have you prepared a rebuttal report in
17   this case?
18          A.     I have not.
19          Q.     Do you plan to?
20          A.     No.
21          Q.     Why not?
22          A.     I wasn't asked to.
23          Q.     The Reliance materials that are
24   provided to me through Mr. Crowley's office, do you
25   know what I am talking about?
```



1        A.    Yes.

2        Q.    Was there anything in there that you

3   can think of right now, I know there was a lot of

4   material in there, was there anything that you

5   gathered that was special to this case, as opposed to

6   any materials that you already had from your previous

7   experience?

8        A.    Well, I gather specific manuals from

9   the Toro website with respect to the Toro Timecutter

10  and the Toro Titan.

11       Q.    Anything else that you can think of?

12       A.    There, I may have gotten some

13  operator's manuals.

14       Q.    The bulk of that material was

15  information that you already had and that you used in

16  this and other cases, is that a fair statement?

17       A.    Yes.

18       Q.    Let me show you what I am sharing on

19  the screen now, which I have marked as Exhibit 2.  Do

20  you see that document?

21       A.    Most of it, yes.

22             (Deposition Exhibit 2 was marked for

23  identification.)

24  BY MR. FLORENCE:

25       Q.    Do you need me to scroll down to see



Exhibit 30-17

1  anything in particular, let me know.  In the

2  meantime, I will go from the top to the bottom so you

3  can see what's there. Do you see that's a three-paged

4  document?

5      A.    Yes.

6      Q.    Is this your most recent CV?

7      A.    I can't see, what's the date on the

8  top corner?

9      Q.    You can't see up at the top here, it

10  says 2020.

11      A.    2020.  I have one that's dated 2022,

12  but it's the same, I don't recall any changes between

13  2020 and 2022.

14      Q.    The only thing you updated was the

15  date?

16      A.    Yes.

17      Q.    According your CV you worked for

18  Advance Technology, Inc., there in Wichita, Kansas

19  from January of 1982 to July of 2005,

20      A.    Yes.

21      Q.    What did you do there?

22      A.    I was a consulting mechanical engineer

23  on various projects that I was assigned.  I started

24  out as a junior engineer and then became a senior

25  engineer when I got my PE license.



Exhibit 30-18

1          Q.     Was that your first job out of
2    college?
3          A.     Yes.
4          Q.     The industrial experience that you
5    have listed below that on Page 1 of your CV were
6    those basically summer jobs?
7          A.     Except there, the third one down, but,
8    yes, it was while I was working through college.
9          Q.     For Cessna and Boeing?
10         A.     Yes.
11         Q.     And the third one down being the
12   quality assurance inspector.  Did you do that while
13   you were a student, is that what you are saying?
14         A.     Yes.
15         Q.     How would you describe your role as a
16   self-employed Thomas A. Berry, PE, what do you do?
17         A.     Well, primarily what I have done is
18   work on projects that have been contacted by
19   attorneys.  There have been some that have been
20   through manufacturers, but most of them have been by
21   attorneys in relating to accidents.  And then also
22   insurance companies have asked me to go out and look
23   at various machines.
24         Q.     Do you have any employees?
25         A.     Not direct employees.  I share a



1    secretary with another gentleman in the office.

2    Sharing office expenses.  And then I hire a paralegal

3    to do deposition reviews for me, so I have a road map

4    to the depositions.

5         Q.    And in this case you mentioned that

6    you have depositions.  Did you read all of those

7    depositions or did you read the summaries?  Or did

8    you skim them?  What did you do?

9         A.    I read all the depositions.

10        Q.    Did you make notes the depositions?

11        A.    No.  No.

12        Q.    Okay.  Have you ever done any work for

13   a ZRT manufacturer?

14        A.    Yes.

15        Q.    Tell me what that is.

16        A.    I worked in design and testing

17   projects with Excel Industries on Hustler, some of

18   their Hustler mowers.  I worked with great, I think

19   it's Great Dane, designing ROPS.  I worked with Femco

20   designing a ROPS for an Exmark LHP, I think, mower,

21   ZTR.  It seemed like there is another one that I am

22   not remembering what it is.

23        Q.    If you do remember just let us know,

24   please.

25        A.    Sure.



Exhibit 30-20

1    Q.    Would the Excel Hustler work, that you

2    mentioned, you said that was design work?

3    A.    '   Some of it, yes.

4    Q.    When was that?

5    A.    2000, well, prior to that there was

6    work in the 1990s with respect to the mowers.  I

7    worked with my brother primarily, Don Berry, in the

8    design testing on ROPS on various mowers.  Some of

9    them was zero turn.  And then in 2000 I was, I worked

10   on a project with the Hustler Super Z models as well

11   as ATZ model.

12   Q.    What types of ROPS were you designing

13   and testing?

14   A.    They were two post ROPS.

15   Q.    For commercial ZRT mowers?

16   A.    I don't know whether they were

17   commercial or not.

18   Q.    What standard were you designing to,

19   if any?

20   A.    I don't recall what we tested to.

21   Definitely OSHA, I think that's the standard we were

22   testing to.

23   Q.    Do you know if the ROPS that you

24   designed was ever, ever made its way to the

25   marketplace?



Exhibit 30-21

```
 1            A.    Yes.  My understanding is, yes.  And
 2    then they replaced it in 2005, I believe, with the
 3    foldable ROPS.
 4            Q.    Did you finish the ROPS?
 5            A.    Well, the one I worked on, yes.
 6            Q.    You are talking about for Excel
 7    Hustlers?
 8            A.    Yes.  And another manufacturer I
 9    worked with was Dynamo.
10            Q.    You mentioned Great Dane designing
11    ROPS, was that any different that what you did for
12    Excel Hustler that you just described?
13            A.    Well, I think we had more to work on
14    in the design.  At Hustler they had their own
15    engineers and they did the drawings, and I think on
16    the Great Dane we did the drawings.  But other than
17    that, no.
18            Q.    Do you recall what type of mower that
19    was for Great Dane?
20            A.    I don't know.  Model number you mean?
21            Q.    Well, or even was it commercial versus
22    consumer?  Do you recall the size, weight, intended
23    user?
24            A.    I don't recall.  It was 1,000-1,200
25    pound machine.  But I don't recall the details on it.
```



1      Q.     What about for the Excel Hustler

2  machine, do you recall what the weight was on that?

3      A.     We tested to 1,300 maybe 1,400 pounds.

4      Q.     And then for the work you did for

5  Exmark that was through Femco?

6      A.     Yes.  I have had several projects

7  involving zero turn mowers through Femco.

8      Q.     Was that while you were working at

9  Advance Technologies?

10     A.     Yes.

11     Q.     So the Advance Technologies and Femco

12 were working together?

13     A.     Yes.

14     Q.     Were they subcontracting out?

15     A.     No.  I was working for Advance

16 Technology and they had hired us to work with them

17 and the tasking and design of the ROPS.

18     Q.     I think you said you designed ROPS for

19 the Exmark LHP?

20     A.     Yeah, there was two.  We got different

21 tires for the machines.  And I recall one of them

22 saying LHP on it.

23     Q.     And was that similar to the work you

24 already described for Great Dane and Excel Hustler?

25     A.     Similar, yes.



Exhibit 30-23

1        Q.      Do you recall when that was?

2        A.      1999-'98, somewhere in that time

3    period.  Maybe 2000.

4        Q.      Was LHP a commercial mower?

5        A.      I don't know.

6        Q.      Do you recall its approximate weight?

7        A.      No.

8        Q.      Do you think it was more than 1,000?

9        A.      I don't recall.

10       Q.      And then you did work for Dynamo.  Is

11   it similar to what you have been describing?

12       A.      Yes.

13       Q.      What type of mower was it?

14       A.      What type of mower?

15       Q.      Yes, sir.  Can you describe it for me.

16       A.      That was a zero turn mower.

17       Q.      Do you recall its size?

18       A.      It was, I would say it was on the

19   smaller size on the ones that we have worked on.

20       Q.      Can you put that on any type, can you

21   give me any indication of what you mean by smaller?

22       A.      It just seemed like a smaller unit

23   than let's say the Super Z or the -- I also worked on

24   a Scag Turf Tiger ROPS project with Femco.

25       Q.      The Dynamo work was also in



Exhibit 30-24

1  conjunction with Femco?

2       A.     No.

3       Q.     Directly with Dynamo?

4       A.     Well, I don't recall that specific, I

5  shouldn't say because I don't recall.  We had the

6  mower here and I remember talking to the people at

7  Dynamo, but I am not certain it wasn't through Femco.

8  So I can't say.

9       Q.     What timeframe are we talking about

10 for this Dynamo work?

11      A.     Late '90s, maybe early 2000s.

12      Q.     The work for Scag, when was that?

13      A.     That was a design testing ROPS on the

14 Scag Super Turf Tiger, STT.

15      Q.     What did you test the ROPS against?

16      A.     SAE J1040, as I recall.  And I think

17 that also OSHA applied.

18      Q.     Were any of these ROPS projects that

19 you worked on in terms of design or testing were any

20 of those ROPS certified?

21      A.     Yes.

22      Q.     To what standard?

23      A.     Well, the Super Turf Tiger was to SAE

24 J1040 and OSHA.  And then Hustler Super Z was to

25 OSHA, I believe.



Exhibit 30-25

1    Q.    Was there any other work that you have

2  done for ZRT manufacturers that you haven't told us

3  about today?

4    A.    Not that I can recall.

5    Q.    What is the last date that you can

6  recall working on behalf of the ZRT manufacturer?

7    A.    The last project they contacted me

8  probably in 2004-2005 on the Hustler they wanted to

9  make some changes and they wanted to know if those

10  changes would require retest.  And I indicated it

11  would after I went through and looked at what they

12  wanted to do.

13    Q.    Changes to the ROPS?

14    A.    Yes.  Basically to the mounting area.

15    Q.    Did you ever work on any design of a

16  four post ROPS for ZRT?

17    A.    The one that we designed for the LHP

18  was a four post.  And I don't know what ended up, I

19  don't remember testing that one.

20    Q.    Do you know if it ever went to market?

21    A.    Well, there are photographs of it in

22  at least one that looks like it, in the

23  advertisements, but I don't know.

24    Q.    When were you first retained in this

25  lawsuit?



Exhibit 30-26

```
 1            A.     Last July, I believe July 6th of '20,
 2    wait a minute, let me find that.  Well, I was
 3    contacted in May of 2021.  So I assume I was retained
 4    at that time and then my most recent attention
 5    agreement date of July of 2022, when I changed my
 6    rates.
 7            Q.     What was your billing rate in May of
 8    2021, when you were initially retained?
 9            A.     $150 per hour.
10            Q.     And then what did you change it?
11            A.     To $200.
12            Q.     When did you make that change to $200
13    per hour?
14            A.     Last July.
15            Q.     Of 2022?
16            A.     Yes.
17            Q.     Was there anything, other than the
18    billing rate that changed, relative to your retention
19    at that time?
20            A.     No.
21            Q.     What were you retained to do?
22            A.     To look at the mower and the safety
23    with respect to the mower of the operator.  Look at
24    why the part locked in and didn't work to stop the
25    mower in this incident.  And just look at the overall
```



Exhibit 30-27

```
 1   safety of the design of the mower.  Look at whether
 2   the mower should have ROPS or not.
 3         Q.     Is there any additional work that you
 4   intend to do on this matter after giving your
 5   deposition and testifying at trial, if needed?
 6         A.     I don't have any that I intend to do,
 7   I may be asked to do some, but I don't have anything
 8   in mind.
 9         Q.     Do you know how many times you have
10   acted as expert witness, whether consulting or
11   testifying, in matters involving zero radius turn
12   mowers?
13         A.     I would estimate 40 to 45, somewhere
14   in there.
15         Q.     Have all of those involved a rollover
16   or a tip over of the mower?
17         A.     No.
18         Q.     How many of those did not involve a
19   rollover or tip over?
20         A.     I would estimate ten did not.
21         Q.     Would you describe what those ten
22   cases involved.
23         A.     I had two, yeah, I had two Bad Boy
24   Mower accidents where the operator got off and
25   activated the control which caused it to spin on top
```



Exhibit 30-28

1   of him and crush him to the ground where they were

2   killed.  I had five or six involving fires with

3   respect to zero turn mowers.

4          Q.     And the rest would be some sort of

5   rollover or turn over, to the best as you can recall?

6          A.     I think so.  There may be one that I

7   am missing, but I think so.

8          Q.     Were all of those cases were you

9   retained by the plaintiffs?

10         A.     Yes.

11         Q.     Have you ever opined that a John Deere

12  zero radius turn mower was defective?

13         A.     Yes.

14         Q.     How many times?

15         A.     Four that I can think of.

16         Q.     Do you happen to know what model of a

17  John Deere radius turn mower would be equivalent to

18  the Toro Timecutter mower that's at issue in this

19  issue?

20         A.     I would say the John Deere 425 would

21  be fairly equivalent.

22         Q.     Are you familiar with the John Deere

23  Z255?

24         A.     I have seen them, I haven't really

25  studied them.



```
 1          Q.     What is it about the John Deere Z425
 2   that makes it similar to the Timecutter involved in
 3   this lawsuit?
 4          A.     Similar size I would say.
 5          Q.     What size is it?
 6          A.     It's around a 600 pound mower, the
 7   engine was similar size, the basic mower was similar
 8   size, I would say.
 9          Q.     Is it a singular ZRT mower?
10          A.     I think that's what they called it, or
11   a residential.
12          Q.     Do you know whether the design was
13   under ANSI B-70.1 and ANSI B-70.2?
14          A.     I don't know what they did, I would
15   have to go back and look.
16          Q.     Okay.
17          A.     Most of those mowers are under B-70, I
18   should say should be under B-70.1, but Cub Cadet's
19   designs are under 71.4, even on their RZT models.  So
20   I would have to go back and look.
21          Q.     In general, what is the difference
22   between ANSI B-70.1 and ANSI B-71.4?
23          A.     Not much.
24          Q.     I mean, is one of these geared toward
25   consumer mowers and one geared toward commercial
```



Exhibit 30-30

```
 1 | mowers?
 2 |         A.    Well, that's what it indicates, yes.
 3 |         Q.    B-71.1 indicates it's for consumer
 4 | mowers, correct?
 5 |         A.    Yes.
 6 |         Q.    And B-71.4 indicates it's for
 7 | commercial mowers?
 8 |         A.    That's what it indicates, yes.
 9 |         Q.    How do you define the difference
10 | between a consumer and a commercial mower?
11 |         A.    How do I define the difference?
12 | Basically it would be more based on use.  If it's
13 | used by a commercial entity then it becomes a
14 | commercial mower.  If it's used by a consumer or
15 | residential area, then it's residential.
16 |         Q.    Have you ever worked on any other
17 | cases with Mr. Crowley's law firm before this one?
18 |         A.    I don't recall any.
19 |         Q.    What about Mr. Schiffman's law firm?
20 |         A.    I think so, yes.
21 |         Q.    What was that?
22 |         A.    I know I worked with him on a Callahan
23 | versus Toro matter, and I can't remember if there was
24 | one 10 or 15 years ago involving a Cushman sand rake.
25 |         Q.    Cushman what?
```



```
 1          A.     Sand rake.

 2          Q.     Sand rake, is that what you said?

 3          A.     Yes, for a golf course.

 4          Q.     Okay.  Do you know what percentage of

 5   your income is derived from working as a plaintiff's

 6   expert?

 7          A.     Professional income?

 8          Q.     Yes, sir.

 9          A.     Kind of, usually varies, but it's over

10   95 percent.

11          Q.     How would you describe the other five

12   percent, where does it come from?

13          A.     For example, the insurance projects

14   that I have been hired on to go out and look at

15   equipment that may have burned up in fire or was

16   involved in an accident.  That would be included in

17   that five percent.  And then also if I am contacted

18   by a manufacturer, that would be in that five

19   percent.

20          Q.     In the last ten years have you been

21   contacted by the manufacturers to do that type of

22   work?

23          A.     I would have to go back and look and

24   see if I could figure that out.  Possibly, but there

25   was a project with Broce Broom and I can't remember
```



```
 1   when that was, whether it was in the last ten years
 2   or not.
 3           Q.     Where was that?
 4           A.     Broce Broom, B-R-O-C-E.
 5           Q.     And they manufacture the zero radius
 6   turn mower?
 7           A.     No.
 8           Q.     What type of machine was that?
 9           A.     This was involving a, well, road
10   construction, the large rotary brushes you see along
11   construction projects.
12           Q.     Okay.
13                  MR. FLORENCE:   Sharing my screen what
14   I will mark as Exhibit Number 3 to your deposition,
15   about 15 pages.
16                  (Deposition Exhibit 3 was marked for
17   identification.)
18   BY MR. FLORENCE:
19           Q.     I will scroll through it as much as
20   you need me to get an understanding of what's there.
21   I will represent to you that was sent through Mr.
22   Crowley's office as your billings in this case.  Does
23   that appear to be an accurate statement of what this
24   is?
25           A.     Yes.
```



1        Q.      Did you say yes?

2        A.      Yes.

3        Q.      Do you have that in front of you?

4        A.      I do.

5        Q.      Okay.  Is this what you referred to

6    earlier when you were determining when you were

7    retained in the case?

8        A.      No.  I was looking at the contact

9    information sheet.

10        Q.      Okay.

11        A.      But I guess I could have.

12        Q.      Does this 15-page document, Exhibit 3,

13    represents all of your billing to date in this case?

14        A.      Yes.

15        Q.      Let me ask you to look at the page I

16    have, sorry, that's not the right one.  We are

17    looking at your bill dated May 5th, 2022, do you see

18    that?

19        A.      Yes.

20        Q.      At that point you were still charging

21    $150 an hour?

22        A.      Yes.

23        Q.      That's you, senior engineer, correct?

24        A.      Yes.

25        Q.      And a bill for an engineer aide at $45



```
 1   an hour, who was that?
 2          A.    Most likely it was my secretary.
 3          Q.    What type of work did she perform?
 4          A.    That would have been preparing
 5   photograph sheets from the inspection and typing,
 6   typing those up after I wrote them up.  And then I
 7   don't know exactly if it's scheduling, that sort of
 8   thing, that's specific to this matter, she might have
 9   some time on it.
10          Q.    Turning your attention to the January
11   6, 2023, bill.
12          A.    Yes.
13          Q.    Do you see the line item for technical
14   assistant at $45 an hour?
15          A.    Yes.
16          Q.    Who was that?
17          A.    That would have been Jeanette May, the
18   paralegal that I use to review depositions.
19          Q.    Other than these two individuals is
20   there anyone else who assisted you with your work on
21   this matter.
22          A.    No.  Well, I guess I should say that
23   my son assisted me with respect to the tilt testing.
24          Q.    Did you pay him for that work?
25          A.    I did.
```



Exhibit 30-35

```
 1          Q.     Who is your son?

 2          A.     Benjamin Berry.

 3          Q.     Is he an employee?

 4          A.     Not a direct employee, only when I

 5    need some grunt assistance.

 6          Q.     How old is your son?

 7          A.     He's 32 now, I believe.

 8          Q.     Are you aware of any courts that have

 9    excluded you from ever testifying in a zero radius

10    turn mower?

11          A.     Absolutely prevented me from

12    testifying?  No.

13          Q.     Have any limited your testimony?

14          A.     Probably there are some where it's

15    been limited, yes.

16          Q.     Do you know which ones?

17          A.     Excuse me, I need to turn that off.

18    Repeat that again.

19          Q.     Which courts have limited your

20    testimony?

21          A.     I don't -- I don't put those things to

22    memory, but I remember in a John Deere case involving

23    a Z425 mower that I was not going to be able to talk

24    directly about the ROPS that I had worked on and

25    developed in another John Deere Z425 case because the
```



Exhibit 30-36

1   deck size was a different size.

2        Q.    Where was that case?

3        A.    It was in Mississippi.

4        Q.    Do you recall when that was?

5        A.    2015. I am just estimating. But last

6   summer I testified basically to everything that I

7   would normally testify to, but the Judge limited me

8   in that trial to not be able to say that the machine

9   was unreasonably dangerous and then he changed his

10   mind and I did. And then later on removed any of the

11   restrictions from his order indicating that he was

12   wrong.

13        Q.    What was the name of that Mississippi

14   case that you are telling me about?

15        A.    Barnett versus John Deere, I believe.

16        Q.    Let me back up for a minute, go back

17   to when you were describing the ROPS work that you

18   did on ZRT mowers. Were any of those ROPS optional

19   ROPS or were they all use standard ROPS?

20        A.    The Excel Hustler I indicated to them

21   that, I had asked whether they were going to be

22   coming standard equipment. I thought, I told them

23   that I thought that was a good idea to do that. And

24   they said, no, the marketing indicated they were

25   going to keep it as an option.



Exhibit 30-37

1    Q.  Did you object to that?

2    A.  What's that?

3    Q.  Did you object to that?

4    A.  Well, to this, to the point that I

5 said I think that they should be going standard

6 equipment.  My brother thought that's what they were

7 going to do is start making them standard, but they

8 didn't until 2004 or 2005.

9    Q.  Can you describe for us what your

10 understanding is of how the accident occurred in this

11 case that we are here about today, the Hillman case?

12    A.  It's expressed in my report, but

13 basically my understanding that Rebekah Hillman was

14 mowing the area above the planter that has a drop off

15 next to it.  And the mower got off the edge in to the

16 planter and stuck.  She couldn't get it out.  So they

17 then went, and Jennifer Hillman brought the tractor

18 that they have, and they released the hydrostatic

19 drive release pins on the back so that the rear

20 wheels could roll.  And they pulled the mower up,

21 lifted it, pulled it up to point 40 some feet above,

22 maybe more, I don't remember going through those

23 measurements, and lowered the mower to the ground.

24 Rebekah Hillman got on it and started the mower.  Had

25 forgotten to release the hydrostatic release levers



Exhibit 30-38

```
 1   and pushed the levers forward, the mower started
 2   rolling down the hill and she couldn't do anything to
 3   stop it.  It was going straight towards the planter
 4   and then off the five-to-six foot drop off.  She
 5   couldn't do anything to stop it.  And when she got
 6   closer to the edge, she opened the levers up, stood
 7   up and jumped down in to the area below the retaining
 8   wall.  And then the mower came down and landed front
 9   end on to her legs.  And tipped forward on to the
10   ground.
11          Q.     That information comes from the
12   depositions you have reviewed in this case?
13          A.     Yes.
14          Q.     Is there any other basis for your
15   understanding of the accident?
16          A.     My inspection of the mower, Mr.
17   Bilek's  reports and reconstruction, those would be
18   my understanding, yeah.
19          Q.     Let me show you what I will mark as
20   Exhibit 4 to your deposition.
21                 (Deposition Exhibit 4 was marked for
22   identification.)
23   BY MR. FLORENCE:
24          Q.     Can you see this photograph that we'll
25   mark as Exhibit 4?
```



```
1              A.    Yes.
2              Q.    Can you read the Bate's number down on
3    the bottom right?
4              A.    RH 00003.
5              Q.    Is this a photograph of the accident
6    scene close to the time that it happened?
7              A.    Yes.
8              Q.    Have you been to the accident scene?
9              A.    I have not.
10             Q.    Just looking at Exhibit Number 4, what
11   hazards can you see relative to mowing with a zero
12   radius turn mower in this particular area?
13             A.    What hazards?
14             Q.    Yes, sir.
15             A.    I don't see anything that would
16   prevent you from mowing that area.
17             Q.    Is there any reason that you think an
18   operator should not mow directly next to what I will
19   call the flower bed area which is above the retaining
20   wall?
21             A.    No.
22             Q.    Do you think it would be perfectly
23   safe to operate close enough to the drop off where
24   the flower bed starts such that you could get a
25   caster wheel over the edge?
```



Exhibit 30-40

1      A.    That could happen, but I would think

2  that the whole purpose of putting the planter along

3  the retaining wall is so that you can mow that area

4  without being next to the retaining wall.  Other than

5  having the wall going all the way to the retaining

6  wall and put a safety edge along it.  I would mow

7  that.

8      Q.    What do you mean by a safety edge?

9      A.    Well, the instructions that you see

10  with most mowers is to leave two, one to two mower

11  widths away from a steep drop off like this retaining

12  wall.  And this has a garden area that was put in, a

13  planter area that was put in to so that that area

14  didn't have to be mowed by hand or with a weed eater

15  and they could mow along the top edge.  That's what I

16  see when I look at it.

17      Q.    But you would not have any concerns,

18  from a safety standpoint, of operating the zero

19  radius turn mower right next to the garden planter?

20      A.    No.  Not a properly designed one, no.

21      Q.    Do you understand that Rebekah Hillman

22  got a caster wheel over the edge in to the planter

23  area and that caused her to slide down in to it and

24  do a complete 180 degree turn the other direction,

25  correct?



```
 1         A.      She got down in to it and probably to
 2   get out of it it spun around, yes.  But that could
 3   happen, but it's away from the retaining wall and
 4   that's the instruction that Toro provides is to stay
 5   away from retaining walls.
 6         Q.      And other drop offs, correct?
 7         A.      And steep areas, yes.
 8         Q.      Do you know how steep that area is
 9   where the planter or flower bed is?
10         A.      Not exactly, no.  I haven't measured
11   it.
12         Q.      You haven't done any analysis of that?
13         A.      I have not measured that.
14         Q.      Do you know whether that planter area
15   is still there in the same way that it's shown in
16   Exhibit 4?
17         A.      I do not.
18         Q.      Are you aware that it's been leveled
19   off?
20         A.      I have heard something about that,
21   yes; but I don't know what exact changes have been
22   made.
23         Q.      If the, if the planter area is steeper
24   than 15 degrees would you still be comfortable mowing
25   right next to it?
```


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 30-42

```
1          A.     Yes.

2          Q.     Why is that?

3          A.     Well, these mowers have pretty good

4   stability.  If I get, I have never lost control and

5   had a wheel I operate next to a 15 degree down slope

6   with my mower.  If you have rollover protection and

7   good brakes, I would have no problem mowing along

8   that.  I never have had a problem.

9          Q.     You would disregard the warnings from

10  the manufacturer not to mow in that area?

11              MR. CROWLEY:  Objection.

12  Argumentative.

13         A.     When I look at it they put the safety

14  barrier of the planter area, that garden area,

15  between the steep drop off and the yard that they

16  were mowing.  And that's kind of what I would expect.

17         Q.     Do you know the width of that planter

18  area?

19         A.     I have seen it about two mower widths,

20  12 to 15 feet, something like that.  I haven't put

21  that to memory.

22         Q.     Do you own a zero radius turn mower?

23         A.     Several.

24         Q.     Which ones do you own?

25         A.     I own a John Deere 968.  A Hustler
```



Exhibit 30-43

```
 1   Super Z.  A Scag Super Turf Tiger.  A Scag Tiger Cat.
 2   And an RZT Cub Cadet.  And a John Deere Z425B.
 3           Q.    Why do you own five or six ZRT mowers?
 4           A.    Well, the Scag Tiger Cat I got to mow
 5   my property after it was purchased for a rollover
 6   case.  And then I have used it since then and it's
 7   about worn out.  The Hustler Super Z I got it as fire
 8   case as an exemplar that I did a lot of testing on.
 9   And then I haven't been using it, it wore out and it
10   no longer runs.  The Tiger Cat was in a rollover
11   case, so some of these I got to put ROPS on.  I guess
12   I have the Toro Timecutter, made around 2011-2012,
13   and I also got to put ROPS on and test it.
14           Q.    That's the one that's in your report,
15   Exhibit 1?
16           A.    I think it is shown in the report,
17   yes.
18           Q.    When did you get this Toro Timecutter?
19           A.    That one?
20           Q.    Yes, sir.
21           A.    I don't know, I don't recall the exact
22   time.  It was 2014-2015.  It could be 2018, I don't
23   recall exactly.
24           Q.    Why did you buy a Toro Timecutter?
25           A.    Well --
```



```
 1                    MR. CROWLEY:  Let me interrupt you and
 2    request you repeat that question.  I didn't hear the
 3    whole thing.
 4                    MR. FLORENCE:  I can repeat it.
 5                    MR. CROWLEY:  Thank you.
 6    BY MR. FLORENCE:
 7          Q.    Why did you buy a Toro Timecutter?
 8          A.    What was that, Steve?
 9                    MR. CROWLEY:  I have no objection to
10    that question.
11          A.    It was purchased in an accident case
12    up in Indiana, Ohio, in Ohio, Ricing versus Toro and
13    I purchased it to design and place a ROPS on it.
14          Q.    You said that was a 2011 or 2012
15    model?
16          A.    I believe so, yes, just going by
17    memory.
18          Q.    Which of the several zero RT mowers do
19    you operate on your own property?
20          A.    Well, I have operated the Toro.  I
21    have operated the Snapper.  I bought the Hustler
22    Super Z, I operated it for quite a few years.  The
23    Scag Turf Tiger I operated for quite a few years.
24    And currently I am using the John Deere 960.
25          Q.    Do all of these mowers presently have
```



1   ROPS on them?

2          A.     Yes.

3          Q.     Which ones did you add a ROPS to?

4          A.     The Toro 5225.  The Cub Cadet I added

5   ROPS to it.  The Scag, the Turf Tiger, I purchased

6   ROPS and put on it.  The Tiger, Scag Tiger Cat I

7   built a ROPS for it.  The, oh, the Hustler Z I

8   purchased the ROPS and put on it.

9          Q.     How much acreage do you have that you

10  mow with those mowers?

11         A.     Five acres.

12         Q.     Do you use them anywhere else?

13         A.     No.  Well, I used, well, one of them

14  to mow the property here at ATI, at my office once in

15  awhile.

16         Q.     What is ATI?

17         A.     Advance Technology, Incorporated, they

18  own the building that I am leasing.

19         Q.     That's your employment?

20         A.     Yes.

21         Q.     All of these ZRT mowers that you have

22  that you described for me, did you obtain all of them

23  in connection with work on litigation matters?

24         A.     No.

25         Q.     Which ones were not obtained in



1   connection with litigation?

2         A.      The Snapper CZT, the John Deere 960A.

3   The rest of them had something to do with litigation.

4   The John Deere Z425 I think it also has ROPS and that

5   was put on in a rollover case.

6         Q.      In all of the ZRT cases that you have

7   evaluated and looked at over the years, have you ever

8   come across a situation where an accident occurred

9   because the hydrostatic motors were bypassed and not

10  returned to the operating, to operating mode, thus

11  leading to a loss of control?

12        A.      In the accidents that I have

13  investigated?

14        Q.      Yes, sir.

15        A.      There was only, to my knowledge, there

16  was only one other and it involved the bypass, it

17  involved the belts becoming slacked due to improper

18  spring being put in a belt tensioner to allow the

19  Woods mower to go down a short slope and off a

20  retaining wall.

21        Q.      So that was due to improper

22  maintenance?

23        A.      I guess it was improper maintenance on

24  the part of the service company, yes, they put the

25  wrong spring on the machine.  That was my



Exhibit 30-47

```
 1   understanding of what was found, yes.
 2          Q.     What case was that?
 3          A.     Something versus Woods Brothers, as I
 4   recall.
 5          Q.     Do you recall when that was?
 6          A.     It was in Alabama; but, no, I don't
 7   recall exactly, but probably at least ten years ago.
 8          Q.     Did you give a deposition?
 9          A.     I did not.
10          Q.     I assume you did not testify at trial?
11          A.     I didn't even do a report.  It settled
12   before I even got to inspect the mower.  And then the
13   only other one that involved the bypass type feature,
14   but that was on the Cushman sand rake they had a
15   breakdown and needed to get the machine back to the
16   shop at this golf course.  So they released the
17   hydrostats and were towing it with a golf cart and
18   they come over a hill and it started down the hill
19   and actually got out inside the golf cart and caused
20   the sand rake to overturn.
21          Q.     Did you do a report in that case?
22          A.     I don't believe so.
23          Q.     Did you give a deposition or trial
24   testimony?
25          A.     No.  It settled before trial.  And I
```



Exhibit 30-48

1  believe it was in Pennsylvania where they didn't have
2  depositions.
3        Q.     In either of those cases did you
4  render an opinion that the mower on the sand rake
5  should have been equipped with an additional service
6  brake?
7        A.     I don't recall giving any opinions in
8  the Woods case.  The Cushman I indicated, at least to
9  the attorney, that they needed to have a brake to
10  control so that the motion of the machine could be
11  controlled.  I need to take a brake.
12        Q.     We'll do that in just a second.  Real
13  quick, the Cushman, what type of sand rake, is it
14  hydrostatically powered?
15        A.     Yes.
16        Q.     And is it steered with levers like a
17  zero radius turn mower?
18        A.     No.
19        Q.     So how does it accelerate and
20  decelerate?
21        A.     I believe it had hand throttles that
22  accelerated the engines and made it go faster.  I
23  would have to go back and look at my notes.  That has
24  been 15 years ago.  I don't remember.
25        Q.     Did it have a foot brake?



```
 1        A.      No, as I recall, no.

 2        Q.      How did it brake?

 3        A.      It would have been hydrostatic braking

 4   until there was an emergency when you don't have

 5   hydrostatic dynamic braking.

 6        Q.      You say you just pulled back on a

 7   lever of some sort?

 8        A.      I would have to go back and look at my

 9   notes.  I don't recall.  I don't even know for sure

10   if I have notes.

11        Q.      Okay.

12            MR. FLORENCE:  Let's take a brake now.

13   How long do you want to take a brake now?

14        A.      Three four or five minutes.

15            MR. FLORENCE:  Let's take a

16   five-minute break.

17            THE VIDEOGRAPHER:  We are going off

18   the record at 11:20 a.m.

19            (REPORTER'S NOTE:  At this time,

20   11:20 a.m., a recess was taken, after which,

21   11:28 a.m., the following proceedings were held:)

22            THE VIDEOGRAPHER:  This is the

23   beginning of media unit 2.  And we are back on the

24   record at 11:28 a.m.

25   BY MR. FLORENCE:
```



1       Q.      Mr. Berry, we are back from a quick

2   break.  Are you ready to soldier on?

3       A.      Yes.

4       Q.      Forgive if you said this when you

5   described the incident earlier, I don't recall you

6   saying it, did you state what your understanding is

7   of the degree of the slope where the mower was towed

8   to once it was out of the flower bed area?

9       A.      I did.

10      Q.      What was your understanding?

11      A.      It was whatever Mr. Bilek indicated in

12  his diagram.  I didn't put it to memory.

13      Q.      You don't recall offhand?

14      A.      No.  It was under ten degrees, as I

15  recall.

16      Q.      Nine point something, does that sound

17  right to you?

18      A.      Well, there was variations, but it was

19  under ten degrees, some of the slope was at nine

20  point something.

21      Q.      And which direction was the mower

22  pointed when she stopped towing it?

23      A.      I don't recall that.  I can't remember

24  if it turned slightly downhill or pointed down the

25  hill.  They pulled it up so I suspect that it was



1  pointed down the hill, at least somewhat.

2          Q.    Do you use the term hazard analysis in

3  your work?

4          A.    Yes.

5          Q.    What does that mean?

6          A.    It's a, I have a better definition I

7  can read it to you, but it's, it is called a lot of

8  different things, but hazard risk analysis, you look

9  at the machine and design and look for hazards that

10  can occur in an expected use with looking at what

11  failures can occur and you look at the hazards that

12  exist.  In this instance it would be loss of control

13  and rollover on slopes or drop offs.

14          Q.    Do you categorize this incident as a

15  rollover?

16          A.    It is a rollover, yes, it rolled over.

17          Q.    What are the different types, there

18  are lateral rollovers, backward rollovers?

19          A.    Yeah, this would be a forward

20  rollover.

21          Q.    Lateral means sideways, right?

22          A.    Yes.

23          Q.    And then rear I think everyone knows

24  what this means.  This is forward head first over the

25  retaining wall, correct?



```
 1            A.      Yes.

 2            Q.      How high is that retaining wall?

 3            A.      Three to six feet, as I recall.

 4            Q.      And did the mower actually roll all

 5    the way over before it impacted Rebekah Hillman?

 6            A.      No.

 7            Q.      So when it impacted her what is your

 8    understanding of the position of the mower?

 9            A.      My understanding is the mower came

10    down and this is an example basically where it went

11    over the edge and landed on its front end.  So it

12    landed like this (indicating).

13            Q.      And what part of the mower impacted

14    Rebekah Hillman?

15            A.      My understanding is the front end of

16    the mower.  The foot rest deck where the caster

17    wheels are at the front.

18            Q.      And after that impact then then it

19    actually rolled over after that and ended upside

20    down, is that your understanding?

21            A.      Yes.

22            Q.      Of the cases that you have looked at

23    in the past, how many of them have been a frontward

24    roll off of a drop off?

25            A.      That Woods mower, that's the way it
```



Exhibit 30-53

1   went off.  I don't recall, there was a Scag, older
2   Scag mower that went off in to a lake.  I think it
3   landed on the front and then over on to its side, but
4   it pinned the operator underneath the water and he
5   ended up with a really bad brain injury.  So there
6   are two that went that way.
7           Q.    That's the least likely way for it to
8   happen is forward?
9           A.    Usually with zero turns it, the ones I
10  have seen it's been lateral or rearward.
11          Q.    Or what?
12          A.    Lateral or rearward.  Where they, and
13  it's lateral, that goes over, the front goes over the
14  edge.  There's been a lot of those, but usually ends
15  up on its side or upside down.
16          Q.    And you have done tilt table testing
17  of zero radius mowers; is that correct?
18          A.    Yes.
19          Q.    So you know from that it's a lot
20  harder to get it to make a forward rollover it takes
21  a much higher angle, right?
22          A.    It should be 60 degrees with this
23  mower to get to the tip point, if you can get it
24  there.
25          Q.    And for a rearward rollover what



1  degrees would be required, with this slope?

2       A.    Well, it depends on the condition.  I

3  have seen rollovers 15, 12.

4       Q.    I mean on a tilting.

5       A.    Oh, on a tilt table you can tip,

6  usually you tip to 30 degrees, 25 to 30 degrees, 32,

7  like the John Deere 8425, I think I went to a 32,

8  almost 33 degrees with it.

9       Q.    Rearward?

10      A.    Rearward, yeah.

11      Q.    And then on a tilt table what is it,

12  what type of angle does it take for a lateral roll?

13      A.    Well, the standard requires 25

14  degrees, but they, almost invariably I have seen, of

15  the ones I have tested, 37 or 38 degrees, maybe 34,

16  depending on the mower.

17      Q.    So these other directions are a lot

18  less than the 60 degrees you referenced for a forward

19  rollover?

20      A.    Yes.

21      Q.    It takes a much steeper angle?

22      A.    Yes.

23      Q.    Have you performed --

24      A.    I have seen a rollover of a Dixon

25  mower that was on fairly level ground.  I would call



```
 1   it flat, but it was one involved in a fire and the
 2   operator was trying to get off and hung off the side
 3   and got caught up and that caused it to roll over on
 4   its side.
 5          Q.     It didn't just roll over forward on
 6   flat ground, did it?
 7          A.     No.  No.  It was a side rollover,
 8   layover.
 9          Q.     Have you performed a hazard analysis
10   on the Timecutter mower at issue in this lawsuit?
11          A.     Yes.
12          Q.     Did you document?
13          A.     Well, as I indicated in my report,
14   yes, I did a hazard analysis as to what was involved
15   in this matter.  I didn't cover seat switches and all
16   the other things that could go wrong with it, but
17   with respect to a rollover and the lost control due
18   to no braking, I covered that.
19          Q.     If you would take a look at your
20   report, Exhibit 1, and tell me what pages contain
21   your hazard analysis.
22          A.     (Witness reviews documents).  It's
23   termed Design Methodology starting on Page 3 and then
24   a discussion continues through basically the rest of
25   the report.
```



1          Q.      Other than --

2          A.      But where I talk about hazard analysis

3     is on Page 3.

4          Q.      Under the heading of Design

5     Methodology?

6          A.      Yes.

7          Q.      Your report starts out as a template

8     that you use in other cases and then you modify it

9     for each particular case; is that right?

10         A.      As needed, yes.  A lot of the history

11    with respect to rollovers and zero turn mowers and

12    mowers in general, I reuse that part.

13         Q.      You didn't start from scratch to

14    generate this report, right?

15         A.      Not all of it, yes, that's correct.

16         Q.      A lot of the same language would be in

17    other reports that you have given in other cases

18    involving other mowers; is that correct?

19         A.      With respect to the rollover aspect,

20    yes.

21         Q.      You have a section starting on Page 16

22    that lists various excuses of manufacturers.

23         A.      Yes.

24         Q.      Is that, for the most part, standard

25    language that you include in most of your reports?



Exhibit 30-57

1          A.     It would be very similar, yes.

2          Q.     Is there anything in this case that

3  you are referring to specifically when you state

4  these excuses beginning on Page 16?

5          A.     No, these are just the excuses that I

6  have seen presented with respect to why they don't

7  put ROPS on smaller ZTR mowers even though they roll

8  over and kill people.

9          Q.     Why do you list these excuses in your

10  report?

11          A.     To address those issues so I didn't

12  have to go and do a rebuttal report with respect to

13  those issues.

14          Q.     Had you seen all of those issues

15  raised in this case?

16          A.     (Witness reviews documents). Most of

17  them.

18          Q.     Which ones?  Can you just tell me,

19  they are numbered one through --

20          A.     Well, one, that basic statement this

21  mower is under 880 pounds and they don't put ROPS on

22  the mowers less than 880 pounds because it's, because

23  you will have a greater risk of a rollover.  Because

24  it raises the CG slightly.

25          Q.     How much does it raise the CG?  How



Exhibit 30-58

1    much is slightly?

2         A.    I haven't measured it, but probably an

3    inch or inch and a half.  Although laterally, the

4    stability is actually better with ROPS, I think.  But

5    rearward, I mean, you are putting a structure over

6    the operator to protect them so it's got to raise the

7    CG some.

8         Q.    Which are other ones that you have

9    seen raised, tell me about the number that's in your

10   report.  And the page that it's on.

11        A.    Not specific, Number 2 is the,

12   there's, their argument is they don't need a ROPS on

13   this size mower because there is just not enough

14   people hurt and killed.  Number 3, I haven't really

15   seen that one that the ROPS can catch on overhead

16   obstructions, but with respect to the Number 4, the

17   center of gravity is higher with ROPS making the

18   machine less stable.  And that has been raised in

19   this, in the reports.  I haven't seen Number 5 talked

20   about.  I haven't seen really a discussion that it is

21   going to give operators a false sense of security.

22   And Number 7, I haven't seen that.  Number 8, that's

23   basically claimed by Toro that there was operator

24   error and that's what led to this incident.  Number

25   9, they definitely are saying, well, it's safe

 1  because we met this consensus voluntary standard.
 2        Q.     Why did you include ones that are not
 3  applicable to the case?
 4               MR. CROWLEY:  Objection,
 5  argumentative, misstates facts and information not in
 6  evidence and not accurate.
 7        A.     Because those are the arguments that I
 8  have seen or issues that I have seen raised in past
 9  matters.
10        Q.     You said something to the affect that
11  someone said enough people hadn't been killed.  Who
12  said that?
13        A.     Well, if these were killing, you know,
14  a hundred people, Toro would have done something,
15  they would have had to have done something, these
16  Timecutters.  That's basically the reason why they
17  don't do it is we have only killed ten or 20.  So
18  that, I haven't seen anybody say that directly, but
19  that's the gist of what I am seeing.
20        Q.     Where do you get this data that there
21  have been ten or 20 fatalities on Timecutters?
22               MR. CROWLEY:  Objection.  Misstates
23  his testimony.
24        A.     I haven't counted the number.  There
25  is a list of people.  I have investigated several



Exhibit 30-60

```
1  | that involved fatalities, or serious injuries anyway.
2  |         Q.    Did I misstate your testimony that you
3  | said there have been ten or 20 fatalities on
4  | Timecutters?
5  |         A.    I haven't said there has, I am saying
6  | if there is only ten or however many they have now, I
7  | haven't counted them up.  I am not saying there are
8  | ten or 20, I am saying that there is not like 100 of
9  | them where they go, oh, my God, we have a huge
10 | problem.
11 |         Q.    How many are you aware of?
12 |         A.    Well, Burrton involved a Timecutter.
13 | It rolled over on the lady and killed her.  Ricing
14 | wasn't a killing, but he was rendered a paraplegic.
15 | The McCall case involved a paraplegic, or
16 | quadriplegic, I can't remember.  And then I have seen
17 | the listing of other accidents that they have had and
18 | I never counted them up.
19 |         Q.    Those were all Timecutter cases that
20 | you are talking about?
21 |         A.    As I recall, yes.
22 |         Q.    And you were an expert for interviews
23 | in those cases?
24 |         A.    In those three, yes.
25 |         Q.    When was the first fatality on the
```



1 | Timecutter that you are aware of?

2 | A. I don't know, I haven't studied that.

3 | Q. Have you undertaken any effort to

4 | determine or quantify the probability of a rollover

5 | or tip over or even a loss of control on a

6 | Timecutter?

7 | A. I haven't calculated the probability.

8 | I looked at the design and know that those type of

9 | incidents will occur. They have occurred, they will

10 | occur.

11 | Q. But you are not able to tell me any

12 | quantification of the probability of those occurring?

13 | A. That's correct. I haven't put a

14 | probability to it. It is probable that it is going

15 | to occur. I haven't put a number to that.

16 | Q. Have you attempted?

17 | A. I guess I, I guess with what I said

18 | it's a hundred percent probable that there will be

19 | loss of control accidents, and it's a hundred percent

20 | probable there will be rollover accidents.

21 | Q. So you are saying every Timecutter is

22 | going to be involved in a loss of control accident?

23 | MR. CROWLEY: Objection, hold on a

24 | minute. Objection, argumentative, misstates his

25 | testimony.



Exhibit 30-62

1    A.    No, I am talking about the fleet of

2  Timecutters that are out there, it is probable,

3  hundred percent probable that it will occur.  It

4  occurred in this accident and the rollovers occurred

5  in other accidents, the loss of control occurred in

6  this accident.  So that makes the probability hundred

7  percent now out of a fleet that it is going to occur.

8    Q.    How many times?

9    A.    I don't know that.

10   Q.    So when you say hundred percent

11  probability, you are not talking about every one of

12  these mowers, right?

13   A.    Correct.

14        MR. CROWLEY:  Objection.

15  Argumentative.

16   Q.    So what percentage of mowers will be

17  involved in one of these situations?

18   A.    I haven't calculated the percentage,

19  that's not a number that would be of interest.  It

20  doesn't, it's not important to know, for example, an

21  automobile is going to be in a collision, to most

22  automobiles aren't going to be in one, but you know

23  that they will happen, that's why you design

24  accordingly, and that's what should be done here.

25   Q.    I am trying to understand what you



Exhibit 30-63

1  calculated this hundred percent to be.

2      A.      Hundred percent means if you take a

3  fleet of Timecutters that have been built, before it

4  happens you would have to have some probability, like

5  you are saying.  Now that it has happened, it's

6  hundred percent.  That's all I am saying.

7      Q.      And when did it first happen?

8          MR. CROWLEY:  Objection.

9      A.      For this one I don't know of all

10  instances on Timecutters, but for the loss of

11  control, for Rebekah Hillman it makes it hundred

12  percent.  The other rollovers depend upon when the

13  first rollovers occurred.  I know the Burrton matter,

14  the Ricing matter, the McCall matter those occurred

15  in rollovers.

16      Q.      But in terms of probability of it

17  happens with any particular user, you haven't

18  determined that?

19      A.      No.  That would be too many things to

20  be able to calculate it.  There's studies out there

21  that I have seen, for example, John Deere indicated

22  that 75 percent of the users were consumer mowers

23  would be mowing long steep embankments or would have

24  steep embankments and drop offs and ditches.  So you

25  know that that environment of use is going to have



1   that potential.  But calculating for any one mower, I

2   don't know how you could put a probability to that.

3        Q.     Where is this John Deere data, where

4   is the source for that?

5        A.     It's a study they did in 2004, but I

6   don't have that any more.  I had to return it.

7        Q.     You haven't provided it to us?

8        A.     I can't.

9        Q.     Why not?

10       A.     Well, I don't have it.  It had to be

11  returned at the end of the case.

12       Q.     When did you last review it?

13       A.     Whenever, what, probably ten years

14  ago.

15       Q.     Was that information subject to a

16  protective order in that case?

17       A.     The study was, yes.

18       Q.     Do you have any other statistics or

19  information similar to that that you can point me to?

20       A.     The CPSE has information with respect

21  to the accidents that are occurring.  I don't know

22  that they have put a percentage on the environment

23  reviews, I would have to go back and look.

24       Q.     Are those studies limited to zero

25  radius turn mowers?



```
 1          A.    No.
 2          Q.    All other types of ride-on mowers?
 3          A.    Yes.
 4          Q.    What other ride-on mowers would be
 5   included?
 6          A.    The front-engine riders, rear-engine
 7   riders, any other mowers used by consumers,
 8   residential consumers.
 9          Q.    Like a lawn or garden tractor?
10          A.    Those would be included, yes.
11          Q.    Are you aware of any other incident
12   where a Timecutter had a loss of stability or
13   traction because the hydrostatic motors were
14   disengaged?
15          A.    No.  I haven't really looked for it,
16   but, no, I am not aware of that.  As far as the
17   forgetting to put the control levers back in, I have
18   done that myself.
19          Q.    When did you do that?
20          A.    Well, ever since I got that first
21   Timecutter here rolling, I rolled the machine back in
22   and got on to try to move it, started it up, tried to
23   move it and it didn't go anywhere.  So I had to get
24   off and reinsert or pull out release pins for the
25   hydrostats.
```



```
 1          Q.      Did you disengage the hydrostats on
 2   unlevel ground?
 3          A.      No, it wasn't on it, it was in my
 4   shop.
 5          Q.      Have you ever done --
 6          A.      It's something that I have forgotten
 7   to do.
 8          Q.      Have you ever disengaged the
 9   hydrostats on the Timecutter on unlevel ground?
10          A.      Yes.
11          Q.      When did you do that?
12          A.      When I received the exemplar mower
13   that I put the ROPS on in this case.
14          Q.      It was part of your testing and
15   analysis in this case, right?
16          A.      Yes.
17          Q.      You haven't done that just in the
18   ordinary course of using a Timecutter, correct?
19          A.      Correct.
20          Q.      Are you aware of anyone else that
21   forgot to reengage hydrostatic levers other than you
22   and the plaintiff in this case?
23          A.      I haven't really looked at it.
24          Q.      Are you aware of any?
25          A.      No. But it wouldn't surprise me at
```



Exhibit 30-67

1   all, but, no.
2           Q.      Have you ever taken any effort to
3   determine incident rate for accidents like this one?
4           A.      No.
5           Q.      On the Timecutter incident that you
6   are aware of, I don't think you said this, I
7   apologize if you did, but did any of those involve a
8   head first roll off of an embankment or retainer
9   wall, some kind of shear drop off?
10          A.      The accidents that I have
11  investigated?
12          Q.      Right.
13          A.      No.
14          Q.      And even setting aside what you
15  investigated, are you aware of others where this
16  happened with a Timecutter?
17          A.      I haven't really looked for it, so,
18  no, I am not aware of others.
19          Q.      What testing have you done in this
20  case?
21          A.      Most of it involves testing of the
22  park lock feature that's on the mower to see if it
23  still holds on a slope.  And it does, engage on a
24  slope, if it's rolling.  I weighed the machine at
25  zero degrees and 30 degrees to try to get some



Exhibit 30-68

1  information on the mower.  I have done tilt testing

2  with respect to the mower, with and without ROPS, and

3  with front weights and without front weights and with

4  the ROPS.  I have done kind of a utility analysis,

5  with and without the ROPS, to see where I could mow

6  and what I could do with the mower.  And I haven't

7  noticed a difference in utility with and without the

8  ROPS.  Other than that, I can't think of any.

9      Q.     I think the first one you said was you

10  tested the park lock feature?

11      A.     Yes.

12      Q.     How did you do that testing?

13      A.     I backed it on to a ramp, I think it's

14  9.2 degrees or 9.5 degrees, I can't remember.  And

15  got off, released the hydrostats, and the mower held.

16  And then I got on the mower and disengaged the park

17  lock and it started rolling down the slope and I

18  opened it up and it didn't stop.  Basically it had a

19  chatter.

20      Q.     You did that on a ramp?

21      A.     Yes.

22      Q.     What kind of ramp was that?

23      A.     It was a steel, steel ramp.

24      Q.     How long was it?

25      A.     It was probably 16 feet long, I would



Exhibit 30-69

```
 1   estimate.  I haven't measured it.
 2          Q.     So it was a smooth surface, correct?
 3          A.     It was a tread, it's got a tread
 4   surface, steel plate tread.
 5          Q.     But it's a different surface from, for
 6   example, the turf grass where the mower was situated
 7   in the Hillman incident, correct?
 8          A.     Yeah, it was on what I described.
 9          Q.     And those were different, right?
10          A.     Well, one's grass and one's a steel
11   plate, yes.
12          Q.     And the park lock held?
13          A.     Initially, yes.  It was holding.
14          Q.     And how did you try to, you tried to
15   engage the park lock while after you let it start
16   free rolling; is that right?
17          A.     Yes.  To see if it would engage or do
18   anything.
19          Q.     And it made a chattering noise?
20          A.     Yes.
21          Q.     What was that?
22          A.     Well, that's the worn parking pawls
23   chattering on the steel cog, gear cog.
24          Q.     What mower did you do that test on?
25          A.     Well, the first one I did it on was
```



1    the accident mower when I received it to see what the

2    characteristics was on the cog pawl after it had been

3    ground down.

4          Q.    How, why had they already been ground

5    down?

6          A.    It was involved in the accident.  So I

7    suspect her trying to get it open and going down that

8    hill, that steel gear wore down the cog metal, that

9    was the cog that engaged it where it's trying to

10   engage but it can't.  It just wears it off.

11         Q.    Do you know how many times the subject

12   mower had been subjected to that before?

13         A.    Three times, well, four times now with

14   my testing.  They did it, the accident and then I

15   remember seeing two videos of testing after the

16   accident because they couldn't figure out why it

17   wouldn't stop.

18         Q.    You understand each one of those times

19   it ground down the cog wheel?

20         A.    That's what I would expect to happen,

21   given the steel gear working against that cog metal.

22   Now, how much, once it's worn down I am not sure how

23   much more wear you are going to get, but there might

24   be some that occurs.

25         Q.    Did you make any effort to determine



Exhibit 30-71

1    how much wear there was from your test?

2          A.     I didn't, I only did a short section,

3    wouldn't have expected any wear from it.

4          Q.     But you didn't take any measurements

5    or photographs to document that?

6          A.     I have photographs of it, but I

7    didn't, I didn't do a before and after, no.

8          Q.     Why did you do that test in reverse?

9          A.     In reverse?

10         Q.     I thought you said you went backwards

11   down the ramp.

12         A.     No, I went forward down the ramp.

13         Q.     Okay.  I misunderstood.  You said you

14   also did tilt table testing?

15         A.     Yes.

16         Q.     Why did you do that?

17         A.     Just to have the information about the

18   difference in the machine with the ROPS and without

19   the ROPS and the front weights.

20         Q.     And you documented that when you did

21   that testing?

22         A.     Yes.

23         Q.     Is that what your son helped you with?

24         A.     Yes.

25         Q.     Have you undertaken any effort to



Exhibit 30-72

1  determine whether the subject mower complies with

2  ANSI B71.1-2013 version, in terms of its stability,

3  static stability?

4       A.    Static stability?  That's my

5  understanding that the documents released by Toro

6  indicate they exceeded the standard by ANSI B71.1.

7       Q.    Do you have any reason to disagree

8  with that?

9       A.    No.

10      Q.    None of your tilt table testing

11  suggested otherwise; is that correct?

12      A.    That's correct.  The lateral stability

13  was over 34 degrees without ROPS, and rearward it was

14  30.1.  So that exceeds the, what the ANSI standard

15  had.

16      Q.    I think you did a utility analysis

17  with and without ROPS; is that right?

18      A.    Yes.

19      Q.    How did you go about that?

20      A.    Well, I, I operated the mower with and

21  without ROPS on on slopes that I had mowed other,

22  with other mowers to get a feel for any difference

23  that I have noted between the mower with and without

24  ROPS, and I did not note any.

25      Q.    Where did you do that?



Exhibit 30-73

```
 1            A.       At my house.

 2            Q.       How long did you do it?

 3            A.       For 15 minutes, I would estimate.

 4            Q.       You operated it in the same areas

 5     where you have operated these other ZRTs that you

 6     have?

 7            A.       Yes.

 8            Q.       And is there any way for you to

 9     quantify the difference in utility?

10            A.       I did not notice any difference in

11     utility, so there is nothing to quantify that I could

12     find.

13            Q.       I guess if you could point to other

14     than a subjective determination by you?

15            A.       No.   Nothing that I can point to.   No.

16            Q.       Did you have to make any repairs to

17     the subject mower before you could operate it?

18            A.       No.

19            Q.       Did it operate normally, as best as

20     you could tell?

21            A.       Other than the choke had to be pulled

22     on a little bit to get the engine to run, yeah, other

23     than, other than that, the engine started and it

24     drove, drove well.  Like I would have expected.

25            Q.       And, forgive me, I think that's all
```



1  the testing that you did, but I may not have written

2  it all down.  Is there something else you did, I

3  think you said you weighed it?

4        A.     Right.  I weighed the mower with and

5  without weights representing the operator and also

6  with and without the ROPS.

7        Q.     Why did you do that?

8        A.     Just to get the information.

9        Q.     And does that weight information, how

10  does it impact your opinions in this case?

11        A.     It doesn't -- it indicates to me I

12  could install the ROPS and it doesn't make a large

13  difference in the machine.  Other than it being

14  safer.

15        Q.     Did you calculate the center of

16  gravity on the subject mower at any time?

17        A.     No.

18        Q.     Did you ever calculate or determine

19  the longitudinal force or tripping force necessary

20  for the subject mower to roll over going forward?

21        A.     I am not sure I understand your

22  question.  It's a matter of the loss of, or there is

23  not a longitudinal force that's going to do that.

24  It's more of the front end dropping over an

25  embankment or retaining wall so that it ends up at



Exhibit 30-75

```
 1   the angle where it can go over.
 2        Q.    Why did you not inspect the accident
 3   scene where this accident happened?
 4        A.    Well, I was in, as indicated by Mr.
 5   Crowley, that he had hired an accident
 6   reconstructionist, Mr. Bilek, and that he had already
 7   looked at it and took the measurements.
 8        Q.    And you, so you relied on those
 9   measurements?
10        A.    I didn't do the reconstruction, so I
11   would rely on his measurements; yes, but I didn't
12   need to.
13        Q.    You haven't needed to.  And you
14   haven't looked at the measurements of the slope of
15   the planter area?
16        A.    I looked at it awhile back, I don't
17   have it put to memory.
18        Q.    Do you know what the turf condition
19   was on the date of the accident?
20        A.    I haven't put that to memory either.
21   My understanding is it was grass.  I just don't
22   recall if it was moist or not.
23        Q.    Do you know what the length of the
24   grass was?
25        A.    No.  She had been mowing, but I don't
```



 1   know.

 2        Q.     But where the mowing was, where it had

 3   been towed and stopped, do you know if that had been

 4   mowed already?

 5        A.     No, I don't recall that.

 6        Q.     Have you done a risk benefit analysis

 7   in this case?

 8        A.     Yes.  With respect to both the brake

 9   and the ROPS and I cannot see any benefit of not

10   providing ROPS or brake that outweighs the risk of

11   not providing the ROPS or an actual brake for the

12   machine, an emergency brake.

13        Q.     You say emergency brake?

14        A.     Yes.

15        Q.     Is that the type of brake that in your

16   opinion should have been added to the mower?

17        A.     Yes, a brake that could be used in an

18   emergency situation to stop the machine.  Just like

19   most other machines have.  They have an actual brake

20   that could be used to stop a car, a tractor.  Other

21   mowers.  If you have an emergency situation.

22        Q.     Have you come out with a design

23   proposal for this type of an emergency brake?

24        A.     I haven't, I would start with the

25   brake, that friction-type brake that Hydro-Gear had



Exhibit 30-77

1  available for their units.  For the EZTe 2200 models
2  and test that.  And if that wasn't providing it then
3  I would go to looking at the brakes that are
4  necessary like they have provided on the, say Toro
5  has on the Z Master or Scag's provides on their units
6  a disc brake on the HR rear wheel.
7          Q.     And those are parking brakes as
8  opposed to service brakes, correct?
9          A.     You don't use them for service brakes,
10  but they are emergency brakes as well as parking
11  brakes.  I tested, like the Snapper AZT and the
12  Snapper CZT had a handle you lift up, I tested those
13  on slopes to see if it stops the mower.  And it does.
14  I tested my Scag Turf Tiger to see if the brake would
15  hold.  I had to bypass the safety switch that's
16  there, but if you try to drive through it you can't
17  even drive through it and that would indicate it
18  would stop on any slope that I could drive on.
19          Q.     When did you do the testing?
20          A.     Over the last 15 years.
21          Q.     When was the last time you did that
22  type of testing?
23          A.     Five or six years ago.
24          Q.     So you would, you haven't done that
25  testing in conjunction with your work in this case,



1    correct?

2         A.     No, it is my, part of my base

3    knowledge of testing that I have done with respect to

4    brakes on these mowers.

5         Q.     Do you have any documentation?

6         A.     I don't.

7         Q.     Did you ever?

8         A.     No.

9         Q.     You didn't photograph it or videotape

10   it or create any type of report related to that

11   testing?

12        A.     No.  I was, at that time I was doing

13   it, basically my interest was, well, did, well, in

14   one of them it was related to a case a guy was kind

15   of going down a hill and he didn't stop and went over

16   an edge, and there was an argument that they should

17   have applied the park brake to stop.  And I tested it

18   to determine whether that would stop it.  It did.

19   But I also determined that it takes longer for it to

20   stop.

21        Q.     How much longer?

22        A.     It was four or five feet longer, it

23   was about a ten degree slope.

24        Q.     What was the speed of the mower?

25        A.     Four or five miles an hour.  I didn't



1 have a measurement on the speed. I was just

2 determining how fast it would stop as opposed to what

3 happens on level ground.

4     Q.     Are you aware that there are skid

5 marks created during the incident involving Miss

6 Hillman?

7            MR. CROWLEY: Objection. Facts not in

8 evidence.

9     A.     I am not aware of. I am aware they

10 had some grooves trying to get the mower pulled out

11 of the planter area or edge that's along the

12 retaining wall; but I haven't seen anybody talk about

13 leaving skid marks.

14     Q.     If you were to learn that there were

15 skid marks, what would that indicate to you?

16            MR. CROWLEY: Objection. Asks for

17 speculation.

18     A.     If there were skid marks, I would have

19 to see the skid marks, or have to see what is being

20 called skid marks.

21     Q.     I am sorry, I didn't hear you.

22     A.     I would have to see what we are

23 talking about.

24     Q.     If Jennifer Hillman said there were

25 two sets of skid marks left during the accident, you



Exhibit 30-80

1    are not aware of that?

2           A.     No.

3           Q.     Have you looked for skid marks in any

4    of the photographs that you have seen at the accident

5    scene?

6           A.     I haven't.  I remember seeing some

7    marks down near the, where the, the mower was pulled

8    up out of the planter area.  But I don't remember, I

9    remember looking at some photographs, but I don't

10   remember seeing any skid marks.

11          Q.     You said you looked at some skid

12   marks, how were you able to determine in your mind

13   that whatever you saw was related to pulling the

14   mower out, as opposed to when it went over the wall?

15          A.     Well, I just would have expected there

16   to be some marks when you pull it out.  But I wasn't

17   asked to reconstruct that part of it.

18          Q.     Was there any testing that you are

19   relying on for that statement?

20          A.     No.

21          Q.     You are just making an assumption?

22          A.     No, I was looking at the photographs.

23          Q.     And you are making an assumption from

24   those photographs, right?

25          A.     Well, you asked me a question about



Exhibit 30-81

1  what I saw, and all I am trying to do is that's kind

2  of what I observed.

3       Q.    I am --

4       A.    I don't remember seeing any other skid

5  marks that could even be track marks, let's say track

6  marks.

7       Q.    But you saw some type of marks I think

8  you said; is that right?

9       A.    Down near the planter area beside the

10  yard, yes, in that wood chip covered area.

11       Q.    Did you see any in the grassy area?

12       A.    I didn't really look for it, but I

13  don't recall seeing it.

14       Q.    And is there any testimony or

15  information you can point to me that indicates where

16  those marks or how those marks were left there that

17  you saw in the planter area?

18       A.    No.  There may be, but I don't recall

19  that.  I didn't focus on that part.

20       Q.    Going back to the risk benefit

21  analysis that we talked about, where is that in your

22  report?

23       A.    Number opinion number 6, on Page 29.

24       Q.    And opinion number 6 on Page 29 I

25  believe it's the second sentence the benefits of not



Exhibit 30-82

```
 1   providing a ROPS on the mower are outweighed by the
 2   risk of not providing a ROPS.  Do you see that?
 3         A.    Yep.
 4         Q.    What are the benefits of not providing
 5   a ROPS?
 6         A.    Cost.
 7         Q.    Any others?
 8         A.    That's the one that I have seen in my
 9   operation of mowers with ROPS.
10         Q.    How did you go about quantifying the
11   risk and the benefit in this analysis?
12         A.    Well, I was determining what benefits
13   would there be for not providing a ROPS, and the only
14   thing I could come up with is you have a cheaper
15   mower because you have to provide the steel and
16   attach it to the frame to provide the protection and
17   that costs money.
18         Q.    Do you know how much money that costs?
19         A.    I would estimate you could put it on
20   this mower for hundred, $150 per unit.
21         Q.    What do you base that estimate on?
22         A.    The ROPS that it costs that I have
23   seen, that's to Toro, but my work with Femco where
24   they would cost out their ROPS, cost of their ROPS to
25   various manufacturers and it would be, depending upon
```



Exhibit 30-83

1   how many they make, if they made lots of them they
2   could make them a lot cheaper; so let's say, I don't
3   recall who the manufacturer was, but let's say it's
4   Cub Cadet and they say we could put it on $120, build
5   this and have it to put on for $120.  That's the cost
6   estimate that I could recall.  And I don't remember
7   if it was Cub Cadet or not.  But it was their cost to
8   Cub Cadet.
9                       So that's where I base it on,
10  on the machine, that information and what I have seen
11  estimated with the weight of the machine and the
12  weight of the ROPS.
13      Q.      The other part of your risk benefit
14  analysis relates to the brake, correct?
15      A.      Yes.
16      Q.      What would be the downsize of a brake
17  like the one that you are proposing?
18      A.      I can't think of one.
19      Q.      How would you --
20      A.      I can't think of a reason why you
21  wouldn't want somebody to be able to stop this mower
22  if they can't get it stopped otherwise by using a
23  brake.
24      Q.      Have you seen a brake used in this
25  fashion on other zero radius turn mowers?



Exhibit 30-84

1          A.     Yes.

2          Q.     Which ones?

3          A.     We just talked about it, I own two

4   Scags that have brakes on the rear wheels, and I have

5   a Snapper CZT and I operated a Snapper AZT and they

6   have brakes on the rear wheels.

7          Q.     Do you use them to stop the mower?

8          A.     I have, yes.  Not normally, but I have

9   tested them to stop the mower, yes.

10         Q.     Is that what you told me about?

11         A.     Yes.

12         Q.     So that wasn't then in connection with

13  this case, correct?

14         A.     Yes.

15         Q.     Have you done any testing to determine

16  what affects there might be from an operator who

17  tried to use both this type of additional brake that

18  you are talking about while the hydrostatic mowers

19  are operational?

20         A.     Well, typically on the machines that I

21  am talking about, they have interlock that would kill

22  the engine if you tried to do that.  So you can't

23  forget to leave the park brake on or the brake on and

24  have the engine operate.  So that's what you would

25  have, just kind of similar to a lot of the park



Exhibit 30-85

1   locks, they will have an interlock on those, say, the

2   Cub Cadet I have.  They would have an interlock on

3   that.  As soon as you moved the handle to drive it

4   would kill the engine unless you release the park

5   brake or the park lock.  So that would be accounted

6   for by that interlock.

7        Q.     Which mowers has this type of brake

8   on?  I am sorry, this type of interlock on?

9        A.     The Scags have that, the Snappers have

10  that, Dixon had that on it when I had a Dixon.  The

11  Cub Cadet has that on it so that you have to release

12  the park brake first before you could drive it.  The

13  John Deere that I have has to have the park brake

14  released before you can drive it.  Both John Deeres

15  have to have the break released before you can drive

16  it.  Let me think of others.  The Hustler does not

17  have that type of feature.  It's more like the Toro

18  where you move the handles in to drive it.

19       Q.     With the Toro you have to move the

20  handles in before you can drive, correct?

21       A.     Yes.

22       Q.     So the parking brake remains in place

23  until you bring the handles in and disengage it and

24  then you --

25       A.     You park lock those, yes.



Exhibit 30-86

1        Q.      Right.

2        A.      It's not a brake.

3        Q.      It prevents the mower from moving when

4    it's stationary, correct?

5        A.      Yes, it's a park lock.  Kind of like

6    your park on your car, it's a lock.  But you still

7    have your emergency parking brake on your car.

8        Q.      Do you know what the definition of a

9    park brake is in ANSI B-71.1-2013 version?

10        A.      I have read through that, but, no, I

11    don't know, what they call a park brake.  Not by

12    memory.

13        Q.      You considered ANSI B-71.1-2013 as

14    part of your work in this case?

15        A.      Yes.  I considered it, read through it

16    completely.  2013?

17        Q.      Yes.

18        A.      I thought it was the 2003.

19        Q.      I am sorry, my mistake, you are

20    exactly right.  2003.  I apologize for that.  The

21    2003 standard is the one that would apply to the

22    subject mower, correct?

23        A.      Yes.  Well, at least that's, you know,

24    the 2012 was probably out and I would have expected

25    them to at least be looking at it when they sold this



1   machine, but that's what is indicated by Toro.

2        Q.    In the risk utility analysis that we

3   have been talking about, is there any quantification

4   or data that I could look at in regard to the risk

5   determining analysis?

6        A.    No.  Because I was looking at what

7   risks exist with this mower and then the utility that

8   it offers by not providing ROPS, for not providing a

9   park brake.  And I didn't come up with any added

10  utility that you get by not providing those important

11  features.

12       Q.    Apart from what's in your report,

13  Exhibit 1, are there any other documents or data that

14  you rely on for your risk utility analysis?

15       A.    No.

16       Q.    Have you made any effort to quantify

17  the risk of serious injury, or even death, from a

18  Timecutter such as the one at issue here?

19       A.    You mean put a number to it?

20       Q.    Right.  Quantify.

21       A.    No.

22       Q.    Have you undertaken an effort to

23  quantify the benefits as part of your risk benefit

24  analysis?

25       A.    I looked at types of injuries that



1  occurred during rollovers, deaths and serious

2  injuries that occurred, and, yes, the benefits of

3  providing a ROPS.  I have looked at the benefits of

4  if you forgot to put the hydrostat release leverage

5  back out, the benefits of having the brake, the

6  emergency brake to stop the machine.

7      Q.    Are you aware of any, any zero radius

8  turn mowers to have an interlock that prevents

9  operation of the mower while the hydrostatic mowers

10  are in bypass mode?

11      A.    I haven't looked for it, but I am not

12  aware of it.

13      Q.    Have you done any testing on

14  interlock?

15      A.    I have not.  I test other interlock

16  and starting in the engine if certain conditions

17  aren't made and those seem to work well in preventing

18  like having the park brake not released, or not on to

19  start the engine.  Something similar to that, those

20  levers on the hydrostats are in the released

21  position, prevent starting the engine I think would

22  be effective, but I haven't actually done it.  But

23  it would be a similar switch and a similar wiring in

24  to the circuit.

25      Q.    Have you assessed how that would



Exhibit 30-89

1   impact the maintenance functions on the mower?

2          A.    Yes.  I have looked at the maintenance

3   part of it and from what I have seen there is no

4   maintenance necessary to be able to have the engine

5   running with those released.  You could have the

6   engine off and push it around.  Maybe there is

7   something to do with their tracking adjustment; but,

8   no, you would want the hydrostats engaged for that.

9   I didn't find anything.

10         Q.    Have you ever heard of maintenance

11  that involves purging the hydrostatic motors?

12         A.    If you change the oil in the

13  hydrostats?

14         Q.    That could be one reason.

15         A.    I have seen that on other ones, I

16  didn't study it on this mower.  That would be

17  basically jacked up the mower and run the wheels

18  forward and backward to have it purged.  I don't

19  think you would have to have the hydrostats released

20  to do that.

21         Q.    Do you think you could do that without

22  having the hydrostats released?

23         A.    I think so, yes.

24         Q.    Why do you think that?

25         A.    Because you could jack up the mower





```
 1    and have the rear wheels lifted off the ground and
 2    drive the wheels back and forward while you purged
 3    it.   That's what I have seen on other mowers and
 4    what I have done on the mowers that I have when I
 5    changed the mower.
 6            Q.    Have you ever purged the access mower?
 7            A.    Not on the Timecutter, no.
 8            Q.    On any ZRT?
 9            A.    Yes.
10            Q.    Which one?
11            A.    The Scag mower.  I did that one, and
12    my Hustler I have done it once.
13            Q.    And you don't, you didn't disengage
14    the hydrostatic motors?
15            A.    No.
16                  MR. FLORENCE:  Why don't we take a
17    quick break?
18            A.    Do you want to take a lunch break or
19    just a break?
20                  MR. FLORENCE:  Let's go off the record
21    and discuss that off the record.
22                  THE VIDEOGRAPHER:  We are going off
23    the record at 12:39 p.m.
24                  (REPORTER'S NOTE:  At this time,
25    12:40 p.m., a lunch recess was taken, said after
```



1  which, 1:13 p.m., the following proceedings were

2  held:)

3                THE VIDEOGRAPHER:  This is the

4  beginning of media unit 3 and we are back at the

5  record at 1:13 p.m.

6  BY MR. FLORENCE:

7        Q.    Mr. Berry, are you ready to proceed?

8        A.    I am.  With respect to what we were

9  talking about the bypass and using it when you are

10  purging, I don't know if that's necessary, but if it

11  is, I wouldn't.  The AZTs are never supposed to be

12  open up anyway, they are supposed to be a sealed

13  system and you don't really do anything.  So the only

14  time you open it up is when the mechanic is actually

15  tearing in to it.  And if you have to have it

16  disengaged while you are, have your engine running,

17  you would have instructions with respect to how to

18  bypass that safety interlock so that you could do

19  that for that purging procedure.  That's, if that

20  needs to be done.

21        Q.    Did you look at some documents while

22  you are on the break to determine that?

23        A.    No, I just ate lunch.  I did think

24  about it.

25        Q.    Any other changes or connections to



1   your previous testimony?

2        A.    No.

3        Q.    Can you identify for us any zero

4   radius turn mowers that were in the market in 2013 at

5   a similar price point to the Timecutter fitted with

6   ROPS?

7        A.    Similar price point?  I haven't looked

8   for that.  It's not a term, you either provide the

9   ROPS or you don't.  I don't know how much the Hustler

10  Sport would have cost in that time period or the ATZ

11  compared to that Toro.  I imagine more expensive

12  because they are better machines.  They are built

13  with a better deck.

14       Q.    The deck has to be built enough to

15  support ROPS; is that correct?

16       A.    The frame, I am talking about the

17  mower deck itself.

18       Q.    The frame?

19       A.    The frame does, too, but that's a

20  matter I put it on like I said a ROPS on a Cub Cadet

21  RZT and those have sheet metal frames, but if you

22  spread out the load you can do that.  And that's

23  basically what Toro has done, the ROPS on the

24  Timecutter in '19-2020 they spread out that load so

25  it's on more parts of the machine.



1          Q.     In 2013 there were plenty of zero

2   radius turns on the market that were equipped with

3   ROPS; is that correct?

4          A.     Were not?

5          Q.     That were.

6          A.     More expensive ones, yes.

7          Q.     So you did do, you did look in to the

8   price comparisons on these various machines?

9          A.     Well, I looked at the, back in the

10  past, you know, when I was looking at buying them,

11  yes, the ones that had ROPS on them that ranged down

12  to about $5,000, whereas like the Toro Titan had

13  ROPS, below that usually I didn't see any ROPS on the

14  machines.

15         Q.     I thought I asked you that a minute

16  ago and you said you hadn't looked in to that.

17         A.     I haven't recently, but as a price

18  point, I haven't.  There may be cheaper ones, but

19  when I was looking at purchasing a mower that's what

20  I found.

21         Q.     There was, there was nothing that

22  prevented the Hillmans from purchasing a ZRT mower

23  with ROPS back in 2014, correct?

24              MR. CROWLEY:  Objection.

25  Argumentative.  States facts not in evidence and



```
 1   misquotes the record.
 2         A.    I don't know what their finances were,
 3   what they were looking for.  This mower, if it met
 4   their needs, and it doesn't need ROPS then they
 5   purchased this one; but, yes, they could have gotten
 6   a mower with ROPS.  They existed in 2013.  They were
 7   more expensive.  But, yes.
 8         Q.    But readily available on the market?
 9         A.    You could buy one, I just said that.
10         Q.    Do you know when the Hillmans began
11   mowing the turf area up above the retainer wall where
12   the accident happened?
13         A.    No.
14         Q.    Do you know if they were planning to
15   do that at the time they bought the Timecutter?
16         A.    I don't recall that discussion at all.
17         Q.    Do you perform any type of analysis of
18   the outcome of this accident involving Rebekah
19   Hillman if the mower had the ROPS that you have
20   proposed in your report should have been on the
21   mower?
22         A.    The outcome?
23         Q.    Right.
24         A.    I have looked at it and looked at the
25   design of the ROPS and the ROPS would have stopped
```



1  the mower when the ROPS hit the ground.

2       Q.    Have you taken that a step further to

3  determine whether it would have changed, whether or

4  not it would have completely protected Rebekah

5  Hillman from any type of impact on the ground under

6  any circumstances?

7       A.    I haven't been asked to do that.  I

8  have considered it would be a dual impact situation.

9  The front end hits and tips over on top of the ROPS.

10  The ROPS doesn't prevent contact with the ground, so

11  there could have been some contact, she could have

12  had bruises to her arms, to her head.

13       Q.    Could have had contact with her head

14  with the ground, correct?

15       A.    Yeah, but you put your hands out

16  usually to protect yourself.  The CG only would drop

17  if you are in this position, it only drops about a

18  foot.  So it's only like a one foot drop.  The big

19  drop is when it landed on the front end on to her

20  legs and tips back on the top.  You know, it went

21  from a stopped position there and then boom over on

22  to a stop.  And there would have been, you know, in

23  all sum energy, but that's only a one-foot drop.

24       Q.    And it is my understanding, is there

25  anything in your report or in your analysis that you



Exhibit 30-96

1   have done, that shows what injuries, if any, she

2   would have sustained if there would have been a ROPS,

3   like you advocate for in your report?

4           MR. CROWLEY:  Objection.

5       A.     I haven't been asked to do that

6   analysis.  I am giving my experience that ROPS

7   provides, and the whole point of the ROPS is to

8   provide a crush protection for the occupant.  And Mr.

9   Kenneth, I believe, is addressing those issues on the

10  injuries.

11      Q.     So that's not in your area for this

12  case?

13      A.     I haven't been asked to do that.

14      Q.     You haven't done it, right?

15      A.     Well, only to the extent of what I

16  have described with respect to the drop of the CG and

17  I wouldn't have expected a major impact to the on top

18  of the ROPS so it would provide a good protective

19  area.  If it dropped 6-foot straight down like this,

20  that's a different story than hitting and tipping

21  over on to the top of the ROPS.  But I would have

22  expected a protected zone for her.

23      Q.     Have you done any calculations to

24  confirm your expectation?

25      A.     No, I looked at the test data from



```
 1   custom products and fully expect this ROPS to have
 2   held up.
 3        Q.    You haven't done an analysis, or any
 4   testing or calculations, that would show exactly what
 5   would show if the ROPS had been on the mower?
 6        A.    I haven't done that, no.  I mean, I
 7   know what would happen if it landed, we know it
 8   landed on the front end, it tipped over upside down.
 9   The ROPS would have prevented that and provide a
10   protective area.  That's what I was asked to look at.
11   And you can provide -- what?
12        Q.    I am sorry, go ahead.  I didn't mean
13   to interrupt you.
14        A.    And that is the part I looked at.  And
15   it wouldn't destroy the ROPS in this accident, it
16   would still provide a crush protective area.
17        Q.    And where are your calculations or
18   your analysis to support that statement that you just
19   made?
20        A.    It's based on experience of rolling
21   these mowers over.  And other machines over.  The
22   ROPS holds up very well.  Typically in a -- we
23   actually have rolled machines over, you don't even
24   see permanent inflexion of a ROPS when you do actual
25   rollovers as opposed to the ROPS test, which is much
```



1   more severe than any rollover I have seen.

2         Q.    Have you done any analysis of whether

3   Rebekah Hillman would have come in contact with the

4   ground even if the ROPS held up?

5         A.    Well, as I indicated, I suspected

6   there would have been contact with the ground,

7   especially a two post ROPS, that could happen.  The

8   experience has shown that that hasn't resulted in

9   severe injuries to people; but that's stated with the

10  machine, that's what I have looked at with respect to

11  ROPS.  I wasn't asked to look at her injuries, she

12  wouldn't have had her legs cut, I am pretty sure of

13  that if she was seat belted in and in her seat if it

14  rolls over.

15        Q.    Did you look at if there might have

16  been other injuries?

17        A.    I wasn't asked to look at that, but

18  other than, I have, since we were looking at the type

19  of drop of a CG there wasn't going to be much speed

20  to cause that injury.

21        Q.    Where are those calculations that you

22  are referring to?

23        A.    That is an estimate based on where I

24  expect the CG to be and how far it drops when it tips

25  over to the top of the ROPS.



1        Q.     But you haven't done any calculations
2   or testing on that?
3        A.     I have not.
4        Q.     You haven't done any simulations to
5   support that?
6        A.     I haven't seen the need for it.  You
7   know where the CG is, it could be eight inches that
8   it drops, it could be a foot that it drops.  I
9   haven't calculated that.
10       Q.     Have you done any simulation where
11  there was a head first roll with the type of this
12  incident involved?
13       A.     Head first roll?  Well, I consider,
14  like I talked about, I considered that landed on its
15  front, that was the impact first.  And then it went
16  over to its top.  So I considered that, yes.
17       Q.     Did you do any testing of that?
18       A.     No.
19       Q.     Did you do any simulations to that?
20  In other words, did you roll this mower over in that
21  same fashion?
22       A.     No.
23       Q.     Is a ROPS hundred percent effective in
24  eliminating injury to an operator in the event of a
25  rollover or overturn of a mower?



Exhibit 30-100

1        A.      Any injury?

2        Q.      Right.

3        A.      Probably not.  You would have bruises

4    from the seatbelt, you could get a bruise hitting

5    against the ground.

6        Q.      Is there anything that you can point

7    me to that would say there would not ever have been a

8    serious injury?

9        A.      Just the record with respect to ROPS.

10   There is a lot of incident data with respect to

11   rollover machines with ROPS, the operator drops a lot

12   farther than on a ZTR, that indicates there is not

13   the injuries, serious injuries occurring.

14       Q.      Has it ever happened?

15       A.      With ROPS?  I suppose there may have

16   been some, I have not, I am not aware of them.  As I

17   said, you know, you could hit the ground with ROPS.

18       Q.      All right.  I am going to talk with

19   you, I misplaced the next document that I want to ask

20   you about.  Do you see the document that I am sharing

21   on the screen now?

22       A.      Yes.

23       Q.      I will scroll through it for you.  It

24   is an eight-paged document.  Can you identify this

25   document?



1          A.      That is the document that I prepared
2   to show what I did to put the ROPS on this
3   Timecutter.
4               MR. FLORENCE:   I will mark this.
5   BY MR. FLORENCE:
6          Q.     The title of it is, ROPS Design and
7   Installation to Install the ROPS Available For
8   Current Toro Timecutter 4225 Mowers on to the
9   Timecutter SS 5000; is that correct?
10         A.     Yes.
11         Q.     Why did you create this document?
12         A.     I just said to show what I did to be
13  able to install it on this Timecutter.
14         Q.     Forgive me, this is Exhibit 5 to your
15  deposition, okay?
16         A.     Okay.
17                (Deposition Exhibit 5 was marked for
18  identification.)
19  BY MR. FLORENCE:
20         Q.     I will go to, you bought a ROPS kit
21  for a Timecutter 4225 and applied it to a Timecutter
22  SS 5000.
23         A.     Yes.
24         Q.     Which Timecutter SS 5000 did you apply
25  it to?



1          A.     An exemplar SS 5000.

2          Q.     What year was it manufactured?

3          A.     I think it was 2012.

4          Q.     Where did you get that exemplar?

5          A.     Mr. Crowley purchased it and he sent

6     it to me.

7          Q.     When did you get it?

8          A.     November last year, I think.  Might

9     have been October.

10         Q.     What modifications did you have to

11    make because you were dealing with a Toro 4225

12    Timecutter as opposed to an SS 5000?

13         A.     Well, I had to purchase the -- stop

14    there -- that plate, that red plate that's up and

15    down, I had to purchase that, that's 4225, that

16    replaces, in the next picture, the smaller black

17    bracket, attach the hydrostats axle to the frame.

18         Q.     When you say stop there you are

19    talking about the red plate in figure 1; is that

20    correct?

21         A.     Yes.  Also shown in figure 2, the

22    black plate on the left that I am holding was

23    replaced with the red plate beside it.  And then on

24    the rear the mounts originally had a hole that bolted

25    down in to the frame of the mower, and I modified it



Exhibit 30-103

1  with a bracket that would attach the rear to the

2  frame of the mower.  Also, as shown here, in the next

3  photograph I installed the four front weight plates

4  that were provided with the ROPS.

5       Q.    How much weight did they add?

6       A.    26, 27 pounds.

7       Q.    Each?

8       A.    No.

9       Q.    Total?

10      A.    Total.

11      Q.    How much did the weight of the machine

12  increase by virtue of adding ROPS including weights

13  or anything else that you added to the mower?  Do you

14  recall?

15      A.    Well, just from memory, I don't

16  recall.  It is in the --

17      Q.    We'll come to that in another

18  document, come back to that.

19      A.    It was around 75 pounds.

20      Q.    So figure 7 in Exhibit 5, do you see

21  that?

22      A.    Yep.

23      Q.    That's a picture of the Toro

24  Timecutter exemplar that you told me about that Mr.

25  Crowley purchased with this ROPS attached to it, is



Exhibit 30-104

1    that correct?

2          A.     Yes.

3          Q.     Is that a certified ROPS?

4          A.     It's certified by Custom Products for

5    Toro.

6          Q.     Is it certified for this model mower?

7          A.     It was tested for the 4225 or current

8    Timecutter, until I got, it wouldn't have mentioned

9    this one, this model.

10          Q.     This is ROPS that, in your opinion,

11   should have been on the mower as standard equipment;

12   is that correct?

13          A.     Well, that's the minimum ROPS that

14   should have been on it, yes.

15          Q.     Is there any other ROPS that you think

16   that would be better and should have been on it?

17          A.     I prefer the ROPS that I put on,

18   designed and put on, it's lighter weight for the

19   upper part and provides a little more protection than

20   this one does.

21          Q.     Figure 18 is the ROPS installed on the

22   Toro Timecutter 4225?

23          A.     What's that?

24          Q.     Figure 8 is a picture of the ROPS

25   installed on the Toro Timecutter 4225?



Exhibit 30-105

```
 1          A.     Yes.
 2          Q.     Is that the same ROPS installed in
 3   figure 7?
 4          A.     Yes.
 5          Q.     You applied the same ROPS to both of
 6   those mowers?
 7          A.     It's the same mower.
 8          Q.     Okay.  I thought figure 8 says
 9   installed on the Toro Timecutter.
10          A.     That's the SS 5000, the top is from
11   the 4225.
12          Q.     Okay.  So on Exhibit Number 5, figure
13   8 where it says ROPS installed on the Toro Timecutter
14   4225 that should say Timecutter SS 5000?
15          A.     Yes.
16          Q.     Not different mowers?
17          A.     Correct.
18          Q.     And then you state your conclusions at
19   the end of this document; is that correct?
20          A.     Yes.
21          Q.     Did you do any testing of the ROPS
22   supplied with this Toro 5000?
23          A.     You mean like rollover testing?  I did
24   a tilt table testing.
25          Q.     Okay.  Did you do any testing as to
```



Exhibit 30-106

```
 1   the durability of the ROPS?
 2          A.     Not intentionally.
 3          Q.     Did you accidentally?
 4          A.     Yeah, on one of the tilt tests the
 5   rope gave way and the mower, that keeps it from
 6   tipping on over, the rope gave way and the mower
 7   tipped off of the tilt platform on to the ground on
 8   to its rear.
 9          Q.     You were testing the longitudinal
10   stability with the ROPS on?
11          A.     Yes.
12          Q.     Did you damage the mower?
13          A.     No.
14          Q.     And no one was hurt, right?
15          A.     No one was hurt.
16          Q.     The mower gave, well, the rope broke,
17   is that what you said?
18          A.     Yeah.  Right.
19          Q.     Okay.  Here my screen now is what
20   we'll mark as Exhibit Number 6.
21                 (Deposition Exhibit 6 was marked for
22   identification.)
23   BY MR. FLORENCE:
24          Q.     Do you see that document?
25          A.     Yes.
```



```
 1          Q.    What is the title of that document?
 2          A.    Testing and Analysis of the Static Tip
 3   Angles of a Toro SS 5000 With and Without ROPS.
 4          Q.    Is this a document that you were
 5   referring to a moment ago when you said you could
 6   check it to find the information --
 7          A.    Yes.
 8          Q.    -- you were looking for?
 9          A.    Yes.
10          Q.    When did you prepare this report,
11   Number 230701?
12          A.    July 3rd.
13          Q.    Of this year?
14          A.    Yes.
15          Q.    When did you do the testing to support
16   or that goes in for the data that goes in to this
17   report?
18          A.    I finally got time enough to do the
19   testing and it wasn't raining on a weekend for when I
20   could have my son assist me.
21          Q.    And when was that?
22          A.    July 1st.
23          Q.    Why did you do this test?
24          A.    Just to get information with respect
25   to the differences in the static tip angles with and
```



```
 1   without ROPS and with and without the front weights.
 2   And then also -- well, that's basically it.
 3        Q.     You did not have this, have these test
 4   results at the time you rendered your report in this
 5   case?
 6        A.     I did not have these test results.  I
 7   had similar ones, but I wanted to do it on this
 8   machine.
 9        Q.     Is there anything about these test
10   results that changes any of the opinions that you
11   stated in your report from March of 2023?
12        A.     No.
13        Q.     What do you mean by static tip angle?
14        A.     It means there is no power being
15   delivered to the machine to cause it to tip.  So in a
16   rear tip over you can apply power and it will tip
17   over a lot sooner than the static tip angle.  Usually
18   it's at least half.  And then also in a lateral
19   direction you are not going over ground that might
20   have bumps, so you are not getting that dynamic
21   bouncing of the mower.  So it's a static versus a
22   dynamic situation.
23        Q.     These are measurements or testing done
24   on a tilt table?
25        A.     Yes.
```



Exhibit 30-109

1        Q.    You have your own tilt table?

2        A.    Yes.

3        Q.    What is the surface of the tilt table?

4        A.    It's steel tread plate.

5        Q.    I think you said earlier that this

6    testing confirmed that the mower passed the ANSI

7    B-71.1-2003 stability test requirements?

8        A.    Well, I didn't really do the stability

9    test that's required in this, it is more of a

10   comparison, but I think it would.

11       Q.    Okay.  So let's look at Page 3,

12   Exhibit Number 6.  That shows the results of your

13   testing, correct?

14       A.    Yes.  The 534 pounds is wrong.

15       Q.    What is this supposed to be?

16       A.    598 pounds.

17       Q.    Where did the 534 come from, do you

18   know?

19       A.    No.  I started with another tilt table

20   test and it may have been one I didn't just didn't

21   change the amounts to.

22       Q.    This is a template that you have used

23   before for testing other mowers?

24       A.    Yes.

25       Q.    So you think that didn't get changed



Exhibit 30-110

1  from the previous version?

2      A.    Correct.  Because I know it's 598

3  pounds without ROPS.

4      Q.    And the 598 pounds, does that include

5  any allowance for operator's weight?

6      A.    That would include the operator, with

7  the 200 pound operator I put below what the weight

8  would be.

9      Q.    Okay.  I see.  Yeah.

10     A.    And evidently I can't add very well

11 because that 796 pounds ought to be 800 pounds.  I

12 took two off instead of adding two on to it.

13     Q.    So you are saying --

14     A.    598 plus 200 should be 798.  The

15 weight I actually used is when I weighed it it was

16 202 pounds.  So 201.5.  So it will be around 799 to

17 800 pounds.

18     Q.    And you are talking about the row that

19 says Toro SS 5000 Timecutter without ROPS?

20     A.    Yes.

21     Q.    That's 796, and it should be what?

22     A.    799.

23     Q.    Do you see any other errors?

24     A.    Nope.

25     Q.    Okay.  So to come back to the question



1  I asked you earlier, the difference between the Toro

2  Timecutter without ROPS and the total weight added

3  from weights and the ROPS is about 98 or 99 pounds?

4       A.     About 100 pounds, yeah, it's 100

5  pounds.

6       Q.     Did you do any testing to determine

7  the difference in the center of gravity between the

8  mower with ROPS and without ROPS?

9       A.     No.  I didn't measure the center of

10  gravity.

11       Q.     And then moving down below that to the

12  bottom of Page 3, this sets out your tilt test

13  results with and without ROPS, correct?

14       A.     Yes.

15       Q.     And you measured it for a rear tip and

16  a tip to the left, correct?

17       A.     Yes.

18       Q.     You did not measure for a forward

19  roll?

20       A.     No, you can't really do that on this,

21  as soon as you got it to a certain point the weight

22  will go on the front wheel and go off the platform.

23       Q.     Is that what you are referring to in

24  note 4 here on Page 4?

25       A.     Yes.



Exhibit 30-112

1          Q.     Your conclusion is, even if a front
2    tipping test was attempted the unit would roll
3    downhill well before it would ever tip; is that
4    correct?
5          A.     Yes.
6          Q.     You say in conclusions that the ROPS
7    does raise the CG of the Toro SS5000 Timecutter a
8    small amount, but the front weights counteract nearly
9    any change in the stability.  Is there any way you
10   can quantify for me what that small amount is?
11         A.     Well, the rear -- laterally it
12   actually seemed to have increased the stability, the
13   lateral stability, the ROPS being on it.   But
14   rearward it changed it from 30.1 degrees down to
15   29.3, I think is, if I recall.  So it may, if you
16   want to get to 30 degrees, you don't have to by the
17   standard, but if you wanted to get to 30 degrees you
18   might have to add another plate on to the front.
19         Q.     Are you referring to the angle
20   achieved in table 2?
21         A.     Yes.
22         Q.     Okay.  But in terms of the change in
23   the center of gravity does it quantify that anywhere?
24         A.     No.
25         Q.     So the raise of the CG that you



Exhibit 30-113

1   reference in the first sentence of your conclusions

2   there is a small amount, but no quantification of

3   what that small amount is, correct?

4         A.     I did not calculate the CG height,

5   which is basically, well, or change.  It would move

6   the CG back, and then the front weights would

7   counteract it back to the front.  But I didn't

8   calculate it.

9         Q.     And then the remainder of the report,

10  I will show it to you basically documentation and

11  photographs showing what you did?

12        A.     Right.  And it should show the one

13  with the mower on its rear.  Do you see the red rope

14  out to the front of this?  That pulls it when it gets

15  to the tip point from going on over or supposed to.

16        Q.     So we are looking at top of Page 7,

17  which is Number 4, that's what you are referring to;

18  is that correct?

19        A.     Yes.

20        Q.     That shows your tilt table there that

21  you have?

22        A.     Yes.  And there, so this photograph

23  you see that the rope is tight and keeping it from

24  tipping on over.

25        Q.     And that's Number 5 Toro SS 5000 at a



1  30 degree angle in tip rear; is that correct?

2       A.    Yes.

3       Q.    And at 30 degree it didn't tip, is

4  that what you are saying?

5       A.    It was still down, yes.  That's with

6  the ROPS and it has the weights on it.

7       Q.    And the tip angle changed to 25.4

8  degrees; is that right?

9       A.    No, that had hadn't tipped yet, I took

10  a photograph when you have ROPS you have to go to 30

11  degrees --

12       Q.    We are on number 9 on Page 9?

13       A.    Right.  The rope released and it

14  tipped all the way over on to the ground.

15       Q.    Okay.  Okay.

16       A.    And that was at 29.3 degrees.

17       Q.    Okay.

18       A.    And this one was without the front

19  weights.

20       Q.    You are talking about Number 12?

21       A.    Yeah.

22       Q.    On Page 11.

23       A.    And that shows the rope tight and it

24  tipped backward.

25       Q.    Okay.



1        A.     And that picture also showed the steel
2    tread plate that I was talking about, the surface.
3        Q.     Okay.  On the tilt table you are
4    talking about?
5        A.     Right.
6        Q.     Besides Exhibits 5 and 6 that we just
7    looked at, are there any other documents that show
8    any testing or analysis that you did for this case?
9        A.     There's quite a few photographs of me
10   doing weight measurements with the mower flat on the
11   ground and so at 30 some, 30.2 degrees, something
12   like that.  But I don't have those in the report.
13       Q.     Those were just, you were collecting
14   the weight at various, I am sorry, say that again,
15   what was it?
16       A.     I got the weight on the wheels at zero
17   degrees and at 30 degrees basically, rear tip.
18       Q.     Okay.
19       A.     Without an operator.
20       Q.     Did you document that?
21       A.     I took photographs.
22       Q.     Okay.  So it would just be photographs
23   that show something that would indicate at this slope
24   and the weight?
25       A.     Yes.



Exhibit 30-116

1      Q.     Okay.  And you provided those to us?

2      A.     Yes.

3      Q.     And aside from those photographs that

4  you just described with the weight and the various

5  angles in Exhibits 5 and 6, that we just looked at,

6  are there any other test results or data that you

7  created in connection with the work in this case?

8      A.     I don't think so.  I don't recall

9  anything else.

10     Q.     Did you examine or take into account

11  the orientation of the mower at the time it landed on

12  Rebekah Hillman?  Or after it landed?

13     A.     I understood the description that the

14  front part of the mower landed on her legs and then

15  it tipped over on to its, on to the seat area and

16  then Jennifer Hillman was able to roll it off of her

17  to the side because it was dripping gas, is what I

18  recall.

19     Q.     Can we agree that operating the Toro

20  Timecutter at issue here with the hydrostatic motors

21  bypassed is not the intended use of the mower?

22     A.     It's allowed, it's not really, at that

23  point you are not using the mower, you are planning

24  on using the mower, but you can't because it's still

25  bypassed.



Exhibit 30-117

1        Q.    So it wouldn't be intended?

2        A.    I mean, I will agree that Toro didn't

3    intend for her, for someone to try to operate it with

4    it bypassed; but they could have, should have

5    expected that someone could forget that it was still

6    bypassed.  And like I said, I have done it, I even

7    did it on my Excel Hustler I forgot that I released

8    the bypass.

9        Q.    Do you think that the operator is free

10   to ignore warnings with accompany a mower like Toro

11   Timecutter?

12       A.    Depends on the warnings that they are

13   given, if they are unreasonable then they could

14   ignore them, yes.

15       Q.    Are there any, that you have

16   identified regarding the Toro Timecutter, that are

17   unreasonable and should be ignored?

18       A.    Well, that might be ignored?  I

19   wouldn't say I have seen any that are, that I would

20   quantify that way.  They really don't have a warning

21   with respect to the bypass feature.  As I said, I

22   don't see the, that anything was ignored with respect

23   to the operation of the mower along that edge of the

24   pining area, that was put there to keep you away from

25   the retaining wall at that drop off.  So that's kind



Exhibit 30-118

1  of following the instructions.

2       Q.    Do you know from the testimony in the

3  case that certainly Jennifer knew that the bypass

4  pins were supposed to be disengaged so that the

5  motors were back in operation before they started to

6  operate it again; is that correct?

7       A.    I mean, both of them knew that, but

8  they just didn't remember. Well, actually Jennifer

9  didn't know and Rebekah didn't remember.

10       Q.    Jennifer, she knew they needed to be

11  disengaged, right?

12       A.    They, our terminology is off here,

13  disengaged to me is when they are pushed in. They

14  needed to be released and pulled out before operating

15  it. But Rebekah knew that, too, she just forgot to

16  do it, is my understanding.

17       Q.    I recognize it's kind of an awkward

18  who-is-on-first-type language, but they both knew

19  that the hydrostatic motors needed to be put back in

20  to operation mode before they started to operate the

21  mower?

22       A.    I think they understood that, yes.

23       Q.    And they just, well, Rebekah, you said

24  Rebekah forgot?

25       A.    That's my understanding of it, yes.



1   Jennifer didn't know that she hadn't done it.

2        Q.    Have you spoken to Jennifer or

3   Rebekah?

4        A.    I believe I did whenever, here at the

5   inspection.  I don't know that I spoke to them.  I

6   listened to them.

7        Q.    Is there anything in your report or

8   opinions that you relied upon in them telling you as

9   opposed to what they testified to?

10       A.    I didn't see anything different that

11  stuck out to me.

12       Q.    Is it your opinion that neither

13  Rebekah nor Jennifer did anything to cause or

14  contribute to this accident?

15       A.    That wasn't foreseeable, that's

16  correct.

17       Q.    Do you agree that this accident never

18  would have happened if the mower hadn't slid down in

19  the planter and gotten stuck?

20       A.    I guess.  It would never have happened

21  if they never bought the mower and used it.  We can

22  go on, never would have happened in all sorts of

23  things.

24       Q.    It had to get stuck in the planter in

25  order for there to be a need to tow it out of there,



Exhibit 30-120

1  right?

2        A.    Well, yes.

3        Q.    Do you agree that based upon the way

4  that Jennifer picked up the rear wheels of the mower

5  that it wasn't necessary to disengage a hydrostatic

6  motors?

7        A.    That wasn't real clear to me in what

8  she was describing because part of it sounded like

9  she was, that she had it in float and was towing it

10  and another one she said the rear wheels were clear

11  off the ground, which wouldn't happen in float.  So

12  that wasn't real clear to me whether they would have

13  needed it; but if you lift the mower clear off the

14  ground then you would not need the pins pushed in.

15        Q.    If you were just going to pick up the

16  rear end clear off the ground just moving on the

17  caster wheels, you wouldn't need to disengage, is

18  that what you are saying?

19        A.    That would be true, yes.  If you are

20  going to be able to keep them off the ground, yes.

21        Q.    Would you agree that this accident

22  wouldn't have happened if Jennifer or Rebekah had

23  reengaged the hydrostatic motors?

24        A.    Based on my testing of the mower, if

25  the pins are pushed in it would not have happened,



1  correct.  Unless she didn't remember to do that.

2        Q.    Right.

3        A.    And that's very easy to do.

4        Q.    Would you agree that the accident

5  wouldn't have happened if the mower had been towed on

6  to flat level surface?

7        A.    Probably it would not have occurred if

8  it was on a flat level surface that didn't have any

9  slope to it whatsoever, then when she tried to move

10  it, it would have just stayed there.

11        Q.    What about if the mower had not been

12  pointing down the hill when it was -- when she

13  stopped towing, if it had not been pointed in that

14  direction, but perpendicular to that, would that have

15  changed the outcome?

16        A.    Not necessarily because once you have

17  the locks released the weight of the mower tends to

18  pull the front wheels downhill.  A guy I worked with

19  he had a case like where the operator was on a side

20  hill and released the brake and then it, or the park

21  lock and it started rolling down the hill.

22                        We talked about this before,

23  but I had another accident involved in a person who

24  was mowing at the top of a pretty good slope, I

25  forget the angle, and a wheel got off edge and it



```
 1   started down the hill and it was on a Dixon mower,
 2   but it had a similar hydro drive and park lock and it
 3   would not stop the machine.  And I tested that park
 4   lock at my inspection, and it would not stop the
 5   mower, it would just chatter.  And that was on like a
 6   five degree slope.
 7        Q.   You did not perform any test to
 8   support an opinion that you have that a ROPS would
 9   have prevented Rebekah Hillman from being seriously
10   injured; is that correct?
11        A.   I was not asked to render that
12   opinion.  I was asked about ROPS.  Where is this
13   opinion at that you are talking about?
14        Q.   Do you not hold that opinion?
15        A.   I haven't done a complete -- we talked
16   about this.
17        Q.   Okay.
18        A.   I was not asked to do it but from what
19   I have seen I don't think she would have been as
20   likely to be seriously injured with ROPS than
21   without.  And that's just based on what we talked
22   about before, how it landed and how just a tip over
23   on to the top of the ROPS.
24        Q.   So your testimony is the same as
25   before when we talked about that?
```



1        A.      Yes.

2        Q.      I apologize for replowing that ground.

3   If you did do testing on that what kind of testing

4   would you do?

5        A.      I guess it would be similar to what I

6   did or have done with the standup forklift.  I tipped

7   one over with me on it to see what the results were.

8   And I might start with increments of however far it

9   drops to see what happens.  You almost need to have a

10  live operator to do that type of test.

11       Q.      You would do a test with a live

12  operator going over?

13       A.      It would be myself, I wouldn't have

14  somebody else do it.  I wouldn't go over the wall, I

15  would have it on its end and tip it on to its top.

16  That's what the difference is.  The first impact is

17  to the ground, and then it tips on to its top.  So as

18  the ROPS provides that protection if I am on it when

19  it hits the ground to prevent injury when it tips

20  over on to the top of the ROPS.  And that's what I

21  would look at.

22       Q.      You are saying that you would do that

23  with yourself seat belted in to the mower?

24       A.      Yes, if I was going to do something to

25  see what the effect is I would be doing it for my



1  interest.  You know, I have seen all sorts of dummy

2  tests and other tests that have been done and it all

3  depends on those, like a dummy can't react like a

4  person would, they can't put their hands out, they

5  can't brace themselves.  So I don't know that that

6  would give me a very good result, of accurate

7  results.  You almost need to have a test, like I

8  said, do it in increments, let it drop, you know,

9  have it tip part way and drop and go until I am

10 straight up and down and then let it fall over and

11 see what happens.

12        Q.     Have you ever done that?

13        A.     Only I have done it on a standup

14 forklift where I tipped it over with me on it, and I

15 did it in increments.

16        Q.     Are you aware of any testing or

17 studies about non operator, might use a type of

18 additional brake that you are proposing to this

19 mower, circumstances like this accident?

20        A.     Have I seen any --

21        Q.     Studies.

22        A.     You can go online to like a lawn mower

23 forum or something like that and there's a lot of

24 discussion about you will be real thankful to have a

25 brake if your drive belt breaks, let's say you put in



1   a search for drive belt breaks on hydrostat and you

2   will be thankful if you will be able to get a brake

3   applied and stopped on a hill.

4        Q.    I am not talking about a little

5   information, I am talking about any studies.

6        A.    I have made that study, but I read

7   through it, and it just supplements my knowledge that

8   you need an emergency brake to stop a machine.

9   Working right most of the time isn't working

10  adequately.

11       Q.    Have you done any testing to determine

12  whether the type of brake that you are proposing, I

13  guess we call it, what do you call it a third brake,

14  and additional brake, an additional brake?

15       A.    An emergency brake, that's what I

16  would call it.

17       Q.    Have you done --

18       A.    An emergency brake.

19       Q.    Have you done any testing to determine

20  whether what you call an emergency brake could have

21  actually stopped the mower under the circumstances of

22  this accident?

23       A.    Not on a ZTR I haven't.  Well, I have

24  tested my, as we talked about before, my Snapper and

25  my Scags shows their brakes work on these slopes to



Exhibit 30-126

1  get stopped.  I have tested lawn tractors that have a

2  similar size brake.  I think Toro LX475 you would put

3  it on there, it works, you can apply it as an

4  emergency brake and it just has one brake disc.

5        Q.    But my question is, have you done it

6  for the Toro Timecutter model at issue under similar

7  circumstances such as the slope and the speed of the

8  mower in this accident?

9        A.    I have not put it on a Toro

10 Timecutter, but it can be put on.  In fact, it's

11 shown in the Hydro-Gear manual and I would expect

12 that to work just as well as it does on the Toro lawn

13 tractors.

14       Q.    That's just your expectation, but not

15 based on any testing or data, correct?

16       A.    The testing of Toro lawn tractors, the

17 brake worked pretty well.

18       Q.    You haven't done it on the Timecutter

19 you just said that, right?

20       A.    I have not done it on a Timecutter.

21       Q.    Have you done any analysis whether

22 there would be any hazards associated with adding an

23 emergency brake of the type that you are suggesting?

24       A.    Well, I considered whether it would be

25 hazards, and I can't think of one.  The advantages is



1  you would have the emergency brake to stop the

2  machine in an emergency situation.  And I can't think

3  of a reason why you wouldn't want that.  Hazard or

4  otherwise.

5          Q.    So is it your opinion that all zero

6  radius turn motors would have the type of what you

7  call an emergency brake that you are suggesting here?

8          A.    Yes.  An emergency brake, I think a

9  combination of the two, the park lock feature and the

10  emergency brake, would be very advantageous.

11          Q.    Is it your opinion that all zero

12  radius turn motors should have a ROPS on as standard

13  equipment?

14          A.    This gets in to a big, I haven't

15  looked at stand on zero turn radius mowers, and I

16  don't know that I have seen all zero turn radius

17  mowers, but the ones I have seen, yes, they should.

18  Whether it's a ROPS or a roll bar, they should have

19  some protection for the operators, should it roll

20  over.

21          Q.    And the distinction between a ROPS and

22  a roll bar is the ROPS includes a seatbelt; is that

23  correct?

24          A.    No.  The difference is that a roll bar

25  is something you would design and put on that may not



Exhibit 30-128

1  meet a specific ROPS rollover protective structure

2  standard, but it still provides that protection.  So

3  the corp of engineers would have a regulation that

4  you could put on, it was basically like the rigid

5  ROPS, but it wasn't really a ROPS, it was more of a

6  roll frame to protect you.  But I think some form of

7  protection when a rollover occurs is needed to limit

8  most rollovers to a tip over, and if it doesn't, it

9  provides a crush protective area and that's something

10  that would be needed even on the smaller units.  It's

11  like the CPSC indicates, if the machine is down to

12  200 kilograms they think it should have rollover

13  protection.

14       Q.     Where in the CPSC does it say that?

15       A.     That was in some comments to the ANSI

16  committee in 2011, I think, prior to them coming out

17  with the 2012 standard.

18       Q.     Where did you see those comments?

19       A.     They were in the comments provided by

20  them and others with respect to lowering the ROPS

21  weight from 1,436 pounds down to 880 pounds.

22       Q.     Is that something that you provided in

23  your Reliance materials?

24       A.     I believe it is in there, yes.

25       Q.     Okay.  And when you drew the



Exhibit 30-129

```
 1   distinction between rollover and ROPS or a roll bar,
 2   are you including seatbelts with that?
 3        A.    Yes.  I think seatbelts would be a
 4   part of that, yes.
 5        Q.    And does that same opinion hold true
 6   for ride-on-garden-type mowers that should be
 7   equipped with ROPS and roll bar?
 8        A.    I haven't seen all of them.  I have
 9   designed ROPS for lawn tractors, but I haven't seen
10   all ride-on mowers to make that distinction.
11        Q.    Have those been adopted for those
12   types of mowers?
13        A.    Some of them have ROPS on them now.
14        Q.    But you think all of them should?
15        A.    Well, I don't know.  I just said I
16   haven't seen all of them to be able to say that.  I
17   don't know, like a rear-ended rider, again you could
18   put a single post on the rear to help prevent it roll
19   over rearward or more to the side.  But it wouldn't
20   necessarily be a ROPS, but it would provide
21   protection.
22        Q.    What would it be if it's not a ROPS?
23        A.    A roll bar.
24        Q.    Okay.  Is it your opinion that an
25   inclinometer would have prevented or affected the
```



1  outcome of Rebekah Hillman's accident?

2        A.    No.  From what I understood, no.

3        Q.    I know that in your report you made

4  reference to an inclinometer, are you saying that

5  that's not really relevant to this case?

6        A.    I don't think, I don't see the

7  causation part of that with respect to, it should

8  have one, but I don't see how it would have prevented

9  it.

10        Q.    Why did you include it in your report?

11        A.    It's opinions that I have developed

12  over the years and this involved a slope, but it

13  wouldn't be a slope of what Toro expected, I don't

14  know that an inclinometer would make a difference.

15        Q.    So it is in your standard report, but

16  it doesn't really apply to the facts of this case, is

17  that what you are saying?

18        A.    Correct.  It's an opinion that I have

19  developed with respect to mowers.  I put it in there

20  because of that.

21        Q.    I am just trying to make sure I

22  understand.  I think we are agreeing it's not really

23  relevant to the facts of this case, is that an

24  accurate statement?

25        A.    Yes.  I don't plan on talking about



Exhibit 30-131

1  it, if this goes to trial.

2       Q.    What, if any, opinions do you have in

3  this case relative to the warnings, instructions for

4  the Toro Timecutter mower at issue here?

5       A.    Well, the information about the

6  release pins was not provided.  With respect to the

7  loss of braking and ability to stop the machine with

8  them in.  The information with respect to the park

9  lock was not provided to tell people that, hey, this

10  machine, these can't be counted on to stop your

11  machine if you are, if it starts free rolling down

12  the slope uncontrolled.  And that's the information

13  that the operator person needs to know.

14       Q.    Any others?

15       A.    Those are the two that I can think of

16  with respect to that loss of control issue.

17       Q.    I think we discussed this earlier,

18  that Jennifer and Rebekah both knew that there

19  wouldn't be any braking when the hydrostatic motors

20  were disengaged, correct?

21            MR. CROWLEY:  Objection, asked and

22  answered, misstates the record.

23       A.    I don't recall that discussion.  They

24  didn't realize that the machine wouldn't stop if you

25  just put the handle out.  I know in their discussion



Exhibit 30-132

1    here, they indicated they were very, Rebekah

2    indicates she was very surprised that, hey, I put

3    them out and it is not stopping, what's going on.

4    And they were confused about it and they went out to

5    do testing later to see why this thing didn't stop,

6    why. And so they didn't have that understanding of

7    the limitations of the park lock. And I think Toro

8    has a user guide for the Timecutters that came out in

9    2002 where they say don't ever engage the park locks

10   with it in motion. So that wasn't even in the

11   manual. That was in some secondary manual.

12        Q.    Have you prepared any warnings that

13   you think should have been provided to address these

14   issues that you just stated?

15        A.    No, I haven't. I could, but, you

16   know, there are warnings that are provided by

17   Hydro-Gear, in their manual, but those would be more

18   applicable to Toro than to the end user to know that

19   you need a brake on these things.

20        Q.    Are you planning to prepare any

21   warnings that you think should have been provided?

22        A.    I would if asked, but I am not

23   planning on it, no.

24        Q.    Have you published any papers about

25   zero radius turn mowers?



Exhibit 30-133

1          A.     Yes.  Well, at least I reference it.

2          Q.     Well, what was that?

3          A.     In April of 2010 it was a

4   stability-related accident involving ride-on mowers'

5   history and designed solutions.  And then in, not

6   relevant to this matter, but in November of 2013,

7   Gasoline Geysering - The Hidden Hazard, would apply

8   to any gasoline engine, but it's based upon what I

9   found of hazards with respect to zero turn mowers and

10  tractors that are gasoline powered.

11         Q.     First one you mentioned, is from April

12  of 2010?

13         A.     Yes.

14         Q.     Do you see that on the screen now?

15         A.     Yes.

16         Q.     Looking at the Exhibit in the file

17  page, the one that you were referring to, Mid Central

18  Meeting of ASABE, St. Joseph, Missouri, Stability

19  Related Accidents Involving Ride-On Mowers - History

20  and Design Solutions, is that what you are talking

21  about?

22         A.     Yes.

23         Q.     Did you provide that paper in the

24  Reliance materials?

25         A.     I think it is in there; if not, I



Exhibit 30-134

 1  could send a copy to Steve and he can get it to you.

 2        Q.     Is it relevant to your opinions in

 3  this case?

 4        A.     About the need for ROPS it would be,

 5  yes.

 6        Q.     I take it from the title it's not

 7  limited to zero radius turn mowers?

 8        A.     No, it's not limited to just zero turn

 9  radius mowers, it includes them but it doesn't, it's

10  not limited to it.

11        Q.     Is there anything in that, anything in

12  that paper that you relied upon for your opinions in

13  this case?

14        A.     Design history of ROPS, my study of

15  the CPSC accident data.

16        Q.     And the CPSC accident data, how far

17  back does it go?

18        A.     1983, I believe.

19        Q.     When did zero radius turn mowers

20  become common place in the market?

21        A.     Late '90s, common place, Hustler

22  claims they made the first zero turn radius mowers

23  and that was in the '70s.  Dixon had zero turn radius

24  mowers mechanical drives hydrostatic drives back to

25  at least '80s, maybe before that.  And then I have



Exhibit 30-135

1   seen other people claim that they were the first to

2   have zero turn mowers.

3          Q.     But in terms of it being used in the

4   industry that was in the '90s, right?

5          A.     Yes.

6          Q.     And the CPSC data that you are talking

7   about, does it break down the information as to the

8   type of mower, such as zero turn radius mowers versus

9   other ride-on mowers and other types of mowers?

10         A.     The only breakdown that I have seen is

11  they talk about rear engine riders versus front

12  engine riders.  Zero turn mowers are usually rear

13  engine riders, but that's the only breakdown that I

14  have seen by the CPSC.

15         Q.     And that would include rear engine

16  mowers that are not zero radius turn mowers, is that

17  correct?

18         A.     Yes.

19         Q.     Would it include agricultural data?

20         A.     No.  They tried to exclude

21  agricultural tractors in their investigations.

22         Q.     Apart from that CPSC data that we

23  talked about, is there any other accident data that

24  you are relying upon for your opinions in this case?

25         A.     Well, that I am aware of, there was a



```
 1   study about by the LPEI, like a 179 accidents, I
 2   think it's a 179, might have been more, that came out
 3   in about 2008.  And that would be something that I
 4   have considered.  And then my own investigations of
 5   30 some other accidents.
 6        Q.    The LPEI study that you reference is
 7   that in your Reliance materials?
 8        A.    I think it is.
 9        Q.    Was your paper from April of 2010, was
10   it peer reviewed?
11        A.    Not, well, in my office it was
12   reviewed, but ASABE does not have a same type of peer
13   review that ASME does.
14        Q.    Who did the in-office peer review that
15   you are talking about?
16        A.    Kevin Sevart who works in my office.
17   When we do papers we have each other review them.
18        Q.    Is he a co-author?
19        A.    No.
20        Q.    You are the only author?
21        A.    I believe so.  I don't recall anybody
22   else that I had on that.  I would have to look but I
23   don't think so.
24        Q.    Mr. Sevart works there with you?
25        A.    He does.  Same office anyway.
```



```
 1              Q.     And he also does similar type of
 2    expert witness work that you do; is that correct?
 3              A.     He has, yes.
 4              Q.     Have your opinions in this case been
 5    subjected to any type of peer review?
 6              A.     I am not sure what, how that would
 7    even occur.  I certainly expressed these opinions
 8    before, but I don't know how that would even occur in
 9    this type of matter.
10              Q.     Is there any way for you to determine
11    potential rate of error in your opinions in this
12    case?
13              A.     Rate of error?  No.  I don't see that
14    there would be a rate of error that I would expect.
15              Q.     And the reason that you prepared your
16    report is because of this lawsuit and you were
17    engaged to do so, right?  Otherwise, you would not
18    have done this report?
19              A.     Not this report, no.
20              MR. FLORENCE:  We have been going a
21    little over an hour.  Let's take a quick break.
22              THE VIDEOGRAPHER:  We are going off
23    the record at 2:33 p.m.
24              (REPORTER'S NOTE:  At this time,
25    2:33 p.m., a recess was taken, after which,
```



1 | 2:42 p.m., the following proceedings were held:)

2 |             THE VIDEOGRAPHER:  This is the

3 | beginning of media unit 4 and we are back on the

4 | record at 2:42 p.m.

5 | BY MR. FLORENCE:

6 |        Q.    Mr. Berry, are there any changes or

7 | corrections that you think of at this point that you

8 | need to make to your previous testimony?

9 |        A.    No.

10 |        Q.    In your report, which is Exhibit 1,

11 | you talk about the design safety hierarchy standard?

12 |        A.    Yes.

13 |        Q.    What is that?

14 |        A.    It's a design methodology used by

15 | engineers in design of equipment, what I was taught

16 | in design, but it's basically a method of looking at

17 | you want to eliminate a hazard, if you can.

18 | Eliminating it would be doing away with it

19 | altogether.  If you can't eliminate it you would

20 | guard against it as the next step.  And this is in

21 | steps of order of preference of how you would address

22 | those hazards.  And you guard against it or control

23 | it by controls and that sort of thing.  And the next

24 | step is warnings and instructions.  Sometimes that's

25 | split up to also do training as a next step.  And



Exhibit 30-139

1   then personal protective gear as a fifth step. But

2   typically I have seen it in three stages, eliminate,

3   design against it by guarding controls, that sort of

4   thing and then warnings and instructions.

5           Q.     Is it your position that they have to

6   be applied sequentially like you have laid them out?

7           A.     They should be, yes, because it's been

8   recognized for 80 years that warnings aren't as,

9   maybe longer than that, warnings aren't as effective

10  as actual guards and doing something about a hazard.

11          Q.     And is that in all situations?

12          A.     Well, if you, if you can guard against

13  it, yes.  I don't know what you, you would have to

14  come up with an example, but if you can't do anything

15  about it you have to rely on warnings and

16  instructions.

17          Q.     And if you can guard against it then

18  there is no need for warnings or instructions?

19          A.     Or you may have additional warnings

20  and instructions about the guard itself in keeping it

21  in place, but, yes.

22          Q.     Is there some literature within the

23  engineering community that lays out this premise that

24  you just stated?

25          A.     Yes.  It is in a lot of documents.  It



```
 1   is in some ANSI standards, I list those in my report,
 2   Page 3, I believe.  But the American Society of
 3   Mechanical Engineers has it in some of their
 4   instructional materials.  The National Safety Council
 5   has had it for years in their accident prevention
 6   manual.  ANSI B-10 and ANSI B-11 standards they are
 7   in there.  And in textbooks.  Engineering textbooks.
 8   And I have a paper that I put, wrote in 2003
 9   presented at ASAE that also covers the history of the
10   design safety hierarchy and design solution.
11        Q.    Which paper are you referring to?
12        A.    It's the first one under April of
13   2003, Enhancing the Safety of the Agricultural
14   Workplace by Machine Design.
15        Q.    And from the title I see that that has
16   to do with agricultural machinery?
17        A.    That was part of it, but it's the
18   design hierarchy applied it to agricultural
19   equipment, yes.  But it applies to all mechanical
20   equipment.
21        Q.    Let me make sure I understand one part
22   of your opinions in this case.  Is it your opinion
23   that the mower at issue in this case experienced a
24   loss of stability as part of the dynamics of this
25   accident?
```




Exhibit 30-141

1        A.    Yes.

2        Q.    And when, at what point did that

3  happen?

4        A.    When it went over the retaining wall.

5        Q.    But up until that point there was no

6  loss of stability, correct?

7        A.    No.  That's correct, it hadn't tipped

8  over.  If she would have come down and hit the

9  retaining wall and that stopped it, it wouldn't have

10  rolled over.  So once it went over the retaining

11  wall, that's when the rollover event started, loss of

12  stability started.

13        Q.    It was, well, part of the fact that it

14  was dependent on the fact pointed downhill going

15  straight towards a retaining wall?

16        A.    It went down the hill towards the

17  retaining wall, yes.

18        Q.    And if it didn't, if it had just gone

19  down in the area where they did those tests there

20  would have been no loss of stability, correct?

21        A.    Are you talking about a different

22  area?

23        Q.    Yes.

24        A.    Yes, if it ends up and rounds out at

25  the bottom and there is not a rollover, there



Exhibit 30-142

```
 1   wouldn't have been loss of stability.
 2         Q.    Have we today covered your opinions in
 3   this case?
 4         A.    I think so.
 5               MR. FLORENCE:  I will pass the
 6   witness.  Thank you, sir.
 7                    CROSS EXAMINATION
 8   BY MR. CROWLEY:
 9         Q.    Mr. Berry, this is Steve Crowley I
10   have a number of questions based on Mr. Florence's
11   several hours of questions here.  I want to return to
12   an early discussion he had with you.  And I will try
13   to be brief and make my questions focused.
14   You do not hold yourself out as a lawyer or an expert
15   on legal causation, do you?
16         A.    I do not.
17         Q.    Okay.  And you have not read the jury
18   instructions for the Central District of the United
19   States Court in Illinois with respect to the
20   definition of cause, is that fair?
21         A.    That's correct.
22         Q.    But we know factually, simply
23   factually that the evidence in this case demonstrates
24   Rebekah Hillman did not get injured at all while she
25   was in the planter, did she?
```



 1          A.      No.

 2          Q.      In fact, once the --

 3          A.      By know I mean that's correct, she was

 4     not injured in the planter, she wasn't injured when

 5     it stuck, she wasn't injured when it crossed.

 6          Q.      My questions are in artful.  I

 7     apologize.  Would you agree, in fact, she and

 8     Jennifer successfully stopped the mower, got the John

 9     Deere tractor out and safely, without injury, pulled

10     the mower out of the planter and got it further, much

11     further up the hill without any injury or damage to

12     the mower?

13          A.      That's my understanding, yes.

14          Q.      Okay.  You remember Mr. Florence

15     talking to you a lot about hazard analysis and risk

16     analysis and your consideration of how people could

17     get injured on this machine.

18          A.      Yes.

19          Q.      Okay.  I want to share the screen here

20     and direct your attention to the deposition of Carol

21     Drutowski taken on January 18th, 2023, in this case.

22     You were provided that deposition, correct?

23          A.      Yes.

24          Q.      Okay.  I am going to start on Page 89,

25     line 21, actually line 23.



Exhibit 30-144

1                           My question to her was, we

2    know from exhibits like the one we just looked at,

3    Exhibit 50, Toro has, in its files, reports of

4    serious injury and death due to loss of control, tip

5    over, rollover of commercial mowers.  Can we agree on

6    that?

7                           Her answer at Page 90 line 4

8    begins, so looking at your documents in 50, right,

9    the looking at the ones that you were talking to just

10   recently, those are commercial Z mowers and there

11   were deaths, fatalities with those.        Question,

12   all right, does your, who keeps, whose job at Toro is

13   it to keep records of what was reported to Toro as an

14   injury, using one of your ZRT mowers, whether it's

15   residential or commercial?

16                           And her answer would be or

17   was, that would be kept in our legal department.

18                    Question, okay and that's in-house?

19                    Answer, I would, I would think so,

20   that would be.

21                           Does that refresh your memory

22   of her testimony on that issue?

23        A.    Yes.

24        Q.    And you were required to acknowledge a

25   protective order in this case, weren't you?



Exhibit 30-145

 1           A.     Yes.

 2           Q.     In other words, Toro asked the Court

 3    for an order making you refrain from sharing any

 4    injury data that they produced in this case with

 5    anybody outside of this litigation, fair?

 6           A.     That's my understanding, yes.

 7           Q.     And that's consistent, that has been

 8    true in other cases against Toro, right?

 9           A.     Yes.

10           Q.     And so one of the reasons that it's

11    difficult to getting a real accurate handle on Toro's

12    injury experiences is because it keeps it secret in

13    the legal department, doesn't it?

14           A.     That's one reason, yes.

15           Q.     And the reason I ask you then is, you,

16    are you aware of any public data put out by Toro that

17    says here's the number of serious injuries and deaths

18    we have at commercial versus residential lawn mowers?

19           A.     I have never seen anything like that.

20           Q.     Okay.  Have you seen any manufacturer

21    of a ZRT publish their injury data and experience?

22           A.     No.

23           Q.     Do you know of, other than the CPSC

24    data that you reference, do you know of any public

25    agency that keeps track of lawn mower accidents by



Exhibit 30-146

```
 1   categories such as ZRT versus riding mower versus

 2   garden tractor?

 3          A.     Not a government institution, no.

 4          Q.     So can we discern, at least from the

 5   existence of information that you have already

 6   discussed, that Toro would be the best expert to know

 7   how people get injured on their ZRT mowers, whether

 8   commercial or residential?

 9                 MR. FLORENCE:  Objection.

10   Speculation.

11          A.     They would be the ones that have that

12   knowledge, yes.

13          Q.     All right.

14          A.     Unless they provided it to the CPSC or

15   somebody.

16          Q.     Right.  And even that data is

17   confidential?

18          A.     I don't know.

19          Q.     All right.  I am now showing you the

20   manual, let me show everybody here.  This is the

21   operator's manual which Toro provided with the mower

22   purchased by Jennifer and Rebekah Hillman.  You have

23   a copy of this listed in your materials, correct?

24          A.     Correct.

25          Q.     Now, I will go through this as quick
```



Exhibit 30-147

1 | as we can here.  So these are the instructions and
2 | warnings which Toro itself provided, correct?
3 |         A.     Yes.
4 |         Q.     Let's start with Page 4.  Well, in
5 | 2012 or 2013, whenever this book was published, you
6 | start on Page 4, it starts with safety and safe
7 | operating practices.  And it talks about the ANSI
8 | standard.  It talks about general operation, correct?
9 | Do you see that?  I am sorry.  I am not sharing.  I
10 | apologize.  All right.
11 |                     We are now on Page 4 and we
12 | are up here, we see the general operation, correct?
13 |         A.     Yes.
14 |         Q.     And now let's take a look at slope
15 | operation.  Before we do that, let's look out here
16 | for a second.  On Page 4 under the heading of, excuse
17 | me, general operation, it says data indicates that
18 | operators, age 60 years and above, are involved in a
19 | large percentage of riding mower related injuries.
20 | Operators should evaluate their ability to operate
21 | the riding mower safely enough to protect themselves
22 | and others from serious injury.  Do you see that?
23 |         A.     Yes.
24 |         Q.     Neither Rebekah nor Jennifer are 60
25 | years old or older, correct?



1        A.      They didn't appear to be to me, no.

2        Q.      Okay.  Now, let's look under the

3    heading of slope operation.  And I am going to read

4    it and you tell me if I am correct.  Slopes are a

5    major factor related to loss of control and tip over

6    accidents which can result in severe injury or death.

7    Operation on all slopes require extra caution.  If

8    you cannot back up on the slope or if you feel uneasy

9    on it, do not mow it.  Did I read that correctly?

10       A.      Yes.

11       Q.      Is that the kind of injury we had

12   here, a loss of control or a tip over?

13       A.      Yes.

14       Q.      Go ahead.

15       A.      Yes.

16       Q.      And then it goes on to say, do not mow

17   slopes greater than 15 degrees.  Watch for ditches,

18   holes, rocks, dips and rises that change the

19   operating angle as rough terrain could overturn the

20   machine.  You agree with that statement with respect

21   to ZRT mowers?

22       A.      Yes.

23       Q.      Would that be more important for

24   somebody driving a commercial or a residential or

25   would it be applicable to both?



```
 1          A.     It would be applicable to both.
 2          Q.     Next one, choose a low ground speed so
 3   you will not have to stop while operating on a slope.
 4   Do you agree with that warning?
 5          A.     I don't know what's meant by low
 6   ground speed there. Creeping along versus, but, yeah,
 7   the slower you go probably the safer you are.
 8          Q.     The next statement, do not mow slopes
 9   when grass is wet.  Slippery conditions reduce
10   traction and could cause sliding and loss of control.
11   Now, can you agree with that statement?
12          A.     Yes.
13          Q.     And is that a statement of caution
14   applicable in your opinion to both residential and
15   commercial ZRT mowers?
16          A.     They would be applicable to both.
17          Q.     Does that mean that danger would be
18   applicable to causing a loss of control for either
19   type mower?
20          A.     Yes.
21          Q.     In your experience does gravity
22   generally make both residential and what are called
23   commercial ZRTs tip over and rollover at the same
24   rate?  I am sorry.  Same rate of falling?
25          A.     Yes, they would have, gravity would
```



1   have the same affect on both residential and

2   commercial mowers.

3        Q.    And then there is the admonish of

4   always keep the drive wheels engaged when going down

5   slopes. Is that a pretty good idea?

6        A.    Yes.

7        Q.    Reduce speed and use extreme caution

8   on slopes. Would you agree with that one?

9        A.    Yes.

10        Q.    And then there is one that says do not

11   make sudden turns or rapid speed changes. In your

12   mind what would that mean to you?

13        A.    It could result in loss of control or

14   rearing up of the mower.

15        Q.    All right. The last one on Page 4

16   says, avoid sudden starts when mowing uphill because

17   the mower may tip backwards; is that correct?

18        A.    That would be -- yes.

19        Q.    And the reason for that is, the mower,

20   motor and the occupant are relatively rearward so

21   that if you are pushing uphill and the only thing --

22   strike that. Let me back up.

23               The only wheels that are

24   powered on a ZRT mower are the rear wheels; is that

25   correct?



Exhibit 30-151

1          A.     That's correct.

2          Q.     So when the mower is mowing uphill, a

3     sudden application of power can create a lifting

4     force on the front end and it will tip over

5     backwards; is that right?

6          A.     Yes.  The torque applied to the wheels

7     is only counteracted by the weight in front.

8          Q.     And that's true with virtually all

9     Toro ZRTs whether they are commercial or residential,

10    they have relatively more weight in the rear, the

11    rear wheels than on the front?

12         A.     Yes.

13         Q.     On the next page it says, be aware of

14    loss of traction may occur going downhill.  Weight

15    transfer to the front wheels may cause drive wheels

16    to slip and cause loss of braking and steering.  Do

17    you see that?

18         A.     Yes.

19         Q.     Do you agree with that warning?

20         A.     Yes.

21         Q.     It says, next one is always avoid --

22         A.     And that would be true even no matter

23    what mower, whether it's a residential or consumer

24    mower versus what's more known as a commercial mower

25    you could lose that traction going downhill.



Exhibit 30-152

1          Q.      And we'll skip down, trying to speed

2    up a little bit.  The last two, last two bullet

3    points under slope operation is, do not mow near drop

4    offs, ditches, steep banks or water.  Wheels dropping

5    over edges can cause rollovers which may result in

6    serious injury, death or drowning.  Did I read that

7    correctly?

8          A.      Yes.

9          Q.      And the last one is use a walk-behind

10   mower and/or hand trimmer near drop offs, ditches

11   steep banks or water.  Is that true?

12         A.      Yes.  And the only problem I have with

13   those warnings is it doesn't describe what near is.

14   Near to me could be six inches and you would be okay.

15   But, you know, other people say two mower widths.

16         Q.      All right.  Now, let's go to Page 10

17   of the Toro manual.  And as you can see on Page 10,

18   you can see the diagram in the upper right-hand

19   corner it tells how to operate bypass levers,

20   correct?

21         A.      Yes.

22         Q.      Do you see, and I will show you slowly

23   and everyone watching, I will show you the entire

24   page of 10.  Do you see anywhere near that diagram on

25   this page, or anywhere on this page, an admonition



```
 1    that caution, warning, when the bypass pins are
 2    pushed forward in the push mode you will have no
 3    ability to turn or stop the machine with the drive
 4    handles until they are returned to the outer
 5    position.
 6         A.    No --
 7               MR. FLORENCE:  Objection.  Leading.
 8         A.    No, I don't see that on that page, I
 9    don't see it in the manual.
10               MR. FLORENCE:  Objection.
11    Nonresponsive.
12         Q.    My question is, is there any kind of
13    warning, as I just described that would tell the
14    operator that they have no forward or rearward
15    motion, no ability to turn or brake when that lever
16    is pushed in and locked down on both motors?
17         A.    No, I have not seen that in the manual
18    at all.
19         Q.    And isn't the function of a warning to
20    alert someone to the level of danger that the hazard
21    presents so that it is both relevant to the person
22    reading it or getting to know it and to help them,
23    help remind them why they need to remember this?
24         A.    Yes.  The literature on warnings is
25    indicated for a hundred years that warnings are there
```



Exhibit 30-154

1  to inform the uninformed and to remind the informed,

2  you know, if they forget.

3        Q.    All right.  Next I want to go to Page

4  16, under the section danger.  Now, this word danger

5  has a specific meaning and function in warnings, does

6  it not?

7        A.    Yes.

8        Q.    It's there to alert the user of the

9  product that, hey, this stuff could get you hurt,

10  right?

11        A.    Yeah, it's eminent.

12        Q.    The first item is mowing on wet grass

13  or steep slopes can cause sliding and loss of

14  control.  Fair?

15        A.    Yes.  It says that.

16        Q.    And actually it repeats something

17  that's already been discussed earlier in the manual,

18  correct?

19        A.    Yes.

20        Q.    And, of course, wheels dropping over

21  edges can cause rollovers which may result in serious

22  injury, death or drowning, correct?

23        A.    Yes.

24        Q.    And that's the kind of danger that the

25  engineering profession has recognized by the use of



1   ROPS and protective structures over the years, is

2   that fair?

3          A.     Yes.

4          Q.     It's nothing new, it's not

5   revolutionary that you came up with on your own, is

6   it?

7          A.     That's correct.

8          Q.     And now a loss of traction is a loss

9   of steering control.  Do you see that?

10          A.     Yes.

11          Q.     That is precisely what Rebekah Hillman

12   experienced when she had no traction from the rear

13   wheels?

14                MR. FLORENCE:  Objection.  Leading.

15          A.     That's correct.

16          Q.     Next it says to avoid loss of control

17   and the possibility of a rollover, do not mow near

18   drops offs or near water.  Do not mow slopes greater

19   than 15 degrees.  Reduce speed and use extreme

20   caution on slopes.  When mowing slopes gradually work

21   from lower to hire areas on the incline.  Avoid

22   sudden turns or rapid speed changes.  Turn up and

23   into the incline when changing direction on slopes,

24   turning down the slope reduces traction.  Attachments

25   change the handling characteristics of the machine,



Exhibit 30-156

1   use extra caution.

2                           It's true that Rebekah did

3   not have any accessories or attachments on the

4   machine that day; is that correct?

5           A.      Not that I am aware of.  It didn't

6   show any.

7           Q.      And again, under this danger sign on

8   Page 16, and you mentioned that, by the way, when you

9   are using the bypass pins in the push mode you have

10  no ability to go forward, stop, or go in reverse.  No

11  warning there?

12          A.      That's not mentioned in that danger.

13          Q.      And then on Page 21.  Excuse me.  Page

14  21.  There is the heading warning.  Do you see that

15  in the lower left-hand corner?

16          A.      Yes.

17          Q.      And it says, the machine can spin very

18  rapidly.  The operator may lose control of the

19  machine and cause personal injury or damage to the

20  machine.  Use caution when making turns, slow the

21  machine down before making sharp turns.  Do you see

22  that?

23          A.      Yes.

24          Q.      Are you aware of an incident that was,

25  that we found in Toro's files where an older



1   gentleman lost power on one of the hydrostatic

2   mowers, began to spin and ended up going in to a pond

3   and drowning?

4          A.     I have seen that, yes.

5          Q.     Now let's to go Page 24.  And we'll

6   get to the pins.  Do you see on Page 24 above or

7   around the heading pushing the machine by hand, do

8   you see the word danger or warning?

9          A.     No.

10          Q.     It says, always push the machine by

11   hand, never tow the machine because damage may occur.

12   Can we agree?

13          A.     Yes.

14          Q.     It says, this machine has an electric

15   brake mechanism and to push the machine the ignition

16   key needs to be in the run position.  The battery

17   needs to be charged and functioning for the electric

18   brake to be disengage, and that should be disengaged,

19   I guess.

20                          Why is that?  Are you

21   familiar how this operates, this park and lock?

22          A.     With the power off you automatically

23   engages the park locks in to the cogs on the mower

24   and it locks the wheels from rotating.

25          Q.     Okay.  The other way that the park



Exhibit 30-158

1  lock engages is if you push the control handles to
2  the outward position, is that fair?
3          A.     Yes.
4          Q.     Okay.  Now, we get to the
5  instructions, to push the machine, Number 1, park the
6  machine on a level surface and disengage the blade
7  control switch.
8                          Now, I don't mean to be
9  critical of Toro, but do they assume by this
10  instruction that whenever anybody gets stuck or needs
11  to move the machine it needs to be on level surface?
12                  MR. FLORENCE:  Objection.  Calls for
13  speculation.
14          Q.     If you know.
15          A.     Well, that's what the instruction
16  says, park the machine on level surface, which in my
17  experience when you get stuck you are not really ever
18  on, or you know what surface that's going to be on.
19          Q.     This Number 1 would make sense if you
20  intentionally were going to perhaps load it on a
21  trailer by pushing it up a ramp, correct?
22          A.     Well, that would be level, it would
23  be, it makes sense if you are ever going to push it
24  around a shop area, that sort of thing.
25          Q.     Okay.  I see.  I see.  Thank you, you



Exhibit 30-159

```
 1   corrected me.  Because they don't even want you to
 2   push it up on to a ramp on to a trailer apparently.
 3   By ramp, by definition that wouldn't be a level
 4   surface?
 5        A.     Correct.  Well, not in my mind anyway.
 6        Q.     Number 2, move the motion control
 7   levers outward to park position.  And did Rebekah and
 8   Jennifer do that when they got the mower to the top
 9   of the hill away from the flower bed?
10        A.     Yes.  My understanding the levers were
11   out.
12        Q.     And it says stop the engine.  Did they
13   do that, if you know, do you remember?
14        A.     Yes, it was stopped.
15        Q.     And, of course, they waited, there
16   were no moving parts moving when they reached that
17   position, correct?  They weren't running the blades?
18        A.     That's correct.
19        Q.     I am sorry, I will withdraw that
20   question.  I got myself mixed up there.
21                      This set of instructions
22   begins with trying to move the machine itself, it
23   says, so assuming you are on a level surface and
24   disengaged the blade control, the next instruction is
25   move the motion control levers outward to park
```



1  position.  Stop the engine and wait for all moving

2  parts to stop before leaving the operating position;

3  is that correct?

4       A.    That's my understanding.

5       Q.    And so far they haven't moved the

6  machine from where it originally stepped.  So 3,

7  locate the bypass levers on the frame on both sides

8  of the engine.  Do you see that?

9       A.    Yes.

10       Q.    And it says, move the bypass levers

11  forward through the keyhole and down to lock them in

12  place.  And it says ensure that this is done for each

13  lever.  Do you see that?

14       A.    Yes.

15       Q.    So that means that neither motor will

16  function now as they do in normal operation, correct?

17       A.    Correct.  There will be no dynamic

18  braking.

19       Q.    And then it says, move the motion

20  control levers inward to the neutral position and

21  turn the ignition key to the run position, do not

22  start the machine.  Do you see that part?

23       A.    Yes.

24       Q.    The machine is now able to be pushed

25  by hand, right?



```
 1          A.     Yes.
 2          Q.     Now, in this area, where they are
 3    talking about now the bypass levers are pushed in so
 4    there is no control from the hydrostatic motors and
 5    telling the operator to move the control levers
 6    inward, which will, of course, remove the park and
 7    lock; is that right?
 8          A.     Yes.
 9          Q.     Is there any warning or instruction
10    that you see in this area that says be very careful,
11    because if you, if the vehicle is not on a level
12    surface, if it's on any kind of a slope, it may begin
13    to roll when you move the levers in?
14          A.     No, I haven't found that there or
15    anywhere in the manual.
16          Q.     It says, now the machine is able to be
17    pushed by hand.  Okay?  Correct?
18          A.     Yes.
19          Q.     So we have a diagram, of course, to
20    show where the operator, where the bypass pins are in
21    figure 28, which shows their position for pushing and
22    for operating.  And then we see Number 6, when
23    finished, ensure the key has been returned to the
24    stop position to avoid draining battery charge.
25    Correct?
```



```
 1          A.     Yes.
 2          Q.     If the machine fails to move the
 3   electric brake may still be engaged.  Any warning or
 4   instruction here that says since the hydrostatic
 5   motors are completely bypassed, you have no control,
 6   be careful?
 7          A.     No, there is nothing in that that says
 8   that.
 9          Q.     All we have then is the next heading
10   which is to operate the machine, move the bypass
11   levers rearward through the keyhole and down to lock
12   them in place as shown in figure 28.  Ensure that
13   this is done for each lever.  Did I read that
14   correctly?
15          A.     Yes.
16          Q.     And, in fact, as you pointed out,
17   there is really no warning anywhere in the manual
18   about the bypass lever removing all braking and
19   directional control, correct?
20                 MR. FLORENCE:  Objection.
21          A.     Yes.
22          Q.     I am sorry, did I get --
23          A.     I thought, maybe we talked over each
24   other, so I said that's correct again.
25          Q.     Now, you had the Hillman's Timecutter
```



1  in your shop quite awhile now; is that correct?

2         A.     Yes.

3         Q.     Were you able to see, excuse me, let

4  me back up here.  So I can show you what I am

5  referring to.  Let's go to Page 8.  I will try to get

6  this done as quick as we can.  There is a heading on

7  Page 8 called Safety and Instructional Decals.

8  Safety decals and instructions are easily visible to

9  the operator and are located near any area of

10  potential danger.  Replace any decal that is damaged

11  or loss.  And then we see a number of symbols here

12  and the definition.  It says, warning do not operate

13  the mower with the deflector up or removed, et

14  cetera.  Do you see that?

15         A.     Yes.

16         Q.     And some other symbols about keeping

17  all guards in place and so forth, and thrown object

18  hazards.  Is there any pictorial or language warning

19  anywhere on the machine that would alert someone that

20  by using the push pins, the bypass pins and putting

21  them in the push operation there is no directional

22  control?

23         A.     No.  Not on the machine.

24         Q.     All right.  Do you remember the

25  testimony by Jennifer Hillman in which she said she



Exhibit 30-164

```
 1   wanted to have a ROPS on this machine because she had
 2   used her parents Toro and it had a ROPS?
 3        A.    Yes, I remember, well, at least the
 4   testimony about her wanting to have a ROPS.
 5        Q.    Do you remember her saying that they
 6   simply couldn't afford to go -- strike that, let me
 7   back up.
 8                   You also recall her testimony
 9   that she had asked about it and the dealer said, the
10   next Toro that actually has a ROPS on it is $5,000
11   instead of $3,000 for the Timecutter?
12        A.    Yes, I remember that testimony.
13        Q.    So that's a difference of $2,000,
14   isn't it?
15        A.    Yes.
16        Q.    In your opinion, I think you indicated
17   that your opinion of the cost of a ROPS would be
18   somewhere around, correct me if I am wrong, $125 or
19   $150 maybe?
20        A.    Yes.
21        Q.    You also, are you also aware Toro
22   didn't even offer a ROPS for the Timecutter when our
23   clients, the Hillmans, bought it?
24        A.    Yes.
25        Q.    Just a second.  Almost finished.
```



1  Mr. Berry, did you have an opportunity to review

2  Toro's own risk assessment of the Timecutters series?

3          A.      Yes.

4          Q.      In fact, their own risk assessment for

5  this product talked about foreseeable misuse, didn't

6  it?

7          A.      Yes.

8          Q.      They said that such, some of these

9  risks were operating on too steep of a slope, right?

10          A.      Correct.

11          Q.      Operating in the rain, correct?

12          A.      Yes.  Yes.

13          Q.      Tendency not to think rationally

14  during an emergency?

15          A.      Yes.

16          Q.      And in that risk assessment it also

17  said, and for counsel's reference, I am talking about

18  document 00072466.  It says, identified claims, there

19  is information of the accidents in the legal

20  department, didn't it?

21          A.      I recall something like that, yes.

22          Q.      Okay.  Do you know of anybody at Toro

23  who has ever admitted in a deposition, either in this

24  case or any other, where they said, well, we put the

25  brake system that's on the Timecutter on there



 1  because of cost, to put a safer brake on there would

 2  cost too much?

 3              MR. FLORENCE:  Objection.

 4      A.      I don't recall them saying that, no.

 5  Not those words.

 6      Q.      Do you recall any Toro representative

 7  in any deposition you have ever read, including

 8  Drutowski, in this case, that said, oh, we couldn't

 9  put a ROPS on this mower because it cost too much?

10      A.      No, I haven't seen that.

11      Q.      Have you seen any representative of

12  Toro in this case, or any other case with Toro that

13  you have been involved in, where they said, we

14  couldn't put better warnings on this mower regarding

15  the bypass pins problem because it would cost too

16  much to reprint the manuals?

17              MR. FLORENCE:  Objection.  Misleading.

18      A.      No.

19              MR. CROWLEY:  Thank you, Mr. Berry,

20  that's all I have.

21              MR. FLORENCE:  Mr. Berry, just real

22  quick, one follow up.

23                  REDIRECT EXAMINATION

24  BY MR. FLORENCE:

25      Q.      On the day of the accident neither



```
 1  │ Jennifer or Rebekah Hillman consulted the operator's
 2  │ manual for the Toro Timecutter; is that correct?
 3  │        A.    It is whatever the testimony is.  I
 4  │ think I recall that, but I don't, I think that was
 5  │ the testimony.
 6  │        Q.    Neither of them had reviewed the
 7  │ operator's manual for several years, correct?
 8  │        A.    I think there was someone, that was in
 9  │ the testimony, yes.  Which is one reason you put
10  │ warnings on the machine.  They are there to remind
11  │ you, it provides the reminder function.
12  │              MR. FLORENCE:  Objection,
13  │ nonresponsive.  That's all I have.  Thank you, sir.
14  │              MR. CROWLEY:  One quick follow up.
15  │              RECROSS EXAMINATION
16  │ BY MR. CROWLEY:
17  │        Q.    That's exactly why you would expect
18  │ Toro, if they were going to put the machine out the
19  │ way it was, the way Jennifer and Rebekah had to buy
20  │ it, that you would expect them to alert them to the
21  │ danger of complete loss of control when using the
22  │ bypass pin.  That's why you put a danger warning
23  │ symbol on the mower and in the manual, correct?
24  │              MR. FLORENCE:  Objection.  Misleading
25  │ facts, misleading.
```



1          Q.      Your answer?

2          A.      Yes.

3                  MR. CROWLEY:  That's all I have.

4    Thank you.

5                  MR. FLORENCE:  Thank you, Mr. Berry.

6                  THE VIDEOGRAPHER:  Before going off

7    the video record, can we get all transcript and video

8    orders.

9                  MR. CROWLEY:  Plaintiff would like an

10   electronic copy of the transcript and a copy of the

11   video because Mr. Berry is such a handsome cat.

12                 THE WITNESS:  And I will be reading

13   and signing the deposition.

14                 MR. FLORENCE:  I would also like an

15   electronic, including condensed including index and a

16   video.

17                 THE VIDEOGRAPHER:  All right.  Anyone

18   else?  This concludes the deposition.  The time is

19   now 3:29 p.m., and we are going off the record.

20                 THE REPORTER:  Where do you want the

21   read and sign sent?

22                 THE WITNESS:  To my office.

23          (Proceedings concluded at 3:30 p.m.)

24

25



1

2

3

4                              _____

5                              TOM BERRY

6

7                    Subscribed and Sworn to before me this

8   ____ day of _____, 2023.

9

10

11                              _____

12                              Notary Public

13

14                              County of _____

15

16                              State of _____

17

18

19  REBEKAH HILLMAN, individually and as next friend of

20  P.J.H, a minor; AND JENNIFER HILLMAN vs. THE TORO

21  COMPANY, a Corporation

22

23

24

25



Exhibit 30-170

TOM BERRY
HILLMAN vs THE TORO COMPANY

July 11, 2023
170

```
 1              ERRATA SHEET

 2    RE:  REBEKAH HILLMAN, individually and as next friend
      of P.J.H, a minor; AND JENNIFER HILLMAN vs. THE TORO
 3    COMPANY, a Corporation

 4    DEPOSITION OF:  TOM BERRY

 5    PG/LN NO.   CORRECTION      REASON FOR CHANGE

 6    :_____:_____:_____

 7    :_____:_____:_____

 8    :_____:_____:_____

 9    :_____:_____:_____

10    :_____:_____:_____

11    :_____:_____:_____

12    :_____:_____:_____

13    :_____:_____:_____

14    :_____:_____:_____

15    :_____:_____:_____

16    :_____:_____:_____

17    :_____:_____:_____

18    :_____:_____:_____

19    :_____:_____:_____

20    _____  I certify that I have read my deposition in
21    the above case and I request that no changes be made.
              I certify that I have read my deposition in
22    the above case and I request that the above changes
      be made.
23
                      SIGNATURE OF DEPONENT:
24                    _____

25                    DATED:  _____
```



800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 30-171

```
1              C E R T I F I C A T E

2

3         I, Rachelle Smith, a Certified Court

4    Reporter, do hereby certify:

5         That prior to being examined the witness was

6    by me duly sworn;

7         That said deposition was taken down by me in

8    shorthand at the time and place hereinbefore stated

9    and was thereafter reduced to writing under my

10   direction;

11        That I am not a relative or employee or

12   attorney or counsel of any of the parties, or a

13   relative or employee of such attorney or counsel, or

14   financially interested in the action.

15        The original transcript is in the custody of:

16        Mr. Kirk T. Florence
          Kilpatrick Townsend & Stockton, LLP
17        2001 Ross Avenue
          Suite 4400
18        Dallas, Texas  75201

19        WITNESS my hand and seal this 11th day of

20   July, 2023.

21

22        Rachelle Smith
          CSR No. 0864

23

24   REBEKAH HILLMAN, individually and as next friend of
     P.J.H, a minor; AND JENNIFER HILLMAN vs. THE TORO
25   COMPANY, a Corporation
```



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 30-172

TOM BERRY
HILLMAN vs THE TORO COMPANY

July 11, 2023
Index: $120..2010

**Exhibits**

9906625 Tom
.Berry.
EXHIBIT1
  10:3,4
  11:2 15:4
  43:15
  55:20
  87:13
  138:10

9906625 Tom
.Berry.
EXHIBIT2
  16:19,22

9906625 Tom
.Berry.
EXHIBIT3
  32:14,16
  33:12

9906625 Tom
.Berry.
EXHIBIT4
  38:20,21,
  25 39:10
  41:16

9906625 Tom
.Berry.
EXHIBIT5
  101:14,17
  103:20
  105:12

9906625 Tom
.Berry.
EXHIBIT6
  106:20,21
  109:12

**$**

$120
  83:4,5

$125
  164:18

$150
  26:9
  33:21
  82:20
  164:19

$2,000
  164:13

$200
  26:11,12

$3,000
  164:11

$45
  33:25
  34:14

$5,000
  93:12
  164:10

**0**

00003
  39:4

00072466
  165:18

**1**

1
  10:3,4
  11:2 15:4
  18:5
  43:15
  55:20
  87:13
  102:19
  138:10
  158:5,19

1,000
  23:8

1,000-1,200
  21:24

1,300
  22:3

1,400
  22:3

1,436
  128:21

10
  30:24
  152:16,
  17,24

100
  60:8
  111:4

10:02
  4:1,7

11
  114:22

11:20
  49:18,20

11:28
  49:21,24

11th
  4:7

12
  42:20
  54:3
  114:20

12:39
  90:23

12:40
  90:25

15
  30:24
  32:15
  41:24
  42:5,20
  48:24
  54:3 73:3

77:20
  148:17
  155:19

15-page
  33:12

16
  56:21
  57:4
  68:25
  154:4
  156:8

1762
  5:16

179
  136:1,2

17th
  10:15

18
  104:21

180
  40:24

18th
  143:21

19-2020
  92:24

1982
  17:19

1983
  134:18

1990s
  20:6

1999-'98
  23:2

1:13
  91:1,5

1st
  107:22

**2**

2
  16:19,22
  49:23
  58:11
  102:21
  112:20
  159:6

20
  26:1
  59:17,21
  60:3,8

200
  110:7,14
  128:12

2000
  20:5,9
  23:3

2000s
  24:11

2002
  132:9

2003
  86:18,20,
  21 140:8,
  13

2004
  37:8 64:5

2004-2005
  25:8

2005
  17:19
  21:2 37:8

2008
  136:3

201.5
  110:16

2010
  133:3,12



136:9

**2011**
44:14
128:16

**2011-2012**
43:12

**2012**
44:14
86:24
102:3
128:17
147:5

**2013**
11:11
86:16
92:4 93:1
94:6
133:6
147:5

**2014**
93:23

**2014-2015**
43:22

**2015**
36:5

**2018**
43:22

**202**
110:16

**2020**
17:10,11,
13

**2021**
26:3,8

**2022**
17:11,13
26:5,15
33:17

**2023**
4:7 10:15
34:11

108:11
143:21

**21**
143:25
156:13,14

**2200**
77:1

**23**
143:25

**230701**
107:11

**24**
157:5,6

**25**
54:6,13

**25.4**
114:7

**26**
103:6

**27**
103:6

**28**
161:21
162:12

**29**
81:23,24

**29.3**
112:15
114:16

**2:33**
137:23,25

**2:42**
138:1,4

---
**3**
---

**3**
32:14,16
33:12
55:23

56:3
58:14
91:4
109:11
111:12
140:2
160:6

**30**
54:6
67:25
112:16,17
114:1,3,
10
115:11,17
136:5

**30.1**
72:14
112:14

**30.2**
115:11

**32**
35:7
54:6,7

**33**
54:8

**34**
54:15
72:13

**37**
54:15

**38**
54:15

**3:29**
168:19

**3:30**
168:23

**3rd**
107:12

---
**4**
---

**4**
38:20,21,
25 39:10
41:16
58:16
111:24
113:17
138:3
144:7
147:4,6,
11,16
150:15

**40**
27:13
37:21

**4225**
101:8,21
102:11,15
104:7,22,
25
105:11,14

**425**
28:20

**45**
27:13

**4:21-CV-
04081-SLD-
JEH**
4:5

---
**5**
---

**5**
58:19
101:14,17
103:20
105:12
113:25
115:6
116:5

**50**
144:3,8

**5000**
7:5 11:7
12:4 14:1
101:9,22,
24 102:1,
12
105:10,
14,22
107:3
110:19
113:25

**5225**
45:4

**534**
109:14,17

**5500**
7:5 14:2

**598**
12:5,14
109:16
110:2,4,
14

**5th**
33:17

---
**6**
---

**6**
34:11
81:23,24
106:20,21
109:12
115:6
116:5
161:22

**6-foot**
96:19

**60**
10:17,20
53:22



Exhibit 30-174

54:18
147:18,24

**600**
12:6 29:6

**6th**
26:1

---

**7**

**7**
58:22
103:20
105:3
113:16

**70s**
134:23

**71.4**
29:19

**74631**
11:6

**75**
63:22
103:19

**796**
110:11,21

**798**
110:14

**799**
110:16,22

---

**8**

**8**
58:22
104:24
105:8,13
163:5,7

**80**
139:8

**800**

110:11,17

**80s**
134:25

**8425**
54:7

**880**
57:21,22
128:21

**89**
143:24

---

**9**

**9**
58:25
114:12

**9.2**
68:14

**9.5**
68:14

**90**
144:7

**90s**
24:11
134:21
135:4

**95**
31:10

**960**
44:24

**960A**
46:2

**968**
42:25

**98**
111:3

**99**
111:3

---

**A**

**A-L-A-N**
5:12

**a.m.**
4:1,7
49:18,20,
21,24

**ability**
131:7
147:20
153:3,15
156:10

**Absolutely**
35:11

**accelerate**
48:19

**accelerated**
48:22

**access**
90:6

**accessories**
156:3

**accident**
7:18,20
31:16
37:10
38:15
39:5,8
44:11
46:8
61:22
62:4,6
70:1,6,
14,16
75:2,3,5,
19 79:25
80:4
94:12,18
97:15
119:14,17
120:21

121:4,23
124:19
125:22
126:8
130:1
133:4
134:15,16
135:23
140:5,25
166:25

**accidentall
y**
106:3

**accidents**
18:21
27:24
46:12
60:17
61:19,20
62:5
64:21
67:3,10
133:19
136:1,5
145:25
148:6
165:19

**accompany**
117:10

**account**
116:10

**accounted**
85:5

**accurate**
32:23
59:6
124:6
130:24
145:11

**achieved**
112:20

**acknowledge**
144:24

**acreage**
45:9

**acres**
45:11

**acted**
27:10

**activated**
27:25

**actual**
76:11,19
97:24
139:10

**add**
45:3
103:5
110:10
112:18

**added**
12:20
45:4
76:16
87:9
103:13
111:2

**adding**
103:12
110:12
126:22

**additional**
27:3 48:5
84:17
124:18
125:14
139:19

**address**
6:16,18
57:11
132:13
138:21

**addressing**
96:9



adequately
  125:10

adjustment
  89:7

admitted
  165:23

admonish
  150:3

admonition
  152:25

adopted
  129:11

Advance
  8:14
  17:18
  22:9,11,
  15 45:17

advantageou
s
  127:10

advantages
  126:25

advertiseme
nts
  25:23

advocate
  96:3

affect
  59:10
  150:1

affected
  129:25

affects
  84:16

affidavit
  13:8,13

affiliation
s
  4:11

afford
  164:6

age
  147:18

agency
  145:25

agree
  116:19
  117:2
  119:17
  120:3,21
  121:4
  143:7
  144:5
  148:20
  149:4,11
  150:8
  151:19
  157:12

agreeing
  130:22

agreement
  26:5

agricultura
l
  135:19,21
  140:13,
  16,18

Agriculture
  8:16

ahead
  97:12
  148:14

aide
  33:25

Alabama
  47:6

Alan
  5:11,12

alert
  153:20

154:8
  163:19
  167:20

allowance
  110:5

allowed
  116:22

altogether
  138:19

American
  8:15
  140:2

amount
  112:8,10
  113:2,3

amounts
  109:21

analysis
  41:12
  51:2,8
  55:9,14,
  21 56:2
  66:15
  68:4
  72:16
  76:6
  81:21
  82:11
  83:14
  87:2,5,
  14,24
  94:17
  95:25
  96:6
  97:3,18
  98:2
  107:2
  115:8
  126:21
  143:15,16

and/or
  152:10

Andrew
  4:19

angle
  53:21
  54:12,21
  75:1
  108:13,17
  112:19
  114:1,7
  121:25
  148:19

angles
  107:3,25
  116:5

ANSI
  29:13,22
  72:2,6,14
  86:9,13
  109:6
  128:15
  140:1,6
  147:7

apologize
  67:7
  86:20
  123:2
  143:7
  147:10

apparently
  159:2

appearing
  7:9

applicable
  59:3
  132:18
  148:25
  149:1,14,
  16,18

application
  151:3

applied
  24:17
  78:17

101:21
  105:5
  125:3
  139:6
  140:18
  151:6

applies
  140:19

apply
  86:21
  101:24
  108:16
  126:3
  130:16
  133:7

approximate
  23:6

Approximate
ly
  12:5

April
  133:3,11
  136:9
  140:12

area
  9:8 25:14
  30:15
  37:14
  38:7
  39:12,16,
  19 40:3,
  12,13,23
  41:8,14,
  23 42:10,
  14,18
  50:8
  75:15
  79:11
  80:8
  81:9,10,
  11,17
  94:11
  96:11,19
  97:10,16



116:15
117:24
128:9
141:19,22
158:24
161:2,10
163:9

**areas**
15:9 41:7
73:4
155:21

**argument**
58:12
78:16

**argumentative**
42:12
59:5
61:24
62:15
93:25

**arguments**
59:7

**arms**
95:12

**artful**
143:6

**ASABE**
133:18
136:12

**ASAE**
140:9

**Asks**
79:16

**ASME**
136:13

**aspect**
56:19

**assessed**
88:25

**assessment**

165:2,4,
16

**assigned**
17:23

**assist**
107:20

**assistance**
35:5

**assistant**
34:14

**assisted**
34:20,23

**assume**
26:3
47:10
158:9

**assuming**
159:23

**assumption**
80:21,23

**assurance**
18:12

**ate**
91:23

**ATI**
45:14,16

**attach**
82:16
102:17
103:1

**attached**
13:21
103:25

**attachments**
155:24
156:3

**attempt**
10:1

**attempted**
61:16

112:2

**attention**
26:4
34:10
143:20

**attorney**
48:9

**attorneys**
18:19,21

**ATZ**
20:11
92:10

**author**
136:20

**automatically**
157:22

**automobile**
62:21

**automobiles**
62:22

**avoid**
150:16
151:21
155:16,21
161:24

**aware**
9:11 35:8
41:18
60:11
61:1
65:11,16
66:20,24
67:6,15,
18 79:4,9
80:1
88:7,12
100:16
124:16
135:25
145:16
151:13

156:5,24
164:21

**awhile**
45:15
75:16
163:1

**awkward**
118:17

**axle**
102:17

**AZT**
77:11
84:5

**AZTS**
91:11

───────────

**B**

───────────

**B-10**
140:6

**B-11**
140:6

**B-70**
29:17

**B-70.1**
29:13,18,
22

**B-70.2**
29:13

**B-71.1**
30:3

**B-71.1-2003**
109:7

**B-71.1-2013**
86:9,13

**B-71.4**
29:22
30:6

**B-R-O-C-E**
32:4

**B71.1-2013**
72:2

**B71.1.**
72:6

**back**
29:15,20
31:23
36:16
37:19
47:15
48:23
49:6,8,23
50:1
64:23
65:17,21
75:16
81:20
88:5 90:2
91:4
93:9,23
95:20
103:18
110:25
113:6,7
118:5,19
134:17,24
138:3
148:8
150:22
163:4
164:7

**backed**
68:13

**backward**
51:18
89:18
114:24

**backwards**
71:10
150:17
151:5

**bad**
27:23
53:5



**banks**
152:4,11

**bar**
127:18,
22,24
129:1,7,
23

**Barnett**
36:15

**barrier**
42:14

**base**
78:2
82:21
83:9

**based**
10:11
30:12
97:20
98:23
120:3,24
122:21
126:15
133:8
142:10

**basic**
29:7
57:20

**basically**
6:7 11:15
15:15
18:6
25:14
30:12
36:6
37:13
52:10
55:24
58:23
59:16
68:18
78:13
89:17
92:23

108:2
113:5,10
115:17
128:4
138:16

**basis**
38:14

**Bate's**
39:2

**battery**
157:16
161:24

**bed**
39:19,24
41:9 50:8
159:9

**began**
94:10
157:2

**begin**
161:12

**beginning**
49:23
57:4 91:4
138:3

**begins**
144:8
159:22

**behalf**
4:13,15,
18,20 5:7
25:6

**belt**
46:18
124:25
125:1

**belted**
98:13
123:23

**belts**
46:17

**benefit**
76:6,9
81:20
82:11
83:13
87:23

**benefits**
81:25
82:4,12
87:23
88:2,3,5

**Benjamin**
35:2

**Berry**
4:3,21
5:3,11,15
6:17 7:2,
8 10:8
11:5
18:16
20:7 35:2
50:1 91:7
138:6
142:9
165:1
166:19,21
168:5,11

**big**
11:18
95:18
127:14

**Bilek**
50:11
75:6

**Bilek's**
38:17

**bill**
33:17,25
34:11

**billing**
26:7,18
33:13

**billings**
32:22

**biomechanical**
9:4

**biomechanics**
9:5

**bit**
73:22
152:2

**black**
102:16,22

**blade**
158:6
159:24

**blades**
159:17

**Boeing**
18:9

**bolted**
102:24

**Bonugli**
14:12

**book**
8:17
147:5

**books**
8:21

**boom**
95:21

**bottom**
17:2 39:3
111:12
141:25

**bought**
44:21
94:15
101:20
119:21

164:23

**bouncing**
108:21

**Boy**
27:23

**brace**
124:5

**bracket**
102:17
103:1

**brain**
53:5

**brake**
48:6,9,
11,25
49:2,12,
13 76:8,
10,11,12,
13,15,17,
19,23,25
77:6,14
78:17
83:14,16,
23,24
84:17,23
85:5,7,
12,13,22
86:2,7,9,
11 87:9
88:5,6,18
121:20
124:18,25
125:2,8,
12,13,14,
15,18,20
126:2,4,
17,23
127:1,7,
8,10
132:19
153:15
157:15,18
162:3
165:25



166:1

**brakes**
11:21
42:7
77:3,7,8,
9,10,11
78:4
84:4,6
125:25

**braking**
11:22,23
49:3,5
55:18
131:7,19
151:16
160:18
162:18

**break**
49:16
50:2
85:15
90:17,18,
19 91:22
135:7
137:21

**breakdown**
47:15
135:10,13

**breaks**
124:25
125:1

**bring**
85:23

**Broce**
31:25
32:4

**broke**
106:16

**Broom**
31:25
32:4

**brother**

20:7 37:6

**Brothers**
47:3

**brought**
37:17

**bruise**
100:4

**bruises**
95:12
100:3

**brushes**
32:10

**build**
83:4

**building**
45:18

**built**
45:7 63:3
92:12,14

**bulk**
16:14

**bullet**
152:2

**bumps**
108:20

**burned**
31:15

**Burrton**
60:12
63:13

**buy**
43:24
44:7 94:9
167:19

**buying**
93:10

**bypass**
46:16
47:13
77:15

88:10
91:9,18
117:8,21
118:3
152:19
153:1
156:9
160:7,10
161:3,20
162:10,18
163:20
166:15
167:22

**bypassed**
46:9
116:21,25
117:4,6
162:5

—————

**C**

**Cadet**
43:2 45:4
83:4,7,8
85:2,11
92:20

**Cadet's**
29:18

**calculate**
63:20
74:15,18
113:4,8

**calculated**
61:7
62:18
63:1 99:9

**calculating**
64:1

**calculations**
96:23
97:4,17
98:21

99:1

**call**
39:19
54:25
86:11
125:13,
16,20
127:7

**Callahan**
30:22

**called**
29:10
51:7
79:20
149:22
163:7

**Calls**
158:12

**capacity**
7:9

**car**
76:20
86:6,7

**careful**
161:10
162:6

**Carol**
143:20

**carried**
7:3

**cart**
47:17,19

**case**
4:5 6:9
8:24 11:4
13:11
15:5,12,
17 16:5
19:5
32:22
33:7,13
35:22,25

36:2,14
37:11
38:12
43:6,8,11
44:11
46:5
47:2,21
48:8 56:9
57:2,15
59:3
60:15
64:11,16
66:13,15,
22 67:20
74:10
76:7
77:25
78:14
84:13
86:14
96:12
108:5
115:8
116:7
118:3
121:19
130:5,16,
23 131:3
134:3,13
135:24
137:4,12
140:22,23
142:3,23
143:21
144:25
145:4
165:24
166:8,12

**cases**
16:16
27:22
28:8
30:17
46:6 48:3
52:22
56:8,17



60:19,23
145:8

**caster**
39:25
40:22
52:16
120:17

**cat**
43:1,4,10
45:6
168:11

**catch**
58:15

**categories**
146:1

**categorize**
51:14

**caught**
55:3

**causation**
130:7
142:15

**caused**
27:25
40:23
47:19
55:3

**causing**
149:18

**caution**
148:7
149:13
150:7
153:1
155:20
156:1,20

**center**
58:17
74:15
111:7,9
112:23

**Central**
133:17
142:18

**certified**
24:20
104:3,4,6

**Cessna**
18:9

**cetera**
163:14

**CG**
57:24,25
58:7
95:16
96:16
98:19,24
99:7
112:7,25
113:4,6

**change**
26:10,12
89:12
109:21
112:9,22
113:5
148:18
155:25

**changed**
26:5,18
36:9 90:5
95:3
109:25
112:14
114:7
121:15

**changing**
155:23

**characteris tics**
11:13,14
70:2
155:25

**charge**
161:24

**charged**
157:17

**charging**
33:20

**chatter**
68:19
122:5

**chattering**
69:19,23

**cheaper**
82:14
83:2
93:18

**check**
107:6

**chip**
81:10

**choke**
73:21

**choose**
149:2

**circuit**
88:24

**circumstanc es**
95:6
124:19
125:21
126:7

**claim**
135:1

**claimed**
58:23

**claims**
134:22
165:18

**clarificati on**

7:8 8:6

**clear**
120:7,10,
12,13,16

**clients**
164:23

**close**
9:16
39:6,23

**closer**
38:6

**co-author**
136:18

**cog**
69:23
70:2,8,9,
19,21

**cogs**
157:23

**collecting**
8:19
115:13

**college**
18:2,8

**collision**
62:21

**combination**
127:9

**comfortable**
41:24

**commenced**
4:1

**comments**
128:15,
18,19

**commercial**
20:15,17
21:21
23:4
29:25

30:7,10,
13,14
144:5,10,
15 145:18
146:8
148:24
149:15,23
150:2
151:9,24

**commercial-
type**
13:17

**committee**
128:16

**common**
134:20,21

**community**
139:23

**companies**
18:22

**company**
4:5,14
5:7 46:24

**compared**
92:11

**comparison**
109:10

**comparisons**
93:8

**complete**
40:24
122:15
167:21

**completely**
86:16
95:4
162:5

**complies**
72:1

**computer**
5:23,24,



25 6:14

concerns
  40:17

concluded
  168:23

concludes
  168:18

conclusion
  112:1

conclusions
  105:18
  112:6
  113:1

condensed
  168:15

condition
  54:2
  75:18

conditions
  88:16
  149:9

confidential
  146:17

confirm
  96:24

confirmed
  109:6

confused
  132:4

conjunction
  24:1
  77:25

connection
  45:23
  46:1
  84:12
  116:7

connections
  91:25

consensus
  59:1

considerati
on
  143:16

considered
  86:13,15
  95:8
  99:14,16
  126:24
  136:4

consistent
  145:7

constructio
n
  32:10,11

consulted
  167:1

consulting
  7:11
  17:22
  27:10

consumer
  13:17
  21:22
  29:25
  30:3,10,
  14 63:22
  151:23

consumers
  65:7,8

contact
  33:8
  95:10,11,
  13 98:3,6

contacted
  18:18
  25:7 26:3
  31:17,21

continued
  8:14

continues
  55:24

contribute
  119:14

control
  27:25
  42:4
  46:11
  48:10
  51:12
  55:17
  61:5,19,
  22 62:5
  63:11
  65:17
  131:16
  138:22
  144:4
  148:5,12
  149:10,18
  150:13
  154:14
  155:9,16
  156:18
  158:1,7
  159:6,24,
  25 160:20
  161:4,5
  162:5,19
  163:22
  167:21

controlled
  11:25
  48:11

controls
  138:23
  139:3

copy
  134:1
  146:23
  168:10

corner
  17:8
  152:19

156:15

corp
  128:3

correct
  5:7 7:14
  9:13,17
  15:14
  30:4
  33:23
  40:25
  41:6
  51:25
  53:17
  56:15,18
  61:13
  62:13
  66:18,19
  69:2,7
  72:11,12
  77:8 78:1
  83:14
  84:13
  85:20
  86:4,22
  92:15
  93:3,23
  95:14
  101:9
  102:20
  104:1,12
  105:17,19
  109:13
  110:2
  111:13,16
  112:4
  113:3,18
  114:1
  118:6
  119:16
  121:1
  122:10
  126:15
  127:23
  130:18
  131:20
  135:17

137:2
  141:6,7,
  20 142:21
  143:3,22
  146:23,24
  147:2,8,
  12,25
  148:4
  150:17,25
  151:1
  152:20
  154:18,22
  155:7,15
  156:4
  158:21
  159:5,17,
  18 160:3,
  16,17
  161:17,25
  162:19,24
  163:1
  164:18
  165:10,11
  167:2,7,
  23

corrected
  159:1

corrections
  14:1
  138:7

correctly
  148:9
  152:7
  162:14

cost
  12:25
  82:6,24
  83:5,7
  92:10
  164:17
  166:1,2,
  9,15

costs
  82:17,18,



22

Council
  140:4

counsel
  4:10

counsel's
  165:17

counted
  59:24
  60:7,18
  131:10

counteract
  112:8
  113:7

counteracted
  151:7

courses
  8:15

court
  4:8
  142:19
  145:2

courts
  35:8,19

cover
  8:21
  13:12
  15:9
  55:15

covered
  8:12
  55:18
  81:10
  142:2

covers
  6:7 13:16
  140:9

CPSC
  128:11,14
  134:15,16

135:6,14,
22 145:23
146:14

CPSE
  64:20

create
  78:10
  101:11
  151:3

created
  79:5
  116:7

Creeping
  149:6

critical
  158:9

CROSS
  142:7

crossed
  143:5

Crowley
  4:15
  13:25
  15:6
  42:11
  44:1,5,9
  59:4,22
  61:23
  62:14
  63:8 75:5
  79:7,16
  93:24
  96:4
  102:5
  103:25
  131:21
  142:8,9
  166:19
  167:14,16
  168:3,9

Crowley's
  6:8 15:24
  30:17

32:22

crush
  28:1 96:8
  97:16
  128:9

Cub
  29:18
  43:2 45:4
  83:4,7,8
  85:2,11
  92:20

current
  6:16,18
  101:8
  104:7

Cushman
  30:24,25
  47:14
  48:8,13

custom
  97:1
  104:4

cut
  98:12

CV
  10:18
  17:6,17
  18:5

CZT
  46:2
  77:12
  84:5

————————

D
————————

damage
  106:12
  143:11
  156:19
  157:11

damaged
  163:10

Dane
  19:19
  21:10,16,
  19 22:24

danger
  149:17
  153:20
  154:4,24
  156:7,12
  157:8
  163:10
  167:21,22

dangerous
  36:9

Daniel
  14:11

data
  59:20
  64:3
  87:4,13
  96:25
  100:10
  107:16
  116:6
  126:15
  134:15,16
  135:6,19,
  22,23
  145:4,16,
  21,24
  146:16
  147:17

date
  17:7,15
  25:5 26:5
  33:13
  75:19

dated
  10:15
  17:11
  33:17

day
  156:4
  166:25

dealer
  164:9

dealing
  102:11

death
  87:17
  144:4
  148:6
  152:6
  154:22

deaths
  88:1
  144:11
  145:17

decal
  163:10

decals
  11:7
  163:7,8

decelerate
  48:20

deck
  36:1
  52:16
  92:13,14,
  17

deem
  14:24

Deere
  28:11,17,
  20,22
  29:1
  35:22,25
  36:15
  42:25
  43:2
  44:24
  46:2,4
  54:7
  63:21
  64:3
  85:13
  143:9



Deeres
  85:14

defective
  28:12

defendant
  5:7

defense
  14:5

define
  30:9,11

defining
  11:13,14

definition
  51:6 86:8
  142:20
  159:3
  163:12

deflector
  163:13

degree
  40:24
  42:5 50:7
  78:23
  114:1,3
  122:6

degrees
  41:24
  50:14,19
  53:22
  54:1,6,8,
  14,15,18
  67:25
  68:14
  72:13
  112:14,
  16,17
  114:8,11,
  16
  115:11,17
  148:17
  155:19

delivered

108:15

demonstrate
s
  142:23

department
  144:17
  145:13
  165:20

depend
  63:12

dependent
  141:14

depending
  54:16
  82:25

depends
  7:20 8:25
  15:8 54:2
  117:12
  124:3

deposition
  4:1,3,6
  6:6 9:20
  10:3,4
  11:3
  16:22
  19:3 27:5
  32:14,16
  38:20,21
  47:8,23
  101:15,17
  106:21
  143:20,22
  165:23
  166:7
  168:13,18

depositions
  6:7 9:12,
  23 19:4,
  6,7,9,10
  34:18
  38:12
  48:2

derive
  12:7

derived
  31:5

describe
  18:15
  23:15
  27:21
  31:11
  37:9
  152:13

describing
  23:11
  36:17
  120:8

description
  116:13

design
  8:7,13,22
  9:1 19:16
  20:2,8
  21:14
  22:17
  24:13,19
  25:15
  27:1
  29:12
  44:13
  51:9
  55:23
  56:4 61:8
  62:23
  76:22
  94:25
  101:6
  127:25
  133:20
  134:14
  138:11,
  14,15,16
  139:3
  140:10,
  14,18

designed

7:24
  20:24
  22:18
  25:17
  40:20
  104:18
  129:9
  133:5

designing
  7:13
  19:19,20
  20:12,18
  21:10

designs
  8:3 29:19

destroy
  97:15

details
  21:25

determinati
on
  73:14

determine
  61:4 67:3
  70:25
  72:1
  74:18
  78:18
  80:12
  84:15
  91:22
  95:3
  111:6
  125:11,19
  137:10

determined
  63:18
  78:19

determining
  33:6 79:2
  82:12
  87:5

developed
  35:25
  130:11,19

diagram
  50:12
  152:18,24
  161:19

difference
  29:21
  30:9,11
  68:7
  71:18
  72:22
  73:9,10
  74:13
  111:1,7
  123:16
  127:24
  130:14
  164:13

differences
  13:16
  107:25

difficult
  145:11

dips
  148:18

direct
  5:1 18:25
  35:4
  143:20

direction
  40:24
  50:21
  108:19
  121:14
  155:23

directional
  162:19
  163:21

directions
  54:17



**directly**
24:3
35:24
39:18
59:18

**disagree**
72:7

**disc**
77:6
126:4

**discern**
146:4

**discuss**
90:21

**discussed**
9:10
131:17
146:6
154:17

**discussion**
55:24
58:20
94:16
124:24
131:23,25
142:12

**disengage**
66:1
85:23
90:13
120:5,17
157:18
158:6

**disengaged**
65:14
66:8
68:16
91:16
118:4,11,
13 131:20
157:18
159:24

**disregard**
42:9

**distinction**
127:21
129:1,10

**District**
142:18

**ditches**
63:24
148:17
152:4,10

**Dixon**
54:24
85:10
122:1
134:23

**document**
10:12,18
16:20
17:4
33:12
55:12
71:5
100:19,
20,24,25
101:1,11
103:18
105:19
106:24
107:1,4
115:20
165:18

**documentati
on**
78:5
113:10

**documented**
71:20

**documents**
55:22
57:16
72:5
87:13

91:21
115:7
139:25
144:8

**dollars**
13:2

**Don**
20:7

**downhill**
50:24
112:3
121:18
141:14
151:14,25

**downsize**
83:16

**draining**
161:24

**drawings**
21:15,16

**drew**
128:25

**dripping**
116:17

**drive**
12:1,2
37:19
77:16,17,
18 85:3,
12,14,15,
18,20
90:2
122:2
124:25
125:1
150:4
151:15
153:3

**drives**
134:24

**driving**
148:24

**drop**
37:14
38:4
39:23
40:11
41:6
42:15
51:13
52:24
63:24
67:9
95:16,18,
19,23
96:16
98:19
117:25
124:8,9
152:3,10

**dropped**
96:19

**dropping**
74:24
152:4
154:20

**drops**
95:17
98:24
99:8
100:11
123:9
155:18

**drove**
73:24

**drowning**
152:6
154:22
157:3

**Drutowski**
143:21
166:8

**dual**
95:8

**due**

46:17,21
55:17
144:4

**duly**
4:22

**dummy**
124:1,3

**durability**
106:1

**dynamic**
11:22
49:5
108:20,22
160:17

**dynamics**
140:24

**Dynamo**
21:9
23:10,25
24:3,7,10

---

**E**

**earlier**
14:4 33:6
50:5
109:5
111:1
131:17
154:17

**early**
24:11
142:12

**easily**
163:8

**easy**
121:3

**eater**
40:14

**edge**
37:15



| | | | | |
|---|---|---|---|---|
| 38:6 | embankments | 74:25 | 138:15 | estimate |
| 39:25 | 63:23,24 | 141:24 | 140:3 | 27:13,20 |
| 40:6,8, | | | | 69:1 73:3 |
| 15,22 | emergency | energy | engines | 82:19,21 |
| 52:11 | 49:4 | 95:23 | 48:22 | 83:6 |
| 53:14 | 76:12,13, | | | 98:23 |
| 78:16 | 18,21,23 | engage | Enhancing | |
| 79:11 | 77:10 | 67:23 | 140:13 | estimated |
| 117:23 | 86:7 88:6 | 69:15,17 | | 83:11 |
| 121:25 | 125:8,15, | 70:10 | Enrique | |
| | 18,20 | 132:9 | 14:12 | estimating |
| edges | 126:4,23 | | | 36:5 |
| 152:5 | 127:1,2, | engaged | ensure | |
| 154:21 | 7,8,10 | 70:9 89:8 | 160:12 | et al |
| | 165:14 | 137:17 | 161:23 | 4:4 |
| education | | 150:4 | 162:12 | |
| 8:12 | eminent | 162:3 | | evaluate |
| | 154:11 | | entire | 147:20 |
| effect | | engages | 152:23 | |
| 123:25 | employee | 157:23 | | evaluated |
| | 35:3,4 | 158:1 | entity | 46:7 |
| effective | | | 30:13 | |
| 88:22 | employees | engine | | event |
| 99:23 | 18:24,25 | 29:7 | environment | 99:24 |
| 139:9 | | 73:22,23 | 63:25 | 141:11 |
| | employer | 84:22,24 | 64:22 | |
| effort | 6:22 | 85:4 | | evidence |
| 61:3 67:2 | | 88:16,19, | equipment | 59:6 79:8 |
| 70:25 | employment | 21 89:4,6 | 31:15 | 93:25 |
| 71:25 | 45:19 | 91:16 | 36:22 | 142:23 |
| 87:16,22 | | 133:8 | 37:6 | |
| | end | 135:11, | 104:11 | evidently |
| eight-paged | 38:9 | 12,13,15 | 127:13 | 110:10 |
| 100:24 | 52:11,15 | 159:12 | 138:15 | |
| | 64:11 | 160:1,8 | 140:19,20 | exact |
| electric | 74:24 | | | 41:21 |
| 157:14,17 | 95:9,19 | engineer | equipped | 43:21 |
| 162:3 | 97:8 | 7:11 | 48:5 93:2 | |
| | 105:19 | 17:22,24, | 129:7 | EXAMINATION |
| electronic | 120:16 | 25 33:23, | | 5:1 142:7 |
| 168:10,15 | 123:15 | 25 | equivalent | 166:23 |
| | 132:18 | | 28:17,21 | 167:15 |
| eliminate | 151:4 | engineering | | |
| 138:17,19 | | 139:23 | error | examine |
| 139:2 | ended | 140:7 | 7:2,3 | 116:10 |
| | 25:18 | 154:25 | 58:24 | |
| eliminating | 52:19 | | 137:11, | exceeded |
| 99:24 | 53:5 | engineers | 13,14 | 72:6 |
| 138:18 | 157:2 | 8:16 | | |
| | | 21:15 | errors | exceeds |
| embankment | ends | 128:3 | 110:23 | 72:14 |
| 67:8 | 53:14 | | | |
| 74:25 | | | essentially | Excel |
| | | | 10:21 | 19:17 |



20:1
21:6,12
22:1,24
36:20
117:7

**exclude**
135:20

**excluded**
35:9

**excuse**
35:17
147:16
156:13
163:3

**excuses**
56:22
57:4,5,9

**exemplar**
43:8
66:12
102:1,4
103:24

**Exhibit**
10:3,4
11:2 15:4
16:19,22
32:14,16
33:12
38:20,21,
25 39:10
41:16
43:15
55:20
87:13
101:14,17
103:20
105:12
106:20,21
109:12
133:16
138:10
144:3

**exhibits**
115:6

116:5
144:2

**exist**
51:12
87:7

**existed**
94:6

**existence**
146:5

**Exmark**
13:9,14
19:20
22:5,19

**expect**
42:16
70:20
97:1
98:24
126:11
137:14
167:17,20

**expectation**
96:24
126:14

**expected**
51:10
71:3
73:24
80:15
86:24
96:17,22
117:5
130:13

**expenses**
19:2

**expensive**
92:11
93:6 94:7

**experience**
8:8 16:7
18:4 96:6
97:20

98:8
145:21
149:21
158:17

**experienced**
140:23
155:12

**experiences**
145:12

**expert**
7:14,16,
17,19,23
8:6,9,24
9:4 14:5
27:10
31:6
60:22
137:2
142:14
146:6

**expertise**
7:12 9:5,
8

**experts**
6:5

**expressed**
37:12
137:7

**extent**
96:15

**extra**
148:7
156:1

**extreme**
150:7
155:19

**EZTE**
77:1

_____

_____
F
_____

**fact**

126:10
141:13,14
143:2,7
162:16
165:4

**factor**
8:24
148:5

**factors**
8:6,9,10,
12,18,19,
22 9:1

**facts**
59:5 79:7
93:25
130:16,23
167:25

**factually**
142:22,23

**fails**
162:2

**failures**
51:11

**fair**
16:16
142:20
145:5
154:14
155:2
158:2

**fairly**
28:21
54:25

**fall**
124:10

**falling**
149:24

**false**
58:21

**familiar**
28:22

157:21

**family**
4:16,18,
20

**farther**
100:12

**fashion**
83:25
99:21

**fast**
79:2

**faster**
48:22

**fatalities**
59:21
60:1,3
144:11

**fatality**
60:25

**feature**
47:13
67:22
68:10
85:17
117:21
127:9

**features**
87:11

**feel**
72:22
148:8

**feet**
37:21
42:20
52:3
68:25
78:22

**Femco**
19:19
22:5,7,11
23:24



24:1,7
82:23

**figure**
31:24
70:16
102:19,21
103:20
104:21,24
105:3,8,
12 161:21
162:12

**file**
133:16

**files**
144:3
156:25

**finally**
107:18

**finances**
94:2

**find**
26:2
73:12
89:9
107:6

**fine**
6:19,22

**finish**
21:4

**finished**
161:23
164:25

**fire**
31:15
43:7 55:1

**fires**
28:2

**firm**
30:17,19

**fitted**
92:5

**five-minute**
49:16

**five-to-six**
38:4

**flat**
55:1,6
115:10
121:6,8

**fleet**
62:1,7
63:3

**float**
120:9,11

**Florence**
4:13 5:2,
6 10:1,6
16:24
32:13,18
38:23
44:4,6
49:12,15,
25 90:16,
20 91:6
101:4,5,
19 106:23
137:20
138:5
142:5
143:14
146:9
153:7,10
155:14
158:12
162:20
166:3,17,
21,24
167:12,24
168:5,14

**Florence's**
142:10

**flower**
39:19,24
41:9 50:8
159:9

**focus**
81:19

**focused**
142:13

**foldable**
21:3

**follow**
166:22
167:14

**foot**
38:4
48:25
52:16
95:18
99:8

**force**
74:19,23
151:4

**foreseeable**
119:15
165:5

**forget**
84:23
117:5
121:25
154:2

**forgetting**
65:17

**forgive**
50:4
73:25
101:14

**forgot**
66:21
88:4
117:7
118:15,24

**forgotten**
37:25
66:6

**forklift**

123:6
124:14

**form**
128:6

**forum**
124:23

**forward**
38:1,9
51:19,24
53:8,20
54:18
55:5
71:12
74:20
89:18
90:2
111:18
153:2,14
156:10
160:11

**found**
47:1
93:20
133:9
156:25
161:14

**frame**
82:16
92:16,18,
19
102:17,25
103:2
128:6
160:7

**frames**
92:21

**Francis**
5:17

**free**
69:16
117:9
131:11

**friction-type**
76:25

**front**
10:23
11:7 33:3
38:8
52:11,15,
17 53:3,
13 68:3
71:19
74:24
95:9,19
97:8
99:15
103:3
108:1
111:22
112:1,8,
18 113:6,
7,14
114:18
116:14
121:18
135:11
151:4,7,
11,15

**front-engine**
65:6

**frontward**
52:23

**fuel**
12:5,6,16

**full**
5:10,11
12:13,18

**fully**
97:1

**function**
153:19
154:5
160:16
167:11



functioning
157:17

functions
89:1

_____

G
_____

garden
40:12,19
42:14
65:9
146:2

gas
12:13,18
116:17

gasoline
133:7,8,
10

gather
16:8

gathered
9:22 16:5

gave
6:20
106:5,6,
16

gear
69:23
70:8,21
139:1

geared
29:24,25

general
29:21
56:12
147:8,12,
17

generally
6:2
149:22

generate
56:14

gentleman
19:1
157:1

get all
168:7

Geysering
133:7

gist
59:19

give
23:21
47:8,23
58:21
124:6

giving
27:4 48:7
96:6

God
60:9

golf
31:3
47:16,17,
19

good
5:3,4
36:23
42:3,7
96:18
121:24
124:6
150:5

government
146:3

gradually
155:20

grass
69:6,10
75:21,24
149:9

154:12

grassy
81:11

gravity
58:17
74:16
111:7,10
112:23
149:21,25

great
19:18,19
21:10,16,
19 22:24

greater
57:23
148:17
155:18

grooves
79:10

ground
28:1
37:23
38:10
54:25
55:6
66:2,9
70:3,4,19
79:3 90:1
95:1,5,
10,14
98:4,6
100:5,17
106:7
108:19
114:14
115:11
120:11,
14,16,20
123:2,17,
19 149:2,
6

grunt
35:5

guard
138:20,22
139:12,
17,20

guarding
139:3

guards
139:10
163:17

guess
15:2
33:11
34:22
43:11
46:23
61:17
73:13
119:20
123:5
125:13
157:19

guide
132:8

guy
78:14
121:18

Gwin
14:13

_____

H
_____

half
58:3
108:18

hand
40:14
48:21
152:10
157:7,11
160:25
161:17

handle

77:12
85:3
131:25
145:11

handles
85:18,20,
23 153:4
158:1

handling
155:25

hands
95:15
124:4

handsome
168:11

happen
28:16
40:1 41:3
53:8
62:23
63:7
70:20
97:7 98:7
120:11
141:3

happened
39:6 63:5
67:16
75:3
94:12
100:14
119:18,
20,22
120:22,25
121:5

harder
53:20

hazard
51:2,8
55:9,14,
21 56:2
127:3
133:7



138:17
139:10
143:15
153:20

**hazards**
39:11,13
51:9,11
126:22,25
133:9
138:22
163:18

**head**
51:24
67:8
95:12,13
99:11,13

**heading**
56:4
147:16
148:3
156:14
157:7
162:9
163:6

**hear**
44:2
79:21

**heard**
41:20
89:10

**height**
113:4

**held**
4:6 49:21
68:15
69:12
91:2 97:2
98:4
138:1

**helped**
71:23

**hey**
131:9

132:2
154:9

**Hidden**
133:7

**hierarchy**
138:11
140:10,18

**high**
52:2

**higher**
53:21
58:17

**hill**
38:2
47:18
50:25
51:1 70:8
78:15
121:12,
20,21
122:1
125:3
141:16
143:11
159:9

**Hillman**
4:4,16,
18,20
10:14
37:11,13,
17,24
40:21
52:5,14
63:11
69:7
79:6,24
94:19
95:5 98:3
116:12,16
122:9
142:24
146:22
155:11
163:25

167:1

**Hillman's**
130:1
162:25

**Hillmans**
9:24
93:22
94:10
164:23

**hire**
19:2
155:21

**hired**
22:16
31:14
75:5

**history**
56:10
133:5,19
134:14
140:9

**hit**
95:1
100:17
141:8

**hits**
95:9
123:19

**hitting**
96:20
100:4

**hold**
61:23
77:15
122:14
129:5
142:14

**holding**
69:13
102:22

**holds**
67:23

97:22

**hole**
102:24

**holes**
148:18

**hour**
26:9,13
33:21
34:1,14
78:25
137:21

**hours**
142:11

**house**
73:1

**HR**
77:6

**huge**
60:9

**human**
8:6,9,10,
12,17,19,
22,23 9:1

**humans**
9:2

**hundred**
59:14
61:18,19
62:3,6,10
63:1,2,6,
11 82:20
99:23
153:25

**hung**
55:2

**hurt**
58:14
106:14,15
154:9

**Hustler**
19:17,18

20:1,10
21:12,14
22:1,24
24:24
25:8
36:20
42:25
43:7
44:21
45:7
85:16
90:12
92:9
117:7
134:21

**Hustlers**
21:7

**hydro**
122:2

**Hydro-gear**
76:25
126:11
132:17

**hydrostat**
88:4
125:1

**hydrostatic**
12:1
37:18,25
46:9
49:3,5
65:13
66:21
84:18
88:9
89:11
90:14
116:20
118:19
120:5,23
131:19
134:24
157:1
161:4



162:4

hydrostatic
ally
  48:14

hydrostats
  47:17
  65:25
  66:1,9
  68:15
  88:20
  89:8,13,
  19,22
  102:17

——————
    I
——————

idea
  36:23
  150:5

identificat
ion
  10:5
  16:23
  32:17
  38:22
  101:18
  106:22

identified
  117:16
  165:18

identify
  10:12
  92:3
  100:24

ignition
  157:15
  160:21

ignore
  117:10,14

Illinois
  142:19

imagine
  92:11

impact
  52:18
  74:10
  89:1
  95:5,8
  96:17
  99:15
  123:16

impacted
  52:5,7,13

important
  62:20
  87:10
  148:23

improper
  46:17,21,
  23

in-house
  144:18

in-office
  136:14

inch
  58:3

inches
  99:7
  152:14

incident
  26:25
  50:5
  51:14
  58:24
  65:11
  67:3,5
  69:7 79:5
  99:12
  100:10
  156:24

incidents
  61:9

incline
  155:21,23

inclinomete
r
  129:25
  130:4,14

include
  10:18
  56:25
  59:2
  110:4,6
  130:10
  135:15,19

included
  31:16
  65:5,10

includes
  127:22
  134:9

including
  5:22 8:15
  103:12
  129:2
  166:7
  168:15

income
  31:5,7

Incorporate
d
  45:17

increase
  103:12

increased
  112:12

increments
  123:8
  124:8,15

index
  168:15

Indiana
  44:12

indicating
  36:11
  52:12

indication
  23:21

individuals
  34:19

industrial
  18:4

Industries
  19:17

industry
  135:4

inflexion
  97:24

inform
  154:1

information
  12:7
  16:15
  33:9
  38:11
  59:5
  64:15,19,
  20 68:1
  71:17
  74:8,9
  81:15
  83:10
  107:6,24
  125:5
  131:5,8,
  12 135:7
  146:5
  165:19

informed
  154:1

initially
  26:8
  69:13

injured
  122:10,20

142:24
  143:4,5,
  17 146:7

injuries
  60:1
  87:25
  88:2
  96:1,10
  98:9,11,
  16 100:13
  145:17
  147:19

injury
  53:5
  87:17
  98:20
  99:24
  100:1,8
  123:19
  143:9,11
  144:4,14
  145:4,12,
  21 147:22
  148:6,11
  152:6
  154:22
  156:19

inside
  47:19

inspect
  47:12
  75:2

inspection
  6:6 34:5
  38:16
  119:5
  122:4

inspector
  18:12

install
  74:12
  101:7,13



Installatio
n
  101:7

installed
  103:3
  104:21,25
  105:2,9,
  13

instance
  51:12

instances
  63:10

institution
  146:3

instruction
  41:4
  158:10,15
  159:24
  161:9
  162:4

instruction
al
  140:4
  163:7

instruction
s
  40:9
  91:17
  118:1
  131:3
  138:24
  139:4,16,
  18,20
  142:18
  147:1
  158:5
  159:21
  163:8

insurance
  18:22
  31:13

intend
  27:4,6

117:3

intended
  21:22
  116:21
  117:1

intentional
ly
  106:2
  158:20

interest
  62:19
  78:13
  124:1

interlock
  84:21
  85:1,2,6,
  8 88:8,
  14,15
  91:18

interrupt
  44:1
  97:13

interviews
  60:22

introduce
  4:10

invariably
  54:14

investigate
d
  46:13
  59:25
  67:11,15

investigati
ons
  135:21
  136:4

involve
  27:18
  67:7

involved

27:15,22
29:2
31:16
46:16,17
47:13
55:1,14
60:1,12,
15 61:22
62:17
70:6
99:11
121:23
130:12
147:18
166:13

involves
  67:21
  89:11

involving
  22:7
  27:11
  28:2
  30:24
  32:9
  35:22
  56:18
  79:5
  94:18
  133:4,19

issue
  11:4
  28:18,19
  55:10
  87:18
  116:20
  126:6
  131:4,16
  140:23
  144:22

issues
  57:11,13,
  14 59:8
  96:9
  132:14

item
  34:13
  154:12

_____

J

J1040
  24:16,24

jack
  89:25

jacked
  89:17

January
  17:19
  34:10
  143:21

Jason
  4:17

Jeanette
  34:17

Jennifer
  37:17
  79:24
  116:16
  118:3,8,
  10 119:1,
  2,13
  120:4,22
  131:18
  143:8
  146:22
  147:24
  159:8
  163:25
  167:1,19

job
  18:1
  144:12

jobs
  18:6

John
  28:11,17,

20,22
29:1
35:22,25
36:15
42:25
43:2
44:24
46:2,4
54:7
63:21
64:3
85:13,14
143:8

Johnson
  4:7

Joseph
  133:18

Judge
  36:7

July
  4:6 17:19
  26:1,5,14
  107:12,22

jumped
  38:7

junior
  17:24

jury
  142:17

_____

K

Kansas
  5:17
  17:18

keeping
  113:23
  139:20
  163:16

Kenneth
  96:9



**Kevin**
  136:16

**key**
  157:16
  160:21
  161:23

**keyhole**
  160:11
  162:11

**kill**
  57:8
  84:21
  85:4

**killed**
  28:2
  58:14
  59:11,17
  60:13

**killing**
  59:13
  60:14

**kilograms**
  128:12

**kind**
  6:25 31:9
  42:16
  67:9
  68:4,22
  78:14
  81:1
  84:25
  86:5
  117:25
  118:17
  123:3
  148:11
  153:12
  154:24
  161:12

**Kirk**
  4:13 5:5

**kit**
  101:20

**knew**
  118:3,7,
  10,15,18
  131:18

**knowledge**
  46:15
  78:3
  125:7
  146:12

———————
            **L**
———————

**lady**
  60:13

**laid**
  139:6

**lake**
  53:2

**landed**
  38:8
  52:11,12
  53:3
  95:19
  97:7,8
  99:14
  116:11,
  12,14
  122:22

**language**
  56:16,25
  118:18
  163:18

**large**
  32:10
  74:12
  147:19

**Late**
  24:11
  134:21

**lateral**
  51:18,21
  53:10,12,

13 54:12
  72:12
  108:18
  112:13

**laterally**
  58:3
  112:11

**law**
  30:17,19

**lawn**
  65:9
  124:22
  126:1,12,
  16 129:9
  145:18,25

**lawnmower**
  11:17

**lawsuit**
  7:10
  12:11
  25:25
  29:3
  55:10
  137:16

**lawyer**
  142:14

**layover**
  55:8

**lays**
  139:23

**Lazer**
  13:9,14

**leading**
  46:11
  153:7
  155:14

**learn**
  79:14

**leasing**
  45:18

**leave**

11:16,17
  40:10
  84:23

**leaving**
  79:13
  160:2

**led**
  58:24

**left**
  79:25
  81:16
  102:22
  111:16

**left-hand**
  156:15

**legal**
  142:15
  144:17
  145:13
  165:19

**legs**
  38:9
  95:20
  98:12
  116:14

**length**
  75:23

**level**
  54:25
  79:3
  121:6,8
  153:20
  158:6,11,
  16,22
  159:3,23
  161:11

**leveled**
  41:18

**lever**
  49:7
  153:15
  160:13

162:13,18

**leverage**
  88:4

**levers**
  37:25
  38:1,6
  48:16
  65:17
  66:21
  88:20
  152:19
  159:7,10,
  25 160:7,
  10,20
  161:3,5,
  13 162:11

**LHP**
  19:20
  22:19,22
  23:4
  25:17

**libraries**
  8:20

**license**
  17:25

**lift**
  77:12
  120:13

**lifted**
  37:21
  90:1

**lifting**
  151:3

**lighter**
  104:18

**limit**
  128:7

**limitations**
  132:7

**limited**
  35:13,15,



19 36:7
64:24
134:7,8,
10
**Lisa**
14:13
**list**
57:9
59:25
140:1
**listed**
18:5
146:23
**listened**
119:6
**listing**
60:17
**lists**
56:22
**literature**
139:22
153:24
**litigation**
45:23
46:1,3
145:5
**live**
123:10,11
**load**
92:22,24
158:20
**locate**
160:7
**located**
163:9
**lock**
67:22
68:10,17
69:12,15
85:5,25
86:5,6

121:21
122:2,4
127:9
131:9
132:7
157:21
158:1
160:11
161:7
162:11
**locked**
26:24
153:16
**locks**
85:1
121:17
132:9
157:23,24
**long**
49:13
63:23
68:24,25
73:2
**longer**
43:10
78:19,21,
22 139:9
**longitudina**
**l**
74:19,23
106:9
**looked**
9:21 13:4
25:11
46:7
52:22
61:8
65:15
66:23
67:17
75:7,14,
16 80:3,
11 87:25
88:3,11

89:2 92:7
93:9,16
94:24
96:25
97:14
98:10
115:7
116:5
127:15
144:2
**lose**
151:25
156:18
**loss**
46:11
51:12
61:5,19,
22 62:5
63:10
65:12
74:22
131:7,16
140:24
141:6,11,
20 142:1
144:4
148:5,12
149:10,18
150:13
151:14,16
154:13
155:8,16
163:11
167:21
**lost**
42:4
55:17
157:1
**lot**
8:18
9:12,15
16:3 43:8
51:7
53:14,19
54:17

56:10,16
83:2
84:25
100:10,11
108:17
124:23
139:25
143:15
**lots**
83:1
**low**
149:2,5
**lower**
155:21
156:15
**lowered**
37:23
**lowering**
128:20
**LPEI**
136:1,6
**lunch**
90:18,25
91:23
**LX475**
126:2

——————

**M**

——————

**machine**
7:12 8:3,
7,13,22
9:1 11:10
21:25
22:2 32:8
36:8
46:25
47:15
48:10
51:9
58:18
65:21

67:24
71:18
74:13
76:12,18
83:10,11
87:1 88:6
92:25
98:10
103:11
108:8,15
122:3
125:8
127:2
128:11
131:7,10,
11,24
140:14
143:17
148:20
153:3
155:25
156:4,17,
19,20,21
157:7,10,
11,14,15
158:5,6,
11,16
159:22
160:6,22,
24 161:16
162:2,10
163:19,23
164:1
167:10,18
**machinery**
140:16
**machines**
9:2 18:23
22:21
76:19
84:20
92:12
93:8,14
97:21,23
100:11



made
  13:19
  20:24
  41:22
  43:12
  48:22
  69:19
  83:1
  87:16
  88:17
  97:19
  125:6
  130:3
  134:22
Mahoney
  4:19
maintenance
  46:22,23
  89:1,2,4,
  10
major
  96:17
  148:5
make
  19:10
  25:9
  26:12
  53:20
  70:25
  73:16
  74:12
  83:1,2
  102:11
  129:10
  130:14,21
  138:8
  140:21
  142:13
  149:22
  150:11
  158:19
makes
  8:9 29:2
  62:6

63:11
  158:23

making
  37:7
  58:17
  80:21,23
  145:3
  156:20,21
manual
  126:11
  132:11,17
  140:6
  146:20,21
  152:17
  153:9,17
  154:17
  161:15
  162:17
  167:2,7,
  23
manuals
  16:8,13
  166:16
manufacture
  32:5
manufacture
d
  11:9,11
  102:2
manufacture
r
  19:13
  21:8 25:6
  31:18
  42:10
  83:3
  145:20
manufacture
rs
  18:20
  25:2
  31:21
  56:22
  82:25

map
  19:3

March
  10:15
  108:11

mark
  10:2
  32:14
  38:19,25
  101:4
  106:20

marked
  10:4 11:1
  16:19,22
  32:16
  38:21
  101:17
  106:21

market
  25:20
  92:4 93:2
  94:8
  134:20

marketing
  7:16,17
  36:24

marketplace
  20:25

marks
  79:5,13,
  15,18,19,
  20,25
  80:3,7,
  10,12,16
  81:5,6,7,
  16

Master
  77:5

material
  16:4,14

materials
  5:21,25

6:5,9
  8:19,21
  9:22
  15:23
  16:6
  128:23
  133:24
  136:7
  140:4
  146:23

matter
  4:4 7:22
  8:1 9:7,
  10,25
  10:14
  13:9,14
  27:4
  30:23
  34:8,21
  55:15
  63:13,14
  74:22
  92:20
  133:6
  137:9
  151:22

matters
  27:11
  45:23
  59:9

Mccall
  60:15
  63:14

meaning
  154:5

means
  11:16
  51:21,24
  63:2
  108:14
  160:15

meant
  149:5

meantime
  17:2

measure
  111:9,18

measured
  41:10,13
  58:2 69:1
  111:15

measurement
  79:1

measurement
s
  37:23
  71:4
  75:7,9,
  11,14
  108:23
  115:10

mechanic
  91:14

mechanical
  7:11
  17:22
  134:24
  140:3,19

mechanism
  157:15

media
  4:2 49:23
  91:4
  138:3

medical
  7:14

meet
  128:1

Meeting
  133:18

memory
  35:22
  42:21
  44:17



50:12
75:17,20
86:12
103:15
144:21

mentioned
19:5 20:2
21:10
104:8
133:11
156:8,12

met
59:1 94:3

metal
70:8,21
92:21

method
138:16

methodology
55:23
56:5
138:14

Mid
133:17

miles
78:25

mind
27:8
36:10
80:12
150:12
159:5

minimum
104:13

minute
26:2
36:16
61:24
93:15

minutes
49:14
73:3

misleading
166:17
167:24,25

misplaced
100:19

misquotes
94:1

missing
28:7

Mississippi
36:3,13

Missouri
133:18

misstate
60:2

misstates
15:6
59:5,22
61:24
131:22

mistake
86:19

misunderstood
71:13

misuse
165:5

mixed
159:20

mode
46:10
88:10
118:20
153:2
156:9

model
11:4,6
20:11
21:20
28:16
44:15

104:6,9
126:6

models
20:10
29:19
77:1

modifications
102:10

modified
102:25

modify
56:8

moist
75:22

moment
107:5

money
82:17,18

morning
5:3,4

motion
48:10
132:10
153:15
159:6,25
160:19

motor
150:20
160:15

motors
46:9
65:13
89:11
90:14
116:20
118:5,19
120:6,23
127:6,12
131:19
153:16
161:4

162:5

mounting
25:14

mounts
102:24

move
65:22,23
85:18,19
113:5
121:9
158:11
159:6,22,
25
160:10,19
161:5,13
162:2,10

moved
85:3
160:5

moving
86:3
111:11
120:16
159:16
160:1

mow
11:18
39:18
40:3,6,15
42:10
43:4
45:10,14
68:5
148:9,16
149:8
152:3
155:17,18

mowed
40:14
72:21
76:4

mower
11:4,13,

18 12:9,
10 19:20
21:18
23:4,13,
14,16
24:6
26:22,23,
25 27:1,
2,16,24
28:12,17,
18 29:6,
7,9
30:10,14
32:6
35:10,23
37:15,20,
23,24
38:1,8,16
39:12
40:10,19
42:6,19,
22 46:19
47:12
48:4,17
50:7,21
52:4,8,9,
13,16,25
53:2,23
54:16,25
55:10
57:21
58:13
64:1
66:12
67:22
68:1,2,6,
15,16
69:6,24
70:1,12
72:1,20,
23 73:17
74:4,16,
20 76:16
77:13
78:24
79:10
80:7,14



82:1,15,
20 83:21
84:7,9
86:3,22
87:7 88:9
89:1,16,
17,25
90:5,6,11
92:17
93:19,22
94:3,6,
19,21
95:1 97:5
99:20,25
102:25
103:2,13
104:6,11
105:7
106:5,6,
12,16
108:21
109:6
111:8
113:13
115:10
116:11,
14,21,23,
24
117:10,23
118:21
119:18,21
120:4,13,
24 121:5,
11,17
122:1,5
123:23
124:19,22
125:21
126:8
131:4
135:8
140:23
143:8,10,
12 145:25
146:1,21
147:19,21
149:19

150:14,
17,19,24
151:2,23,
24
152:10,15
157:23
159:8
163:13
166:9,14
167:23

mowers
7:13
12:23
13:17,19,
20 19:18
20:6,8,15
22:7
27:12
28:3
29:17,25
30:1,4,7
36:18
40:10
42:3 43:3
44:18,25
45:10,21
53:17
56:11,12,
18 57:7,
22 62:12,
16 63:22
64:25
65:2,4,7
72:22
76:21
78:4 82:9
83:25
84:18
85:7
88:8,9
90:3,4
92:4
97:21
101:8
105:6,16
109:23

127:15,17
129:6,10,
12 130:19
132:25
133:9,19
134:7,9,
19,22,24
135:2,8,
9,12,16
144:5,10,
14 145:18
146:7
148:21
149:15
150:2
157:2

mowers'
133:4

mowing
37:14
39:11,16
41:24
42:7,16
63:23
75:25
76:2
94:11
121:24
150:16
151:2
154:12
155:20

_____

N
_____

National
140:4

nature
10:19

necessarily
121:16
129:20

needed
10:10

27:5
47:15
48:9
56:10
75:13
118:10,
14,19
120:13
128:7,10

neutral
160:20

noise
69:19

nonresponsive
153:11
167:13

normal
160:16

North
5:16

note
49:19
72:24
90:24
111:24
137:24

noted
5:5 72:23

notes
19:10
48:23
49:9,10

notice
73:10

noticed
7:3 68:7

November
102:8
133:6

number

4:5 21:20
32:14
39:2,10
58:9,11,
14,16,19,
22,24
59:24
61:15
62:19
81:23,24
87:19
105:12
106:20
107:11
109:12
113:17,25
114:12,20
142:10
145:17
158:5,19
159:6
161:22
163:11

numbered
57:19

_____

O

_____

oath
4:22

object
37:1,3
163:17

objection
15:6
42:11
44:9
59:4,22
61:23,24
62:14
63:8
79:7,16
93:24
96:4



131:21
146:9
153:7,10
155:14
158:12
162:20
166:3,17
167:12,24

**observed**
81:2

**obstruction**
**s**
58:16

**obtain**
45:22

**obtained**
45:25

**occupant**
12:4 96:8
150:20

**occur**
51:10,11
61:9,10,
15 62:3,7
137:7,8
151:14
157:11

**occurred**
37:10
46:8 61:9
62:4,5
63:13,14
88:1,2
121:7

**occurring**
61:12
64:21
100:13

**occurs**
70:24
128:7

**October**

102:9

**offer**
164:22

**offers**
87:8

**offhand**
50:13

**office**
5:16,25
6:8,14,18
15:24
19:1,2
32:22
45:14
136:11,
16,25
168:22

**offs**
41:6
51:13
63:24
152:4,10
155:18

**Ohio**
44:12

**oil**
89:12

**older**
53:1
147:25
156:25

**one's**
69:10

**one-foot**
95:23

**online**
124:22

**open**
70:7
91:12,14

**opened**

38:6
68:18

**operate**
39:23
42:5
44:19
73:17,19
84:24
117:3
118:6,20
147:20
152:19
162:10
163:12

**operated**
9:2
44:20,21,
22,23
72:20
73:4,5
84:5

**operates**
157:21

**operating**
40:18
46:10
116:19
118:14
147:7
148:19
149:3
160:2
161:22
165:9,11

**operation**
82:9 88:9
117:23
118:5,20
147:8,12,
15,17
148:3,7
152:3
160:16
163:21

**operational**
84:19

**operator**
26:23
27:24
39:18
53:4 55:2
58:6,23
74:5
84:16
99:24
100:11
110:6,7
115:19
117:9
121:19
123:10,12
124:17
131:13
153:14
156:18
161:5,20
163:9

**operator's**
16:13
110:5
146:21
167:1,7

**operators**
13:18
58:21
127:19
147:18,20

**opined**
28:11

**opinion**
48:4
76:16
81:23,24
104:10
119:12
122:8,12,
13,14
127:5,11

129:5,24
130:18
140:22
149:14
164:16,17

**opinions**
13:12,19
15:5,8,
12,13
48:7
74:10
108:10
119:8
130:11
131:2
134:2,12
135:24
137:4,7,
11 140:22
142:2

**opportunity**
165:1

**opposed**
16:5 77:8
79:2
80:14
97:25
102:12
119:9

**option**
36:25

**optional**
36:18

**order**
36:11
64:16
119:25
138:21
144:25
145:3

**orders**
168:8

**ordinary**



66:18

**orientation**
116:11

**originally**
102:24
160:6

**OSHA**
20:21
24:17,24,
25

**outcome**
94:18,22
121:15
130:1

**outer**
153:4

**outward**
158:2
159:7,25

**outweighed**
82:1

**outweighs**
76:10

**overhead**
58:15

**overturn**
47:20
99:25
148:19

———————————

**P**

———————————

**p.m.**
90:23,25
91:1,5
137:23,25
138:1,4
168:19,23

**paged**
10:18

**pages**
10:20
32:15
55:20

**paper**
133:23
134:12
136:9
140:8,11

**papers**
132:24
136:17

**paralegal**
19:2
34:18

**paraplegic**
60:14,15

**parents**
164:2

**park**
67:22
68:10,16
69:12,15
78:17
84:23,25
85:4,5,
12,13,25
86:5,6,9,
11 87:9
88:18
121:20
122:2,3
127:9
131:8
132:7,9
157:21,
23,25
158:5,16
159:7,25
161:6

**parking**
69:22
77:7,10
85:22

86:7

**part**
8:12
26:24
46:24
52:13
56:12,24
66:14
78:2
80:17
81:19
83:13
86:14
87:23
89:3
97:14
104:19
116:14
120:8
124:9
129:4
130:7
140:17,
21,24
141:13
160:22

**parts**
92:25
159:16
160:2

**pass**
142:5

**passed**
109:6

**past**
9:13
52:23
59:8
93:10

**pawl**
70:2

**pawls**
69:22

**pay**
34:24

**PE**
7:2 17:25
18:16

**peer**
136:10,
12,14
137:5

**Pennsylvani
a**
48:1

**people**
9:15 24:6
57:8
58:14
59:11,14,
25 98:9
131:9
135:1
143:16
146:7
152:15

**percent**
31:10,12,
17,19
61:18,19
62:3,7,10
63:1,2,6,
12,22
99:23

**percentage**
31:4
62:16,18
64:22
147:19

**perfectly**
39:22

**perform**
9:9 34:3
94:17
122:7

**performed**
54:23
55:9

**period**
23:3
92:10

**permanent**
97:24

**perpendicul
ar**
121:14

**person**
121:23
124:4
131:13
153:21

**personal**
139:1
156:19

**photograph**
34:5
38:24
39:5 78:9
103:3
113:22
114:10

**photographs**
25:21
71:5,6
80:4,9,
22,24
113:11
115:9,21,
22 116:3

**pick**
120:15

**picked**
120:4

**pictorial**
163:18

**picture**
102:16



103:23
104:24
115:1

**pin**
167:22

**pining**
117:24

**pinned**
53:4

**pins**
37:19
65:24
118:4
120:14,25
131:6
153:1
156:9
157:6
161:20
163:20
166:15

**pivot**
11:16,19

**place**
44:13
85:22
134:20,21
139:21
160:12
162:12
163:17

**places**
7:6

**plaintiff**
66:22
168:9

**plaintiff's**
31:5

**plaintiffs**
28:9

**plan**
13:24

14:3
15:19
130:25

**planning**
94:14
116:23
132:20,23

**planter**
37:14,16
38:3
40:2,13,
19,22
41:9,14,
23 42:14,
17 75:15
79:11
80:8
81:9,17
119:19,24
142:25
143:4,10

**plate**
69:4,11
102:14,
19,22,23
109:4
112:18
115:2

**plates**
103:3

**platform**
106:7
111:22

**plenty**
93:1

**point**
12:22,25
33:20
37:4,21
50:16,20
53:23
64:19
73:13,15
81:15

92:5,7
93:18
96:7
100:6
111:21
113:15
116:23
138:7
141:2,5

**pointed**
50:22,24
51:1
121:13
141:14
162:16

**pointing**
121:12

**points**
152:3

**pond**
157:2

**position**
52:8
88:21
95:17,21
139:5
153:5
157:16
158:2
159:7,17
160:1,2,
20,21
161:21,24

**possibility**
155:17

**Possibly**
31:24

**post**
20:14
25:16,18
98:7
129:18

**potential**
64:1
137:11
163:10

**pound**
21:25
29:6
110:7

**pounds**
12:5,15
22:3
57:21,22
103:6,19
109:14,16
110:3,4,
11,16,17
111:3,4,5
128:21

**power**
108:14,16
151:3
157:1,22

**powered**
48:14
133:10
150:24

**practices**
147:7

**precisely**
155:11

**prefer**
104:17

**preference**
138:21

**premise**
139:23

**prepare**
9:19
107:10
132:20

**prepared**
13:9

15:16
101:1
132:12
137:15

**preparing**
34:4

**presented**
57:6
140:9

**presenting**
8:23

**presently**
44:25

**presents**
153:21

**pretty**
42:3
98:12
121:24
126:17
150:5

**prevent**
39:16
88:21
95:10
123:19
129:18

**prevented**
35:11
93:22
97:9
122:9
129:25
130:8

**preventing**
88:17

**prevention**
140:5

**prevents**
86:3 88:8

**previous**



16:6 92:1
110:1
138:8

price
12:22,25
92:5,7
93:8,17

primarily
11:22
18:17
20:7

printed
6:5 14:17

prior
20:5
128:16

probability
61:4,7,
12,14
62:6,11
63:4,16
64:2

probable
61:14,18,
20 62:2,3

problem
42:7,8
60:10
152:12
166:15

procedure
91:19

proceed
91:7

proceedings
49:21
91:1
138:1
168:23

process
9:17

produced
145:4

product
154:9
165:5

products
97:1
104:4

profession
154:25

Professiona
l
31:7

project
20:10
23:24
25:7
31:25

projects
17:23
18:18
19:17
22:6
24:18
31:13
32:11

properly
40:20

property
43:5
44:19
45:14

proposal
76:23

proposed
94:20

proposing
83:17
124:18
125:12

proprietors
hip
6:24 7:1

protect
58:6
95:16
128:6
147:21

protected
95:4
96:22

protection
42:6
82:16
96:8
104:19
123:18
127:19
128:2,7,
13 129:21

protective
64:16
96:18
97:10,16
128:1,9
139:1
144:25
155:1

provide
13:25
82:15,16
92:8
96:8,18
97:9,11,
16 129:20
133:23

provided
6:9 13:8
15:24
64:7 77:4
103:4
116:1
128:19,22
131:6,9

132:13,
16,21
143:22
146:14,21
147:2

providing
76:10,11
77:2
82:1,2,4,
13 87:8,
10 88:3

public
145:16,24

publish
145:21

published
132:24
147:5

pull
65:24
80:16
121:18

pulled
37:20,21
49:6
50:25
73:21
79:10
80:7
118:14
143:9

pulling
80:13

pulls
113:14

purchase
102:13,15

purchased
43:5
44:11,13
45:5,8
94:5

102:5
103:25
146:22

purchasing
93:19,22

purged
89:18
90:2,6

purging
89:11
91:10,19

purpose
40:2

push
89:6
153:2
156:9
157:10,15
158:1,5,
23 159:2
163:20,21

pushed
38:1
118:13
120:14,25
153:2,16
160:24
161:3,17

pushing
150:21
157:7
158:21
161:21

put
23:20
35:21
40:6,12,
13 42:13,
20 43:11,
13 45:6,8
46:5,18,
24 50:12
57:7,21



61:13,15
64:2,22
65:17
66:13
75:17,20
82:19
83:4,5
87:19
88:4
92:20
95:15
101:2
104:17,18
110:7
117:24
118:19
124:4,25
126:2,9,
10 127:25
128:4
129:18
130:19
131:25
132:2
140:8
145:16
165:24
166:1,9,
14 167:9,
18,22

**putting**
40:2 58:5
163:20

---

**Q**

**quadriplegi
c**
60:16

**quality**
18:12

**quantificat
ion**
61:12

87:3
113:2

**quantify**
61:4
73:9,11
87:16,20,
23
112:10,23
117:20

**quantifying**
82:10

**question**
44:2,10
74:22
80:25
110:25
126:5
144:1,11,
18 153:12
159:20

**questions**
142:10,
11,13
143:6

**quick**
48:13
50:1
90:17
137:21
146:25
163:6
166:22
167:14

---

**R**

**radius**
11:13,15,
20 27:11
28:12,17
32:5 35:9
39:12
40:19
42:22

48:17
53:17
64:25
83:25
88:7 92:4
93:2
127:6,12,
15,16
132:25
134:7,9,
19,22,23
135:8,16

**rain**
165:11

**raining**
107:19

**raise**
57:25
58:6
112:7,25

**raised**
57:15
58:9,18
59:8

**raises**
57:24

**rake**
30:24
31:1,2
47:14,20
48:4,13

**ramp**
68:13,20,
22,23
71:11,12
158:21
159:2,3

**ranged**
93:11

**rapid**
150:11
155:22

**rapidly**
156:18

**rate**
26:7,18
67:3
137:11,
13,14
149:24

**rates**
26:6

**rationally**
165:13

**reached**
159:16

**react**
124:3

**read**
9:21,22,
23 19:6,
7,9 39:2
51:7
86:10,15
125:6
142:17
148:3,9
152:6
162:13
166:7
168:21

**readily**
94:8

**reading**
153:22
168:12

**ready**
50:2 91:7

**real**
48:12
120:7,12
124:24
145:11
166:21

**realize**
131:24

**rear**
11:19
37:19
51:23
77:6
84:4,6
90:1
102:24
103:1
106:8
108:16
111:15
112:11
113:13
114:1
115:17
120:4,10,
16 129:18
135:11,
12,15
150:24
151:10,11
155:12

**rear-ended**
129:17

**rear-engine**
65:6

**rearing**
150:14

**rearward**
53:10,12,
25 54:9,
10 58:5
72:13
112:14
129:19
150:20
153:14
162:11

**reason**
39:17
59:16



72:7
83:20
89:14
127:3
137:15
145:14,15
150:19
167:9

reasons
145:10

Rebekah
4:4
37:13,24
40:21
52:5,14
63:11
94:18
95:4 98:3
116:12
118:9,15,
23,24
119:3,13
120:22
122:9
130:1
131:18
132:1
142:24
146:22
147:24
155:11
156:2
159:7
167:1,19

rebuttal
15:16
57:12

recall
6:10 15:1
17:12
20:20
21:18,22,
24,25
22:2,21
23:1,6,9,

17 24:4,
5,16
25:4,6
28:5
30:18
36:4
43:21,23
47:4,5,7
48:7
49:1,9
50:5,13,
15,23
52:3 53:1
60:21
75:22
76:5
81:13,18
83:3,6
94:16
103:14,16
112:15
116:8,18
131:23
136:21
164:8
165:21
166:4,6
167:4

received
66:12
70:1

recent
17:6 26:4

recently
93:17
144:10

recess
49:20
90:25
137:25

recognize
118:17

recognized
139:8

154:25

reconstruct
80:17

reconstruct
ion
7:18,21
38:17
75:10

reconstruct
ionist
75:6

record
5:9
49:18,24
90:20,21,
23 91:5
94:1
100:9
131:22
137:23
138:4
168:7,19

records
144:13

RECROSS
167:15

red
102:14,
19,23
113:13

REDIRECT
166:23

reduce
149:9
150:7
155:19

reduces
155:24

reengage
66:21

reengaged

120:23

refer
11:2
13:13

reference
8:21
113:1
130:4
133:1
136:6
145:24
165:17

referenced
54:18

referred
33:5

referring
57:3
98:22
107:5
111:23
112:19
113:17
133:17
140:11
163:5

refrain
145:3

refresh
144:21

regard
87:4

regulation
128:3

reinsert
65:24

related
78:10,14
80:13
133:19
147:19
148:5

relates
83:14

relating
18:21

relative
26:18
39:11
131:3

release
37:19,25
65:24
85:4,11
88:4
131:6

released
37:18
47:16
68:15
72:5
85:14,15
88:18,20
89:5,19,
22 114:13
117:7
118:14
121:17,20

relevant
14:25
130:5,23
133:6
134:2
153:21

Reliance
6:9 15:23
128:23
133:24
136:7

relied
75:8
119:8
134:12

rely
75:11



87:14
139:15

**relying**
80:19
135:24

**remainder**
113:9

**remains**
85:22

**remember**
14:21
19:23
24:6
25:19
30:23
31:25
35:22
37:22
48:24
50:23
60:16
68:14
70:15
80:6,8,9,
10 81:4
83:6
118:8,9
121:1
143:14
153:23
159:13
163:24
164:3,5,
12

**remembering**
19:22

**remind**
153:23
154:1
167:10

**reminder**
167:11

**remotely**

4:6

**remove**
161:6

**removed**
36:10
163:13

**removing**
162:18

**render**
48:4
122:11

**rendered**
60:14
108:4

**repairs**
73:16

**repeat**
35:18
44:2,4

**repeats**
154:16

**Replace**
163:10

**replaced**
21:2
102:23

**replaces**
102:16

**replowing**
123:2

**report**
6:4,6
7:2,4
9:21
10:13,21
13:5,8,
11,15,22,
24 14:1,
11,12
15:4,10,
13,16

37:12
43:14,16
47:11,21
55:13,20,
25 56:7,
14 57:10,
12 58:10
78:10
81:22
87:12
94:20
95:25
96:3
107:10,17
108:4,11
113:9
115:12
119:7
130:3,10,
15
137:16,
18,19
138:10
140:1

**reported**
144:13

**reporter**
4:8
168:20

**REPORTER'S**
49:19
90:24
137:24

**reports**
6:4 9:23
14:5
38:17
56:17,25
58:19
144:3

**represent**
32:21

**representative**

166:6,11

**representing**
74:5

**represents**
33:13

**reprint**
166:16

**request**
44:2

**require**
25:10
148:7

**required**
54:1
109:9
144:24

**requirements**
109:7

**requires**
54:13

**research**
8:18

**residential**
13:17
29:11
30:15
65:8
144:15
145:18
146:8
148:24
149:14,22
150:1
151:9,23

**respect**
8:3,7,17,
18 13:19,
20 16:9
20:6
26:23

28:3
34:23
55:17
56:11,19
57:6,12
58:16
64:20
68:2 76:8
78:3
91:8,17
96:16
98:10
100:9,10
107:24
117:21,22
128:20
130:7,19
131:6,8,
16 133:9
142:19
148:20

**rest**
28:4 46:3
52:16
55:24

**restrictions**
36:11

**result**
124:6
148:6
150:13
152:5
154:21

**resulted**
98:8

**results**
108:4,6,
10 109:12
111:13
116:6
123:7
124:7

**retained**


ESQUIRE
DEPOSITION SOLUTIONS

25:24
26:3,8,21
28:9 33:7

**retainer**
67:8
94:11

**retaining**
38:7
39:19
40:3,4,5,
11 41:3,5
46:20
51:25
52:2
74:25
79:12
117:25
141:4,9,
10,15,17

**retention**
26:18

**retest**
25:10

**return**
64:6
142:11

**returned**
46:10
64:11
153:4
161:23

**reuse**
56:12

**reverse**
71:8,9
156:10

**review**
14:18
34:18
64:12
136:13,
14,17
137:5

165:1

**reviewed**
14:7,10,
19 38:12
136:10,12
167:6

**reviews**
19:3
55:22
57:16
64:23

**revolutiona
ry**
155:5

**RH**
39:4

**Ricing**
44:12
60:13
63:14

**ride-on**
65:2,4
129:10
133:4,19
135:9

**ride-on-
garden-type**
129:6

**rider**
129:17

**riders**
65:6,7
135:11,
12,13

**riding**
11:17
146:1
147:19,21

**right-hand**
152:18

**rigid**

128:4

**rises**
148:18

**risk**
51:8
57:23
76:6,10
81:20
82:2,11
83:13
87:2,4,
14,17,23
143:15
165:2,4,
16

**risks**
87:7
165:9

**road**
19:3 32:9

**rocks**
148:18

**role**
18:15

**roll**
37:20
52:4,24
54:12
55:3,5
57:7 67:8
74:20
99:11,13,
20 111:19
112:2
116:16
127:18,
19,22,24
128:6
129:1,7,
18,23
161:13

**rolled**
51:16

52:19
60:13
65:21
97:23
141:10

**rolling**
38:2
65:21
67:24
68:17
69:16
97:20
121:21
131:11

**rollover**
27:15,19
28:5 42:6
43:5,10
46:5
51:13,15,
16,20
53:20,25
54:19,24
55:7,17
56:19
57:23
61:4,20
98:1
99:25
100:11
105:23
128:1,7,
12 129:1
141:11,25
144:5
149:23
155:17

**rollovers**
51:18
54:3
56:11
62:4
63:12,13,
15 88:1
97:25

128:8
152:5
154:21

**rolls**
98:14

**room**
5:18,22

**rope**
106:5,6,
16
113:13,23
114:13,23

**ROPS**
7:12,13
19:19,20
20:8,12,
14,23
21:3,4,11
22:17,18
23:24
24:13,15,
18,20
25:13,16
27:2
35:24
36:17,18,
19 43:11,
13 44:13
45:1,3,5,
6,7,8
46:4
57:7,21
58:4,12,
15,17
66:13
68:2,4,5,
8 71:18,
19 72:13,
17,21,24
74:6,12
76:9,10,
11 82:1,
2,5,9,13,
22,24
83:12



87:8 88:3
92:6,9,
15,20,23
93:3,11,
13,23
94:4,6,
19,25
95:1,9,10
96:2,6,7,
18,21
97:1,5,9,
15,22,24,
25 98:4,
7,11,25
99:23
100:9,11,
15,17
101:2,6,
7,20
103:4,12,
25 104:3,
10,13,15,
17,21,24
105:2,5,
13,21
106:1,10
107:3
108:1
110:3,19
111:2,3,
8,13
112:6,13
114:6,10
122:8,12,
20,23
123:18,20
127:12,
18,21,22
128:1,5,
20 129:1,
7,9,13,
20,22
134:4,14
155:1
164:1,2,
4,10,17,
22 166:9

rotary
  32:10
rotating
  157:24
rough
  148:19
rounds
  141:24
row
  110:18
RT
  44:18
run
  73:22
  89:17
  157:16
  160:21
running
  89:5
  91:16
  159:17
runs
  43:10
RZT
  29:19
  43:2
  92:21

_____

S

_____

SAE
  24:16,23
safe
  39:23
  58:25
  147:6
safely
  143:9
  147:21
safer

74:14
149:7
166:1
safety
  7:12
  26:22
  27:1
  40:6,8,18
  42:13
  77:15
  91:18
  138:11
  140:4,10,
  13 147:6
  163:7,8
sand
  30:24
  31:1,2
  47:14,20
  48:4,13
Scag
  23:24
  24:12,14
  43:1,4
  44:23
  45:5,6
  53:1,2
  77:14
  90:11
Scag's
  77:5
Scags
  84:4 85:9
  125:25
scene
  39:6,8
  75:3 80:5
scheduling
  34:7
Schiffman
  4:17
Schiffman's
  30:19

scratch
  56:13
screen
  10:2,8,11
  16:19
  32:13
  100:21
  106:19
  133:14
  143:19
scroll
  10:10
  16:25
  32:19
  100:23
sealed
  91:12
search
  125:1
seat
  55:15
  98:13
  116:15
  123:23
seatbelt
  100:4
  127:22
seatbelts
  129:2,3
secondary
  132:11
secret
  145:12
secretary
  19:1 34:2
section
  56:21
  71:2
  154:4
security
  58:21

self-
employed
  6:23
  18:16
send
  134:1
senior
  17:24
  33:23
sense
  58:21
  158:19,23
sentence
  81:25
  113:1
separate
  9:1
September
  11:11
sequentiall
y
  139:6
series
  165:2
service
  46:24
  48:5
  77:8,9
set
  15:4
  159:21
sets
  79:25
  111:12
setting
  67:14
settled
  47:11,25
Sevart
  136:16,24



**severe**
98:1,9
148:6

**share**
18:25
143:19

**sharing**
10:7
16:18
19:2
32:13
100:20
145:3
147:9

**sharp**
156:21

**shear**
67:9

**sheet**
33:9
92:21

**sheets**
34:5

**Shelly**
4:9

**shop**
47:16
66:4
158:24
163:1

**short**
8:15
46:19
71:2

**show**
10:1,2
16:18
38:19
97:4,5
101:2,12
113:10,12
115:7,23

146:20
152:22,23
156:6
161:20
163:4

**showed**
115:1

**showing**
113:11
146:19

**shown**
41:15
43:16
98:8
102:21
103:2
126:11
162:12

**shows**
96:1
109:12
113:20
114:23
125:25
161:21

**side**
53:3,15
55:2,4,7
116:17
121:19
129:19

**sides**
160:7

**sideways**
51:21

**sign**
156:7
168:21

**signing**
168:13

**similar**
22:23,25

23:11
29:2,4,7
57:1
64:19
84:25
88:19,23
92:5,7
108:7
122:2
123:5
126:2,6
137:1

**simply**
142:22
164:6

**simulation**
99:10

**simulations**
99:4,19

**single**
129:18

**singular**
29:9

**sir**
23:15
31:8
39:14
43:20
46:14
142:6
167:13

**situated**
69:6

**situation**
46:8
76:18,21
95:8
108:22
127:2

**situations**
62:17
139:11

**size**
21:22
23:17,19
29:4,5,7,
8 36:1
58:13
126:2

**skid**
79:4,13,
15,18,19,
20,25
80:3,10,
11 81:4

**skim**
19:8

**skip**
152:1

**slacked**
46:17

**slid**
119:18

**slide**
40:23

**sliding**
149:10
154:13

**slightly**
50:24
57:24
58:1

**slip**
151:16

**Slippery**
149:9

**slope**
42:5
46:19
50:7,19
54:1
67:23,24
68:17
75:14

77:18
78:23
115:23
121:9,24
122:6
126:7
130:12,13
131:12
147:14
148:3,8
149:3
152:3
155:24
161:12
165:9

**slopes**
51:13
72:21
77:13
125:25
148:4,7,
17 149:8
150:5,8
154:13
155:18,
20,23

**slow**
156:20

**slower**
149:7

**slowly**
152:22

**small**
112:8,10
113:2,3

**smaller**
23:19,21,
22 57:7
102:16
128:10

**Smith**
4:9

**smooth**



69:2

**Snapper**
44:21
46:2
77:11,12
84:5
125:24

**Snappers**
85:9

**Society**
8:16
140:2

**Sofia**
4:7

**sold**
86:25

**soldier**
50:2

**sole**
7:1

**solo**
6:24

**solution**
140:10

**solutions**
133:5,20

**son**
34:23
35:1,6
71:23
107:20

**sooner**
108:17

**sort**
28:4 34:7
49:7
138:23
139:3
158:24

**sorts**

119:22
124:1

**sound**
50:16

**sounded**
120:8

**source**
64:4

**special**
16:5

**specialist**
8:4

**specific**
16:8 24:4
34:8
58:11
128:1
154:5

**specifically**
57:3

**speculation**
79:17
146:10
158:13

**speed**
78:24
79:1
98:19
126:7
149:2,6
150:7,11
152:1
155:19,22

**spelled**
5:12

**spin**
27:25
156:17
157:2

**split**

138:25

**spoke**
119:5

**spoken**
119:2

**Sport**
92:10

**spot**
11:16,18

**spread**
92:22,24

**spring**
46:18,25

**spun**
41:2

**SS**
7:5 11:7
12:4 14:1
101:9,22,
24 102:1,
12
105:10,14
107:3
110:19
113:25

**SS5000**
112:7

**St**
5:16
133:18

**stability**
42:4 58:4
65:12
72:2,3,4,
12 106:10
109:7,8
112:9,12,
13 133:18
140:24
141:6,12,
20 142:1

**stability-related**
133:4

**stable**
58:18

**stages**
139:2

**stand**
127:15

**standard**
20:18,21
24:22
36:19,22
37:5,7
54:13
56:24
59:1
72:6,14
86:21
104:11
112:17
127:12
128:2,17
130:15
138:11
147:8

**standards**
140:1,6

**standpoint**
40:18

**standup**
123:6
124:13

**start**
37:7
56:13
69:15
76:24
88:19
123:8
143:24
147:4,6
160:22

**started**
17:23
37:24
38:1
47:18
65:22
68:17
73:23
109:19
118:5,20
121:21
122:1
141:11,12

**starting**
55:23
56:21
88:16,21

**starts**
39:24
56:7
131:11
147:6
150:16

**state**
8:13,20
50:6 57:3
105:18

**stated**
98:9
108:11
132:14
139:24

**statement**
16:16
32:23
57:20
80:19
97:18
130:24
148:20
149:8,11,
13

**States**
93:25



Exhibit 30-207

142:19

**static**
72:3,4
107:2,25
108:13,
17,21

**stationary**
86:4

**statistics**
64:18

**stay**
41:4

**stayed**
121:10

**steel**
68:23
69:4,10,
23 70:8,
21 82:15
109:4
115:1

**steep**
40:11
41:7,8
42:15
63:23,24
152:4,11
154:13
165:9

**steeper**
41:23
54:21

**steered**
48:16

**steering**
151:16
155:9

**step**
95:2
138:20,
24,25
139:1

**stepped**
160:6

**steps**
138:21

**Steve**
44:8
134:1
142:9

**Steven**
4:15

**stood**
38:6

**stop**
26:24
38:3,5
68:18
70:17
76:18,20
77:18
78:15,17,
18,20
79:2
83:21
84:7,9
88:6
95:22
102:13,18
122:3,4
125:8
127:1
131:7,10,
24 132:5
149:3
153:3
156:10
159:12
160:1,2
161:24

**stopped**
50:22
76:3
83:22
94:25
95:21

121:13
125:3,21
126:1
141:9
143:8
159:14

**stopping**
132:3

**stops**
77:13

**story**
96:20

**straight**
38:3
96:19
124:10
141:15

**strike**
150:22
164:6

**structure**
58:5
128:1

**structures**
155:1

**STT**
24:14

**stuck**
37:16
119:11,
19,24
143:5
158:10,17

**student**
18:13

**studied**
28:25
61:2

**studies**
63:20
64:24

124:17,21
125:5

**study**
13:18
64:5,17
89:16
125:6
134:14
136:1,6

**stuff**
154:9

**subcontract
ing**
22:14

**subject**
12:10
64:15
70:11
72:1
73:17
74:16,20
86:22

**subjected**
70:12
137:5

**subjective**
73:14

**successfull
y**
143:8

**sudden**
150:11,16
151:3
155:22

**suggested**
72:11

**suggesting**
126:23
127:7

**sum**
95:23

**summaries**
6:6 19:7

**summer**
18:6 36:6

**Super**
20:10
23:23
24:14,23,
24 43:1,7
44:22

**supplement**
13:24

**supplementa
l**
13:10,14

**supplemente
d**
13:5,8

**supplements**
125:7

**supplied**
105:22

**support**
92:15
97:18
99:5
107:15
122:8

**suppose**
100:15

**supposed**
91:11,12
109:15
113:15
118:4

**surface**
69:2,4,5
109:3
115:2
121:6,8
158:6,11,
16,18



159:4,23
161:12

**surprise**
66:25

**surprised**
132:2

**suspect**
50:25
70:7

**suspected**
98:5

**sustained**
96:2

**switch**
77:15
88:23
158:7

**switches**
55:15

**sworn**
4:12,22

**symbol**
167:23

**symbols**
163:11,16

**system**
91:13
165:25

— — — — —

**T**

**table**
53:16
54:5,11
71:14
72:10
105:24
108:24
109:1,3,
19 112:20
113:20

115:3

**takes**
53:20
54:21
78:19

**taking**
8:15

**talk**
35:23
56:2
79:12
100:18
135:11
138:11

**talked**
58:19
81:21
84:3
99:14
121:22
122:15,
21,25
125:24
135:23
162:23
165:5

**talking**
11:3
15:25
21:6
24:6,9
60:20
62:1,11
79:23
84:18,21
87:3 91:9
92:16
102:19
110:18
114:20
115:2,4
122:13
125:4,5
130:25

133:20
135:6
136:15
141:21
143:15
144:9
161:3
165:17

**talks**
147:7,8

**tank**
12:13,18

**tasking**
22:17

**taught**
138:15

**tearing**
91:15

**technical**
34:13

**Technologie
s**
22:9,11

**Technology**
8:14
17:18
22:16
45:17

**telling**
36:14
119:8
161:5

**tells**
152:19

**template**
56:7
109:22

**ten**
27:20,21
31:20
32:1 47:7

50:14,19
59:17,21
60:3,6,8
64:13
78:23

**Tendency**
165:13

**tensioner**
46:18

**term**
51:2 92:8

**termed**
55:23

**terminology**
118:12

**terms**
24:19
63:16
72:2
112:22
135:3

**terrain**
148:19

**test**
24:15
43:13
69:24
71:1,8
77:2
88:15
96:25
97:25
107:23
108:3,6,9
109:7,9,
20 111:12
112:2
116:6
122:7
123:10,11
124:7

**tested**
20:20

22:3
54:15
68:10
77:11,12,
14 78:17
84:9
104:7
122:3
125:24
126:1

**testified**
4:22 36:6
119:9

**testify**
36:7
47:10

**testifying**
27:5,11
35:9,12

**testimony**
10:19
14:25
15:7
35:13,20
47:24
59:23
60:2
61:25
81:14
92:1
118:2
122:24
138:8
144:22
163:25
164:4,8,
12 167:3,
5,9

**testing**
19:16
20:8,13,
22 24:13,
19 25:19
34:23



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 30-209

TOM BERRY
HILLMAN vs THE TORO COMPANY

July 11, 2023
Index: tests..title

43:8
53:16
66:14
67:19,21
68:1,12
70:14,15
71:14,21
72:10
74:1
77:19,22,
25 78:3,
11 80:18
84:15
88:13
97:4
99:2,17
105:21,
23,24,25
106:9
107:2,15,
19 108:23
109:6,13,
23 111:6
115:8
120:24
123:3
124:16
125:11,19
126:15,16
132:5

**tests**
106:4
124:2
141:19

**textbooks**
140:7

**thankful**
124:24
125:2

**thing**
17:14
34:8 44:3
82:14
132:5
138:23

139:4
150:21
158:24

**things**
10:19
35:21
51:8
55:16
63:19
119:23
132:19

**Thomas**
5:11,13
7:1 18:16

**thought**
36:22,23
37:6
71:10
86:18
93:15
105:8
162:23

**thousand**
13:1

**three-paged**
17:3

**throttles**
48:21

**thrown**
163:17

**Tiger**
23:24
24:14,23
43:1,4,10
44:23
45:5,6
77:14

**tight**
113:23
114:23

**tilt**
34:23

53:16
54:5,11
68:1
71:14
72:10
105:24
106:4,7
108:24
109:1,3,
19 111:12
113:20
115:3

**tilting**
54:4

**time**
5:14 13:6
23:2
26:4,19
34:9 39:6
43:22
49:19
74:16
77:21
78:12
90:24
91:14
92:10
94:15
107:18
108:4
116:11
125:9
137:24
168:18

**Timecutter**
12:4 16:9
28:18
29:2
43:12,18,
24 44:7
55:10
60:12,19
61:1,6,21
65:12,21
66:9,18

67:5,16
87:18
90:7
92:5,24
94:15
101:3,8,
9,13,21,
24 102:12
103:24
104:8,22,
25 105:9,
13,14
110:19
111:2
112:7
116:20
117:11,16
126:6,10,
18,20
131:4
162:25
164:11,22
165:25
167:2

**Timecutters**
59:16,21
60:4 62:2
63:3,10
132:8
165:2

**timeframe**
24:9

**times**
27:9
28:14
62:8
70:11,13,
18

**tip**
27:16,19
53:23
54:5,6
61:5
107:2,25
108:13,

15,16,17
111:15,16
112:3
113:15
114:1,3,7
115:17
122:22
123:15
124:9
128:8
144:4
148:5,12
149:23
150:17
151:4

**tipped**
38:9 97:8
106:7
114:9,14,
24 116:15
123:6
124:14
141:7

**tipping**
96:20
106:6
112:2
113:24

**tips**
95:9,20
98:24
123:17,19

**tires**
12:1
22:21

**Titan**
16:10
93:12

**title**
101:6
107:1
134:6
140:15



TOM BERRY
HILLMAN vs THE TORO COMPANY

July 11, 2023
Index: today..type

**today**
5:15 9:20
13:3,4
25:3
37:11
142:2

**told**
25:2
36:22
84:10
103:24

**Tom**
4:3,21
5:13,14

**Toomey**
14:11

**top**
17:2,8,9
27:25
40:15
95:9,20
96:17,21
98:25
99:16
105:10
113:16
121:24
122:23
123:15,
17,20
159:8

**Toro**
4:4,14
5:7 7:5
11:6 12:4
16:9,10
28:18
30:23
41:4
43:12,18,
24 44:7,
12,20
45:4
58:23

59:14
72:5 77:4
82:23
85:17,19
87:1
92:11,23
93:12
101:8
102:11
103:23
104:5,22,
25 105:9,
13,22
107:3
110:19
111:1
112:7
113:25
116:19
117:2,10,
16 126:2,
6,9,12,16
130:13
131:4
132:7,18
144:3,12,
13 145:2,
8,16
146:6,21
147:2
151:9
152:17
158:9
164:2,10,
21 165:22
166:6,12
167:2,18

**Toro's**
145:11
156:25
165:2

**torque**
151:6

**total**
103:9,10

111:2

**tow**
119:25
157:11

**towed**
50:7 76:3
121:5

**towing**
47:17
50:22
120:9
121:13

**track**
81:5
145:25

**tracking**
89:7

**traction**
65:13
149:10
151:14,25
155:8,12,
24

**tractor**
37:17
65:9
76:20
143:9
146:2

**tractors**
126:1,13,
16 129:9
133:10
135:21

**trailer**
158:21
159:2

**training**
8:8,11
138:25

**transcript**
168:7,10

**transfer**
151:15

**tread**
69:3,4
109:4
115:2

**trial**
27:5 36:8
47:10,23,
25 131:1

**trimmer**
152:10

**tripping**
74:19

**true**
120:19
129:5
145:8
151:8,22
152:11
156:2

**turf**
23:24
24:14,23
43:1
44:23
45:5 69:6
75:18
77:14
94:11

**turn**
11:13,15,
16,17,18,
19 20:9
22:7
23:16
27:11
28:3,5,
12,17
32:6
35:10,17
39:12
40:19,24
42:22

48:17
56:11
64:25
83:25
88:8 92:4
127:6,12,
15,16
132:25
133:9
134:7,8,
19,22,23
135:2,8,
12,16
153:3,15
155:22
160:21

**turned**
50:24

**turning**
34:10
155:24

**turns**
53:9 93:2
150:11
155:22
156:20,21

**type**
13:18
21:18
23:13,14,
20 31:21
32:8 34:3
47:13
48:13
54:12
61:8
76:15,23
77:22
78:10
81:7
84:17
85:7,8,17
94:17
95:5
98:18



99:11
123:10
124:17
125:12
126:23
127:6
135:8
136:12
137:1,5,9
149:19

types
11:21
20:12
51:17
65:2
87:25
129:12
135:9

typically
84:20
97:22
139:2

typing
34:5,6

— U —

uncontrolled
131:12

underneath
53:4

understand
5:6 9:17
40:21
62:25
70:18
74:21
130:22
140:21

understanding
21:1

32:20
37:10,13
38:15,18
47:1
50:6,10
52:8,9,
15,20
72:5
75:21
95:24
118:16,25
132:6
143:13
145:6
159:10
160:4

understood
116:13
118:22
130:2

undertaken
61:3
71:25
87:22

uneasy
148:8

uninformed
154:1

unit
4:2 23:22
49:23
82:20
91:4
112:2
138:3

United
142:18

units
77:1,5
128:10

University
8:13,20

unlevel
66:2,9

unreasonable
117:13,17

unreasonably
36:9

updated
17:14

uphill
150:16,21
151:2

upper
104:19
152:18

upside
52:19
53:15
97:8

user
21:23
63:17
132:8,18
154:8

users
63:22

utility
68:4,7
72:16
73:9,11
87:2,7,
10,14

utilize
11:21

— V —

variations
50:18

varies
31:9

vehicle
161:11

version
72:2 86:9
110:1

versus
4:4 13:9,
14 21:21
30:23
36:15
44:12
47:3
108:21
135:8,11
145:18
146:1
149:6
151:24

video
168:7,11,
16

videos
70:15

videotape
78:9

virtually
151:8

virtue
103:12

visible
163:8

voluntary
59:1

— W —

wait
26:2
160:1

waited
159:15

walk-behind
152:9

wall
38:8
39:20
40:3,4,5,
6,12 41:3
46:20
51:25
52:2 67:9
74:25
79:12
80:14
94:11
117:25
123:14
141:4,9,
11,15,17

walls
41:5

wanted
25:8,9,12
108:7
112:17
164:1

wanting
164:4

warning
117:20
149:4
151:19
153:1,13,
19
156:11,14
157:8
161:9
162:3,17
163:12,18
167:22

warnings
7:23,24,
25 8:2,4



42:9
117:10,12
131:3
132:12,
16,21
138:24
139:4,8,
9,15,18,
19 147:2
152:13
153:24,25
154:5
166:14
167:10

**Watch**
148:17

**watching**
152:23

**water**
53:4
152:4,11
155:18

**wear**
70:23
71:1,3

**wears**
70:10

**website**
16:9

**weed**
40:14

**weekend**
107:19

**weighed**
67:24
74:3,4
110:15

**weighing**
12:9

**weight**
11:25
12:3,20

21:22
22:2 23:6
74:9
83:11,12
103:3,5,
11 104:18
110:5,7,
15 111:2,
21
115:10,
14,16,24
116:4
121:17
128:21
151:7,10,
14

**weights**
68:3
71:19
74:5
103:12
108:1
111:3
112:8
113:6
114:6,19

**wet**
149:9
154:12

**whatsoever**
121:9

**wheel**
11:19
39:25
40:22
42:5
70:19
77:6
111:22
121:25

**wheels**
12:1
37:20
52:17

84:4,6
89:17
90:1,2
115:16
120:4,10,
17 121:18
150:4,23,
24 151:6,
11,15
152:4
154:20
155:13
157:24

**who-is-on-
first-type**
118:18

**Wichita**
5:17
8:13,20
17:18

**width**
42:17

**widths**
40:11
42:19
152:15

**wiring**
88:23

**withdraw**
159:19

**wood**
81:10

**Woods**
46:19
47:3 48:8
52:25

**word**
154:4
157:8

**words**
99:20
145:2

166:5

**wore**
43:9 70:8

**work**
8:14,22
9:6 11:24
18:18
19:12
20:1,2,6
21:13
22:4,16,
23 23:10,
25 24:10,
12 25:1,
15 26:24
27:3
31:22
34:3,20,
24 36:17
45:23
51:3
77:25
82:23
86:14
88:17
116:7
125:25
126:12
137:2
155:20

**worked**
17:17
19:16,18,
19 20:7,9
21:5,9
23:19,23
24:19
30:16,22
35:24
121:18
126:17

**working**
18:8
22:8,12,
15 25:6

31:5
70:21
125:9

**Workplace**
140:14

**works**
126:3
136:16,24

**worn**
43:7
69:22
70:22

**written**
74:1

**wrong**
36:12
46:25
55:16
109:14
164:18

**wrote**
34:6
140:8

---

**Y**

**yard**
42:15
81:10

**year**
11:8
102:2,8
107:13

**years**
8:19
30:24
31:20
32:1
44:22,23
46:7 47:7
48:24
64:13


ESQUIRE
DEPOSITION SOLUTIONS

77:20,23
130:12
139:8
140:5
147:18,25
153:25
155:1
167:7

**yesterday**
7:3

─────────────

**Z**

─────────────

**Z255**
28:23

**Z425**
29:1
35:23,25
46:4

**Z425b**
43:2

**zone**
96:22

**Zoom**
4:6

**ZRT**
19:13
20:15
25:2,6,16
29:9
36:18
43:3
45:21
46:6 90:8
93:22
144:14
145:21
146:1,7
148:21
149:15
150:24

**ZRTS**
73:5

149:23
151:9

**ZTR**
7:13
19:21
57:7
100:12
125:23

