# Thomas A. Berry P.E.

1762 N. St. Francis
Wichita, Kansas 67214
(316) 685-8061 (316) 262-6834
FAX (316) 262-3903

March 17, 2023

Mr. Steve Crowley
Crowley & Prill Law Firm
3012 Division Street
Burlington, IA 52601

RE: Hillman v. Toro

Dear Mr. Crowley:

Summary of Opinions:

I have reviewed the information supplied to me in regard to the above referenced litigation in preparing this preliminary report. The items that have been supplied to me and/or reviewed by me include the following:

1. Deposition of Rebekah Hillman w/ Exhibits, November 16, 2022.
2. Deposition of Jennifer Hillman w/ Exhibits, November 16, 2022.
3. Deposition of Jennifer Hillman w/ Exhibits, November 17, 2022.
4. Deposition of Todd Porter w/ Exhibits, January 17, 2023.
5. Deposition of Carol Drutowski w/ Exhibits, January 18, 2023.
6. Plaintiff's 1st Amended & Substituted Complaint.
7. Joint Motion for Extension of Discovery Deadlines.
8. Initial Disclosures 26(a)(1) - Hillman v Toro Final.
9. Supplemental Plaintiff Initial Disclosures.
10. Plaintiffs' First Set of Requests for Production to Defendant.
11. Plaintiffs' Second Set of Requests for Production to Defendant.
12. Plaintiffs' First Set of Interrogatories for Production to Defendant.
13. Plaintiffs' Second Set of Interrogatories for Production to Defendant.
14. TTC's Objections to Plaintiffs 30(b)(6) Notice – Final.
15. Hydro-gear BLN-52622_ZT2100_ZT2200 Manual.
16. Operators Manual TTC 1-85.
17. Parts Catalog 75187.
18. Service Manual 78978.
19. Toro Model 74630 Parts Catalog 59837.
20. Toro Titan Operators Manual with ROPS and Friction Park Brake.
21. Kubota ZG200_300-Brochure.
22. Kubota ZG222 Brochure.
23. Hydro-Gear 310-0510 Integrated Hydrostatic Transaxle Manual.
24. Extracted Medical records.

Exhibit 14-1

Mr. Steve Crowley                                         March 17, 2023
Re: Hillman v Toro                                             Page 2

25. Photographs provided Exhibit A, Hillman photos taken by SJC20220419, Inspection
    Pictures of Toro Mower taken by SJC on 20220419 in Wichita, Hillman Terrain 3 side,
    RH00001 - RH00066 - 66 Photos Taken by SJC,.
26. B71.1 TTC 86-201.
27. US Patent 7,275,371 B1.
28. US Patent 8,919,224 B1.
29. US Patent 9,816,611 B1.
30. Hydrostatic Transmission Application Considerations For Commercial Turf Maintenance
    Vehicles 1991.
31. RH04143 - RH04157 Scene Photos fr. client, received by SJC 20221102.
32. RH04158 - RH04172 Toro Photos fr. client, received by SJC 20221102.
33. RH04173 - RH04177 Home modifications fr. client, received by SJC 20221102.
34. RH04178 - RH04257 Injury Photos fr. client, received by SJC 20221102.
35. RH04258 - RH04258 Test video fr. client, received by SJC 20221102.
36. RH04259 - RH04259 Test video fr. client, received by SJC 20221102.
37. RH00067 - RH00094 -Toro Parts Catalog.
38. RH00095 - RH00146 - Toro ss5000 Operators Manual.
39. RH04089 Interview Video - Taken by SJC on 20200713.
40. RH04090 - Video Taken by SJC on 20200713.
41. RH04091 - RH04092 - Photos of Planter Wall - Taken by SJC 20200713.
42. RH04093 - Photo of Lawmower in Hangar.
43. RH04094 - RH04095 - 20200908 Subro Correspondence.
44. Plaintiffs' Motion to Compel Production of Documents Withheld Under Claims of
    Priviledge for In Camera Inspection and Production.
45. Plaintiffs' Brief in Support of Motion to Compel Production of Documents.
46. Plaintiffs' Motion to Compel Toro to Serve Responsive Answers to Plaintiffs
    Interogatorries.
47. Defendants Answers to Plaintiffs First and Second Set of Interrogatories.
48. Plaintiffs' First Motion for Production of Documents and Material.
49. Plaintiffs' Comined Brief in Support of Plf Motion to Compel Answers to Interrogatories
    and Motion to Compel Production of Docs.
50. Documents produced by Toro.
51. Toro Zero Turn Operator Safety Training video- fr youtube

Based on my review of the above information and the information provided it is my
understanding that the machine involved in the accident is as follows:

                     Toro Timecutter SS5500 Zero-Turn Mower
                     Model No. 74631
                     Serial Number: 313015934
                     Build Date: September 2013
                     Purchased new: 2014/5

Exhibit 14-2

Based on my review of the above information, this accident occurred on June 18, 2020, as follows:

> On the day of the accident the victim, Rebekah Hillman, was mowing the yard at her home. She indicates that as she was mowing the tires went over the edge of a landscaped area protecting the yard from the retaining wall and she could not get the mower out of the landscaped area. She obtained the assistance of Jennifer Hillman who got their JD tractor and used the loader to lift and move the mower from the planter landscaped area up into the yard well uphill from the landscape planter. To move the mower the two pins had been actuated at the rear of the mower that released the hydrostatic drive motors to the free roll position.

> Once the mower had been moved with the JD tractor well up the slope into the yard the tow straps were removed and Ms. Hillman got onto the mower and started the engine. She then moved the drive control levers to the center position and the mower began to move down the hill. She tried to use the control levers to control the mower but they did not work. The release pins at the rear of the mower were still in the position that allowed free roll. She tried to move the levers rearward and then out numerous times to stop the mower, but the mower would not stop. The mower continued to move down the hill until it again went into and across the landscaped planter area and over the retaining wall. The mower went front end first over the retaining wall while Ms. Hillman tried to jump off the mower. She landed on the ground below and the front of the mower landed on her legs crushing both. The mower landed on its front end and then tipped over onto its seat area. The control levers limit exit to the front of the mower. Ms. Hillman received severe injuries to both legs including crush injuries to her left leg that ended up requiring her leg to be amputated below the knee.

### Design Methodology

To evaluate the design of the Toro Timecutter SS500 zero turn lawn tractor I have utilized the accepted methodology for engineers for analyzing the safety of a design. This methodology has been called by various names such as Risk Analysis, Failure Mode and Effect Analysis, Hazard Discovery Rating System, Safety Analysis, and Hazard Analysis has been recognized as being appropriate methodology with respect to design safety by the National Safety Council, the American Society of Mechanical Engineers and many others for over 50 years and well before this zero-turn lawn tractor was designed or manufactured. This methodology has been incorporated into ANSI standards such the ANSI Z10 and ANSI B11.0 standards. These are methods that allow hazards to be discovered and anticipated before a design is completed and to develop hazard control designs, methods, procedures and programs. Further this methodology allows for the measure, auditing and evaluation of a hazard control program after a design is in use to measure its effectiveness in reducing the risk associated with a hazard. See Appendix B – Design Methodology.

This design safety hierarchy standard has been recognized for many years as a guiding principle of proper design. It has been adopted by ANSI. It is a design principle implicit in the mandatory

Exhibit 14-3

Mr. Steve Crowley                                                   March 17, 2023
Re: Hillman v Toro                                                        Page 4

duty to exercise reasonable care in the design of equipment to provide safety in the design of equipment for foreseeable uses and misuses. Specifically, I have reviewed the design of the Toro Timecutter SS5500 with respect to the safety related to the operator and identified the hazard and risk involved in this accident which is that of loss of control due to the loss of braking and control from the hydrostatic drive motors and the operator being crushed under the zero-turn mower when it overturns. Once the hazards were identified I followed is a design standard which is typically referred to as the safety design hierarchy, which states:

> a. Eliminate hazards, if possible, without unduly compromising function or utility of machine.
> b. Provide some form of physical protection or guarding from remaining hazards.
> c. Provide warnings and instructions, which can practically be followed, for avoiding the hazards. However, warnings are not a substitute for positive mechanical safeguards.

There are two hazards involve in this accident. The first is the loss of control which leads to the rollover event and the rollover event itself. The zero-turn mower is manufactured with hydrostatic motors which propel and entirely control the locomotion, steering and general stopping of the mower. No other feature is provided for the operator to use to stop a moving mower. It is also provided with two controls that allow the hydrostatic drives to be disengaged so that the mower can be moved from a stuck position or rolled without using the drive. Once disengaged there is no brake available to stop the mower. Another feature provided on the mower engages park locking pawls on small steel gears attached to each hydrostatic drive. These parking locks are able to lock the hydrostatic drives from allowing drift/creeping while the levers are in the outward neutral positions. The park locking pawls also will hold the mower stationary on slopes over 15 degrees as long as they are engaged. However, the park locks are not designed to be able to stop a mower that is already moving and in fact attempts to engage the park locks results in a chattering sound and fast wear of the non-steel teeth on the parking pawls against the steel cog gear. There are many zero-turn mowers that are provided with mechanical brakes that can be applied by a lever or foot pedal to allow the brake to be applied from the operator seat. These brakes also serve to hold the mower stationary in a parked position. In fact, Toro provides friction type park brakes on many of its zero-turn mowers but not on its cheaper zero-turn residential mowers.

Included in the means utilized to guard against hazards and the risk of serious injury or death is a responsibility to use reasonable care to minimize the risk of injury when a crash occurs. This method of guarding is known as designing to make a machine crash-worthy such that protection is offered to the operator or passengers in the event of a crash. One example of this with respect to automobiles is to include seat belts, air bags, padded dashes, collapsible steering wheels, safety glass and roof crush protection when the automobile crashes or rolls over. John Deere, a competitor to Toro, indicated in 1972 in their John Deere Design Data Manual 16 with respect to the hazards of instability and overturn to: Design machines for minimum possibility of overturn or hazardous tipping. "When intended function or probable use of a machine is likely to subject it to tipping or overturn, provide protection to minimize personal hazards." Deere in 1985 in their Product Safety Design Manual with respect to the instability and rollover hazard that one

Exhibit 14-4

design measure is to: "Provide protective frames (roll-over protective structures) and seat belts to restrain and help protect from crushing injuries in the event of machine tip or overturn."

Another early example is related to passenger rail cars where it indicated in an article entitled "Roof Structure for Steel Cars" written in April 1913 it is stated "The strength of roofs of some cars that have been rolled over in accidents has been checked against the formula used and it has been found to afford ample support against serious roof distortion in such cases." This same application of making tractors and mowers crash-worthy, particularly with respect to rollover incidents was employed in the tractor industry beginning in the late 1950's and 1960's with respect to means to protect the operator from being crushed when the tractors rolled over. Stevenson and Gustin, engineers with International Harvester and John Deere, respectively, in a June 1968 article for the American Society of Agricultural Engineers dealing with the need for roll over protection on tractors indicated:

> Educational institutions and various other groups have diligently promoted work on personal safety for many years. Yet, in spite of all these efforts, accidents still occur at an alarming rate. (Fig. 1)  We, the industry, have accepted the challenge of providing safety features on tractors to protect the operator, since our experience has clearly indicated we cannot prevent the accidents from occurring. Information obtained from the United States Department of Agriculture (USDA), various state bulletins, National Safety Council (NSC) and other surveys indicate that approximately half the farm fatalities are a result of accidents involving tractor upsets, either side or rear. Therefore, to reduce this number of fatalities the first major program is to provide adequate protection in case of an accidental tractor upset.

Even 40 years ago it was recognized that off-road work machine rollovers were going to continue to occur, despite warnings, instruction and training efforts, such that protection to operators when rollover crashes occurred was needed.

## Hazard/Risk Due to Loss of Drive Control

The zero-turn mower is manufactured with hydrostatic motors which propel and entirely control the locomotion, steering and general stopping of the mower. No other feature is provided for the operator to use to stop a moving mower. It is also provided with two controls that allow the hydrostatic drives to be disengaged so that the mower can be moved from a stuck position or rolled without using the drive. Once disengaged there is no brake available to stop the mower.

As indicated in the technical publication with respect to hydrostatic drives on turf equipment entitled Application Considerations for Commercial Turf Maintenance Vehicles by Michael Betz in December 18, 1991

> Dynamic Braking and Input Speed Requirements
> For descending slopes, the hydrostatic transmission will provide some braking torque to the wheels due to the retarding characteristic of the engine. This is a transmission characteristic called "dynamic braking". This braking capability does not eliminate the need for a service brake. Some type of service brake must be included in the vehicle design to aid dynamic braking or for use in case of

Exhibit 14-5

> transmission failure. Hydrostatic braking must not be considered as the primary
> braking device for vehicles at static conditions either with the engine running or
> the engine off...

Toro did not provide any way of braking or stopping the subject mower if the hydrostatic drives
were disengaged or some failure had occurred. They did provide mechanical brakes on many of
its other mowers including zero turn mowers. For example the Toro Titan, another residential
zero turn mower, had a brake that could be applied to stop the mower. The subject mower was
provided with park locks but these are not effective to stop the mower if it is already moving.

Hydro Gear also noted that the means to bypass the closed hydrostatic circuit that removes
hydraulic braking can lead to uncontrolled free wheeling of the mower and create significant
safety risks. This knowledge can be seen in US Patent 7,275,371 B1 which states:

> There is need to have a means to open, or bypass, this closed circuit in certain
> circumstances. For example, when the vehicle is stopped, the oil in the closed
> circuit provides hydraulic braking, making it impossible to manually move the
> vehicle. Mechanical bypass designs are known in the art...
> However, such prior art designs have drawbacks. For example, in addition to
> those identified above, a completely open hydraulic circuit can lead to
> uncontrolled free-wheeling of the vehicle and create significant safety risks.

The Hydro-Gear US Patent 8,919,224 B1 indicates:
> On sufficient inclines, however, gravity may overcome the vehicle's inherent
> braking effect permitting the vehicle to slowly move downhill when in neutral.
> Whether in neutral or not, failure of a drive train component can result in the
> vehicle freewheeling down an incline. There is a need for a compact braking
> mechanism associated with the output axle. When used in a hydrostatic transaxle,
> the brake of the present invention is effective even if there is a loss of drive force
> applied to the axle caused by, for example, breakage of gear teeth in the drive
> train, loss of fluid integrity of the hydraulic circuit or breakage of an input drive
> belt. The mechanical brake mechanism disclosed herein acts upon and within the
> final drive gear engaged to the output axle. The present invention has applications
> to vehicles such as lawn mowers and tractors, garden tractors, snow throwers and
> other applications where a compact drive is desired.

The Hydro-Gear manual for the ZT-2100/ZT-2200 (EZT) Integrated Zero-turn Transaxle Service
and Repair Manual, BLN-52622 indicates:

### WARNING

**Actuating the bypass will result in the loss of hydrostatic braking capacity. The
machine must be stationary on a level surface and in neutral when actuating the
bypass.**

Exhibit 14-6

Mr. Steve Crowley
Re: Hillman v Toro

March 17, 2023
Page 7

There is not a similar warning in the Toro manual for this Timecutter indicating that the mower does not have any braking if the hydrostatic drives are bypassed. Indeed, Toro calls their park lock feature a brake which is very misleading as it is nothing of the sort.

The Fluid Power Safety Institute has publications that state:

**Why can't this "inherent dynamic braking system" be used for brakes? -**
There are simply too many things that can go wrong:
**1.** Lose the oil in the reservoir due to a transmission line failure (even if the failure is in an unrelated circuit).
**2.** Shear a motor or pump shaft.
**3.** Shear a pump or motor drive coupling.
**4.** Lose a transmission line unexpectedly due to wear or neglect.
**5.** Barrel "lift-off" due to wear or over-speeding (in some designs).
**6.** Wear in the pump and/or motor.
**7.** Contaminated or defective valves: charge pressure relief valve; main pressure relief valve; shuttle valve; etc.
**5. The manufacturer's warnings are very clear! -**
Here is the warning extracted from Sundstrand's 90 series service manual (ref. SM-S90 • 06/96 • 300047F BLN-09947 • Rev. F • June 1996 – Page 2)
*"Loss of Hydrostatic Braking Capability*
*WARNING -*
*When Series 90 units are used in vehicular hydrostatic drive systems, the loss of hydrostatic drive line power in any mode of operation (e.g., acceleration, deceleration*
*or "neutral" mode) may cause a loss of hydrostatic braking capacity. A braking system which is independent of the hydrostatic transmission must, therefore, be provided which is adequate to stop and hold the system should the condition develop."*

As can be seen in the above literature even the manufacturers of the hydrostatic drives indicate that some form of braking needs to be included in the design to enable a vehicle such as this zero-turn mower to be stopped that is independent of the hydrostatic drives.

Toro could have provided a simple park brake similar to that provided by John Deere on the JD Z425 zero turn mower as shown below in addition to their park lock system. The JD park brake on the Z425 EZTrak uses a lever to rotate two steel pawls against the rear tires and provides braking and a park brake. It is operated by hand and would provide a simple means for the operator to use to stop the Toro zero turn mower on the slope it was on. Testing shows that the brake effectively holds the tire on slopes up to 30 degrees.

Exhibit 14-7

Mr. Steve Crowley
Re: Hillman v Toro

March 17, 2023
Page 8



Park Brake lever and park brake pawl force against the rear tire to provide braking.

A more sophisticated brake system could be provided such as that provided by Scag on its Patriot and Freedom Z mower. The Freedom Z mower is only slightly bigger than the Toro Timecutter.



Exhibit 14-8

Mr. Steve Crowley                                          March 17, 2023
Re: Hillman v Toro                                                Page 9

Hydro-gear also has friction type park brakes that could have been selected to use with the
Hydro-gear EZT hydrostatic transaxle.

1. Check the brake disc and pucks for excessive wear. Replace if necessary.



**Figure 11. Disc Brake Assembly**

Sauer Danfoss provides the following warning in its product literature:

Warning

**Unintended vehicle or machine movement hazard.** The loss of hydrostatic drive line power, in
any mode of operation (forward, neutral, or reverse) may cause the system to lose hydrostatic
braking capacity. You must provide a braking system, redundant to the hydrostatic transmission,
sufficient to stop and hold the vehicle or machine in the event of hydrostatic drive power loss.

## Hazard/Risk Due to Rollover

The hazard in this instance is the rollover of the riding mower laterally and longitudinally.
There is a risk of serious injury or death associated with the rollover of the riding lawn mower.
The hazard and risk has been recognized for over 40 years as can be seen in the information
contained in Appendix B – Stability and Accident Data and Statistics.  Appendix A contains a
review of the Consumer Product Safety Commission (CPSC) studies over a large number of
years that indicate tipping/sliding hazards, bank/wall hazards, and scenarios where the operator
was found pinned under a tipped mower were identified in about half of the death incidents
reviewed.  The hazard and risk from the tip over and rollover of ride-on mowers represents the
hazard that is the number one cause of death and serious injuries from their use by a large margin
over other hazards that lead to deaths occurring.  A study of the certified CPSC incidents
reported, investigated and from death certificates indicate that there were more than 700 deaths
(averaging 31-32 deaths per year) reported from rollovers, tipping and flipovers from calendar
year 1980 until June 30, 2003.  In addition, an analysis of the NEISS data from the CPSC for this
same time period indicated that there were an estimated more than 45,000 injuries (averaging
over 1900 injuries per year) that occurred due to roll-over, tipping or flipping.  These incidents

Exhibit 14-9

occurred with riding mowers and garden tractors that would have met the stability test requirements of the ANSI/OPEI B71.1 and B71.4 standards.

In 1993, a report by the CPSC, Ride-on Mower Analysis (1987-1990), CPSC, Propit Adler, September 1993, revealed that stability related accidents resulted in some 2200 injuries per year and was the primary hazard with 20% of the victims being hospitalized. The study further indicated that approximately 76% of the operators fell or jumped off the mower. Note that the design of the Toro Timecutter SS5500 seat position and the lap bars over the operator's legs makes falling or jumping from the Toro Timecutter SS5500 very difficult. Ms. Hillman stayed in the seat area of the zero-turn mower until she knew the mower was going to go over the retaining wall, at which time she stood up and went off forward landing on the ground below and then the front of the mower landed on her legs. I am aware of no tests that would indicate that operators of zero-turn mowers are able to always or nearly always safely exit an overturning mower. The lack of the ability of the operator to fully separate from the mower during an overturn increases the risk of injury or death when a rollover occurs.

In my years of designing ROPS, reviewing industry literature and studying the problem of rollovers of sit-down ride-on lawn mowers I have seen no tests which indicate that it is possible for the operator to safely exit a zero-turn riding mower or lawn tractor that is tipping over. Also note that the CPSC determined that many individuals that tried to exit were struck and severely injured by mower or the spinning blades of the mower itself as it tipped over.

Further, the tractor/mower does not protect operators that may be able to get off the mower from the spinning blades or the weight of the falling tractor/mower. The design of the tractor/mower without roll protection is such that once tipping is initiated the tractor will likely roll at least 180 degrees or more. The weight of the riding lawn mower is more than a normal person could withstand in a dynamic rollover situation. The operator presence sensing system offered by Toro does not protect operators who get separated from the mower as it is rolling over. This system utilizes a seat switch activated by weight on the seat and can take 5 seconds or more to kill the engine and stop the rotation of the blade from a full throttle running condition. Five seconds is longer than most rollovers will take to occur since many will occur in 1 second or less once stability has been lost. The Appendix of ANSI B71.1-1990 reads:

> 13.2.1.5 Analysis of Consumer Product Safety Commission (NEISS) in-depth investigation reports indicates that an operator presence control is an effective means of addressing certain types of blade contact injuries. These are the injuries in which the operator deliberately leaves the operator's position without first disengaging power to the mower blades, or without stopping the engine in accordance with the safety instructions, or both. Operator presence controls are not intended to protect the operator from sudden access to the blades, as would occur because of jumping or falling from the machine.

The last sentence provides indication that the industry knew that an OPC that was not required to stop the blades in less than 5 or 7 seconds would not be effective to operators who became separated from the mower such as could occur in a tipover/rollover accident.

Exhibit 14-10

Mr. Steve Crowley                                      March 17, 2023
Re: Hillman v Toro                                          Page 11

## **Warnings and Instructions:**

A common response to the hazard and risk as demonstrated above with respect to rollovers is to provide further warnings and instructions. This is the final step in the design safety hierarchy standard and as can be seen has not been effective in eliminating or reducing the severity of the injuries being incurred by the public using riding lawn mowers and lawn tractors. This should be expected in that it is recognized that warnings and instructions are the least effective method of dealing with hazards and risks when more positive design steps can be taken. As indicated by the National Safety Council in their Accident Prevention Manual 11th edition published in 1997:

> For many design situations, a combination of these five priorities will apply. However, companies should not choose a lower level of priority until they have exhausted the practical applications of higher priority levels. First and second priorities are more effective in safeguarding workers and creating safe systems because they reduce the risk by design measures that eliminate or adequately control the potential of an incident occurring and the severity of its consequences. Third and fourth priorities rely on human intervention, which means the level of safety achieved tends to depend on the knowledge and skill of the personnel involved.

As stated in the "An Instructional Aid for Occupational Safety and Health in Mechanical Engineering Design" published in 1984 prepared by the ASME Safety Division

> At the outset, designers must realize that the equipment or products they are helping create will ultimately be used by human beings. These people vary considerably in both physical and mental abilities.

> General users have wide variations in abilities, and their minimum skill level overrated.

Warnings rely upon the user to read, understand, remember and always follow them every time. There can be no mistakes, errors in judgment or forgetfulness. This is not possible to happen and the continuing deaths and serious injuries from rollovers is indication that warnings and instructions are not sufficient in dealing with the hazard of rollover.

The manufacturer (TORO) provided no warnings or instructions alerting users of the complete loss of control of the Timecutter when the bypass pins are actuated to be able to move a stuck mower. There are no warnings that the machine can roll uncontrollably, cannot be stopped or steered on slopes and could even end up going off a retaining wall. The manufacturer that makes the transaxle does provide warnings in their service manual.

The manufacturer recognized the rollover hazard and risk as can be seen by the information contained in the Operator's Manual for the Toro Timecutter SS5500 zero turn riding mower. For example, there are numerous reasons listed on page 4, 5, 7 and 16 that can lead to rollovers yet even this list is incomplete. Excel Corporation, which manufactures the Hustler brand of zero-turn lawn tractors, recognizes in its operator's manuals for their mowers that the factors of man, machine and the environment of use that can lead to rollover are too numerous to name.

Exhibit 14-11

Mr. Steve Crowley
Re: Hillman v Toro

March 17, 2023
Page 12

The slope gauge in the manual for the Toro Timecutter has a line at 5, 10, 15 and 20 degrees. Studies of charts such as these have shown that some operators are poor at eye-balling the slope using the slope gauge and can be off 5-6 degrees. The CPSC performed studies with respect to slopes that consumers were willing to mow and these angles were greater than 15 degrees and some up to slopes of more than 20 degrees. A better method would be to provide an inclinometer on the mower to allow the operator to get an accurate measurement of a slope. A market study in 2004 by John Deere found that three out of four consumers reported having at least one of the following: Moderate/severe hills, ditches and rough ground.

Providing a mower such as the Toro Timecutter SS5500 that did not protect operators from rollovers is defective design when it was known that most owners of these residential mowers had environments of use that would present higher risks of rollover. The design of the machine should match the expected environment of use and the environment of use that is indicated by the prior accident history for ride-on mowers.

Note that the JD 510A residential zero turn mower provided a ROPS as standard equipment indicating:

> Standard ROPS. Safety is always first with us. A foldable Roll Over Protection Structure (ROPS) is standard on all of our Z-Trak Estate mowers; push up for mowing and fold down for storing.

Note that the set-up instructions for the JD 510A indicate:

> On slope angles of 10° or less the risk of rollover is low, but as the slope angle increases to the John Deere recommended maximum of 20° the risk increases to a moderate level.

### Stability Considerations:

The hazard of rollover cannot be completely eliminated by design. However, the design of the machine should match the expected environment of use and the environment of use that is indicated by the prior accident history for ride-on mowers. Still even increasing the stability of the Toro Timecutter SS5500 could not be expected to render the lawn tractor incapable of overturning. With the design of the Toro Timecutter SS5500 when stability is lost to the rear or laterally it is very unlikely that the lawn tractor would end up stopping on its side, rear or front. This would be like expecting a flipped coin to land and remain on its edge. Like a coin, the Toro Timecutter SS5500 is more likely to rotate on over and be upside down on top of the operator than to stay on its rear or side.

The stability tests included in the ANSI/OPEI B71.1 and B71.4 minimum voluntary standards utilize static tests, where the lawn tractors are not moving up and down or across the slopes they are on and provide a measure of comparison of stability but cannot assure that the stability limits of a moving lawn tractor will never be exceeded resulting in a rollover. The static stability tests are conducted on a flat platform that is tilted with the machine stationary. The tests do not take into account the movement of the mower over non-flat slopes that may have bumps and

Exhibit 14-12

Mr. Steve Crowley
Re: Hillman v Toro

March 17, 2023
Page 13

undulations, nor does it take into account the power that can be applied to the rear wheels causing the lawn tractors to lift at the front. The CPSC recommended dynamic stability tests in 1974 on 20-degree slopes with respect to riding lawn tractors, along with a warning inclinometer to alert operators to the steepness of the slope and that the control station needed to be designed so as not to inhibit the escape of the operator when a rollover occurs. The lawn tractor industry has not changed the basic requirements for their stability tests since 1960. The CPSC stopped their efforts for changing the standard due to lack of funding in 1984 and relied upon the industry to develop their standards to meet user safety needs and still the stability tests have not changed particularly with respect to the ANSI B71.4 standards. The B71.1-2003 standard does have some dynamic stability tests added but only on level ground and the use of design means to prevent rollovers during the tests. However, these design means are not provided to users on the lawn tractors.

In addition, the stability tests utilize an operator weight of 200lb even though operators can be expected to weigh considerably more. The operator is located at nearly the highest point of the machine. Because of this the combined CG of the tractor/mowing deck/operator will raise with larger and taller operators than 200 lbs and would make a rollover correspondingly more likely while still not providing protection in the form of a ROPS. The smaller the zero-turn mower the more effect the operators weight has on the CG combination. Toro did not provide any warnings or instructions for heavier operators with respect to operating the Timecutter.

In 1984, the CPSC (McNamara and Folkes, "Riding Mower Project - Status Report") noted that a correlation between stability-related requirements in the industry's voluntary minimum Outdoor Power Equipment Institute (OPEI)/American National Standards Institute (ANSI) standard and actual mower stability during slope operations had not been demonstrated. It further recommended inclinometers for riding mowers. At the same time, in 1984 the CPSC specifically noted that it did not approve the ANSI B71.1 voluntary safety standards for riding mowers. It specifically found that these new measures were not adequate to reduce riding mower dynamic stability related deaths and serious injuries. It expressed "deep concern over deaths and injuries associated with dynamic (when moving) stability...."

There are many other examples of rollovers of lawn tractors occurring each year which demonstrate the hazard and risk associated with rollovers of this type of lawn tractor that nevertheless meet the stability requirements of the minimum voluntary industry standards.

**Operator Protection When a Rollover Occurs**

The operator can be provided substantial protection in the event of a rollover through the provision of a protective structure known as a ROPS or roll bar and seatbelts. There are numerous industry performance standards that have and can be used to design, test and certify a ROPS on the subject lawn tractor. Many times, the OSHA regulations are used. More recently the ISO 21299 standard has been utilized. Deere, for example, began utilizing the ISO 21299 standard by 2007. The ISO 21299 standard was developed relying on previous ROPS performance standards from ASABE, SAE and OSHA along with the Corps of Engineers for a rigid ROPS. A ROPS significantly reduces the risk of injury to the operator in a rollover accident by limiting many accidents to a roll of less than 180 degrees and by providing a protective zone in the event the tractor/mower rolls 180 degrees or more.

Exhibit 14-13

Mr. Steve Crowley                                                    March 17, 2023
Re: Hillman v Toro                                                         Page 14

Seatbelts offer further protection by keeping the operator within the protective zone. Riding mowers and lawn tractors began to have ROPS installed on them in the mid-1970's by Hustler and even earlier by Yazoo. Jacobsen Manufacturing applied for U.S. Patent Number 3,826,530 for a riding lawn tractor on July 3, 1972, with the provision for a roll-bar to protect the operator in the event that the tractor tips over.

Engineers have long recognized that operators of ROPS equipped tractors will avoid injury in rollover incidents due to the presence of the ROPS. As indicated by L. Dale Baker of Case Corporation in his article in the Journal of Agricultural Safety and Health, Nov. 1998:

> There are very few fatalities in this country from overturns of tractors equipped with ROPS. As noted in the article (Myers, 1999), very few farmers are currently using seatbelts." He indicates that there were approximately 5000 tractor overturns in 1993 and estimates that 38% of the overturns involved ROPS equipped tractors since that is the percentage of tractors with ROPS in 1993. He indicates: "If we assume that 38% of these overturns occurred with ROPS-protected tractors, then there were approximately 1,900 of such overturns. We do not hear of the injuries from these overturns, either through the literature or through proprietary industry information. ROPS, without the use of seatbelts, can be an effective injury prevention response. ROPS is the primary protection, and the seatbelt is the secondary protection. Help eliminate the excuses for not installing a ROPS.

In 1975, OSHA indicated that "There is virtually no dispute that a ROPS with a seat belt meeting the performance requirements of the final standard will significantly reduce the hazards associated with roll-overs." Federal Register Vol. 40, No. 81 page 18254 April 25, 1975. OSHA also indicated:

> Finally, use of the required seat belt keeps the operator in the protective
> enclosure formed by the ROPS and prevents the operator from being thrown or
> jumping from the tractor, thus avoiding additional hazards such as the tractor
> rolling over the operator, or the operator being thrown into a stationary object.

In addition, Myers, Cole and Westneat found with respect to their published paper "Seatbelt Use During Tractor Overturns" that:

> Table 3 shows a comparison of injury by severity experienced during tractor overturns between ROPS-equipped and non-ROPS tractors as related to seatbelt use. No death was reported from an overturn of belted operators on ROPS-equipped tractors, whereas one death out 92 overturns was reported on a ROPS-equipped tractor but for a functional seatbelt was absent...... This death is in contrast with 24 deaths reported out of 445 overturns of non-ROPS tractors. Moreover, the seriousness of injuries was reduced on ROPS-equipped tractors regardless of seatbelt use.

A tractor or machine that is provided with a ROPS and operator restraints in the form of seat belts provides significant protection for the operator compartment. This was not new knowledge for 2005 or 2013 and has been evidenced for more than 50 years on various types of equipment.

Exhibit 14-14

Mr. Steve Crowley                                      March 17, 2023
Re: Hillman v Toro                                            Page 15

An operator of a ROPS equipped lawn tractor that stays in the operator seat area is much less likely to receive serious or fatal injuries during a tipover or rollover accident. It prevents the zero-turn mower from crushing the operator in the operator seat as the tractor/mower rolls over. The ROPS is not designed to prevent contact of the operator with the ground surfaces as can be seen by a review of the industry standards and the allowable deformation of the ROPS during rollover. This is also shown by the allowable leaning of the crush protective zone in many of the standards. Further, studies of this potential in the late 1950's and 1960's resulted in no recommendation for safety helmets and head protection for tractor operators with excellent protection during rollovers being realized from the crush protection provided by the ROPS structures itself. My research and experience have shown this to be true for any off-road machinery subject to tipovers or rollovers such as forklifts, front-end loaders, farm and industrial tractors, skid steer loaders, motor graders, scrapers, bull dozers and lawn and garden tractors See Appendix B - ROPS Effectiveness Information. In addition, I know this to be true as a result of my experience in designing, testing and certifying ROPS systems for manufacturers of front mount and zero-turn lawn tractors and for a company that manufactures ROPS for front mount and zero-turn lawn tractor manufacturers.

The accepted engineering practice in the design of off-road equipment is to provide a protective zone and restraints to provide protection from crushing injuries to the operator during a tip-over or rollover incident. Engineers and literature on the subject have long recognized that jumping from equipment as it overturns is a poor substitute for some means of positive mechanical protection. Engineers have recognized the operator's inability to jump clear of upsetting machines and that some operators are severely injured or killed attempting to jump (MacCollum 1984). This fact has been recognized and addressed by providing a protective zone for the operator and means and instructions to the operator to stay in the seated operator area. These means and instructions have been found to be very effective in preventing serious injury in the event of a rollover incident. The operator area on a lawn tractor such as the Toro Timecutter SS5500 ride-on mower is similar in size to that of many other tractors that are equipped with ROPS since similar size operators will operate this equipment.

Rollover protection on these larger tractors has proven itself to be very effective in preventing serious injuries and death even when seatbelts are not worn by limiting most rollovers to a side or rear tip-over and by providing crush protection when a rollover of more than 90 degrees occurs. Further, in the development of ROPS for tractors Deere found that "Injury inflicted on an operator during an upset of a tractor equipped with a protective canopy would probably result from some other cause than the force of impact." (See Bucher, ASAE Paper No 66-625, "The Design and Evaluation of a Protective Canopy for Agricultural Tractors".) It was technically and economically feasible to have installed roll over protection on the Toro Timecutter SS5500 as on other models available at the same time as the Timecutter. Such rollover protection limits most rollovers to a lateral or rear tip over and provides crush protection if the mower rolls over onto its top.

I am unaware of any manufacturer that has removed ROPS from their designs of the riding lawn mowers and tractors once they have been included in the design. I am unaware of any documented permanent injuries or deaths that have occurred in rollovers of a lawn mower with a deployed ROPS and utilizing the seatbelt. Toro and Exmark, when they decided that ROPS should be included on many of their zero turn mowers also decided to retrofit ROPS onto older

Exhibit 14-15

Mr. Steve Crowley
Re: Hillman v Toro

March 17, 2023
Page 16

zero turn tractor models of the same models. Toro indicated on 1/1/2005 in their Product Safety Information document the following:

> Rollover Protective Systems (ROPS) in combination with seat belts, are shown to be effective in preventing serious injuries or death if equipment overturns. ROPS are standard equipment on Toro Z Master Mid Mount ZRT commercial mowers manufactured in 2004 and later. Owners of Z Masters manufactured before 2004 (click here for a list of model numbers) can obtain the same protection by selecting one of the following:
> 1. Free non-foldable ROPS, or
> 2. Two-post foldable ROPS at a discounted price of just $179.

This was not new knowledge as of January 1, 2005. The knowledge of the effectiveness of ROPS in preventing serious injuries or death when a tractor overturns had been known for 30 years prior to 2004.

Various excuses have been voiced by some manufacturers with respect to providing ROPS on their lawn tractors or ride-on mowers. These are stated and addressed below:

*1. The provision of a ROPS/rollbar on a mower below 880 lbs would lead to greater risk to the operator in the event of a rollover by leading to more rollovers and the possibility of trapping the operator under the ROPS.*
Comment: This Toro Timecutter SS5500 riding mower has a weight of over 598 lbs. which does not include various attachments. This weight is such that a person caught beneath the overturned Timecutter zero turn mower can be crushed and severely injured or killed. The weight of riding mowers and lawn tractors even below 500 lb without a ROPS is sufficient to seriously injure or kill the operator pinned beneath the machine or coming into contact with spinning blade during the roll. These weights and the 21.5-horsepower engine would all place the weight of the Toro Timecutter SS5500 at the upper range of ride-on mowers increasing the risk or injury or death when a rollover occurs as seen in the CPSC accident data with respect to the cause of deaths with respect to the use of ride-on mowers.

In fact, the CPSC data (Smith 1992) indicates that the average horsepower for the ride-on mowers reported in the accident databases have a mean horsepower of approximately 11 hp with rear engine riders averaging 8.5 hp and front engine riders averaging 12 hp. Further, Prowpit Adler of the CPSC indicated in 1993 that the same accident rate was found between rear engine riders and front engine riders. McConnell (1968 indicates the weight range of riding power lawn mowers as ranging from 150 lbs to 750 lbs. More recent articles indicate that the average advertised horsepower for lawn tractors has increased. I am aware of no tests or data that demonstrate that the risk of injury for lighter weight mowers is sufficiently less to base a decision for not providing rollover protection on ride-on mowers. It is the length, width, and height of the mowers that pins the operator and the weight that holds them in place and if the operator is separated the risk of contact the blade is substantial. The dimensions of these machines and position of the operator on them without ROPS are sufficient to pin the operator when they roll over, and without ROPS the machines are more likely roll over onto their top and/or allow the operator to come into contact with the spinning blades during the roll.

Exhibit 14-16

Mr. Steve Crowley                                                                 March 17, 2023
Re: Hillman v Toro                                                                        Page 17

The very presence of a ROPS implies that there will be structure above the height of the operator to keep the weight off of operator during a rollover. This is how ROPS protects the operator. Without a ROPS the operator has no choice but to try to separate from the mower since if they stay in the seat they will be crushed between the seat and ground.  While the presence of a ROPS would generally cause the CG of the mower to be raised virtually all changes in stability can be corrected by providing wider rear wheels and repositioning the wheels in relation to the CG at the design stage.  For example, the rear wheels of the Exmark Lazer Z (a competing brand of mower) have different wheel designs for different deck sizes that provide several inches wider outside to outside tire width for mowers with wider decks. My own testing with respect to static stability has indicated very small differences in lateral stability when a ROPS is installed.  Rearward stability is decreased a small amount but, if necessary, those differences can be countered by the addition of front weights onto the mower as is commonly done when a rear bagging attachment is used on the mower such as those that were provided with the ROPS kit for the Timecutter SS4225.  My testing and experience have indicated that even with the small changes in the height of the center of gravity the usefulness of the mower is not changed, and the mower operates in the same environments without change.  This testing includes the operation of a smaller and similarly sized zero turn mowers with a ROPS installed.  Below is an example of a zero-turn mower with a ROPS installed.



Toro Timecutter SS5000 with ROPS installed.

Exhibit 14-17

Mr. Steve Crowley
Re: Hillman v Toro

March 17, 2023
Page 18



Toro Timecutter 5225, SS5500, Z5035 and Snapper CZT with ROPS installed.



Toro Timecutter 5225, SS5500, Z5035 and Snapper CZT with ROPS installed.

Testing by Toro for "Z Slope Operation" indicated that the machines with ROPS performed similarly with and without ROPS and that the minor changes in the CG of the units was overshadowed by other factors such as operator input and turf condition.  It was indicated that the machines with ROPS were capably operated on slopes of 20 degrees. I have operated various Toro Timecutter zero-turn mowers on slopes over 20 degrees in testing.  My own experience with lighter weight zero-turn mowers with ROPS installed have easily passed the stability requirements of ANSI B71.1 or B71.4 for the machines tested and have noticed no differences in utility of the operation on slopes.

Exhibit 14-18

Mr. Steve Crowley
Re: Hillman v Toro

March 17, 2023
Page 19

The data and studies with respect to the provision of rollover accidents involving rollovers of all ROPS equipped tractors indicate that severe injuries and deaths have been significantly reduced over machines without roll-protection. This protection is provided by preventing the weight of the tractor or equipment from pinning and crushing the operator while being able to remain on the machine protected from having the rolling machine land on them. In addition, studies have shown that on tractors without ROPS protection that operators have only a slight chance of jumping clear. The paper "Development of a Protective Frame and Cab Recommended Practice for Agricultural and Light Industrial Tractors in the United States," by D.L. Stevenson and W.E. Gustin, American Society of Agricultural Engineers, Paper No. 68-110 presents the study and work done in the development of a protective frame and cab for tractors in the 1960's by an engineer for IHC and an engineer for John Deere. The paper clearly states: The protective frame ASAE R-305 and SAE J-333 recommends the seat belts conform to the SAE J4 Standard. Also, the seat mounting, and seat belt anchorage be tested according to the SAE Recommended Practice J-787 with the exception listed as the speed of a tractor during actual upsets usually considerably less than automotive speeds. It is not recommended seat belts be used unless a tractor is equipped with a protective frame. The seat belt would eliminate the slight possibility of an operator jumping or being thrown clear during tractor upsets (emphasis added). Performance industry standards, ASAE S478 Jun00 and ASAE S547 Dec02, provide ROPS performance requirements for similar equipment without a minimum weight limitation. Also, these standards utilize a reduced size for the operator clearance zone for these machines. See Appendix B – ROPS Information packet.

2. *There is currently no data supporting the effectiveness of having ROPS on a riding mower.*

Comment: There has been a tremendous amount of data documenting the effectiveness of having rollover protection on many different tractors over the past 50 years. As Deere has noted in their literature, lawn tractors are tractors with similar hazards and risks. ROPS with seat belts have been unequivocally shown to be effective in minimizing the number of deaths and serious injuries to the public using the ROPS equipped machines. In 1975, OSHA indicated that "There is virtually no dispute that a ROPS with a seat belt meeting the performance requirements of the final standard will significantly reduce the hazards associated with roll-overs." Federal Register Vol. 40, No. 81 page 18254 April 25, 1975. OSHA also indicated: "Finally, use of the required seat belt keeps the operator in the protective enclosure formed by the ROPS and prevents the operator from being thrown or jumping from the tractor, thus avoiding additional hazards such as the tractor rolling over the operator, or the operator being thrown into a stationary object." Agricultural tractors vary greatly in size from small sub-compact utility tractors of approximately the same power as the Toro Timecutter SS5500 up to huge 4-wheel drive tractors weighing over 30 tons. There should be no question that ROPS technology would be effective in protecting operators of Toro Timecutter SS5500 mowers in 2013 as it was in protecting operators of other tractors.

Some manufacturers of zero turn mowers similar to the Toro Timecutter SS5500 have installed ROPS as standard equipment. For example Scag places a ROPS on the 2006 Freedom Z with a weight of 785 lb with the ROPS installed. Excel Hustler installs ROPS on the Hustler Sport at a weight of 594 lb with the ROPS installed. Clearly ROPS can be and has been installed on machines similar in size and weight to the Toro Timecutter.

Exhibit 14-19

Mr. Steve Crowley
Re: Hillman v Toro

March 17, 2023
Page 20



Some claims are made that because of the smaller size of these machines that injury would be more likely due to having limbs pinned between the ground and the ROPS. Studies that I have conducted indicate that the potential of an operator to have a part of their body caught between the ROPS frame and the ground or other objects could occur with many ROPS designs including those provided by Toro and others on other tractors. ROPS is provided to create a crush protective zone and that zone is allowed by most performance standards to bend and deflect at least partially into the operator zone not to prevent all contact with the ground. Again as indicated by John Deere in the development of ROPS for tractors which is the basis for ROPS on zero-turn mowers "Injury inflicted on an operator during an upset of a tractor equipped with a protective canopy would probably result from some other cause than the force of impact." (See Bucher, ASAE Paper No 66-625, "The Design and Evaluation of a Protective Canopy for Agricultural Tractors".) ROPS designed to these performance standards have provided needed and effective crush protection over and over. Ride-on mowers such as the Toro Timecutter SS5500 would have a similarly sized operator areas to that of larger tractors since similarly sized users will operate them.



JD 717A with ROPS showing operator can lean outside of the periphery of the ROPS.

Exhibit 14-20

Mr. Steve Crowley
Re: Hillman v Toro

March 17, 2023
Page 21

One death or serious permanent injury due to the lack of a ROPS is too many. There is not a quota of deaths or injuries that must be reached before a foreseeable hazard with respect to the use of the machine is addressed by the application of the design safety hierarchy standard. People are not to be used as guinea pigs to determine a set number of deaths that must occur before corrective action is taken. Such an attitude is contrary to the design safety hierarchy standard and the ethical standards of the engineering profession which require the safety of the public to be held paramount. I am unaware of any publicly documented rollovers of ROPS equipped and deployed lawn tractors and specifically ROPS equipped and deployed ride-on mowers or lawn tractors including ZTR models where the operator was paralyzed or received fatal injuries. See Appendix B - ROPS Effectiveness Information packet.

Toro in providing ROPS on its Z-Master mowers indicates "Roll-over Protection Systems (ROPS) in combination with seat belts are shown to be effective in preventing serious injuries and death if equipment overturns. ROPS are standard equipment on Toro Z-master Mid-Mount ZRT commercial mowers manufactured in 2004 or later." The LSU Ag Center in its 2008 publication "Preventing Overturns with Zero-Turning-Radius Mowers" indicates All zero-turn mowers should have a ROPS....A ROPS is important to protect you in case an overturn does occur." The National Safety Council in their "Commercial Equipment Operator's Safety Training Program" states: "Rollover protection and a seatbelt or "ROPS" is an important safety feature to protect you in the event of an unexpected rollover. Wear your seatbelt at all times." and "The use of ROPS will reduce the chance you could be injured or killed if your mower rolls over."

*3. A ROPS can catch on overhead obstructions and lead to tipovers.*
Comment: Every riding mower, whether equipped with a ROPS or not, can encounter low clearance situations. There are many accidents reported to the CPSC of operator injuries and fatalities from encounters with low hanging objects on machines without ROPS. A ROPS is necessary to create the protected safety zone for the operator. Further, Toro has available an overhead sunshade and steel structure that would present similar problems with overhead objects. There is a hazard with a risk of serious injury or death that is introduced by allowing operation in low overhead areas in that the operator safety zone can be encroached by the low overhead objects and cause severe injury. There are many injuries and deaths that have occurred from encountering this very hazard on non-ROPS equipped lawn tractors.

An operator should not have to crouch down to avoid overhead obstructions. Crouching down can lead to not being able to see the direction of travel and loss of control. Further, there are many areas already that cannot be mowed because the objects are lower than the machine itself. Actual testing, by myself, of tractor mowers equipped with ROPS such that the ROPS catches on low hanging objects indicates that rollover was not caused by this occurrence. I am not aware of any documented rollovers where a low clearance object caught on a deployed ROPS and caused a rollover of a tractor causing a permanent injury or death. In any event a ROPS provides protection for an operator when a tip-over or rollover occurs and a ROPS would add about 6-12 inches to the overall height of the Toro Timecutter SS5500 with a seated operator. Finally, if this were a real problem that prevented ROPS protection from being provided to operators, Toro would not have made ROPS standard equipment on the other models made after 2003.

Exhibit 14-21

   *4. The center of gravity is higher with a ROPS making the machine less stable.*

Comment:  While a ROPS may slightly raise the center of gravity there is not any indication that ROPS equipped machines cannot meet the stability recommendations of the industry's own voluntary, minimum, consensus standards.  Weights can be added to counter changes made with the addition of a ROPS.  Toro has weights available for the Toro Timecutter SS5500 that can counteract any loss of rearward stability. (Toro Front Weight Kit for Timecutter Series Riding Mowers).

 In addition, meeting the stability recommendations does not prevent rollovers that occur due to slipping over embankments or retaining walls.  With the Timecutter a ROPS was not considered in the base design.  A machine with a ROPS included in the design from the start can have the wheels, tires, engine, operator and other components designed to provide the same stability characteristics as the machine without a ROPS.  When rollover protection is added to an existing design, the added weight of the ROPS and its affect on the stability can be offset by the provision of counterweights, if necessary.  In addition, the mounting structure for the ROPS can be built into the frame reducing the weight added by the ROPS itself.

Any machine including the subject machine will overturn when it exceeds its stability limits which as stated in the Toro Timecutter SS5500 operator's manual can occur due to operation on slopes, near drop-offs, ditches or banks, due to sharp turns and starts and stops on slopes. Further, studies have shown that ROPS equipped equipment actually makes operators more conscious that machines can roll over.  See Appendix B - "Tractor Anti-Roll Bars Really Work" Implement and Tractor, Aug 21, 1966 – ROPS Effectiveness Information.  It has been shown that with mowing equipment rollovers of ride-on machines are the leading cause of deaths on machines not equipped with rollover protection. This information is not provided to operators. See Appendix A and Appendix B– Mower Stability and Rollover Accident Information. Stability is also significantly affected (raised) by the presence of an operator on a lawn tractor. The weight of an operator can be a large part of the man-machine system.  A 200lb operator would represent 25% of the man/machine weight.  A 250 lb. operator would represent 29% of the combined weight.  With a ROPS any potential loss of stability is offset by the protection offered by the ROPS.

5. *Use of ROPS without a seat belt creates a potentially more hazardous condition.*
   Comment: ROPS have proven to be effective in preventing deaths and serious injuries without use of a seatbelt.  The use of the seatbelt enhances the protection offered.  See Appendix B - ROPS Effectiveness Information.  ROPS are allowed to be a minimum of 24 inches wide by OSHA and ASAE standards and many ROPS have been provided that would permit an operator to lean from a seated position well outside the periphery of the ROPS.  ROPS designed and constructed to the requirements of these standards have demonstrated their effectiveness in limiting injuries over and over again.  ROPS are intended to limit many rollovers to a side layover and to provide a crush protective zone for the operator should the machine roll onto its top or further.  Early in the development of ROPS it was recognized that the operator may contact the ground during the roll and there was thought to recommending a helmet to protect the operators head as can be seen in the test reports and papers by Professor Lamouria at the University of California – Davis in 1959.  However, helmets have not been required and utilized and ROPS have been proven over and over again to provide lifesaving and injury preventing

Exhibit 14-22

Mr. Steve Crowley
Re: Hillman v Toro

March 17, 2023
Page 23

protection to operators when their tractors have rolled over. An operator of a Toro Timecutter SS5500 zero turn mower would be subjected to a lower fall height and less energy than a corresponding operator of a farm tractor that rolls over and ROPS would be even more effective in preventing injury. Again, if this were a real problem that prevented ROPS protection from being provided to operators, Toro would not have made ROPS standard equipment on the other ZTR models made after 2003.

6. *Installation of a ROPS can give the operator a false sense of security which leads him to operate on dangerously steep slopes.*
   Comment: There is no indication in the literature that a false sense of security is created by ROPS. If anything, not providing a ROPS, provides a false sense of security that the Timecutter is safe for use without such protection and that the stability is sufficient for the operator to rely upon to never encounter a rollover. Studies have shown that ROPS equipped equipment actually makes operators more conscious that machines can roll over. (Appendix B – "Tractor Anti-Roll Bars Really Work" Implement and Tractor, Aug 21, 1966 – Appendix B - ROPS Effectiveness Information. A ROPS provides protection when a rollover occurs. Stevenson and Gustin in their ASAE paper in 1968 also reported

> The established purpose of the Recommended Practice is clearly defined as to minimize the possibility of operator injury resulting from accidental upsets during normal operations. A protective frame will not prevent such accidents from occurring. In fact, both the highway maintenance departments of North Dakota and Illinois stated they originally felt the protective frame would have an adverse psychological effect on operators, making them overconfident and causing the operators to operate the tractors on slopes too steep. In these two cases it was not true. Apparently, the protective frames made the operators more conscious that it could roll-over as less accidental upsets have occurred with protective frames than without protective frames.

Operation on slopes of any height can lead to rollovers due to the loss of traction as can operation in areas with drop-offs in elevation whether the tractors or mowers are equipped with ROPS or not. With a ROPS the operator is provided adequate protection when a rollover occurs.

7. *If the machine rolls into water, the ROPS can prevent pinning the victim under water but can also make it more difficult to get free from the machine if a seatbelt was used.*
   Comment: As mentioned the ROPS keeps the machine off the operator making it likely that the operator would not be trapped under the machine that rolls over allowing him to get free. Without a ROPS, the operator is at substantial risk of being trapped under the machine. I am not aware of any publically documented incidents where an operator was trapped under water by a deployed ROPS on a ROPS equipped tractor of any type including ZTR lawn tractors.

Accidents specific to waterways and drainage canals were specifically addressed by OSHA in 1975. OSHA indicated:

> And since these deaths occurred because the operator was trapped between the tractor and the mud, we believe a ROPS with a seat belt may well have saved these operator's lives. In weighing the known hazards of rollovers into canals

Exhibit 14-23

Mr. Steve Crowley                                                    March 17, 2023
Re: Hillman v Toro                                                         Page 24

> where a ROPS with a seat belt were not used, against the potential hazard of
> drowning because a seat belt is used, we have concluded that where tractors are
> used in the vicinity of drainage canals, the use of a ROPS with a seat belt is
> necessary and appropriate to protect operators from the hazards associated with
> roll-overs. Accordingly we decline to exempt drainage canal usage from the
> requirements of the standard.

If rollovers at the banks of ponds and other bodies of water were a real reason not to provide
ROPS, Toro would not have made them standard on other zero turn models made after 2003.

8. *The accident was caused by operator error.*
   Comment: Accidents are the result of an interaction between the man, the machine and the
   environment of use. All operators can make mistakes and errors in judgment that lead to
   rollover incidents, the machine and its characteristics can lead to rollover incidents and the
   environment of use can lead to rollover incidents. A Deere engineer, Mike Lee, testified in the
   Ousley v Deere case that he had rolled a lawn tractor over. The designer of a machine such as
   the Toro Timecutter SS5500 riding mower and other lawn tractors cannot and should never
   assume that the operator will be perfect or control the environment of use. If that were a
   legitimate assumption, ROPS and many safety features on the mower would never be needed at
   all. The designer and manufacturer can provide adequate protection to the operator to prevent
   serious or fatal injuries and/or death should a rollover occur. E.W. Hodgson in his article
   entitled "The Engineer and Society – Safety is Our Responsibility" published in The Charted
   Mechanical Engineer in April 1966 states:

> There is a tendency of some engineers to think of safety as someone else's
> responsibility, something, perhaps to be considered later when all the other
> pressing problems of design and organization have been dealt with. The truth is
> that safety must be built into all machines, processes and organizations from their
> very inception. And it is not good enough to assume that a user or operator of
> equipment will never do anything careless or downright stupid: we all slip up at
> times and the designer or manager who ignores this possibility is as responsible
> for the ensuing accident as a motorist who allows no margin of error in others.

Providing a ROPS on the Toro Timecutter SS5500 zero turn mower provides such protection
when an upset occurs. As indicated by Stevenson and Gustin (engineers for IHC and Deere) in
1968 in their American Society of Agricultural Engineers paper entitled "Development of a
Protective Frame and Cab Recommended Practice for Agricultural and Light Industrial Tractors
in the United States"

> We, the industry, have accepted the challenge of providing safety features on
> tractors to protect the operator, since our experience has clearly indicated we
> cannot prevent the accidents from occurring.

Similarly, Ernest C. Carlson (Chief Engineer at IHC) indicated in an Oct. 1968 Excavating
Contractor article:

Exhibit 14-24

Mr. Steve Crowley
Re: Hillman v Toro

March 17, 2023
Page 25

> When an upset occurs it is a complete waste of time and energy to argue "who is to blame." Required is a complete and thorough study of all technical data and a consolidation into an effective preventative. This was the achievement attained......when it assumed the initiative for developing a practical and effective tractor protective frame.

Howard S. Latham, Chief Safety Engineer for the US Department of Interior in the 1968 National Safety Congress indicated:

> While the cause of rollovers is an important safety consideration, it was not and is not pertinent to the consideration or the need for rollover protection. Regardless of whether the rollovers were caused by operator error, mechanical failure, or poor haul roads, the indisputable fact was that they did occur. Consequently, we could only conclude that there was a need to protect the operator and the equipment in event of upset or rollover......Significantly, subsequent reports of lives saved and damage to equipment minimized due to the installation of rollover protective systems have proven the value of and necessity for the protection.

See Appendix B – General ROPS Information packet. A ROPS assumes that an accident will occur and is provided to protect the operator during the rollover.

Finally at page 40 it stated - Consumers are probably not accurate in estimating either the degree of slope or its associated risk.

As shown by the operator's manual, proper operation of ZTR machines is a complex task. Inevitably mistakes can and will be made. This was well known by the mower and tractor manufacturing industry. One of the purposes of ROPS is to protect operators when conditions including mistakes occur that can lead to rollovers. In that respect ROPS are like seat belts, airbags and many other safety devices in our cars.

9. *The* Toro Timecutter SS5500 *was reasonably safe because it complied with a minimum consensus voluntary standard such as ANSI/OPEI B71.1 or B71.4.*
Comment: The ANSI/OPEI B71.4 standard and other similar industry standards are voluntary standards. Toro chose to put ROPS on some models after 2005 despite not being required by the B71.1 standard in effect at that time. A manufacturer can choose to meet or exceed the requirements or not. In addition, manufacturers such as Toro write and control what is in the standard that is built on consensus between manufacturers. The standard is a consensus standard that is controlled by the industry (OPEI) and only includes the safety requirements that have developed a consensus within the committee of industry representatives. The standard is a minimum standard and does not include all of the requirements for designing a safe machine. The ANSI/OPEI standard does not indicate that a ROPS or similar protection should not be placed upon the Toro Timecutter SS5500. As indicated in 1984 in the ASME "An Instructional Aid for Occupational Safety and Health in Mechanical Engineering Design" ".... courts have interpreted such standards as minimal standards for product acceptability." See Appendix B - Design Methodology Packet. The Code of Ethics for Engineers indicates that "engineers shall hold safety paramount in the performance of their professional duties." See Appendix B – Standards packet. Standards are not just what the industry can agree to adopt in its various

Exhibit 14-25

Mr. Steve Crowley
Re: Hillman v Toro

March 17, 2023
Page 26

organizations. They are also set forth in textbooks, treatises, and ethical standards. The design
safety hierarchy is a standard. The law is a standard. To provide a tractor/mower such as a zero-
turn mower that is safe for its reasonably foreseeable use and misuse such that safety is held
paramount, protection for the operator from being crushed or injured during rollovers is
necessary.

OSHA is a standard that addresses the employer/employee relationship. (OSH Act of 1970
Section 5 Duties) It is a standard that could have been chosen to be followed by manufacturers of
lawn tractors the same as other voluntary standards. OSHA 1926.1002 is a regulation that
requires that ROPS be placed on equipment where there is a risk of rollover occurring including
grounds keeping equipment. Specifically, OSHA 1926.1002 (j)2 describes an industrial tractor as
"that class of wheeled type tractor of more than 20 engine horsepower used in operations such as
landscaping, construction services, loading, digging, grounds keeping, and highway
maintenance" and 1926.1000 (a) and (b) indicates that ROPS shall be equipped on industrial
tractors. The 2005 Toro Timecutter SS5500 indicated it was tested to the requirements of
ANSI/OPEI B71.1. During the dynamic stability testing that standard expected that operators
would be provided with protection from rollovers by placing anti roll over outriggers on the
mower as shown below:

**19.2.3.1  Test equipment**

The machine shall be equipped with lateral outriggers to indicate lift-off of the wheels on the portion of the
frame that supports the operator's seat to prevent overturn during the test and to determine test
acceptance.

That same protection was not offered to regular operators of the Timecutter. It would not be
reasonable to expect employees to design, test and certify their own ROPS. Yet, Toro chose not
to offer ROPS on the Timecutter SS5500 in 2013 or any other time to protect employees that
operate the lawn tractor. They did provide ROPS as standard equipment on other models
holding "safety of the operators first" on those models but not on this Timecutter. Toro
developed a ROPS for later Timecutters beginning in 2020. If the OSHA and agricultural
standards did not provide an adequate ROPS to protect operators of zero turn, sit-down, ride-on
mowers those standards would not be appropriate to design and certify ROPS and protect
operators. Yet those standards are commonly used by many ride-on mower manufacturers when
certifying ROPS.

The SAE J1042Jun93 standard indicates in the Scope that it applies to "General Purpose
industrial Machines described in Category 2 of SAE J1116. SAE J1116 lists in Category 2 the
following machines: Tractors, Loaders, Backhoe Loaders, Mowers and Trenchers. Additionally,
the Scope of 2. Self-propelled General Purpose Industrial Machines in SAE J1116Jun86 states:

> "This recommended practice applies to machines that are in regular commercial
> production and are over 20 hp. They are used for landscaping, construction site
> services, public and commercial grounds keeping, and highway right-of-way
> maintenance."

SAE J1041Jun93 indicates

Exhibit 14-26

Mr. Steve Crowley                                                 March 17, 2023
Re: Hillman v Toro                                               Page 27

> 3. Rollover Protection - In order to fulfill the intended purpose of this standard, subject machines shall be equipped as specified in paragraphs 3.1 and 3.2. 3.1 A rollover protective structure (ROPS) per SAE J1040. Wheeled machines similar in configuration to agricultural tractors may, as an alternative, be equipped with a ROPS per SAE J1194. 3.2 Seat belts conforming to SAE J386. The seat mounting and seat belt anchorage(s) shall meet the requirements of SAE J386 (Part III, Industrial Machines Test Procedure).

Toro did not provide any kind of ROPS and seat belts as standard equipment or optional equipment in 2013 for the Timecutter SS5500. By not providing ROPS as standard equipment it is indicated to the purchaser that ROPS is not a necessary feature required by OSHA or for the protection of operators. As reported by the University of Saskatchewan in the article "Tractor ROPS (Rollover Protection Structures): Barriers and Motivators" ROPS was not installed on tractors in high percentages in the US until manufacturers began to provide ROPS as standard equipment in 1985. The article states:

> For locations without supportive legislation (for ROPS installation before 1985, in the US) the prevalence of ROPS-retrofitted tractors was low. In a study of cash-grain farms in Ohio, only 28.8% of tractors manufactured before 1985 were ROPS-equipped in contrast to 92% of those manufactured after 1985 (6). In Iowa, only 39% of tractors had ROPS (7). Tractors manufactured after 1984 were 84% ROPS equipped while only 3% of tractors manufactured before 1960 were retrofitted (7).

*10. The manufacturer has few or no reported rollover accidents with this model mower.* Comment: When a new model is designed and produced there would be no reported accidents with the design. A market study for Deere in 2004 indicated that 75% of residential owners of zero turn mowers had moderate/severe slopes, ditches and drop-offs. These are the conditions that were found to be involved in rollovers of ride-on mowers by the CPSC for many years, not the design of a particular mower model. Few designs are so new and different that accident history of other predecessor and competitor models would not be applicable. All of the riding lawn mowers and lawn tractors whether front mount, ZTR lawn tractors or more conventional lawn tractors are covered by the same stability requirements of ANSI B71.1 or B71.4. They all have a similarly sized operator areas since similarly sized users will operate them. They all will be operated by users with similar abilities and faults. With respect to this lawn tractor there is nothing unique about its size, shape or design that would lead a knowledgeable engineer to believe that rollovers would not occur as they had with other mowers in the past with devastating results to operators.

## The Design Chosen by Toro

Toro chose to provide an unprotected operator station on the Timecutter SS5500 by not providing ROPS or a roll bar as the base part of each and every machine. This design without the ROPS exhibited failure during this accident in that the design failed to protect Rebekah Hillman from a well-known and recognized hazard that presented a substantial risk of serious injury or death. Toro should have known that the operator needed to be protected against that hazard on this model of ride-on mower. This is especially true of the ZTR models which by their

Exhibit 14-27

Mr. Steve Crowley

Re: Hillman v Toro

March 17, 2023

Page 28

control bar controls over the lap of the operator coupled with the speed of rollovers tends to eliminate the possibility of the operator falling free should that occur during the rollover.

Toro chose not to provide any type of brake that could be used by the operator to stop the travel of the mower in the event of the bypass pins being activated or some failure of the hydrostatic transaxles or drive belt as noted by Hydro-gear in their patents. They have designed such a feature on other hydrostatic drive zero turn mowers and lawn tractors but chose not to provide this protection on the subject Timecutter.

I have reviewed accident reports and investigated many rollover accidents involving tractors and riding mowers similar in design to the one Ms. Hillman was operating. These investigations are merely recent indications of the long-term problem of deaths and serious injuries as a result of rollovers of riding mowers documented as early as 1969 by Professor McConnell and later by the CPSC. See Appendix A and Appendix B – Mower Stability and Rollover Accident Information. Further, there is a substantial amount of information that demonstrates the life saving protection offered on machines that incorporate ROPS or similar protection.

Many manufacturers of zero turn mowing tractors, including Toro, were offering ROPS, some as standard equipment prior to the date of sale of the subject Timecutter in 2013. The technology to design, test and provide a ROPS was available for the Toro Timecutter SS5500 well before 2013. I have designed, built and tested a ROPS for similar residential zero turn lawn tractors that meets the requirements of OSHA regulations. No new technology was necessary, and the ROPS was very effective in preventing a full rear overturn on steep slopes. (Appendix B - ROPS Information Packet.)

Advance Technology, Inc., including myself, have been designing, testing and certifying ROPS for tractors in the 10 to 20 horsepower range for more than 25 years and for zero-turn lawn tractors for more than 20 years. See ASAE Paper MCR-81-402 "The Design of ROPS for Small Tractors in the Ten to Twenty Horsepower Range" and ASAE Paper MCR 87-124 "Roll Over Protective Structures (ROPS) For Front Mount Mowers" in the ROPS Information packet. The technology and materials were available well prior to 2013 to design and install ROPS or a roll bar on the Toro Timecutter SS5500 ride-on mowers as standard equipment. (See Appendix B - ROPS Information, Standards Information.) Toro should have been aware that ROPS had been proven nearly 100% effective in preventing deaths and serious injuries during rollovers of tractors of every size and type that they have been employed upon. ROPS on these riding mowers and lawn tractors minimize the unnecessary risk to the public using these machines if and when they rollover. There is substantial reason to expect that employing ROPS on the Toro Timecutter SS5500 would provide similar protective results as I indicated earlier and to date I have not seen any documented data that indicates operator has been paralyzed or killed on a lawn tractor with a deployed ROPS that was wearing their seatbelt. Specifically, for Ms. Hillman there is clear evidence that she was severely injured under the weight of the overturned mower because he was not provided with a crush protective zone that a ROPS would offer.

Toro did not advise users that the number one cause of deaths with ride-on mowers were rollovers and stability related accidents or of the need for rollover protection to protect users when a rollover occurs.

Exhibit 14-28

Mr. Steve Crowley
Re: Hillman v Toro

March 17, 2023
Page 29

**Opinions**

Based upon my knowledge of the outdoor power and mowing equipment industries; my experience in designing, testing and certifying ROPS on ride-on mowers, lawn tractors and zero turn lawn tractors; previous injury/accident investigations; knowledge of rollover accidents and design history; knowledge of the industry safety standards for this machine; knowledge of what other industries were utilizing in their designs to protect workers from recognized hazards; knowledge of machine design and human factors as it relates to the design of the machine and specific references that describe a number of accidents on similar equipment and design alternatives that would prevent severe injuries such as suffered by Rebekah Hillman; my understanding of this accident and designing and testing of ROPS on substantially similar zero turn mowers, I also have the following additional opinions based upon a reasonable degree of engineering certainty:

1. The Toro Timecutter SS5500 zero turn mower is defective in design and unreasonably dangerous. The riding mower lacked crashworthiness protection for the operator when it rolls over. The mower also lacked a means the operator could be used to stop the mower if control from the hydrostatic transaxles was not available. The riding mower has associated with its foreseeable use a recognized hazards with a foreseeable high risk of serious injury or death. The manufacturer knew or should have known of technically and economically feasible design alternatives that would have significantly reduced the risk without adversely affecting the utility of the machine. The hazard in this instance is that of loss of control and the rollover of the riding mower and the risk is that of serious injury or death which exceeds by far any benefit from not installing protection in the event of a rollover for the operator on the mower.

2. Toro failed to properly follow the well-recognized design safety hierarchy standard in the design of the Toro Timecutter SS5500 zero turn mower by not installing rollover protection or a means for the operator to stop the mower in the event of loss of control from the hydrostatic transaxles.

3. The Toro Timecutter SS5500 zero turn mower became uncontrollable on the slope and went forward over a retaining wall. Ms. Hillman was then severely injured under the falling zero-turn mower after she tried to jump as the mower went over the retaining wall, landed on its front and then overturned onto its top.

4. The design of the operator compartment which neglected protection of the operator from rollovers was present in the machine when it left the control of the Toro.

5. The defects in the design of the Toro Timecutter SS5500 zero turn mower were causative of the severe injuries received by Rebekah Hillman.

6. The design of the Toro Timecutter SS5500 zero turn mower failed to meet a risk/benefit test considering the availability of alternative designs, their cost and the magnitude of the risk of the existing design. The benefits of not providing a ROPS on the mower are outweighed by the risks of not providing a ROPS. The benefit for operation in its foreseeable environment of use of not providing a brake that could be applied by the operator to stop the mower in an emergency do not outweigh the risk of not providing such a brake. The benefits of providing a feature that bypasses Toro's intended means of maintaining control of the mower i.e., the hydrostatic drive motors, without providing interlocks and warnings and instructions does not outweigh the risk of providing the feature.

Exhibit 14-29

Mr. Steve Crowley
Re: Hillman v Toro

March 17, 2023
Page 30

7. The Toro Timecutter SS5500 zero turn mower was being used in a foreseeable manner and in a foreseeable environment of use by Ms. Hillman at the time of the accident which was to mow lawns that would contain moderate to severe slopes, ditches, drop-offs and/or embankments.

8. Owners, operators and users of the Toro Timecutter SS5500 zero turn lawn tractor would not expect the machine to be as dangerous as it was. Persons that would typically operate this type of equipment would not be expected to appreciate the extent of the hazard and the extent or the risk associated with rollover of the machine. They would not have an appreciation of how irreversible the accident would be and how often accidents had occurred and the numerous ways that rollovers can occur. They would expect it to be reasonably safe for foreseeable uses as it was designed and provided by the manufacturer without ROPS.

9. A ROPS and seat would have provided Ms. Hillman a crush protected seated area. ROPS including seatbelts have proven 99% effective on all models of tractors and ride-on mowers in preventing and/or minimizing deaths and serious injuries due to rollovers.

10. The Toro Timecutter ZTR 5500 was inadequately tested for loss of control due to the loss of hydrostatic braking and rollovers.

The design alternatives that were available for the Toro Timecutter SS5500 zero turn mower would have included but should not be limited to the following:

1. The Toro Timecutter SS5500 zero turn mower should have had installed a rollover protective structure or rollbar and seat belts that would create an operator protective zone in the event of a tipover and/or rollover accident. The cost of providing a ROPS and seatbelt for the Toro Timecutter SS5500 zero turn mower is estimated to be in the range of $100-$250 if the mounting structure is designed into the frame as standard equipment.

2. The Toro Timecutter SS5500 should have had a mechanical brake that could be applied by the operator to stop the mower when the hydrostatic drive motors were not functionally able to stop the mower. Hydrogear who manufactured the hydrostatic motors had available a disc brake design that could have been utilized. The mechanical brake could also be provided on each rear wheel independent of the hydrostatic drives such as those provided by Toro on other mowers, by JD on its zero turn mowers and Scag on its Freedom Z mowers.

3. Interlocks could have been provided to prevent the engine from starting and or the park locks from disengaging if the hydrostatic bypass pins were actuated.

I base these opinions to a reasonable degree of engineering certainty and on reasonable recognized design engineering, manufacturing, safety and human factors principles, as well as on my education, training and experience. While holding the disclosed opinions, I reserve the right to amend or revise said opinions based upon expanded information obtained through discovery. In closing, should you have any questions or require further information, please contact my office.

Documents that I will rely on in support of my opinions include, but should not be limited to, those contained in Appendix B and the documents you provided. I also may refer to photographs that demonstrate the operator can extend beyond the ROPS on larger mowers and tractors. Appendix A is a summary of my review of CPSC studies and documents. Appendix B

Exhibit 14-30

Mr. Steve Crowley                                                    March 17, 2023
Re: Hillman v Toro                                                       Page 31

is a list of recognized and reliable authorities and information with respect to the hazard and risk associated with respect to rollovers and the protection of operators from serious injuries and deaths in the event of a rollover incident.  Appendix C contains my current resume that provides a list of publications that I have authored over the past ten years and describes my qualifications. Appendix D contains a list of litigation that I have testified in trial or by deposition in the last four (4) years.

As previously agreed, I will charge for my time spent working on this case at the rate of $150 per hour. In closing, should you have any questions or require further information, please contact my office.

Sincerely,

Thomas A Berry

Thomas A. Berry, P.E.

Encl.: Appendix A - Review of CPSC studies and documents
       Appendix B - See Following List.
       Appendix C - Resume
       Appendix D - List of trial and deposition testimony over the last four years.

Exhibit 14-31

Mr. Steve Crowley                                                    March 17, 2023
Re: Hillman v Toro                                                   Page 32

## Appendix A - Review of CPSC studies and documents

In 1973 the CPSC, in its report "Major Hazards Associated with Power Lawn Mowers and Garden Tractors" indicated that there were an estimated 8992 emergency room treated injuries from riding mowers and garden tractors. Hazards often associated with power mowers were blade contact, a thrown object, overturning and run over. The report indicated that overturning or slipping of the machine is a hazard associated with riding mowers. Typically, the accident occurs on uneven terrain. Injuries are caused by resultant contact with blades, entanglement of body parts with the machine, being pinned under the machine, from the act of falling, etc. It was noted that one operator died as a result of jumping just before a rollover and striking his head on a rock.

As far back as April 25, 1977, the CPSC published a Proposed Safety Standard for Power Lawn Mowers that was published in the May 5, 1977 Federal Register, Vol. 42, No. 87. In the "Background" section it was indicated "After consideration of the available information concerning injuries and injury potential associated with power mowers, the Commission preliminarily determined that the following hazards were associated with power lawn mowers and presented unreasonable risks of death or injury to consumers:  3) Lacerations, contusion, abrasions, and other injuries resulting from the rolling, slipping, or overturning of power lawn mowers..."

In 1979 the CPSC released its base line study of accidents from 1977. They found that accidents associated with power lawn mowers resulted in approximately 60,400 injuries treated in United States emergency room during 1977 with 13,400 occurring from ride-on mowers. They found that body part entrapment in a mower mechanism and tip-over of riding mowers resulted in the most severe injuries and that in 57% of the tip-over accidents of ride-on mowers that hospitalization was required. It was also found that with respect to the death certificates received that the overturning of riding mowers caused more deaths than any other accident sequence. It was found that an estimated 1500 injuries occurred with the tip-over hazard pattern which occurred when the riding mower or garden tractor was operated on an incline or ran into a ditch or hole. The injury in most situations was caused by the weight of the mower as it came to rest on top of the victim. The injuries from the tip-over hazard were found to be often more serious because of the weight of mower resting on top of the victim and 57% required hospitalization. Of the 43 death certificates received in 1977, 17 were attributed to the overturning hazard, the most of any hazard group.

In 1983, the CPSC staff determined that 80% of riding mower fatalities resulted from situations where "the mower tipped over, the victim fell under, or was run over by the mower, or the victim fell or was thrown from the mower...." In 1984, the CPSC (McNamara and Folkes, "Riding Mower Project - Status Report") noted that a correlation between stability-related requirements in the industry's voluntary minimum Outdoor Power Equipment Institute (OPEI)/American National Standards Institute (ANSI) standard and actual mower stability during slope operations had not been demonstrated. It further recommended inclinometers for riding mowers. At the same time, in 1984 the CPSC specifically noted that it did not approve the ANSI B71.1 voluntary safety standards for riding mowers. It specifically found that these new measures were not adequate to reduce riding mower dynamic stability related deaths and serious injuries. It expressed "deep concern over deaths and injuries associated with dynamic (when moving)

Exhibit 14-32

Mr. Steve Crowley                                              March 17, 2023
Re: Hillman v Toro                                                   Page 33

stability...." At no time since then has the CPSC ever seen fit to endorse any of the subsequent voluntary OPEI/ANSI riding mower standards which were proposed by the industry itself.

On September 3, 1985 Final Report on "Analysis of Warning Devices for Riding Type Lawn Mowers" to the CPSC Commission by Jacqueline Elder of the CPSC it was indicated the following:

page 1 - "This report addresses two prevalent scenarios within this group (a) loss of vehicle control on slopes; ... Operator warnings cannot "solve" these problems in the sense of precluding any such accidents;..."

page 2 - "The distinction riding mowers and garden tractors is based on the force of a drawbar pull (ANSI B71.1, 1980). All of these vehicles are generally designed for cutting grass, but generally the garden tractors are heavier machines, with more horsepower, and provision for attachments separate from the tractor itself. However, the safely problems of concern here are similar for both and they are discussed together. The term "riding mower" is understood here to refer to " riding mower," "lawn tractors," and "lawn and garden tractors."

page 3 - "Slope-Related Accidents PROBLEM OVERVIEW: Newman and Miles (198]) found tipover accidents to be the major hazard pattern in riding mower fatalities, accounting for 50% of the fatalities. This accident type also accounted for 13% of the emergency room injuries. Tipover accidents are certainly not a problem unique to riding mowers. Overturn accidents account for about half of all farm tractor fatalities (Murphy and Johnson, 1982.

page 3-4 - Piercy and Turner (1983) reported that 4-H youth generally had basic knowledge of common mower hazards, but not understanding of riding mower stability on slopes. Accident experience, and general industry opinion, seems to confirm this general result: consumers likely do not have a good appreciation of the hazards related to slope, the degree of slope that may be dangerous, the dynamics of loss of control on slopes, or the proper methods for mowing on slopes.

page 6 - Some manuals provide a specific degree of slope (15 degrees) over which the mower should not be operated. Some are accompanied by a diagram to permit an estimation of slope (see Figure 1 for an example); however. these templates only permit comparing the general slope of an area with a single reference (15 degree) slope. Also typical are cautions not to operate on slopes that are "too steep" without specifying a specific slope. Some manuals recommend backing up steep slopes, rather than driving uphill in forward gear. Others indicate using a lower gear on slopes, and not changing gears while on a slope. Not specifying a specific maximum slope is a very deliberate decision on the part of some companies, since they feel that the many contributing factors to stability, in addition to the degree of slope itself, make any such number highly arbitrary, and possibly misleading.

page 12 - This also refers to "steep slopes," without referring to any specific levels or examples. It further indicates that slopes should be mowed up and down, never crosswise.

page 18 - It may be of interest that four of the ten non-transition cases where slope was known involved slopes of less than 15 degrees (13- 14 degrees), ... These generally moderate slopes actually involved in accidents provide an interesting contrast with the ANSI B71.1 specified tilt-table static stability values (30 degrees for longitudinal slope, 20 degrees from lateral slope). The ANSI standard addresses only static stability criteria, not dynamic stability criteria. Perhaps this helps account for the cases with more moderate slopes.

page 20 - In addition to the findings from riding mower accident cases, another important accident feature may be assumed based on the literature on heavier equipment stability. That is

Exhibit 14-33

that loss of vehicle stability occurs in a quite sudden manner. For instance, Spencer (1978), in a study of tractors on slopes, actually had drivers drive down progressively steeper slopes until sliding occurred. He reported: "The suddenness of the loss of control was a feature of these failures. The driver reported no warning signs were available, such a noticeable wheel slip. This was confirmed from films taken during the trials." Assuming this to be true of consumer mower accidents as well, there are some important implications. First, the operator likely lacks any feedback that he is in an unstable situation, even when it is quite severe.

page 21 - Factors in Slope Stability: The degree of slope is only one of the many factors that determine the stability of a riding mower operating on a hill. Because these other factors interact in complex ways, and may be very important determinants, there is no simple relationship between a given riding mower and a "safe" slope. This becomes a critical concern in providing operator warnings, since user belief and acceptance can be compromised if a too moderate slope is warned against due to a margin of safety under worst case conditions.

page 22 Important determinants of stability on slopes were identified through review of technical literature and industry contacts. Some of this information comes from work on farm tractors or construction equipment, but the dynamics are similar.

page 23-24 - One manufacturer claims to have tested the ability of untrained people to use the device, with positive results. However, both the contact at this manufacturer, and other manufacturer, were skeptical of whether it would be used; there are not data on this. A further problem is that the device provides only a gross measure of terrain slope, and not local measures; often a grade is uneven. Even an operator using the device according to instructions may be unaware of where the maximum hazard area is and how severe it is ...

page 27 - Our review of. . . . it was sufficient to indicate that it is feasible to provide relatively inexpensive slope indicators capable of providing measurement in both fore-aft and lateral directions; and further, that some existing, relatively inexpensive devices may be adaptable for use on mowers.

page 31-32 - Most accidents appear to involve operators who are familiar with the mower and have used it without incident a number of times before. People are less likely to read warnings or instructions if they are familiar with the product (Godfrey, Allender, Laughery, Lind Smith, 1983) or have used it frequently (Wright, Creighton and Threlfall, 1982) If an event is perceived as rare, the warning is less likely to be attended to (McCarthy. Robinson, Finnegan, and Taylor, 1982, and riding mower users may well perceive tipovers to be rare events. If warnings occur without an incident occurring, people are less likely to respond to the warning (Dorris and Purswell, 1978, Finally, the effectiveness of a warning is related to the perceived hazard involved (Godfrey et al., 1981). Consumers are likely to underestimate the hazard not only because of some of the factors above but also because of a tendency, identified in several lines of research, for individuals to consider themselves as more skillful or accident immune, than other people (e.g., Slovic, Fischhoff, and Lichtenstein, 1980). The task of mowing has those features. believed to accentuate this tendency: the risk is seen as being under the users control; personal experience leads to familiarity without incident, so that the "personal experience is overwhelmingly benign." Therefore, in providing warning to consumers regarding tipover hazards tor riding mowers there is a priori reason to question (as a number of industry people did in our conversations) whether the operator will make use of the warning. This tendency, along with the other problems cited above, must be taken into account in developing a warning system which will be effective in alerting the operator and producing desired behaviors.

page 40 - Consumers are probably not accurate in estimating either the degree of slope or its associated risk.

Exhibit 14-34

Mr. Steve Crowley                                                      March 17, 2023
Re: Hillman v Toro                                                            Page 35

In 1987, the CPSC indicated in its FY 1987 Priority Project for Riding Mowers, Status as of December 31, 1986, that the review of the death certificates for 1983, 1984 and 1985 resulted in an estimate of 100 deaths occurring each of those years and in 1985 ride-on mowers were involved in an estimated 20,300 emergency room treated injuries and 50,000 medically treated injuries. The major hazards associated with riding mowers and garden tractors were blade contact and mower instability. It further noted the rate of hospitalization for riding mower injuries was almost twice the average rate for all other injuries reported on the CPSC National Electronic Injury Surveillance System (NEISS). The NEISS system is based on actual injuries repeated at certain hospitals across the country from which the CPSC calculates injuries on a national basis.

In 1988 the CPSC released another study of riding mower accidents. This study "Hazard Analysis on Ride-On Mowers" indicated the highest percentage (14%) of persons (estimated at 1800 people) treated in the ERs were from stability accidents. In 80% of those cases the operator fell off, or were thrown off, or jumped off. Half of those were hit by the mower or pinned by the mower on some parts of their bodies as they fell with it. Tipping occurred on level ground as well as slopes. Numerous common roll-over scenarios were described including flat ground roll-over, obstructions hidden in grass; operators hit in face by tree limbs. It was found that the tipping and sliding accidents occurred on slopes from 5 to 25 degrees with more than 2/3 on slopes ranging from 12 to 19 degrees. Slope was found not to be the only factor. Other factors were turns, damp or wet grass, depressions, bumps, terrain transitions and edges of roads and driveways inability to stop on slopes and sudden traction. Three (3) % of accidents were from the runover/backover hazard.

It was indicated that in 85% of the stability accidents that the machine tipped over and in the remainder the mower slid. However, it was also found that 25% of the riding mowers slipped and then tipped. It was found in about 1/2 of the death reports reviewed the operators were pinned under the tipped mower after tipping/sliding and bank/wall accidents. The average annual estimate of deaths related to ride-on mowers was 75. Over 1/2 of the victims died from injuries to the head or chest.

In 1992, the CPSC staff noted in that at least 42% of riding mowers owned by consumers were used to mow slopes of 15° or more, and 19% were used to mow slopes of 20° or more. Additionally, 43% of such consumer–owned riding mowers were being used to mow areas of grass bordered by steep drop offs.

In 1993, a ride on mower hazard analysis, "Deaths Related to Ride-on Mowers 1987-1990", U.S. Consumer Product Safety Commission, J. Annette David, Sept. 1993, showed that the primary hazard associated with these riding mowers was the loss of stability. It was indicated that between January 1987 and December 1990 that there were 362 deaths associated with power ride-on mowers. Of the 362 deaths, 213 (59%) were identified as involving tip-over. Using a capture/recapture method they estimated that an average of 150 deaths occurred each year from 1987 to 1990. They indicated that 60 of these deaths resulted from ride-on mowers (riding mowers, lawn tractors and lawn and garden tractors.) The remaining 90 deaths were on tractors that were not specified but which were not farm or industrial tractors. The report indicates that

Exhibit 14-35