# EXHIBIT E

```
1              IN THE UNITED STATES DISTRICT COURT
2            FOR THE CENTRAL DISTRICT OF ILLINOIS
3                      ROCK ISLAND DIVISION
4
5
6    REBEKAH HILLMAN, individually
7    and as next friend of P.J.H, a
8    minor; AND JENNIFER HILLMAN,         No.
9                    Plaintiffs,          4:21-CV-04081-
10   vs.                                  SLD-JEH
11   THE TORO COMPANY, a
12   Corporation,
13                    Defendant.
14
15
16
17        REMOTE VIDEOTAPED DEPOSITION OF TOM BERRY, a
18   Witness, taken on behalf of the Defendant, pursuant
19   to the Code of Civil Procedure before Rachelle Smith,
20   CSR. No. 0864 on the 11th day of July, 2023, with all
21   parties, including the witness, appearing via mobile
22   videoconference.
23
24
25
```



```
 1                      APPEARANCES

 2

 3    APPEARING FOR THE PLAINTIFFS VIA MOBILE
      VIDEOCONFERENCE:
 4
              Mr. Steven J. Crowley
 5            Mr. Andrew Mahoney
              Crowley & Prill
 6            3012 Division Street
              Burlington, Iowa  52601
 7            319-753-1330
              scrowley@cbp-lawyers.com
 8
      and
 9
              Mr. Jason M. Schiffman
10            Schiffman Firm, LLC
              1300 Fifth Avenue
11            Pittsburgh, Pennsylvania  15219
              412-288-9444
12            Jason@schiffmanfirm.com

13
      APPEARING FOR THE DEFENDANTS VIA MOBILE
14    VIDEOCONFERENCE:

15            Mr. Kirk T. Florence
              Kilpatrick Townsend & Stockton, LLP
16            2001 Ross Avenue
              Suite 4400
17            Dallas, Texas  75201
              214-922-7139
18            kflorence@kilpatricktownsend.com

19

20    VIDEOGRAPHER VIA MOBILE VIDEOCONFERENCE:

21            Ms. Sofia Johnson

22

23

24

25
```



```
 1        A.    It's a sole proprietorship, Thomas A.
 2   Berry, PE.  I do have one error.  In my report I
 3   noticed yesterday I have an error that I carried
 4   through the report.  I have it as, in the report, as
 5   a Toro SS 5500 and it should actually be Toro SS 5000
 6   in all places.
 7        Q.    I was going to ask you about that.
 8   Thank you for that clarification.  Mr. Berry, in what
 9   capacity are you appearing as a witness in this
10   lawsuit?
11        A.    Consulting mechanical engineer with
12   expertise in the machine safety and ROPS and
13   designing ROPS and ZTR mowers.
14        Q.    You are not a medical expert, correct?
15        A.    I am not.
16        Q.    Or a marketing expert?
17        A.    I am not a marketing expert, no.
18        Q.    Are you an accident reconstruction
19   expert?
20        A.    It depends on the accident
21   reconstruction, I wasn't asked to do that in this
22   matter.
23        Q.    Are you a warnings expert?
24        A.    Warnings, yes.  I have designed
25   warnings.
```



```
 1         Q.     Have you done that in this matter?
 2         A.     No.  And I should say the warnings is
 3   with respect to machine designs.  I am not a
 4   specialist in warnings.
 5         Q.     Okay.  Thank you for that
 6   clarification.  Are you a human factors expert?
 7         A.     With respect to machine design, yes.
 8         Q.     What training or experience do you
 9   have in human factors that makes you an expert in
10   human factors?
11         A.     The training I have had is one of my
12   education, human factors was covered as part of
13   machine design at Wichita State University.  And then
14   it continued under my work at Advance Technology,
15   including taking short courses through the American
16   Society of Agriculture of Engineers.  They have a
17   book that you go through with respect to human
18   factors.  And I did a lot of research with respect to
19   human factors over the years collecting materials at
20   Wichita State University and other libraries,
21   reference materials.  And I have books that cover
22   human factors in my machine design work.
23         Q.     Are you presenting yourself as a human
24   factor expert in this case?
25         A.     Depends on what I am asked.  You can't
```



```
 1        A.    Yes.
 2        Q.    How high is that retaining wall?
 3        A.    Three to six feet, as I recall.
 4        Q.    And did the mower actually roll all
 5   the way over before it impacted Rebekah Hillman?
 6        A.    No.
 7        Q.    So when it impacted her what is your
 8   understanding of the position of the mower?
 9        A.    My understanding is the mower came
10   down and this is an example basically where it went
11   over the edge and landed on its front end.  So it
12   landed like this (indicating).
13        Q.    And what part of the mower impacted
14   Rebekah Hillman?
15        A.    My understanding is the front end of
16   the mower.  The foot rest deck where the caster
17   wheels are at the front.
18        Q.    And after that impact then then it
19   actually rolled over after that and ended upside
20   down, is that your understanding?
21        A.    Yes.
22        Q.    Of the cases that you have looked at
23   in the past, how many of them have been a frontward
24   roll off of a drop off?
25        A.    That Woods mower, that's the way it
```



1  went off.  I don't recall, there was a Scag, older
2  Scag mower that went off in to a lake.  I think it
3  landed on the front and then over on to its side, but
4  it pinned the operator underneath the water and he
5  ended up with a really bad brain injury.  So there
6  are two that went that way.
7           Q.     That's the least likely way for it to
8  happen is forward?
9           A.     Usually with zero turns it, the ones I
10 have seen it's been lateral or rearward.
11          Q.     Or what?
12          A.     Lateral or rearward.  Where they, and
13 it's lateral, that goes over, the front goes over the
14 edge.  There's been a lot of those, but usually ends
15 up on its side or upside down.
16          Q.     And you have done tilt table testing
17 of zero radius mowers; is that correct?
18          A.     Yes.
19          Q.     So you know from that it's a lot
20 harder to get it to make a forward rollover it takes
21 a much higher angle, right?
22          A.     It should be 60 degrees with this
23 mower to get to the tip point, if you can get it
24 there.
25          Q.     And for a rearward rollover what



```
 1   all, but, no.
 2           Q.      Have you ever taken any effort to
 3   determine incident rate for accidents like this one?
 4           A.      No.
 5           Q.      On the Timecutter incident that you
 6   are aware of, I don't think you said this, I
 7   apologize if you did, but did any of those involve a
 8   head first roll off of an embankment or retainer
 9   wall, some kind of shear drop off?
10           A.      The accidents that I have
11   investigated?
12           Q.      Right.
13           A.      No.
14           Q.      And even setting aside what you
15   investigated, are you aware of others where this
16   happened with a Timecutter?
17           A.      I haven't really looked for it, so,
18   no, I am not aware of others.
19           Q.      What testing have you done in this
20   case?
21           A.      Most of it involves testing of the
22   park lock feature that's on the mower to see if it
23   still holds on a slope.  And it does, engage on a
24   slope, if it's rolling.  I weighed the machine at
25   zero degrees and 30 degrees to try to get some
```



```
 1   misquotes the record.
 2           A.      I don't know what their finances were,
 3   what they were looking for.  This mower, if it met
 4   their needs, and it doesn't need ROPS then they
 5   purchased this one; but, yes, they could have gotten
 6   a mower with ROPS.  They existed in 2013.  They were
 7   more expensive.  But, yes.
 8           Q.      But readily available on the market?
 9           A.      You could buy one, I just said that.
10           Q.      Do you know when the Hillmans began
11   mowing the turf area up above the retainer wall where
12   the accident happened?
13           A.      No.
14           Q.      Do you know if they were planning to
15   do that at the time they bought the Timecutter?
16           A.      I don't recall that discussion at all.
17           Q.      Do you perform any type of analysis of
18   the outcome of this accident involving Rebekah
19   Hillman if the mower had the ROPS that you have
20   proposed in your report should have been on the
21   mower?
22           A.      The outcome?
23           Q.      Right.
24           A.      I have looked at it and looked at the
25   design of the ROPS and the ROPS would have stopped
```



1   the mower when the ROPS hit the ground.
2          Q.     Have you taken that a step further to
3   determine whether it would have changed, whether or
4   not it would have completely protected Rebekah
5   Hillman from any type of impact on the ground under
6   any circumstances?
7          A.     I haven't been asked to do that.  I
8   have considered it would be a dual impact situation.
9   The front end hits and tips over on top of the ROPS.
10  The ROPS doesn't prevent contact with the ground, so
11  there could have been some contact, she could have
12  had bruises to her arms, to her head.
13         Q.     Could have had contact with her head
14  with the ground, correct?
15         A.     Yeah, but you put your hands out
16  usually to protect yourself.  The CG only would drop
17  if you are in this position, it only drops about a
18  foot.  So it's only like a one foot drop.  The big
19  drop is when it landed on the front end on to her
20  legs and tips back on the top.  You know, it went
21  from a stopped position there and then boom over on
22  to a stop.  And there would have been, you know, in
23  all sum energy, but that's only a one-foot drop.
24         Q.     And it is my understanding, is there
25  anything in your report or in your analysis that you



```
 1   have done, that shows what injuries, if any, she
 2   would have sustained if there would have been a ROPS,
 3   like you advocate for in your report?
 4              MR. CROWLEY:  Objection.
 5         A.   I haven't been asked to do that
 6   analysis.  I am giving my experience that ROPS
 7   provides, and the whole point of the ROPS is to
 8   provide a crush protection for the occupant.  And Mr.
 9   Kenneth, I believe, is addressing those issues on the
10   injuries.
11         Q.   So that's not in your area for this
12   case?
13         A.   I haven't been asked to do that.
14         Q.   You haven't done it, right?
15         A.   Well, only to the extent of what I
16   have described with respect to the drop of the CG and
17   I wouldn't have expected a major impact to the on top
18   of the ROPS so it would provide a good protective
19   area.  If it dropped 6-foot straight down like this,
20   that's a different story than hitting and tipping
21   over on to the top of the ROPS.  But I would have
22   expected a protected zone for her.
23         Q.   Have you done any calculations to
24   confirm your expectation?
25         A.   No, I looked at the test data from
```



1  custom products and fully expect this ROPS to have
2  held up.
3       Q.    You haven't done an analysis, or any
4  testing or calculations, that would show exactly what
5  would show if the ROPS had been on the mower?
6       A.    I haven't done that, no.  I mean, I
7  know what would happen if it landed, we know it
8  landed on the front end, it tipped over upside down.
9  The ROPS would have prevented that and provide a
10 protective area.  That's what I was asked to look at.
11 And you can provide -- what?
12      Q.    I am sorry, go ahead.  I didn't mean
13 to interrupt you.
14      A.    And that is the part I looked at.  And
15 it wouldn't destroy the ROPS in this accident, it
16 would still provide a crush protective area.
17      Q.    And where are your calculations or
18 your analysis to support that statement that you just
19 made?
20      A.    It's based on experience of rolling
21 these mowers over.  And other machines over.  The
22 ROPS holds up very well.  Typically in a -- we
23 actually have rolled machines over, you don't even
24 see permanent inflexion of a ROPS when you do actual
25 rollovers as opposed to the ROPS test, which is much



```
 1   more severe than any rollover I have seen.
 2           Q.      Have you done any analysis of whether
 3   Rebekah Hillman would have come in contact with the
 4   ground even if the ROPS held up?
 5           A.      Well, as I indicated, I suspected
 6   there would have been contact with the ground,
 7   especially a two post ROPS, that could happen.  The
 8   experience has shown that that hasn't resulted in
 9   severe injuries to people; but that's stated with the
10   machine, that's what I have looked at with respect to
11   ROPS.  I wasn't asked to look at her injuries, she
12   wouldn't have had her legs cut, I am pretty sure of
13   that if she was seat belted in and in her seat if it
14   rolls over.
15           Q.      Did you look at if there might have
16   been other injuries?
17           A.      I wasn't asked to look at that, but
18   other than, I have, since we were looking at the type
19   of drop of a CG there wasn't going to be much speed
20   to cause that injury.
21           Q.      Where are those calculations that you
22   are referring to?
23           A.      That is an estimate based on where I
24   expect the CG to be and how far it drops when it tips
25   over to the top of the ROPS.
```



```
 1        Q.    But you haven't done any calculations
 2   or testing on that?
 3        A.    I have not.
 4        Q.    You haven't done any simulations to
 5   support that?
 6        A.    I haven't seen the need for it.  You
 7   know where the CG is, it could be eight inches that
 8   it drops, it could be a foot that it drops.  I
 9   haven't calculated that.
10        Q.    Have you done any simulation where
11   there was a head first roll with the type of this
12   incident involved?
13        A.    Head first roll?  Well, I consider,
14   like I talked about, I considered that landed on its
15   front, that was the impact first.  And then it went
16   over to its top.  So I considered that, yes.
17        Q.    Did you do any testing of that?
18        A.    No.
19        Q.    Did you do any simulations to that?
20   In other words, did you roll this mower over in that
21   same fashion?
22        A.    No.
23        Q.    Is a ROPS hundred percent effective in
24   eliminating injury to an operator in the event of a
25   rollover or overturn of a mower?
```



1    get stopped.  I have tested lawn tractors that have a
2    similar size brake.  I think Toro LX475 you would put
3    it on there, it works, you can apply it as an
4    emergency brake and it just has one brake disc.
5           Q.     But my question is, have you done it
6    for the Toro Timecutter model at issue under similar
7    circumstances such as the slope and the speed of the
8    mower in this accident?
9           A.     I have not put it on a Toro
10   Timecutter, but it can be put on.  In fact, it's
11   shown in the Hydro-Gear manual and I would expect
12   that to work just as well as it does on the Toro lawn
13   tractors.
14          Q.     That's just your expectation, but not
15   based on any testing or data, correct?
16          A.     The testing of Toro lawn tractors, the
17   brake worked pretty well.
18          Q.     You haven't done it on the Timecutter
19   you just said that, right?
20          A.     I have not done it on a Timecutter.
21          Q.     Have you done any analysis whether
22   there would be any hazards associated with adding an
23   emergency brake of the type that you are suggesting?
24          A.     Well, I considered whether it would be
25   hazards, and I can't think of one.  The advantages is



```
 1    outcome of Rebekah Hillman's accident?
 2            A.      No.  From what I understood, no.
 3            Q.      I know that in your report you made
 4    reference to an inclinometer, are you saying that
 5    that's not really relevant to this case?
 6            A.      I don't think, I don't see the
 7    causation part of that with respect to, it should
 8    have one, but I don't see how it would have prevented
 9    it.
10            Q.      Why did you include it in your report?
11            A.      It's opinions that I have developed
12    over the years and this involved a slope, but it
13    wouldn't be a slope of what Toro expected, I don't
14    know that an inclinometer would make a difference.
15            Q.      So it is in your standard report, but
16    it doesn't really apply to the facts of this case, is
17    that what you are saying?
18            A.      Correct.  It's an opinion that I have
19    developed with respect to mowers.  I put it in there
20    because of that.
21            Q.      I am just trying to make sure I
22    understand.  I think we are agreeing it's not really
23    relevant to the facts of this case, is that an
24    accurate statement?
25            A.      Yes.  I don't plan on talking about
```



1  it, if this goes to trial.
2          Q.    What, if any, opinions do you have in
3  this case relative to the warnings, instructions for
4  the Toro Timecutter mower at issue here?
5          A.    Well, the information about the
6  release pins was not provided.  With respect to the
7  loss of braking and ability to stop the machine with
8  them in.  The information with respect to the park
9  lock was not provided to tell people that, hey, this
10 machine, these can't be counted on to stop your
11 machine if you are, if it starts free rolling down
12 the slope uncontrolled.  And that's the information
13 that the operator person needs to know.
14         Q.    Any others?
15         A.    Those are the two that I can think of
16 with respect to that loss of control issue.
17         Q.    I think we discussed this earlier,
18 that Jennifer and Rebekah both knew that there
19 wouldn't be any braking when the hydrostatic motors
20 were disengaged, correct?
21              MR. CROWLEY:  Objection, asked and
22 answered, misstates the record.
23         A.    I don't recall that discussion.  They
24 didn't realize that the machine wouldn't stop if you
25 just put the handle out.  I know in their discussion



1  here, they indicated they were very, Rebekah
2  indicates she was very surprised that, hey, I put
3  them out and it is not stopping, what's going on.
4  And they were confused about it and they went out to
5  do testing later to see why this thing didn't stop,
6  why.  And so they didn't have that understanding of
7  the limitations of the park lock.  And I think Toro
8  has a user guide for the Timecutters that came out in
9  2002 where they say don't ever engage the park locks
10 with it in motion.  So that wasn't even in the
11 manual.  That was in some secondary manual.
12        Q.    Have you prepared any warnings that
13 you think should have been provided to address these
14 issues that you just stated?
15        A.    No, I haven't.  I could, but, you
16 know, there are warnings that are provided by
17 Hydro-Gear, in their manual, but those would be more
18 applicable to Toro than to the end user to know that
19 you need a brake on these things.
20        Q.    Are you planning to prepare any
21 warnings that you think should have been provided?
22        A.    I would if asked, but I am not
23 planning on it, no.
24        Q.    Have you published any papers about
25 zero radius turn mowers?



C E R T I F I C A T E

   I, Rachelle Smith, a Certified Court Reporter, do hereby certify:

   That prior to being examined the witness was by me duly sworn;

   That said deposition was taken down by me in shorthand at the time and place hereinbefore stated and was thereafter reduced to writing under my direction;

   That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

   The original transcript is in the custody of:

   Mr. Kirk T. Florence
   Kilpatrick Townsend & Stockton, LLP
   2001 Ross Avenue
   Suite 4400
   Dallas, Texas  75201

   WITNESS my hand and seal this 11th day of July, 2023.



_____
   Rachelle Smith
   CSR No. 0864

REBEKAH HILLMAN, individually and as next friend of P.J.H, a minor; AND JENNIFER HILLMAN vs. THE TORO COMPANY, a Corporation