# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, ROCK ISLAND DIVISION

| | |
|---|---|
| REBEKAH HILLMAN, individually and as next friend of P.J.H., a minor; AND JENNIFER HILLMAN<br><br>                    Plaintiffs,<br><br>v.<br><br>THE TORO COMPANY, a Corporation,<br><br>                    Defendant. | No. 4:21-cv-04081-SLD-JEH |

## PLAINTIFFS' RESISTANCE TO DEFENDANT THE TORO COMPANY'S MOTION IN *LIMINE* TO EXCLUDE THOMAS BERRY (Dkt.156)

### (ORAL ARGUMENT REQUESTED)

### I.    SUMMARY OF RESISTANCE AND RELIEF REQUESTED

Plaintiffs resist Toro's Motion to Exclude Thomas Berry for all grounds alleged in the Motion, in support of which they state:

1.  Toro's Motion (Dkt.156) is not simply a Motion to Exclude Expert Testimony under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals. Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 469 (1993). In clear violation of the Scheduling Orders of this Court, Toro has filed three Motions, including:

    a.  A Motion to Exclude all testimony from mechanical engineer Thomas Berry;

    b.  A Motion under Fed. R. Civ. P. 37, asking for exclusion of rebuttal evidence due to alleged, untimely disclosure of testing and measurements of the accident mower; and,

    c.  A Rule 37 Motion, asking for sanctions, due to alleged spoliation of evidence.

2.  Plaintiffs resist all three Motions, and ask that the Motions described in subparagraphs b and c, above, be DENIED, as having no factual merit, and as being in violation of Magistrate Judge Hawley's Standing Order, with respect discovery disputes. Additionally, the Motions should be

dismissed summarily as untimely, as the record is undisputed that Toro intentionally violated the Court's Scheduling Orders by waiting to file both Motions until after the close of discovery, and after the dispositive motion deadline, with full knowledge of the grounds for both, well before the deadlines ran. Furthermore, at no time prior to filing these Motions did Toro attempt to "meet and confer" with Plaintiffs' counsel regarding the alleged spoliation or the alleged, "untimely" disclosure of the rebuttal evidence. Toro never asked for an informal discovery conference from the Court, as required by Magistrate Judge Hawley's Standing Order.

3.   With respect to the *Daubert* Motion, Thomas Berry is the most qualified expert identified in this litigation to discuss mower design and the lack of mower safety features (lack of effective warnings, lack of brake and lack of ROPS) which make the Toro Timecutter unreasonably dangerous and the result of institutional negligence on the part of Toro. (**Exhibit A**, Thomas Berry Report, dated March 17, 2023, and **Exhibit B**, Thomas Berry CV)

4.   With respect to the *Daubert* Motion, Thomas Berry applied long accepted and well recognized principles of failure mode analyses, hazard analysis recognized by the National Safety Council, ANSI, and the American Society of Mechanical Engineers in forming his opinions and conclusions. (**Exhibit A**, p.3 through p.31, inclusive.)

5.   With respect to the *Daubert* Motion, Thomas Berry applied the facts of the design and equipment of the 2013 Timecutter mower, the injury history of ZRT mowers and the Timecutter in particular, Toro's conduct over the years, his extensive experience and training in the ZRT mower industry, the facts of Rebekah's accident, and the design of ROPS to the appropriate scientific and engineering method to form his opinions, and his testimony will assist the trier of fact in deciding key issues of fact in this case. (**Exhibit A**, p.3 through p.31, inclusive)

6.   With respect to the *Daubert* Motion, Toro's Motion to Exclude all of Mr. Berry's testimony is little more than a shotgun approach consisting of a disparate collection of unsupported conclusory statements that are often untrue, criticisms that often have no relevance, and/or confusing assertions that are not appropriate reasons for exclusion under *Daubert*.

7.   With respect to the Rule 37 request for discovery sanctions alleging "untimely opinions", Toro's Motion is fatally defective as it relates to Mr. Berry's alleged, "untimely opinions" because the evidence disclosed before the close of discovery was not untimely as it related solely to rebuttal and impeachment evidence first disclosed on July 20, 2023, by defense expert, Enrique Bonugli, and was timely disclosed and produced within thirty days as allowed by Fed. R. Civ. P. 26(2)(D)(ii).

8.   With respect to Toro's claims of untimely disclosure, Toro's Motion is fatally defective as it contains material misstatements of fact and mischaracterizes the record. For example, the deadline to complete expert depositions was <u>not August 1, 2023, but August 18, 2023</u>, based on the Joint Motion filed with the Court by both parties (Dkt.100), which was granted by text order dated July 27, 2023. (Compare with Dkt.156, Section II, p.3) (Emphasis mine) Toro failed to mention that Plaintiffs agreed to allow Toro to depose Mr. Berry for a supplemental deposition concerning the rebuttal evidence (slope testing and measurement of rolling resistance) on August 16, 2023, four days before the deadline for expert depositions. (August 18, 2023)

9.   Conspicuously absent from Toro's Motion, is any mention of these facts:

a.   Without doing any testing of any Toro ZRT, including a Timecutter mower, and with no data from Toro regarding the rolling resistance of the Timecutter mowers, on July 20, 2023, Bonugli first disclosed that he intended to testify to his opinion that, during the accident sequence, the ZRT sat on a 9.5-degree slope, facing downhill, with the hydrostatic motors disconnected, without rolling one inch, and it required a push from some "outside motive force" to get the mower rolling down the hill. This opinion was based only on his theoretical calculation of the rolling resistance of the mower (which was not explained in the Rule 26 report) and was outside the bounds of engineering

credibility. Measuring the mower's rolling resistance with actual equipment, and the slope demonstration/test, was done to directly contradict and rebut Bonugli's theoretical rolling resistance value/behavior for the Timecutter mower. (**Exhibit C-2**, Excerpts of Bonugli Depo, p.123, L.10 – p.124, L.17)

b. Bonugli admitted that his whole theory of the "mysterious, outside motive force" depended upon his mathematical assumption that the rolling resistance of the accident mower was .165 or greater, a value that was extraordinarily and unrealistically high to say the least. (**Exhibit C-2**, p.123, L.10 – p.124, L.17)

c. After Bonugli's deposition, and after the timely rebuttal report of David Bilek (**Exhibit D**, Bilek Rebuttal Report, dated July 3, 2023) questioning Bonugli's calculation of the rolling resistance of the accident mower, Mr. Berry conducted two reliable and simple tests/measurements of the accident mower's demonstrated rolling resistance to rebut Bonugli's rolling resistance opinion.  Plaintiffs were not even required to disclose this evidence under Fed. R. Civ. P. 26(2)(D)(ii), as the evidence is "solely intended to contradict or rebut evidence on the same subject matter identified by Toro under Rule 26(a)(B) or (C)". (Emphasis mine) Furthermore, even if the Court finds the rebuttal/impeachment evidence should be disclosed, Plaintiffs timely disclosed it and even provided Toro with an opportunity to depose Mr. Berry (before August 18, 2023) concerning the slope testing and the rolling resistance measurements, in conformity with Fed. R. Civ. P. 26(2)(D) – within 30 days of Bonugli's specific disclosure.

10. Toro's attempt to distinguish the Hillman accident by asserting it was not a "rollover" (and therefore, Thomas Berry's testimony about braking and ROPS is irrelevant, unreliable and inadmissible), is completely contrary to decades of engineering safety experience, in which the entire mower industry (including Toro) admits that ROPS are highly effective at protecting operators from harm **regardless of the direction of the tip or roll or fall**. In fact, Toro's own Corporate ROPS Guideline admits that ROPS are affective at preventing injury, when if a ZRT **turns over in any direction**. (Emphasis mine)

11. Plaintiffs preserved the precise shape and slope of the area where the mower rolled down and over the retaining wall, in a digital survey provided to Toro, at no cost, along with hundreds of pictures of the site which were part of the raw data that Mr. Bonugli could, and did, use to model the accident site. Toro accepted the survey and their expert used it without complaint.

12. Toro never disclosed any problems reconstructing the accident path with Mr. Bilek's survey data, and never disclosed or even alleged any disadvantage or prejudice until after the discovery deadline. Toro failed to request any "meet and confer" conference with Plaintiffs' attorneys regarding any alleged spoliation issues or proposed resolutions. Finally, Toro made no Motion or effort to prove up its claims of spoliation before the close of discovery and so, the issue is precluded.

## II.     CORRECTED RECORD OF TORO'S "FACTUAL BACKGROUND"

### A.  No "plunging over a six-foot retaining wall" and absolutely no "somersault" according to both reconstruction experts.

1.   While it is true that lawyers have a duty to "vigorously represent their clients", that mission is also tempered by the duty to avoid misrepresentations of fact and law to the Court. TTC makes a number of outright, false allegations and arguments in the opening salvo of its Motion against Mr. Berry and the plaintiffs, alleging 1) the Hillman accident was not a rollover so Berry cannot testify, 2) Berry's rebuttal testing was untimely and would be excluded under Rule 37, and 3) alleging Plaintiffs are guilty of spoliation of evidence because they had the accident hill graded after they documented its original shape and slope by digital survey. All of the bases Toro argues for the exclusion of Mr. Berry's testimony are false and without merit.

2.   The accident mower did not plunge over a six-foot retaining wall and do a "somersault"[1] in mid-air, as stated by TTC. (Dkt.156, p.1 – p.2).  Rather, both accident reconstruction experts (Bilek, Plaintiffs' expert, and Bonugli, defense expert) describe this event in a 2-stage scenario, the first, where the front of the mower simply pitches downward as it goes over the wall, hits the ground (and Plaintiffs' legs) at approximately 90 degrees downward, and second, pitches forward,

---

[1] A somersault is defined as an acrobatic movement in which a person turns head over heels in the air or on the ground and lands or finishes back on their feet.

after landing, literally just tips over on the control handles. (**Exhibit E**, Bilek Initial Report, dated March 17, 2023, p.8 – p.10 and **Exhibit F**, Bonugli Report, dated May 8, 2023, p.21 – p.22)

3.   Plaintiffs did not "intentionally disable" the mower. (Dkt.156, p.2) Toro built and sold Plaintiffs a ZRT mower that **required** complete and total disconnection of the hydrostatic motors for towing (**Exhibit G**, Operator's Manual, p.24 – p.25) because of **Toro's unsafe design, failure to instruct and failure to warn.** It is undisputed that Toro:

   a.   Refused to include the Hydro-Gear[2] warning that all control and stopping ability was bypassed once the bypass levers were used. (**Exhibit H**, Hydro-Gear Manual, p.4)

   b.   Failed to provide any instructions, suggestions, or warnings to owners on how to safely tow the mower if it got stuck or broke down (**Exhibit G**, generally).

   c.   Told owners they should engage the bypass pins to "push" the mower with absolutely no warning about the fact that a) the bypass pins removed all ability to control or stop the mower using the control handles, and b) **warning that forgetting to reengage the motors after towing or on any slope could lead to a loss of control, or runaway mower resulting in damage to the machine as well as serious injury.** (emphasis mine)

   d.   Failed to employ such common precautions as an interlock, or even a warning light on the instrument panel that the hydrostatic motors were disconnected and the brake should not be released unless the mower was on level ground or secured in place with blocks.

   e.   Had actual knowledge when they built the accident mower, that users of its ZRTs would have to tow their machines if they broke down or got stuck because they called the bypass pins "tow pins" in the Owner's Manual, but gave no instructions for safe towing. (**Exhibit G**, p.48)

4.   Neither reconstruction expert, nor any lay eyewitness, has ever suggested, much less testified under oath, that the accident mower rotated 360 degrees in mid-air or did a somersault.

**B.   Defense counsel's attempt to distinguish a ZRT ROPS intent and ability to mitigate or prevent injury during a rollover in the roll axis, as opposed to a "tip over" in either the roll or pitch axis is contrary to accepted occupant protection research and understanding, unsupported, and intentionally misleading. (Dkt.156, p. 2)**

---

[2] Hydro-Gear was the manufacturer of the hydrostatic motors that drove the thousands of Timecutters and other model ZRTs. Hydro-Gear's product manual warned that all control and stopping ability was lost when the bypass pins were used for towing. Toro did not pass that information on to Plaintiffs. (**Exhibit H**, p.4)

5. When any engineer discusses machine motion, they refer to three axes of motion, whether they are talking about a car, an airplane, a boat, **or a Toro lawnmower**. They are: a) the pitch axis (nose down or nose up); b) the roll axis (turning about the roll axis with one side up or downward) and finally, c) the yaw axis (side to side motion around the yaw axis).



**Figure 1 – Yaw, Pitch and Roll Diagram from Vehicle
Dynamics Engineering Site**

6. It is undisputed that, regardless of how or in what direction a ZRT mower turns upside down in any type of accident (as the Hillman mower did) in the roll direction, or the pitch direction (as the accident mower did), the transfer of impact forces, including the weight of the mower onto the operator, is considered a very serious hazard which can lead to catastrophic injuries and even death. (**Exhibit A**, p.9 – p.10 – "Hazard/Risk Due to Rollover")

7. TTC's lawyers spend the better part of page 2, of their Motion against Mr. Berry's testimony (Dkt.156), trying to make a distinction without a difference. Whether a mower turns over in one direction or another, rollover, or pitch over, for whatever reason, tipping, sliding into pond or off a raised surface, the purpose of the ROPS is the same, to prevent the machine's weight from crushing the operator by a) providing a "protective zone" via the ROPS structure which keeps the machines full weight from falling on the operator, and b) keeping the operator in the protective

zone via a seatbelt. (**Exhibit A**, p.13 – p.19) When discussing ROPS, authors often use "rollover" and "tip over" and "overturn" interchangeably in discussions of a ROPS' effectiveness because, (surprise!) a well-designed ROPS protects the operator no matter how the mower gets upside down. (**Exhibit A**, *id*.)  Berry quotes Toro's evaluation of ROPS in 2005 at the top of page 16, in which Toro simply uses the term "overturns" (regardless of direction of rotation). (**Exhibit A**, p.16)

8.   Here is what Toro says about the importance and effectiveness of ROPS during tip overs, rollovers, or even a fall:

> *"**Accidental machine upset (tipping or rolling) in any direction can cause severe injury or death to the operator.** This policy establishes the criteria under which Toro products will be offered for sale to minimize the frequency and severity of such an incident."* (Emphasis mine)

(Dkt.161, p.3, para.71)

9.   So, trying to exclude Mr. Berry's ROPS opinions and testimony by saying Rebekah Hillman was not in a rollover, but a tip over (or worse, a non-existent somersault), demonstrates either a significant lack of technical understanding of the subject matter of this case or a disingenuous attempt to mislead the Court. It is not zealous advocacy, it is misrepresentation. The most likely conclusion is obviously up to the Court.

**C.  Toro's accusations and claims of spoliation are unsupported, completely unfounded and Toro cannot prove any damage or prejudice whatsoever by any of Plaintiffs' actions in connection with this case.**

10.  The loss of control incident which injured Rebekah Hillman and her family occurred on their property on June 18, 2020. While Plaintiffs and their counsel were engaged in appropriate due diligence and investigating whether or not they had a viable products liability case against Toro, the Hillmans and their minor daughter relived that terrible day every time they looked at the hill where it happened. Jennifer's Answer to Supplemental Interrogatory No. 10 is as follows:

a. As I said in my previous interrogatory answer, whenever the three of us looked at the spot where the mower went out of control and Rebeka lost her leg, we were all reminded of that terrible day and what happened.  It seemed like every time Payton would go out on the deck and look at the wall, she would cry.  The whole scene just reminded me of how she laid there screaming in pain and how terrified my daughter and I were seeing someone we loved so horribly injured.  Rebekah is a strong woman and the front of the mower smashed her legs so badly one was barely holding on by a thin amount of flesh when I got the mower off of her.

b. My best memory is that the work on the hill started during the week after Mr. Bilek did the digital survey of the hill as it was on the date of the injury which I understand my attorneys gave you long ago.  This started with conversations by Karl Drapaux, Rebekah's union rep and Ann Walsh of Walsh, the company Rebekah was working for at the time.  These folks really thought the world of Rebekah and wanted to know if there was anything they could do for us.  I made the remark something like "Well, you could take the hill down."  So, to my surprise they offered to do it. I paid a contractor $200 to cut the trees down. It was painful to look at that scene we all wanted it changed for Payton's mental health and our terrible memories of that scene.    Then, Karl and the union guys brought a bulldozer and other equipment to our property.  I cannot remember the date the work was actually done.  I do not think we were home, but in an afternoon, they bulldozed the hill down and removed the trees. I think the name of the dozer operator was Ryan.  We had no plans, contract, or blueprints—only my request that they flatten that hill.  These friends of ours knew how bad this scene took us back to that awful day and traumatized us, so they volunteered their labor at no cost to us. So, we have no invoices or canceled checks.

c. The hill was dozed off same day it was started.

d. I don't know the names and addresses of everyone who worked on the project that afternoon.

e. There is no documentation such as plans, blueprints, invoices, or contracts.

f. The only thing I recall paying for was the cost of a separate contractor just cutting the trees down before the heavy equipment operators arrived. I cannot find that but I will look further.

11. Mechanical engineer and accident reconstruction expert David J. Bilek was hired (at Plaintiffs' expense) to preserve all relevant details about the part of the south yard where the mower rolled down the hill, by digitally surveying and photographing the area where the incident occurred

(the south yard) on August 5, 2020. (**Exhibit E**, p.3 – p.5) Plaintiffs did not even retain ZRT mower expert Tom Berry until shortly before they filed their suit in May of 2021. (See Dkt.1)

12. In other words, Plaintiffs did everything necessary to preserve the details of the accident area before they had even decided to sue Toro and then, provided all that technical information to Toro after they filed suit, without charge, and ready to build a digital replica of the yard where the accident happened. Both accident reconstruction experts employed Mr. Bilek's digital data to adequately "reconstruct" the slope of the yard where this occurred.

> "*A section of terrain encompassing the approximate path of travel of the Toro mower was created using vertices of the polygons of the model (shown in blue). As viewed from the side in elevation, the relative slope of the yard area is shown to be approximately 9.5º. The photographs and files generated, along with a work flow outline describing the various files, were previously provided to attorneys for the defendants in this case through Drobox on February 10, 2022, and I was informally questioned about this material by them in a conference call.*" (**Exhibit E**, p.4 – p.5)

13. Likewise, Plaintiffs preserved the accident mower in its post-accident condition, and Toro and their experts had all the time they needed to inspect, measure, document, or test the accident mower, if they so desired. (**Exhibit F**, p.17)

14. Contrary to the statements and allegations of spoliation by TTC's counsel, the facts show there was no spoliation or prejudice to Toro whatsoever. The Court should consider:

    a. Toro made no Motion to establish spoliation before the Court in the last two years;

    b. No Toro expert identified any prejudice or inability to testify to their opinions because of Plaintiffs' actions in any reports or deposition testimony; and,

    c. Toro's reconstruction expert, Mr. Bonugli, did a detailed reconstruction of the accident site and the accident itself <u>using Mr. Bilek's digital data</u> and formed very specific opinions, based on Bilek's data and photographs used by Bonugli. (**Exhibit F**, p.22 – p.23, especially Bonugli's elevation profile from Bilek's data on p.23) (emphasis mine)

15. To establish spoliation, a proponent has the burden of proving a) the party accused of spoliation knew or should have known the evidence may be important to possible litigation

someday, b) the litigant accused of spoliation destroyed the evidence with the intent to hide it from the opponent because it was bad for one destroying the evidence, and c) the destruction of the evidence created actual harm or prejudice due to the destruction.

16. The only evidence is that the Hillmans accurately preserved the shape of the slope and relevant characteristics of the accident area by a survey and voluminous photographs, precisely because they knew it might be evidence of importance someday. They turned all data in usable form over to Toro and their experts without even the need for a request for production. So, a) Plaintiffs did not destroy any relevant evidence, b) they did not try to hide anything, and c) in two years of litigation, Toro has not disclosed one scintilla of evidence of damage or prejudice to its defense because of anything the plaintiffs did or failed to do. Toro's claim of spoliation and prejudice are nothing more than counsel's hyperbolic rhetoric.

## III.    LAW AND ARGUMENT

### A.  Principles of Daubert Analysis and the Court's Gatekeeping Function

1.   One of the Seventh Circuit's most recent discussions of the Court's "gatekeeping" process under Fed. R. Evid. 702 and the seminal case of *Daubert v. Merrell Dow Pharmaceuticals. Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 469 (1993), is *Anderson v. Raymond Corporation*, 61 Fed 4th, 505, U.S. Ct. Appls. Seventh Circ. (March 2023).

2.   Ironically, *Anderson, id.* involved a forklift which failed to restrain the female operator who fell out of the forklift when it hit a bump. The forklift ran over the woman's leg, injuring it so seriously that it eventually required amputation. Plaintiffs' expert, Meyer, opinioned that the forklift was negligently designed because it lacked a door to restrain and protect the occupant by keeping her inside the protected zone of the machine. (*id.*, at 507-508) The appeal alleged that the

District Court erred when it excluded Meyer's opinion about the lack of the door as unreliable. *Id.*, at 508. The District Court held:

> "*This Court finds that John Meyer's opinion that Raymond was negligent or that its forklift is dangerously and defectively designed because it does not come standard with a compartment door, especially one that locks or latches, simply does not pass the Daubert test." That is a conclusion—not an analysis—to which we owe no deference.*" *Id.*, at 509

3. The Seventh Circuit reiterated the process by which the District Courts are to approach a challenge to expert testimony under Rule 702 and *Daubert:*

> *Federal Rule of Evidence 702 governs the admissibility of expert testimony. Haley v. Kolbe & Kolbe Millwork Co., 863 F.3d 600, 611 (7th Cir. 2017). Rule 702 provides that a qualified expert witness may offer an opinion if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. See Gopalratnam v. Hewlett-Packard Co., 877 F.3d 771, 779 (7th Cir. 2017) ("[T]he district court must evaluate: (1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony.") (emphasis omitted). Because "much depends upon the particular circumstances of the particular case at issue," the Rule 702 analysis is case-specific. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); see also C.W. ex rel. Wood v. Textron, Inc., 807 F.3d 827, 835 (7th Cir. 2015) ("Ultimately, reliability is determined on a case-by-case basis.").*

4. The Seventh Circuit expressed disapproval of the District Court's one-sentence dismissal of Meyer's "forklift door" opinion as failing the *Daubert* test. *"A court "must provide more than just conclusory statements of admissibility or inadmissibility to show that it adequately performed its gatekeeping function." Gayton v. McCoy, 593 F.3d 610, 616 (7th Cir. 2010); Naeem, 444 F.3d at 607–08. (Id.*, at 508) In the instant case, Toro's Motion to Exclude Mr. Berry under Rule 702 (Dkt.156) relies almost entirely on conclusory statements, outright false assertions of fact and confusing, often conflating, arguments unsupported by any safety engineering authority.

5.   Plaintiffs will qualify all of Thomas Berry's opinions and testimony using the most recent pronouncement by the Seventh Circuit Court of Appeals in *Anderson., id.*

**B.** ***Daubert* Consideration #1. The subject matter of this case is relatively simple and Thomas Berry's testimony will assist the trier of fact understand the evidence to determine a fact in issue. – Was this Toro ZRT negligently designed and/or is it unreasonably dangerous?**

6.   The Court's *Daubert* analysis is case specific, and the *Daubert* analysis should be performed on a case-by-case basis. *Anderson, id.*, at 508*.* This case is about very simple and uncomplicated machines, called zero turn radius lawnmowers. This is not a drug causation case, as *Daubert*. These mowers have one function – to cut grass. They are not supercomputers, rocket guidance systems, or GPS satellite components. They have four wheels, an air-cooled engine, two control handles, non-steerable, castered front wheels, and rotating sharp blades beneath the deck. They are manufactured by dozens of companies, in many different countries. But they have no steering wheel and no suspension (springs or shock absorbers) like a car or truck. They are not meant to operate on highways. ZRTs are designed to operate, always, off-road, in proximity to hazards, such as slopes more than 15 degrees, ponds, trees, planters and retaining walls.

7.   Toro admits their ZRTs are dangerous in the Owner's Manual (**Exhibit G**), as well as their public safety videos and literature. Toro and other manufacturers warn people to slow down and take time to learn how to control the mowers due to their unusual handling characteristics and controls.

8.   These ZRT lawnmowers are operated by humans ranging in age from teenagers to elderly people in their seventies and perhaps older. Operators include people with widely varying experience and training in operating these unique and uniquely dangerous machines. At one end of the spectrum, we have commercial mowing and landscaping people who operate the same

mower 8 hours a day, with the other end being a younger, inexperienced operator who is mowing the family lawn two or three hours a week.

9. Toro's constant attempts to differentiate these machines (by acting as if they are highly complicated and specialized) is simply not supported by the facts. The truth is, that these lawnmowers all have substantially similar hazards and injury-producing mechanisms in common, regardless if they are painted Toro red, John Deere green or Scag Orange.

10. So, this case is about ZRT lawnmowers, how they work, what are the dangers to people inherent in these designs, and how can they be made safer to prevent foreseeable use and misuse.

## C.  Mr. Berry's Qualifications as an Expert

11. Attached as Exhibit B is Thomas Berry's Curriculum Vitae. Mr. Berry is a mechanical engineer with Bachelors Degrees and a Master's Degree in ME from Wichita State University. He graduated Cum Laude from his Bachelors Program and received a 4.0 grade average during his Masters training. He has spent his career on a wide variety of engineering employment and projects with machines of all types. He has extensive experience in lawnmower design and lawnmower safety, including specialized expertise in rollover protection systems (ROPS) on all manner of human operated machine. (**Exhibit B**) He has designed ROPS, machine warnings, and authored or co-authored a number of papers dealing with failure analysis and injury prevention.

12. With respect to this litigation and the subject matter, Mr. Berry authored a 37-page report (**Exhibit A**) with 23 additional pages of references supporting his testimony, including:

   a.  Standards,

   b.  Mower Standards,

   c.  Hydrostatic Drive and Brake Information,

   d.  General ROPS information,

14

e.  ROPS Effectiveness Information,

f.  Mower ROPS Information,

g.  Deere Information,

h.  Stability and Accidents Data and Statistics,

i.  Safety Sign Information,

j.  Manufacturer Responsibility Towards Guarding,

k.  Design Methodology,

l.  Relevant Patents,

m.  Value of Life (from the engineering perspective) and

n.  Seat Belt Information.

13. Since Toro (wisely) has not directly challenged Mr. Berry's engineering qualifications, Plaintiffs will not belabor that issue further. It would be difficult to imagine a mechanical engineer more qualified to testify in this particular case and assist the trier of fact understand the design and feasibility issues Plaintiffs have raised and which Toro has raised in its defense.

**D. *Daubert* Consideration #2. Mr. Berry's Opinions are Based on Sufficient Facts and Data.**

14. In strict conformity with Fed. R. Civ. P. Rule 26, pages 29 through 31 of Exhibit A list in detail Mr. Berry's opinions, the basis for those opinions and the alternative designs he knows would spare Rebekah Hillman from her serious injuries.

15. Pages 1 and 2 of Mr. Berry's report list 51 specific documents or categories of case specific, factual material he reviewed and relied upon in forming his opinions and conclusions.  These include technical information like the Operator's Manual and internal Toro engineering documents, as well as competitors' information and alternative designs. He also has examined the

accident mower and an exemplar Toro ZRT Timecutter of the same vintage and compared these mowers to other machines in the industry.

16. The 23 pages of authorities and information included at the end of Mr. Berry's report provide additional support for his opinions in this case. Based on Thomas Berry's education with a Master degree in mechanical engineering, his many years of experience of failure analysis, and accident reconstruction, the facts he has taken into consideration in this case and the law as expressed in the following quote from *Anderson, id.*, Plaintiffs submit that Thomas Berry is well qualified to provide the expert testimony identified in his report and deposition.

17. Finding that Mr. Meyer should have been allowed to express his opinion about the lack of door on the forklift, that Court said:

> "*We conclude that Meyer's opinion should have been permitted. First, considering his "full range of practical experience as well as academic or technical training ... in a given area[,]" we agree with the district court that Meyer is qualified to offer his opinion. United States v. Parra, 402 F.3d 752, 758 (7th Cir. 2005) (citation omitted). Meyer has extensive training—he received his doctorate in mechanical engineering from MIT—and experience in failure analysis. He has spent most of his professional career investigating machine accidents and performing accident reconstructions. He even has a license to operate a stand-up forklift like that at issue here, albeit not this specific model. Raymond argues that Meyer is unqualified to offer his opinion because he has limited experience with forklifts. That focus is misplaced. An expert's specialization or lack thereof "typically goes to the weight to be placed on [her] opinion, not its admissibility." Hall v. Flannery, 840 F.3d 922, 929 (7th Cir. 2016); Gayton, 593 F.3d at 617 (citation omitted) ("Ordinarily, courts impose no requirement that an expert be a specialist in a given field."). Meyer's extensive familiarity with accident reconstruction and training as a professional engineer qualify him to render opinions on what could have been done to prevent Anderson's injuries.*"

**E.  *Daubert* Considerations #3 and #4. Mr. Berry's testimony is the product of reliable principles and methods, and Berry has reliably applied the principles and methods to the facts of the case.**

18. On page 4 of Toro's Motion (Dkt.156), Toro lists under Section III-GROUNDS FOR EXCLUSION of Berry's testimony as:

1. Mr. Berry's methodology underlying all his opinions is unreliable;

2. Mr. Berry's opinions are not based on facts and data reasonably related to the evidence in this case or the mechanism and nature of this incident; and

3. Mr. Berry's Late Opinion was not timely disclosed.

19. Toro asks the Court to completely bar all of Thomas Berry's testimony, in its entirety, and then spends pages 6 through 18 of their Motion cherry-picking snippets of testimony or conclusions, raising irrelevant points, mischaracterizing Berry's analysis and making unsupported statements that have no basis in fact. (Dkt.156, p. 6 – p.18)

20. Beginning on page 3 of Exhibit A, Mr. Berry begins with the heading **Design Methodology**, and continues through page 31 with his discussion of how and why he applied the principles and methods of risk analysis, sometimes referred to as failure mode and effect analysis, to the Hillman case and the 2013 Toro Timecutter lawnmower to arrive at his opinions. He also explains how he applied those methodology and principles to this litigation. A perfunctory reading of pages 3 through 31 of the report should satisfy any District Court that Berry applied the correct principles faithfully to the facts of this case.

**F.  Response to Toro's Specific Argument Points**

21. **Section V, Subsection A. page 6. (***Mr. Berry uses these unrelated mowers to compare and come to the conclusion that the Subject Mower is defective an unreasonably dangerous……. But Mr. Berry fails to connect these various other mowers and materials to the conclusion that the Subject Mower is defective and Unreasonably dangerous.***)** Throughout the *Daubert* Motion, most, if not all, of Toro's arguments are confusing and often convoluted. So, Plaintiffs will track Mr. Berry's actual analysis and methodology to avoid many of the unsupported twists and turns of Toro's arguments.

22. Beginning at page 3 of Exhibit A, the mechanical engineer explains that he followed a design methodology used by engineers for several decades. He then identifies two hazards in this accident, a) loss of control leading to a rollover event, and b) the rollover itself. (**Exhibit A**, p.4) Berry then goes on to discuss engineering and design evolution concerning **Hazard/Risk Due to Loss of Drive Control** (**Exhibit A**, p.5), including his discussion of various types of brake systems that pre-dated Toro's Timecutter series.

23. Plaintiffs ask the Court to take judicial notice of the obvious hazard pointed out by Mr. Berry, that losing control of a 600 lb. machine with spinning blades underneath it, and which is intended to operate on slopes and hills and around an endless variety of potential hazards and drop-offs or ponds, is a dangerous thing. The hazard attendant to loss of control is obvious. (**Exhibit A**, Appendices, particularly p.47, and section entitled "Stability and Accident Data and Statistics", p.55 – p.58)

24. Berry identifies the primarily loss of control issues presented by Toro's design:

> "*The zero-turn mower is manufactured with hydrostatic motors which propel and entirely control the locomotion, steering and general stopping of the mower. No other feature is provided for the operator to use to stop a moving mower. It is also provided with two controls that allow the hydrostatic drives to be disengaged so that the mower can be moved from a stuck position or rolled without using the drive. Once disengaged there is no brake available to stop the mower.*" (**Exhibit A**, p.5)

25. In other words, despite all the independent braking mechanisms used by other manufacturers, like Deere for decades before the Timecutter came out, Toro went right ahead and designed and built a ZRT prone to loss of control without a brake, if the motors fail or if the tow pins are used to move it.

26. It is undisputed that Toro's design results in loss of control whenever one or more of the hydrostatic motors loses effectiveness, as all control is then lost on that side. The hydrostatic motors can simply break or fail in service, which happens very often according to Toro's warranty

records. By design, Toro built and sold a machine so that both hydrostatic motors must be disconnected for pushing, according to the Timecutter Owner's Manual, through the use of the "bypass pins" or towing pins" at the back and bottom of the machine.

27. Toro tries to convince the Court that Berry's tracking engineering knowledge and technology linked to preventing injury by loss of control is somehow disconnected from the facts of this case based solely on defense expert Daniel Toomey (Dkt.156, p.7).  Plaintiffs are unable to find any case where the Seventh Circuit excluded an expert's testimony because of the opinions or criticisms of an opposing expert hired by a defendant.

28. **The slope and rolling resistance tests. (Dkt.156, p.7)** After reviewing Bonugli's deposition testimony, Mr. Berry conducted two very simple tests in early August 2023 to check the accuracy of Bonugli's opinion of the rolling resistance of the accident mower. This factor is the very heart of Bonugli's primary opinion about the mysterious "outside, motive force" that he claims (contrary to two sworn eyewitnesses) propelled the mower from sitting totally still on a 9.5-degree slope, pointed downhill, with the motors bypassed, and the parking brake disengaged, and Rebekah sitting on the seat.

29. Mr. Berry took the accident mower and, on a concrete surface, measured how much force it required to make the mower roll.[3] The values he found and commented were far below that which Bonugli theorized. Then, he took the accident mower and moved to a sloped grassy surface. After three attempts at lower angles, the mower broke loose and rolled down the hill at 8.05 degrees without any "outside, motive force". Toro's criticism that Berry did not try to use other mowers with brakes to see if their braking system would hub held misses the entire point of the testing

---

[3] This is the very definition of rolling resistance – how much resistance to rolling is created by the machine itself, through friction and weight distribution, etc.

altogether. The rolling resistance and slope testing was performed to rebut Bonugli's theory, not to test the relative effectiveness of other braking systems (like John Deere, etc.).

30. **(The inclinometer—no good deed goes unpunished – Dkt.156, p.7, bottom)** Mr. Berry included his opinion that the Toro ZRT would benefit and help consumers if it had an inclinometer built in and Toro once considered this as a safety device. Out of an abundance of candor and caution, Berry simply included his opinion about an inclinometer in the report to make sure it was disclosed if the questions ever went there. Since there is no dispute that the Hillman accident happened on a slope less than 15 degrees, and Berry indicated he did not plan to discuss it at trial, Plaintiffs have no idea why Toro seems to want to exclude an opinion that will not be proffered during direct examination.

31.  Toro ends this section with the totally unsupported conclusion that Berry's testimony lacks the analytical connector to the facts of the case **without even discussing the pages and pages of Berry's report which address exactly the two hazards (loss of control and roll over a retaining wall) which injured Rebekah.**

32. **Subsection 2, Dkt.156, p.8 – p.12 – The rollover argument.** Mercifully, Toro's "But this is not a rollover so ROPS won't matter" argument can be dismissed as the pure misleading nonsense that it is. First, Toro itself, in a "confidential" internal document it tried to keep secret, admits that ROPS protect occupants during tip overs, rollovers and falls, regardless of the direction of the tip.

33. Berry spends pages 5 through 9 of his report (**Exhibit A**) including extensive references in his appendices, discussing the hazard of loss of control to a) make clear that loss of control was a serious injury hazard, b) that the industry knew about the dangers of loss of control for decades before the Timecutter was first made, and c) discussed various alternative designs of braking

systems which would have prevented the Hillman loss of control which led to the tip over off the wall:

> *"Accidental machine upset (tipping or rolling)* **_in any direction_** *can cause severe injury or death to the operator. This policy establishes the criteria under which Toro products will be offered for sale to minimize the frequency and severity of such an incident."* (Emphasis mine)

(Dkt.161, p.3, para.71)

34. Unlike Toro's lawyers, Mr. Berry has designed ROPS for various types of agricultural tractors and, yes, even riding lawn mowers. Couple the quote from Toro's 2010 Corporate ROPS policy, cited above, and Berry's report **Operator Protection When a Rollover Occurs** (**Exhibit A**, p.13 – p.16). While Berry might be criticized for providing far more history of ROPS design, usage and effectiveness than would be required to testify in this case (given the simplicity of the accident), he focuses on riding mowers and why ROPS would and should have prevented serious injury for Rebekah Hillman.

> "*An operator of a ROPS equipped lawn tractor that stays in the operator seat area is much less likely to receive serious or fatal injuries during a tipover or rollover accident. It prevents the zero-turn mower from crushing the operator in the operator seat as the tractor/mower rolls over.*" (**Exhibit A**, p.15)

35. Notably, Toro cites no qualified expert who opines that ROPS will not help prevent injury in a tip over and a fall, which is the thrust of their entire argument. Mr. Berry is an expert in designing and building ROPS to prevent injury and he has been doing research and study in the area for decades. Plaintiffs have also identified injury biomechanics expert, Kelly Kennett, who agrees with Berry that if the Timecutter was equipped with a properly designed ROPS, it would have saved Rebekah Hillman from most of her serious injuries.

36. Last, but not least, the hollow and disingenuous nature of Toro's "This is not a rollover argument" is pointed out by Berry on page 16 of Berry's report (**Exhibit A**), where he actually cites Product Safety Information document authored and disseminated by Toro:

> Rollover Protective Systems (ROPS) in combination with seat belts, **are shown to be effective in preventing serious injuries or death if equipment overturns.** ROPS are standard equipment on Toro Z Master Mid Mount ZRT commercial mowers manufactured in 2004 and later. Owners of Z Masters manufactured before 2004 (click here for a list of model numbers) can obtain the same protection by selecting one of the following:
> 1. Free non-foldable ROPS, or
> 2. Two-post foldable ROPS at a discounted price of just $179. (Emphasis mine)

37. This was not new knowledge as of January 1, 2005. The knowledge of the effectiveness of ROPS in preventing serious injuries or death when a tractor overturn had been known for 30 years prior to 2004.

38. So, clearly, Mr. Berry knows that ROPS prevent serious injuries when a mower tips over in the pitch attitude, Toro knows that ROPS prevent serious injuries when a mower tips over in the pitch attitude, the CPSC [4] knows that ROPS prevent serious injuries when a mower tips over in the pitch attitude, the engineering safety community knows that ROPS prevent serious injuries when a mower tips over in the pitch attitude. Only Toro's defense counsel appears to be of the belief that a ROPS does not prevent injury when the operator is belted and the mower tips over in the pitch attitude.

39. Toro misstates the facts and testimony of Mr. Berry and, again, attempts to mislead the Court on page 9 when discussing the inclinometer testimony. The inclinometer is an instrument that displays the incline the mower is on while operating on the slope. It is a safety device that helps operators know and identify when he/she may be on or entering a slope considered too steep by the manufactuer risking a stability loss of control. (**Exhibit A**, p.12, top paragraph, and p.32,

---

[4] Consumer Products Safety Commission

last paragraph) So, Plaintiffs agree with Toro that, while an inclinometer would be a good addition to ZRTs to help the operator avoid a dangerous slope and, hence, a stability/loss of control accident, the device really has no relevance in this case. Not because "this case does not involve a rollover" as Toro's counsel asserts without any support whatsoever on page 9. The inclinometer issue is not relevant <u>because the case does not involve an accident caused by the operator driving on too steep a slope</u>. (emphasis mine)

40. **Toro's argument that Berry cannot testify because he has not investigated enough accident exactly like this one.** (Dkt.156, p.9, bottom) Toro points out that Mr. Berry has investigated at least 40 ZRT mowers. (Dkt.156, p.9, Footnote 4) Then, in a linguistic somersault, claims that somehow Berry's opinion that an inclinometer is not relevant to this case, supports Toro's conclusory statement that all of Berry's opinions lack the requisite connection between underlying facts, when all the expert is doing is agreeing that one safety device (the inclinometer) is not relevant to the facts of this case.

41. The investigation of similar incidents is recognized by the Seventh Circuit as sufficient foundation for expert opinions on safety devices and causation under the *Daubert* criteria.

> "*Second, we consider the reliability of Meyer's opinion by making "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid."* Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786. Some factors we look to include: (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community.* Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003) (quoting* Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786). "No one factor is dispositive, however, and 'the Supreme Court has repeatedly emphasized [that] the <u>Rule 702</u> test is a flexible one.' "* Timm*, 932 F.3d at 993 (alteration in original) (quoting* Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000)). At all times "the correct inquiry focuses not on 'the ultimate correctness of the expert's conclusions,' but rather on 'the soundness and care with which the expert arrived*

*at her opinion.' " Timm, 932 F.3d at 993 (quoting Schultz v. Akzo Nobel Paints, LLC, 721 F.3d 426, 431 (7th Cir. 2013)). Meyer's insights stem from his training and experience investigating industrial accidents.*

*Meyer visited the FedEx warehouse with Anderson to reconstruct (to the best of Anderson's recollection) what happened. He reviewed troves of data generated from forklift accidents. He noted that Raymond implemented structural measures to guard against tip-over events, where a forklift goes forks-first over a ledge or is improperly balanced while carrying a load. (Recall, the need for a quick escape in such situations was Raymond's justification for not fitting a door as standard.) Meyer looked to operators who elected to install the optional door Raymond offers and found no increase in tip-over injuries. From all of this, Meyer concluded that Raymond's reliance on training and warnings, as opposed to structural changes like those implemented to prevent tip-overs, was insufficient to mitigate the risk of an accident like Anderson's. Given that Raymond designed and offered a door as an option, Meyer concluded that installing it as standard was feasible and would reduce the frequency of crush accidents like Anderson's".* (See *Anderson, id.,* at 509-510)

42. Toro's arguments on pages 11 and 12 of their Motion truly descend into nothing more than a series of disjointed criticisms of Berry's writing style, comments and assertions, most of which have no support and some are just plain wrong. For example, at the top of page 11, counsel quotes Berry as saying *"the hazard in this instance is the rollover of the riding mower laterally and longitudinally"* and then Toro's counsel erroneously asserts "But that did not occur here-the mower did a nosedive over a drop off." Neither accident reconstruction expert (Plaintiff nor defense) described the accident as the mower "doing a nosedive over a drop off". Both experts (Bilek and Bonugli) say the mower went over the wall without significant speed, nosed down as it tipped over the wall, landed on its front nose (crushing Rebekah's legs) and then tipped forward landing over Rebekah supported by control handles. **<u>The pitch down when the mower went over the wall and final tip over after it had landed on its front end are exactly what Berry described--a forward tip over or rollover along the pitch or longitudinal axis. (See Figure 1, above)</u>** (Emphasis mine)

43. Mr. Berry was not retained to reconstruct the accident, but Berry read the extensive testimony of Jennifer and Rebekah, as well as the testimony about the accident by Toro's 30(b)(6) representatives, Drutowski and Porter. (**Exhibit A**, p.1 – p.3)

44. Nobody hired by Toro, not one expert, has opined that the hardness of the soil, or grass conditions along the path of the mower as it descended, or air pressure of the tires on the accident mower or any other characteristics of the hill (other than slope and general material characteristics which were all preserved), had any significant impact on the accident. Yet, counsel says the Court should exclude Berry's testimony because he did not do things he was not asked to do, and were apparently unnecessary to understand Mr. Bilek and Mr. Bonugli's reconstructions because if Berry had been asked to do them and he did, it "may have impacted any such analysis". (Dkt.156, p.11, near bottom) Such an argument is not only confusing and counterintuitive, it is almost embarrassing.

45. Toro then curves back around to the old "what is or is not a rollover argument" at the top of page 12 of the Motion. Since this argument has already been thoroughly debunked, Plaintiffs will not repeat the rebuttal here.

46. Pages 12 through 17 contain, by Toro's admissions, mostly argument concerning counsel's view of Mr. Berry's writing style, followed by conclusory statements not supported by any actual factual, scientific or correct legal authority. For example, Toro's counsel simply argues with the use of the term crashworthiness, when the principle of crashworthiness is creating a protected space for a driver or operator of a machine and then keeping the operator inside the protected space created by the ROPS with the use of a seatbelt. (**Exhibit A**, p.13 – p.14) These are the same principles of occupant protection used in motor vehicles by creating an enclosed space and then seat belting occupants so they do not strike the inside of the space.

47. On page 13 and part of 14, Toro largely makes its closing argument to the jury instead of citing any legitimate reasons to exclude any of Berry's opinion under *Daubert, id.,* and *Anderson, id.* For example, since Toro built the Timecutter without an independent brake, exactly what was Mr. Berry supposed to test? Brakes have been successfully used on moving machines for over 100 years.  Does Toro really think it cannot put a brake on a ZRT mower when their own supplier of hydrostatic motors offered one with a disc brake? (**Exhibit A**, p.9) *Anderson, id.,* offers the answer to the "no testing" argument for the Court at page 510:

> *Raymond, however, insists that Meyer's methodology is flawed. Pointing to our opinion in Dhillon v. Crown Controls Corporation, Raymond argues that Meyer's failure to conduct his own tests renders his door opinion categorically inadmissible. 269 F.3d 865 (7th Cir. 2001). Not so. While in Dhillon we held that a district court did not abuse its discretion in excluding an expert who failed to design or test his proposed forklift door, we expressly rejected the notion that hands-on testing is an absolute prerequisite to the admission of expert testimony. Id. at 870. Just two years ago we reiterated the point, holding that the "absence of testing represents only one factor in the Daubert analysis." Kirk v. Clark Equip. Co., 991 F.3d 865, 877 (7th Cir. 2021). We reaffirm that conclusion today even though the underlying principle is obvious. An expert hoping to testify about benzene's effects on children need not expose children to benzene. See Schmude v. Tricam Indus., Inc., 556 F.3d 624, 626 (7th Cir. 2009) ("[T]he defendant has never explained what kind of test could be performed ... except to remove the same rivet from an identical ladder, have a 350-pound man climb halfway up and start poking with his hands in the ceiling, and see what happens."). That Raymond markets Meyer's proposed alternative underscores our conclusion: when data are available from another source, there's no need to duplicate that information by testing. See Lapsley v. Xtek, Inc., 689 F.3d 802, 815 (7th Cir. 2012) ("We do not require experts to drop a proverbial apple each time they wish to use Newton's gravitational constant in an equation."). Raymond's customers who have elected to fit their forklifts with Raymond's optional door have been testing Meyer's alternative for him. Raymond can critique the use of those customers as comparators, but such arguments go to the weight, not the admissibility, of Meyer's testimony.*

48. Other manufacturers sell mowers with independent brakes that work with hydrostatic drives and that is enough.

49. The advisability and reliability of ROPS in preventing injuries, like Rebekah Hillman suffered when her mower tipped over a retaining wall and landed on her legs, is born out by decades of ROPS usage with amazing results. When the machine does tip over "in any direction", the protective ability of a well-designed ROPS is well supported in the abundant articles and authorities cited in Mr. Berry's lengthy report.

50. The arguments on pages 14 through 17 are not grounds for exclusion under *Daubert*. Toro's counsel is not arguing scientific methodology or failure to adhere to evidence and established engineering. Rather, Toro's counsel sort of wanders through the end of Berry's report while insisting that because Mr. Berry has not adopted Toro's characterizations of the evidence and arguments about comparative fault (sole proximate cause), all his opinions must be excluded. That is not the law.

51. On page 16, Toro's counsel actually argues that this accident was not foreseeable when Toro:

    a.  Designed the mower to <u>require</u> the use of bypass or tow pins to completely disconnect all controllability to tow or move their mower without damage to their $3,000 mower. In other words, Toro forced the operators to disconnect the motors on both wheels whenever they got stuck or needed to be towed or pushed. (emphasis mine)

    b.  Intentionally rejected passing on the warning from its vendor that use of bypass pins disconnected all ability to stop or turn.

    c.  Intentionally called the parking brake an electric brake and nowhere warns that it cannot be braked to a stop with the parking pawl once the mower is moving.

    d.  Intentionally excluded an instruction for the safe towing of this machine, even though mowers often get stuck and need towing. Notably page 48 of the Owner's Manual demonstrates the Toro knew people would use the "tow" pins to tow the mower and forget to put them back into push mode.

    e.  Designed and built the mower with no interlock or even a warning light or message on the dash to prevent operators form accidentally trying to start the mower without the motors engaged.

52. Then, there are the latest documents from Toro. (See Dkt.161 and attached exhibits)

**Exhibit 46**. Corporate Safety PowerPoint Presentation February 25, 2010 – 3 years before the Hillmans' accident mower was built and almost 10 years before Rebekah is injured.

Slide # 2. **Potential Future Product Liability Cases**
-Tens of thousands of ZRTs without ROPS are still in the field.
**-Consumer ZTRs**
-Foldable ROPS (Plaintiffs' expert criticized foldable ROPS as "an easily bypassable safety feature".)
**-Lack of Braking**
**-Lack of Steering Control** (Emphasis mine, via bold)

Slide #3. **Ongoing "Safer Alternative Design" Considerations.**
Standard ROPS on all ZTRs.
Steerable caster wheels.
Ted brakes/Caster brakes.
Emergency brakes.

(These recommendations support Plaintiffs' experts Berry and Bilek.)

Slide #4. **Consumer ZRT's and ROPS**
**-**Where do we draw the line?
-What is the rationale? Is the rationale relevant? **Is the rationale supportable in litigation?** (Emphasis mine)

**Exhibit 48.** September 4, 2012, one year before the Hillmans' Timecutter was built and 8 years before Rebekah gets injured, the **"ZRT Initiative Team Design Concepts - Recommendations to Pursue"** lists many of the same safety improvements in design as Plaintiffs'expert witnesses:
**Accident Avoidance-Control & Traction**
Front caster steer
4 Wheel Steer
Emergency Brake/ Anchor
**Crashworthiness Protection**
Enhanced ROPS etc.

53. **Toro claims Berry cannot be tested, has not been subject to peer review and provides no potential error rate. (Dkt.156, Subparagraph 3, p.17)** Toro's argument on page 17 and 18 miss the mark completely. *Daubert* was a complex, medical drug interaction causation case. This is a case of a lawn mower rolling out of control, down a hill, and eventually over a retaining wall.

This case involves known and foreseeable risks and known engineering and safety technology that has been tested and proven reliable for decades. Toro just did not use it to make its mower safer.

54. Disconnection of all control and braking of a 600 lb. machine designed to be used off road on hills and slopes and which, ultimately, need to be towed or pushed, is a very dangerous design characteristic and a foreseeable hazard.

55. ROPS have been designed and tested (including by Toro) with excellent results for decades as they protected people from serious injury or harm when the machine tips over in any direction. (**Exhibit A**, especially Appendices)

56. Risk identification and hazard analyses are the accepted methodology to analyze accidents with products such as this case. Like brakes and ROPS, the method has been subjected to peer review and accepted as a tool to identify hazards and reduce risk by corrective action. (Like putting brakes and ROPS on ZRT lawnmowers.) (**Exhibit A**, especially Appendices)

57.  Brakes have been thoroughly tested to work and prevent loss of control on an endless list of movable machines from airplanes to lawn mowers—they just need to be designed into the machine properly to work reliably.

58. There are no exotic designs, high tech equipment, new or controversial engineering concepts associated with this case. Indeed, the design safety hierarchy which Toro's counsel so despises, has now been incorporated into the ANSI standards which Toro seems to admire as long as they can pick and choose the ANSI standards and procedures they will employ.

59. **Warnings.** Mr. Berry is a warnings expert as he has ample experience with machines and implements such as ZRT lawnmowers. Ironically, the warnings issues in this case do not involve the precise language of warnings, they involve the complete absence of warnings and instruction which Toro knowingly omitted from the Operator's Manual and the machine itself.

**G.  Plaintiffs' Resistance to Toro's Rule 37 Sanctions Motions.**

60.  **The Rule 37 Sanctions Motion. (Dkt.156, p.18, Subparagraph B)** Plaintiffs resist Toro's untimely Rule 37 Motions regarding both a) alleged spoliation and b) the allegedly untimely disclosed evidence of Mr. Berry, and ask the Court to DENY both Motions as untimely, filed after the discovery deadline closed without any justification and without any attempt to comply with Magistrate Judge Hawley's Standing Order and express verbal instructions to Plaintiffs' and Toro's counsel that Rule 37 Motions were subject to the "meet and confer" and "informal discovery" conference procedures outlined in the Order. Toro ignored these portions of the Court Order without excuse or justification.

61.  Both Motions are without factual merit and contain material misstatements of fact and law.

62.  As for the alleged and unproven spoliation of the accident scene, Toro had actual knowledge of the grounds for any alleged spoliation motion for over two years and has disclosed no evidence or expert opinions that the use of Plaintiffs' digital survey of the property before it was graded, created any problems or had any deleterious effect on Toro's defense. Both Bilek and Bonugli built highly accurate computer models of the exact shape and slope of the accident site from Plaintiffs' digital survey and the hundreds of photographs produced at no cost to Toro.

63.  The original Scheduling Order in this case gave Plaintiffs just short of 60 days from the time the retained defense expert had to disclose their opinions via reports before Plaintiffs had to provide "rebuttal testimony reports".  (from May 8, 2023 until July 3, 2023) Because of scheduling problems (Dkt.100), Plaintiffs' counsel was not able to depose Mr. Bonugli (Toro's reconstruction expert) until July 20, 2023. In fact, due to scheduling issues and other complications, the deadline for completion for discovery was eventually extended to August 18, 2023.

64. Mr. Berry's slope testing and roll resistance testing was done to rebut TTC's expert Enrique Bonugli's calculated "roll resistance" of the accident mower on the date of Rebekah's injuries and specifically how it affected the mower's behavior immediately before it started downhill. Mr. Berry's testing also responds to Bonugli's rolling resistance calculation/opinion, which was only disclosed during his deposition on July 20, 2023, which was the first time Plaintiffs learned the affect he (Bonugli) claims it had on the Toro mower during the accident was not disclosed in his expert report, but only admitted in response to counsel's specific questions in his deposition of July 20, 2023. (**Exhibit C-3**, p.120, L.8 – p.121, L.10) See also, **Exhibit C-4**, p.123, L.10-17, where Bonugli says,

> "***Q****. And actually, your entire analysis assumes that that mower was sitting on a nine and a half degree slope with the bypass pins engaged so that the hydrostatic motors were disconnected, and the parking brake was off and it didn't move without a push.*
> ***A****. That's right.  That is what the slope is."*

65. Berry's slope testing (July 24, 2023) and roll resistance testing (August 10, 2023), were done specifically to rebut Bonugli's opinion that the rolling resistance of the accident mower was as high as .165 gs, when actual testing shows Bonugli's calculation has an error rate of up to 100%. Thus, Plaintiffs were obliged to provide it to Toro within 30 days of disclosure of Bonugli's opinion on July 20, 2023. Fed. R. Civ. P. 26(a)(2)(D)(ii)

66. David Bilek (armed only with Bonugli's report) provided a timely rebuttal report dated July 3, 2023 (**Exhibit D**), which responded to Bonugli's blatant misuse of the "tests" Jennifer and her friends conducted in the west yard. Bilek addressed Bonugli's assumptions about the rolling resistance of the mower necessary to reverse engineer his numbers to support his "outside motive force" opinion (i.e., somebody had to push the mower). At page 2 of his rebuttal report (**Exhibit D**), Bilek says:

"*Bonugli's opinion, "that the rolling resistance of the mower while stationary on a sloped terrain was sufficient to overcome the effect of Earth's Gravity", is incorrect. Further, as an engineer, Bonugli should have recognized that the rolling resistance based on his interpretation of the "testing" was wrong. Since acceleration due to gravity on a 9.5 degree slope, "can be as much as 0.165 g" as reported by Bonugli, the rolling resistance is therefore higher. For reference, routinely employed rolling resistances for passenger vehicles are in the range of 0.01 to 0.02 g's. Simply considering the ramifications of this conclusion indicates that the mower has what would be an unreasonably high rolling resistance, greater than 0.165 g's as designed by Toro, and thus the engine will have to continually work to overcome the high rolling resistance, even on level ground, just to keep the mower moving. This is comparable to trying to drive an automobile with the brakes moderately applied all the time.  As an engineer, this should have alerted Benugli that there was a fundamental problem with his analysis. Toro would not design and produce their mower to be so inefficient.*"

67. All rebuttal test data and logs were produced to Toro via supplemental disclosure on August 11, 2023, less than thirty days after Bonugli disclosed his calculation opinion (without raw data) and before the close of discovery. Toro's counsel, Kirk Florence, **conducted a supplemental deposition of Tom Berry on August 16, 2023, and asked about the testing**. (Dkt.100) (emphasis mine) Hence, Plaintiffs' disclosure of Mr. Berry's test data and supplemental deposition **was timely and appropriate under Fed. R. Civ P. 26(a)(2)(D)(ii)**. (Emphasis mine)

68. Mr. Berry and Mr. Bilek's have not changed their disclosed opinions including their rebuttal opinions. Rather, the slope testing and rolling resistance testing of the actual accident mower had to be done once Bonugli finally disclosed that his theoretical calculations and his "outside motive force" opinion relied entirely on an assumption about the force necessary to roll the accident ZRT mower that defied physics.

69. Conspicuously absent from Toro's Motion, is any mention of the fact that Bilek's opinion rebutting the rolling resistance assumption by Bonugli was timely disclosed and the testing of the actual mower that proved Bonugli was wrong was timely produced in accord with Fed. R. Civ P. 26(a)(2)(D)(ii). Even if one uses the standard of Fed. R. Civ. P. 37(c)(1), the delay was

substantially justified since Bonugli violated Rule 26's expert report requirements by failing to state and explain his opinions and the basis for those opinions until he was deposed by Plaintiffs' counsel on July 20, 2023.

70. Toro's Motions provide no certification, excuse, or justification for failing to raise either of these issues according to the requirements of Magistrate Judge Hawley's Standing Order. The Court even informed Toro before the close of discovery that Rule 37 Motions required the same attempt to meet and confer as any discovery motion; yet, Toro elected to wait until after the close of discovery to include the Motions within *Daubert* challenges with no notice or opportunity to be heard by Plaintiffs via separate motion hearings with evidence.

WHEREFORE, Plaintiffs ask this Court for an Order:

a. DENYING Toro's Motion to exclude any of the opinions or testimony of Thomas Berry for the reasons cited;

b. DENYING Toro's Rule 37 Sanctions Motion alleging spoliation, as untimely filed in violation of Judge Hawley's Standing Order, and without factual merit;

c. DENYING Toro's Rule 37 Sanctions Motion alleging untimely disclosure of rebuttal evidence of Thomas Berry, as untimely filed in violation of Judge Hawley's Standing Order, and without factual merit; and,

d. PROVIDING such additional relief as the Corut deems appropriate in the circumstances.

Respectfully submitted,


By: /s/ Steven J Crowley
Lead Counsel

REBEKAH HILLMAN, individually and as next friend of P.J.H., a minor; and JENNIFER
HILLMAN Plaintiffs
Steven J Crowley Lead Counsel ARDC#6314756
Edward J. Prill ARDC#6271392
CROWLEY & PRILL
3012 Division Street
Burlington, IA 52601
T: (319) 753-1330
F: (319) 752-3934
E: scrowley@crowleyprillattorneys.com
E: eprill@crowleyprillattorneys.com
ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE


I HEREBY CERTIFY that on *Monday, November 27, 2023*, I electronically filed the
foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing is being
served this day on all counsel of record identified below via transmission of Notices of Electronic
Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who
are not authorized to receive electronic Notice of Electronic Filing:

Michael Giacopelli
Thomas Grace
Jonathan R. Sichtermann
McVey & Parsky, LLC
30 North LaSalle Street, Suite 210
Chicago, Illinois 60602
Email: mng@mcveyparsky-law.com
Email: tgg@mcveyparsky-law.com
Email: jrs@mcveyparskylaw.com

Jason Schiffman
Schiffman Firm, LLC
1300 Fifth Avenue
Pittsburgh, PA 15219
P: (412) 288-9444
F: (412) 288-9455
E: jason@SchiffmanFirm.com
ATTORNEY FOR PLAINTIFFS

Kirk T. Florence
Kilpatrick Townsend & Stockton LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
P: (214) 922-7100
F: (214) 279-9194
kflorence@kilpatricktownsend.com
ATTORNEYS FOR THE TORO COMPANY