```
 1           IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                  ROCK ISLAND DIVISION

 3

     REBEKAH HILLMAN,    )
 4   individually and as )
     next friend of      )
 5   P.J.H., a minor;    )   Case No. 4:21-cv-04081-SLD-JEH
     AND JENNIFER        )
 6   HILLMAN,            )
                         )   DEPOSITION OF
 7        Plaintiffs,    )   ENRIQUE JUAREZ BONUGLI
                         )
 8        vs.            )
                         )
 9   THE TORO COMPANY,   )
     a Corporation,      )
10                       )
          Defendant.     )
11   --------------------)

12

13

14       THE DEPOSITION OF ENRIQUE JUAREZ BONUGLI,
     taken on behalf of the plaintiffs herein, on
15   Thursday, July 20, 2023, beginning at the hour of
     10:05 a.m., via Zoom videoconference, before
16   Kelly M. Pieper, Registered Professional
     Reporter, Certified Shorthand Reporter, and
17   Notary Public of the State of Iowa,
     1521 - 330th Avenue, Wever, Iowa.
18

19

20

21

22

23

24

25
```

122

1  suppose unless she was doing something very
2  active on it while she was sitting there and
3  disengaging the park brake.
4      Q.  What's your assumption as to the slope
5  of the mower in the 26-second video which ends
6  in Number 48?  I'm just going to call them 49
7  and 48.
8          49 is five seconds and 48 is 26
9  seconds, correct?
10     A.  Yes, 58 is 26 seconds and 59 is five
11 seconds.
12     Q.  I'm sorry, 59 and 58, not 48.
13         Okay.  And Number 58 is the 26-second
14 test and it begins with the mower sitting
15 still, correct?
16     A.  Yes, sir.
17     Q.  And it's running, and Mr. Darnell is
18 in the operator's seat, correct?
19     A.  Yes.
20     Q.  And then Jennifer says, "Okay, push
21 it," and it starts rolling, does it not?
22     A.  Yes.
23     Q.  What do you assume was the slope of
24 the ground where it was sitting still before
25 the test starts?

123

1      A.  Approximately nine degrees, so
2  substantially similar to the accident area.
3      Q.  So if that slope was two degrees or
4  less, that would affect your -- would that
5  affect your opinion about the motive force?
6      A.  Well, I didn't do an assessment of two
7  degrees or less.  I did an assessment of the
8  test video, which is at nine degrees,
9  approximately.
10     Q.  And, actually, your entire analysis
11 assumes that that mower was sitting on a nine
12 and a half degree slope with the bypass pins
13 engaged so that the hydrostatic motors were
14 disconnected, and the parking brake was off and
15 it didn't move without a push.
16     A.  That's right.  That's what the slope
17 is --
18         MR. FLORENCE:  Objection.
19         THE WITNESS:  -- in that area.
20         MR. CROWLEY:  I'm sorry, what was the
21 objection?
22         MR. FLORENCE:  Mischaracterizes
23 testimony.
24 BY MR. CROWLEY:
25     Q.  Well, I don't want to mischaracterize

124

1  your testimony, Mr. Bonugli, because I gave you
2  a significant amount of money, in my opinion,
3  to get your opinions out here today.
4          So your analysis begins with the
5  assumption that this Toro mower will sit on a
6  nine and a half degree slope, downhill slope,
7  with the bypass pins disconnecting the
8  hydrostatic motors and the parking brake off
9  without starting to roll down the hill,
10 correct?
11     A.  It's not an assumption.  It was
12 documented by the test video, so in the test
13 video, you can see the mower on that slope,
14 which I determined was at -- that had a slope
15 of approximately nine degrees, so it's
16 substantially similar to the slope where the
17 accident happened.
18     Q.  I have looked at your supplemental
19 materials.  Do you think you can accurately --
20 do you believe that you can more accurately
21 tell the jury where the tests were conducted
22 than Jennifer Hillman or Dave Darnell or
23 Mr. Wheaton?
24     A.  Yes, sir.  I do believe so, because it
25 was determined through reverse projection and

125

1  photogrammetry techniques that are very
2  accurate.  And, yes, they're testifying that it
3  happened in one area, but it's their
4  subjective, you know, assessment of where they
5  think this happened years after they did this
6  video.  In fact, you can see from, you know, I
7  guess the pictures that you took that, that
8  that area is a long way from where that mower
9  was.  And there are a lot of ways to correlate
10 where that mower was in the test video from the
11 environment that it was in.  So, yes, it's a
12 determination.  It's not relying on someone's
13 memory subjectively.
14         One way that they could have resolved
15 that would have been to document it, to
16 document where everything occurred, but they
17 didn't.  No one did.
18     Q.  You finished?
19     A.  Yes.
20     Q.  Do you notice anything different in
21 the location where the 58 starts as opposed to
22 59, where it begins?
23     A.  Yes.
24     Q.  What did you notice was different?
25     A.  It's in a different location about 25

**118**

1  So, again, a lot of this is kind of
2  dependent on what their recollection is, but
3  that is supported by my analysis.  In other
4  words, analyzing the video -- the test videos
5  tells me that's consistent with what she says
6  in this -- in this part of her deposition, page
7  276, 277, 278 and 279.
8  Q.  During this deposition how many times
9  have you spoken to Mr. Florence off the record?
10  A.  None.
11  Q.  Have you talked to your legal
12  assistant or anybody that works at BRC?
13  A.  No, sir.
14  Q.  Okay.  "Rebekah Hillman subsequently
15  attempted to resume mowing by disengaging the
16  electric park brake and operating the motion
17  control levers.  Forward movement of the mower
18  was initiated with Rebekah Hillman positioned
19  in the operator's seat.  The mower moved down
20  the sloped terrain toward a retaining wall.
21  The retaining wall was elevated approximately
22  five and a half feet above the adjacent ground
23  level.  Prior to reaching the retaining wall,
24  Rebekah Hillman jumped in front of the
25  mower..."

**119**

1  Does that statement mean to say that
2  she intended to jump in front of it?
3  A.  Well, I -- well, yes, I think her
4  intention was to get off of the mower, and she
5  had to have gotten off before she got to the
6  retaining wall in order for her to get ahead of
7  it and for it to land on her the way it did.
8  So I would imagine it was her
9  intention, but, you know, in terms of my
10  reconstruction of the sequence, it had to have
11  happened that way.  She had to have departed
12  the machine ahead of it, probably took a couple
13  of missteps and then went over the retaining
14  wall, followed by the machine.  It couldn't
15  have happened simultaneously, otherwise it
16  would have completely landed on her.
17  Q.  I'm sorry, maybe my question was
18  inartful.  I simply wanted to ask:  Do you
19  think she intended to step in front of it or
20  just get off of it?
21  A.  I think she was trying to get off of
22  it.
23  Q.  Okay.  "The mower continued on its
24  path and was projected off the retaining wall
25  leading with its left front.  The mower

**120**

1  partially landed on Rebekah Hillman's left
2  lower extremity while she was on the ground."
3  Did I read that correctly?
4  A.  Yes, sir.
5  Q.  Do you have any additional opinions or
6  conclusions about that aspect of the accident?
7  A.  No, sir.
8  Q.  Based on an accident -- now we're at
9  the second -- well, actually, the first full
10  bullet point on page 34 of Exhibit 1 to your
11  deposition, which is your May 8 report.  "Based
12  on an accident reconstruction analysis of the
13  subject incident, it was determined that a
14  motive force was applied to the rear of the
15  mower while stationary with the electric park
16  brake disengaged, causing the mower to overcome
17  rolling resistance and initiate forward
18  movement.  Application of a motive force
19  accelerated the mower to a speed greater than
20  its acceleration due to gravity alone."
21  Did I read that correctly?
22  A.  Yes, sir.
23  Q.  Is it your opinion that the Hillman
24  Toro TimeCutter could not begin rolling on an
25  8.8 degree slope pointed downhill unless

**121**

1  somebody pushed it?
2  A.  It is my opinion that more likely than
3  not, it would have remained stationary had
4  something not made contact with it.  I'm not
5  saying that, you know, it had to have been a
6  push, but any kind of additional force would
7  have increased its velocity.  Although, you
8  know, if it was just a lean or something like
9  that, it could just be a really small
10  difference, but a difference, nonetheless.
11  Q.  How about the addition of an operator
12  weighing over 160 pounds?
13  A.  No, I don't believe --
14  Q.  Would that --
15  A.  I don't believe so, primarily because
16  when you watch the test video which involves
17  the person pushing the mower, that has the same
18  sort of circumstance in which we're talking
19  about here which is, you know, if she gets onto
20  the mower while, you know, it is running, and
21  then disengages, all of that would have been
22  the same as you see in the test video, and in
23  that test video, it doesn't move until someone
24  pushes it.  So I don't believe her getting on
25  it would be enough for it to get going, I

```
                                                  122
 1   suppose unless she was doing something very
 2   active on it while she was sitting there and
 3   disengaging the park brake.
 4       Q.   What's your assumption as to the slope
 5   of the mower in the 26-second video which ends
 6   in Number 48?  I'm just going to call them 49
 7   and 48.
 8            49 is five seconds and 48 is 26
 9   seconds, correct?
10       A.   Yes, 58 is 26 seconds and 59 is five
11   seconds.
12       Q.   I'm sorry, 59 and 58, not 48.
13            Okay.  And Number 58 is the 26-second
14   test and it begins with the mower sitting
15   still, correct?
16       A.   Yes, sir.
17       Q.   And it's running, and Mr. Darnell is
18   in the operator's seat, correct?
19       A.   Yes.
20       Q.   And then Jennifer says, "Okay, push
21   it," and it starts rolling, does it not?
22       A.   Yes.
23       Q.   What do you assume was the slope of
24   the ground where it was sitting still before
25   the test starts?
```

```
                                                  123
 1       A.   Approximately nine degrees, so
 2   substantially similar to the accident area.
 3       Q.   So if that slope was two degrees or
 4   less, that would affect your -- would that
 5   affect your opinion about the motive force?
 6       A.   Well, I didn't do an assessment of two
 7   degrees or less.  I did an assessment of the
 8   test video, which is at nine degrees,
 9   approximately.
10       Q.   And, actually, your entire analysis
11   assumes that that mower was sitting on a nine
12   and a half degree slope with the bypass pins
13   engaged so that the hydrostatic motors were
14   disconnected, and the parking brake was off and
15   it didn't move without a push.
16       A.   That's right.  That's what the slope
17   is --
18            MR. FLORENCE:  Objection.
19            THE WITNESS:  -- in that area.
20            MR. CROWLEY:  I'm sorry, what was the
21   objection?
22            MR. FLORENCE:  Mischaracterizes
23   testimony.
24   BY MR. CROWLEY:
25       Q.   Well, I don't want to mischaracterize
```

```
                                                  124
 1   your testimony, Mr. Bonugli, because I gave you
 2   a significant amount of money, in my opinion,
 3   to get your opinions out here today.
 4            So your analysis begins with the
 5   assumption that this Toro mower will sit on a
 6   nine and a half degree slope, downhill slope,
 7   with the bypass pins disconnecting the
 8   hydrostatic motors and the parking brake off
 9   without starting to roll down the hill,
10   correct?
11       A.   It's not an assumption.  It was
12   documented by the test video, so in the test
13   video, you can see the mower on that slope,
14   which I determined was at -- that had a slope
15   of approximately nine degrees, so it's
16   substantially similar to the slope where the
17   accident happened.
18       Q.   I have looked at your supplemental
19   materials.  Do you think you can accurately --
20   do you believe that you can more accurately
21   tell the jury where the tests were conducted
22   than Jennifer Hillman or Dave Darnell or
23   Mr. Wheaton?
24       A.   Yes, sir.  I do believe so, because it
25   was determined through reverse projection and
```

```
                                                  125
 1   photogrammetry techniques that are very
 2   accurate.  And, yes, they're testifying that it
 3   happened in one area, but it's their
 4   subjective, you know, assessment of where they
 5   think this happened years after they did this
 6   video.  In fact, you can see from, you know, I
 7   guess the pictures that you took that, that
 8   that area is a long way from where that mower
 9   was.  And there are a lot of ways to correlate
10   where that mower was in the test video from the
11   environment that it was in.  So, yes, it's a
12   determination.  It's not relying on someone's
13   memory subjectively.
14            One way that they could have resolved
15   that would have been to document it, to
16   document where everything occurred, but they
17   didn't.  No one did.
18       Q.   You finished?
19       A.   Yes.
20       Q.   Do you notice anything different in
21   the location where the 58 starts as opposed to
22   59, where it begins?
23       A.   Yes.
24       Q.   What did you notice was different?
25       A.   It's in a different location about 25
```