

ANALYZING HOW INJURIES ARE CAUSED™

May 8, 2023

Mr. Kirk Florence
Kilpatrick Townsend & Stockton LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201

Re:     Hillman, Rebekah et al vs. TORO

Dear Mr. Florence:

Per your request, I submit this report regarding my opinions to date based on an accident reconstruction analysis related to the subject incident involving Rebekah Hillman. The purpose of this report is to set forth my general qualifications and opinions involved in this incident.

I am currently employed at Biodynamic Research Corporation as a Technical Director. My educational background includes a Bachelor of Science in Industrial Engineering from Marquette University in Milwaukee, Wisconsin, and a Master of Science in Biomechanical Engineering through a joint program from the University of Texas Health Science at San Antonio and the University of Texas at San Antonio (UTSA) College of Engineering. Since 2007, I have successfully completed over 600 hours of coursework specific to accident reconstruction.

Additionally, I have authored publications in the fields of accident reconstruction and biomechanics, and I am a certified accident reconstructionist through the Accreditation Commission for Traffic Accident Reconstructionist (ACTAR No. 2183). As part of my accident reconstruction training and experience I have conducted hundreds of full-scale crash tests and analyzed thousands of vehicle collision events over the past twenty years. I am also a reviewer for scientific journals including SAE International and Elsevier Publishing.

My Curriculum Vitae is attached which provides a detailed description of my background and publications.

A copy of my testifying history is also attached. My time is billed by Biodynamic Research Corporation at an hourly rate of $330.00.

Mr. Kirk Florence
May 8, 2023
Page 2

During the course of my study in this matter, I have had access to the following materials:

- Plaintiff Expert Report of:
  - Dale Berry, CP, FAAOP, LP – Prosthetic Life Cost Projection
  - David J. Bilek, P.E. – Accident Analysis/Reconstruction
  - Thomas A. Berry, P.E. – Mechanical Engineer
  - Kelly B. Kennett, MS – Biomechanical Engineer
  - Shelly Kinney, MSN, RN, CCM, CNLCP – Life Care Plan;
- Various Pleadings & Discovery;
- Deposition of:
  - Jennifer Hillman w/Exhibits – Vol. I & II
  - Matt Karam, M.D., w/Exhibits
  - Tim Fowler, M.D., w/Exhibits;
- Video-Recorded Rule 30(b)(6) Deposition of The Toro Company through the testimony of Carol Drutowski;
- Video-Recorded Rule 30(b)(6) Deposition of The Toro Company through the testimony of Todd Porter w/Exhibit;
- 1 Color Photograph of Mower;
- 2 Color Photographs of Site;
- 66 Color Photographs of Site;
- 1 Color Photograph of Lawnmower in Hangar;
- 176 Digital Color Photographs of Site;
- 7 Color Photographs of TimeCutter® SS 5000 Riding Mower;
- 4 Color Photographs of Site;
- 1 Color Photograph of John Deere 3038E Tractor;
- 2 Color Photographs of TimeCutter® SS 5000 Riding Mower;
- 6 Color Photographs of Site;
- 1 Color Photograph of Tow Strap;
- 15 Color Photographs of Site;
- 15 Color Photographs of TimeCutter® SS 5000 Riding Mower;
- 5 Color Photographs of Home Modifications Post-Incident;
- 80 Color Photographs of Rebekah Hillman's Injuries;
- Interview Video of Jennifer Hillman at Site;
- Shortened Interview Video of Jennifer Hillman at Site;
- Video of A Day in the Life of Rebekah Hillman;
- 4 Videos of Rebekah Hillman's Injuries Post-Op;
- 2 Test Videos of TimeCutter® SS 5000 Riding Mower;
- Download Containing Legal, Photographs, Video, Drone Survey Data of Property, Scans, Medical, Imaging, Test Video & Drone Photographs, and Depositions;

Mr. Kirk Florence
May 8, 2023
Page 3

- Aerial Drone Survey Scans, Models, by David J. Bilek, P.E. – Mechanical Systems analysis, Inc.;
- TimeCutter® SS 4235, 4260, 5000, or 5060 Riding Mower Operator's Manual;
- American National Standard Safety Specifications;
- Medical Records of Rebekah Hillman from the following:
  Genesis Ambulance Service
  Quad City Helicopter EMS/Medforce Air Medical Transport
  University of Iowa Hospitals & Clinics
  American Prosthetics & Orthotics
  Genesis VNA Illinois
  Genesis Medical Center/Genesis Health Plex
  Billing Records from Various Providers
  University of Iowa Health Care

## Background

According to *Plaintiffs' First Amended and Substituted Complaint*, on June 18, 2020, Plaintiff Rebekah Hillman was operating the Toro Timecutter SS 5000 and mowing the upper elevation on the lot. When the Toro Timecutter became stuck in the planter on the higher portion of the lot above the retaining wall, Rebekah Hillman shut the mower off, moved the control handles to the outboard position, and waited for her spouse, Jennifer Hillman, to assist in getting the mower out. Jennifer Hillman then went to get a tow chain or strap and a separate small tractor to tow the mower from its position back up onto the grass so Rebekah could resume mowing.

A towing strap and a small tractor were retrieved to pull the Toro Timecutter up the hill. They fastened the tow straps/chains to the mower and pulled it approximately 40 to 50 feet up where it was on turf.

Rebekah Hillman then turned on the ignition and moved the control levers outboard to set what she understood was the brake for the mower. They then removed the tow chain/strap from the mower and attempted to resume mowing.

With the bypass pins in the rearward position, Rebekah Hillman got back on the Toro Timecutter and started the motor. Rebekah Hillman then moved the two control handles from the outboard position inward to begin mowing. When the control handles were moved from the outboard to the inboard position, the parking brake disconnected, and the mower began to roll down the incline toward the retaining wall. Rebekah Hillman attempted to stop the machine from rolling forward by pulling backward on the handles. However, with the towing bypass pins in the rearward position, the rear drive motors were not effective at controlling either rear wheel. Rebekah Hillman immediately then moved the control handles to the outboard position to use the braking system to stop the machine from moving toward the top

Mr. Kirk Florence
May 8, 2023
Page 4

of the retaining wall and the 6-foot drop from the top of the retaining wall to the seating area below.

When Rebekah Hillman moved the steer handles to the outboard position, the brake operated by the solenoid failed to significantly slow or stop the machine and it continued to roll toward the top of the retaining wall.

When Rebekah Hillman realized that the brake connected to the steering arms was not going to stop the mower, she realized that the mower was going to continue over the retaining wall and fall to the lower area below.

As the Toro Timecutter started to go over the retaining wall, Rebekah Hillman attempted to jump from the mower to get off the machine so that it would not fall on her. Both Rebekah Hillman and the Toro Timecutter continued forward and went over the top of the retaining wall, falling approximately 5 or 6 feet to the seating area below. Rebekah Hillman successfully got clear of the majority of the mower. However, a portion of the mower did land on her left leg, severely crushing the limb, which ultimately required the amputation of Rebekah Hillman's left leg.

*Deposition Testimony*

According to the *Deposition of Jennifer Hillman* taken on November 16, 2022, she is the wife of Rebekah [a/k/a Bekah] Hillman. She is a college graduate and also has a military background, being in the Army; she had been deployed twice. She also has an electrical apprenticeship, worked in construction [Hillman Construction], and has worked in carpentry. Rebekah and Jennifer both have a CDL, commercial Driver' license. In preparation for her deposition, Jennifer reviewed some documents that include the Operator's Manual, photographs, and interrogatory responses. Jennifer and Rebekah are the owners of the property where the subject incident occurred. They "cleared" some of the property after its purchase and prior to the incident; it was cleared "in or about 2016". The slope in the property was not over 15 degrees [sloping down toward the house], which matched the manual's [Exhibit 6] chart for the mower as suggested. They live at the location with Jennifer's biological daughter. In addition to the house located on the property, there is an outbuilding and a "little" shed. The property has been on the market for sale since October 2022. The flowerbed located "feet" away from the wall is the same dimensions as at the time of the incident. The subject Toro TimeCutter was purchased from B & B Geneseo in "2014 or 2015". They discussed the turning radius, levers, and operating of the Toro. Jennifer confirmed the subject mower and its parts from a photograph marked as Exhibit 1. Lever instructions were discussed from photograph marked as Exhibits 2 and 3. There was never a time that the mower had "tipped over or rolled over" or got stuck. The property layout and buildings were discussed and confirmed from an aerial view photograph marked as

Mr. Kirk Florence
May 8, 2023
Page 5

Exhibit 8; north direction and main lawn area was marked by Jennifer. Bypass levers were depicted in Exhibit 9.



The "general area" where the incident occurred is shown on Exhibit 10 which shows the retaining wall and "flat gravely" area below the retaining wall where the fire pit is located. The retaining wall was "put up" "probably in 2012…maybe 2014…probably 2015". The highest point of the wall is "about six feet" and the lowest point "about three feet."   Mr. Bilek, at the direction of Jennifer's attorney, surveyed the property "the end of August, beginning of September."

Mr. Kirk Florence
May 8, 2023
Page 6



Jennifer Hillman testified that the subject incident occurred on June 18, 2020. Jennifer and Rebekah were "cleaning up the yard, mowing." Jennifer's daughter, Payton, and her nephew, Knox were "playing in the yard."   It was approximately 11:30 in the morning; Bekah was mowing for approximately half an hour; Jennifer was pulling weeds around the house.  Jennifer was "dumping weeds" while Bekah mowed and was not paying attention when the mower got stuck in the "bed" area. "She had asked me to come up and pull the mower out with the can-am."   Jennifer explained to Bekah that it was because of the hump of the flowerbed that they needed to use another vehicle, their John Deere, to tow the Toro out of the flowerbed. Jennifer went and retrieved the John Deere tractor and returned. Jennifer put the dog and kids inside the house. A tow strap was used to remove the mower from the flowerbed. "I hooked the strap to the zero turn and pulled the pins. I put the key in the run position and pulled the levers in to unlock the electric brake."  The engine of the mower was not running. "I had just tuned it to the run position."   Jennifer put the John Deere in reverse and towed the mower out of the flowerbed. "I was going to the flattest part of the ground. And I would say roughly 40 plus. It could have been more, 40 feet away from the wall, away from the flowerbed."  Rebekah stood clear during the process. Jennifer towed the mower to the "flat part" and stopped. "I put the tractor in park, and Bekah came up and unhooked the strap. She took the clevis off and pulled the strap off each side and tossed it into the bucket of the tractor."   The mower was not running, the bypass pins were still in bypass mode, the levers were in neutral position. The mower was perpendicular to the wall. After Jennifer got off the John Deere, she recalled moving the levers "out to the park brake position...the outward position."  "We were working together and, yeah, I pulled the levers in the outward position.  And then I went back to the

Mr. Kirk Florence
May 8, 2023
Page 7

John Deere, and she got on the TimeCutter. I got on the John Deere tractor and went to start it up, and she started the TimeCutter. She pulled the levers in...and it stared to roll." Jennifer observed Rebekah move the levers "in" and the slope "was enough that it just started rolling on its own." The mower was pointed directly towards the wall. Jennifer stated, "When she started it and pulled the levers in, it would have released the electric brake. I realized at that moment that it was still in bypass mode. So, I started screaming at her to put it in park, to put the levers outward. I was watching her push the levers outward. The machine made a weird sound, but it would not stop. I don't know if she heard me or didn't hear me. I just know that I was screaming it. She was pushing them, pulling them backwards, pushing them outwards." The mower rolled straight down toward the wall. "It went straight till it hit the wall. Once it hit the wall, one wheel went off the lower end, one wheel went off the top end, so it went towards the left. Once it hit the flowerbed, it – it picked up speed a lot." Exhibit 12 was marked with a "Y" where the mower went off of the wall. Two bricks got knocked off of the wall and into the "lower area". "I didn't see it hit the ground. [She could not see from her perspective.] "When I saw her pulling those out and continually putting them in the outward position, and it wouldn't stop, I started screaming for her to jump." Rebekah jumped "at some point." "I think it was about to go over the wall, or going over the wall, when she jumped...towards the left." Jennifer could not see Rebekah land. "Once the mower went over the wall, I couldn't see anything until I came around, and they were on the ground." Jennifer stated that when she got to scene, "I made sure the tractor was in park, and I ran to the can-am to get my phone and call 911. I was running toward her, calling 911". The mower was positioned upside down and the front of it was facing toward the retainer wall. "It was pretty perpendicular, maybe a little bit to the left." Jennifer drew on an exhibit, exhibit number not identified (Exhibit 12), the positions of the mower and Rebekah [A circle indicated where Rebeka's head was located.]. Both of Rebeka's legs were positioned underneath the mower. Exhibit 14 was marked with an X as where the TimeCutter was located when she detached the strap. The area where the mower was stuck was also marked on Exhibit 14. The deposition was concluded.

Mr. Kirk Florence
May 8, 2023
Page 8



According to the *Continued Deposition of Jennifer Hillman Volume II*, taken on November 17, 2022, this was a continued deposition from the day prior. Jennifer testified as to the position of the mower when she arrived where Rebekah was located following the incident. "The whole mower as upside down over her legs. Her left side was on the ground."  [As drawn on Exhibit 12] Rebekah was positioned "away from the retaining wall…to the left". Both of her legs were under the mower. "I would say from about hip to mid-thigh, everything was under the mower." "I know when I came around the corner, I was on the phone with 911, and what – what I first noticed was gasoline dripping and -- and my mind immediately went to it, it's going to blow up.  I have to get this off of her.  And so, I don't know that I focused on exactly what parts of the mower were laying on her.  I instantly went to the – the mower is going to blow up on my wife. I need to get this off of her.  I reached down and grabbed it and threw it. Towards the bench and the fire pit direction."  Exhibit 15 was a photograph taken of the mower after it was moved by a neighbor.  The location was "pretty close" to where it landed after Jennifer "threw" it. Exhibit 16 is a photograph of the area where the incident occurred, "within a few weeks later".

Mr. Kirk Florence
May 8, 2023
Page 9



Exhibits 16, 17, and 18 were marked where the mower was stuck, moved to, and where it went off of the retaining wall. Exhibit 18 is a photograph taken on June 19th by Jennifer. "When I threw the tractor [mower] off, I saw her foot was almost completely severed off, so I ran inside. I had my phone.



I ran inside to go get a belt and some towels, towels to cover her leg and to help if I could wrap it in a belt in case, I needed to tie a tourniquet. I didn't touch her." Bekah was screaming. A neighbor arrived to ask if he could help. At that point, the Fire Chief arrived along with the first responders. A location where the helicopter could land was established. The paramedics used

Mr. Kirk Florence
May 8, 2023
Page 10

the splints Jennifer got when she ran inside the house. Emergency personnel had to transport Rebekah to the location of the helicopter, Jennifer rode with the transport to the helicopter. Jennifer walked home, called family, and they drove for approximately one hour to the hospital. Rebekah was in the hospital for approximately 30 days. Jennifer described the current living conditions and how the incident affected their life and relationship. The attorney clarified that the area Mr. Bilek digitally surveyed was the same as the day of the incident. Jennifer confirmed that Exhibit 22 is a photograph "taken after the accident at your property".



According to the *Deposition of Rebekah Hillman*, taken on November 17, 2022, "Bekah" was the rider of the subject Toro TimeCutter mower on the date of the subject incident on June 18, 2020. As a result of the incident, Bekah underwent an amputation of her left leg. Her testimony included background information about her work history and operation of various types of heavy machinery. Bekah had been a member of the union Local 150 since 2018. Through the union, she obtained "dozer certification, skid steer certification, forklift certification, loader

Mr. Kirk Florence
May 8, 2023
Page 11

certification, telehandler's certification." At the time of her deposition, she held both a Class B and CDL driver's license.

Bekah explained that due to the demands of her job, her wife, Jennifer "Jen" would handle much of the maintenance around their home and property. Jennifer had surprised Bekah with the Toro TimeCutter in "2014 or 2015." At the time of its purchase from B & B, Bekah had operated a zero radius turn mower which belonged to Jennifer's father "four or five times." She did not review the Operator's Manual for the TimeCutter prior to using it but fanned through it to locate the grease inserts on the machine. "I would help Jen maintain that part of it, while she maintained the oils and all that." To prepare for operating the subject mower for the first time, she sat in the seat and "looked at everything to make sure I could figure it all out." Bekah took note of and understood the warnings on the mower itself every time she got on, "they were right there on the foot."

Prior to the incident, Bekah could not recall having any maintenance problems with the TimeCutter. She had never gotten stuck on it, nor had she ever lost control of it. She had mowed the area where the incident occurred (above the retaining wall) several times prior to the incident. She was unaware of any slope issues on the property; Jennifer had checked and told Bekah everything was safe. She did not recall having any problems operating the mower in that area before; she did not mow there often, "Jen did most all that."

On the date of the incident, the weather was sunny and dry. Bekah had mowed the backyard before moving to the area above the retaining wall; Jennifer was picking weeds. Exhibit 12 was reviewed regarding Bekah's approach to the retaining wall (p.85). Exhibit 16 was reviewed to describe the area and manner in which the mower initially got stuck (p.95). "I was coming up here. My tire got stuck, and I remember trying to correct it. And I pulled back, and then I went forward to turn." The left front wheel went over the edge of the retaining wall and "the side" of the mower slid in. Bekah got off the TimeCutter and waited for Jennifer. Jennifer determined it would be best to use their John Deere 3038E tractor to tow the mower. Bekah helped attach the tow strap to the mower and Jennifer towed it out of the retaining wall.

The next thing Bekah recalled is getting back on the mower. "...I started it up. I pulled the levers inbound and pushed forward to go, and it started rolling. And I wanted to turn it; I couldn't turn. I'm like, I pulled the levers outboard to stop; it wouldn't stop. I pulled them back in, to go – try to reverse. I pulled them out. I tried to turn and then I seen the wall coming and... and I was thinking to myself, I'm going to have to jump. It was coming. In my mind, I said I had to jump. I remember throwing the levers out. The next thing I know, it was dark and... Now I've given childbirth naturally and the pain that I felt that day was unbearable." She did not know where Jennifer was at the time, but recalled screaming and Jennifer came to her. The paramedics came.

Mr. Kirk Florence
May 8, 2023
Page 12

*Plaintiff Rebekah Hillman's Answers to Defendant's Interrogatories*

"I, Rebekah Hillman, was mowing with the Toro Timecutter ZTR mower at our home on June 18, 2020. As I was mowing along the front of the planter above the retaining wall, the front wheel went over the edge of the planter and got stuck. Jennifer was working in the yard too-pulling weeds. Jennifer went to get our John Deere tractor to pull the Toro out of the planter. I pushed the handles outboard into the neutral stop position and turned off the Toro's engine. I then went to the back of the mower and pulled the handles out to put it in tow mode. I then walked up to the tractor to get a strap to hook to the mower and tractor to get pulled out. Jennifer Hillman was on the tractor and pulled the mower out. I then unhooked the mower. I got on the mower, started it, then pulled the handles inboard and pushed them forward. The Toro started to roll downhill and when I tried to turn or change speed with the control levers, which had no effect, the Toro kept rolling down the hill and started to go faster. So, I pulled the control levers outboard to try to get it to stop and back into park so it would stop, but the Toro would not slow down. I tried over and over, and it still would not stop. The wall was getting closer, and the Toro just would not stop."

"It was gaining speed and I knew it was going to go over the wall. My thought was I had to jump as I reached the wall or this mower will land on me. I pulled handles apart and jumped as I reached the wall. The mower landed on me, especially hard on my left leg. I was lying on the ground in so much pain and I looked at my left leg. The bones were broken, visible and detached. The flesh had been crushed so badly that the leg was sort of hanging on by some of the muscle and tissue. Jennifer called 911 right away and I was then taken by helicopter to the University of Iowa."

"We bought the Toro Timecutter new and there were no repairs, modifications or alterations done to the mower before it injured my leg."

*Plaintiff Jennifer Hillman's Answers to Defendant's Interrogatories*

"The injury caused by the Toro mower happened on June 18, 2020, and the ambulance report says 11:38 which sounds about right –late morning. I was pulling weeds and took our can-am up the lane to dump a pile of weeds while Bekah was mowing the upper part of our yard. When I returned from emptying the can-am, I saw that the front swiveling wheel of the Toro had dropped down into the planter above the wall and was stuck. As you know, the Toro Timecutter has caster front wheels that do not steer-they are not attached to any direct steering mechanism."

"I got the John Deere (Model 3038 I believe) out and some common yellow nylon tow straps out of the garage and went to help get the Toro unstuck. We attached the two straps to the Toro and the John Deere. We pulled the pins in the back of the mower outward as directed in

3A - 12

Exhibit F-12

Mr. Kirk Florence
May 8, 2023
Page 13

the manual for towing. She had put the accident lawnmower in park and pulled the tow pins out so we could tow the mower without damaging it and hooked the mower to the small tractor with the tow strap."

"I got on the John Deere and pulled the accident lawnmower over the hump or lip of the flowerbed and away from the wall about 20-30 feet. At that point Bekah said she would get it from there. She unhooked the Toro ZTR and got on the machine. She started the Toro's engine and pulled the drive levers from the outboard position inboard. The moment she pulled the levers inboard, the Toro Timecutter began to roll forward."

"Bekah immediately tried to pull the drive levers rearward to go into reverse and it kept rolling forward. She then tried to put the levers into the outboard positions apply the brake and stop the mower. It made a funny sound but did not stop and kept rolling. I started screaming at her to jump and the accident lawnmower kept speeding up. She tried again several times to put the levers in the park/stop position but the mower would not stop."

"As the Toro Timecutter went over the wall Bekah jumped thankfully so instead of the mower landing on her back it landed on her legs. I put the small tractor in park and called 911 and ran down to where she was. The Toro fell so that it was on top of Bekah, upside down. Then I lifted the mower off of her and realized her left foot was almost completely severed off. They air lifted her to Iowa City where she underwent several surgeries and eventually suffered the removal of her left leg below the knee and pins and plates put into her right leg."

"We still have the John Deere tractor. We may have the straps but they were very common tow straps like you see in stores." Plaintiffs will look to see if they can identify the straps for inspection if necessary.

"We did not mow again with the mower after Bekah was injured."

"After the accident, we had the mower on a safe section of yard, let it roll slowly and again tried to stop it with the drive pins out and putting the levers outboard to stop the mower. Again, all it did was make a noise and continued to roll. We then stored the mower in a shed and left it there until we eventually contacted our current lawyers."

"Before the area was re-graded, I discussed it with our lawyers who were investigating the case. We were advised that we should not make changes to the hillside without preserving the exact configuration of the landscape, so we did an exact survey with the help of Mr. Bilek who surveyed the area and confirmed that it was complete and accurate. The area was also photographed and measured extensively, and you have that information or will have it soon."

Mr. Kirk Florence
May 8, 2023
Page 14

"To the best of my recollection, we decided around July 1st to re-grade the area. The actual work started shortly after that. I don't remember exactly when and it took about 4 months to complete."

*Plaintiff Jennifer Hillman's Answers to Defendant Toro's Supplemental Interrogatories*

"The accident mower was stored by Jennifer and Rebekah Hillman at their home place in a small wooden shed out of the weather from the time of Rebekah's injuries, the incident where Rebekah lost her leg, until August 2020 when the accident mower was transported by trailer to Burlington Iowa by Mr. Crowley and locked in his aircraft hangar at the Burlington, Airport. Crowley and Prill then stored the evidence in the northwest corner of the hangar (E-3) until February 15, 2022, when Jennifer and Rebekah Hillman loaded the mower in an enclosed trailer and transported the mower to the offices of Tom Berry in Wichita, Kansas where Mr. Berry took over storage responsibilities. The mower was in the possession of B&B for a short time to repair the bent control handles, but they did not touch anything else to my understanding and observation. (See plaintiff's previous answers) The people who have had access to the mower since the incident complained of in the complaint, were the people at B & B, plaintiffs, plaintiffs' lawyers, and Mr. Berry. The accident mower was transported from Colona, Illinois to Burlington, Iowa by trailer by Mr. Crowley. The mower was loaded on the trailer via its full width ramp and secured with blocks and tiedowns. The accident mower was transported from Burlington, Iowa to Wichita Kansas to Mr. Berry with an enclosed trailer pulled by truck driven by the plaintiffs. The mower remains there at Mr. Berry's as far as I know."

"The only modification of which we are aware after the injury to Rebekah was B & B's report of straightening the bent drive handles."

"My best memory is that the work on the hill started during the week after Mr. Bilek did the digital survey of the hill as it was on the date of the injury which I understand my attorneys gave you long ago. This started with conversations by Karl Drapaux, Rebekah's union rep and Ann Walsh of Walsh, the company Rebekah was working for at the time. These folks really thought the world of Rebekah and wanted to know if there was anything they could do for us. I made the remark something like "Well, you could take the hill down." So, to my surprise they offered to do it. I paid a contractor $200 to cut the trees down. It was painful to look at that scene we all wanted it changed for Payton's mental health and our terrible memories of that scene. Then, Karl and the union guys brought a bulldozer and other equipment to our property. I cannot remember the date the work was actually done. I do not think we were home, but in the afternoon, they bulldozed the hill down and removed the trees. I think the name of the dozer operator was Ryan. We had no plans, contract, or blueprints—only my request that they flatten that hill. These friends of ours knew how bad this scene took us back to that awful day and traumatized us, so they volunteered their labor at no cost to us. So, we have no invoices or canceled checks."

Mr. Kirk Florence
May 8, 2023
Page 15

"Before we got the Accident mower, I operated a Toro Timecutter 5000 series owned by a Mobile Home Park that I worked for. I don't know the model number or the year. I have no other information other than I mowed with it on occasion. I have no idea the model number, or any specific information other than I believe it was a Timecutter series. It was not mine, so I am not sure where it is today."

Jennifer Provided the following information regarding the Test Video:

"The "test" as you refer to it was almost exactly like the incident that injured Bekah except done on a part of the yard that went harmlessly into a flat area and not over a retaining wall. The pins were in the "push "or bypass position, and once the mower started to roll the brakes were applied and failed to work –just made noise. I wanted to see why, what Toro described as a brake, did not stop the machine when it was rolling toward the retaining wall drop-off when Bekah tried to save herself. It made the same weird noise as you can hear on the video. But it did not stop the mower and it continued down the hill until it got to the flat part and rolled to a stop. So, the test run to see if the brake worked was exactly like the accident except not on a part of the yard where it ran off a retaining wall."

"I have no personal knowledge of any other tests or evaluations of the mower. This is the only test I did because I wanted to see why it did not stop when she tried to brake. I asked B & B to look it over since it had been upside down for a short period, I wanted to know if gasoline may have entered the oil or why the brake did not work. Tim told me they looked it over and the only thing they did was straighten the control levers that were bent from falling over the wall on Rebekah."

**Incident Location**

The subject incident occurred on a residential property located 5319 E High Street in Colona, Illinois. The property included Jennifer and Rebekah Hillman's house and several small buildings. There was a fireplace and seating area adjacent to the house and detached garage. A retaining wall separated an elevated yard that included a perimeter of mature trees. The retaining wall was between 3 and 6 feet tall. The elevated yard sloped downward from the tree perimeter to the retaining wall. The subject incident occurred in the elevated yard. The area of the incident (AOI) is demarcated in red below. There were other areas of the property that included sloped terrain and trees.

Mr. Kirk Florence
May 8, 2023
Page 16



I had the opportunity to inspect the incident site in Colona, Illinois on October 27, 2022. The area was documented using digital still photography including the use of an unmanned aircraft system (UAS). The geometry and topographical features were measured using a high-fidelity three-dimensional laser scanner (FARO S350, FARO Technologies, Inc.). The elevated yard had been graded and modified prior to my inspection.



Mr. Kirk Florence
May 8, 2023
Page 17

**Subject Mower: Toro TimeCutter SS 5000 Riding Mower Model No. 74631**

I had the opportunity to inspect the subject Toro TimeCutter riding mower on November 3, 2022. The mower was model number 74631 with a serial number of 31301534 and was manufactured in September of 2013. The manufacturer's label stated that the mower meets ANSI B71.1 2003 requirements. The Toro TimeCutter is a consumer level ZRT ride-on rotary-blade lawnmower intended to be used by homeowners in residential applications. The cutting capacity is 50 inches (2 blades) powered by a 23 hp rear-mounted twin cylinder Kawasaki engine. The TimeCutter was documented using digital photography and was digitally captured using a three-dimensional laser scanner.

 

 

The subject mower showed evidence of normal wear and tear to the exterior finish of the fuel tanks and side panels. There was patterned scuffing located at the upper left corner of the operator's seatback. The left front aspect of the foot plate had a series of light abrasions that were diagonally oriented. The paint was chipped from the leading edge of the left front caster

3A - 17

Exhibit F-17

Mr. Kirk Florence
May 8, 2023
Page 18

wheel housing. According to Jennifer Hillman the left motion control lever had been repaired following the subject incident. The operator's seat was adjusted to the full forward position.







The operator's manual for the Toro TimeCutter SS 5000 Riding Mower Model No. 74631- Serial No. 313000001 and Up provides the mower's operator with information regarding safety, operation, maintenance, storage, and troubleshooting. The operation section within the owner's manual describes "Pushing the Machine by Hand" procedure which includes the use of the bypass levers. This section advises the operator to push the machine by hand and to, "never tow the machine because damage may occur." The procedure instructs to park the machine on a level surface prior to engaging the bypass levers.

Mr. Kirk Florence
May 8, 2023
Page 19



## Accident Reconstruction Analysis

*Sequence of Events*

The subject incident occurred on the Hillman's residential property on June 18, 2020. The following is a summary of the sequence of events according to Jennifer Hillman:

- Rebekah was operating the Toro TimeCutter mowing the grass while Jennifer was dumping weeds using the can-am (pg. 244).
- While mowing the yard above the retaining wall, Rebekah got all four wheels of the mower stuck in the flowerbed. The mower was facing west and was approximately two feet from the retaining wall (pg. 248). It was parallel with the retaining wall (pg. 250).
- Jennifer decided to pull the mower out with the John Deere 3038E tractor and a tow strap (pg. 257).
- Jennifer attached the strap to the front of the tractor and the rear of the mower so she could lift the rear wheels of the mower. The tractor was facing down the hill towards the mower when she attached the tow strap (pg. 265).

Mr. Kirk Florence
May 8, 2023
Page 20

- Jennifer engaged the bypass pins, put the key in the run position and pulled the motion control levers in to unlock the electric brake (pg. 266). The engine was not running.
- Jennifer started to lift the bucket of the tractor in order to lift the back end of the mower to get it over the hump of the flowerbed (pg. 270).
- She backed the tractor up while lifting the mower to get the mower perpendicular with the retaining wall (pg. 272). The rear wheels of the mower were a few inches off the ground during this process.
- Jennifer backed the mower roughly 40 feet away from the wall to an area that was the flattest part of the ground by the tree at the top of the hill. She described the area as "pretty flat" and "flat enough when I stopped, it didn't move" (pg. 277).
- Jennifer put the tractor bucket down on the ground and moved it forward a little bit to make sure the rope wasn't taut (pg. 278).
- Bekah then came up and unhooked the strap and took the clevis off each side and tossed it into the bucket of the tractor. The pins were still in bypass mode and the motion control levers were neutral at this time. The mower was facing down the hill and perpendicular to the retaining wall. The John Deere tractor was parallel to the wall (pg. 281).
- Jennifer then put the brake on the tractor, shut it down and moved the motion control levers for the mower outward (pg. 284).
- Rebekah got on the TimeCutter and Jennifer went back to the John Deere. The pins were still in bypass mode.
- Rebekah started the TimeCutter and pulled the motion control levers in and it started to roll (pg. 287).
- Rebekah started pulling back on the levers and it still rolled forward. Jennifer realized at that moment that it was still in bypass mode, so she started screaming to put the levers outward (pg. 297).
- Jennifer was watching Rebekah push the levers outward and the mower made a weird sound, but it would not stop. Rebekah was "pushing them, pulling them backward, pushing them outward" (pg. 298).
- Jennifer estimated that Rebekah pushed the levers outward three or four times.
- The mower went straight until it hit the wall. Once it hit the wall, one wheel went off the lower end and one wheel went off the top end and so it went off towards the left. The mower picked up speed as it approached the wall and really picked up speed when it got to the flowerbed (pg. 300).
- Jennifer yelled to Rebekah to jump off. Rebekah jumped off of the mower as it was about to go over the wall. Rebekah jumped toward the left (pg. 303).
- The mower hit and knocked off the top bricks of the retaining wall.
- Once the mower went over the wall, Jennifer couldn't see anything until she came around and they were on the ground.

Mr. Kirk Florence
May 8, 2023
Page 21

- When she came around, she could see the mower was upside down and Rebekah was under the mower. The mower was perpendicular to the wall (pg. 305). Rebekah was on her side and her legs were under the mower.

The following is a summary of the sequence of events according to Rebekah Hillman:

- Rebekah was mowing the lawn when it got stuck in the flowerbed. She attempted to back up, but it slid into the flowerbed further (pg. 97).
- The entire mower was in the flowerbed, and it was parallel with the retaining wall.
- Rebekah turned off the mower and got off (pg. 101).
- She waited for Jennifer and discussed the tractor.
- Rebekah recalled Jennifer went to get the tractor and the strap, pulled the mower out and Rebekah went to help unstrap the mower (pg. 104).
- Rebekah put the straps near the bucket and hopped on the mower.
- Rebekah recalled that Jennifer engaged the bypass pins (pg. 109).
- Once she was on the mower, Rebekah started it up and pulled the levers inboard and pushed them forward and it started to roll (pg. 112).
- She tried to turn it and it wouldn't turn. She pulled the levers outboard to stop it, but it wouldn't stop. She pulled the levers back, pulled them out, tried to turn and realized she was coming to the wall.
- Rebekah recalled thinking she had to jump. Her last recollection was throwing the levers out.

According to Jennifer Hillman, the incident site was surveyed by Mr. David Bilek on August 5th of 2020. I was provided the data collected by Mr. Bilek for review. It appears that Mr. Bilek generated a three-dimensional textured mesh from aerial images obtained with an unmanned aircraft system (UAS). The textured mesh was utilized to reconstruct the travel path of the Toro Timecutter since the yard above the retaining wall was re-graded prior to my inspection.

The images below demonstrate the path of the mower based on witness testimony, geometry of the terrain, post-incident photographs, and inspection of the subject Toro TimeCutter. The initiation of the mower's movement occurred approximately 40 feet south of the retaining wall. The mower followed a relatively straight path towards the retaining wall. Prior to reaching the retaining wall, the mower entered the flowerbed. The front of the mower struck the top layer of bricks of the retaining wall. The mower departed the upper yard, translated forward, and pitched down toward the ground below. The front of the mower made contact with the ground, pitched over and landed upside down. The path and dynamics of the mower was consistent with Rebekah Hillman jumping off fully ahead of the mower while it was moving toward the retaining wall. Rebekah likely misstepped in front of the mower causing her to fall to the ground below. While on the ground, the front of the mower partially landed on Rebekah's lower extremity.

Mr. Kirk Florence
May 8, 2023
Page 22





Mr. Kirk Florence
May 8, 2023
Page 23



The elevation profile for the travel path of the mower is shown below. The slope of the terrain from the flowerbed to the mower's static location at the top of the hill varied between 14.4 degrees and 8.8 degrees. The slope decreased closer to the top of the hill.



*Analysis of "Test" Videos*

Two videos of the subject Toro TimeCutter mower were provided for review. The videos files were entitled:

RH04258 - RH04258 Test video

Mr. Kirk Florence
May 8, 2023
Page 24

RH04259 - RH04259 Test video
The metadata for the files indicated that the videos were created on June 27, 2020, or nine days after the subject incident. The time stamp for the videos stated that RH04258 Test video was recorded within minutes of video RH04259 Test video. The videos were recorded at a frame rate of 30 frames per second.



The file entitled RH04259 Test video was approximately 5 seconds in duration. The video showed a male operator riding the subject Toro TimeCutter within an adjacent area of the Hillman's residential property. The mower was in motion at the beginning of the video and was traveling forward down a sloped terrain. The mower's engine was running, and the motion control levers were in neutral position. Jennifer Hillman can be heard giving directions to the operator. Jennifer stated, "Keep goin'…. now stop." The operator complied and moved the motion control levers outward into the park position. The operator held the motion control levers outward and an audible mechanical grinding noise could be heard until the mower stopped.

The file entitled RH04258 Test video was approximately 26 seconds in duration. The video showed a male in the operator's seat of the subject Toro TimeCutter. The mower was

Mr. Kirk Florence
May 8, 2023
Page 25

positioned within an adjacent area of the Hillman's residential property. The mower was stationary with the engine running at the beginning of the video. The motion control levers were outward and in the parking position. Jennifer Hillman can be heard speaking during the video. Jennifer stated, "OK so this is a test, to see if the mower will stop at the same speed Bekah was goin' before she went off the hill. Go ahead." The operator increased the throttle and moved the motion control levers inward into the neutral position. The mower remained stationary while in neutral. Jennifer then instructed a second male to push the mower by saying, "now push it." The second male complied and shoved the mower forward. The mower was accelerated forward by the shove and within a few seconds the operator of the mower moved the motion control levers outward. An audible mechanical grinding noise can be heard as the mower remained in park while moving forward. The mower began to slow and nearly came to a stop when the video ended. Just before the video ended, Jennifer stated, "It is not stopping" while the mower moved slowly down a sloped terrain.

The videos were analyzed to determine the dynamics and performance of the subject Toro TimeCutter while traveling down a sloped terrain and engaging the electric park brake. The three-dimensional scan data obtained from my inspection was utilized to identify the location of the mower from the RH04259 Test video. The initial frame from this video file was reproduced within the three-dimensional environment through a method referred to as Reverse Camera Projection. Reverse Camera Projection is a photogrammetry technique of obtaining information about physical objects from still or video images. The process involves re-creating the environment observed within the field of view of the video by correlating known geometry that was digitally captured at the incident location. The three-dimensional scans provided the geometry that serves as the foundation for the re-created environment. The series of images below show the initial frame from RH04259 Test video (left), an overlay of the 3D point cloud for the subject Toro TimeCutter (center) and an overlay of the 3D point cloud of the environment.



Mr. Kirk Florence
May 8, 2023
Page 26

The image below shows the location of the subject mower within the three-dimensional environment of the Hillman's property.



The slope of the terrain in this location was measured to be 9.5 degrees. This slope was consistent with the slope measured along the path of the mower at the time of the subject incident.



Exhibit F-26

Mr. Kirk Florence
May 8, 2023
Page 27

A method described by Dr James Funk in a study entitled, "*Geometric Derivation of Camera Equations*" was employed to determine the distance traveled by the subject mower in RH04259 Test video. The method describes the geometric relationship between known dimensions and projected distances using image projection equations. The equations below relate the distance in an image (p) to the distance in the world:

$$p = a + \frac{b}{s + c} \qquad (1)$$

$$a = p_1 - \frac{b}{s_1 + c} \qquad (2a)$$

$$b = \frac{\left(p_1 - p_2\right)\left(s_1 + c\right)\left(s_2 + c\right)}{s_1 - s_2} \qquad (2b)$$

$$c = -\frac{\left(p_1 - p_2\right)\left(s_2 - s_3\right)s_1 - \left(p_2 - p_3\right)\left(s_1 - s_2\right)s_3}{\left(p_1 - p_2\right)\left(s_2 - s_3\right) - \left(p_2 - p_3\right)\left(s_1 - s_2\right)} \qquad (2c)$$

These equations were used to determine the distance traveled by the mower in RH04259 Test video just before the operator engaged the electric park brake. The distance was 10.9 feet.

| Photogrammetry | | |
|---|---|---|
| Distance in image: p | -262.7 | pixels |
| Distance in world: s | 10.9 | ft |
| | | |
| a | -396.2 | pixels |
| b | 2201.6 | pixels |
| c | 5.6 | pixels |
| | | |
| p1 | 0 | pixels |
| p2 | 43.2 | pixels |
| p3 | 174.2 | pixels |
| | | |
| s1 | 0 | ft |
| s2 | 0.68 | ft |
| s3 | 4.36 | ft |



The velocity of the mower was calculated to be 3.3 ft/s or 2.2 mph just before the application of the electric park brake.

Mr. Kirk Florence
May 8, 2023
Page 28

$$Velocity = \frac{Distance}{Time}$$

$$Velocity = \frac{10.9\ feet}{3.3\ sec.}$$

$$Velocity = 3.3\frac{ft}{s} = 2.2\ mph$$



Next, the velocity of the mower was computed using the known dimensions of the rear wheel for the Toro TimeCutter SS 5000. The diameter of the mower was measured to be 17 inches at the time of my inspection. The tire specifications indicated that the tire diameter was 18 inches. These values were averaged to compute the wheel circumference. The wheel circumference was 4.6 feet.



**17 inches**

$$Circumference = 2\pi r$$

$$Circumference = 2\pi\ 8.8\ in.$$

$$Circumference = 55\ in. = 4.6\ ft.$$

The circumference of the rear wheel was then used to calculate the velocity of the mower. Rotation of the rear wheel displaces the mower in the form of forward movement. The forward displacement of the mower is proportional to the circumferential displacement as the wheel rotates such that one complete revolution of the rear wheel is equal to a forward displacement of 4.6 feet. In RH04259 Test video, the Schrader valve or valve stem was visible in contrast to

Mr. Kirk Florence
May 8, 2023
Page 29

the white wheel rim. One complete revolution of the wheel was determined by tracking the valve stem. The velocity of the mower was then calculated to be 2.6 ft/s or 1.8 mph at the beginning of the video.





$$Velocity = \frac{Distance}{Time}$$

$$Velocity = \frac{4.6\ feet}{1.73\ sec.}$$

$$Velocity = 2.6\frac{ft}{s} = 1.8\ mph$$

The two velocity calculations were then used to calculate the Effective Acceleration of the mower as it moved down the 9.5-degree sloped terrain. Theoretically, the acceleration due to gravity is a function of the slope and in the absence of any resistive forces the acceleration due to gravity can be as much as 0.165 g based on a 9.5-degree slope. However, this level of acceleration is not possible due to rolling resistance associated with the mechanical friction of the mower's internal components and its interaction with the external environment. Based on the velocity calculations, the Effective Acceleration was 0.013 g as it moved down the 9.5-degree slope shown in RH04259 Test video.

$$Effective\ Acceleration = \frac{Ve^2 - Vi^2}{2d}$$

$$Effective\ Acceleration = \frac{3.3^2 - 2.6^2}{2 * (10.9\ ft - 4.6\ ft)}$$

$$Effective\ Acceleration = 0.42\frac{ft}{s^2} = 0.013\ g$$

Mr. Kirk Florence
May 8, 2023
Page 30

In RH04259 Test video, the operator of the mower was instructed to stop the machine after traveling forward for several seconds. The operator complied by moving the motion control levers outward into the park position. The electric park brake is heard engaging through an audible mechanical grinding noise. A short time later, the mower stopped. The moment in which the electric park brake was engaged was determined by both visual and audio cues. At frame 121 the operator engaged the electric park brake by fully extending both motion control levers. The forward movement of the mower was stopped by frame 140. The time difference was 0.63 seconds.



The file RH04259 Test video was imported into the video editing software package Adobe Premiere Pro 2023. The software was used to analyze the audio frequency when the electric park brake was applied. The amplitude of the audio signal demonstrably increased at frame 121 when the operator fully extended the motion control levers. The deceleration rate of the mower was then calculated to be -0.16 g. The distance traveled while slowing to a stop was calculated to be 1.0 ft.

Mr. Kirk Florence
May 8, 2023
Page 31



$$Deceleration = \frac{Ve - Vi}{Time}$$

$$Deceleration = \frac{0\frac{ft}{s} - 3.3\frac{ft}{s}}{0.63 \ sec.}$$

$$Deceleration = -5.2\frac{ft}{s^2} = -0.16 \ g$$

$$Distance \ to \ Stop = \frac{Ve^2 - Vi^2}{2a}$$

$$Distance \ to \ Stop = \frac{0^2 - 3.3^2}{2 * -5.2\frac{ft}{s^2}}$$

$$Distance \ to \ Stop = 1.0 \ ft.$$

The second video file RH04258 Test video was analyzed using the methods described above. The video shows the operator increasing the throttle moving the motion control levers inward into the neutral position. The mower remained stationary while in neutral. This indicated that there was sufficient rolling resistance for the mower to remain in place while stationary on a sloped terrain. Since the mower remained stationary, a second male was instructed to "now push it." The second male complied and shoved the mower propelling it forward. The rotation of the rear wheels was tracked to calculate the velocity and Effective Acceleration caused by the shove. The initial velocity of the mower was 2.8 ft/s and 1.9 mph and it was accelerated at a rate of 0.053 g. This was 4 times greater than the acceleration in the previous RH04258 Test video.




$$Velocity = \frac{Distance}{Time}$$

$$Velocity = \frac{4.6 \ feet}{1.6 \ sec.}$$

$$Velocity = 2.8\frac{ft}{s} = 1.9 \ mph$$

$$Effective \ Acceleration = 1.7 \ \frac{ft}{s^2} = 0.053 \ g$$

Mr. Kirk Florence
May 8, 2023
Page 32

The velocity of the mower was calculated at a point further down the hill in RH04258 Test video. The velocity of the mower increased to 6.2 ft/s or 4.3 mph. This demonstrated the effect of applying an external motive force to the mower. By pushing the mower, the velocity increased at a greater rate than the Effective Acceleration due to Earth's Gravity alone.

$$Velocity = \frac{Distance}{Time}$$

$$Velocity = \frac{4.6\ feet}{0.83\ sec.}$$

$$Velocity = 6.2\ \frac{ft}{s} = 4.3\ mph$$




The acceleration rates associated with both RH04259 Test video and RH04258 Test video were used to estimate the velocity of the subject Toro TimeCutter just before reaching the retaining wall. The calculations assume a nominal slope of 9.5 degrees over a 40-foot distance. Based on RH04259 Test video, the end velocity would have been 5.8 ft/s or 3.9 mph. It would have taken the mower 13.7 seconds to reach the retaining wall. Based on RH04258 Test video, the end velocity would have been 11.7 ft/s or 8.0 mph. It would have taken the mower 6.8 seconds to reach the retaining wall.

Review of the "test" videos showed that the rolling resistance of the mower while stationary on a sloped terrain was sufficient to overcome the effect of Earth's Gravity. Initial movement required an external motive force to overcome the resistance of the tire-to-ground contact patch, mechanical resistance of the mower's components, compliance of the soil and grass, and normal force of the mower and operator. The "test" videos also demonstrated the effectiveness of the electric park brake. In the absence of an external motive force, the mower was able to stop within a 1-foot distance once the electric park brake was engaged. Furthermore, the mower nearly stopped after being accelerated by an external motive force as shown in RH04258 Test video. Analysis of the "test" videos indicated that the electric park brake was capable of stopping the mower operated by Rebekah Hillman had the initial movement of the mower been caused by acceleration due to Earth's Gravity alone.

Mr. Kirk Florence
May 8, 2023
Page 33

*Plaintiff Expert Mr. David Bilek*

I reviewed the report prepared by David Bilek dated March 17, 2023. The following are some opinions and responses as they relate to Mr. Bilek's accident reconstruction conclusions.

- Mr. Bilek computed the Static Stability Factor for the subject Toro TimeCutter to quantify the mower's roll propensity. This comparison is inappropriate as it applies to roadworthy passenger vehicles not riding lawn mowers intended for off-road use. Passenger vehicles are significantly different than consumer grade riding lawn mowers. There is no data to support the use of the SSF as it relates to riding lawn mowers. Furthermore, the Toro TimeCutter did not roll during the subject incident but rather it pitched forward. The SSF has no use or intent for application in the pitch axis.
- Mr. Bilek calculated the theoretical velocity of the subject mower; however, this calculation has no relevance since it does not account for any resistive forces.
- Mr. Bilek stated, "the park lock cannot stop the mower once it is moving." This statement lacks foundation and contradicts the findings from the "test" videos which demonstrated that the electric park brake can, in fact, stop the mower.

I have arrived at the following opinions, based upon a reasonable degree of scientific certainty:

- On the day of the subject incident, Rebekah Hillman was operating the 2013 Toro TimeCutter over uneven terrain located on a residential property. The terrain in the vicinity of the subject incident was both sloped and elevated. While mowing the grass, Rebekah Hillman moved the front of the Toro TimeCutter into a recessed flowerbed causing the mower to become immobilized.

- Jennifer Hillman and Rebekah Hillman decided to extract the Toro TimeCutter by engaging the bypass levers located at the rear of the mower and towing the mower up the sloped terrain using a tow strap anchored to a John Deere 3038E tractor. The mower was towed approximately 40 feet up the sloped terrain to an area with a downward nominal slope of 9.5 degrees. The mower was oriented with the front facing downward.

- Once the mower was positioned near the top of the sloped terrain, the electric park brake was engaged, and the tow strap was removed. Rebeka Hillman subsequently attempted to resume mowing by disengaging the electric park brake and operating the motion control levers. Forward movement of the mower was initiated with Rebekah Hillman positioned in the operator's seat. The mower moved down the sloped terrain toward a retaining wall. The retaining wall was elevated approximately 5.5 feet above the adjacent ground level. Prior to reaching the retaining wall, Rebekah Hillman jumped

Mr. Kirk Florence
May 8, 2023
Page 34

in front of the mower, misstepped and fell to the ground below. The mower continued on its path and was projected off of the retaining wall leading with its left front. The mower partially landed on Rebekah Hillman's left lower extremity while she was on the ground.

- Based on an accident reconstruction analysis of the subject incident, it was determined that a motive force was applied to the rear of the mower while stationary with the electric park brake disengaged, causing the mower to overcome rolling resistance and initiate forward movement. Application of a motive force accelerated the mower to a speed greater than its acceleration due to gravity alone.

- Acceleration of the mower due to the external motive force proportionately increased its velocity which in turn decreased the time available for Rebekah Hillman to respond as she moved toward the retaining wall.

- The "test" videos demonstrated the effectiveness of the electric park brake. In the absence of an external motive force, the mower was able to stop within a 1-foot distance once the electric park brake was engaged.

- Failure to disengage the bypass pins allowed the subject Toro TimeCutter mower to freeroll down a sloped terrain. This was further exacerbated by moving the mower near the top of a sloped terrain during the manual movement procedure. Additionally, application of an external motive force to the rear of the mower contributed to the decreased effectiveness of the electric park brake.

Mr. Kirk Florence
May 8, 2023
Page 35

As additional information is made available to me or as new facts are uncovered during the investigation and discovery process, my professional opinions may change to reflect the newfound information. The opinions expressed herein, to a reasonable degree of medical and scientific certainty, however, are current and accurately reflect my conclusions based upon the information reviewed and the analysis performed as of this date.

Should you require additional information, please do not hesitate to contact me.

Sincerely,

Enrique Bonugli

EJB/mrc

Attachments:    Curriculum Vitae
                Testifying History
                Rate Schedule

Mr. Kirk Florence
May 8, 2023
Page 36


<u>*ADDITIONAL MATERIALS REVIEWED*</u>

Fricke, L. <u>Traffic Accident Reconstruction</u>. Northwestern University Traffic Institute, Second Edition. 2010.

Collins, J. C, Accident Reconstruction. p. 152. Charles C. Thomas Publisher, Springfield Ill. (1979)

Funk, J., "Geometric Derivation of Camera Equations," *SAE Int. J. Adv. & Curr. Prac. in Mobility* 4(4):1189-1197, 2022, https://doi.org/10.4271/2022-01-0831.

Gillespie, Thomas D. 2021. *Fundamentals of Vehicle Dynamics*. Revised Edition. Warrendale: SAE International.

Struble, Donald E., and John D. Struble. *Automotive accident reconstruction: practices and principles*. CRC press, 2020

Wirth, J., Bonugli, E., and Freund, M., "Assessment of the Accuracy of Google Earth Imagery for use as a Tool in Accident Reconstruction," SAE Technical Paper 2015-01-1435, 2015, doi:10.4271/2015-01-1435.