

| | 46475 Desoto Court |
| **DESIGN** | Novi, Michigan 48377 |
| **RESEARCH** | Tel: (248) 668 - 3450 |
| **ENGINEERING** | Fax: (248) 668 - 3460 |

May 8, 2023

Kirk Florence, Esquire
Kilpatrick Townsend & Stockton LLP
2001 Ross Avenue Suite 4400
Dallas, TX  75201

**RE: Hillman, Rebekah v Toro**

Dear Mr. Florence:

Pursuant to your request, the following report was prepared summarizing my observations and findings in the case referenced above. A curriculum vitae is attached that outlines my professional background (Attachment 1). I am a licensed and registered professional engineer in the State of Michigan. I have extensive background in vehicle dynamics, accident reconstruction and vehicle crash mechanics, automotive occupant protection and restraint system performance, human injury mechanism and tolerance, experiment design and instrumentation, and dynamic and impact testing of on-road and off-road passenger vehicles and systems. I have spent over 20 years involved in the analysis of vehicle collisions. I am a member of the Association for the Advancement of Automotive Medicine and the Society of Automotive Engineers (SAE). I am a technical paper reviewer in the area of occupant protection including biomechanics and restraint system design and performance for SAE and Traffic Injury Prevention.

My educational background includes a Bachelor of Science in Engineering (BSE) degree and a Master of Science in Engineering (MSE) degree in mechanical engineering from the University of Michigan, and a Ph.D. in biomedical engineering from Wayne State University. My Ph.D. thesis was focused on impact biomechanics. I have completed additional studies in the areas of accident reconstruction and statistics. In addition to my current position at Design Research Engineering (DRE) as a Principal Engineer, I have mechanical engineering design experience from previous employment at TRW Automotive that included automotive brake component and system design, testing, and vehicle performance optimization.

## Materials Considered

In conducting my research and formulating my opinions in this case, I have reviewed the following case materials:

- Legal documents including the Complaint and other information and materials produced in discovery
- Genesis Ambulance Report, Record No. 245061, dated June 18, 2020, pertaining to Rebekah Hillman
- Quad City Medforce Air Medical Transport Report, Incident No. 20-16227, dated June 18, 2020, pertaining to Rebekah Hillman
- Photographs of the incident site
- Photographs of the subject mower
- Medical record pertaining to Rebekah Hillman
- Photographs and video of Plaintiff and Plaintiff's injuries, including "Day in the Life" video
- Toro documents produced by Plaintiffs
- Documents produced by Toro
- Depositions and/or exhibits of Carol Drutowski, Tim Fowler, M.D., Jennifer Hillman (Volumes 1 & 2), Rebekah Hillman, Matt Karam, M.D., and Todd Porter
- Interview videos describing subject incident
- Plaintiffs' Experts' Reports and associated materials prepared by Thomas Berry, P.E., dated March 17, 2023; David Bilek, P.E., dated March 17, 2023; Kelly Kennett, M.S., dated March 17, 2023; and Shelly Kinney, MSN, RN, dated January 16, 2023
- Plaintiffs testing videos
- Additional reference material in Attachment 2

Additionally, I inspected the subject mower on November 3, 2022, in Wichita, Kansas.

## Emergency Responder-Reported Information

### Genesis Ambulance EMS

According to the Genesis Ambulance records, dated June 18, 2020, around 1137 hours personnel were dispatched to 5319 E. High St., in Colona, Illinois. Rebekah Hillman had reportedly rolled a garden tractor while mowing a hillside. Family members freed her from the tractor. The patient complained of only pain in her right [sic] distal tibia-fibula area. Upon arrival, personnel found Ms. Hillman lying on her left lateral side, complaining of her ankle area. Her right [sic] ankle had a compound open fracture with dislocation and bleeding. She was alert and oriented with a pain level of 10. An ALS survey was performed with no immediate life threats. Ms. Hillman was listed in the report as a 50-year-old female weighing 200 pounds.

### Quad City Medforce Air Medical Transport

Records from Quad City Medforce Air Medical Transport, dated June 18, 2020, indicate that they were dispatched around 1145 hours to 5319 E. High St., in Colona, Illinois. Rebekah Hillman had a zero-turn lawn mower fall onto her left lower leg, which had a large open fracture of both the tibia and fibula just above the ankle. Ms. Hillman stated that the zero-turn lawn mower she was driving started to slide while being towed up a slight hill after being stuck, and then the mower fell off a 5-6 foot retaining wall and landed on her left ankle. The chief complaint was noted to be open



4A - 2

Exhibit 3-2

fracture of left tibia and fibula/wound and secondary complaint was superficial abrasion to left forearm. She denied any loss of consciousness during the accident. Ms. Hillman was noted to be a 50-year-old female, weighing 190.3 pounds. She was transported to University of Iowa Hospital, in Iowa City, for Level 1 trauma care.

## Deposition Testimony

### Rebekah Hillman, Plaintiff, Driver of Subject Mower

According to the deposition testimony of Rebekah Hillman, she has a class B driver's license as well as a commercial driver's license. Through her union at work, she has dozer, skid steer, forklift, loader, and telehandler's certifications. She has worked on these certifications since 2018. For her job, she has received training in interpreting warning labels and symbols.

Her wife Jennifer surprised her with the Toro TimeCutter. Jennifer asked about a rollover protection system when the mower was purchased but was told it was not available. Jennifer said they needed to be careful. Other brands with ROPS were way out of their budget. Jennifer evaluated the slopes on their property to see if they were a potential problem, and then said that everything was safe. Rebekah does not recall if there were any restrictions or precautions related to slope operation.

Rebekah had previously operated her father's zero radius turn mower maybe four or five times. She felt comfortable with how the TimeCutter operated. She reviewed the subject TimeCutter owner's manual for specific information, rather than reading it from cover to cover. She fanned through the manual because she was curious to know where the grease inserts were. She had an electric grease gun and helped Jennifer maintain that part of the mower every 25 hours or so. She never read any portions of the Operator's Manual dealing with the bypass pins. She knew the bypass pins were there before the accident. She had never gotten stuck or had any maintenance problems with the TimeCutter, nor did she ever have a loss of control or instability. She did not need any orientation or training to first use the mower; she felt comfortable operating it. She could not get off the mower unless the levers were moved to the outboard position because they were right in front of her.

At the time of this accident, she thinks she had not mowed the lawn during that season. The day of the accident was sunny and dry. She has vague memories of that day. She is not sure if she got stuck on her first pass. She had been mowing for maybe twenty minutes at that point. She was coming up the hill and her tire got stuck. One wheel slipped over the edge at the beginning – it had to be the front left one. Then the mower kind of slid in and she backed up to straighten it and move to the side. The mower went in the flower bed. She backed it up and it slid further in. When it first went in it was two wheels, it would be the back and front. When she got off the TimeCutter, she was a little shaken up. There was a wall right there. She realized she was in a precarious position. So, either one or two wheels on the left side went over the edge into the bed. Then the front swung around, catching her off guard. She backed up to redo it. When she went to turn, it came down and scared her, so she got off of it.

When she first got in the flower bed, she backed up and turned. The flower bed soil was not soft. She tried to pull forward, staying away from the wall. She had come at it one way, and by the time she was stuck, she was facing the other way, and the whole mower was in at that time, with all

3

four wheels stuck. Once she was stuck, she turned off the engine. She disengaged the blades because mulch was flying everywhere. She suggested using the can-am to pull out the mower, but Jennifer wanted to use the tractor instead. When she got off the mower, the control levers were in park. Jennifer came back with the strap and the John Deere tractor. They strapped it to the loader and Jennifer planned to pull out the TimeCutter. There was only one strap. Jennifer engaged the bypass pins by pushing them in.

She was aware the bypass pins were engaged. In order to tow the mower, they would have had to be engaged. She vaguely remembers removing the tow strap. The next thing she did was get on the mower. She started up the mower and pulled the levers inbound and pushed forward to go. It started rolling. She pulled the levers outboard to stop, but it would not stop. She pulled the levers to go into reverse. She pulled them out. She tried to turn. Then she saw the wall. It was coming, and she was going to jump. She remembers throwing the levers out. She does not remember which direction she jumped. The blades were stopped when she was going towards the retaining wall.

The mower did not move after it was towed and she first sat on it. It started rolling sometime after she brought the control levers to the neutral position. In her mind it took seconds for the mower to roll. She does not recall any sliding. She was lying on her left side, facing the driveway and firepit. The house was toward her head. She could not see the mower.

With regard to Exhibit 12, looking from straight on, she would approach from the right side. She was down near the edge of the flower bed with the first pass all blown away from the bed. She would be right along the edge and the house would be to the left. The uphill part of the slope would be to the right and the flower bed was on the left. She thinks she got stuck on her first pass. The left front wheel went over the ridge and started to turn to the left towards the downhill part.

### Jennifer Hillman, Plaintiff, Scene Witness

According to the deposition testimony of Jennifer Hillman, prior to the subject accident, neither she nor Rebekah ever had any other accidents with the TimeCutter. On the day of the accident, it was sunny, and the grass was dry. The accident happened around 11:30 a.m., after Rebekah had been mowing for around half an hour. Rebekah asked her to pull the mower out with the Can-Am. Because of the flower bed's hump, she told Rebekah that the John Deere was needed. She was going to have to lift the back end. The stuck mower was facing west with all four wheels in the flower bed. She doesn't know which direction Rebekah was going. Rebekah said one wheel caught and took her in. It is a nine-foot bed and only a five-foot tractor. The mower was probably in the middle of the bed with a couple of feet on either side. The mower wasn't facing the wall; it was parallel to it. She had never gotten a wheel of the TimeCutter into the flower bed. The terrain was a little steeper at the beginning of the bed. The soil was not softer – it was a pretty hard bed.

Jennifer got the tractor and a tow-strap. She attached the strap to the front of the front loader. She had to lift up on the back end, so the mower was not on the ground, and walk the tractor, so it was facing straight on. The John Deere was facing the TimeCutter, pointed down the hill toward the retaining wall. She hooked the strap to the zero turn and pulled the pins. She put the key in the run position and pulled the levers in to unlock the electric brake. All engines were off, and she only turned the TimeCutter to the run position.

4



4A - 4

Exhibit 3-4

She started to lift up on the bucket, in order to lift up the back end. She slowly started moving back to turn perpendicular to the wall. The mower was in bypass mode. She started to back up. The wheels of the TimeCutter were maybe two inches off the ground. She backed up, lifted the tractor, backed up a little more, and lifted a little more, and backed up a little more She did this maneuver probably four or five times. The process turned the mower, so it was perpendicular to the wall. The nose of the mower was facing down over the edge of the wall. After getting the mower parallel to the tractor, she started to go in reverse, maybe 30 feet. As she moved in reverse, she slowly began to lower the loader attachment to the tractor. As it came out of the flower bed, she did not want the wheels to be a foot off the ground. She wanted to keep it very low to the ground. She used float mode on the tractor so it would gradually lower itself as she backed up. She had no problems pulling out the mower. She had no traction issues. She was moving towards the flattest ground, which was by the tree.

The top of the slope was flat enough that when she stopped, the mower did not move. When she stopped, she put the bucket on the ground. She moved forward a bit to loosen the strap so they could unhook it. Rebekah took off the clevis and pulled the strap off each side. The pins were still in bypass mode. The key was in the run position, but the mower was not running. The levers were inward, in the neutral position. It was the same position used during the towing. The TimeCutter was rolling on just the caster wheel the entire time while moving it with the tractor.

She got off the tractor when Rebekah was taking off the straps. She put the handles back out on the TimeCutter. She moved the levers into the outward position. Disengaging the bypass pins did not cross her mind. She knew she had to disengage the pins before the mower would start in operating mode again. They did not discuss it; she just assumed that when Rebekah was unhooking the straps, Rebekah put in the pins. The TimeCutter was started first by Rebekah. Rebekah pulled in the levers, and it started to roll. While the levers were in the outboard position, it was not rolling. The slope was enough that it started rolling on its own. Gravity pulled the mower directly towards the wall.

After Rebekah started rolling, Rebekah started pulling back on the levers. At that time, she realized it was still in bypass mode. She started screaming for Rebekah to put it in park, to put the levers outward. She saw Rebekah push the levers outward. The machine made a weird sound but would not stop. Rebekah pushed and pulled the levers about three or four times. There were skid marks on the way down; she assumes it was the electric brake attempting to catch. The mower went straight and hit the wall. It gradually picked up speed as it went down. It fell off where the top of the wall is uneven, so one wheel went off the lower side, and one wheel went off the higher side. The mower fell.

When she saw that the mower would not stop, she screamed for Rebekah to jump. At some point, right as it was going over the wall, Rebekah jumped towards the left. She ran to the Can-Am to get her phone to call 911. She ran toward Rebekah while calling 911. She saw Rebekah under the TimeCutter. It was upside down. The front of the mower was towards the retaining wall. It was fairly perpendicular to the wall, maybe a little to the left. Looking from up above towards the path it traveled, the left side of the mower would have hit and toppled to the seat of the left side. The front wheels were closest to the wall, and it was upside down right on the seat. Rebekah was lying so her head away from the mower. Both of Rebekah's legs were under the mower. There was



4A - 5

Exhibit 3-5

damage to the levers. The left lever was repaired after the incident, but previously it was bent all the way in, almost touching the seat.

A week after the accident she made a test video of the mower. It was her idea because she was curious to learn why the mower did not stop. It says in the manual that if something fails while in bypass, you still have electric brakes. The manual says you need to pull the bypass pins out to have movement and control in the left and right wheels. But if something fails during that time, you still can engage the electric brake.

## Toro TimeCutter Design Review

Zero-turn lawn mowers were originally developed for commercial applications, such as golf courses and sports fields such as baseball and football fields, and for professional landscaping companies. These mowers can generally mow at higher speed with better maneuverability than traditional lawn tractors. This allows for faster mowing and less need for push mowers or trimmers around edging. Over the past approximately 20 years, manufacturers have introduced zero-turn mowers for the residential marketplace that offer the same advantages at a lower cost for the homeowner. Residential zero-turn mowers generally have smaller engines and smaller cutting decks and are therefore in a lower weight range than larger commercial mowers.

The Toro TimeCutter zero-turn mower was introduced in 2001. It is Toro's smallest zero-turn mower for the residential/consumer market. Following its introduction, the TimeCutter was redesigned in 2011, 2015, and 2020. Deck sizes in the TimeCutter line have ranged from 32 inches to 60 inches. Depending on the engine and deck sizes, TimeCutter mowers generally weigh approximately 400 to 650 pounds. The subject Toro TimeCutter mower is model number 74631 and was manufactured in September 2013. The mower designator is SS 5000, in which the "50" means a 50-inch deck, equipped with three blades. It has a 23 HP 726 cc Kawasaki engine.

To use the mower, the operator ensures that the motion control levers are in the spread park (brake) position and sits down in the seat. While sitting on the mower's seat, the control panel is to the operator's right (see Figure 1). To start the engine, the motion control levers must stay in the spread park position and the blade control switch must be off, then the choke lever on the control panel is pulled out, and the key/ignition switch is rotated to the Start position. After the engine has successfully started, the choke lever can be pushed back in. The throttle may be adjusted to any position between a low engine speed (indicated by a turtle symbol) and a high engine speed (indicated by a rabbit symbol). The operator's manual indicates that the mower will be operated at the full throttle engine speed for most applications.

The mower can be driven by pulling the motion control levers inward together into the center unlock position, which releases the parking brake, and then pushing forward on both levers to go straight forward or pulling rearward on both levers to go straight backwards. Turning is accomplished with individual or combined opposite movements of the left and right control levers. The smart speed lever below the front of the seat allows the operator to switch between low and high mower speed ranges (maximum speed of 4.0 mph in low range and 7.0 mph in high range).



4A - 6

Exhibit 3-6



| | | | | | |
|---|---|---|---|---|---|
| 1. | Deflector | 4. | Height of cut lever | 7. | Footrest |
| 2. | Rear drive wheel | 5. | Operator seat | 8. | Fuel tank cap |
| 3. | Motion control levers | 6. | Smart Speed™ lever | 9. | Control panel |

| | | | |
|---|---|---|---|
| 10. | Engine | | |
| 11. | Front caster wheel | | |

| | | | | |
|---|---|---|---|---|
| 1. | Control panel | 4. | Continuous variable setting |
| 2. | Throttle | 5. | Slow |
| 3. | Fast | 6. | Choke control |

**Figure 1 – TimeCutter components layout diagrams from the Operator's Manual**

Propulsion for the lawn mower is provided by a set of belt-driven hydrostatic transaxles – one driving each rear wheel. These transaxles are the EZT (ZT-2200) model manufactured by Hydro-Gear. Each motion control lever controls the operation of the corresponding hydrostatic drive (see Figure 2).



**Figure 2 – TimeCutter EZT Hydrostatic drive (parts "1" and "2") layout from the SS 5000 parts diagram.**

7

The operator may engage the blades by ensuring that the engine is at full throttle and the motion control levers are released into the neutral position (with the control levers still pulled together), then pulling up on the blade control switch. The deck mowing height is adjustable between 1.5 inches and 4.5 inches.

To push the machine by hand, an electric brake mechanism is utilized. The battery must be charged and functioning and the ignition key needs to be in the Run position for the electric brake to disengage. The procedure for disengaging the rear wheels for pushing the machine by hand is outlined in the operator manual as follows: With the machine on a level surface and the blade control switch disengaged, move the motion control levers outward to the park position, stop the engine if it is running, and wait for all moving parts to stop before leaving the seat. Then locate the bypass levers on the rear frame on both sides of the engine (see Figure 3). Next, move the bypass levers forward through the keyhole and down to lock them in place, then move the motion control levers inward to the neutral position and turn the ignition key to the Run position. Do not start the machine. The machine is now able to be pushed by hand. When finished moving the machine, the key should be moved to the Stop position. When the machine is ready to be operated, move the bypass levers rearward through the keyhole and down to lock them in place.

According to the deposition of Toro engineer Todd Porter, when the bypass levers are pushed in and locked, the wheel motor in the transmission is lifted so that fluid can bypass it and the mower can be manually pushed without damaging the transmission. This means that there is no hydrostatic braking capacity when using the bypass.



**Figure 28**

1.  Bypass lever location
2.  Lever position for operating the machine
3.  Lever position for pushing the machine

g017303

**Figure 3 – TimeCutter bypass levers as shown in the Operator's Manual**

The operator's manual also outlines the functionality of the safety interlock system. The engine will not crank if the blade control switch is set to "ON" or if either motion control lever is in the center unlocked position. With the engine running, the engine will stop if the operator rises from



4A - 8

Exhibit 3-8

the seat with the blade control switch "ON" or with either motion control lever in the center unlocked position.

According to the 2013 TimeCutter operator's manual, the safe operating practice instructions in the manual are provided by ANSI[1] standard B71.1-2003. Among other guidelines, the operator is instructed to use extra caution when mowing on slopes and to not mow on slopes greater than 15 degrees or when the grass is wet. The operator's manual also provides a slope indicator to assist the operator in determining the approximate angle of certain slopes (see Figure 4).



Figure 4 – Slope indicator diagram in 2013 Toro TimeCutter Operator's Manual

### Physical Evidence

I inspected the subject mower and the incident location on November 3, 2022. The mower is shown in Figure 5. The following observations were made of the subject TimeCutter mower, at that time:

- "Timecutter SS 5000" sticker under front of seat.
- Model No. 74631, Serial No. 313015934, Date of Manufacture (DOM) SEP 2013.
- Kawasaki engine, Code: FR691V-DS07-R, E/NO: FR691VC35511, Displacement 726 cm3, Engine Family: KAXS.726N4CA, data of mfg 0913.
- Both battery terminals were electrically connected.

---

[1] American National Standards Institute

4A - 9

Exhibit 3-9

- The fuel level appeared to be low; there was no fuel visible in the fuel window.
- The motion control levers were in the separated park (brake) position.
- The smart speed lever was set to high speed.
- The key was in the Stop ignition position.
- The throttle lever was in the full (rabbit) position.
- The choke control was fully up (choke on).
- The blade control was pushed down (blade off).
- The seat was adjusted in the full rear position.
- The mowing height adjustment was set to the maximum height of 4.5 inches.
- The rear tires appeared to be original (the DOT code for the right rear tire indicated that it was manufactured during the 27th week of 2013).
- The warning labels on the footrest were intact and visible, including the "< 15" slope warnings.
- The instruction stickers near each of the bypass levers were intact. The bypass levers were found in the rearward, non-bypassed, position.
- Some horizontal scraping was noted along the left side of the black plastic body.
- Some scraping was noted on the forward surface of the footrest.
- There was scuffing on the top left area of the seatback.
- The left motion control arm appeared to have been damaged and then bent back into a position that was close to its OEM orientation.
- There was damage noted to the parking brake lever arms that engage the cog wheel or sprocket on the inner side of the housing of the left and right hydrostatic transaxles of the mower. A groove was cut into the teeth of each of the lever arms by the cog wheel, consistent with attempting to move the lever into position with the sprocket rotating (see Figure 6). It is my understanding that the plaintiffs did some demonstrations of attempting to apply the parking brake to the moving subject mower on a sloped surface post-incident but prior to my inspection. It is expected that the grooves were cut deeper as a result of these demonstrations.



**Figure 5 – Subject Toro TimeCutter SS 5000**

4A - 10

Exhibit 3-10



**Figure 6 – Location of and damage to the parking brake lever arm that engages the drive cog wheel / sprocket.**

The functionality of the parking brake was verified during my mower inspection. These activities were videotaped. First, with the motion control levers in the park / outboard position the mower was unable to move when manually pushed. This indicates that despite the lever arm damage shown above, there is sufficient engagement between the lever arm and drive sprocket in a static situation to preclude wheel rotation.

Next, the bypass levers on the rear frame were moved inward and secured in the neutral position. With the motion control levers in the center position, the key was turned to the Run position, and the sound of the electric brake solenoid was heard. The lever arms were then visually confirmed to be separated from the drive sprockets on each side of the mower, thus releasing the parking brake. The mower was then able to be manually pushed forward (see Figure 7).

4A - 11

Exhibit 3-11



**Figure 7 – The subject mower moved when manually pushed with the bypass levers set to release the parking brake, the motion control levers centered, and the key in the Run position.**

Finally, with the key in the Run position, the motion control arms were moved from the center position to the park position. When the second motion control arm reached the park position, the sound of the electric brake solenoid was heard, indicating that the lever arms had moved back into contact with the drive sprockets, thus applying the parking brake (see Figure 8). The bypass levers were then pulled out and secured in the position for operating the machine.



**Figure 8 – The subject mower with the parking brake lever arms re-engaged with the sprockets.**



**Industry Standards and Design Considerations**

The serial decal on the subject mower indicates that it meets the requirements of ANSI B71.1 2003, "Walk-Behind Mowers and Ride-On Machine with Mowers – Safety Specifications". Per the language in the standard, it applies to consumer products for personal use around the house and not to commercial products used by hired operators or for agricultural purposes. ANSI certifies the standard which is written by members of OPEI, the Outdoor Power Equipment Institute. Toro is a member of OPEI and serves on the standards committees. Language in the standard indicates that the use of the standard is completely voluntary, and that ANSI does not develop or offer interpretations of the standard but rather points the reader to the sponsor of the standard, in this case OPEI, for questions on interpretation.

Part III, "Ride-on mowers, lever steer mowers, lawn tractors, and lawn and garden tractors", of ANSI B71.1 2003 applied to the TimeCutter 2011 redesign, and thus the 2013 model year residential zero-turn mowers, including the subject mower. Guidance provided in B71.1 Part III includes identification of the mower, including model and serial number and where to obtain replacement parts; requirements for hand and foot controls, safety interlocks, braking, and steering; requirements for shielding and guarding of components; electrical requirements; static stability, dynamic turn stability, and service brake system test requirements; product labeling requirements; blade enclosure, blade speed, and blade stopping time requirements; impact testing, unbalance testing, blade security testing, structural integrity testing, and thrown object testing requirements. Per the 2013 Toro Product Safety Test Report, the 2013 Toro TimeCutter met all applicable requirements of the ANSI B71.1 standard.

*Rollover Protective Structure (ROPS)*

The subject mower was not required to be equipped, and did not come equipped, with an Operator Protective Structure (OPS), such as ROPS (Rollover Protective Structure), framework protecting operators of turf care machinery that minimizes the likelihood of crushing injury resulting from accidental overturning during operation. According to ANSI B71.1 2003 section 19.1.3, if the machine and mower attachment combined mass with all fluids full and with ballast as recommended by the manufacturer is less than 1,245 pounds, then an OPS, such as a ROPS, is not required. The subject mower is significantly under this weight; per Toro engineer Carol Drutowski,[2] the 2013 TimeCutter SS 5000 mower weighs 578 pounds. Section 19.2.2, Static Stability Tests, requires that the machine wheels do not lift off the table before a tilt of 30 degrees with the mower oriented longitudinally, and do not lift off the table before a tilt of 25 degrees with the mower oriented laterally.

The addition of a ROPS bar changes the center of gravity of a mower, which causes an increasing loss of stability as the weight of the mower decreases. The center of gravity and therefore the stability of a larger, heavier mower will be minimally affected by a ROPS bar, whereas the stability of a lighter mower will be more adversely affected. Table 1 is a summary of stability requirements in different versions of B71.1. Of note in Table 1 is the differentiation that was introduced for the 2012 version of ANSI B71.1 for a zero-turn residential machine equipped with ROPS. When equipped with ROPS, this type of mower had to meet longitudinal and lateral static stability requirements of 25 and 20 degrees respectively, rather than 30 and 25 degrees as specified for all

---

[2] January 18, 2023 deposition of Carol Drutowski, 111:19-21.



4A - 13

Exhibit 3-13

ride-on mowers in the 2003 version of the standard. The subject mower was designed before the adaptation of the 2012 standard.

**Table 1 – Static Stability Requirements in ANSI B71.1**

| ANSI B71.1 Version | Longitudinal Stability | Lateral Stability |
|---|---|---|
| 2003 – All Ride-On (Section 19.2.2.1.2) | 30 degrees | 25 degrees |
| 2012 – Zero-Turn w/ ROPS (Section 20.2.2.3) | 25 degrees | 20 degrees |
| 2017 – Zero-Turn w/ ROPS (Section 21.2.2.3) | 25 degrees | 20 degrees |

The 2012 version of ANSI B71.1 also specified that the OPS should be in the form of a ROPS with a seat belt, and that the ROPS design should comply with nationally or internationally recognized standards. Additionally, the 2012 version lowered the mower mass at which ROPS is required for a residential zero-turn mower to 882 pounds or greater (section 20.1.3). This mass includes the heaviest mowing attachment and full fuel levels, but not the operator or any other attachments or ballasts. This is significantly heavier than the subject Toro TimeCutter mower.

The ANSI B71.1 2003 standard does not provide guidance on how to design and test an OPS or ROPS system, it simply specifies when such a system should be used. Historically, Toro relied on OSHA Part 1928 "Occupational Safety and Health Standards for Agriculture" Subpart C "Roll-Over Protective Structures", which defines requirements for ROPS designs in the United States.[3] However, this standard is not specific to ride-on or zero-turn lawn mowers. Creation of the OSHA standard came from the agriculture industry, which mainly consists of much larger machines with the operator commonly seated more rearward.

In 2009, the international standard ISO 21299, "Powered ride-on turf care equipment – Roll-over protective structures (ROPS) – Test procedures and acceptance criteria" was released. This standard is the first international standard covering ROPS for powered ride-on turf care machinery, including zero-turn mowers. The standard enables the ROPS to be tested by the application of static loads that simulate actual loads when the machine overturns without free-fall to observe the strength of the structure, the ROPS brackets, and any affected components of the machine. The type of testing is separated based on whether the ROPS is designed for a rigid ROPS or an energy-absorbing ROPS. Rigid ROPS can be used on smaller, low mass vehicles that experience little or no permanent deformation to the ROPS when it overturns. The release of this standard was the first to address a set of ROPS design guidelines that applied directly to ride-on mowers.

*Service and Parking Brakes*

Section 3.23 of ANSI B71.1 2003 defines the service brake system as the designated primary brake system used for decelerating and stopping a machine. Section 3.20 defines the parking brake system as a system used to hold one or more brakes or braking means continuously in an applied position. Section 14.2.3 defines the brake requirements for ride-on consumer mowers. It states that a service brake shall be provided, and it allows for either a foot-operated service brake or a combined lever steer and brake control. The lever steer brake shall be accomplished by motion of the levers in a direction opposite that of machine travel. The parking brake can be hand-operated, foot-operated, or automatically applied, and may be in combination with the service brake. Section

---

[3] E.g. TTCHillman00189152



19.3.2 defines service brake tests for effectiveness, durability, and proof load. Section 19.3.3 defines parking brake testing. The machine shall be held on a 16.7 degree or 30% slope by the parking brake.

Annex A of the ANSI B71.1 2003 standard provides rationale for the requirements in the standard. Section A.19.3.2 states that the service brake system testing involves a pedal force (50 lbf) that represents an operator with less than average strength. The pedal force requirement is intended to minimize the possibility of any operator loss of brake control but is not intended to be the maximum pedal force for greatest machine braking capability. Section A.19.3.2.2 states that machines with hydrostatic drives or with combined lever steer and brake controls, such as the subject mower, are exempt from the test durability requirement, which is intended for wheel brakes not integral with the drive system. Section A19.3.2.3 states that the proof load test establishes a minimum structural requirement for the service brake system to ensure integrity under extreme load conditions. Section A.19.3.3 states that the parking brake system is required as a means to hold a ride-on machine on a slope without assistance from the engine to minimize the possibility of a hazard to the operator or bystander from unintentional movement of the machine.

## Subject TimeCutter Design Analysis

### Rollover Protective Structure (ROPS)

As with many design decisions, implementation of ROPS on a small, lightweight lawn mower has design tradeoffs. While a ROPS may provide a benefit to the operator in certain situations, there are others in which it will provide no benefit or even contribute to further injuries to the operator. First and foremost, use of ROPS requires the use of a seat belt to maximize the ROPS effectiveness and minimize the potential for ROPS induced injuries. Even while wearing the seatbelt on a ROPS-equipped machine, there are certain situations in which the operator would be better off being able to separate from the machine in a rollover.

A ROPS adds additional weight to the above the main structure of the rear of the mower, shifting the center of gravity upward, which is especially significant on a mower that is lightweight to begin with. This can lead to additional instability in certain situations, such as when driving the mower on steep slopes. The addition of counterweights to balance this shift in center-of-gravity increases the overall mass of the mower, which increases the potential injury for impinged operators in rollover situations.

The ROPS significantly increases the height of the machine. Operators must be aware of the ROPS contacting and impeding the forward motion of the mower on objects like trees, clotheslines, signs, pole supports, etc. Contact of the ROPS with an overhead object may in and of itself potentially cause a rearward pitch-over or cause entrapment of the operator between the object and the ROPS bar. In situations where obstacles are constantly encountered by the operator, specifically a homeowner cutting their yard repeatedly, ROPS can become such a nuisance that the owner may decide to remove it or replace the mower with a non-ROPS machine. Some machines are equipped with a foldable ROPS. These offer little to no benefit if the operator chooses to keep the ROPS folded down at all times.

DRE performed research of many zero-turn mower brands to determine whether ROPS is standard or optional equipment on their mowers close in size to the Toro TimeCutter. Where possible, DRE

15

determined which brands may have offered ROPS in their 2013 TimeCutter equivalent model. The only model aside from the TimeCutter that was found that currently offers ROPS as an optional accessory, is the entry-level Bobcat, model ZT2000 48" / 52", which is in the prosumer price range and weight.

Aside from Excel (Hustler/Big Dog) mowers, there did not appear to be 50" or similar residential zero-turn mowers of similar weight and price to the Toro TimeCutter that were offered with ROPS as standard or optional equipment in model year 2013. ROPS is currently not offered on the Excel residential mowers equivalent to the TimeCutter, such as the Hustler Raptor or Big Dog Alpha. Examples of current or recent entry-level zero-turn mowers of similar size to the 50" TimeCutter equipped without ROPS are shown in Figure 9. These mowers do not have standard ROPS, and aside from the prosumer Bobcat, none appear to offer ROPS as an option.

16



**Figure 9 – Examples of other 50-inch or similarly sized entry-level zero-turn mowers**

*Service and Parking Brakes*

The service brakes on the subject mower are implemented by the hydrostatic drives. The parking brake is an electric brake that engages brake levers/pawls onto a cog wheel or sprocket on the hydrostatic drives. The parking brake is not, and is not intended to be, a form of service brake. This is a common implementation in the industry. Older pre-electric brake systems may have applied pawls directly to the rear wheels, but these basic systems have been updated to hydrostatic transaxle-based parking brakes.

Incorporating a service brake in the form of a lever or pedal on a hydrostatic transaxle mower, beyond the obvious redundancy in operation of the mower, also complicates the safe operation of the mower. Both tractive force and braking force could be applied at the same time, increasing the potential for wheel slip, directional instability, and loss of control. Use of a parking brake during the dynamic operation of the mower similarly can lead to simultaneous application of tractive force and braking force, leading to loss of control.

DRE performed research of many zero-turn mower brands to determine the parking/service brake mechanisms for mowers close in size to the Toro TimeCutter. The entry-level model with a deck size most similar to the 50-inch subject mower for each of several zero turn mower OEMs was determined and categorized as either residential/consumer or prosumer based on weight and/or price.[4] The operator manual and/or parts manual was used to determine the type of transaxle, the parking brake operation (e.g. lever, motion control arms) and actuation (e.g. cog wheel, pawl), and whether bypass levers are available on each mower (see Table 2 and Table 3). If the parking brake is operated by putting the motion control levers in the spread position, the tables will indicate "Motion levers". If the parking brake must be manually controlled by the operator, the tables will indicate either "Handle lever" or "Ball knob lever". This type of parking brake typically involves cables and linkages between the operating lever and the actuating parking brake device that pulls it against the rotating component. Every mower in the tables has hydrostatic transaxles that can be put into bypass mode for manually moving the mower. The mechanism to actuate each of the two bypasses and the verbiage used by the OEM to describe the mechanism in each transaxle are slightly different from mower to mower, i.e. "rod", "lever", "linkage", "dump valve".

---

[4] A mower was considered a prosumer model if its approximate price was greater than approximately $5,000 or its approximate weight was greater than 700 pounds.

4A - 18

Exhibit 3-18

**Table 2 – Current or recent entry-level <u>residential/consumer</u> mowers similar in size to subject 50-inch Toro TimeCutter**

| Current/Recent Model | Hydrostatic Transaxle | Parking Brake Operation | Parking Brake Actuation | Bypass Operation |
|---|---|---|---|---|
| Cub Cadet Ultima ZT1 50" | EZT | Motion levers | Cog wheel | 2 bypass rods |
| John Deere Z325E 48" | EZT | Motion levers | Cog wheel | 2 bypass rods |
| Husqvarna Z248F / Z254F 48"& 54" | EZT | Motion levers | Cog wheel | 2 bypass linkages |
| Hustler Raptor XL 54" | EZT | Motion levers | Cog wheel | 2 bypass rods |
| Craftsman Z5600 50" | EZT | Motion levers | Cog wheel | 2 bypass rods |
| Troy Bilt Mustang Z 46" & 54" | EZT | Motion levers | Cog wheel | 2 bypass rods |
| Ariens Ikon 52" | EZT | Motion levers | Cog wheel | 2 bypass levers |
| Bad Boy MZ Magnum 48" & 54" | EZT | Ball knob lever | Cog wheel | 2 bypass rods |
| RedMax RZT48 48" | EZT | Handle lever | Cog wheel | 2 bypass linkages |
| Jonsered Z48F 48" | EZT | Handle lever | Cog wheel | 2 bypass linkages |
| Big Dog Alpha 52" | EZT | Motion levers | Cog wheel | 2 bypass rods |
| Gravely ZT X 48" & 52" | EZT | Handle lever | Cog wheel | 2 bypass levers |

**Table 3 – Current or recent entry-level <u>prosumer</u> mowers similar in size to subject 50-inch Toro TimeCutter**

| Current/Recent Model | Hydrostatic Transaxle | Parking Brake Operation | Parking Brake Actuation | Bypass Operation |
|---|---|---|---|---|
| Country Clipper Avenue 54" | EZT | Handle lever | Cog wheel | 2 bypass actuator tabs |
| Scag Liberty Z 48" | Tuff Torq 450 | Handle lever | Brake pawl | 2 dump valve levers |
| Scag Liberty Z 52" | ZT-2800 | Handle lever | Brake pawl | 2 dump valve levers |
| Encore Fuzion 48K20 48" | EZT | Handle lever | Cog wheel | 2 bypass linkages |
| Simplicity Courier 48" Briggs | EZT | Motion levers | Cog wheel | 2 roll release levers |
| Simplicity Courier 48" Kawasaki | EZT | Motion levers | Cog wheel | 2 roll release levers |
| Simplicity Courier 52" Briggs | ZT-2800 | Motion levers | Brake pawl | 2 roll release levers |
| Snapper 360Z 48" | EZT | Motion levers | Cog wheel | 2 roll release levers |
| Snapper 360Z 52" | ZT-2800 | Motion levers | Brake pawl | 2 roll release levers |
| Bobcat ZT2000 | ZT-2800 | Handle lever | Disc brake | 2 bypass rods |

The predominant parking brake mechanism in these entry-level zero-turn mowers is the cog/sprocket wheel and toothed brake lever arm or pawl, the same as the Toro SS 5000. Many mowers in this class use the Hydro-Gear EZT (ZT-2200) hydrostatic transaxles, the same as the Toro SS 5000. A few OEMs use other transaxle options, including the Tuff Torq 300 or 400 series or the Hydro-Gear ZT-2800, which is generally used on higher priced models. Each of these transaxles has an internal mechanism, usually a brake pawl arm, that mechanically engages a rotating component to keep the mower stationary and is only intended to do so when the mower is standing still. Like the EZT, these transaxles also have an option for a disc or friction parking brake, although this option appears to be an uncommon selection. Each mower has bypass linkages to put the hydrostatic transaxle in a neutral state in order to manually move it. I have not identified any evidence of a peer mower with hydrostatic transaxles incorporating a redundant service brake. DRE inspected select mowers, either from the surveyed group or sister mowers to those surveyed, to confirm the survey findings. The survey results were confirmed in each of the inspected mowers. See Figure 10, which shows the EZT transaxle and parking brake actuator mechanism for each mower.





**John Deere Z325E**

**Husqvarna Z254F**

**Craftsman Z5200**

**Cub Cadet Ultima ZT1**

**Bad Boy MZ Magnum 54"**

**Figure 10 – DRE-inspected mowers**

## Plaintiff Expert Thomas Berry Report Comments

Thomas Berry's opinions are contained in his report dated March 17, 2023. Generally, Mr. Berry opined that the Toro TimeCutter SS 5000 is defective in design and unreasonably dangerous because it lacks crashworthiness protection for the operator when it rolls over. He also opined that the mower lacks a means that the operator could use to stop the mower if control from the hydrostatic transaxles was not available. He opined that a ROPS would have provided Ms. Hillman a crush protected seated area.

*On pages 4 and 5, Mr. Berry referenced John Deere documents from 1972 and 1985 regarding protection in tipping and overturning situations, including ROPS. On page 12, Mr. Berry cited the JD 510A residential mower as one that provided ROPS as standard equipment.*

This statement is clearly unrelated to ZRT mowers as they were not in production in the 1970's and 1980's. With respect to small entry-level residential zero turn mowers in the class of the Toro TimeCutter, this statement is misleading and inaccurate. For example, Figure 11 depicts the currently offered 48-inch John Deere Z325E. There is no ROPS standard or optional for this machine or any other John Deere zero-turn in the Z-300 series class, which is the TimeCutter equivalent class. The JD510A mower was 1,128-1,132 pounds (model years 2008 and 2009) and is therefore not in the class of the approximately 400-650-pound TimeCutter residential mowers.



**Figure 11 – John Deere Z325E 48-inch**

*On page 15, Mr. Berry described ROPS as though it will prevent injury in every conceivable type of incident and has no downsides, and that he is unaware of any manufacturer that has removed ROPS from their design. Additionally, on page 19, Mr. Berry stated that that 785-pound 2006 Freedom Z and the 594-pound Excel Hustler Sport had ROPS.*

In addition to the overhead clearance and elevated center of gravity design trade-offs with ROPS implementation on lighter machines, the efficacy of a ROPS in mitigating injury in any given accident scenario is fundamentally related to the operator's behavior and use of the available seat belt assembly. Beyond belt use, based on the underlying dynamics of the accident, a ROPS may or may not mitigate the potential for injury. In some scenarios, a ROPS structure can be the source of an injury to extremities, or to the head or torso if the seat belt is not used.

The Freedom Z is not in the residential/consumer TimeCutter class; rather, it is in the Titan prosumer class. The current Excel Hustler residential TimeCutter class mowers, Dash and Raptor, do not have ROPS standard, and there is no optional ROPS offered.

*On page 4 of his report, Mr. Berry stated that there are many zero-turn mowers provided with mechanical brakes that can be applied by a lever or foot pedal. He stated that Toro provides friction type park brakes on many zero-turn mowers but not on the cheaper zero-turn residential mowers. On pages 7-8, he gave an example of a John Deere Z425 mower with a manual parking*



*brake utilizing a handle and a pawl that provides force against the rear tire. He also showed a diagram of a disc style brake from larger Scag mowers, the Patriot and Freedom Z.*

The John Deere design is very basic; toothed pawls dig directly into the rear tire tread when the parking brake is applied by the operator lifting a lever. Figure 12 shows the left rear tire on a 2008 John Deere Z225 with the parking brake applied. When the lever is out of adjustment or the tire is overinflated, significant force is required on the operator lever to lock the parking brake. Not only can tire damage be caused by these manual parking brakes, but they are clearly not intended to be utilized as a service brake. There was no automatic electric parking brake on this series of John Deere mower, i.e., there was no automatic engagement of a parking brake when the motion control arms were moved to the outboard position, so it was incumbent of the operator to engage the parking brake.



**Figure 12 – Example 2008 John Deere Z225 with parking brake applied**

The 2013 peer mower to the Toro TimeCutter is the John Deere Z255. This mower has EZT hydrostatic transaxles with the same cog wheels and brake lever pawls as the TimeCutter. The operator utilized a small lever to operate the parking brake on the Z255. This lever was linked to the brake lever pawl on each hydrostatic transaxle via a cable and linkage rod. In other words, the parking brake was not automatically engaged when the handle levers were moved outward; the operator had to specifically engage the parking brake similar to a typical passenger car. Like the TimeCutter, bypass valves on each transaxle can be engaged to manually move the Z255 mower. The latest consumer John Deere models, such as the Z325E, function the same as the Toro TimeCutter; by moving the motion control arms outboard, the electric parking brake is auto-engaged and bypass levers/pins are used to disengage the hydrostatic transaxles for manual moving of the mowers.

The Scag mowers mentioned by Mr. Berry weigh at least 745 pounds and start at just under $7,000 MSRP. These are not entry-level residential mowers like the TimeCutter. Mr. Berry has done no



testing to show that mowers with these alternative parking brake systems could or should be used to stop the mower while it is dynamically moving down a slope.

*On page 6, Mr. Berry stated that the Toro Titan had a brake that could be applied to stop the moving mower. On page 7, Mr. Berry cited a Fluid Power Safety Institute paper that states that hydrostatic transaxles should not be used as the service brake. On page 9, Mr. Berry stated that the supplier of the hydrostatic transaxles, Hydro-Gear, also provides friction type park brakes.*

The Toro Titan is a heavier, more expensive "prosumer" mower. Mr. Berry does not give specifics of what year and what type of brake was installed. The Toro Titan hydrostatic transaxle parts drawing exploded views that I have reviewed depict an internal parking brake pawl. A description in the Hydro-Gear ZT-2800/3100/3400 manual states that "The ZT-2800, ZT-3100 and ZT-3400 have an internal cog style parking brake." The parking brake pawl engages into slots on the internal hydrostatic motor block, similar to the park pawl in a passenger vehicle's transmission or transaxle (see Figure 13).



**Figure 13 – Hydro-Gear ZT-2800 internal motor block and parking brake pawl**

The use of a cog wheel type parking brake is common industry practice for zero turn mowers (see Tables 2 and 3). Toro engineer Todd Porter testified that cog wheel type brakes have more positive engagement than a disc parking brake, which is why they use it[5] and per the mower survey, the cog wheel parking brake is very commonly used in the TimeCutter class peer mowers.

*On page 11, Mr. Berry opined that Toro should have provided an inclinometer on the mower instead of the gauge in the manual.*

Mr. Berry provides no examples of mowers with inclinometers as standard equipment, specifically in the TimeCutter class. He does not clarify whether this inclinometer should be mounted laterally or longitudinally or some other way. Nor does he opine on how an inclinometer would have affected the outcome in the Hillman incident.

*On page 30, Mr. Berry provided proposed alternative designs, including that the subject machine should have had an interlock to prevent the engine from starting or the park lock from disengaging if the hydrostatic pins were actuated.*

Per Toro engineer Todd Porter, an interlock would not allow them to do certain service procedures that require the machine to run and operate the engine in the bypass mode. An example of this is the procedure to purge air from the hydrostatic system. Furthermore, I have not identified any competitor machines that incorporated such an interlock. The manual bypass pins of the subject mower require two purposeful actions and were knowingly engaged in the subject incident.

## Conclusions and Opinions

At this time, I have formed several conclusions and opinions based on the material reviewed and physical evidence in combination with my training, education, background and experience in field accident investigation, accident reconstruction, vehicle testing, restraint system performance, occupant kinematics, biomechanics, statistics and scientific literature review. They are to a reasonable degree of engineering certainty and are as follows:

- The subject incident was caused by neither plaintiff Rebekah Hillman nor plaintiff Jennifer Hillman re-engaging the bypass pins after towing the mower out of the landscaping bed to a non-level surface and before getting back on it with the intention of continuing to mow.

- There is no requirement for a small mower the size of the Toro TimeCutter to have a ROPS. The addition of a ROPS presents design trade-offs that may provide a benefit to an operator in certain situations, whereas there are others in which it will provide no benefit or even contribute to injuries sustained by the operator. There is no evidence that a ROPS would have benefited Ms. Hillman in the subject incident.

- The many other manufacturers of small residential zero-turn mowers overwhelmingly do not offer ROPS as standard or optional equipment on these machines.

---

[5] January 17, 2023 deposition of Todd Porter, 40:16-22.



4A - 24

Exhibit 3-24

- Incorporating a service brake in the form of a lever or pedal on a hydrostatic transaxle consumer mower, beyond the obvious redundancy in operation of the mower, also complicates the safe operation of the mower.

- Other manufacturers of small residential zero-turn mowers overwhelmingly use the same parking brake actuation method as the Toro TimeCutter, an electrically actuated external cog wheel and a toothed lever arm.

- The subject mower as designed, when functioned in a manner consistent with its intended use, is safe. The benefits of the nature and function of the mower outweigh any risks inherent in operating a zero-turn lawn mower.

The above opinions are based upon the material I have reviewed to date. Further review of related materials or additional discovery and examination of available evidence may cause these opinions to be refined accordingly. Exhibits will be used and relied upon to better illustrate findings and opinions at the time of trial such as accident vehicle and site photographs, graphics/illustrations, and other materials. Additionally, a list of cases in which I have testified can be found in Attachment 3. Design Research Engineering currently charges $345 per hour for my professional services.

Sincerely,

Daniel E. Toomey, Ph.D., P.E.
Principal Engineer

Enclosures

4A - 25

Exhibit 3-25

**Attachment 1**

 D E S I G N | 46475 Desoto Court
RESEARCH | Novi, Michigan 48377
| Tel: (248) 668 - 3450
ENGINEERING | Fax: (248) 668 - 3460

## DANIEL E. TOOMEY, Ph.D., P.E.

**Professional Specialization**
Passenger vehicle, heavy truck and off-road recreational vehicle accident analysis and reconstruction, including vehicle crash mechanics, occupant kinematics, biomechanical reconstruction and computer simulation. Biomechanics of occupant injury including mechanisms of injury and human injury tolerance. Performance and design analysis of on and off-road passenger vehicle systems, subsystems and components, including occupant protection systems, active and passive restraint systems, and chassis systems. Modeling, analysis, simulation and control of dynamic systems. Vehicle, system and component testing, including test fixture design, instrumentation, signal processing and data analysis.

**Professional Background**
Ph.D. (Biomedical Engineering), Wayne State University
M.S.E. (Mechanical Engineering) University of Michigan-Dearborn
B.S.E. (Mechanical Engineering), University of Michigan-Ann Arbor
Traffic Accident Reconstruction, Northwestern University Traffic Institute
Engineering Dynamics Corporation - HVE Simulations Forums

**Principal Engineer,**
    Design Research Engineering
**Senior Engineering Consultant,**
    Design Research Engineering
**Senior Project Engineer,**
    Design Research Engineering
**Project Engineer,**
    Design Research Engineering
**Engineering Co-op,**
    TRW Automotive Chassis Systems

Registered Professional Mechanical Engineer, Michigan #6201056035
Cum Laude, University of Michigan
Pi Tau Sigma, National Mechanical Engineering Honor Society - Pi Rho Chapter (University of Michigan)
Member, Society of Automotive Engineers (SAE)
Member, Association for the Advancement of Automotive Medicine
Technical Paper Reviewer – SAE Occupant Restraints and Biomechanics, Traffic Injury Prevention

**Publications**
"Evaluation of Large Pickup Truck Occupants: Size, Seated Height and Biomechanical Responses in Drop Tests", SAE Paper No. 2023-01-0649, 2023 (with R. Burnett, C. Parenteau, M. Vogler, K. Orlowski, and R. Krishnaswami).
"Application of Lateral Pole Impact Force-Displacement Data to the Reconstruction of Side Impacts with Narrow Objects," *SAE Int. J. Trans. Safety* 5(1):2017 (with B.N. Ault).
"Evaluation of Air Bag Electronic Sensing System Collision Performance through Laboratory Simulation", SAE Paper No. 2015-01-1484, 2015 (with E. Winkel and R. Krishnaswami).
"The Influence of Body Mounted Shoulder Seat Belt Anchor (D-ring) Displacement During Dynamic Vehicle-to-Ground Impacts", SAE Paper No. 2015-01-1756, 2015 (with D. Marth, W. Ballard, J. Belwafa, R. Burnett, and R. McCoy).
"Assessment of Compressive Thoracolumbar Injury Potential and Influence of Seat Cushions on Vertical Impact Loading of a Seated Occupant", SAE *Int J Trans Safety* 3(1), 2015 (with E. Winkel and R. Taylor).

4A - 26

Exhibit 3-26

**DANIEL E. TOOMEY, Ph.D., P.E.**

"ATV Rollover, Rider Response, and Determinants of Injury: In-Depth Analysis of Video-Documented Rollover Incidents," *Traffic Inj Prev* 15:S190-S196, 2014 (with C. VanEe, B. Moroski-Browne, M. Vander Roest and A. Wilson).

"The Hybrid III Upper and Lower Neck Response in Compressive Loading Scenarios with Known Human Injury Outcomes," *Traffic Inj Prev* 15:S223-S230, 2014 (with K. Yang and C. VanEe).

"Towards a More Robust Lower Neck Compressive Injury Tolerance - An Approach Combining Multiple Test Methodologies," *Traffic Inj Prev* 14(8): 845-52, 2013 (with K. Yang, N. Yoganandan, F. Pintar and C. VanEe).

"Exploring the Role of Lateral Bending Postures and Asymmetric Loading on Cervical Spine Compression Responses," 2009 ASME International Mechanical Engineering Congress & Exposition, IMECE2009-12911, (w. M. Mason, W. Hardy, K. Yang, J. Kopacz and C. VanEe).

"Vehicle Chassis, Body, and Seat Belt Buckle Acceleration Responses in the Vehicle Crash Environment," *SAE Int. J. Passeng. Cars – Mech.Syst.* 2(1): 1151-1170, 2009. Paper No. 2009-01-1246 (with E. Paddock, E. Winkel, and R. Burnett ).

"Evaluation of Seat Belt Assembly Physical Evidence in Properly Functioning and Intentionally Disabled Retractor Demonstrations," SAE Paper No. 2009-01-1245, 2009 (with M. Klima and E. Cooper).

"Vehicle Rollover Recovery Using Active Steering/Wheel Torque Control," *International Journal of Vehicle Design* 46(1) : 51-71, 2008 (with T. Shim, C. Ghike, and H. Sardar).

"Safety Restraint System Physical Evidence and Biomechanical Injury Potential Due to Belt Entanglement" SAE Paper No. 2006-01-1670, 2006 (with C. VanEe and M. Klima).

"Seat Belt Retractor Performance Evaluation in Rollover Crashes," *SAE 2005 Transactions -. J. Passeng. Cars – Mech.Syst.* Section 6 – Vol 114: 2016-2023, 2005. Paper No. 2005-01-1702 (with M. Klima and M. Weber).

"Seat Belt Buckle Performance in High Energy Wheel-to-Ground Impacts," *SAE 2005 Transactions -. J. Passeng. Cars – Mech.Syst.* Section 6 – Vol 114: 2034-2041, 2005. Paper No. 2005-01-1709 (with M. Klima and M. Weber).

"Investigation of Active Steering/Wheel Torque Control at the Rollover Limit Maneuver," *SAE 2004 Transactions. J. Passeng. Cars – Mech.Syst.* . Section 6 – Vol 113: 1133-1140, 2004. Paper No. 2004-01-2097 (with Taeyhun Shim).

**Presentations**

"Evaluation of Air Bag Electronic Sensing System Collision Performance through Laboratory Simulation", Society of Automotive Engineers, 2015 World Congress, Detroit, MI, April 2015.

"The Influence of Body Mounted Shoulder Seat Belt Anchor (D-ring) Displacement During Dynamic Vehicle-to-Ground Impacts", Society of Automotive Engineers, 2015 World Congress, Detroit, MI, April 2015.

"The Hybrid III Upper and Lower Neck Response in Compressive Loading Scenarios with Known Human Injury Outcomes," 58th Annual Scientific Conference of the Association for the Advancement of Automotive Medicine (AAAM), Munich, DEU, October 2014.

"Occupant Protection Study", US Consumer Product Safety Commission: Recreational Off-Highway Vehicles (ROVs) Meeting, Bethesda, MD, November 2011.

"Exploring the Role of Lateral Bending Postures and Asymmetric Loading on Cervical Spine Compression Responses", 2009 ASME International Mechanical Engineering Congress & Exposition, Lake Buena Vista, FL, November 2009.

"Vehicle Chassis, Body, and Seat Belt Buckle Acceleration Responses in the Vehicle Crash Environment," Society of Automotive Engineers, 2009 World Congress, Detroit, MI, April 2009.

"Investigation of Active Steering/Wheel Torque Control at the Rollover Limit Maneuver," Society of Automotive Engineers, 2004 Automotive Dynamics Stability Conference, Detroit, MI, May 2004.

## Attachment 2 - Technical Literature

ANSI B71.1-2003 – American National Standard for Consumer Turf Care Equipment – Walk-Behind Mowers and Ride-On Machines with Mowers – Safety Specifications

ANSI/OPEI B71.1-2012 – American National Standard for Consumer Turf Care Equipment – Pedestrian-Controlled Mowers and Ride-On Mowers – Safety Specifications

ANSI/OPEI B71.1-2017 – American National Standard for Consumer Turf Care Equipment – Pedestrian-Controlled Mowers and Ride-On Mowers – Safety Specifications

ANSI B71.4-2004 – American National Standard for Commercial Turf Care Equipment – Safety Specifications

OSHA Part 1928 Subpart C (29 CFR 1928.51, 52, 53) – Occupational Safety and Health Standards for Agriculture, Roll-Over Protective Structures

ISO 21299:2009 – Powered ride-on turf care equipment – Roll-over protective structures (ROPS) – Test procedures and acceptance criteria

SAE J1194 APR 2009 – Rollover Protective Structures (ROPS) for Wheeled Agricultural Tractors

SAE J2194 APR 2009 – Roll-Over Protective Structures (ROPS) for Wheeled Agricultural Tractors

SAE J1040 MAY 1994 – Performance Criteria for Rollover Protective Structures (ROPS) for Construction, Earthmoving, Forestry, and Mining Machines

Literature related to ROPS design and analysis:

1. Abubakar MS; Almad D, and Akande FB. A review of farm tractor overturning accidents and safety. *Petanika J Sci Technol*. 2010; 18(2):377-385.

2. Arndt JF. Rollover protective structures for farm and construction tractors -- A 50 year review. *Earthmoving Industry Conference*. SAE #710508. 1971:1-12.

3. Ayers PD and Rondelli V. Tractor ROPS and stability research: Introduction to a special issue. *J Agr Safety Health*. 2016; 22(4):213-214.

4. Centers for Disease Control and Prevention (CDC). Effectiveness of rollover protection structures for preventing injuries associated with agricultural tractors. *Morbid Mortal Wkly Rep*. 1993; 42:57-59.

5. Dogan, K. H., Demirci, S., Sunam, G. S., Deniz, I., & Gunaydin, G. (2010). Evaluation of farm tractor-related fatalities. *The American journal of forensic medicine and pathology*, *31*(1), 64-68.

6. Etherton JR; Myers JR; Jensen RC; Russell JC, and Braddee RW. Agricultural machine-related deaths. *Am J Public Health*. 1991; 81(6):766-768.

7. Jones CB; Day L, and Staines C. Trends in tractor related fatalities among adults working on farms in Victoria, Australia, 1985-2010. *Accid. Anal. Prev*. 2013; 50:110-114.

8. Moreschi C; Da Broi U; Fanzutto A; Cividino S; Gubiani R, and Pergher G. Medicolegal investigations into deaths due to crush asphyxia after tractor side rollovers. *Am J Forensic Med Pathol*. 2017; 38(4):312-317.

9. Myers ML. Compactor overturns and rollover protective structures. *Center to Protect Workers' Rights, NIOSH*. 2004.

1

10. Myers ML. Ride-on lawnmowers the hazards of overturning. *Professional Safety*. 2009; 54(5):52-63.

11. Occupational Safety and Health Administration (OSHA). Dangers of roll-overs of riding mowers. U.S Department of Labor. 2014 April, www.osha.gov/dsg/riding_mowers/index.html. Accessed May 2023.

12. Rondelli V; Casazza C, and Martelli R. Tractor rollover fatalities, analyzing accident scenario. *J Safety Res*. 2018; 67:99-106.

13. Sevart KB. Ride-on mower rollover accidents: Study and design solutions. *International Mechanical Engineering Congress*. 2016; 14:doi:10.1115/IMECE2016-67718.

Documentation related to Ariens zero-turn mowers

Documentation related to Bad Boy zero-turn mowers

Documentation related to Big Dog zero-turn mowers

Documentation related to Bobcat zero-turn mowers

Documentation related to Country Clipper zero-turn mowers

Documentation related to Craftsman zero-turn mowers

Documentation related to Cut Cadet zero-turn mowers

Documentation related to Encore zero-turn mowers

Documentation related to Gravely zero-turn mowers

Documentation related to Husqvarna zero-turn mowers

Documentation related to Hustler zero-turn mowers

Documentation related to John Deere zero-turn mowers

Documentation related to Jonsered zero-turn mowers

Documentation related to RedMax zero-turn mowers

Documentation related to Scag zero-turn mowers

Documentation related to Simplicity zero-turn mowers

Documentation related to Snapper zero-turn mowers

Documentation related to Toro zero-turn mowers

Documentation related to Troy-Bilt zero-turn mowers

Documentation related to Hydro-Gear hydrostatic transaxles

Documentation related to Tuff Torq hydrostatic transaxles

**Attachment 3**
**Legal Testimony of Daniel E. Toomey, Ph.D., P.E.**

| Case Name | Date of Testimony Deposition | Date of Testimony Trial/Hearing | State | Court | Case No. |
|---|---|---|---|---|---|
| Christianson, Jonathan v Honda | Apr-23 | | GA | In the State Court of Clayton County, State of Georgia | 2018 CV 2040 |
| Coiffard, Ingrid v Ford | | Jan-23 | OH | In the Common Pleas Court, Erie County, Ohio | 2020 CV 0343 |
| Kuqo, Peltamp v Chen, Stanley | Dec-22 | | MI | In the Circuit Court for the County of Oakland, Michigan | 22-192184-NI |
| Vilchis Balcazar, Linda v Ford | Nov-22 | | CA | Superior Court of the State of California, County of Santa Barbara | 18CV03753 |
| Coiffard, Ingrid v Ford | Oct-22 | | OH | In the Common Pleas Court, Erie County, Ohio | 2020 CV 0343 |
| Williams, Antonio v U-Haul | | Oct-22 | PA | In the Court of Common Pleas Philadelphia County, Pennsylvania | No.: 02-21-0016-3418 |
| Hall, Jonathan v Ford | Sep-22 | | AL | In the Circuit Court of Montgomery County, Alabama | Civil Action No. CV-3019-901903 |
| Sanchez, Kirk v TA Operating Nevada LLC | Sep-22 | | NV | District Court of Clark County, Nevada | Case No. A-19-807349-C |
| Coll, Nancy v Ford | Aug-22 | | TX | In the County Court of Nueces County, Texas | No. 2020-CCV-60458-1 |
| Lewis, Dalton v Sandvik Mining and Construction USA, LLC et al. | Jul-22 | | AL | In the Circuit Court of Jefferson County, Alabama | CV2019-90501.00 |
| Fontana, Stacy v Ford | Jun-22 | | WV | In the Circuit Court of Reane County, West Virginia | Civil Action No. : 18-C-27 |
| Metzger, John v Walt Disney Parks and Resorts | Apr-22 | | FL | In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida | Case No. 2020-CA-008160-O |
| Jones, Steplamy v Brown, Jeremy | Mar-22 | | FL | In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida | Case No. 2020-CA-7408-O |
| McCall, Barry v Toro | Mar-22 | | AL | In the Circuit Court of Mobile County, Alabama | Case No. 02-CV-2010-903150 |
| Currie, Arleen v Ford | Jan-22 | | SC | In the Court of Common Pleas, State of South Carolina, County of Kershaw | Civil Action No. 2019-CP-28-00303 |
| Tyler, Davis v Ford | Jan-22 | | TX | In the District Court of Midland County, Texas | Cause No. 2016-CV-52904 |
| Furm, Marlon v Turner Chevrolet | Oct-21 | | TX | In the District Court of Harris County, Texas | Cause No. 2019-05984 |
| Gonzalez Pagan, Raul v FedEx | Oct-21 | | FL | United States District Court for the Middle District of Florida Orlando Division | 6:20-cv-1199-ORL-41GJK |
| Robles, Mariano v TA Operating | Sep-21 | | TX | In the District Court, 95th Judicial District of Dallas County, Texas | Cause No. DC-19-09734 |
| Brennan, Kathleen v Ford | | Aug-21 | PA | United States District Court for the Eastern District of Pennsylvania | No. 2:19-cv-01830-CDJ |
| Dominguez, Kristen v Ford | Aug-21 | | GA | In the United States District Court for the Middle District of Georgia, Valdosta Division | No. 720-cv-00098-HL |
| Boetz, Jerad v Toyota | Jul-21 | | MD | In the Circuit Court for Montgomery County, Maryland | Case No. 480810-V |
| Perry, Kamiya v Kia | | Jul-21 | CA | Superior Court of the State of California for the County of Orange | Case No. 30-2019-01081281 CU-PL-CJC |
| Chirico v Pure Insurance Company et al. | Apr-21 | | LA | Twenty Second Judicial District Court for the Parish of St. Tammany, State of Louisiana | No.: 2016-11297 |
| Perry, Kamiya v Kia | Mar-21 | | CA | Superior Court of the State of California for the County of Orange | Case No. 30-2019-01081281 CU-PL-CJC |
| Bonazzo, Shirley v Toyota | Feb-21 | | CT | Superior Court of the State of Connecticut, J.D. of Milford | Case No. D.N.AAN-CV 18-6030031-S |
| White, Lue Bertha v Ford | Jan-21 | | AL | In the United States District Court for the Northern District of Alabama, Northeastern Division | Civil Action No. 5:19-cv-00916-CLS |
| Perry, Kamiya v Kia | Jan-21 | | CA | Superior Court of the State of California for the County of Orange | Case No. 30-2019-01081281 CU-PL-CJC |
| Valdez, Edith v Ford | Dec-20 | | CA | Superior Court of the State of California, County of Los Angeles | Case No. BC710322 |
| Martin, Linda v Ford | Oct-20 | | IN | In the United States District Court, Southern District of Indiana, Indianapolis Division | 1:19-cv-00628-JPH-DML |
| Nelson, Robert v Maggio, Joseph and Cintas Corporation | | Sep-20 | NY | State of New York Supreme Court : County of Erie | Index No. 803363/2018 |
| Mannarino, Sophie v FCA | Aug-20 | | MI | United States District Court for the Eastern District of Michigan, Southern Division | 2:18-cv-10173-DML-DRG |
| Reilly, Natalie v John Charles Hill and Pike Electric, LLC | Apr-20 | | FL | In the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida | Case No.: 2018-CA-005874 |
| Aggarwal, Sushma v Toyota | Feb-20 | | TX | United States District Court, Western District of Texas, Austin Division | Civil Action No. 1:17-cv-247 |
| Bauersberg, Donna v FCA | Feb-20 | | IL | In the United States District Court for the Central District of Illinois, Rock Island Division | No. 4:17-cv-04213-SLD-JEH |
| Stroud, Jeremaih v Kia | | Feb-20 | CA | Superior Court of the State of California, County of Los Angeles, Central District | Case No. BC705872 |
| Sills, Marcia Lynee v Ford | | Jan-20 | FL | United States District Court for the Middle District of Florida | Civil Action No. 8:18-cv-1372 - T-26TGW |
| Stroud, Jeremaih v Kia | Jan-20 | | CA | Superior Court of the State of California, County of Los Angeles, Central District | Case No. BC705872 |
| Gutierrez, Maria v Toyota | Oct-19 | | TX | United States District Court, Eastern District of Texas, Marshall Division | Case No: 2:19-cv-58 JRG |
| Arana, Jayliah v Evenflo Company, Inc. | Sep-19 | | CA | Superior Court of the State of California, County of Los Angeles, Unlimited Jurisdiction | Case No. BC635440 |
| Reichenbach v Logan and Cassidy | | Sep-19 | FL | In the Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Florida | No. 2017 CA 003275 NC |
| Reichenbach v Logan and Cassidy | Aug-19 | | FL | In the Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Florida | No. 2017 CA 003275 NC |
| Oliver, Patricia v Ford | Aug-19 | | SC | In the Court of Common Pleas, State of South Carolina, County of Charleston | Civil Action No. 2017-CP-23-06748 |
| Sills, Marcia Lynee v Ford | Jul-19 | | FL | United States District Court for the Middle District of Florida | Civil Action No. 8:18-cv-1372 - T-26TGW |
| Young, April v Stevens Transport | Jun-19 | | LA | United States District Court, Eastern District of Louisiana | 2:17-CV-08500-SM-MBN |
| Wilson, Paul v Ford | | May-19 | MD | In the Circuit Court for Harford County, Maryland | Case No. 12-C-17-001746 MT |