IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

REBEKAH HILLMAN, individually and as next friend of P.J.H., a minor; and JENNIFER HILLMAN,

Plaintiffs,

vs.

THE TORO COMPANY, a Corporation,

Defendant.

No. 4:21-cv-04081-SLD-JEH

VOLUME II

The continued videotaped deposition of JENNIFER HILLMAN, called by the Defendant for examination, pursuant to the Rules of Civil Procedure for United States District Courts pertaining to the taking of depositions, taken before A. Christine Hylton, a Notary Public, Registered Professional Reporter, at Hampton Inn & Suites - Moline Quad Cities, 2450 69th Avenue, Moline, Illinois 61265 at 9:00 a.m., November 17, 2022.

APPEARANCES

Plaintiff By: STEVEN J. CROWLEY, ESQ.
Crowley & Prill
3012 Division Street
Burlington, Iowa 52601
Scrowley@cbp-lawyers.com

JASON M. SCHIFFMAN, ESQ.
Schiffman Firm, LLC
1300 Fifth Avenue
Pittsburgh, Pennsylvania 15219
Jason@schiffmanfirm.com
Via telephone

Defendant By: KIRK T. FLORENCE, ESQ.
Kilpatrick Townsend & Stockton, LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
Kflorence@kilpatricktownsend.com

Also Present: Rebekah Hillman
David Crossley
Scot Ziarko, Videographer

INDEX

WITNESS PAGE
JENNIFER HILLMAN
Direct Examination Continued By Mr. Florence.314
Cross-Examination By Mr. Crowley.............387
Redirect Examination By Mr. Florence.........406
Recross-Examination By Mr. Crowley...........408

EXHIBITS

Exhibit 13 - Photograph 314
Exhibit 15 - Photograph 322
Exhibit 16 - Photograph 327
Exhibit 17 - Photograph 334
Exhibit 18 - Photograph 335
Exhibit 19 - Photograph 336
Exhibit 20 - Photograph 338
Exhibit 21 - Interrogatory Answers 381
Exhibit 22 - Photograph 404
Exhibit 23 - Photograph 404

(Exhibit 13 marked.)
THE VIDEOGRAPHER: Good morning. This is the continuing deposition of Jennifer Hillman on November 17th, 2022. The time is now 9:00 A.M.
THE COURT REPORTER: You are still under oath from yesterday.
THE WITNESS: Okay.
DIRECT EXAMINATION CONTINUED
BY MR. FLORENCE:
Q. Good morning, Jennifer.
A. Good morning.
Q. Are you ready to proceed?
A. I'm as ready as I'll ever be.
Q. Okay. Well, let's go.
I've shown you what's been marked as Exhibit No. 13.
Can you tell me, is that a photograph of the strap that you used on the day of the accident to tow the TimeCutter?
A. Yes.
Q. Is that the same strap you used when you towed the TimeCutter that belonged to the mobile home park?
A. Yes.

Q. And you only used one strap, right?
A. Yes.
Q. Okay. Thank you.
Now, when we broke yesterday, I think we had just gotten to the point where the accident had basically just happened, right? Do you remember that --
A. Yes.
Q. -- in -- in our discussions?
A. Yes.
Q. So I believe you had just described for me how you had put the -- the John Deere tractor in park and called 911 and come over to where Rebekah was; and you had shown us how the -- the mower was situated and how she was situated when you found her.
Do you recall that?
A. Yes.
Q. Okay.
THE WITNESS: He's not muted.
MR. CROWLEY: What?
THE WITNESS: He needs to mute. He's not muted. He needs to mute.
MR. CROWLEY: Did you mute your mike, Jason?

about the same speed Bekah was going when she went over the hill.

Q. But in the test, the starting point is on a flatter space than where the mower was at the time of the accident where you had towed it to?

A. Yes. Well, we just started it. We had him push it.

I wasn't thinking about starting it and stopping it, where it should start, where it -- I wanted the mower to go about the same speed it was when she was going towards the hill, without putting him up there and facing them towards the hill.

Q. Right.

But -- but the difference is, you -- no one pushed the mower on the day of the accident, it just started rolling once the parking brake was disengaged; is that right?

A. Yes.

Q. And how many -- did you just do the test two times, or was there another one?

A. No, that was it.

Q. Okay. Did you take any photographs in addition to the videotape?

A. Not that I can recall, no.

Q. And did you examine the braking mechanism before or after that test?

A. I didn't examine it at all. I just -- I just know that it said there should have been a brake, and in -- in my mind, there was an electric brake, and I don't know why it did not stop that machine. So my intent was to find out why the brake did not stop it.

And when we tested it, it did not stop it, either; it just made a grinding noise.

Q. So when -- when you got the mower out for the -- the test, how did you get it up onto the area above the retaining wall where you did that test?

A. We didn't do it above the retaining wall.

Q. Where did you do it?

A. In the back by the -- going down into the ravine, like not -- someplace he wouldn't get hurt. I wasn't going to send him over a retaining wall.

Q. I'm just not clear on where in the backyard you did that, then. It's not where I thought it was.

Do we have a photograph that shows where that test was run?

A. I do not believe so.

Q. Is it in the --

MR. CROWLEY: It's the --

THE WITNESS: It would be in the aerial shot.

MR. FLORENCE: Okay.

THE WITNESS: I could show you in maybe the aerial shot. It was back here. (Witness drawing on exhibit.)

BY MR. FLORENCE:

Q. Okay. So you -- on Exhibit 8, you've written a -- you've marked a circle with an X to mark the area where the test video was -- was performed?

A. Yes, back in that direction.

Q. Okay. And that is west, sort of the west side of what we've called the south yard?

A. Yes.

Q. As marked in Exhibit 8?

A. Yes.

Q. Okay. All right. You've provided some information in some disclosures in this case where you gave us some information about people with knowledge.

One of them, it says, Rebekah's daughter, Sarah Hasenmiller, H-a-s-e-n-m-i-l-l-e-r?

A. Yes. She has since been married. Now,

it's Dahms.

Q. Okay. When was she married?

A. Last summer. It would have been August, August, maybe.

Q. Okay. Was Hasenmiller --

A. Of 2021.

Q. Hasenmiller, was that her maiden name?

A. No. She was married before.

Q. Okay.

A. That was her orig -- her first married name.

Q. Okay. And what is her husband's name?

A. Bradly. Sorry, we call him Jim, but it's Bradly.

Q. Of course, you do.

A. I know. I was going to say Jim, but it's Bradly.

Q. Where do they live?

A. Buffalo, Iowa.

Q. Okay. And in terms of what Sarah may know about the accident, or this lawsuit, what do you think she -- she has knowledge of?

A. I mean, she went with me the day that it happened, so they came. They were asking me -- she

Confidential-protected by Court Order of the United States District Court-Central District of Illinois

EXHIBIT 8 11-14-22 CH

TTCHillman00230740

