# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, ROCK ISLAND DIVISION

| | |
|---|---|
| REBEKAH HILLMAN, individually and as next friend of P.J.H., a minor; AND JENNIFER HILLMAN<br><br>                    Plaintiffs,<br>v.<br><br>THE TORO COMPANY, a corporation,<br><br>                    Defendant. | No. 4:21-cv-04081-SLD-JEH |

---

## PLAINTIFFS' SUPPLEMENTAL MOTION IN *LIMINE* – ISSUE 29

COME NOW the plaintiffs, by and through counsel of record, and, in support of their Supplemental Motion in *Limine* Issue 29, state as follows:

## I.      GOOD CAUSE FOR LATE FILING MIL 29 AND HISTORY OF DISPUTE

Plaintiffs timely filed their Initial Motions in *Limine* Issues 1-18, inclusive, and 19-28, inclusive, on October 30, 2023. (Dkt.155 and Dkt.158, respectively). Plaintiffs first raised Toro's untimely and unsupported claim of spoliation of the accident scene in Plaintiffs' MIL Issue No. 5 (Dkt.155). The issue stems from the plaintiffs' modification of the slope of the accident hill, only after they preserved the exact shape and slope of the accident scene by having a mechanical engineer (Mr. Bilek) professionally survey the accident scene with digital equipment and provide that to Toro and their experts. With no complaints, Toro's reconstruction expert (Bonugli) used the plaintiffs' digital survey data and photographs to produce a highly detailed, computer model of the slope on which he reconstructed the Hillman mower accident in great detail. Bonugli's slope/cross section is reproduced below from his report dated May 8, 2023. (Dkt.158-3)

*"The elevation profile for the travel path of the mower is shown below. The slope of the terrain from the flowerbed to the mower's static location at the top of the hill varied between 14.4 degrees and 8.8 degrees. The slope decreased closer to the top of the hill."*



**Figure 1 – Bonugli's cross section of the accident hill created with Bilek's survey data**

Bonugli produced some of his file materials only two days before his deposition on July 20, 2023. (**Exhibit S** – Bonugli deposition transcript). Bonugli's report, his deposition of July 20, 2023, and his file materials, produced July 18, 2023, contain no mention of any spoliation of evidence or any hint that Toro's expert had been prejudiced or restricted in any way from reconstructing the accident or from forming his opinions to defend Toro.

In fact, no lay witness or expert witness identified by Toro provided any observation or opinion that Plaintiffs had spoliated the scene of the accident or that Toro had been prejudiced in defending itself before Plaintiffs received Bonugli's untimely Affidavit attached to Toro's Resistance to Plaintiffs' Motions in Limine on November 27, 2023 (Dkt.175), **three and a half months after the close of discovery on August 18, 2023. (Emphasis mine)**

In Plaintiffs' MIL Issue No. 5 (Dkt.155), Plaintiffs asked the Court to prevent Toro from claiming (in any fashion) that Plaintiffs' grading the hill after the survey was any attempt to hide evidence or create unfair prejudice to Toro. Plaintiffs properly asked that Toro be prevented from making a claim of spoliation at trial.

Plaintiffs had also asked the Court to restrict Toro from introducing any evidence, argument or testimony of undisclosed expert opinions in Plaintiffs' MIL Issue No. 19 (Dkt.158).  At that point, there were no expert opinions disclosed supporting any claim of spoliation and Toro had not filed any claim of spoliation for determination before the close of discovery.

Defendant filed a Resistance to Motion in *Limine* Issues 19-28 on November 27, 2023. (Dkt.175) Attached to Toro's Resistance (Dkt.175) was an Affidavit by Mr. Bonugli. (Dkt.176, Exh. E to Dkt.175) Mr. Bonugli includes the following opinion:

> "*6. Further, Mr. Bilek collected only aerial images of part of the yard where the incident occurred and used those aerial images to create a 3D map of the hill at issue. However, the accuracy of those images or the resulting 3D map cannot be determined because Mr. Bilek did not provide a quality report for the post-processing of the aerial images. The aerial images collected by Mr. Bilek were over-exposed and therefore sub-optimal to produce 3D terrain data of the accident site. When an image is over-exposed, the contrast between the image pixel becomes too difficult to differentiate and can create errors when generating a composite 3D image.*"

(Dkt.176, p.1-2)

Mr. Bonugli provided an extensive 36-page report setting out his findings in this case. (Dkt.158-3) Mr. Bonugli also gave a lengthy deposition. (**Exhibit S**) At *no* point during his deposition or in his report does Mr. Bonugli even come close to giving an opinion that the aerial photographs taken by Mr. Bilek were "over-exposed" or there was a problem with the "contrast".

Of equal importance, is that, during his deposition, Bonugli never hinted that he had been limited in any way from forming the opinions and conclusions he wanted to express in Toro's defense. (No prejudice to Toro)

So, long after discovery has closed, Toro produced a self-serving and conclusory Affidavit from Bonugli who, for the first time, now voices some generic complaints about the resolution of the photographs by Plaintiffs' expert (Mr. Bilek), as if the photographs were not of sufficient detail

to do something to help Toro defend itself. Notably, Bonugli still does not actually state what it is he wanted to do that he could not do or how it created any actual prejudice to Toro. In fact, Bonugli had already produced a very detailed cross section of the accident hill using Bilek's digital survey data and photographs, long before he signed the Affidavit submitted with Dkt.175.

 Clearly, Toro is trying to retroactively create evidence to allow them to claim spoliation with an untimely Affidavit that Mr. Bonugli seeks to introduce an entirely new opinion at the 11th hour in an attempt to ambush Plaintiffs when Toro failed to even mention the issue before the close of discovery.  As Bonugli's opinions expressed in the November 27, 2023 Affidavit are literally three and a half (3 1/2) months late, they should be excluded from any mention at trial.

Plaintiffs could not have included the specifics of this issue in their first Motions in *Limine* because it had not been disclosed yet. Not to belabor the point, but Bonugli's new opinions in the November 27th disclosed Affidavit were not raised until three and a half months after the close of discovery (August 18, 2023), and a month after the deadline for filing Motions in *Limine*.

Additionally, if Toro is not precluded from any further untimely efforts to retroactively support any claim of spoliation, the Court and Plaintiffs will likely continue to get supplemental affidavits such as this one.

Therefore, Plaintiffs urge the Court to find that Plaintiffs have established GOOD CAUSE for this late filing of Plaintiffs' MIL No. 29, in an attempt to fully and finally resolve this issue before trial as it would create enormous unfair prejudice to Plaintiffs and the Court, if Toro is allowed to continually serve supplemental expert affidavits as Toro struggles to create the opportunity to claim spoliation without any evidence of prejudice whatsoever.

Such a situation would create enormous unfair prejudice to Plaintiffs if they were forced to go to trial with Toro harping about spoliation and hiding evidence when no such thing occurred. Toro

never disclosed any evidence of it and never filed any Motion so the Court could adjudicate the claim.

## II.    REQUEST FOR RELIEF

Plaintiffs request the Court grant Plaintiffs' Motion in *Limine* Issue No. 29, which to prohibit Defendant's expert Mr. Bonugli and anyone else on behalf of Toro from offering any argument, evidence or testimony alleging prejudice to Toro from alleged spoliation and particularly from mentioning any criticisms of Mr. Bilek's photographs or survey data as being inaccurate, substandard or that it prevented Toro from pursuing any avenue of defense it wanted before the close of discovery.

## III.    LAW & ARGUMENT IN SUPPORT OF REQUESTED RELIEF

The law on untimely and undisclosed expert opinions in Illinois is crystal clear. "If a party does not make a timely and complete expert-witness disclosure, the expert's testimony ordinarily cannot be presented at trial." *Hassebrock v. Bernhoft*, 815 F.3d 334, 341 (7th Cir. 2016).  Pursuant to Rule 37(c)(1), the exclusion of undisclosed expert testimony is automatic and mandatory unless the non-disclosure was substantially justified or is harmless. *Novak v. Bd. of Trustees of S. Illinois Univ.*, 777 F.3d 966, 972 (7th Cir. 2015). Importantly, Defendant agrees that untimely and undisclosed expert opinions should not be admitted as they admitted Plaintiffs' Motion in *Limine* Issue No. 19 should be granted reciprocally. In other words, Defendant knows untimely and undisclosed opinions are improper.

As set forth above, Mr. Bonugli's new and previously undisclosed opinion is that there was a problem with the "over-exposure" of Plaintiffs' expert, Mr. Bilek's, photographs. The purported quality of photographs and how the quality affects their ability to generate a 3D digital survey is unquestionably expert testimony under Rule 702, as it is not within the purview of a layperson.

Therefore, the question centers around whether this expert testimony alleging prejudice was clearly and timely disclosed.

What follows is particularly relevant as Bonugli impeaches himself on this issue.

Bonugli likes to use a technique called photogrammetry when it behooves his opinions. Used properly, the process involves using digital photographs of an actual area or object to "overlay" a point cloud created by a scanner or a digital survey to check and see if the photograph "fits" on top of the point cloud. If it does, then the survey is accurate. If not, then the producer needs to start looking at where he/she introduced error.

During the following examination in Bonugli's deposition, he refuses to say that his slope cross section (created by using the Bilek survey data from the drone digital photographs) is reasonably accurate and instead refers counsel to Bilek to answer the question, since he smugly claimed that was all the data he had. As the Court will soon see, this was not true.

Calling Bilek's survey an "incomplete survey", Bonugli's first big mistake was claiming that Bilek took only aerial photos.

> "*Q. Well, you have photographs of the hill -- a bunch of photographs and a digital survey of the hill -- the accident site, correct?*
> ***A. Sir, it's an incomplete survey. From my perspective, Mr. Bilek only took aerial photographs and the photographs weren't all that great to begin with either. He took all orthogonal pictures; he did not take any oblique images, which I would expect for a three-dimensional rendering of that nature. So he wasn't able to get anything below the canopy of the trees, so I feel it was a very incomplete job.***
> *Q. Of the accident site?*
> ***A. Yes, sir.***
> ***Q.** Do you express that opinion in your report?*
> *Trust me, you don't.*

> *A. I don't believe so.*"

(**Exhibit S-15**, p.54, L.14 – p.55, L.8)

Then, Bonugli plays games for several pages refusing to say whether his slope diagram is reasonably accurate and tells Plaintiffs' counsel to ask Bilek.

> "*Q. Let me ask you this: Do you think that your report accurately relates the slope of the accident site on page 23 in the illustration at the bottom?*
>
> *A. Well, that kind of depends. I think the answer to me would be I'm relying on the data that was provided to me by Mr. -- that was done by Mr. Bilek, so the accuracy of htat data is going to be the result of the fidelity of his own work. I don't have a comparative.*
>
> *In other words, if I would have been out there, I would have scanned everything, including that hill, the entire property. Then we could have taken his data, plotted it over my data and I could have told you the error rate between the calibrated instrumentation versus a few pictures with a drone.*
>
> *So I don't know the precise answer to that except that I'm relying on what Mr. Bilek did for my work because I was not able to do the inspection myself.*
>
> *Q. Do you believe that the drone data and the survey data provided you by Mr. Bilek gave you a reasonable survey of the slope to form your opinions and conclusions in this case?*
>
> *A. It's what I had to work with.*
>
> *Q. Yes or no?*
>
> *A. I think when you look at the -- pardon me?*
>
> *Q. Please just give me a yes or no. That's a yes or no question.*
>
> *MR. FLORENCE: Please don't interrupt the witness, Mr. Crowley.*
>
> *MR. CROWLEY: Well, the witness has a Tendency to give 14 paragraphs to a one-answer question.*
>
> *MR. FLORENCE: Objection to the sidebar. Please allow him to answer the*

*questions.*
<u>*BY MR. CROWLEY:*</u>
     *Q. Mr. Bonugli, I know you're a professional witness, and that's not an insult, it's just you do this for a living. I don't need all the editorialization. It's not going to do any good because your deposition is probably not going to be read to the jury, you're going to be called as a witness, so I just want to get the facts and get them on the table so we can move on.*
     *My question is, again, do you have an opinion within a reasonable degree of engineering certainty whether or not the data you had from Mr. Bilek's survey was accurate enough to form the opinions and conclusions you have in this case?*
     **A.  I don't think I could answer that question directly, and primarily for what I said earlier, I don't have anything to compare it to. So I only have what he provided to -- to I guess you, which was then provided to me. So I don't have a precise answer to that yes or no.**
     **The answer is that, that's what I was given to use, and so I was working within the constraints of that data. So whether it is reasonably accurate or not, I think that's a question for Mr. Bilek.**
     **I would like to hear what his method was for determining its accuracy. I would argue that -- that there probably was a more accurate way to do it. Certainly I think that if I would have done it, it would have been more accurate. So I don't know how to answer your question directly."**

(**Exhibit S-15 – S-16**, p.55, L.11 – p.58, L.10)

Then, beginning at page 58, line 11, through page 59, line 25, Bonugli hangs himself as far as

criticizing Bilek's survey. Bonugli claims to be an expert in photogrammetry, which he used on

the west yard to check the accuracy of his survey of the west yard, but then has to be reminded

that he got Bilek's photos of the accident site and that he could check the accuracy of the Bilek

survey of the accident site, that is comparing or overlaying Bilek's 47 digital photographs of the accident site (**Exhibit T** – 47 terrain photographs taken by Bilek before the hill was graded) to the survey points. He first claims he does not know how many photos Bilek provided, then, after being reminded by counsel, Bonugli vacillates on how good or bad they "might "be. But when pursued and asked if he even tried to compare the digital photographs to the survey scene, he finally gave an honest answer, "I did not.".

So, without even using the most obvious tools available to check the accuracy of Bilek's survey as recreated by Bonugli and the folks at BRC, Bonugli had to admit he did not even try.

> "*Q. You claim to be an expert in photogrammetry to the point where you can reconstruct the two test data done by Jennifer, Mr. Darnell and Mr. Wheaton, correct?*
> ***A. Yes, sir.***
> *Q. How many digital still photographs do you have of the accident site before it was modified by grading?*
> ***A. You know, I don't know. I would have to count them. They're in my file, I just don't know exactly how many.***
> *Q. Did you ever try to take any of those photographs and overlay them on the accident site to check the accuracy of the digital data versus the photogrammetric data that you had?*
> ***A. No, sir, I did not.***
> *Q. You did that, though, for the test area, didn't you, in the west yard?*
> ***A. Yes, sir.***
> *Q. Okay. So you could have done it to check Mr. -- to see if there was any inaccuracies in Mr. Bilek's digital data, you just didn't?*
> ***A. I don't know the answer to that in terms of -- it really depends on the pictures that are taken, the quality of the pictures that are taken and the angle they're taken from. So it's possible that it could be done; it's also possible that it could not be done.***
> *Q. You didn't try. You didn't try, did*

*you?*
    ***A. I did not do that, no sir.***
    ***Q.*** *Thank you.*
*Did you ever do any testing in*
*connection with this set of opinions in your*
*May 8 report?*
    ***A. No, sir, no testing.***
    ***Q.*** *You did not obtain an exemplar*
*TimeCutter?*
    ***A. I did not."***

(**Exhibit S-16**, p.58, L.11 – p.59, L.25)

Bonugli failed to mention that Bilek had provided not only drone photographs to recreate a 3D mesh of the accident hill, but he also provided 47 highly detailed, JPEG, digital photographs of the accident slope standing right on top of it or next to it. (**Exhibit T**)

When Bonugli complained that he wished he had better resolution to the survey, plaintiffs' counsel asked if he (Bonugli) remembered getting any photographs from Bilek along with the survey data. Bonugli feigned ignorance and said he might have but could not remember how many. Bonugli admitted that he could have checked the accuracy of the Bilek drone data using photogrammetry and overlaying Bilek's terrain photographs against the slope using photogrammetry, he just did not do it. It appears he did not do it before providing the latest Affidavit on November 27, 2023, as there is no specificity to his Affidavit, nor is there any new work product identified, as required by Fed. R. Civ. P. 26 (2)(D) & (E).

The *only* issue Mr. Bonugli ever testified to in his report regarding the quality of the photographs was the fact they were all orthogonal pictures, not any oblique images. At no point does Mr. Bonugli complain about the "over-exposure" or "contrast" of the photographs.

For the first time since this suit was filed on May 4, 2021 (Dkt.1), well over two years ago, Defendant Toro initiated an all-out attack based on alleged spoliation in this case. While Mr. Bonugli complained of the supposed inadequacy of the survey in his deposition (despite having no

evidence it was incorrect), spoliation had not been the subject of any hearings, motion practice, or even a "meet and confer" session. Defendant has never provided any evidence they were prejudiced, or that the digital survey by Mr. Bilek was actually inaccurate or prejudicial to Toro in any way. In fact, Bonugli uses the same Bilek survey to opine that some "outside motive force" propelled the mower forward down the hill with Rebekah on the operator's seat.

Mr. Bonugli's prowess with photogrammetry created a large problem that left him and Defendant exposed. If Mr. Bonugli could utilize a short cell phone video taken from one angle to accurately recreate testing of a lawnmower in the west yard (which Bonugli claims), including the slope of the ground, rolling resistance of the mower, etc., then how is it Mr. Bonugli would be unable to use the same process in order to process terrain photographs taken by Mr. Bilek from multiple angles (not one angle like the cell phone video) with a high-quality camera to verify the slope (and nothing else) of one hill? This defies common sense.

What is now clear is that when Plaintiffs took the initiative and asked the Court to tell Toro it was not allowed to argue spoliation (Dkt.155) in late October of 2023, Toro realized it had no real evidence or support and that the ambush would not work unless they could resurrect the claim. Toro had to do something to try and salvage the whole spoliation circus by trying to rehabilitate Mr. Bonugli—which has failed.

WHEREFORE, Plaintiffs ask the Court to GRANT their Supplemental Motion in *Limine* Issue 29.

Respectfully submitted,

By: /s/ Steven J Crowley
Lead Counsel

REBEKAH HILLMAN, individually and as next friend of P.J.H., a minor; and JENNIFER
HILLMAN Plaintiffs
Steven J Crowley Lead Counsel ARDC#6314756
Edward J. Prill ARDC#6271392
CROWLEY & PRILL
3012 Division Street
Burlington, IA 52601
T: (319) 753-1330
F: (319) 752-3934
E: scrowley@crowleyprillattorneys.com
E: eprill@crowleyprillattorneys.com
ATTORNEY FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on *Tuesday, December 19, 2023*, I electronically filed the
foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing is being
served this day on all counsel of record identified below via transmission of Notices of Electronic
Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who
are not authorized to receive electronic Notice of Electronic Filing:

Michael Giacopelli                             Jason Schiffman
Thomas Grace                                   Schiffman Firm, LLC
Jonathan R. Sichtermann                        1300 Fifth Avenue
McVey & Parsky, LLC                            Pittsburgh, PA 15219
30 North LaSalle Street, Suite 210             P: (412) 288-9444
Chicago, Illinois 60602                        F: (412) 288-9455
Email: mng@mcveyparsky-law.com                 E: jason@SchiffmanFirm.com
Email: tgg@mcveyparsky-law.com                 ATTORNEY FOR PLAINTIFFS
Email: jrs@mcveyparskylaw.com


Kirk T. Florence
Kilpatrick Townsend & Stockton LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
P: (214) 922-7100
F: (214) 279-9194
kflorence@kilpatricktownsend.com
ATTORNEYS FOR THE TORO COMPANY