UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| REBEKAH HILLMAN, individually and as next friend of P.J.H., a minor; AND JENNIFER HILLMAN, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:21-cv-04081-SLD-JEH |
| THE TORO COMPANY, a corporation, | ) ) | |
| Defendant. | ) ) | |

ORDER

Plaintiff Rebekah Hillman ("Rebekah") was severely injured when her zero-radius turn

("ZRT") lawnmower, manufactured by Defendant The Toro Company, rolled down a sloped

lawn, fell over a six-foot retaining wall, and landed on her legs ("the Incident"). Before the

Court are (a) Defendant's Motion for Summary Judgment, ECF No. 113; (b) Defendant's

motions to seal: Defendant's Supplemental Motion to Seal Documents, ECF No. 149; and

Defendant's Response to Plaintiffs' Motion for Temporary Seal Order, ECF No. 164, construed

as a motion to seal, *see* Nov. 21, 2023 Text Order; (c) Defendant's motions *in limine* and

motions relating to expert testimony: Defendant's Motion in *Limine*, ECF No. 152; Defendant's

Motion to Exclude Plaintiffs' Expert Kelly Kennett, ECF No. 153; Defendant's Motion to

Exclude Plaintiffs' Expert David Bilek, ECF No. 154; Defendant's Motion to Exclude Plaintiffs'

Expert Thomas Berry, ECF No. 156; Defendant's Motion to Exclude Certain Opinions from

Plaintiffs' Experts Shelley Kinney and Dale Berry, ECF No. 157; Defendant's Emergency

Motion to Strike or in the Alternative for Additional Time to File a Response, ECF No. 178; and

Defendant's Emergency Motion to Strike Plaintiffs' Supplemental Motion *In Limine* No. 29 or in

the Alternative for Additional Time to File a Response, ECF No. 183; and (d) Plaintiffs' motions *in limine* and motions relating to expert testimony: Plaintiffs' General Motions in Limine Issues 1 Through 18, ECF No. 155; Plaintiffs' Daubert Challenges and Motions in Limine Issues 19 Through 28 Regarding Toro's Proffered Expert Testimony, ECF No. 158; Plaintiffs' Motion to Exclude Defense Expert Enrique Bonugli and All of His Work Product and Opinions at Time of Trial for Failure to Disclose Basis for Opinions, ECF No. 165; Plaintiffs' Motion for Leave to File Reply Brief to Defendant Toro's Resistance to Plaintiffs' Motion in *Limine*, ECF No. 179; and Plaintiffs' Supplemental Motion in *Limine* – Issue 29, ECF No. 181.

For the following reasons, the Court GRANTS Defendant's motion for summary judgment, motions to seal, and motions to exclude Kennett, Bilek, and Berry. The Court finds the remaining nine motions MOOT.

## BACKGROUND[1]

Plaintiffs Rebekah Hillman, individually and as next friend of P.J.H., a minor, and Jennifer Hillman ("Jennifer") (collectively, "Plaintiffs") assert product liability claims against Defendant arising out of the Incident, which occurred on June 18, 2020. Rebekah was operating a 2013 Toro TimeCutter SS 5000 model 74361 ZRT Mower (the "Subject Mower") and suffered severe leg injuries after the Subject Mower rolled down a slope, fell over a six-foot retaining wall, and landed upside down on top of her legs, necessitating amputation of her left leg.

---

[1] At summary judgment, a court must "view the evidence in the light most favorable to the non-moving party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). Unless otherwise noted, the factual background of this case is drawn from Defendant's statement of undisputed material facts, Mot. Summ. J. ¶¶ 7.1–7.57; Plaintiffs' statements of disputed material facts and additional material facts, Resistance Mot. Summ. J. 19–27, 41–79, ECF No. 159; Defendant's reply to Plaintiffs' additional material facts, Reply 4–32, ECF No. 147; Plaintiffs' supplemented additional material facts, Suppl. Pls.' Additional Material Facts ¶¶ 65–78, ECF No. 161; Defendant's reply to Plaintiffs' supplemented additional material facts, Supp. Reply 2–15, ECF No. 163; and exhibits to the filings.

## I.      An Overview of ZRT Mowers

The defining feature of a ZRT mower is its ability to make a zero-radius turn which makes it highly maneuverable and able to effectively pivot in place and perform sharp 180-degree turns.  ZRT mowers utilize two independently controlled rear drive wheels which can operate at different speeds and in different directions to turn and rotate.  The two rear drive wheels are each powered by a hydraulic transmission known as a hydrostatic motor or hydrostatic transmission.  Instead of controlling the front wheels with a steering wheel—as one would on a traditional riding mower—the operator of a ZRT mower controls the two rear wheels independently of each other with two motion control levers on either side of the operator's seat. The two front caster wheels simply swivel, like the wheels on a grocery cart, in the direction dictated by the rear drive wheels.  When the two rear wheels operate at different speeds, the mower will turn left or right.  When the two rear wheels are operated in different directions, one forward and one in reverse, the mower turns on a dime by pivoting around a point midway between the rear drive wheels.  To illustrate, with the right lever forward and the left lever back, the ZRT mower would make a counterclockwise rotation.  A ZRT mower can also pivot around one of the rear wheels with one rear wheel stopped and the other moving forward or backward.

The hydrostatic transmissions also function as the mower's service brake by slowing or stopping the rear drive wheels when the motion control levers are pulled in toward the center position.  To bring the mower to a full stop, the operator moves both motion control levers to the center position.  Unlike traditional riding mowers, most ZRT mowers—including the Subject Mower—do not have a foot-operated service brake.  Many ZRT mowers—including the Subject Mower—are equipped with a parking brake to keep the mower stationary, especially on an

3

incline, which can be engaged by moving the motion control levers outward away from the center position.

ZRT mowers are manufactured for both commercial and residential use. Heavy-duty commercial ZRT mowers typically come equipped with a Roll-Over Protection System ("ROPS"), which consists of a roll bar and a seatbelt. ROPS have been shown to be effective in certain scenarios at preventing the operator from severe injury or death in the event of a rollover.

The American National Standards Institute ("ANSI"), under the sponsorship of the Outdoor Power Equipment Institute, has promulgated two different safety standards applicable to ZRT mowers: ANSI B71.4 for commercial ZRT mowers, and ANSI B71.1 for residential ZRT mowers. Among other things, ANSI B71.4 and B71.1 set forth criteria for when a ZRT mower should be equipped with a ROPS as well as the requirements for steering, braking, and static stability. ANSI is not a government agency, nor does it enforce the standards it promulgates. *See, e.g.*, ANSI B71.1 – 2003: American National Standard for Consumer Turf Care Equipment – Walk-Behind Mowers and Ride-On Machines with Mowers – Safety Specifications ("ANSI B71.1 – 2003") at TTC 89,[2] Mot. Summ. J. Ex. D-1, ECF No. 113-4 at 9–125 ("The use of American National Standards is completely voluntary . . . .").

## II.     The Subject Mower

Defendant manufactured the Subject Mower (Serial No. 313015934) in 2013. It was "intended to be used by homeowners in residential applications" and was "primarily designed for cutting grass on well-maintained lawns." Operator's Manual 2, Mot. Summ. J. Ex. D-4, ECF No. 113-4 at 128–79. Plaintiffs purchased the Subject Mower in new condition in May 2014 from a Toro dealer in Geneseo, Illinois. Jennifer read and understood the Operator's Manual

---

[2] The first four pages of the ANSI B71.1 – 2003 manual are not paginated so the Court uses the page number provided by Defendant when citing those pages.

right after she purchased the Subject Mower and saved a copy of the manual to her phone.

Rebekah "fanned through" the manual sometime later so that she could help Jennifer with

maintenance of the Subject Mower but did not review any portions of the manual that dealt with

bypass pins, the mechanism of which is discussed below.  Rebekah Dep. 67:13–68:19,

Resistance Mot. Summ. J. Ex. 20, ECF No. 134-6.  Before choosing the Subject Mower,

Plaintiffs considered many options—including mowers that were equipped with ROPS—but

decided to purchase the Subject Mower—which does not come with a ROPS—due to cost.

   At the time the Subject Mower was designed and manufactured, the industry safety

standard in effect was ANSI B71.1 – 2003.  The Subject Mower complied with ANSI B71.1 –

2003, but Plaintiffs assert that it did not comply with ANSI Z590.3 – 2011, "which require[d]

[Defendant] to design out the effects Plaintiffs complain of, before the mower was built in

2013."  Resistance Mot. Summ. J. 8, ECF No. 159;[3] see ANSI/ASSE Z590.3 – 2011 (R2016)

Prevention through Design: Guidelines for Addressing Occupational Hazards and Risks in

Design and Redesign Processes, Resistance, Resistance Mot. Summ. J. Ex. 32, ECF No. 135 at

1–60.

   As relevant here, section 19.1.3 of ANSI B71.1 – 2003 states that a ZRT mower was not

required to be equipped with ROPS if the mass of the mower (including attachments with all

fluids full and with ballast as recommended by the manufacturer) was less than 1,245 pounds.

The Subject Mower weighed about 600 pounds and did not have a ROPS.  Section 19.2.2 set

standards for Static Stability and required that, when a mower is positioned longitudinally on a

---

[3] Plaintiffs filed their Resistance as ECF No. 126 on October 2, 2023.  Many images in that document were pixelated beyond recognition so the Court directed Plaintiffs to file a new version of their Resistance.  Oct. 26, 2023 Text Order ("[T]he Court apprises Plaintiffs that many of the images inserted into their 126 response are unintelligible. See, e.g., pages 19, 42-43, 45, 48-50, 55, 77, 79, 82. The Court therefore DIRECTS Plaintiffs to file an amended response to Defendant's 113 motion for summary judgment with legible images, maintaining the same pagination.").  Plaintiffs filed their amended Resistance, ECF No. 159, on November 3, 2023, and the Court cites to the amended version throughout this Order.

slope, the (front or back, respectively) wheels do not lift off the ground before a 30-degree incline is reached.  When a mower is positioned laterally on a slope, the mower "shall not roll over"—*i.e.*, the left or right wheels, respectively, do not lift off the ground—before a 25-degree incline is reached.  ANSI B71.1 – 2003 § 19.2.2.1.2(b).  Section 14.2.3.1 required that a service brake control be provided which could be in the form of a foot-operated brake or combined lever steer and brake controls.  The Subject Mower was equipped with the latter and was designed to stop when the operator moved the motion control levers to the neutral position then outward to the park position.  Operator's Manual 22.  The Subject Mower was also equipped with a parking brake as well as a safety interlock system which was "designed to prevent the engine from starting unless: [t]he blades [were] disengaged . . . [and] [t]he motion control levers [were] in the park position." *Id.* at 17.  "The safety interlock system also [was] designed to stop the engine whenever the control levers [were] out of the park position and [the operator] r[o]se from the seat." *Id.* at 18.  The "service brake system" was "[t]he designated primary brake system used for decelerating and stopping a machine," ANSI B7.1 – 2003 § 3.23, and the "parking brake system" was "used to hold one or more brakes or braking means continuously in an applied position," *id.* § 3.20.

When the Subject Mower needed to be manually pushed or towed—to be loaded onto a trailer or pulled out of a stuck position, for example—the operator had to engage bypass pins located on the back of the mower on either side of the engine.  The bypass pins, also referred to as bypass valves or tow valves or bypass levers, are so named because they allow the operator to bypass the hydrostatic transmission circuits.  When the bypass pins are pushed in, the hydrostatic transmissions disengage, meaning that the motion control levers cannot steer or brake the rear

drive wheels.  With the bypass pins pushed in, the rear drive wheels can turn freely, similar to an automobile in neutral gear.



**Figure 28**

1. Bypass lever location
2. Lever position for operating the machine
3. Lever position for pushing the machine

Operator's Manual 25 fig.28.

To return to normal operation, the operator had to "[m]ove the bypass levers rearward through the key hole and down to lock them in place."  *Id.* at 25.  The Subject Mower did not have any warnings on the machine itself indicating that when the bypass pins were engaged, the motion control levers could not steer or brake the machine.  The Subject Mower also did not have an interlock system to prevent the engine from starting when the bypass pins were engaged.

## III.    The Incident

In about 2016, Plaintiffs cleared a brushy area of their property above a six-foot-high retaining wall and began mowing that area with the Subject Mower.  Plaintiffs also put in a flower bed above the retaining wall that was about 9 to 12 feet in width.  Plaintiffs' expert David Bilek is a mechanical engineer who was retained to reconstruct the accident.  He is the only expert witness in this case who inspected Plaintiffs' property before the lawn was regraded

7

shortly after the Incident.  Bilek calculated the relative slope of the grassy lawn to be 9.5 degrees.
Bilek Report 5, 10, Def.'s Mot. Exclude Bilek Ex. D, ECF No. 154-4.  Bilek determined that the
width of the flower bed, though not uniform, was "nominally 12 feet wide" and had "basically
two slopes[:] initially from the grass at 31° for 4 feet, then 4° for 8 feet."  *Id.* at 10.  Defendant
asserts that both the flower bed and the retaining wall were drop-off hazards, but Plaintiffs
dispute this and assert that the only drop-off hazard was the retaining wall.  The Operator's
Manual warns: "Do not mow near drop-offs, ditches, steep banks or water.  Wheels dropping
over edges can cause rollovers, which may result in serious injury, death or drowning.  Use a
walk behind mower and/ or a hand trimmer near drop-offs, ditches, steep banks or water."
Operator's Manual 5.  The manual does not define what constitutes a "drop-off."



Incident Site Photo No. 1, Grace Aff. Ex. C-4, Mot. Summ. J. Ex. C-4, ECF No. 113-3 at 20–21.



Incident Site Photo No. 2, Grace Aff. Ex. C-3, Mot. Summ. J. Ex. C-3, ECF No. 113-3 at 18–19.

The Incident occurred on June 18, 2020.  Plaintiffs had encountered no problems with the Subject Mower during the six years prior to the Incident.  *See, e.g.*, Jennifer Dep. 133: 9–12, Resistance Mot. Summ. J. Ex 21, ECF Nos. 137–38 ("Q.  Before the incident that this lawsuit is about, did you ever have any accidents on [the Subject Mower]?  A.  No."); *id.* 135:1–7 (Q.  To your knowledge, had [the Subject Mower] ever gotten stuck, before the date of this incident?  A.  No, not that I can recall.  Q.  Before the date of the incident, had you ever had occasion to tow [the Subject Mower]?  A.  To tow it?  No.").

On the day of the Incident, Rebekah was mowing the lawn with the Subject Mower while Jennifer worked in other areas of the yard.  Rebekah was mowing the sloped grassy area parallel to the retaining wall near the edge of the flower bed when the Subject Mower's front left caster wheel dipped into the flower bed and the Subject Mower became stuck.  As Rebekah attempted to back out of the flower bed using the motion control levers, the Subject Mower slid further into the flower bed, coming to a stop about "a foot" from the retaining wall with all four wheels stuck in the flower bed.  Rebekah Dep. 100:18–21.  Rebekah was shaken up by the experience.

Jennifer drove Plaintiffs' John Deere utility tractor onto the slope above the flower bed and retaining wall to tow the Subject Mower out of its stuck position.  Jennifer then disengaged the Subject Mower's rear drive wheels by pushing in the bypass pins on the back of the mower. Jennifer was familiar with pushing in the bypass pins to disengage the rear drive wheels because she had followed this procedure on the Subject Mower almost every spring when she needed to jump the battery after the Subject Mower had been sitting all winter.  *See* Jennifer Dep. 155:16–18 ("If I needed to jump [the Subject Mower], it was in the shed, I kept it in the shed, so I would put in the [bypass] pins and push [the Subject Mower] out [of the shed.]").  Jennifer had also once towed a similar Toro Timecutter ZRT mower at a mobile home park she managed:

> Q.  . . . And so you -- How did you know to -- how to use the bypass pins to get the mobile home TimeCutter unstuck?
>
> A.  I mean, I grew up around equipment.  My grandfather built the mobile home park.  I've been around equipment my whole life.  We have golf carts.  We have -- And if you push a golf cart, you've got to put it in tow, if you push, you know, so I know the manuals say to put it in the bypass.  And every equipment has to go into some kind of bypass to -- for the most part, to tow it, so you don't damage anything.

*Id.* 137:8–20.  After pushing in the bypass pins, Jennifer attached a tow strap to the back of the Subject Mower and attached the other end to the John Deere tractor's front loader.  Jennifer then towed the Subject Mower about 40 feet up the slope above the flower bed.  When Jennifer lowered the Subject Mower down onto all four wheels, the mower was pointing down the slope toward the flower bed and retaining wall and the parking brake was engaged.

Rebekah then removed the tow strap from the Subject Mower but forgot to pull the bypass pins back out to re-engage the rear drive wheels which meant that the motion control levers could not be used to steer or brake the Subject Mower.  With the parking brake activated and the Subject Mower remaining stationary on the slope, Rebekah got back on the Subject Mower and started the engine to resume mowing.  Rebekah then pulled the motion control levers inward and pushed them forward.  This action released the parking brake but did not engage the rear drive wheels because they were still in bypass mode.  The Subject Mower began to roll down the slope toward the retaining wall, gradually picking up speed.  Rebekah pulled the motion control levers back to try to reverse the Subject Mower's direction and pushed the levers outward to try to engage the brake.  Neither of these actions was effective at stopping the Subject Mower from continuing to roll down the slope.  When the Subject Mower rolled into the flower bed, "it picked up speed a lot" "[b]ecause [the flower bed] was a little steeper."  Jennifer Dep. 300:16–22.

When Rebekah realized the Subject Mower was not stopping and was certain to go over the retaining wall, she attempted to jump clear of the machine.  Rebekah landed on the ground below the flower bed and six-foot retaining wall.  The Subject Mower rolled off the retaining wall, landed front first—perpendicular to the ground and parallel to the retaining wall—and then tipped over, landing upside down on Rebekah's legs.  Rebekah suffered severe injuries to both legs and her left leg had to be amputated.

## IV.   Procedural History

Plaintiffs filed suit on May 4, 2021, *see generally* Compl., ECF No. 1, and amended their complaint on August 12, 2021, *see generally* Am. Compl., ECF No. 17.  Defendant moved for summary judgment on September 8, 2023.  Plaintiffs filed their resistance to Defendant's motion for summary judgment on October 2, 2023.  *See supra* n.2.  On October 16, 2023, Defendant filed its reply in support of its motion for summary judgment.  Reply, ECF No. 147.

On October 10, 2023, Plaintiffs filed a motion for leave to supplement their additional material facts, ECF No. 143, on the grounds that Defendant failed to provide twenty specific discovery documents until October 5, 2023, after Plaintiffs' response deadline.  The Court granted Plaintiffs' motion in part, allowing Plaintiffs to supplement their additional material facts, and allowing Defendant to respond within ten days.  Oct. 26, 2023 Text Order.  Plaintiffs filed their supplement, ECF No. 161, on November 6, 2023, and Defendant filed a response, ECF No. 163, addressing Plaintiffs' additional material facts on November 16, 2023.

Defendant also argues that certain summary judgment exhibits contain trade secrets and moves for those exhibits to remain under seal.  *See* Def.'s Suppl. Mot. Seal Docs.; Def.'s Resp. Pls.' Mot. Temp. Seal Order.  Additionally, on October 30, 2023, the parties each filed multiple motions *in limine* and *Daubert* motions seeking to exclude certain topics and expert opinions

12

from consideration at trial and summary judgment.  *See* Def.'s Mot. in *Lim.*; Def.'s Mot. Exclude Kennett; Def.'s Mot. Exclude Bilek; Def.'s Mot. Exclude Berry; Def.'s Mot. Exclude Kinney & Berry; Pls.' Gen. Mots. in Lim. Issues 1 Through 18; Pls.' Daubert Challenges & Mots. in Lim. Issues 19 Through 28; and Pls.' Mot. Reply Def.'s Resistance Pls.' Mot. in *Lim.*  On November 27, 2023—nearly a month after the *Daubert* motion deadline had passed—Plaintiffs filed a motion seeking to exclude defense expert Enrique Bonugli, resulting in a cavalcade of emergency motions to strike and an additional motion *in limine* centered on Bonugli.  *See* Pls.' Mot. Exclude Bonugli; Def.'s Emergency Mot. Strike; Pls.' Suppl. Mot. in *Lim.* – Issue 29; and Def.'s Emergency Mot. Strike Pls.' Suppl. Motion *In Lim.* No. 29.

Plaintiffs bring claims of strict product liability and negligence against Defendant, alleging that the Subject Mower was unreasonably dangerous and that Defendant was negligent because the Subject Mower (1) was not equipped with an independent service brake or braking system, (2) was not equipped with a separate interlock system to prevent starting or moving the mower when the hydrostatic braking system was disengaged, (3) lacked a ROPS, and (4) lacked sufficient warnings or instructions.[4]  Am. Compl. ¶¶ 27, 35.  Defendant argues it is entitled to summary judgment on all claims.

## DISCUSSION

### I.   Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

---

[4] On October 4, 2023, Plaintiffs moved to withdraw Count III (breach of express and implied warranty) from their amended complaint.  Pls.' Mot. Withdraw Claims Based on Express & Implied Warranty 1, ECF No. 139; Am. Compl. ¶¶ 40–49.  Construing Plaintiffs' motion as a request for leave to amend the complaint, the Court granted the motion and dismissed the claims based on express and implied warranty (Count III) with prejudice.  Oct. 18, 2023 Text Order.

56(a).  A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In ruling on a motion for summary judgment, the court "must view the evidence in the light most favorable to the non-moving party," *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009), and it must "construe all facts and draw all reasonable inferences in favor of the nonmoving party," *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011).  The court "cannot weigh conflicting evidence, assess the credibility of the witnesses, or determine the ultimate truth of the matter, as these are functions of the jury."  *Walker v. Macy's Merch. Grp., Inc.*, 288 F. Supp. 3d 840, 851 (N.D. Ill. 2017).  The court's singular role at summary judgment is "to determine whether there is a genuine issue for trial."  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quotation marks omitted).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  To defeat summary judgment, the "nonmov[ing party] must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial."  *Warsco v. Preferred Tech. Grp.*, 258 F.3d 557, 563 (7th Cir. 2001) (citing *Celotex Corp.*, 477 U.S. at 324).  The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" to establish a genuine issue of material fact.  *Payne v. Pauley,* 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

## II.   Analysis

Plaintiffs base their strict liability and negligence claims on defective design and inadequate warnings.  Plaintiffs argue that the Subject Mower was defectively designed because it (1) was not equipped with an additional brake or braking system (in addition to the hydrostatic service brakes and parking brake), (2) was not equipped with an interlock to prevent operating the mower when the bypass pins were pushed in and the hydrostatic braking system was disengaged; and (3) did not come standard with a ROPS.  Am. Compl. ¶¶ 27(a)–(c), (e); *id.* ¶¶ 35(a)-(c), (e); Resistance Mot. Summ. J. 7.  For their inadequate warnings claims, Plaintiffs argue that Defendant failed to warn regarding (1) the fact that pushing in the bypass pins to disengage the hydrostatic motors also disengaged the service brake, (2) the fact that the lack of a ROPS made the Subject Mower dangerous, (3) how to safely tow the mower when it was not on a flat surface, and (4) that the electric brake was really just a parking brake and was not designed to stop the Subject Mower while it was in motion.  Am. Compl. ¶¶ 27(d), (f)–(g); *id.* ¶¶ 35(a)-(c), (e); Resistance Mot. Summ. J. 7.

Defendant argues it is entitled to summary judgment because the undisputed facts show that (1) Plaintiffs cannot establish proximate cause which is a requisite element of Plaintiffs' strict liability and negligence claims, (2) Plaintiffs cannot show that the Subject Mower was unreasonably dangerous using the consumer-expectation or risk-utility tests for strict product liability claims, and (3) Plaintiffs cannot establish a duty to warn because the danger was open and obvious and Plaintiffs do not provide alternative warnings.  Mot. Summ. J. ¶¶ 6, 8–37.

The Court will first address Plaintiffs' defective design claims in conjunction with Defendant's proximate cause argument.  It will then address Plaintiffs' failure-to-warn claims.

a. **Design Defect and Proximate Cause**

The Court applies Illinois substantive law in this diversity suit. *Hakim v. Safariland, LLC*, 79 F.4th 861, 868 (7th Cir. 2023). To recover on a strict products liability claim, a plaintiff must prove that she suffered an injury that was proximately caused by a condition of the product, that the condition was unreasonably dangerous, and that the unreasonably dangerous condition existed at the time the product left the defendant's control. *Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 335 (Ill. 2008), *op. modified on denial of reh'g* (Dec. 18, 2008). Any of the following may constitute an unreasonably dangerous condition: a manufacturing defect, a design defect, or a failure of the manufacturer to adequately warn of the product's danger or instruct on its proper use. *Walker*, 288 F. Supp. 3d at 855. Plaintiffs argue that there is a design defect. To succeed on a negligence claim in a product liability action, "a plaintiff must establish the existence of a duty, a breach of that duty, an injury that was proximately caused by that breach, and damages." *Jablonski v. Ford Motor Co.*, 955 N.E.2d 1138, 1153–54 (Ill. 2011).

A product is only defective if the condition of the product that proximately caused the plaintiff's injury was unreasonably dangerous. *Mikolajczyk*, 901 N.E.2d at 339. In determining whether a product has an unreasonably dangerous defect, "the threshold question is not whether the product could have been made safer, but whether it is dangerous because it fails to perform in the manner reasonably to be expected in light of its nature and intended function." *Salerno v. Innovative Surveillance Tech., Inc.*, 932 N.E.2d 101, 111 (Ill. App. Ct. 2010); *see also Spurgeon v. Julius Blum, Inc.*, 816 F. Supp. 1317, 1322 (C.D. Ill. 1993) (recognizing that this "threshold question of unreasonably dangerous design" applies in both strict liability and negligence actions).

The principles of proximate cause are the same for negligence and strict liability. *Kleen v. Homak Mfg. Co., Inc.*, 749 N.E.2d 26, 29 (Ill. App. Ct. 2001). "Under both strict liability and

negligence, a proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause." *Id.* Though proximate cause is commonly a question of fact, "it becomes a question of law where there is no material issue of fact regarding the matter or only one conclusion is clearly evident." *Id.*

"Under Illinois law, proximate cause can only be established when there is a reasonable certainty that the defendant's acts caused the injury," *Teran v. Coloplast Corp.*, 633 F. Supp. 3d 1103, 1109 (N.D. Ill. 2022) (quotation marks omitted), and establishing causation in complex design defect claims requires expert testimony. *Wheeler v. C.R. Bard, Inc.*, No. 19-cv-08273, 2022 WL 971394, at *4 (N.D. Ill. Mar. 31, 2022); *see also Muller v. Synthes Corp.*, No. 99 C 1492, 2002 WL 460827, at *6 (N.D. Ill. Mar. 26, 2002) (recognizing that where an issue "is one that goes beyond the knowledge that the average lay person reasonably could be expected to possess . . . , competent proof on th[at] issue requires expert testimony"). A plaintiff "must present expert testimony to establish a *prima facie* case of strict products liability when the claim involves technical knowledge beyond the common knowledge and experience of jurors." *Show v. Ford Motor Co.*, 697 F. Supp. 2d 975, 985 (N.D. Ill. 2010), *aff'd*, 659 F.3d 584 (7th Cir. 2011). If expert testimony is necessary and the plaintiff does not present expert opinions that would be admissible at trial, summary judgment must be granted in the defendant's favor. *May-Weirauch v. Ethicon, Inc.*, No. 1:20-cv-01205-SLD-JEH, 2020 WL 6946445, at *4 (C.D. Ill. Nov. 25, 2020); *see also Baltus v. Weaver Div. of Kidde & Co.*, 557 N.E.2d 580, 584 (Ill. App. Ct. 1990) ("[I]n cases in which expert opinion is necessary to sustain allegations of the complaint, summary judgment is proper when the plaintiff has failed to present an expert opinion or indicate that such expert opinion would be forthcoming.").

Plaintiffs agree that they must establish proximate cause to proceed with any of their claims, Resistance Mot. Summ. J. 81, and does not dispute that *expert* testimony is necessary at least for their design defect claims, *cf. id.* at 9, 99 (arguing that "expert witness testimony is not always required to submit a claim for insufficient warnings and instructions"). They assert that they have "voluminous and substantial evidence" that the Subject Mower's defects were both the cause-in-fact and legal cause of Rebekah's injuries, *id.* at 7, and that but for the alleged design defects of the Subject Mower's hydrostatic transmission control system, lack of independent service brake, and lack of ROPS, Rebekah would not have been injured. *Id.* at 86.

Here, both parties have filed *Daubert* motions seeking to exclude certain expert opinions from consideration at both summary judgment and trial which the Court will address first.

### i. *Daubert* Motions

Plaintiffs rely on expert opinions in opposing summary judgment and, on the proximate cause element, argue that "[t]he Court could simply review the expert witness reports of Thomas Berry, David Bilek and Kelly Kennett and deny summary judgment." Resistance Mot. Summ. J. 80 (citations omitted). Parties may use expert opinions to support or oppose summary judgment so long as the expert testimony is admissible at trial and the expert affidavits lay out specific facts and "a process of reasoning leading to the expert[']s conclusion." *Berg ex rel. Wiesner v. CI Investments, Inc.*, No. 15 C 11534, 2017 WL 1304082, at *5 (N.D. Ill. Apr. 7, 2017). An expert report will not defeat summary judgment "if the expert fails to identify any specific facts, source materials relied upon, or steps in her reasoning that led her to her conclusions." *Walker*, 288 F. Supp. 3d at 851 (quotation marks omitted).

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. *Anderson v. Raymond Corp.*, 61 F.4th 505, 508 (7th Cir. 2023). A qualified expert witness may provide an opinion if the proponent demonstrates by a preponderance of the evidence that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702(a)–(d).  The Supreme Court, in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993), held that Rule 702 requires the court to serve as an evidentiary gatekeeper and make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid."  Under Rule 702 and *Daubert*, the court engages in a three-step analysis to assess "(1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017).

To determine whether the reasoning or methodology is reliable and whether the expert evidence is admissible, the court looks at many factors, including:

> (1) whether the particular scientific theory can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community.

*Haley v. Kolbe & Kolbe Millwork Co.*, 863 F.3d 600, 611 (7th Cir. 2017) (alterations and quotation marks omitted).  In determining admissibility of expert evidence, the court must also keep in mind Federal Rule of Evidence 403, *see Daubert*, 509 U.S. at 595, which permits exclusion of "relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403.

19

Defendant does not challenge the qualifications of Plaintiffs' experts but does contend that their opinions should be excluded because their methodologies are unreliable and their opinions are not relevant and will not assist the trier of fact.  *See Gopalratnam*, 877 F.3d at 779.

### A.  Kelly Kennett

Defendant seeks to exclude the opinions and testimony of Plaintiffs' expert Kelly Kennett, arguing that "Kennett's opinion is based on unreliable methodology, unsupported by evidence in the record, and conclusory."  Def.'s Mot. Exclude Kennett 2–3.[5]  Defendant further contends that his opinions will not assist the trier of fact, averring that his "conclusion lacks the requisite analytical connection between the underlying facts and his opinion."  *Id.* at 4. Accordingly, the Court will consider "whether there is too great an analytical gap between the data and the opinion proffered."  *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015) (quotation marks omitted).

Kennett is a biomechanical engineer who was retained by Plaintiffs to give a causation opinion on Rebekah's injuries.  Pls.' Resistance Mot. Exclude Kennett 3, ECF No. 172.[6] Kennett did not provide any design or warning opinions for this case.  Kennett Dep. 8:17–22, Def.'s Mot. Exclude Kennett Ex. B, ECF No. 153-2.  Kennett's report includes X-rays showing Rebekah's leg injuries and an "Injury Diagram" designating the specific injuries at specific locations on Rebekah's body.  Kennett Report 5–7, G-10, Def.'s Mot. Exclude Kennett Ex. A, ECF No. 153-1.  He opines on the mechanisms of Rebekah's injuries and how those injuries could have been mitigated.  *Id.* at 5–8.

---

[5] In each *Daubert* motion, Defendant also argues that it and its experts "never got the opportunity to inspect and visit the scene of the accident after Plaintiffs intentionally destroyed it," suggesting that Plaintiffs violated their "duty to preserve the scene of the accident."  *See, e.g.*, Def.'s Mot. Exclude Kennett 7–8.  Finding other reasons to exclude Plaintiffs' experts' opinions, the Court need not address Defendant's spoliation accusation.
[6] The Court uses the page numbers generated by CM/ECF because Plaintiffs' Resistance to Defendant's Motion to Exclude Kennett is not paginated.

Defendant seeks to exclude Kennett's two causation opinions: (1) that the presence of an "operator actuated brake" on the Subject Mower would have prevented the accident, and (2) that the presence of a ROPS would have "mitigated" Rebekah's injuries. *See* Def.'s Mot. Exclude Kennett 2, 4–8.

Kennett's first opinion is:

> One obvious injury prevention strategy is to prevent the accident itself with an operator actuated brake, as discussed by other experts in the case. Were the machine able to be braked and not go over the wall, that would represent a robust and complete solution for the serious injuries sustained in this accident.

Kennett Report 7. Kennett testified that, in reaching his opinion, he relied on Bilek's reconstruction of the Incident but did not rely on any specific testing by other experts nor did he do any testing of his own because "that's not been [his] work in the case." Kennett Dep. 19:13–21. Kennett stated that his opinions "are very focused on . . . biomechanics injury mechanism" and he asserts that he does not need to perform tests for those opinions. *Id.* 19:21–25.

Plaintiffs employed Kennett as a "causation expert," and they argue that the only reason Defendant wants to exclude his opinion is because "*[i]t is too obvious*." Pls.' Resistance Mot. Exclude Kennett 3–4, ECF No. 172. For expert opinions to be admissible under *Daubert* and Rule 702, the expert must lay out "a process of reasoning leading to the expert's conclusion," *Berg*, 2017 WL 1304082, at *5, and the opinion must "assist[] the trier of fact in understanding the evidence or in determining the fact in issue," *Walker*, 288 F. Supp. 3d at 851–52 (quotation marks omitted). To be helpful to the factfinder, the expert "must testify to something more than what is *obvious* to the layperson." *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998) (emphasis added) (quotation marks omitted).

Plaintiffs are correct that Kennett's opinion is obvious, but that does not work in their favor. His tautological statement—"One obvious injury prevention strategy is to prevent the

accident itself," Kennett Report 7—is common sense and does not require expert testimony.  The larger problem here is that Kennett has no basis for opining that the Incident would have been "prevent[ed] . . . with an operator actuated brake."  *See id*.  Kennett provides no reasoning to support that opinion and is merely parroting an opinion offered by someone else.  He opines that Rebekah's injuries could have been avoided entirely if the Subject Mower had been "able to be braked and not go over the wall."  *Id*.  This opinion is too obvious to help the factfinder understand the element of causation.  Moreover, the undisputed facts show that the Subject Mower was not *incapable* of braking—Plaintiffs do not contend that the service brake malfunctioned or that the Subject Mower as a whole was unable to brake.  It was only because Rebekah had forgotten to pull the bypass pins back out to reengage the hydrostatic motors that the Subject Mower did not brake in the moments before Rebekah was injured.

Kennett's second opinion is:

ROPSs seek to create and preserve an occupant survival space in the event of an overturn, while a lap belt is designed to restrain an occupant in that survival space. In the event Rebekah and the mower fall over the retaining wall and land nose down, with a worn lap belt, she would be able to ride over the wall with the machine and be restrained by the belt. By staying with and restrained to the machine in the occupant space, she would not have sustained the primary impact loading to her right leg (which caused the tibial plateau fracture), or have gotten her leg in front of the crossmember to receive her crushing injuries.

Kennett Report 8.  Defendant argues that Kennett's opinion is unreliable because his methodology cannot be tested, has not been subject to peer review, and provides no potential error rate.  Def.'s Mot. Exclude Kennett 5–8.  The only data Kennett appears to have relied upon to support his conclusion is Bilek's calculations of Rebekah's center of gravity and ground impact speed which he then compared "to the well-studied world of automotive frontal impacts." Kennett Report 8.  Kennett reasons that since an automobile's airbag would not deploy if the automobile encountered a similar impact force as the Subject Mower experienced, Rebekah

would not have been injured if the Subject Mower had a ROPS and she was wearing her seatbelt. *Id.* Plaintiffs make no attempt to explain Kennett's methodology but instead ask, "[W]hat is Defendant even talking about here? Error rate as to what?" Pls.' Resistance Mot. Exclude Kennett 6. This essentially proves Defendant's point—Kennett did not explain his methodology for determining that a ROPS would have prevented serious injury. Absent more explanation, the Court cannot conclude that a comparison of whether airbags would go off in an automobile is a reliable method of opining on what impact a nosedive at a similar speed would have on a ZRT mower and its operator. An expert must "show that his conclusions were the fruit of a rigorous, objectively-verifiable approach—something more than mere speculation." *Timm v. Goodyear Dunlop Tires N.A., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019). Kennett has not done so.

Defendant also asserts that Kennett equivocates about what type of ROPS would have prevented or mitigated Rebekah's injuries and that for his expert testimony to be reliable and admissible, Kennett "must be unequivocal" in his opinion that a specific ROPS design would have prevented her injuries. Def.'s Mot. Exclude Kennett 7; *see also Young v. Bryco Arms*, 821 N.E.2d 1078, 1085 (Ill. 2004) (noting that to evaluate cause-in-fact, the court must ask "whether the injury would have occurred absent the defendant's conduct."). The Court finds that Kennett's opinion on ROPS and mitigation is unhelpful to the trier of fact to the extent that Kennett is not relying on any particular form of ROPS. *See* Def.'s Mot. Exclude Kennett 6 (pointing out that Kennett admitted that "whether Rebekah could be spared a serious injury depends on the ROPS that is installed" (citing Kennett Dep. 60:1–61:6)). Additionally, to the extent that Kennett testified in his deposition that Berry's proposed ROPS design would have prevented severe injuries, he has no basis beyond speculation for such opinion. He merely described the general purpose of ROPS and stated that he did not "see any reason why" those

23

purposes could not be accomplished in this case while acknowledging that he had seen no testing to confirm his statement.

> A. . . . But, I mean, that's the basic analysis, is, again, is the purpose of a ROPS is to keep the machine from loading the occupant. Right? And then the purpose of the belt is to preserve the occupant in that location, in that preserved space. Having looked at this incident, I don't see any reason why we can't accomplish both of those things.
> Q. Did you do any type of simulation or surrogate testing to confirm what you just said?
> A. No. And I don't see that anybody has done that.

Kennett Dep. 64:15–25. An expert's opinion must be "based on sufficient facts or data" and the expert must have applied reliable "principles and methods *to the facts of the case*." *Raymond Corp.*, 61 F.4th at 508 (emphasis added). Kennett conceded that he had not "seen any testing of ROPS on a ZRT mower in relation to a forward pitch-over event." Kennett Dep. 59:8–10. He can only speculate as to whether a ROPS would have prevented any injuries in the instant case and the Court has an obligation to bar testimony from "an expert who offers speculation and subjective beliefs, not opinions backed by scientific methodologies." *Burns v. Sherwin-Williams Co.*, No. 19-cv-5258, 2022 WL 4329417, at *25 (N.D. Ill. Sept. 18, 2022), *aff'd*, 78 F.4th 364 (7th Cir. 2023).

Finally, Defendant objects that Kennett is not a warnings expert and should not be allowed to testify about warnings. Def.'s Mot. Exclude Kennett 8. Plaintiffs quickly dispense with this argument because Kennett has no opinions on warnings. Pls.' Resistance Mot. Exclude Kennett 7.

Kennett's opinions do not pass muster under *Daubert* and Federal Rule of Evidence 702 and cannot be used to oppose summary judgment. Defendant's Motion to Exclude Plaintiffs' Expert Kelly Kennett is GRANTED.

## B. David Bilek

Defendant moves to exclude Plaintiffs' expert David Bilek on the grounds that the "methodology underlying all of his opinions is unreliable; and . . . [his] opinions are not based on facts and data reasonably related to the evidence in this case or the mechanism and nature of this incident." Def.'s Mot. Exclude Bilek 4. Bilek is a mechanical engineer who was retained by Plaintiffs to reconstruct the Incident. Bilek Report 2. His report generally opines on the causation of the Incident and that the Subject Mower is unreasonably dangerous and defective in design. *See generally id.*

With respect to Bilek's Report as a whole, Defendant argues that Bilek's underlying data is incomplete and unreliable because "while surveying the scene of the accident, his drone crashed, and he could not complete taking photographs of the scene at all relevant angles." Def.'s Mot. Exclude Bilek 9. Defendant asserts that Bilek's methodology and results cannot be tested because Plaintiffs bulldozed and regraded the Incident site within the months immediately following the Incident in 2020. *Id.* at 9–10. Bilek is the only expert witness in this case who saw the actual Incident site before the lawn was regraded so Defendant and its experts necessarily had to rely on data collected by Bilek. The Court finds Bilek's opinions unreliable for other reasons and so does not address whether Bilek's drone photography and survey were complete and accurate.

Defendant distills Bilek's report down to four opinions and asserts that "none [of those opinions] results from his scientific, technical or other specialized knowledge or from a scientific method." *Id.* at 6. Furthermore, Defendant argues that Bilek is simply "serv[ing] as a mouthpiece to backdoor opinions" rendered by Plaintiffs' other experts. *Id.*

First, Defendant objects to Bilek's opinion that "Toro did not warn that with the hydrostatic motor disengaged, there was no directional control or braking of the machine

25

possible." Bilek Report 12. Bilek testified in his deposition that he was not representing himself

to be a warnings expert but instead was opining "just from a macro standpoint." Bilek Dep. 9:5–

12, Def.'s Mot. Exclude Bilek Ex. B, ECF No. 154-2. Plaintiffs respond that Bilek's opinions on

warnings "come from the engineering perspective, of [sic] which he is well acquainted with."

Pls.' Resistance Mot. Exclude Bilek 4, ECF No. 171. Plaintiffs indicate that "Defendant had a

duty from an engineering perspective to warn" and that Bilek "testified to this [duty to warn]

specifically and is well qualified to give this opinion." *Id.* However, "[t]he determination of

whether a duty to warn exists is a *question of law* and not of fact," *Schultz v. Hennessy Indus.,*

*Inc.*, 584 N.E.2d 235, 241–42 (Ill. App. Ct. 1991) (emphasis added), and an expert witness

cannot testify to a legal conclusion, *Good Shepherd Manor Found., Inc. v. City of Momence*, 323

F.3d 557, 564 (7th Cir. 2003).

Defendant also objects to the following opinion from Bilek: "The lack of a functional

independent service brake renders the machine defective and unreasonably dangerous. Had there

been a functional brake, the accident does not occur." Bilek Report 12. Bilek admits, however,

that he conducted no testing to support this conclusion:

> Q. But in terms of the characteristics of the service brake you're talking
> about, you don't have any -- any opinions or information on that; is that – is that
> true?
> A. That's correct. Again, I am addressing from a macro standpoint. And,
> to me, that's something that's very obvious.
> Q. But you haven't given any consideration to how the brake would work,
> what features it would have and what type of testing would be necessary for that
> type of brake to be implemented, correct?
> A. That -- that's correct. That's not my task here.
> Q. Okay. Well, a little above that [in your report], you said, "It is
> recognized that the Hillmans failed to reengage the bypass levers leaving the Toro
> in a free-wheeling mode and uncontrollable with the motion control levers"; do you
> see that?
> A. Yes.
> Q. And had they -- had they not failed to reengage the bypass levers, the
> accident wouldn't have happened either, correct?

26

A.  Yes, that's true.

Bilek Dep. 128:2–24.  Bilek testifies both that his conclusion regarding a brake is "very obvious," and that the accident would not have occurred had Plaintiffs pulled the bypass pins back out after towing the Subject Mower out of the flower bed.  To the extent Bilek opines on the element of causation, his opinion about a brake is too obvious to be helpful and his opinion that the accident would not have occurred had Plaintiffs remembered to pull out the bypass pins does not help Plaintiffs' case.

Defendant raises similar objections to Bilek's opinion that "[h]ad there been a safety interlock, as there is for the parking lock, which insures the hydrostatic motor is engaged, the accident does not occur."  Bilek Report 12; *see* Bilek Dep. 136:23–137:3 ("Q.  Okay.  So I assume that you don't have any specifics on how this interlock would work or be designed?  A. No, that's -- again, that's not my task here.  My task is from a macro standpoint to look at things that can and do go wrong.").  Plaintiffs assert that Bilek's causation opinions regarding an independent service brake and an additional interlock system are "obvious[]," "common sense," and that "this is simply not a complex subject."  Pls.' Resistance Mot. Exclude Bilek 5–7. Plaintiffs' assertions again seem to obviate the need for an expert.  *See Ancho*, 157 F.3d at 519 ("[A]n expert . . . must testify to something more than what is obvious to the layperson in order to be of any particular assistance to the [factfinder]." (quotation marks omitted)).

Finally, Defendant moves to exclude Bilek's opinion regarding ROPS: "Given the low [Static Stability Factor], the risk of rollover is significant and ROPS should be standard.  Without this driver protection, the machine is defective and unreasonably dangerous."  Bilek Report 12. Whether the Subject Mower is unreasonably dangerous and therefore defective is a legal conclusion and again, "experts may not testify as to legal conclusions that will determine the outcome of the case."  *Marquis ProCap Sys. v. Novozymes N.A., Inc.*, No. 20-1020, 2023 WL

3775173, at *2 (C.D. Ill. June 2, 2023) (quotation marks omitted).  Bilek similarly testifies that

he opines on this subject from a "macro" standpoint and has not conducted any testing regarding

a ROPS design that would have prevented Rebekah's injuries on the Subject Mower at the

Incident Site.  *See* Bilek Dep. 110:12–111:9.

The Court finds that Bilek's opinions on causation are conclusory, will not assist the

factfinder, and cannot be used to oppose summary judgment.  "An expert who supplies nothing

but a bottom line supplies nothing of value to the judicial process."  *Zenith Elecs. Corp. v. WH-*

*TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (quotation marks omitted).  Defendant's

Motion to Exclude Plaintiffs' Expert David Bilek is GRANTED.

### C.  Thomas Berry

Defendant seeks to exclude the opinions and testimony of Plaintiffs' expert Thomas

Berry because, as Defendant argues, "Berry's methodology underlying all of his opinions is

unreliable . . . [and his] opinions are not based on facts and data reasonably related to the

evidence in this case or the mechanism and nature of this incident."[7]  Def.'s Mot. Exclude Berry

1.  Plaintiffs retained Berry to opine on lawnmower design and the lack of safety features,

including lack of effective warnings, lack of an independent brake, and lack of ROPS.  Pls.'

Resistance Mot. Exclude Berry 2, ECF No. 168.  In his deposition, Berry described himself as a

"[c]onsulting mechanical engineer with expertise in the machine safety and ROPS and designing

ROPS and ZTR mowers," Berry Dep. 7:8–13, Def.'s Mot. Exclude Berry Ex. E, ECF No. 156-5,

as well as a "warnings expert," *id.* 7:23–25.

---

[7] Defendant also argues that Berry's opinions in his memorandum dated August 10, 2023, should be excluded for
untimeliness.  *See, e.g.*, Def.'s Mot. Exclude Berry 4.  Plaintiffs correctly point out, however, that the deadline for
discovery was extended to August 18, 2023, and therefore Berry's August 10, 2023 opinions were not untimely.  *See*
Pls.' Resistance Mot. Exclude Berry ¶ 8, ECF No. 168; July 27, 2023 Text Order (Hawley, M.J.).

Defendant asserts that much of Berry's Report discusses ROPS in the context of "rollover" incidents but argues that those opinions are not relevant because "**this is not a rollover case**." Def.'s Mot. Exclude Berry 10. Defendant provides the following definition of "rollover":

> A *rollover* occurs in one of two ways: (1) a lateral rollover – when a mower loses traction on a sloped surface, slides down the slope and encounters a tripping hazard (such as landscape border, culvert or pond), and rolls over its side or (2) a backward longitudinal rollover – when a mower is driven forward up a steep incline, causing the front of the mower to lift off the ground and roll over its back end.

*Id.* at 2. Here, in contrast, the Subject Mower rolled forward down an incline and off a six-foot retaining wall, landed nose first, and then continued tipping forward until it was upside down.

The definition of "rollover" in this case is significant because Berry devotes many pages of his report to the long history of rollover accidents involving agricultural equipment (including tractors, commercial lawnmowers, and residential lawnmowers) as well as the numerous studies proving the efficacy of ROPS in protecting operators. Berry Report 3–28. Berry opines that "[a] ROPS and seat[belt] would have provided Ms. Hillman a crush protected seated area. ROPS including seatbelts have proven 99% effective on all models of tractors and ride-on mowers in preventing and/or minimizing deaths and serious injuries due to rollovers." Berry Report 30, Def.'s Mot. Exclude Berry Ex. D., ECF No. 156-4. But Berry provides no specific data on the efficacy of ROPS involved in *forward longitudinal* "rollovers." Indeed, Berry stated in his deposition that he has only examined two incidents in which the lawnmower rolled forward and that "[u]sually with zero turns [*i.e.*, ZRT mowers] . . ., the ones [he] ha[d] seen [were] lateral or rearward." Berry Dep. 53:9–10. Berry's conclusions regarding the efficacy of ROPS are misleading at best when applied to the facts of this case. *Cf. Easterwood v. Husqvarna Pro. Prods., Inc.*, 576 F. Supp. 3d 950, 963 (M.D. Ala. 2021) (holding that the same expert, Berry, could not testify that ROPS would prevent deaths and serious injuries because "[w]ithout any

studies specifically looking at ZTRs, it is at least misleading to say that 'ROPS including

seatbelts have *proven* 99% effective on *all* models of . . . ride-on mowers'" and that Berry could

"not state or imply a statistical certainty for something that has never been tested").

In his report, Berry opines that many ZRT mower manufacturers, including Toro, offered

ROPS prior to the Subject Mower being manufactured in 2013.  Berry Report 28.  He indicates

in his report: "I have designed, built and tested a ROPS for *similar* residential zero turn lawn

tractors that meets the requirements of OSHA regulations.  No new technology was necessary,

and the ROPS was very effective in preventing a *full rear overturn* on steep slopes."  *Id.*

(emphasis added).  As Defendant has emphasized, though, the Incident in this case was not a rear

overturn.  Berry does not indicate that he designed a ROPS for the Subject Mower specifically,

nor does he indicate that he has ever designed and tested the efficacy of a ROPS in preventing

the Incident here which led to Rebekah's injuries.

In *Burns*, the plaintiff's expert ran multiple tests on the actual allegedly defective product

at the actual accident site to try to reconstruct the accident.  *Burns*, 2022 WL 4329417, at *18–

26.  The expert then concluded that the product was unsafe because it performed much

differently than what he anticipated.  *Id.* at *22.  The court determined that the expert's

methodology was unreliable because he based his conclusion not on industry standards or a

standard found in the product manual but only on his own expectations for how the product

should perform.  *Id.*  The court excluded the expert's testimony, finding that "his expectation

[wa]s not enough to set a standard for safety."  *Id.*

Here, Berry did not test a ROPS on the Subject Mower itself nor did he test any mower

under the same conditions as were involved in this case.  *See Anderson*, 61 F.4th at 508

(affirming that an expert's opinion is only admissible when the expert applies reliable "principles

and methods *to the facts of the case*" (emphasis added)).  Berry testified in his deposition that he

conducted no tests and made no calculations as to whether ROPS would have prevented

Rebekah's injuries or what would have happened if the Subject Mower had ROPS.

> Q.  You haven't done an analysis, or any testing or calculations, that would show
> exactly what would show if the ROPS had been on the mower?
> A.  I haven't done that, no.
> . . .
> A.  [I]t wouldn't destroy the ROPS in this accident, it would still provide a crush
> protective area.
> Q.  And where are your calculations or your analysis to support that statement that
> you just made?
> A.  It's based on experience of rolling these mowers over.  And other machines
> over.  The ROPS holds up very well.

Berry Dep. 97:3–22, Def.'s Mot. Exclude Berry Ex. E, ECF No. 156-5.  Berry based his expert

opinion on how ROPS performed on different mowers in different scenarios but did not apply his

expertise to the specific facts of this case.

Plaintiffs defend Berry by saying that "authors often use 'rollover' and 'tip over' and

'overturn' interchangeably in discussions of a ROPS' effectiveness because, (surprise!) a well-

designed ROPS protects the operator no matter how the mower gets upside down."  Pls.'

Resistance Mot. Exclude Berry ¶ 7.  But Berry's Report does not confirm that authors often use

"rollover" and "tipover" and "overturn" interchangeably and without some evidence of that, the

Court cannot assume that Berry's tests and data will help the factfinder because they are not

based on substantially similar circumstances.  *Cf. Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d

1261, 1268 (7th Cir. 1988) (holding that evidence of other accidents is only admissible if its

proponent "show[s] that the other accidents occurred under *substantially similar*

*circumstances*").  Berry's report provides large swaths of data but much of it is unconnected to

the facts of this case and therefore irrelevant.  *See* Def.'s Mot. Exclude Berry 7 (asserting that

Berry fails to connect his facts and data about "other mowers and materials to the conclusion that

the Subject Mower is defective or unreasonably dangerous").  "[A] proposed expert must bridge the analytical gap by showing a rational connection between the data and the expert's contested conclusion."  *Downing v. Abbott Lab'y's*, 48 F.4th 793, 809 (7th Cir. 2022) (quotation marks omitted).

Berry's opinions do not satisfy the reliability standards of *Daubert* and Federal Rule of Evidence 702.  Accordingly, Defendant's Motion to Exclude Plaintiffs' Expert Thomas Berry is GRANTED.

Without expert testimony proving proximate cause, no genuine issues of material fact remain and Plaintiffs' strict product liability and negligence claims based on design defects fail. *See May-Weirauch*, 2020 WL 6946445, at *4 ("If [the p]laintiff[] . . . fails to provide pertinent expert testimony regarding causation, summary judgment must be granted for [the d]efendants.").  The Court GRANTS summary judgment for Defendant as to Plaintiffs' strict liability and negligence claims premised on defective design.

Plaintiffs correctly point out that failure-to-warn claims do not always require expert testimony because a lay juror does not need any specialized knowledge to "determine whether there was a known risk and whether it was sufficiently disclosed."  Resistance Mot. Summ. J. 99 (quoting *Hakim*, 79 F.4th at 870).  For that reason, the Court evaluates Plaintiffs' failure-to-warn claims apart from the design defect claims.

### b.  Failure to Warn

As an alternative theory of liability, Plaintiffs argue that Defendant failed to warn regarding (1) the fact that pushing in the bypass pins to disengage the hydrostatic motors for pushing or towing the Subject Mower also disengaged the service brake, (2) the fact that the lack of a ROPS made the Subject Mower dangerous, (3) how to safely tow the mower when it was not on a flat surface, and (4) that the "electric brake" was really just a parking brake and was not

designed to stop the Subject Mower while it was in motion.  Am. Compl. ¶¶ 27(d), (f)–(g); *id.* ¶¶ 35(a)-(c), (e); Resistance Mot. Summ. J. 7.

Defendant argues that Plaintiffs' inadequate warning claims fail because Plaintiffs have not (1) shown that Defendant owes a duty to warn, (2) presented any alternative warnings, (3) shown that any alternative warnings would have been heeded, or (4) shown that alternative warnings would have prevented Rebekah's injuries.  Mot. Summ. J. ¶¶ 31–36.

"Under Illinois law, a plaintiff must prove that the defendant did not warn of danger despite knowledge in the industry of the dangerous propensity of the manufacturer's product." *Elward v. Electrolux Home Prods., Inc.*, No. 15 C 9882, 2024 WL 3650117, at *9 (N.D. Ill. Aug. 5, 2024) (alterations and quotation marks omitted).  "A manufacturer has a duty to warn where the product possesses dangerous propensities and there is unequal knowledge with respect to the risk of harm, and the manufacturer, possessed of such knowledge, knows or should know that harm may occur absent a warning."  *Sollami v. Eaton*, 772 N.E.2d 215, 219 (Ill. 2002).  "There is no duty to warn where the product is not defectively designed or manufactured, and where the possibility of injury results from a common propensity of the product that is open and obvious." *Klen v. Asahi Pool, Inc.*, 643 N.E.2d 1360, 1363 (Ill. App. Ct. 1994).

Contrary to Defendant's argument that Plaintiffs do not provide any alternative warnings, Plaintiffs do in fact propose that Defendant could adopt "the very warning issued by Hydro-Gear, the manufacturer of the hydrostatic motor," Resistance Mot. Summ. J. 102, which states: "WARNING: Actuating the bypass will result in the loss of hydrostatic braking capacity.  The machine must be stationary on a level surface and in neutral when actuating the bypass," Hydro-Gear ZT-2100 / ZT-2200 (EZT) Integrated Zero-Turn Transaxle Service and Repair Manual 2, Resistance Mot. Summ. J. Ex. 18, ECF No. 134-4.  There are two issues with

Plaintiffs' argument.  First, the Subject Mower's Operator's Manual already included the warning that the Subject Mower needed to be on a level surface and in neutral when the bypass pins were pushed in to allow an operator to push or tow the Subject Mower.  Operator's Manual 24–25.  Plaintiffs did not heed that part of the warning which already existed in the Operator's Manual because it was impractical to do so when the Subject Mower was stuck in the flowerbed. But even more critically, Plaintiffs assert that they believed that the Subject Mower had an "electric brake" which would stop the machine even if the hydrostatic motors were disengaged. Resistance Mot. Summ. J. 54 ("Jennifer knew that the bypass pins likely disconnected the hydrostatic motors, but she believed that the electric brake would still stop the mower if it began to roll or move.").  Jennifer testified that she believed the Subject Mower still had an electric brake even when the bypass pins were pushed in.  Jennifer Dep. 183:7–184:3.  There is no evidence then that a warning about loss of hydrostatic braking capacity would have changed Plaintiffs' behaviors since they already believed there was another braking mechanism available to stop the moving Subject Mower.

Additionally, though Plaintiffs argue that Defendant failed to warn that the lack of ROPS made the Subject Mower unreasonably dangerous, Illinois courts recognize that "[i]n determining whether a product is unreasonably dangerous, the focus should be placed on the product itself and not on the availability of any additional safety devices." *Rodriguez v. Glock, Inc.*, 28 F. Supp. 2d 1064, 1069 (N.D. Ill. 1998) (quotation marks omitted).  "[T]he pivotal question is whether the product in its present state, without installation of optional safety devices, is dangerous because it fails to perform in the manner reasonably to be expected in light of its nature and intended function." *Miller v. Dvornik*, 501 N.E.2d 160, 163–64 (Ill. App. Ct. 1986). Because the lack of ROPS cannot, as a matter of law, mean that the Subject Mower itself was

unreasonably dangerous, the lack of ROPS was not a design defect and Defendant had no duty to warn about it. *See Thornton v. M7 Aerospace LP*, 796 F.3d 757, 773 (7th Cir. 2015) (holding that there was no duty to warn "because the plaintiffs ha[d] not established that there was any 'defect' in the design of the [product] of which to warn").

Plaintiffs bear the burden of establishing that the failure to warn was a proximate cause of Rebekah's injuries. *Blaue v. Kissinger*, No. 03 C 9025, 2006 WL 2092380, at *5–6 (N.D. Ill. July 24, 2006). Plaintiffs present evidence of injuries and accidents involving Toro products, but evidence of other accidents to show foreseeability and causation is only admissible if Plaintiffs show that the other accidents occurred under *substantially similar circumstances*. *See Nachtsheim*, 847 F.2d at 1268. Based on the evidence provided, it appears that the Incident involving the Subject Mower is relatively unique. Plaintiffs' expert Berry—whom they tout as "the most qualified expert identified in this litigation to discuss mower design and the lack of mower safety features (lack of effective warnings, lack of brake and lack of ROPS)," Pls.' Resistance Mot. Exclude Berry 2—testified that he knew of only two cases involving "a frontward roll off of a drop off," Berry Dep. 52:22–53:6, and that the majority of rollover incidents he was familiar with were "lateral or rearward," *id.* 53:9–10. Plaintiffs provide no examples of accidents substantially similar to the circumstances of this case, namely, an operational ZRT mower that was positioned at the top of a slope and rolled down and tipped over a retaining wall after the operator forgot to reengage the hydrostatic motors. Plaintiffs do not prove why the evidence of dissimilar prior accidents means that Defendant should be held liable for the injuries that occurred here.

Moreover, Plaintiffs must show that alternative warnings would have been read and heeded. *Elward*, 2024 WL 3650117, at *11. It is undisputed that "*Rebekah* forgot the bypass

pins were still in tow mode." Resistance Mot. Summ. J. 57 (emphasis added). Plaintiffs only

provide evidence showing that *Jennifer* likely would have heeded alternative warnings but they

also establish that Jennifer already knew that the bypass pins disconnected the hydrostatic

motors. *Id.* at 54, 100. Plaintiffs do not provide evidence showing that different warnings would

have changed Rebekah's behavior and prevented her injuries. *See Elward*, 2024 WL 3650117, at

*11 n.12 (finding "no evidence in the record [that] suggest[ed] that [the plaintiff] would have

heeded [a different warning], or that a different warning would have been effective").

Without evidence demonstrating that the lack of adequate warnings was the proximate

cause of Rebekah's injuries, Plaintiffs cannot sustain their failure-to-warn claims. Accordingly,

the Court GRANTS summary judgment for Defendant as to Plaintiffs' strict liability and

negligence claims premised on failure to warn.

### c. Motions to Seal

With its motion for summary judgment, Defendant filed two exhibits, ECF Nos. 115 &

116, under seal and an accompanying Motion for Leave to File Documents Under Seal, ECF No.

114. On October 2, 2023, Plaintiffs filed their Unresisted Motion to Seal and Motion for Leave

to File Overlength Brief in Support of Plaintiffs' Resistance to Defendant TTC's Motion for

Summary Judgment, ECF No. 125. In their Motion to Seal, Plaintiffs identified numerous

documents produced by Defendant in discovery that Plaintiffs requested to be filed under seal

and concurrently filed those identified documents under seal, ECF Nos. 126–28. The Court

subsequently entered the following Text Order:

> TEXT ORDER entered by Chief Judge Sara Darrow on October 6, 2023. On
> September 8, 2023, Defendant filed a <u>114</u> Motion for Leave to File Documents
> Under Seal. It seeks to file two of the exhibits to its <u>113</u> Motion for Summary
> Judgment under seal. On October 2, 2023, Plaintiffs filed a <u>125</u> Motion to Seal and
> Motion for Leave to File an Overlength Brief in Support of Plaintiffs' Resistance
> to Defendant TTC's Motion for Summary Judgment. Plaintiffs seek to file their
> brief in support of their response to Defendant's <u>113</u> Motion for Summary

Judgment under seal and many exhibits to their response under seal.  Both parties' 114 125 motions to seal fail to comply with Local Civil Rule 5.10(A)(2) which states that a motion for leave to file under seal "must include an explanation of how the document meets the legal standards for filing sealed documents."  The parties reference the Court's 23 Protective Order as justification for why the requested documents should be sealed.  However, the Court's 23 Protective Order expressly states that the order "does not authorize the filing of any document under seal.  A party who wishes to file a document under seal must do so in accordance with Local Rule 5.10 and establish a legal basis for why such document may and should be sealed under applicable law."  Para. 3(a).  The Court STRIKES 114 and 125 motions for leave to file under seal for noncompliance with Local Civil Rule 5.10(A)(2).  The parties may file new motions for leave to file under seal by October 20, 2023.

Oct. 6, 2023 Text Order.  After the Court struck Defendant's and Plaintiffs' respective motions to file under seal, Defendant filed a Supplemental Motion to Seal Documents on October 20, 2023 seeking leave to seal twelve documents, including two of its own exhibits and ten of Plaintiffs' exhibits arguing that the identified documents contained trade secrets.  Defendant then filed a second motion to seal certain documents that had been filed by Plaintiffs with their supplemental additional material facts.[8]

A party who seeks leave to file a document under seal must file a motion explaining "how the document meets the legal standards for filing sealed documents."  Civil LR 5.10(A)(2).  "The Court does not approve of the filing of documents under seal as a general matter."  *Id.*; *see also Jessup v. Luther*, 277 F.3d 926, 927 (7th Cir. 2002) ("The general rule is that the record of a judicial proceeding is public."); *Citizens First Nat'l Bank v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999) ("[T]he public at large pays for the courts and therefore has an interest in what goes on at all stages of a judicial proceeding.").  "These considerations, however, support a

---

[8] Concurrent with their supplement to their additional material facts, Plaintiffs filed a Motion for Temporary Seal Order seeking to seal their exhibits 39–54 "out of an abundance of caution" "to allow [Defendant] to make any Motion to Seal."  Pls.' Mot. Temp. Seal Order 2, ECF No. 160.  Defendant then filed its Response to Plaintiffs' Motion for Temporary Seal Order, which the Court construes as a motion to seal.  *See* Nov. 21, 2023 Text Order.  The Court then found Plaintiffs' Motion for Temporary Seal Order to be moot and ordered that certain documents remain under seal until resolution of Defendant's two motions to seal.  *Id.*

strong presumption rather than an absolute rule. When there is a compelling interest in secrecy, as in the case of trade secrets, the identity of informers, and the privacy of children," portions of the record may be sealed. *Jessup*, 277 F.3d at 928 (collecting cases). The Seventh Circuit has recognized that "[s]ecrecy is fine at the discovery stage, before the material enters the judicial record," but the documents "that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality." *Baxter Int'l, Inc. v. Abbott Lab'ys*, 297 F.3d 544, 545 (7th Cir. 2002). Courts must weigh the interest in secrecy against the competing interests of the public in each particular case. *Jessup*, 277 F.3d at 928.

Here, Defendant asserts that several documents that have been filed with the Court contain trade secrets and argues "that the protection of a litigant's trade secrets is a sufficient basis to file documents under seal and provides a compelling reason to prevent public disclosure as part of the court proceedings." Def.'s Resp. Pls.' Mot. Temp. Seal Order 5. The Seventh Circuit recognizes that "genuine trade secrets" are one category of documents that "may be held in long-term confidence," that is, that may be sealed. *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000). The Illinois Trade Secrets Act provides the following definition of "trade secret":

> (d) "Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d)(1)–(2); *see In re Bank One Sec. Litig.*, 222 F.R.D. 582, 587–88 (N.D. Ill. 2004) (using the Illinois Trade Secrets Act definition of "trade secret" to evaluate whether

certain parts of the record should be sealed).  A litigant cannot simply state in a conclusory manner that a certain document is a trade secret but instead it must "winnow out properly confidential information," *Plair v. E.J. Brach & Sons, Inc.*, No. 94 C 244, 1996 WL 67975, at *5 (N.D. Ill. Feb. 15, 1996), and it must provide explanation and support for why injury could result from disclosure of those trade secrets, *Baxter Int'l*, 297 F.3d at 547.

In its two pending motions, Defendant seeks to seal 28 exhibits (or portions thereof) listed in the chart below.[9]

| ECF No. | Document Title | Exhibit Number |
|---|---|---|
| **Documents identified in Defendant's Supplemental Motion to Seal Documents, ECF No. 149** | | |
| 115 | November 2010 ANSI Certifications | Def. Ex. D-2 |
| 116 | February 2014 Certifications | Def. Ex. D-3 |
| 126-2 | Proposed agenda for Safety Meeting on ROPS Egress | Pls. Ex. 2 |
| 126-6 | Chart of Prior Incidents | Pls. Ex. 6 |
| 126-7 | Confidential Exhibit A to TTC's Supplemental Answers to Interrogatories and Requests for Production | Pls. Ex. 7 |
| 126-8 | New Product/Product Modification Memorandum dated January 15, 2016 | Pls. Ex. 8 |
| 126-9 | New Product/Product Modification Memorandum dated January 15, 2016 | Pls. Ex. 9 |
| 126-10 | New Product/Product Modification Memorandum dated October 5, 2016 | Pls. Ex. 10 |
| 126-11 | New Product/Product Modification Memorandum dated November 17, 2017 | Pls. Ex. 11 |
| 127-1 | Risk Assessment (Timecutter Z) dated August 5, 2009 | Pls. Ex. 23 |

---

[9] In its second motion to seal, Defendant wrote that Plaintiffs listed an Exhibit 39 in their supplement to their additional material facts but that Plaintiffs failed to include an Exhibit 39 in the documents submitted to the Court. Def.'s Resp. Pls.' Mot. Temp. Seal Order 3 n.1.  The Court addressed this issue via text order: "Contrary to Defendant's assertion that Plaintiffs 'did not include an Exhibit 39 among the documents submitted to the Court under seal,' 164 Def.'s Resp. to Pl.'s Mot. Temp. Seal Order 3 n.1, the Court apprises the parties that Plaintiffs' Exhibit 39 was indeed filed as the main document of docket entry 162.  Though Defendant did not specifically address 162 Exhibit 39 in its 164 response, the Court acknowledges that Exhibit 39 contains 'Meeting Minutes of the Corporate Product Safety Board,' and that type of document is already addressed by Defendant.  See Aff. John Heckel 4, Def.'s Resp. to Pl.'s Mot. Temp. Seal Order Ex. A, ECF No. 164-1."  Nov. 21, 2023 Text Order.  The Court therefore includes Plaintiffs' Exhibit 39, ECF No. 162, as one of the documents Defendant requests to seal.

| 127-2 | Claims by Part Summary dated November 1, 2006 | Pls. Ex. 28 |
| 127 | Selected pages from Deposition Transcript of Carol Drutowski | Pls. Ex. 12 |
| 128 | Selected pages from Deposition Transcript of Carol Drutowski[10] | Pls. Ex. 12 |

**Documents identified in Defendant's Response to Plaintiffs' Motion for Temporary Seal Order, ECF No. 164, construed as a motion to seal**

| ECF No. | Document Title | Exhibit Number |
|---|---|---|
| 158-13 | ZRT Initiative Team Design Concept Recommendations to Pursue | Pls. Ex. L |
| 162 | Corporate Product Safety Board Meeting Minutes of March 14, 2003 | Pls. Ex. 39 |
| 162-1 | Corporate Product Safety Board Meeting Minutes of September 10, 2003 | Pls. Ex 40 |
| 162-2 | Corporate Product Safety Board Meeting Minutes of August 17, 2004 | Pls. Ex. 41 |
| 162-3 | Partially Redacted Corporate Product Safety Board Meeting Minutes of April 15, 2005 | Pls. Ex. 42 |
| 162-4 | Corporate Product Safety Board Meeting Minutes of September 14, 2007 | Pls. Ex. 43 |
| 162-5 | Partially Redacted Corporate Product Safety Board Meeting Minutes of December 16, 2008 | Pls. Ex. 44 |
| 162-6 | Toro Memo, dated February 23, 2010, Discussing Proposed Changes to Toro's Corporate ROPS Policy | Pls. Ex. 45 |
| 162-7 | Toro's Corporate Safety Board Presentation of February 25, 2010 | Pls. Ex. 46 |
| 162-8 | Toro Memo, dated May 17, 2010, Concerning Feasibility and Cost of ROPS for All Timecutter Mowers | Pls. Ex. 47 |
| 162-9 | ZRT Initiative Team Design Concept Recommendations to Pursue, of September 4, 2012 | Pls. Ex. 48 |
| 162-10 | Partially Redacted Toro Memo Regarding ROPS Safety Committee Review, dated October 3, 2013 | Pls. Ex. 49 |
| 162-11 | Partially Redacted Toro Memo, dated February 12, 2014, Regarding ROPS Discussion on Direct Collect Z8000 and Navigator | Pls. Ex. 50 |
| 162-12 | Partially Redacted Toro Memo, dated April 17 and 29, 2015, by Jim Fear, Concerning "Rincon Project ROPS analysis" | Pls. Ex. 51 |
| 162-13 | Additional Copy of Exhibit 51, with different bates numbers | Pls. Ex. 52 |

[10] The specific pages and lines from Carol Drutowski's Deposition Transcript that Toro wants sealed are identified in a chart attached to the affidavit of John Heckel. *See* Selected Pages of Drutowski Deposition, Def.'s Suppl. Mot. Seal Docs. Ex. 2-A, ECF No. 149-2 at 10–11.

| 162-14 | Partially Redacted Toro Memo, dated March 21, 2017, by Jim Fear, Concerning "Safety Meeting to review the TimeCutter HD ROPs System" | Pls. Ex. 53 |
|---|---|---|

Defendant provides affidavits from its Senior Director of Engineering John Heckel who has examined documents that Defendant requests to keep under seal. *See generally* First Heckel Aff., Def.'s Suppl. Mot. Seal Docs. Ex. 2, ECF No. 149-2 at 1–9; Second Heckel Aff., Def.'s Resp. Pls.' Mot. Temp. Seal Order Ex. A, ECF No. 164-1 at 1–9. For example, Heckel describes Plaintiffs' Exhibit 6 which contains information collected by Defendant's legal department pertaining to investigations of incidents reported by customers and attests that:

> [Defendant] takes the protection of its customers' personal data seriously and does so to encourage its customers and/or users of its products to report any issues or concerns with products, including any safety issues, to [Defendant] so that [Defendant] may continually improve its products and product features, including safety features. Public disclosure of this customer and/or operator data may result in a chilling effect on customers and/or users reporting information to [Defendant] and negatively impact [Defendant] product safety development.

First Heckel Aff. ¶ 18. Heckel also attests to Defendant's internal security procedures and employee training to emphasize the importance of maintaining confidentiality. *Id.* ¶¶ 5–11.

Additionally, Heckel addresses Plaintiffs' Exhibits 40–44 which are meeting minutes of the Corporate Product Safety Board which outline Defendant's "process of identifying and addressing safety issues . . . [which] was developed over time and resulted from much effort, time, and expense." Second Heckel Aff. ¶ 18. Heckel asserts that Defendant's confidential procedures of addressing safety issues "gives [Defendant] a competitive advantage in the marketplace to bring new and safe products to market" and that access to this information by Defendant's competitors "would diminish [Defendant]'s competitive advantage and provide [Defendant]'s competitors with insight and understanding of [Defendant] that they could not otherwise legally receive." *Id.*

41

Contrast Defendant's approach here with that of the defendants in *Baxter International*—

there, the attorneys did "not cite a single statute, rule, or opinion" to support their request that

certain documents be hidden from public view on the basis that they contained "trade secrets."

*Baxter Int'l*, 297 F.3d 544 at 547.

> Beyond asserting that the document must be kept confidential because we say so
> . . . [the motion to seal] contends only that disclosure "could . . . harm Abbott's
> competitive position." How? Not explained. Why is this sort of harm (whatever
> it may be) a legal justification for secrecy in litigation? Not explained. Why is the
> fact that some other document contains *references* to a license sufficient to conceal
> the referring document? Not explained.

*Id.* Here, Defendant winnowed the documents that they request to keep out of the public record

with precision and explained one-by-one why each document (or portion thereof) meets the

requirements for sealing in the Seventh Circuit.

A determination of good cause does not require a document-by-document review because

"such a requirement might impose an excessive burden on the [court]," *Citizens First*, 178 F.3d

at 944, but the court must bear in mind that "[t]he parties to a lawsuit are not the only people

who have a legitimate interest in the record compiled in a legal proceeding," *id.*, 178 F.3d at 944.

A judge may order a litigant's trade secrets and other legitimately confidential information to be

sealed and kept "out of the public record, provided the judge (1) satisfies [her]self that the parties

know what a trade secret is and are acting in good faith in deciding which parts of the record are

trade secrets and (2) makes explicit that either party and any interested member of the public can

challenge the secreting of particular documents." *Id.*

It is the Court's responsibility to determine whether good cause exists to allow parts of

the record to be filed under seal. The Court has reviewed each of the documents Defendant

requests to keep under seal as well as Defendant's arguments as to why public disclosure of

those specific documents would be damaging. After weighing Defendant's interest in secrecy

against the competing interest of the public in this case, *see Jessup*, 277 F.3d at 928, the Court

finds that good cause exists to seal the specific exhibits requested by Defendant.  Accordingly,

the Court GRANTS Defendant's two motions to seal.  Defendant is directed to file a redacted

version of Plaintiffs' Exhibit 12 (Carol Drutowski's Deposition Transcript) after redacting the

specific pages and lines identified in the chart attached to the First Heckel Affidavit.  *See*

Selected Pages of Drutowski Deposition, Def.'s Suppl. Mot. Seal Docs. Ex. 2-A, ECF No. 149-2

at 10–11.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 113, is

GRANTED.  Defendant's motions to seal—Defendant's Supplemental Motion to Seal

Documents, ECF No. 149; and Defendant's Response to Plaintiffs' Motion for Temporary Seal

Order, ECF No. 164, construed as a motion to seal—are GRANTED.  Three of Defendant's

*Daubert* motions—Defendant's Motion to Exclude Plaintiffs' Expert Kelly Kennett, ECF No.

153; Defendant's Motion to Exclude Plaintiffs' Expert David Bilek, ECF No. 154; and

Defendant's Motion to Exclude Plaintiffs' Expert Thomas Berry, ECF No. 156—are

GRANTED.  The remaining nine motions—Defendant's Motion in *Limine*, ECF No. 152;

Plaintiffs' General Motions in Limine Issues 1 Through 18, ECF No. 155; Defendant's Motion to

Exclude Certain Opinions from Plaintiffs' Experts Shelley Kinney and Dale Berry, ECF No.

157; Plaintiffs' Daubert Challenges and Motions in Limine Issues 19 Through 28 Regarding

Toro's Proffered Expert Testimony, ECF No. 158; Plaintiffs' Motion to Exclude Defense Expert

Enrique Bonugli and All of His Work Product and Opinions at Time of Trial for Failure to

Disclose Basis for Opinions, ECF No. 165; Defendant's Emergency Motion to Strike or in the

Alternative for Additional Time to File a Response, ECF No. 178; Plaintiffs' Motion for Leave

to File Reply Brief to Defendant Toro's Resistance to Plaintiffs' Motion in *Limine*, ECF No. 179; Plaintiffs' Supplemental Motion in *Limine* – Issue 29, ECF No. 181; and Defendant's Emergency Motion to Strike Plaintiffs' Supplemental Motion *In Limine* No. 29 or in the Alternative for Additional Time to File a Response, ECF No. 183—are MOOT.

Defendant is DIRECTED to file a redacted version of Plaintiffs' Exhibit 12 (Carol Drutowski's Deposition Transcript) after redacting the specific pages and lines identified in the chart attached to the First Heckel Affidavit.  *See* Selected Pages of Drutowski Deposition, Def.'s Suppl. Mot. Seal Docs. Ex. 2-A, ECF No. 149-2 at 10–11.

The Clerk is directed to enter judgment and close the case.

Entered this 30th day of September, 2024.


                                        s/ Sara Darrow
                                    _____
                                      SARA DARROW
                            CHIEF UNITED STATES DISTRICT JUDGE